# Exhibit A

*Execution Version*

TV AZTECA, S.A.B. DE C.V.,

THE SUBSIDIARY GUARANTORS PARTY HERETO

THE BANK OF NEW YORK MELLON,

as TRUSTEE

and

THE BANK OF NEW YORK MELLON, LONDON BRANCH,

as PRINCIPAL PAYING AGENT

8.250% Senior Notes Due 2024

INDENTURE

Dated as of August 9, 2017

# TABLE OF CONTENTS

**Page**

## ARTICLE I
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1    Definitions ................................................................. 1

Section 1.2    Incorporation by Reference of Trust Indenture Act ...................................... 30

Section 1.3    Rules of Construction ......................................................... 30

## ARTICLE II
## THE NOTES

Section 2.1    Form and Dating ............................................................. 30

Section 2.2    Execution and Authentication ................................................... 31

Section 2.3    Registrar and Paying Agent; Depositary ........................................... 32

Section 2.4    Paying Agent to Hold Money in Trust ............................................. 32

Section 2.5    Holder Lists ................................................................ 33

Section 2.6    Global Note Provisions ........................................................ 33

Section 2.7    Legends ................................................................... 34

Section 2.8    Transfer and Exchange ........................................................ 34

Section 2.9    Mutilated, Destroyed, Lost or Stolen Notes ........................................ 36

Section 2.10   Temporary Notes ............................................................ 37

Section 2.11   Cancellation ............................................................... 37

Section 2.12   Defaulted Interest ........................................................... 37

Section 2.13   Additional Notes ............................................................ 38

## ARTICLE III
## COVENANTS

Section 3.1    Payment of Notes ............................................................ 38

Section 3.2    Maintenance of Office or Agency ................................................ 39

Section 3.3    Corporate Existence .......................................................... 40

Section 3.4    Payment of Taxes ............................................................ 40

Section 3.5    Compliance Certificate ........................................................ 40

Section 3.6    Further Instruments and Acts ................................................... 40

Section 3.7    Waiver of Stay, Extension or Usury Laws .......................................... 40

Section 3.8    Repurchase Upon a Change of Control ............................................ 41

Section 3.9    Limitation on Incurrence of Additional Indebtedness .................................. 42

## TABLE OF CONTENTS
(continued)

**Page**

Section 3.10    Limitation on Guarantees ................................................................ 46

Section 3.11    Limitation on Restricted Payments .............................................. 46

Section 3.12    Limitation on Asset Sales and Sales of Subsidiary Stock ............ 50

Section 3.13    Limitation on Designation of Unrestricted Subsidiaries .............. 53

Section 3.14    Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries ............................................................... 55

Section 3.15    Limitation on Liens ...................................................................... 56

Section 3.16    Limitation on Transactions with Affiliates .................................. 57

Section 3.17    Conduct of Business ..................................................................... 58

Section 3.18    Reports to Holders ........................................................................ 58

Section 3.19    Listing ........................................................................................... 59

Section 3.20    Payment of Additional Amounts .................................................. 60

Section 3.21    Suspension of Covenants .............................................................. 63

### ARTICLE IV
### SURVIVING ENTITY

Section 4.1    Merger, Consolidation and Sale of Assets ..................................... 64

### ARTICLE V
### OPTIONAL REDEMPTION OF NOTES

Section 5.1    Optional Redemption ...................................................................... 67

Section 5.2    Optional Redemption upon Equity Offerings .................................. 67

Section 5.3    Optional Redemption for Changes in Withholding Taxes .............. 68

Section 5.4    Optional Redemption Procedures .................................................... 68

Section 5.5    Notice of Redemption ..................................................................... 68

Section 5.6    Selection of Notes to Be Redeemed in Part .................................... 70

Section 5.7    Deposit of Redemption Price .......................................................... 70

Section 5.8    Notes Payable on Redemption Date ................................................ 70

Section 5.9    Unredeemed Portions of Partially Redeemed Note ........................ 71

### ARTICLE VI
### DEFAULTS AND REMEDIES

Section 6.1    Events of Default ............................................................................ 71

Section 6.2    Acceleration .................................................................................... 72

# TABLE OF CONTENTS
(continued)

**Page**

Section 6.3    Other Remedies ................................................................ 73

Section 6.4    Waiver of Past Defaults ................................................... 73

Section 6.5    Control by Majority ......................................................... 73

Section 6.6    Limitation on Suits ......................................................... 73

Section 6.7    Rights of Holders to Receive Payment ........................... 74

Section 6.8    Collection Suit by Trustee ............................................. 74

Section 6.9    Trustee May File Proofs of Claim, etc ........................... 74

Section 6.10   Priorities ........................................................................ 75

Section 6.11   Undertaking for Costs .................................................... 75

## ARTICLE VII
## TRUSTEE

Section 7.1    Duties of Trustee ............................................................ 76

Section 7.2    Rights of Trustee ............................................................ 77

Section 7.3    Individual Rights of Trustee ........................................... 79

Section 7.4    Trustee's Disclaimer ...................................................... 79

Section 7.5    Notice of Defaults .......................................................... 79

Section 7.6    [Reserved] ...................................................................... 79

Section 7.7    Compensation and Indemnity ......................................... 79

Section 7.8    Replacement of Trustee .................................................. 80

Section 7.9    Successor Trustee by Merger .......................................... 81

Section 7.10   Eligibility; Disqualification ........................................... 81

Section 7.11   Preferential Collection of Claims Against Company ....... 82

Section 7.12   Appointment of Co-Trustee ........................................... 82

Section 7.13   The Agents ..................................................................... 83

## ARTICLE VIII
## DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1    Legal Defeasance and Covenant Defeasance .................. 83

Section 8.2    Conditions to Defeasance .............................................. 84

Section 8.3    Application of Trust Money ............................................ 86

Section 8.4    Repayment to Company .................................................. 86

Section 8.5    Indemnity for U.S. Government Obligations ................... 86

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.6    Reinstatement..................................................................................... 86

Section 8.7    Satisfaction and Discharge.................................................................. 87

## ARTICLE IX
## AMENDMENTS

Section 9.1    Without Consent of Holders ................................................................ 87

Section 9.2    With Consent of Holders .................................................................... 89

Section 9.3    Revocation and Effect of Consents and Waivers.............................. 90

Section 9.4    Notation on or Exchange of Notes...................................................... 90

Section 9.5    Trustee to Sign Amendments and Supplements ................................ 90

## ARTICLE X
## NOTE GUARANTEES

Section 10.1    Note Guarantees................................................................................ 91

Section 10.2    Limitation on Liability; Termination, Release and Discharge........... 94

Section 10.3    Right of Contribution ....................................................................... 94

Section 10.4    No Subrogation ................................................................................ 94

Section 10.5    Execution and Delivery of Note Guarantee ...................................... 95

Section 10.6    Additional Note Guarantees ............................................................. 95

## ARTICLE XI
## MISCELLANEOUS

Section 11.1    Notices ............................................................................................. 95

Section 11.2    Communication by Holders with Other Holders .............................. 97

Section 11.3    Certificate and Opinion as to Conditions Precedent ........................ 97

Section 11.4    Statements Required in Certificate or Opinion ................................. 97

Section 11.5    Rules by Trustee, Paying Agent and Registrar ................................. 97

Section 11.6    Payment Date Other than a Business Day ........................................ 98

Section 11.7    Governing Law, etc........................................................................... 98

Section 11.8    No Recourse Against Others............................................................. 99

Section 11.9    Successors ........................................................................................ 99

Section 11.10    Duplicate and Counterpart Originals .............................................. 99

Section 11.11    Severability ..................................................................................... 100

Section 11.12    Currency Indemnity ....................................................................... 100

# TABLE OF CONTENTS
(continued)

**Page**

Section 11.13     Table of Contents; Headings.................................................................... 100

Section 11.14     USA Patriot Act ........................................................................................ 100

Section 11.15     Foreign Account Tax Compliance Act (FATCA) ...................................... 101

Section 11.16     Anti-Money Laundering, Terrorism and Economic Sanctions................... 101

**EXHIBIT A**         **FORM OF NOTE**

**EXHIBIT B**         **FORM OF SUPPLEMENTAL INDENTURE FOR ADDITIONAL NOTE GUARANTEE**

INDENTURE, dated as of August 9, 2017, by and among TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States ("Mexico"), the Subsidiary Guarantors party hereto, The Bank of New York Mellon, as trustee (the "Trustee") and The Bank of New York Mellon, London Branch, as initial Principal Paying Agent.

Each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of the Company's 8.250% Senior Notes Due 2024 issued under this Indenture.

ARTICLE I

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1    Definitions.

"Acquired Indebtedness" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person.  Such Indebtedness shall be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Company or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"Additional Amounts" has the meaning assigned to it in Section 3.20.

"Additional Note Board Resolutions" means resolutions duly adopted by the Board of Directors of the Company and each of the Subsidiary Guarantors and delivered to the Trustee in an Officers' Certificate providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Additional Notes" means the Company's 8.250% Senior Notes Due 2024 originally issued after the Issue Date pursuant to Section 2.13, including any replacement Notes issued therefor.

"Additional Note Supplemental Indenture" means a supplement to this Indenture duly executed and delivered by the Company, each Subsidiary Guarantor and the Trustee pursuant to Article IX providing for the issuance of Additional Notes (and the Guarantee by the Subsidiary Guarantors thereof).

"Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Affiliate Transaction" has the meaning assigned to it in Section 3.16(a).

"Agents" means, collectively, the Registrar, any co-Registrar, the Principal Paying Agent, any other Paying Agents and any other agent appointed by the Company under this Indenture.

"Agent Members" has the meaning assigned to it in Section 2.6(b).

"Applicable Premium" means, with respect to any Note on any applicable Redemption Date, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at, August 9, 2021 (such redemption price being set forth in the table appearing in Section 5.1(b)) plus (ii) all required interest payments due on such Note through August 9, 2021 (excluding accrued but unpaid interest to the Redemption Date), computed in each case using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points over (b) the outstanding principal amount of such Note.

"Asset Sale" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer, including a Sale and Leaseback Transaction (each, a "disposition") by the Company or any Restricted Subsidiary of:

      (a)      any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Company); or

      (b)      any property or assets (other than cash, Cash Equivalents or Capital Stock of the Company) of the Company or any Restricted Subsidiary.

Notwithstanding the preceding, the following items shall not be deemed to be Asset Sales:

      (1)      the disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries as permitted under Section 4.1;

      (2)      sales, leases, conveyances or other dispositions of real or personal property, including, without limitation, exchanges or swaps of real estate, for the development of the Company's or any of its Restricted Subsidiaries' projects in the ordinary course of business

      (3)      for purposes of Section 3.12 only, the making of Restricted Payments permitted under Section 3.11 or any Permitted Investment;

      (4) a disposition to the Company or a Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

      (5)      any single transaction or series of related transactions that involves assets or Capital Stock of the Company or a Restricted Subsidiary having a Fair Market Value of less than U.S.$10.0 million;

      (6)      a transfer of assets between or among the Company and any of its Restricted Subsidiaries;

- 2 -

(7)    an issuance or sale of Capital Stock by a Restricted Subsidiary of the Company to the Company or any of its Restricted Subsidiaries;

(8)    any sale or other disposition of damaged, worn-out, obsolete or no longer useful  assets  or properties in the ordinary course of business;

(9)    any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(10)    the good faith surrender or waiver of contract rights, tort claims or statutory rights in connection with a settlement; and

(11)    sales or other dispositions of  inventory, advertising time (including barter transactions), receivables and current assets in the ordinary course of business.

"Asset Sale Offer" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Amount" has the meaning assigned to it in Section 3.12(d).

"Asset Sale Offer Notice" means written notice of an Asset Sale Offer made pursuant to Section 3.12, that shall state:

(1)    that an Asset Sale has occurred, the circumstances of the Asset Sale, the Net Cash Proceeds of which are included in the Asset Sale Offer, that an Asset Sale Offer is being made pursuant to Section 3.12, and that all Notes that are timely tendered will be accepted for payment, subject to proration, as described in Section 3.12;

(2)    the Asset Sale Offer Amount (including the portion thereof representing accrued interest) and the Asset Sale Offer Payment Date;

(3)    that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)    that, unless the Company defaults in the payment of the Asset Sale Offer Amount with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest from and after the Asset Sale Offer Payment Date;

(5)    that any Holder electing to have any Notes or portions thereof purchased pursuant to the Asset Sale Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Asset Sale Offer Payment Date;

(6)    that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Asset Sale Offer Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is

- 3 -

withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Asset Sale Offer;

(7)    that any Holder electing to have Notes purchased pursuant to the Asset Sale Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)    that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof;

(9)    that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note; and

(10)   any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.12.

"Asset Sale Offer Payment Date" has the meaning assigned to it in Section 3.12(f).

"Authenticating Agent" has the meaning assigned to it in Section 2.2(d).

"Authorized Agent" has the meaning assigned to it in Section 11.7(c).

"Average Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving facility or line of credit, the quotient of (x) the sum of each Individual Quarterly Balance for each fiscal quarter ended on or prior to such date of determination and included in the Reference Period divided by (y) 4.

"Bankruptcy Law" means any bankruptcy, *concurso mercantil*, insolvency or other similar laws now or hereafter in effect.

"Bankruptcy Law Event of Default" means:

(1)    pursuant to or within the meaning of any Bankruptcy Law, any Bankruptcy Party (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for any substantial part of its property, or (D) makes a general assignment for the benefit of its creditors, or takes any comparable action under any comparable laws relating to insolvency; or

(2)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against any Bankruptcy Party in an involuntary case, (B) appoints a Custodian of any Bankruptcy Party or for any substantial part of its property, or (C) orders the winding up or liquidation of any Bankruptcy Party, or any similar relief is granted

- 4 -

under any comparable laws and the order or decree remains unstayed and in effect for 60 consecutive days.

"Bankruptcy Party" means the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary.

"Board of Directors" means, as to any Person, the board of directors, management committee, sole administrator or similar governing body of such Person or any duly authorized committee thereof.

"Board Resolution" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City, Mexico City or London.

"Capitalized Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under IFRS.  For purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with IFRS.

"Capital Stock" means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2)     with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"CASA" means Comunicaciones Avanzadas, S.A. de C.V.

"Cash Equivalents" means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

- 5 -

(2)      *Certificados de la Tesoreria de la Federacion (Cetes)* or *Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(3)      marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Moody's, S&P or Fitch or any successor thereto;

(4)      commercial paper maturing no more than one year from the date of creation thereof and at the time of acquisition, having a rating of at least F-1 from Fitch, at least P-1 from Moody's, or at least A-1 from S&P;

(5)      demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than U.S.$500 million, (c) Nacional Financiera S.N.C., Banco Nacional de Comercio Exterior, S.N.C., Banco Nacional de Obras y Servicios Públicos, S.N.C. or Banco Azteca, S.A., , Institución de Banca Múltiple or (d) in the case of Mexican peso deposits, Banco Azteca, S.A., Institución de Banca Múltiple or any of the five top-rated banks (as evaluated by any Rating Agency) organized under the laws of Mexico;

(6)      repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above; and

(7)      investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (6) above.

"Certificated Note" means any Note issued in fully-registered certificated form (other than a Global Note), which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Change of Control" means the occurrence of one or more of the following events:

(1)      any Person or Group other than the Permitted Holders is or becomes the beneficial owner (as defined below), directly or indirectly, in the aggregate of more than 50% of the total voting power of the Voting Stock of the Company (including a Surviving Entity, if applicable);

(2)      during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Company, together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Company was approved by a vote of a majority of the directors of the Company then still in office who were either directors at the beginning of such period or whose

- 6 -

election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors of the Company then in office;

(3)    the Company consolidates with, or merges with or into, another Person, or the Company sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Company, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Company are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect Wholly Owned Subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with this Indenture; or

(4)    the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation or dissolution of the Company, whether or not otherwise in compliance with the provisions of this Indenture.

For purposes of this definition:

(a)    "beneficial owner" shall have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group shall be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition.

(b)    "Person" and "Group" shall have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the Exchange Act; and

(c)    the Permitted Holders or any other Person or Group shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50% of the voting power of the Voting Stock of the parent entity and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent entity.

"Change of Control Notice" means written notice of a Change of Control Offer made pursuant to Section 3.8, which notice shall govern the terms of the Change of Control Offer and shall state:

(1)    that a Change of Control has occurred, the circumstances or events causing such Change of Control and that a Change of Control Offer is being made pursuant to Section 3.8 , and that all Notes that are timely tendered will be accepted for payment;

(2)    the Change of Control Payment (including the portion thereof representing accrued interest), and the Change of Control Payment Date;

(3)      that any Notes or portions thereof not tendered or accepted for payment will continue to accrue interest;

(4)      that, unless the Company defaults in the payment of the Change of Control Payment with respect to Notes tendered and accepted for payment, all such Notes or portions thereof accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest from and after the Change of Control Payment Date;

(5)      that any Holder electing to have any Notes or portions thereof purchased pursuant to a Change of Control Offer will be required to tender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Trustee at the place or places specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)      that any Holder shall be entitled to withdraw such election if the Trustee receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a notice of withdrawal, setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing such Holder's election to have such Notes or portions thereof purchased pursuant to the Change of Control Offer;

(7)      that any Holder electing to have Notes purchased pursuant to the Change of Control Offer must specify the principal amount that is being tendered for purchase, which principal amount must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof and any portion of Notes not tendered must satisfy the U.S.$200,000 minimum denomination requirement;

(8)      that any Holder of Certificated Notes whose Certificated Notes are being purchased only in part will be issued new Certificated Notes equal in principal amount to the unpurchased portion of the Certificated Note or Notes surrendered, which unpurchased portion will be equal in principal amount to U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof;

(9)      that the Trustee will make a notation on the schedule of increases or decreases of any Global Note adjusting the principal amount thereof to be equal to the unpurchased portion of such Global Note;

(10)     that, in the event that Holders of not less than 90% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or third party purchases all of the Notes held by such Holders, the Company will have the right, upon prior notice, to redeem all of the Notes that remain Outstanding in accordance with Section 3.8(h); and

(11)     any other information necessary to enable any Holder to tender Notes and to have such Notes purchased pursuant to Section 3.8.

"Change of Control Offer" has the meaning assigned to it in Section 3.8(c).

- 8 -

"Change of Control Payment" has the meaning assigned to it in Section 3.8(a).

"Change of Control Payment Date" has the meaning assigned to it in Section 3.8(c).

"Clearing Agency" means one or more of Euroclear, Clearstream, or the successor of either of them, in each case acting directly, or through a custodian, nominee or depository.

"Clearstream" means Clearstream Banking, *société anonyme*, or the successor to its securities clearance and settlement operations.

"CNBV" means the *Comision Nacional Bancaria y de Valores*, the Mexican National Banking and Securities Commission.

"Code" means the U.S. Internal Revenue Code of 1986, as amended as of the Issue Date.

"Commodity Agreement" means any commodity or raw material futures contract, commodity or raw materials option, or any other agreement designed to protect against or manage exposure to fluctuations in commodity or raw material prices.

"Common Depositary" means a depositary common to the Clearing Agencies, which initially shall be The Bank of New York Depository (Nominees) Limited, or any successor thereto.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"Company" means TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*), and its successors and assigns, including any Surviving Entity.

"Company Order" has the meaning assigned to it in Section 2.2(c).

"Comparable Treasury Issue" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Notes through August 9, 2021 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to August 9, 2021.

"Comparable Treasury Price" means, with respect to any Redemption Date (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotation, or (2) if the Company obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"Consolidated EBITDA" means, for any Person for any period, Consolidated Net Income for such Person for such period, plus the following, without duplication, to the extent deducted or added in calculating such Consolidated Net Income:

 (1) Consolidated Income Tax Expense for such Person for such period;

 (2) Consolidated Interest Expense for such Person for such period;

 (3) Consolidated Non-cash Charges for such Person for such period; and

 (4) any income or loss from discontinued operations;

in each case as set forth for such Person in the most recent financial statements of such Person, prepared in accordance with IFRS.

"Consolidated Income Tax Expense" means, with respect to any Person for any period, the provision for federal, state, local and non-U.S. income taxes, and any applicable statutorily mandated employee profit sharing tax or similar payments, payable by such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period as determined on a consolidated basis in accordance with IFRS.

"Consolidated Interest Expense" means, for any Person for any period, the sum of, without duplication determined on a consolidated basis in accordance with IFRS:

 (1) the aggregate of cash and non-cash interest expense of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period determined on a consolidated basis in accordance with IFRS; and

 (2) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person or its Subsidiaries (Restricted Subsidiaries in the case of the Company) during such period.

"Consolidated Leverage Ratio" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness at the time of determination to (2) the Consolidated EBITDA of the Company and its Restricted Subsidiaries for the most recently ended four full fiscal quarters for which financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur; *provided* that:

 (1) if the Company or any Restricted Subsidiary has Incurred, repaid, repurchased, redeemed, retired, defeased or otherwise discharged any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio involves an Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving effect on a pro forma basis to such Incurrence, repayment, repurchase, redemption, retirement, defeasance or other discharge of Indebtedness as if such Indebtedness had been Incurred or repaid, repurchased, redeemed, retired, defeased or otherwise discharged on the first day of such period;

(2)    if since the beginning of such period the Company or any Restricted Subsidiary will have made any Asset Sale or disposed of or discontinued any company, division, operating unit, segment, business, group of related assets or line of business or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio includes such an Asset Sale, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Asset Sale, disposition or discontinuation occurred on the first day of such period;

(3)    if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary or is merged with or into the Company or a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made under this Indenture, which constitutes all or substantially all of a company, division, operating unit, segment, business or group of related assets or line of business, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

(4)    if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) will have Incurred any Indebtedness or discharged any Indebtedness or made any disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (1), (2) or (3) above if made by the Company or a Restricted Subsidiary during such period, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period shall be calculated after giving pro forma effect thereto as if such transaction occurred on the first day of such period.

The pro forma calculations provided for in this definition of Consolidated Leverage Ratio shall be determined in good faith by a responsible financial or accounting Officer of the Company. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person (Restricted Subsidiaries in the case of the Company)) for such period on a consolidated basis, determined in accordance with IFRS; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)    net after-tax items classified as extraordinary gains or losses;

- 11 -

(2)      the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Company) to the extent that (and only so long as) a corresponding amount could not be distributed  or otherwise transferred to such Person at the date of determination as a result of any restriction  pursuant to the constituent documents of such Subsidiary (Restricted Subsidiary in the case of the Company) or any law, regulation, agreement or judgment applicable to any such distribution;

(3)      any gain (or loss) from foreign exchange translation or change in net monetary position;

(4)      any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early  extinguishment of Indebtedness and Hedging Obligations; and

(5)      the cumulative effect of changes in accounting principles.

"Consolidated Non-cash Charges" means, for any Person for any period the aggregate depreciation, amortization and other non-cash expenses or losses, of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) for such period, determined on a consolidated basis in accordance with IFRS (excluding any such charge which constitutes an accrual of or a reserve for cash charges for any future period or the amortization of a prepaid cash expense paid in a prior period after the Issue Date).

"Consolidated Tangible Assets" means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as set forth on the balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with IFRS, less (i) Intangible Assets and (ii) any assets securing Non-Recourse Indebtedness.

"Consolidated Total Indebtedness" means, as at any date of determination, an amount equal to the sum of the aggregate amount of all outstanding Indebtedness of the Company and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments; provided that Indebtedness of the Company and its Restricted Subsidiaries under any revolving credit facility or line of credit as at any date of determination shall be determined using the Average Quarterly Balance of such Indebtedness for the applicable Reference Period.

"Corporate Trust Office" means the office of the Trustee at which at any time its corporate trust business shall be principally administered, which office at the date hereof is located at 101 Barclay Street, 7th Floor East, New York, NY 10286, Fax (212) 815-5603, Attention:  Global Corporate Trust, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Covenant Defeasance" has the meaning assigned to it in Section 8.1(c).

"Covenant Suspension Event" has the meaning assigned to it in Section 3.21(a).

"Credit Facilities" means one or more debt facilities, commercial paper facilities, structured notes, certificates or other similar instruments (including any Cebures), in each case with banks, investment banks, *sociedades financieras de objeto múltiple*, *sociedades financieras de objeto limitado*, insurance companies, mutual funds and/or other institutional lenders or institutional investors, in each case providing for revolving credit or term loans or letters of credit, and in each case, as amended, extended, renewed, restated, Refinanced, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"Currency Agreement" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Default" means any condition, event or act, which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or request and/or the taking of any similar action and/or fulfillment of any similar condition would constitute, an Event of Default.

"Defaulted Interest" means overdue installments of interest.

"Designation" has the meaning assigned to it in Section 3.13(a). "Designate," "Designated" and "Designating" will have the corresponding meanings.

"Designation Amount" has the meaning assigned to it in Section 3.13(a).

"Directive 2004/39/EC" means Directive 2004/39/EC of the European Parliament and of the Council on Markets in Financial Instruments (MiFID of April 21, 2004).

"disposition" has the meaning assigned to it in the definition of "Asset Sale."

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the Notes; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the Notes shall not constitute Disqualified Capital Stock if:

(1)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described under Section 3.12 and Section 3.8, respectively; and

- 13 -

(2)    any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.  The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to this Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price shall be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"Equity Offering" means (i) a primary public offering of Qualified Capital Stock of the Company in accordance with applicable Mexican or other laws, rules and regulations, (ii) a rights offering of Qualified Capital Stock of the Company made generally to the holders of such Qualified Capital Stock or (iii) any private placement of Qualified Capital Stock of the Company to any Person, in each case other than issuances upon exercise of options by employees of the Company or any of its Subsidiaries.

"Euroclear" means Euroclear S.A./N.V., as operator of the Euroclear System, or its successor in such capacity.

"Event of Default" has the meaning assigned to it in Section 6.1(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Fair Market Value" means, with respect to any asset, the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset or assets will be determined conclusively by the Board of Directors of the Company acting in good faith, and will be evidenced by a Board Resolution.

"Fitch" means Fitch Ratings, Inc. and any successor to its rating agency business.

"Global Note" means any Note issued in fully-registered global form, which shall be substantially in the form of Exhibit A, with appropriate legends as specified in Section 2.7 and Exhibit A.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)    to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership

- 14 -

arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

        (2)     entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business.  "Guarantee" used as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning assigned to it in Section 10.1(a).

"Hedging Obligations" means the obligations of any Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means the Person in whose name a Note is registered in the Note Register.

"IFRS" means International Financial Reporting Standards, as issued by the International Accounting Standards Board, as in effect on the Issue Date.

"Incur" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

"Indebtedness" means with respect to any Person, without duplication:

        (1)     the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

        (2)     the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

        (3)     all Capitalized Lease Obligations of such Person;

        (4)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

        (5)     all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

        (6)     Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) and (9) below;

- 15 -

(7)     all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8)     all net payment obligations under Hedging Obligations of such Person; and

(9)     all Disqualified Capital Stock issued by such Person.

"Indenture" means this Indenture, as amended or supplemented from time to time, including the Exhibits hereto.

"Independent Financial Advisor" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in the judgment of the Company's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction, appointed by the Company at its own expense.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Company.

"Individual Quarterly Balance" means, with respect to any Indebtedness incurred by the Company or its Restricted Subsidiaries under a revolving credit facility or line of credit during any fiscal quarter of the Company, the quotient of (x) the sum of the aggregate outstanding principal amount of all such Indebtedness at the end of each day of such quarter divided by (y) the number of days in such fiscal quarter.

"Intangible Assets" means with respect to any Person all unamortized debt discount and expense, unamortized deferred charges, restricted cash, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with IFRS.

"Interest Payment Date" means the stated due date of an installment of interest on the Notes as specified in the Form of Face of Note contained in Exhibit A.

"Interest Rate Agreement" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"Investment" means, with respect to any Person, any:

(1)     direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

(2)    capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3)    any purchase or acquisition by such Person of any Capital Stock (but not including interests in bonds, notes, debentures or other securities or evidences of Indebtedness) issued by, any other Person.

"Investment" will exclude purchases and acquisitions of inventory, supplies, materials or equipment, accounts receivable or deposits, in each case  arising in the ordinary course of business.  "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of Section 3.11, the Company shall be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which shall be valued at the Fair Market Value of the sum of the Relevant Proportion of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of the transfer. If the Company or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock of a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Company or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any other Restricted Subsidiary immediately following such sale or other disposition.

"Investment Grade Rating" means a rating equal to or higher than (i) Baa3 (or the equivalent) by Moody's, (ii) BBB- (or the equivalent) by Fitch, (iii) or BBB- (or the equivalent) by S&P, or (iv) if any of the foregoing entities cease to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other Rating Agency.

"Investment Return" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Company or any Restricted Subsidiary:

(1)    (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Company and its Restricted Subsidiaries in full, less any payments previously made by the Company or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distribution received by the Company or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

- 17 -

(2)     in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the least of:

(a)     the Company's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b)     that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Company's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c)     the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3)     in the event the Company or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Company and its Restricted Subsidiaries in such Person,

in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under Section 3.11 *less* the amount of any previous Investment Return in respect of such Investment.

"Issue Date" means August 9, 2017.

"Issue Date Notes" means the U.S.$400,000,000 aggregate principal amount of Notes originally issued on the Issue Date and any replacement Notes issued therefor in accordance with this Indenture.

"Legal Defeasance" has the meaning assigned to it in Section 8.1(b).

"Lien" means any lien, mortgage, deed of trust, pledge, security trust (*Fideicomiso de Garantías*), security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"Mexican Restructuring" means any case or other proceeding against the Company or any Subsidiary with respect to it or its debts under any bankruptcy, concurso mercantil, quiebra, insolvency or other similar law now or hereinafter in effect or seeking the appointment of a trustee, receiver, conciliador, liquidator, custodian or other similar official of it or any substantial part of its property.

"Maturity Date" means August 9, 2024.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1)      reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)      taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)      repayment of Indebtedness secured by a Lien permitted under this Indenture that is required to be repaid in connection with such Asset Sale; and

(4)      appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with IFRS, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"Non-Recourse Indebtedness" with respect to any Person means Indebtedness of such Person for which (1) the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 365 days after the acquisition or construction of such property and (2) no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"Note Guarantee" means any guarantee of the Company's Obligations under the Notes and this Indenture provided by a Restricted Subsidiary pursuant to Article X.

"Note Register" has the meaning assigned to it in Section 2.3(a).

"Notes" means any of the Company's 8.250% Senior Notes Due 2024 issued and authenticated pursuant to this Indenture.  All references to Notes shall include the Issue Date Notes and any Additional Notes, as applicable, unless the context requires otherwise.

"Obligations" means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including in the case of the Notes and the Note Guarantees, this Indenture.

"Offering Circular" means the offering circular dated August 2, 2017 relating to the offering of the Issue Date Notes.

- 19 -

"Officer" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, the General Counsel, any Vice President, the Treasurer, the Controller, the Secretary or sole administrator of the Company or such Subsidiary Guarantor, as the case may be.

"Officers' Certificate" means, when used in connection with any action to be taken by the Company or a Subsidiary Guarantor, as the case may be, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company or a Subsidiary Guarantor, as the case may be, and delivered to the Trustee.

"Official List of the SGX-ST" means the list of issuers maintained by SGX-ST.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in this Indenture) and which opinion shall be acceptable to the Trustee.

"Outstanding" means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, *except*:

    (i)    Notes theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

    (ii)    Notes, or portions thereof, for the payment, redemption or, in the case of an Asset Sale Offer or Change of Control Offer, purchase of which money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company) in trust or set aside and segregated in trust by the Company, a Subsidiary Guarantor or an Affiliate of the Company (if the Company, a Subsidiary Guarantor or such Affiliate of the Company is acting as Paying Agent) for the Holders of such Notes; *provided* that, if Notes (or portions thereof) are to be redeemed or purchased, notice of such redemption or purchase has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

    (iii)    Notes which have been surrendered pursuant to Section 2.9 or in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser in whose hands such Notes are valid obligations of the Company; and

    (iv)    solely to the extent provided in Article VIII, Notes which are subject to Legal Defeasance or Covenant Defeasance as provided in Article VIII;

*provided*, *however*, that in determining whether the Holders of the requisite aggregate principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, Notes owned by the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee

- 20 -

shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which a Trust Officer of the Trustee actually knows to be so owned shall be so disregarded.  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

"Paying Agent" has the meaning assigned to it in Section 2.3(a). For the avoidance of doubt, the term "Paying Agent" includes the Principal Paying Agent and any other Paying Agent appointed from time to time.

 "Permitted Acquisition Indebtedness" means Indebtedness of the Company or any of its Restricted Subsidiaries to the extent such Indebtedness was Indebtedness of (i) a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary or (ii) a Person that was merged or amalgamated into the Company or a Restricted Subsidiary, *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged or amalgamated into the Company or a Restricted Subsidiary, as applicable, after giving *pro forma* effect thereto, (a) the Company, would be permitted to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a), or (b) the Consolidated Leverage Ratio of the Company and the Restricted Subsidiaries would be less than such Consolidated Leverage Ratio immediately prior to such transaction.

"Permitted Business" means the business or businesses conducted by the Company and its Restricted Subsidiaries as of the Issue Date and any business ancillary or complementary thereto.

"Permitted Holders" means (i) RBSP, (ii) any trust for the benefit of RBSP, his spouse, issue or immediate family, (iii) CASA or (iv) any Person directly or indirectly controlled by RBSP.

"Permitted Indebtedness" has the meaning set forth in Section 3.9(b).

"Permitted Investments" means:

(1)     Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor;

(2)     Investments by any Restricted Subsidiary in the Company;

(3)     Investments in cash and Cash Equivalents;

(4)     any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or

- 21 -

accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(5)     Investments permitted pursuant to Section 3.16(b)(2) and Section 3.16(b)(5);

(6)     Investments received as a result of the bankruptcy or reorganization of any Person or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(7)     Investments made by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with Section 3.12.

(8)     Investments in the form of Hedging Obligations permitted under Section 3.9(b)(5);

(9)     Investments in any Persons engaged in a Permitted Business (or a Person intending to engage in a Permitted Business immediately following such Investment) not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of Consolidated Tangible Assets of the Company and its Restricted Subsidiaries at any one time outstanding;

(10)     receivables owing to the Company or any Restricted Subsidiary (including advances from advertisers) if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(11)     payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary, not to exceed U.S.$5.0 million at any one time outstanding;

(13)     cash deposits with banks made in the ordinary course of business of the Company and its Restricted Subsidiaries, consistent with past practice, to secure payment of trade payables;

(14)     Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(15)     any Investment, to the extent the consideration therefor consists entirely of Qualified Capital Stock; and

(16)     Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be

- 22 -

used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50.0 million at any one time outstanding,

*provided, however*, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (16) so that the entire Investment would be a Permitted Investment.

"Permitted Liens" means any of the following:

(1)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2)     Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, contracts, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3)     Liens upon specific items of inventory or other goods of any Person and any proceeds thereof securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(5)     Liens encumbering deposits (including in favor of financial institutions or governmental authorities) made to secure obligations arising from statutory, regulatory, contractual, or insurance or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(6)     Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with Section 3.9;

(7)     Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness Incurred in accordance with Section 3.9 which has been secured by a Lien permitted under Section 3.15 other than Liens Incurred pursuant to clause (9) of the definition of "Permitted Liens"; *provided* that such new Liens:

- 23 -

(a)    are not materially less favorable to the Holders of Notes and are not materially more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced, and

(b)    do not extend to any property or assets (or type of assets or property) other than the property or assets (or type of assets or property) securing the Indebtedness Refinanced by such Refinancing Indebtedness and the proceeds thereof;

(8)    purchase money Liens securing Purchase Money Indebtedness, Non-Recourse Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property and assets of the Company or a Restricted Subsidiary used in a Permitted Business, any improvements thereon and the reasonable costs and expenses incurred in connection therewith, *provided* that:

(a)    the related Purchase Money Indebtedness or Non-Recourse Indebtedness does not exceed the cost of such property, assets, and improvements thereon and the reasonable costs and expenses incurred in connection therewith and shall not be secured by any property or assets of the Company or any Restricted Subsidiary other than the property and assets so acquired or financed and the proceeds thereof, and

(b)    the Lien securing such Indebtedness will be created within 365 days of such acquisition or financing;

(9)    Liens securing an amount of Indebtedness under Credit Facilities at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of the Consolidated Tangible Assets of the Company at such time;

(10)    any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(11)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12)    Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligations and forward contracts, options, futures contracts, futures options or similar agreements or arrangement designed to protect the Company and its Restricted Subsidiaries from fluctuations in the price of commodities;

(13)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(14)    licenses and sub-licenses of intellectual property in the ordinary course of business;

- 24 -

(15)    easements, rights of way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(16)    Liens on Capital Stock of an Unrestricted Subsidiary; and

(17)    Liens in favor of the Company or any Subsidiary Guarantor.

"Person" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"Post-Petition Interest" means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"Preferred Stock" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"Primary Treasury Dealer" means a primary United States government securities dealer in New York City.

"Principal Paying Agent" means, initially, The Bank of New York Mellon, London Branch.

"Purchase Money Indebtedness" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property or asset; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that are not convertible into or exchangeable into Disqualified Capital Stock.

"RBSP" means Mr. Ricardo B. Salinas Pliego.

"Rating Agencies" means (i) Fitch, (ii) Moody's, (iii) S&P and (iv) if any of Fitch, Moody's or S&P shall not make a rating of the Notes publicly available for reasons outside the

- 25 -

control of the Company, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for Fitch, Moody's and/or S&P, as the case may be.

"Reference Period" means the most recently ended four fiscal quarters for which internal financial statements are available as of such date of determination.

"Reference Treasury Dealer" means BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc or their respective affiliates which are primary United States government securities dealers and not less than one other leading primary United States government securities dealer in New York City reasonably designated by the Company; *provided*, *however*, that if any of the foregoing shall cease to be a Primary Treasury Dealer, the Company will substitute therefor another Primary Treasury Dealer.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Company, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 3:30 pm New York City time on the third Business Day preceding such Redemption Date.

"Record Date" has the meaning assigned to it in the Form of Face of Note contained in Exhibit A.

"Redemption Date" means, with respect to any redemption of Notes, the date fixed for such redemption pursuant to this Indenture and the Notes.

"Refinance" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "Refinanced" and "Refinancing" will have correlative meanings.

"Refinancing Indebtedness" means Indebtedness of the Company or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Company or a Restricted Subsidiary so long as:

(1)    the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Company or such Restricted Subsidiary in connection with such Refinancing);

(2)    such new Indebtedness has:

(a)    a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

(b)    a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

- 26 -

(3)     if the Indebtedness being Refinanced is:

(a)     Indebtedness of the Company, then such Refinancing Indebtedness will be Indebtedness of the Company and/or a Subsidiary Guarantor,

(b)     Indebtedness of a Subsidiary Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Company and/or such Subsidiary Guarantor, and

(c)     Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinated to the Notes or the relevant Note Guarantee, if applicable, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"Registrar" has the meaning assigned to it in Section 2.3(a).

"Relevant Date" has the meaning assigned to it in Section 3.20(a)(4).

"Relevant Proportion" means, with respect to the net assets of any Unrestricted Subsidiary, a percentage equal to the aggregate ownership interest that the Company and its Restricted Subsidiaries own, directly or indirectly, in such Unrestricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company which at the time of determination is not an Unrestricted Subsidiary.

"Revocation" has the meaning set forth under Section 3.13(b).

"S&P" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"Sale and Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced to the Company or a Restricted Subsidiary on the security of such property.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

"Senior Indebtedness" means the Notes and the Note Guarantees and any other Indebtedness of the Company or any Subsidiary Guarantor that ranks equal in right of payment with the Notes or the relevant Note Guarantee, as the case may be.

"SGX-ST" means the Singapore Exchange Securities Trading Limited.

- 27 -

"Significant Subsidiary" means a Subsidiary of the Company constituting a "Significant Subsidiary" of the Company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the Issue Date.

"Special Record Date" has the meaning assigned to it in Section 2.12(a).

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"Subordinated Indebtedness" means, with respect to the Company or any Subsidiary Guarantor, any Indebtedness of the Company or such Subsidiary Guarantor, as the case may be which is expressly subordinated in right of payment to the Notes or the relevant Note Guarantee, as the case may be.

"Subsidiary" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding Voting Stock.

"Subsidiary Guarantor" means any Restricted Subsidiary which provides a Note Guarantee pursuant to this Indenture until such time as its Note Guarantee is released in accordance with this Indenture.

"Supplemental Indenture" means a supplemental indenture providing for the Note Guarantee of a Subsidiary Guarantor substantially in the form of Exhibit B hereto.

"Surviving Entity" has the meaning assigned to it in Section 4.1(a).

"Taxes" has the meaning assigned to it in Section 3.20(a).

"TIA" means the U.S. Trust Indenture Act of 1939, as amended, as in effect on the Issue Date.

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Trust Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, having direct responsibility for the administration of this Indenture or any other officer of the Trustee to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Trustee" means the party named as such in the introductory paragraph of this Indenture until a successor replaces it in accordance with the terms of this Indenture and, thereafter, means the successor.

NAI-1502882142v7

"Unrestricted Subsidiary" means any Subsidiary of the Company Designated as such pursuant to Section 3.13.  Any such Designation may be revoked by a Board Resolution of the Company, subject to the provisions of Section 3.13.

"U.S. Dollar Equivalent" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such non-U.S. dollar currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable non-U.S. dollar currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if no longer so published, from an appropriate publicly available source of such market data) on the date two Business Days prior to such determination.

"U.S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable or redeemable at the issuer's option.

"U.S. Legal Tender" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"Voting Stock" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1)	the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2)	the sum of the products obtained by multiplying:

(a)	the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b)	the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"Wholly Owned Subsidiary" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Company) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person or any other Person that satisfies this definition in respect of such Person.

Section 1.2    Incorporation by Reference of Trust Indenture Act.  If any provision of this Indenture limits, qualifies or conflicts with the duties that would be imposed on any person by any of Sections 310 to 318 of the TIA if this Indenture were qualified under the TIA, such imposed duties shall control.

All other TIA terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by rules or regulations of the SEC have the meanings assigned to them by such definitions.

Section 1.3    Rules of Construction.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(3)    "including" means including without limitation;

(4)    words in the singular include the plural and words in the plural include the singular;

(5)    references to the payment of principal of the Notes shall include applicable premium, if any; and

(6)    references to any payments on the Notes shall include Additional Amounts.

ARTICLE II

THE NOTES

Section 2.1    Form and Dating.

(a)    The Issue Date Notes will be issued in an aggregate principal amount of U.S.$400,000,000.  The Notes will be issued in fully-registered global form without coupons, and only in denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A.

(b)    The terms and provisions of the Notes set forth in the form of Note included in Exhibit A shall constitute, and are hereby expressly made, a part of this Indenture, and, to the extent applicable, the Company, the Subsidiary Guarantors and the Trustee, by their execution and delivery of this Indenture expressly agree to such terms and provisions and to be bound thereby.  Except as otherwise expressly permitted in this Indenture, all Notes shall be identical in all respects.  Notwithstanding any differences among them, all Notes issued under this Indenture shall vote and consent together on all matters as one class.

NAI-1502882142v7

(c)     The Notes shall be issued initially in the form of one or more Global Notes substantially in the form of Exhibit A hereto, with such notations, legends or endorsements as specified in Section 2.7 or as otherwise required by law, stock exchange rule or depositary rule or usage, except as otherwise permitted herein.  The Company shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

(d)     The Notes, which shall be deposited on behalf of the purchasers of the Notes with the Common Depositary and registered in the name of the Common Depositary or its nominee, as the case may be, for the accounts of Persons entitled thereto at the Clearing Agencies, shall be duly executed by the Company and authenticated by the Trustee (or an Authenticating Agent appointed by the Trustee in accordance with Section 2.2) as hereinafter provided.

Section 2.2     Execution and Authentication.

(a)     Two Officers, one of whom shall be the Chairman of the Board of Directors, the President, the Chief Executive Officer or the Chief Financial Officer of the Company, shall sign the Notes for the Company by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(b)     A Note shall not be valid until an authorized signatory of the Trustee manually authenticates the Note.  The signature of the Trustee on a Note shall be conclusive evidence that such Note has been duly and validly authenticated and issued under this Indenture.

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Trustee shall authenticate and make available for delivery Notes upon a written order of the Company signed by an Officer of the Company (the "Company Order").  A Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of such Notes is to be authenticated.

(d)     The Trustee may appoint an agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate the Notes.  Unless limited by the terms of such appointment, any such Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by the Authenticating Agent.

(e)     In case a Surviving Entity has executed an indenture supplemental hereto with the Trustee pursuant to Article IV, any of the Notes authenticated or delivered prior to such transaction may, from time to time, at the request of the Surviving Entity, be exchanged for other Notes executed in the name of the Surviving Entity with such changes in phraseology and form as may be appropriate, but otherwise identical to the Notes surrendered for such exchange and of like principal amount; and the Trustee, upon Company Order of the Surviving Entity, shall authenticate and deliver Notes as specified in such order for the purpose of such exchange.  If Notes shall at any time be authenticated and delivered in any new name of a Surviving Entity pursuant to this Section 2.2 in exchange or substitution for or upon registration of transfer of any

- 31 -

Notes, such Surviving Entity, at the option of the Holders but without expense to them, shall provide for the exchange of all Notes at the time Outstanding for Notes authenticated and delivered in such new name.

Section 2.3     Registrar and Paying Agent; Depository.

(a)     The Company shall maintain an office or agency where Notes may be presented or surrendered for payment (the "Paying Agent"), where Notes may be presented or surrendered for registration of transfer or for exchange and for the service of notices and demands to or upon the Company (other than the type contemplated by Section 11.7) in respect of the Notes and this Indenture.  The registrar (the "Registrar") shall keep a register of the Notes and of their transfer and exchange (the "Note Register").  The Company may have one or more co-Registrars and one or more additional Paying Agents. So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a paying agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Note(s) representing such Notes is exchanged for Certificated Notes. In addition, in the event that the Global Note(s) is exchanged for Certificated Notes, an announcement of such exchange will be made by or on behalf of the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes including details of the paying agent in Singapore. As the context requires, the term "Paying Agent" includes any additional paying agent as may be appointed by the Company from time to time.

(b)     The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee in writing of the name and address of each such Agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.7.  The Company or any Subsidiary Guarantor may act as any Agent (other than Paying Agent for purposes of Article VIII).

(c)     The Company initially appoints the Trustee as Registrar and agent for service of demands and notices in connection with the Notes and this Indenture (other than the type contemplated by Section 11.7), until such time as another Person is appointed as such.  The Company initially appoints The Bank of New York Mellon, London Branch as Principal Paying Agent. The Trustee and the initial Principal Paying Agent accept the aforementioned appointments subject to the terms and conditions set forth herein.

(d)     The Company may change any Agent without notice to Holders.

(e)     The Company initially appoints each of the Clearing Agencies to act as a depositary with respect to the Notes. The Clearing Agencies have advised the Company and the Trustee that the Common Depositary will act as common depositary for the Notes on behalf of the Clearing Agencies.

Section 2.4     Paying Agent to Hold Money in Trust.  The Company shall require each Paying Agent (other than the Trustee or one of its Affiliates) to agree in writing that such Paying

- 32 -

Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal of or interest on the Notes and shall notify the Trustee in writing of any Default by the Company or any Subsidiary Guarantor in making any such payment.  If the Company or any Subsidiary Guarantor or an Affiliate of the Company or any Subsidiary Guarantor acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund.  The Company at any time may require a Paying Agent (other than the Trustee or one of its Affiliates) to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this Section 2.4, the Paying Agent (if other than the Company or a Subsidiary Guarantor) shall have no further liability for the money delivered to the Trustee.  Upon any proceeding under any Bankruptcy Law with respect to the Company or any Subsidiary Guarantor or any Affiliate of the Company or any Subsidiary Guarantor, if the Company, a Subsidiary Guarantor or such Affiliate is then acting as Paying Agent, the Trustee shall replace the Company, such Subsidiary Guarantor or such Affiliate as Paying Agent.

Section 2.5    Holder Lists.  The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders.  If the Trustee is not the Registrar, the Company shall furnish to the Trustee, in writing at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.6    Global Note Provisions.

(a)    Each Global Note initially shall:  (i) be registered in the name of and delivered to the Common Depositary or the nominee of the Common Depositary and (ii) bear the appropriate legend(s), as set forth in Section 2.7 and Exhibit A.  Any Global Note may be represented by more than one certificate.  The aggregate principal amount of each Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as provided in this Indenture.

(b)    Members of, or participants in, the Clearing Agencies ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Common Depositary under such Global Note, and the Common Depositary may be treated by the Company, the Subsidiary Guarantors, the Trustee, and each Agent and any of their respective agents as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Subsidiary Guarantors, the Trustee, or any Agent or any of their respective agents from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Clearing Agencies and their respective Agent Members, the operation of customary practices governing the exercise of the rights of an owner of a beneficial interest in any Global Note.  The registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action that a Holder is entitled to take under this Indenture or the Notes.

NAI-1502882142v7

(c)     None of the Trustee, any Agent, the Company or any Subsidiary Guarantor shall have any responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other Person with respect to the accuracy of the records of the Clearing Agencies, the Common Depositary or any Agent Member, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than the Clearing Agencies) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Common Depositary or its nominee in the case of a Global Note).  The rights of beneficial owners in any Global Note shall be exercised only through the Clearing Agencies subject to the applicable rules and procedures of the Clearing Agencies.  The Trustee, each Agent, the Company and the Subsidiary Guarantors may rely and shall be fully protected in relying upon information furnished by the Clearing Agencies with respect to its Agent Members and any beneficial owners.

Section 2.7     Legends.

(a)     Each Global Note shall bear the legend specified in Exhibit A on the face thereof.

(b)     Certificated Notes shall not bear the first three paragraphs of the legend specified in Exhibit A on the face thereof.

(c)     If Notes are issued upon the transfer, exchange or replacement of Notes bearing the legends set forth in Exhibit A hereto, the Notes so issued shall also bear such legends, except as otherwise permitted herein or by applicable law and at the written direction of the Company.

Section 2.8     Transfer and Exchange.

(a)

(i)     Subject to the other provisions of this Section 2.8, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested if its requirements for such transaction are met; *provided* that any Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.  To permit registrations of transfers and exchanges and subject to the other terms and conditions of this Article II, the Company will execute and upon Company Order the Trustee will authenticate Certificated Notes and Global Notes at the Registrar's or co-Registrar's written request.

(ii)     No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company and the Registrar may require payment of a sum

- 34 -

sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charges payable upon exchange or transfer pursuant to Section 2.8(c), Section 3.8, Section 3.12, Section 4.1 or Section 9.4).

(iii)     The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note for a period beginning: (1) 15 days before the giving of a notice of redemption or an offer to repurchase Notes and ending at the close of business on the day such notice is given or (2) 15 days before an Interest Payment Date and ending on such Interest Payment Date.

(iv)     Prior to the due presentation for registration of transfer of any Note, the Company, the Subsidiary Guarantors, the Trustee, and each Agent may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Subsidiary Guarantors, the Trustee, or any Agent shall be affected by notice to the contrary.

(v)     All Notes issued upon any registration of transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(vi)     Notwithstanding any provision to the contrary herein, so long as a Global Note remains Outstanding and is held by or on behalf of the Common Depositary, transfers of a Global Note or of any beneficial interest therein, shall only be made in accordance with this Section 2.8 and Section 2.6).

(b)     Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on exchange or transfer imposed under this Indenture or under applicable law with respect to any exchange or transfer of any interest in any Note (including any transfers between or among Agent Members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(c)

(i)     Except as provided in this Section 2.8(c), owners of a beneficial interest in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

(ii)     A Global Note deposited with the Common Depositary pursuant to Section 2.1 shall be transferred in whole to the beneficial owners thereof in the form of Certificated Notes only if such transfer complies with this Section 2.8 and (i) the

NAI-1502882142v7

applicable Clearing Agency notifies the Company in writing that it is unwilling or unable to continue as the depositary and clearing system for such Global Note, or if at any time it becomes ineligible to serve as such a clearing system and a successor clearing system (which may be either Euroclear or Clearstream alone) is not appointed by the Company within 90 days of such notice or (ii) the Trustee has instituted, or has been directed to institute, any judicial proceeding in a court to enforce the rights of the Holders under the Notes and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of the Notes.

(iii)      Any Global Note that is transferable to the beneficial owners thereof in the form of Certificated Notes pursuant to this Section 2.8 shall be surrendered by the Common Depositary to the Trustee, to be so transferred, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Notes of authorized denominations in the form of Certificated Notes.  Any portion of a Global Note transferred or exchanged pursuant to this Section 2.8 shall be executed, authenticated and delivered only in fully registered form without coupons in minimum denominations of U.S.$200,000 of principal amount and integral multiples of U.S.$1,000 in excess thereof and registered in such names as the Clearing Agencies shall direct the Trustee in writing.  Subject to the foregoing, a Global Note is not exchangeable except for a Global Note of like denomination to be registered in the name of the Common Depositary or its nominee.  In the event that a Global Note becomes exchangeable for Certificated Notes, payment of principal, premium, if any, and interest on the Certificated Notes will be payable, and the transfer of the Certificated Notes will be registrable, at the office or agency of the Company maintained for such purposes in accordance with Section 2.3.  Such Certificated Notes shall bear the applicable legends set forth in Exhibit A hereto.

(iv)      In the event of the occurrence of any of the events specified in Section 2.8(c)(ii), the Company will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(v)      Persons exchanging beneficial interests in a Global Note for Certificated Notes shall be required to provide the Clearing Agencies with written instruction and other information required by the Company and the Registrar in order to complete, execute and deliver such Certificated Notes.

Section 2.9      Mutilated, Destroyed, Lost or Stolen Notes.

(a)      If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall execute and upon Company Order the Trustee shall authenticate a replacement Note if the Company shall certify in an Officers' Certificate that the requirements of Section 8-405(a) of the New York Uniform Commercial Code are met.  If required by the Trustee or the Company, such Holder shall furnish an affidavit of loss and indemnity bond sufficient in the judgment of the Company and the Trustee to protect the Company, the Subsidiary Guarantors, the Trustee and the Agents from any loss that any of them may suffer if a Note is replaced, and, in the absence of

- 36 -

notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute and upon Company Order the Trustee shall authenticate and make available for delivery, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a new Note of like tenor and principal amount, bearing a number not contemporaneously Outstanding.

(b)    Upon the issuance of any new Note under this Section 2.9, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith.

(c)    Every new Note issued pursuant to this Section 2.9 in exchange for any mutilated Note, or in lieu of any destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Company, any Subsidiary Guarantor and any other obligor upon the Notes, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Notes duly issued under this Indenture.

Section 2.10    Temporary Notes.  Until definitive Notes are ready for delivery, the Company may execute and upon Company Order the Trustee will authenticate and make available for delivery temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes.  Without unreasonable delay, the Company will prepare and execute and upon Company Order the Trustee will authenticate and make available for delivery definitive Notes.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at any office or agency maintained by the Company for that purpose and such exchange shall be without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Company will execute and upon Company Order the Trustee will authenticate and make available for delivery in exchange therefor one or more definitive Notes representing an equal principal amount of Notes.  Until so exchanged, the Holder of temporary Notes shall in all respects be entitled to the same benefits under this Indenture as a Holder of definitive Notes.

Section 2.11    Cancellation.  The Company at any time may deliver Notes to the Trustee for cancellation.  Each Agent shall forward to the Trustee any Notes surrendered to it for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and dispose of cancelled Notes in accordance with its policy of disposal or, upon the written instruction of the Company, return to the Company all Notes surrendered for registration of transfer, exchange, payment or cancellation.  The Company may not issue new Notes to replace Notes it has paid or delivered to the Trustee for cancellation for any reason other than in connection with a registration of transfer or exchange upon Company Order.

Section 2.12    Defaulted Interest.  When any installment of interest becomes Defaulted Interest, such installment shall forthwith cease to be payable to the Holders in whose names the Notes were registered on the Record Date applicable to such installment of interest.  Defaulted Interest (including any interest payable on such Defaulted Interest) may be paid by the Company as provided in Section 2.12(a).

(a)    The Company may elect to make payment of any Defaulted Interest (including any interest on such Defaulted Interest) to the Holders in whose names the Notes are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "Special Record Date"), which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Holders entitled to such Defaulted Interest as provided in this Section 2.12(a). Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than 15 calendar days and not less than ten calendar days prior to the date of the proposed payment and not less than ten calendar days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be given to each Holder in accordance with Section 11.1, not less than ten calendar days prior to such Special Record Date.  Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been given as aforesaid, such Defaulted Interest shall be paid to the Holders in whose names the Notes are registered at the close of business on such Special Record Date.

Section 2.13    Additional Notes.  The Company may, from time to time, subject to compliance with any other applicable provisions of this Indenture (including, but not limited to, Section 3.9), without the consent of the Holders, pursuant to Additional Note Board Resolutions or an Additional Note Supplemental Indenture, create and issue pursuant to this Indenture Additional Notes having terms and conditions set forth in Exhibit A identical to those of the other Outstanding Notes, except that Additional Notes may have a different issue date and issue price from other Outstanding Notes, *provided* that any issue of Additional Notes that is to utilize the same CUSIP, Common Code and/or ISIN as a Note already issued under this Indenture shall be effected in a manner and under circumstances whereby the issue of Additional Notes is treated as a "qualified reopening" (within the meaning of US Treas. Reg. §1.1275-2(k)(3), or any successor provision, all as in effect at the time of the further issue) of the issue of Notes having the shared CUSIP, Common Code and/or ISIN.

ARTICLE III

COVENANTS

Section 3.1    Payment of Notes.

(a)    (1)    The Company shall pay the principal of and interest (including Defaulted Interest) on the Notes in U.S. Legal Tender on the dates and in the manner provided in the Notes and in this Indenture.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent in immediately available funds U.S. Legal Tender sufficient to make cash

payments due on such Interest Payment Date or the Maturity Date, as the case may be. If the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor is acting as Paying Agent, the Company, such Subsidiary Guarantor or such Affiliate shall, prior to 10:00 a.m. New York City time on each Interest Payment Date or the Maturity Date, as the case may be, segregate and hold in trust U.S. Legal Tender sufficient to make cash payments due on such Interest Payment Date or the Maturity Date, as the case may be. Principal and interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent (other than the Company, a Subsidiary Guarantor or an Affiliate of the Company or of a Subsidiary Guarantor) holds in accordance with this Indenture U.S. Legal Tender designated for and sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

(2) Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by the transfer of immediately available funds to the account specified by the Clearing Agencies. The Company shall make all payments in respect of a Certificated Note (including principal, premium, if any, and interest) by mailing a check to the registered address of each Holder thereof; *provided, however*, that payments on the Certificated Notes may also be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Company and the Trustee or the Paying Agent to such effect designating such account at least 10 Business Days immediately preceding the relevant due date for payment (or such other date as the Company and the Trustee or Paying Agent may accept in its discretion).

(b) Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder. The Trustee shall be entitled to receive from the Company, each Guarantor and each Holder forms W-9 or W-8, as applicable. The Company agrees to pay interest on overdue principal and Defaulted Interest at the rate per annum specified on the face of the Notes.

Section 3.2    Maintenance of Office or Agency.

(a) The Company shall maintain each office or agency required under Section 2.3. The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

(b) The Company may also from time to time designate one or more other offices or agencies (in or outside of The City of New York) where the Notes may be presented or

- 39 -

surrendered for any or all such purposes and may from time to time rescind any such designation; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency so long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, in Singapore, for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

Section 3.3    Corporate Existence.  Except as permitted by the provisions of Article IV, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 3.4    Payment of Taxes.  The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, all taxes, assessments and governmental charges levied or imposed upon the Company or any Restricted Subsidiary or for which it is or any of them are otherwise liable, or upon the income, profits or property of the Company or any Restricted Subsidiary; *provided*, *however*, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment or governmental  charge whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which appropriate reserves, if necessary (in the good faith judgment of management of the Company), are being maintained in accordance with IFRS.

Section 3.5    Compliance Certificate.

The Company and each Subsidiary Guarantor shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company ending December 31, an Officers' Certificate certifying compliance with all of their respective obligations under this Indenture and stating whether or not any Default or Event of Default has occurred during the previous fiscal year. In such case, the certificate shall describe the Default or Event of Default, its status and what action the Company or any Subsidiary Guarantor is taking or proposes to take with respect thereto.

Section 3.6    Further Instruments and Acts.  The Company and each Subsidiary Guarantor shall execute and deliver such further instruments and do such further acts as may be required by applicable law or may be reasonably necessary or proper to comply with their respective obligations under this Indenture, the Notes and the Note Guarantees or as the Trustee may reasonably request to carry out more effectively the purpose of this Indenture.

Section 3.7    Waiver of Stay, Extension or Usury Laws.  The Company and each Subsidiary Guarantor covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company or such Subsidiary Guarantor from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture. The Company and each Subsidiary Guarantor hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 3.8     Repurchase Upon a Change of Control.

(a)     Upon the occurrence of a Change of Control, each Holder shall have the right to require that the Company purchase, at such Holder's option, all or a portion (in minimum principal amounts of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof) of the Holder's Notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon to, but not including, the date of purchase (the "Change of Control Payment").

(b)     The Company shall notify the Trustee in writing promptly upon the occurrence of a Change of Control.

(c)     Within 30 days following the date upon which the Change of Control occurred, the Company must give a Change of Control Notice to each Holder, with a copy to the Trustee, offering to purchase the Notes as described above (a "Change of Control Offer").  The Change of Control Offer shall state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the Change of Control Notice, other than as may be required by law (the "Change of Control Payment Date"), and instructions and materials necessary to enable Holders of the Notes to tender Notes pursuant to the Change of Control Offer.

(d)     On the Business Day immediately preceding the Change of Control Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered. On the Change of Control Payment Date, the Company will, to the extent lawful:

(1)     accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Offer; and

(2)     deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(e)     If only a portion of a Note is purchased pursuant to a Change of Control Offer, a new Note in a principal amount equal to the portion thereof not purchased shall be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies).  Notes (or portions thereof) purchased pursuant to a Change of Control Offer will be cancelled and cannot be reissued.

(f)     The Company shall not be required to make a Change of Control Offer upon a Change of Control if:

(1)     a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and

NAI-1502882142v7

purchases all Notes properly tendered and not withdrawn pursuant to the Change of Control Offer, or

(2)    notice of redemption has been given pursuant to Section 5.5 hereof, unless and until there is a default in payment of the applicable redemption price.

(g)    A Change of Control Offer may be made in advance of a Change of Control, conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

(h)    In the event that Holders of not less than 90.0% of the aggregate principal amount of the Outstanding Notes accept a Change of Control Offer and the Company or a third party purchases all of the Notes held by such Holders, the Company shall have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date pursuant to the Change of Control Offer described above, to redeem all of the Notes that remain Outstanding following such purchase at a purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, on the Notes that remain Outstanding, to, but not including, the payment date (subject to the right of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

(i)    To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes in connection with a Change of Control Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.8, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by doing so.

Section 3.9    Limitation on Incurrence of Additional Indebtedness.

(a)    The Company (i) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, (ii) shall not, and shall not cause or permit any of its Restricted Subsidiaries to, Incur any Disqualified Capital Stock (other than Disqualified Capital Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), and (iii) shall not cause or permit any of its Restricted Subsidiaries that is not a Subsidiary Guarantor to Incur any Preferred Stock (other than Preferred Stock of Restricted Subsidiaries held by the Company or a Wholly Owned Subsidiary, so long as it is so held), except, in each case, that the Company and any Subsidiary Guarantor may Incur Indebtedness or Disqualified Capital Stock and any Restricted Subsidiary that is not a Subsidiary Guarantor may Incur Preferred Stock if, at the time of and immediately after giving *pro forma* effect to the Incurrence thereof and the application of the proceeds therefrom, the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries would not have been greater than 3.5 to 1.0.

(b)    Notwithstanding paragraph (a) above, the Company and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("Permitted Indebtedness"):

- 42 -

(1)     Indebtedness in respect of the Issue Date Notes (including any Note Guarantee in respect thereof) and excluding Additional Notes;

(2)     Guarantees by any Subsidiary Guarantor of Indebtedness of the Company or any other Subsidiary Guarantor permitted under this Indenture; *provided* that if any such Guarantee is of Subordinated Indebtedness, then the Note Guarantee of such Subsidiary Guarantor shall be senior to such Subsidiary Guarantor's Guarantee of such Subordinated Indebtedness;

(3)     Indebtedness Incurred by the Company or any Subsidiary Guarantor under Credit Facilities (including Guarantees in respect thereof) in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$100.0 million and (y) 10.0% of Consolidated Tangible Assets;

(4)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b);

(5)     Hedging Obligations entered into by the Company and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the Notes;

(6)     intercompany Indebtedness between the Company and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

(x)     if the Company or any Subsidiary Guarantor is the obligor on such Indebtedness and the payee is not the Company or any Subsidiary Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all Obligations under the Notes and this Indenture, in the case of the Company, or such Subsidiary Guarantor's Note Guarantee, in the case of any such Subsidiary Guarantor,

(y)     in the event that at any time any such Indebtedness ceases to be held by the Company or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (6) at the time such event occurs; and

(z)     the Company and any Restricted Subsidiary shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the Notes and other unaffiliated creditors of the same class as the Notes;

(7)     Indebtedness of the Company or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against

- 43 -

insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(8)     Indebtedness of the Company or any of its Restricted Subsidiaries represented by letters of credit for the account of the Company or any Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(9)     Indebtedness of the Company or any Restricted Subsidiary constituting Capitalized Lease Obligations or Purchase Money Indebtedness, in each case Incurred for the purpose of acquiring or financing all or any part of the purchase price or cost of construction or improvement of property or equipment used in the business of the Company or such Restricted Subsidiary in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) U.S.$25.0 million and (y) 2.5% of Consolidated Tangible Assets;

(10)     Indebtedness in respect of bid, performance or surety bonds in the ordinary course of business for the account of the Company or any of its Restricted Subsidiaries, including Guarantees or obligations of the Company or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(11)     Refinancing Indebtedness in respect of:

(x)     Indebtedness (other than Indebtedness owed to the Company or any Subsidiary of the Company) Incurred pursuant to paragraph (a) above (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such paragraph (a) above), or

(y)     Indebtedness Incurred pursuant to clause (1), (4) (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (3) of this Section 3.9(b) or Indebtedness owed to the Company or a Subsidiary of the Company) or (11) of this Section 3.9(b);

(12)     additional Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed U.S.$20.0 million at any one time outstanding (which amount may, but need not, be Incurred, in whole or in part, under Credit Facilities);

(13)     the Guarantee by the Company of any Indebtedness Incurred by a Subsidiary Guarantor in accordance with the terms of this Indenture and the Notes;

(14)     Guarantees by the Company or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such

- 44 -

purchase of property or other assets, then (x) each of the Company and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Company or a Restricted Subsidiary, and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of U.S.$50 million at any one time outstanding; and

(15)     Permitted Acquisition Indebtedness.

(c)     For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with, this Section 3.9:

(1)     The amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with IFRS.

(2)     The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Preferred Stock or Disqualified Capital Stock in the form of additional Preferred Stock or Disqualified Capital Stock with the same terms shall not be deemed to be an Incurrence of Indebtedness or issuance of Preferred Stock or Disqualified Capital Stock for purposes of this Section 3.9; *provided* that any such outstanding additional Indebtedness or Preferred Stock or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of Section 3.9(b) shall be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision.

(3)     In the event that Indebtedness meets the criteria of more than one of clauses (1) through (15) of Section 3.9(b), or is entitled to be Incurred pursuant to Section 3.9(a) above, the Company, in its sole discretion, will be permitted to classify such Indebtedness at the time of its Incurrence in any manner that complies with this Section 3.9. In addition, any Indebtedness originally classified as Incurred pursuant to clauses (1) through (15) of Section 3.9(b) or Section 3.9(a) may later be reclassified by the Company, in its sole discretion, such that it will be deemed to be Incurred pursuant to another of such clauses or Section 3.9(a) to the extent that such reclassified Indebtedness could be Incurred pursuant to such other clause or Section 3.9(a) at the time of such reclassification (*provided* that Indebtedness outstanding on the Issue Date under Credit Facilities shall at all times be deemed incurred under Section 3.9(b)(3).

(4)     For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness, the principal amount of Indebtedness denominated in a currency other than U.S. dollars shall be the U.S. Dollar Equivalent thereof.  Notwithstanding any other provision of this Section 3.9, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 3.9 shall not be deemed

- 45 -

to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(5)    For purposes of determining any particular amount of Indebtedness: (i) Guarantees, Liens or obligations with respect to letters of credit supporting Indebtedness otherwise included in the determination of such particular amount shall not be included and (ii) any Liens granted together with an equal and ratable Lien to secure the Notes and the Note Guarantees, pursuant to the provisions of this Indenture and the Notes shall not be treated as Indebtedness.

Section 3.10    Limitation on Guarantees.  The Company shall not permit any Restricted Subsidiary that is not a Subsidiary Guarantor to Guarantee any Indebtedness of the Company or to secure any Indebtedness of the Company with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the Notes, as the case may be, on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured.  Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Company will be subordinated and junior in right of payment to the contemporaneous Guarantee of the Notes by such Restricted Subsidiary.

Section 3.11    Limitation on Restricted Payments.

(a)    The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "Restricted Payment"):

(1)    declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Company or any Restricted Subsidiary to holders of such Capital Stock, other than:

(x)    dividends, returns of capital or distributions payable in Qualified Capital Stock of the Company,

(y)    dividends, returns of capital or distributions payable to the Company and/or a Restricted Subsidiary, or

(z)    dividends, distributions or returns of capital made on a *pro rata* basis to the Company and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than *pro rata* basis to any minority holder);

(2)    purchase, redeem or otherwise acquire or retire for value:

(x)    any Capital Stock of the Company, or

(y)    any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary) or any

- 46 -

Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Company or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Company and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(3)     make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness (excluding (x) any intercompany Indebtedness between or among the Company and/or any Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the Notes or any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(4)     make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(A)     a Default or an Event of Default shall have occurred and be continuing;

(B)     the Company is not able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); or

(C)     the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof shall exceed the sum of:

(i)     50% of cumulative Consolidated Net Income of the Company or, if such cumulative Consolidated Net Income of the Company is a loss, minus 100% of the loss, accrued during the period, treated as one accounting period, beginning in the fiscal quarter immediately preceding the fiscal quarter in which the Issue Date occurs, to the end of the most recent fiscal quarter for which consolidated financial information of the Company is available; plus

(ii)     100% of the aggregate net cash proceeds received by the Company or any Restricted Subsidiary from any Person (other than, in the case of any Restricted Subsidiary, from the Company or another Restricted Subsidiary) from any:

- 47 -

(1)     contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock or issuance or sale of Qualified Capital Stock of the Company, in each case, subsequent to the Issue Date, or

(2)     issuance or sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Company or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Company,

excluding, in each case, any net cash proceeds:

(w)     received from a Subsidiary of the Company;

(x)     used to redeem Notes in accordance with the provisions under Section 5.2; or

(y)     applied in accordance with Section 3.11(b)(2) or (3) below; *plus*

(iii)     any Investment Return.

(b)     Notwithstanding paragraph (a) above, this Section 3.11 does not prohibit:

(1)     the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)     the acquisition of any shares of Capital Stock of the Company,

(x)     in exchange for Qualified Capital Stock of the Company, or

(y)     through the application of the net proceeds received by the Company from a substantially concurrent sale of Qualified Capital Stock of the Company or a contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock, in each case not received from a Subsidiary of the Company;

*provided* that the value of any such Qualified Capital Stock issued in exchange for such acquired Capital Stock and any such net proceeds shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

- 48 -

(3)      the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of:

(x)      Qualified Capital Stock of the Company, or

(y)      Refinancing Indebtedness for such Subordinated Indebtedness;

*provided* that the value of any Qualified Capital Stock issued in exchange for Subordinated Indebtedness and any net proceeds referred to above shall be excluded from Section 3.11(a)(C)(ii) above (and were not included therein at any time);

(4)      if no Default or Event of Default shall have occurred and be continuing, repurchases by the Company of Common Stock of the Company or options, warrants or other securities exercisable or convertible into Common Stock of the Company from any current or former employees, officers, directors or consultants of the Company or any of its Subsidiaries or their authorized representatives, estates, heirs, family members, spouses or former spouses upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed U.S.$5.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years) plus the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries in such calendar year;

(5)      the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)      the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Company or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant set forth in Section 3.9;

(7)      upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the Notes pursuant to Section 3.8, any repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Company or any Subsidiary Guarantor required pursuant to the terms thereof as a result of such Change of Control; *provided* that (A) the terms of such purchase or redemption are substantially similar in all material respects to the comparable provision included in this Indenture, and (B) at the time of such purchase or redemption no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

(8)     if no Default or Event of Default shall have occurred and be continuing, the purchase by the Company of fractional shares arising out of stock dividends, splits or combinations or business combinations;

(9)     payments or distributions in the nature of satisfaction of statutory redemption or dissenters' rights under Mexican law; and

(10)    if no Default or Event of Default shall have occurred and be continuing, the payment of cash dividends on or in respect of Capital Stock of the Company or the repurchase of Capital Stock of the Company in an aggregate amount not to exceed U.S.$10.0 million in any calendar year.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4) and (7) of paragraph (b) of this Section 3.11 shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (6), (8), (9) and (10) above shall not be included in such calculation.

Section 3.12    Limitation on Asset Sales and Sales of Subsidiary Stock.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)     the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(2)     at least 75.0% of the consideration received for the assets or Capital Stock sold by the Company or the Restricted Subsidiary, as the case may be, in the Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

(b)     For purposes of Section 3.12(a)(2), the following are deemed to be cash:

(x)     any liabilities (as shown prior to the date of such Asset Sale on the Company's or such Restricted Subsidiary's most recent consolidated balance sheet) of the Company or any of its Restricted Subsidiaries (other than contingent liabilities and liabilities that constitute Subordinated Indebtedness or are otherwise subordinated to the Notes) that are assumed by the transferee of any such assets and as a result of which the Company and its Restricted Subsidiaries are no longer responsible for such liabilities; and

(y)     the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current assets as determined in

accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business; and

(z)    any securities, Notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted, sold for or exchanged by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 120 days (180 days in the case of land sales) of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion, sale or exchange,

*provided* that amounts received pursuant to clauses (x) and (y) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

(c)    The Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(1)    repay any Senior Indebtedness of the Company or a Subsidiary Guarantor that is secured by a Lien,

(2)    make capital expenditures in a Permitted Business, or

(3)    purchase

(x)    assets (other than current assets as determined in accordance with IFRS or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business, or

(y)    all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary

from a Person other than the Company and its Restricted Subsidiaries; *provided* that, in the case of clauses (x) and (y), the Company will have complied with its obligations if (i) it enters into a binding commitment to acquire such assets or such Capital Stock within 365 days after receipt of such Net Cash Proceeds, (ii) such binding commitment is subject only to customary conditions and (iii) such acquisition is consummated within 180 days from the date of signing such binding commitment.

(d)    To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within 365 days of the Asset Sale as set forth in Section 3.12(c)(1) or (2) (or, in the case of Section 3.12(c)(3) only, within such longer period set forth therein), the Company shall make an offer to purchase Notes (the "Asset Sale Offer"), at a purchase price equal to 100% of the principal amount of the Notes to be purchased, plus accrued and unpaid interest thereon, to, but not including, the date of purchase (the "Asset Sale Offer Amount"). The Company shall purchase pursuant to an Asset Sale Offer from all tendering Holders on a *pro rata* basis (subject

to any necessary rounding), and, at the Company's option, on a *pro rata* basis with the holders of any other Senior Indebtedness with similar provisions requiring the Company to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of Notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds.  The Company may satisfy its obligations under this <u>Section 3.12</u> with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period (or, if applicable, such longer period set forth above with respect to <u>Section 3.12(c)(3)</u> only).

(e)    The Company may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of U.S.$15.0 million.  At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of U.S.$15.0 million, shall be applied as required pursuant to this <u>Section 3.12</u>.  Pending application in accordance with this <u>Section 3.12</u>, Net Cash Proceeds shall be applied to temporarily reduce revolving credit borrowings that can be reborrowed or Invested in Cash Equivalents.

(f)    Each Asset Sale Offer Notice shall be given to the record Holders as shown on the Note Register, with a copy to the Trustee, within 20 days following such 365th day (or, if applicable such longer period as set forth above with respect to <u>Section 3.12(c)(3)</u> only), offering to purchase the Notes pursuant to this <u>Section 3.12</u>, which notice shall govern the terms of the Asset Sale Offer.  Each Asset Sale Offer Notice will state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is provided, other than as may be required by law (the "<u>Asset Sale Offer Payment Date</u>"), and instructions and materials necessary to enable Holders to tender Notes pursuant to the Asset Sale Offer.

(g)    Upon receiving the Asset Sale Offer Notice, Holders may elect to tender their Notes in whole or in part in amounts of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof in exchange for cash.

(h)    On the Business Day immediately preceding the Asset Sale Offer Payment Date, the Company shall, to the extent lawful, deposit with the Paying Agent U.S. Legal Tender in an amount equal to the Asset Sale Offer Amount in respect of all Notes or portions thereof so tendered. On the Asset Sale Offer Payment Date, the Company will, to the extent lawful:

(1)    accept for payment all Notes or portions thereof properly tendered and not withdrawn pursuant to the Asset Sale Offer; and

(2)    deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(i)    To the extent Holders of Notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender and do not withdraw Notes or the other Senior Indebtedness in an aggregate amount exceeding the amount of unapplied Net

- 52 -

Cash Proceeds, the Company shall purchase the Notes and the other Senior Indebtedness on a *pro rata* basis (subject to any necessary rounding) based on amounts tendered. If only a portion of a Note is purchased pursuant to an Asset Sale Offer, a new Note in a principal amount equal to the portion thereof not purchased will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate, in accordance with the applicable procedures of the relevant Clearing Agencies). Notes (or portions thereof) purchased pursuant to an Asset Sale Offer shall be cancelled and cannot be reissued.

(j)      To the extent applicable, the Company shall comply with the requirements of all applicable securities laws and regulations in connection with the purchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with this Section 3.12, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 3.12 by doing so.

(k)      Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero. Accordingly, to the extent that the aggregate amount of Notes and other Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Company and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by this Indenture.

(l)      In the event of the transfer of substantially all (but not all) of the property and assets of the Company and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under Section 4.1, the Surviving Entity shall be deemed to have sold the properties and assets of the Company and its Restricted Subsidiaries not so transferred for purposes of this Section 3.12 and shall comply with the provisions of this covenant with respect to the deemed sale as if it were an Asset Sale. In addition, the Fair Market Value of properties and assets of the Company or its Restricted Subsidiaries so deemed to be sold shall be deemed to be Net Cash Proceeds for purposes of this Section 3.12.

Section 3.13      Limitation on Designation of Unrestricted Subsidiaries.

(a)      The Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under this Indenture (a "Designation") only if:

(1)      no Default or Event of Default shall have occurred and be continuing at the time of or after giving effect to such Designation and any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with Section 3.16;

(2)      at the time of and after giving effect to such Designation, the Company could Incur U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a); and

(3)      the Company would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted

Payment pursuant to Section 3.11(a) in an amount (the "Designation Amount") equal to the Company's Investment in such Subsidiary on such date, and

(4)    at the time of such Designation, neither the Company nor any Restricted Subsidiary will:

(x)    provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(y)    be directly or indirectly liable for any Indebtedness of such Subsidiary; or

(z)    be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non recourse Guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

(b)    The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1)    no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2)    all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

(c)    Upon a Designation, (i) all existing Investments of the Company and its Restricted Subsidiaries in such Subsidiary will be deemed to be made at that time, (ii) all existing transactions between such Subsidiary and the Company or its Restricted Subsidiaries will be deemed entered into at that time, (iii) such Subsidiary will be released, if applicable, from its Note Guarantee, and (iv) such Subsidiary will cease to be subject to the provisions of this Indenture as a Restricted Subsidiary.

(d)    Upon a Revocation, (i) all of such Subsidiary's Indebtedness and Disqualified Capital Stock or Preferred Stock will be deemed Incurred at that time for purposes of Section 3.9 (ii) Investments in such Subsidiary previously charged under Section 3.11 will be credited thereunder, (iii) it may be required to issue a Note Guarantee pursuant to Article 10 and (iv) it will thereafter be subject to the provisions of this Indenture as a Restricted Subsidiary.

(e)    The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.  All Designations and Revocations must be evidenced by resolutions of the Board of Directors of the Company, delivered to the Trustee certifying compliance with the preceding provisions.

Section 3.14    <u>Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries</u>.

(a)    Except as provided in paragraph (b) of this <u>Section 3.14</u>, the Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)    pay dividends or make any other distributions on or in respect of its Capital Stock to the Company or any other Restricted Subsidiary or pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

(2)    make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Company or any other Restricted Subsidiary; or

(3)    transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b)    Paragraph (a) of this <u>Section 3.14</u> shall not apply to encumbrances or restrictions existing under or by reason of:

(1)    applicable law, rule, regulation or order;

(2)    this Indenture, the Notes and the Note Guarantees;

(3)    the terms of any Indebtedness or other agreement outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or Refinancing thereof; *provided* that any such amendment, modification, restatement, renewal, restructuring, replacement or Refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(4)    customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under this Indenture;

(5)    (x) any existing instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant

acquisition, merger or consolidation, or (y) existing under any other existing agreement or instrument binding on a Person acquired or its assets or properties which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(6)    restrictions with respect to a Restricted Subsidiary of the Company imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(7)    customary restrictions imposed on the transfer of copyrighted or patented materials;

(8)    an agreement governing Indebtedness of the Company or any Restricted Subsidiaries permitted to be Incurred subsequent to the date hereof in accordance with Section 3.9; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are not materially more restrictive than those contained in the Indebtedness or agreement referred to in Section 3.14(b)(3) above;

(9)    Purchase Money Indebtedness for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3.14(a)(3) above;

(10)    Liens permitted to be incurred under Section 3.15 that limit the right of the debtor to dispose of or otherwise transfer the assets subject to such Lien or securing such Indebtedness and any proceeds thereof; or

(11)    organizational documents, shareholders' agreements, joint venture agreements or similar documents of, or related to, Restricted Subsidiaries that are not Wholly Owned Subsidiaries and which have been entered into with the approval of the Company's Board of Directors.

Section 3.15    Limitation on Liens.

(a)    The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets (including without limitation Capital Stock of any Restricted Subsidiaries), whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made:

(1)    in the case of the Company or any Restricted Subsidiary other than a Subsidiary Guarantor, to secure the Notes and all other amounts due under this Indenture; and

(2)    in the case of a Subsidiary Guarantor, to secure such Subsidiary Guarantor's Note Guarantee and all other amounts due under this Indenture;

in each case, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the Notes or such Note Guarantee, as the case may be, prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien.

Section 3.16    <u>Limitation on Transactions with Affiliates</u>.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "<u>Affiliate Transaction</u>"), unless:

(1)    the terms of such Affiliate Transaction are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company;

(2)    in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$7.5 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Company (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(3)    in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of U.S.$15.0 million, the Company will, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such Affiliate Transaction to the Company and the relevant Restricted Subsidiary (if any) from a financial point of view from an Independent Financial Advisor and deliver the same to the Trustee.

(b)    The provisions of paragraph (a) of this <u>Section 3.16</u> shall not apply to:

(1)    Affiliate Transactions with or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(2)    reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Company's Board of Directors;

(3)    Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment,

- 57 -

modification, extension or replacement of such agreement (so long as such amendment, modification, extension or replacement is not materially more disadvantageous to the Holders, taken as a whole, than the original agreement as in effect on the Issue Date);

(4)    any Restricted Payments made in compliance with Section 3.11;

(5)    loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding U.S.$3.0 million at any one time outstanding;

(6)    any issuance of Capital Stock (other than Disqualified Capital Stock) of the Company to Affiliates of the Company or to any director, officer, employee or consultant of the Company or any Restricted Subsidiary, and the granting and performance of registration rights;

(7)    the sale of advertising by the Company or any Restricted Subsidiary on terms that are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company; and

(8)    any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar agreement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto.

Section 3.17    Conduct of Business.  The Company and its Restricted Subsidiaries shall not engage in any business other than a Permitted Business.

Section 3.18    Reports to Holders.

(a)    So long as any Notes are Outstanding, the Company shall furnish to the Trustee:

(i)    within 120 days following the end of each of the Company's fiscal years, an annual report containing an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(i), consolidated audited income statements, statements of shareholders equity, balance sheets and cash flow statements and the related notes thereto for the Company for the two most recent fiscal years in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an audit report on such financial statements by the Company's independent auditors (in each case, presented in the English language);

(ii)      within 60 days following the end of the first three fiscal quarters in each of the Company's fiscal years, quarterly reports containing unaudited consolidated balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Company and the Subsidiaries on a consolidated basis, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with IFRS, which need not, however, contain any reconciliation to IFRS or otherwise comply with Regulation S-X of the SEC, together with an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of the Offering Circular (after taking into consideration any changes to the business and operations of the Company after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this Section 3.18(a)(ii) (in each case, presented in the English language); and

(iii)      within 20 days following such filing, copies (including English translations thereof), if applicable, of public filings which reasonably would be material to Holders made with any securities exchange or securities regulatory agency or authority, *provided*, that the Company will not be required to so provide copies or English translations of (a) public filings which may be obtained from the SEC via the EDGAR system or its successors or (b) except to the extent required by paragraphs (i) and (ii) of this Section 3.18(a), annual or quarterly and other reports or other documents filed (in Spanish) with the CNBV and the Mexican Stock Exchange (*Bolsa Mexicana de Valores*).

In addition, each of the reports provided pursuant to this Section 3.18(a) shall include the Consolidated Leverage Ratio of the Company and its Restricted Subsidiaries for such period, together with an appropriate footnote or other disclosure providing in reasonable detail the calculation of such ratio.

(b)      None of the information provided pursuant to paragraph (a) of this Section 3.18 shall be required to comply with Regulation S-K as promulgated by the SEC.

(c)      Delivery of such reports, information and documents to the Trustee, as well as any opinion delivered pursuant to Section 3.16(a)(3), shall be for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of the covenants contained in this Indenture (as to which the Trustee shall be entitled to conclusively rely upon an Officers' Certificate). The Trustee shall have no obligation to monitor the Company's compliance with its obligations to deliver reports and information in accordance with this Section 3.18.

Section 3.19    Listing.

(a)      So long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a Paying Agent in Singapore, where such Notes may be presented or surrendered for payment or redemption in the event that the Global Notes representing such Notes are exchanged for Certificated Notes. In addition, in the event that

- 59 -

the Global Notes are exchanged for Certificated Notes, an announcement of such exchange will be made by, or on behalf of, the Company through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive Notes, including details of the Paying Agent in Singapore.

(b)    The Company agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

Section 3.20    Payment of Additional Amounts.

(a)    Subject to Sections 3.20(b) and (c), the Company or, as the case may be, the Subsidiary Guarantors shall pay such additional amounts ("Additional Amounts") as may be necessary in order to ensure that the net amounts received by the Holders of Notes after any withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed or levied by Mexico or any authority in Mexico shall equal the respective amounts of principal and interest which would have been received in respect of the Notes in the absence of such withholding or deduction, and the delivery by the Company, or as the case may be, the Subsidiary Guarantors of any such Additional Amounts to the appropriate Mexican authorities shall constitute receipt by the relevant Holders of such Additional Amounts so delivered; except that no such Additional Amounts shall be payable with respect to:

(1)    any Taxes imposed solely because at any time there is or was a connection between the Holder or beneficial owner of the Note (or between a fiduciary, settler, beneficiary, member or owner of, or holder of power over, such holder or beneficial owner, if such holder or beneficial owner is an estate, trust, partnership or corporation) and Mexico (or any political subdivision or territory or possession thereof), including such Holder or beneficial owner (or such fiduciary, settler, beneficiary, member, owner or holder of a power) (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the mere receipt of payments under, or the ownership or holding of, a Note);

(2)    any estate, inheritance, gift, sales, stamp, personal property, transfer or similar Tax, assessment or other governmental charge imposed with respect to the Notes;

(3)    any Taxes imposed solely because the Holder or any other person having an interest in the Notes fails to comply with any certification, identification, information, documentation or other reporting requirement concerning the nationality, residence, identity or connection with Mexico of the Holder or any beneficial owner of the Note, if compliance is required by statute, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty, which is in effect and to which Mexico is a

- 60 -

party, as a precondition to exemption from, or reduction in the rate of, the Tax and at least 30 days' prior to the first payment date with respect to which the Company or a Subsidiary Guarantor shall apply this clause, the Company or, as the case may be, the relevant Subsidiary Guarantor shall have notified the Holder of such Note that such Holder or beneficial owner will be required to comply with such certification, identification, information, documentation or other reporting requirement;

(4)    any Note presented for payment more than 15 days after the Relevant Date (as defined below) except to the extent that the Holder would have been entitled to such Additional Amounts on presenting such Note for payment on the last day of such 15-day period (the "Relevant Date" in respect of any payment being the date on which such payment first becomes due except that, if the full amount of the monies payable has not been received by the Paying Agent on or prior to such due date, being the date on which, the full amount of such monies having been so received, notice to that effect is duly given to the Holders in accordance with Section 11.1 hereof);

(5)    any Taxes required to be deducted or withheld by any Paying Agent from a payment on a Note, if such payment can be made without such deduction or withholding by any other Paying Agent who can make such payment in accordance with the terms of this Indenture and the Notes;

(6)    any Taxes which are payable otherwise than by deduction or withholding from payments on or in respect of any Note (other than stamp, transfer or other similar taxes);

(7)    any payment on a Note to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of such Note;

(8)    any Taxes payable otherwise than by deduction or withholding from payments on the Notes;

(9)    any Taxes withheld or deducted on or in respect of any Note under Section 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement; or

(10)    any combination of Section 3.20(a)(1) through (a)(9).

(b)     The limitations on the obligations to pay Additional Amounts set forth in Section 3.20(a)(3) above shall not apply if (i) the provision of information, documentation or other evidence described in such Section 3.20(a)(3)  would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a note, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulations (including temporary or proposed regulations) and administrative practice, or (ii) Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta*) (or a substitute or equivalent provision, whether included in any law, rule or regulation) is in effect, unless (A) the provision of the information, documentation or other evidence described in such clause (c) above is expressly required by the applicable Mexican laws and regulations in order to apply Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (or substitute or equivalent provision), (B) the Company cannot obtain the information, documentation or other evidence necessary to comply with the applicable Mexican laws and regulations on its own through reasonable diligence and (C) the Company otherwise would meet the requirements for application of the applicable Mexican laws and regulations. In addition, such Section 3.20(a)(3) above does not require, and shall not be construed to require, that any holder, including any non-Mexican pension fund, retirement fund, tax-exempt organization or financial institution, register, to the extent applicable, with the Tax Management Service (Servicio de Administracion Tributaria) or the Mexican Ministry of Finance and Public Credit (Secretaria de Hacienda y Credito Público) to establish eligibility for an exemption from, or a reduction of, Mexican withholding taxes, or take any other action different from providing periodic information thereto.

(c)     Upon request, the Company and the Subsidiary Guarantors shall provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which the Company or any Subsidiary Guarantor has paid any Additional Amount.  The Company shall make copies of such documentation available to the Holders of the Notes or the Paying Agents upon request.

(d)     The Company shall pay all stamp and other duties, if any, which may be imposed by Mexico or any political subdivision thereof or taxing authority of or in the foregoing with respect to the execution and delivery of this Indenture or the issuance of the Notes.

(e)     In the event of any merger or other transaction described and permitted under Section 4.1, then all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this section (other than Section 3.20(b), which relates to an exception to the obligation to pay Additional Amounts under Section 3.20(a)(3)) and under Section 5.3 shall be deemed to also include the United States, the European Union and any political subdivision therein or thereof, United States and European Union laws or regulations, and any taxing authority of the United States or the European Union or any political subdivision therein or thereof, respectively.

(f)     At least 5 Business Days prior to the first payment date on the Notes and at least 5 Business Days prior to each payment date thereafter, the Company shall furnish to the Trustee and each Paying Agent an Officers' Certificate (but only if there has been any change with respect to the matters set forth in any previously delivered Officers' Certificate) instructing the Trustee and such Paying Agent as to whether any payment of principal of or any interest on

such Notes due on such payment date shall be made subject to deduction or withholding for or on account of any tax, duty, assessment or other governmental charge.  If any such deduction or withholding shall be required, then such Officers' Certificate shall specify the amount, if any, required to be deducted or withheld on such payment to the relevant recipient, shall certify that the Company shall pay the appropriate deduction or withholding amount to the appropriate taxing authority, and shall certify that the Company shall pay or cause to be paid to the Trustee or such Paying Agent Additional Amounts, if any, required.

(g)    Any reference in this Indenture or the Notes to principal, premium, interest or any other amount payable in respect of the Notes by the Company or any Subsidiary Guarantor will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this <u>Section 3.20</u>.

Section 3.21    <u>Suspension of Covenants</u>.

(a)    During any period of time that (i) the Notes have Investment Grade Ratings from at least two Rating Agencies, and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "<u>Covenant Suspension Event</u>"), the Company and its Restricted Subsidiaries will not be subject to <u>Sections 3.9</u>, <u>3.10</u> (*provided* that such covenant shall apply to any Restricted Subsidiary that guarantees Indebtedness upon any Reversion Date (as defined below)), <u>3.11</u>, <u>3.12</u>, <u>3.13</u>, <u>3.14</u>, <u>3.16</u>, <u>3.17</u> and <u>4.1(a)(2)</u> (collectively, the "<u>Suspended Covenants</u>").

(b)    In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "<u>Reversion Date</u>") the Covenant Suspension Event ceases to exist, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants.  The period of time between the date of the Covenant Suspension Event and the Reversion Date is referred to as the "<u>Suspension Period</u>." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

(c)    On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified to have been Incurred pursuant to <u>Section 3.9(a)</u> or <u>Section 3.9(b)</u> (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred prior to the Suspension Period and outstanding on the Reversion Date).  To the extent such Indebtedness would not be so permitted to be Incurred pursuant to <u>Section 3.9(a)</u> or <u>Section 3.9(b)</u>, such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under <u>Section 3.9(b)(4)</u>. Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under <u>Section 3.11</u> will be made as though <u>Section 3.11</u> had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the <u>Section 3.11(a)</u>.  For purposes of <u>Section 3.12</u>, on the Reversion Date, the

- 63 -

amount of Net Cash Proceeds of Asset Sales will be reset to the amount of Net Cash Proceeds in effect as of the first day of the Suspension Period ending on such Reversion Date.

(d)    The Company will give the Trustee written notice of any Covenant Suspension Event and in any event not later than ten Business Days after such Covenant Suspension Event has occurred.  In the absence of such notice, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect.  The Company will give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after it becomes aware of such Reversion Date.  After any such notice of the occurrence of the Reversion Date, the Trustee shall assume without liability that the Suspended Covenants apply and are in full force and effect. In the absence of such notice of a Reversion Date, the Trustee shall assume without liability that the Suspended Covenants continue to be suspended.

ARTICLE IV

SURVIVING ENTITY

Section 4.1    <u>Merger, Consolidation and Sale of Assets</u>.

(a)    The Company shall not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Company is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), to any Person unless:

(1)    either:

(ii)    the Company (in the case of a consolidation or merger with or into any Person) shall be the surviving or continuing corporation; or

(iii)    the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "<u>Surviving Entity</u>"):

(A)    shall be a corporation organized and validly existing under the laws of Mexico or the United States of America, any State thereof or the District of Columbia or any member state of the European Union, and

(B)    shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the Notes and the performance and observance of every covenant of the Notes and this Indenture on the part of the Company to be performed or observed;

- 64 -

(2)    immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this Section 4.1 (including giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred in connection with or in respect of such transaction), the Company or such Surviving Entity, as the case may be, will be able to Incur at least U.S.$1.00 of additional Indebtedness pursuant to Section 3.9(a).

(3)    immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(1)(iii)(B) of this Section 4.1 (including, without limitation, giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(4)    each Subsidiary Guarantor (including Persons that become Subsidiary Guarantors as a result of the transaction) has confirmed by Supplemental Indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of this Indenture and the Notes;

(5)    if the Company is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union or the Company is organized under the laws of the United States, any State thereof or the District of Columbia  or any member state of the European Union and merges with a corporation, or the Surviving Entity is, organized under the laws of Mexico, the Company or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of (x) Mexico and (y) the United States or the applicable European Union member state, to the effect that, as applicable:

(i)    each Holder of the Notes will not recognize income, gain or loss for United States or European Union, as applicable, or Mexican income tax purposes as a result of the transaction and will be taxed in the Holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the Notes) and at the same time as would have been the case if the transaction had not occurred;

(ii)    no other taxes on income, including capital gains, will be payable by Holders of the Notes under the laws of the United States or the European Union, as applicable, or Mexico relating to the acquisition, ownership or disposition of the Notes, including the receipt of interest or principal thereon; *provided* that the Holder does not use or hold, and is not deemed to use or hold the Notes in carrying on a business in the United States or the European Union, as applicable, or Mexico; and

- 65 -

(6)    the Company or the Surviving Entity has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to the transaction have been satisfied.

(b)    For purposes of this Section 4.1, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company (determined on a consolidated basis for the Company and its Restricted Subsidiaries), shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

(c)    Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries in accordance with this Section 4.1, in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such Surviving Entity had been named as such and the Company shall be released from its obligations under the Notes and this Indenture.  For the avoidance of doubt, compliance with this Section 4.1 will not affect the obligations of the Company (including a Surviving Entity, if applicable) under Section 3.8, if applicable.

(d)    Each Subsidiary Guarantor shall not, and the Company shall not cause or permit any Subsidiary Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Company) that is not a Subsidiary Guarantor unless such transaction is otherwise in compliance with this Indenture and:

(1)    such Person (if such Person is the surviving entity) assumes all of the obligations of such Subsidiary Guarantor in respect of its Note Guarantee by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and the Supplemental Indenture comply with the applicable provisions of this Indenture and all conditions precedent in this Indenture relating to the transaction have been satisfied;

(2)    such Note Guarantee is to be released as provided under Section 10.2 or

(3)    such sale or other disposition of substantially all of such Subsidiary Guarantor's assets is made in accordance with Section 3.12.

(e)    The provisions of this Section 4.1 will not apply to:

- 66 -

(1)     any transfer of the properties or assets of a Restricted Subsidiary to the Company, a Subsidiary Guarantor or another Restricted Subsidiary;

(2)     any merger of a Restricted Subsidiary into the Company, a Subsidiary Guarantor or another Restricted Subsidiary; or

(3)     any merger of the Company into a Wholly Owned Subsidiary of the Company;

so long as, in each case the Indebtedness of the Company and its Restricted Subsidiaries taken as a whole is not increased thereby.

## ARTICLE V

## OPTIONAL REDEMPTION OF NOTES

Section 5.1     <u>Optional Redemption</u>.

(a)     Prior to August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium and accrued and unpaid interest to, but not including, the Redemption Date.

(b)     On and after August 9, 2021, the Company may redeem the Notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on August 9 of any year set forth below, plus accrued and unpaid interest to, but not including, the Redemption Date:

| Year | Percentage |
|------|-----------|
| 2021 ............................... | 104.125% |
| 2022 ............................... | 102.063% |
| 2023 ............................... | 100.000% |

Section 5.2     <u>Optional Redemption upon Equity Offerings.</u>

(a)     Prior to August 9, 2021, the Company may, at its option, at any time or from time to time, upon at least 30 days' but not more than 60 days' notice, use the net cash proceeds of one or more Equity Offerings to redeem up to 35% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the Redemption Date; *provided that*:

(1)     after giving effect to any such redemption at least 65% of the aggregate principal amount of the Notes issued under this Indenture remains Outstanding; and

- 67 -

(2)      the Company shall make such redemption not more than 90 days after the consummation of such Equity Offering.

Section 5.3      Optional Redemption for Changes in Withholding Taxes.

(a)      If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of Mexico or any political subdivision or taxing authority or other instrumentality thereof or therein affecting taxation, or any amendment to or change in an official interpretation or application of such laws, rules or regulations, which amendment to or change of such laws, rules or regulations becomes effective on or after the Issue Date the Company or the Subsidiary Guarantors have become obligated or will become obligated, in each case, after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of those attributable to a Mexican withholding tax rate of 4.9% with respect to the Notes, then the Company may redeem the Notes, at its option, in whole but not in part at any time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon up to, but not including, the Redemption Date; provided, however, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Company or the Subsidiary Guarantors would be obligated to pay these Additional Amounts if a payment on the Notes were then due, and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

(b)      Prior to the publication or delivery to Holders of any notice of redemption pursuant to this provision, the Company will deliver to the Trustee:

- an Officers' Certificate stating that the Company is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Company's right to redeem have occurred, and

- an opinion of Mexican legal counsel (which may be the Company's outside counsel) of recognized standing to the effect that the Company has or will become obligated to pay such Additional Amounts as a result of such change or amendment.

Section 5.4      Optional Redemption Procedures.

(a)      The Company shall evidence its election to redeem any Notes pursuant to Section 5.1, 5.2 or 5.3 by a Board Resolution delivered prior to delivery of notice of redemption to the Holders.

Section 5.5      Notice of Redemption.

(a)      The Company shall give (or direct the Trustee to give on its behalf) notice to the Holders of Notes to be redeemed pursuant to Section 5.1, 5.2 or 5.3 of this Indenture of any redemption the Company proposes to make at least 30 days (but not more than 60 days) before the Redemption Date.

(b)     Notice of any redemption will (i) in the case of Holders of Certificated Notes, be mailed by first-class mail, postage prepaid, to each Holder of Notes to be redeemed at its registered address and (ii) in the case of the Holders of Global Notes, be given in accordance with the customary procedures of the applicable Clearing Agency.  If the Company itself gives the notice, it shall also deliver a copy to the Trustee. This notice, once delivered by the Company to the Holders, shall be irrevocable.  If Notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed.  A new Note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

(c)     The Company shall deliver to the Trustee, at least 45 days prior to the Redemption Date (unless the Trustee is satisfied with a shorter period), (i) notice of the proposed redemption and (ii) if the Company is not redeeming all Outstanding Notes or the Company directs the Trustee to give notice of redemption to Holders, an Officers' Certificate requesting that the Notes to be redeemed be selected in accordance with Section 5.6 and/or give notice of redemption and setting forth the information required by paragraph (d) of this Section 5.5 (with the exception of the identification of the particular Notes, or portions of the particular Notes, to be redeemed in the case of a partial redemption).  If the Company directs the Trustee to give notice of redemption, the Trustee shall give the notice in the name of the Company and at the Company's expense.

(d)     All notices of redemption shall state:

(1)     the Redemption Date,

(2)     the redemption price and the amount of any accrued interest payable as provided in Section 5.8,

(3)     whether or not the Company is redeeming all Outstanding Notes,

(4)     if the Company is not redeeming all Outstanding Notes, the aggregate principal amount of Notes that the Company is redeeming and the aggregate principal amount of Notes that will be Outstanding after the partial redemption, as well as the identification of the particular Notes, or portions of the particular Notes, that the Company is redeeming,

(5)     if the Company is redeeming only part of a Note, that on and after the Redemption Date, upon surrender of that Note, the Holder will receive, without charge, a new Note or Notes of authorized denominations for the principal amount of the Note remaining unredeemed,

(6)     that on the Redemption Date the redemption price and any accrued interest payable to the Redemption Date as provided in Section 5.6 shall become due and payable in respect of each Note, or the portion of each Note, to be redeemed, and, unless the Company defaults in making the redemption payment, that interest on each Note, or the portion of each Note, to be redeemed, shall cease to accrue on and after the Redemption Date,

NAI-1502882142v7

(7)      the place or places where a Holder must surrender the Holder's Notes for payment of the redemption price,

(8)      that the redemption of Notes with unpaid and accrued interest to the Redemption Date will not affect the right of Holders on a Record Date to receive interest due on the related Interest Payment Date, and

(9)      the Common Code and ISIN, if any, listed in the notice or printed on the Notes, and that no representation is made as to the accuracy or correctness of such Common Code and ISIN.

Section 5.6      <u>Selection of Notes to Be Redeemed in Part</u>.

(a)      If the Company is not redeeming all Outstanding Notes, the Notes to be redeemed shall be settled in compliance with the requirements of the principal securities exchange, if any, on which the Notes are listed or, if the Notes are not then listed on a securities exchange, on a *pro rata* basis, by lot or by any other method as the Trustee shall deem fair and appropriate (subject, in each case, to the applicable procedures of the Clearing Agencies); *provided*, *however*, that if a partial redemption is made with the proceeds of an Equity Offering, selection of the Notes, or portions of the Notes, for redemption shall, subject to this <u>Section 5.6</u>, be made by the Trustee only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to the applicable procedures of the Clearing Agencies), unless that method is otherwise prohibited.  The Trustee shall make the selection from the Outstanding Notes not previously called for redemption.  The Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed.  In the event of a partial redemption by lot, the particular Notes to be redeemed shall be selected not less than 30 nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption. Notes selected for redemption shall be redeemed in portions (equal to U.S.$200,000 or any integral multiple of U.S.$1,000 in excess thereof) of the principal of Notes, subject to the minimum authorized denomination requirement of this Indenture.

(b)      For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

Section 5.7      <u>Deposit of Redemption Price</u>.  Prior to 10:00 a.m. New York City time on the Business Day immediately preceding the relevant Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as Paying Agent, segregate and hold in trust as provided in <u>Section 2.4</u>) an amount of U.S. Legal Tender in immediately available funds sufficient to pay the redemption price of, and accrued interest on, all the Notes that the Company is redeeming on the Redemption Date.

Section 5.8      <u>Notes Payable on Redemption Date</u>.  If the Company, or the Trustee on behalf of the Company, gives notice of redemption in accordance with this <u>Article V</u>, the Notes, or the portions of Notes, called for redemption shall, on the Redemption Date, become due and

payable at the redemption price specified in the notice (together with accrued interest, if any, to the Redemption Date), and from and after the Redemption Date (unless the Company shall default in the payment of the redemption price and accrued interest) such Notes or such portions of Notes shall cease to bear interest.  Upon surrender of any Note for redemption in accordance with the notice, the Company shall pay the redemption price for such Note, together with accrued interest, if any, to, but not including, the Redemption Date (subject to the rights of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).  If the Company shall fail to pay the redemption price for any Note called for redemption upon its surrender for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes. Upon redemption of any Notes by the Company, such redeemed Notes shall be cancelled and may not be reissued.

Section 5.9    <u>Unredeemed Portions of Partially Redeemed Note</u>.  Upon surrender of a Note that is to be redeemed in part, the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of the Note at the expense of the Company, a new Note or Notes, of any authorized denomination as requested by the Holder, in an aggregate principal amount equal to, and in exchange for, the unredeemed portion of the principal of the Note surrendered.

ARTICLE VI

DEFAULTS AND REMEDIES

Section 6.1    <u>Events of Default</u>.

(a)    Each of the following is an "<u>Event of Default</u>":

(1)    default in the payment when due of the principal of or premium, if any, on any Notes, including the failure to make a required payment to purchase Notes tendered or to redeem Notes pursuant to an optional redemption, Change of Control Offer or an Asset Sale Offer;

(2)    default for 30 consecutive days or more in the payment when due of interest, or Additional Amounts, if any, on any Notes;

(3)    the failure to perform or comply with any of the provisions described under <u>Section 4.1</u> for 20 consecutive days or more following written notice of such failure (i) to the Company from the Trustee or (ii) to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

(4)    the failure by the Company or any Restricted Subsidiary to comply with any other covenant or agreement contained in this Indenture or in the Notes for 45 consecutive days or more after written notice to the Company from the Trustee or to the Company and the Trustee from Holders of at least 25.0% in aggregate principal amount of the Outstanding Notes;

- 71 -

(5)     default by the Company or any Restricted Subsidiary under any Indebtedness which:

(1)     is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period and which failure shall not have been cured or waived; or

(2)     results in the acceleration of such Indebtedness prior to its Stated Maturity;

and in either case the principal or accreted amount of Indebtedness covered by subclause (1) or (2) at the relevant time, aggregates U.S.$25.0 million or more;

(6)     failure by the Company or any of its Restricted Subsidiaries to pay one or more final judgments not subject to appeal against any of them, aggregating U.S.$25.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more and which are not covered by insurance or bonds;

(7)     a Bankruptcy Law Event of Default; or

(8)     except as permitted in this Indenture, any Note Guarantee is held to be unenforceable or invalid in a judicial proceeding or ceases for any reason to be in full force and effect or any Subsidiary Guarantor, or any Person acting on behalf of any Subsidiary Guarantor, denies or disaffirms such Subsidiary Guarantor's obligations under its Note Guarantee.

(b)     The Company shall deliver to the Trustee upon becoming aware of any Default or Event of Default written notice of events which would constitute such Default or Event of Default, their status and what action the Company is taking or proposes to take in respect thereof.

Section 6.2     Acceleration.

(a)     If an Event of Default (other than an Event of Default specified in Section 6.1(a)(7) above with respect to the Company) shall occur and be continuing, the Trustee or the Holders of at least 25% in principal amount of Outstanding Notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be immediately due and payable by notice in writing to the Company and the Trustee specifying the Event of Default and that it is a "notice of acceleration."  If an Event of Default specified in Section 6.1(a)(7) above occurs with respect to the Company, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     At any time after a declaration of acceleration with respect to the Notes as described in Section 6.2(a), Holders of a majority in principal amount of the Outstanding Notes may rescind and cancel such declaration and its consequences:

(1)      if the rescission would not conflict with any judgment or decree;

(2)      if all existing Events of Default have been cured or waived, except nonpayment of principal, interest or premium that has become due solely because of the acceleration;

(3)      to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(4)      if the Company has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances.

No rescission shall affect any subsequent Default or impair any rights relating thereto.

Section 6.3      Other Remedies.

(a)      If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)      The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in such proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

Section 6.4      Waiver of Past Defaults.  The Holders of a majority in principal amount of Outstanding Notes may waive any existing Default or Event of Default under this Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any Notes.  For the avoidance of doubt, the Holders may not waive any declaration of acceleration with respect to the Notes, except as provided in Section 6.2(b).

Section 6.5      Control by Majority.  Subject to all provisions of this Indenture and applicable law, Holders of a majority in aggregate principal amount of the then Outstanding Notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee, *provided* that, the Trustee shall be under no obligation to exercise any right or power under this Indenture at the request, order or direction of any Holders unless such Holders have offered to the Trustee indemnity reasonably satisfactory to it.

Section 6.6      Limitation on Suits.

(a)      No Holder of any Notes shall have any right to institute any proceeding with respect hereto or for any remedy under this Indenture, unless:

(1)     such Holder gives to the Trustee written notice of a continuing Event of Default;

(2)     Holders of at least 25% in principal amount of the then Outstanding Notes make a written request to pursue the remedy;

(3)     such Holders of the Notes provide to the Trustee reasonably satisfactory indemnity;

(4)     the Trustee does not comply within 60 days; and

(5)     during such 60-day period the Holders of a majority in principal amount of the Outstanding Notes do not give the Trustee a written direction which is inconsistent with the request;

*provided* that a Holder of a Note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such Note on or after the respective due dates expressed in such Note.

Section 6.7     Rights of Holders to Receive Payment.  Notwithstanding any other provision hereof (including, without limitation, Section 6.6), the right of any Holder to receive payment of principal of or interest on the Notes held by such Holder, on or after the respective due dates, Redemption Dates or repurchase date expressed in this Indenture or the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.8     Collection Suit by Trustee.  If an Event of Default specified in Section 6.1(a)(1) and Section 6.1(a)(2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company and each Subsidiary Guarantor for the whole amount then due and owing (together with applicable interest on any overdue principal and, to the extent lawful, Defaulted Interest) and the amounts provided for in Section 7.7.

Section 6.9     Trustee May File Proofs of Claim, etc.

(a)     The Trustee may (irrespective of whether the principal of the Notes is then due):

(1)     file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders under this Indenture and the Notes allowed in any bankruptcy, insolvency, liquidation or other judicial proceedings relative to the Company, any Subsidiary Guarantor or any Subsidiary of the Company or their respective creditors or properties; and

(2)     collect and receive any moneys or other property payable or deliverable in respect of any such claims and distribute them in accordance with this Indenture.

Any receiver, trustee, liquidator, sequestrator (or other similar official) in any such proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee pursuant to Section 7.7.

(b)    Nothing in this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    Priorities.  If the Trustee collects any money or property pursuant to this Article VI, it shall pay out the money or property in the following order:

FIRST:  to the Trustee for amounts due under Section 7.7;

SECOND:  if the Holders proceed against the Company directly without the Trustee in accordance with this Indenture, to Holders for their collection costs;

THIRD:  to Holders for amounts due and unpaid on the Notes for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

FOURTH:  to the Company or, to the extent the Trustee collects any amount pursuant to Article X from any Subsidiary Guarantor, to such Subsidiary Guarantor, or to such party as a court of competent jurisdiction shall direct.

The Trustee may, upon notice to the Company, fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by the Company, a suit by a Holder pursuant to Section 6.7 or a suit by Holders of more than 10% in principal amount of Outstanding Notes.

ARTICLE VII

TRUSTEE

Section 7.1     Duties of Trustee.

(a)     If a Default or an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)     Except during the continuance of a Default or an Event of Default:

(1)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)     The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)     this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.1;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.2, Section 6.5 or Section 6.8.

(d)     The Trustee shall not be liable for interest on, or the investment of, any money received by it except as the Trustee may agree in writing with the Company.

(e)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)     No provision hereof shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties under this

NAI-1502882142v7

Indenture or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and/or any Agent shall be subject to the provisions of this Article VII.

(h)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities that might be incurred by it in compliance with such request or direction.

Section 7.2     Rights of Trustee. Subject to Section 7.1 hereof and Sections 315(a) through (d) of the TIA:

(a)     The Trustee may rely upon, and shall be fully protected in acting or refraining from acting based upon any document reasonably believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in any such document.

(b)     Before the Trustee acts or refrains from acting at the direction of the Company or any Subsidiary Guarantor, it may require an Officers' Certificate or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officers' Certificate or Opinion of Counsel.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers.

(e)     The Trustee may consult with counsel of its selection, and the advice or opinion of such counsel with respect to legal matters relating to this Indenture, the Notes and the Note Guarantees shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it under this Indenture in good faith and in accordance with the advice or opinion of such counsel.

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon a 15 (fifteen) working days written notice to the Company, to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company. The Trustee shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

- 77 -

(g)    The Trustee shall not be deemed to have notice of any Default or Event of Default (other than payment default under Section 6.1(a)(1) or (2)) unless written notice of any event which is in fact such a Default or Event of Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities under this Indenture, and to each Agent, custodian and other Person employed to act under this Indenture.

(i)    The Trustee may request that the Company and each Subsidiary Guarantor deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(j)    Any request, direction, order or demand of the Company and/or any Subsidiary Guarantor mentioned in this Indenture shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be in this Indenture specifically prescribed); and any resolution of the Board of Directors of the Company or any Subsidiary Guarantor may be evidenced by a Board Resolution.

(k)    Notwithstanding any provisions in this Indenture to the contrary, in no event shall the Trustee be liable for any failure or delay in the performance of its obligations under this Indenture because of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same class or kind as specifically named above, it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l)    In no event shall the Trustee be responsible or liable for special, indirect, consequential or punitive loss or damage of any kind whatsoever (including, but not limited to, loss of profit), irrespective of whether the Trustee has been advised of the likelihood or such loss or damages and regardless of the form of action.

(m)    The permissive rights of the Trustee enumerated in this Indenture shall not be construed as duties.

(n)    Neither the Trustee nor any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire (i) as to the Company's or any Subsidiary Guarantor's compliance with any covenant under this Indenture (other than the

- 78 -

covenant to make payment on the Notes, including upon redemption or purchase by the Company pursuant to this Indenture), or (ii) as to whether or not any Rating Agency has adjusted the rating of the Notes.

Section 7.3    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, the Subsidiary Guarantors or any of their Affiliates with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee must comply with Section 7.10 and Section 7.11.

Section 7.4    Trustee's Disclaimer.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes or the Note Guarantees, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company in this Indenture, the Notes, the Offering Circular or in any other document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.5    Notice of Defaults.  If a Default or Event of Default occurs and is continuing and if such Default or Event of Default is a payment default or a Trust Officer has actual knowledge thereof, or has received written notice thereof pursuant to Section 7.2(g) above, the Trustee shall give to each Holder notice of the Default or Event of Default within 90 days after the Trustee has knowledge thereof.  Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a responsible Trust Officer in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.6    [Reserved]

Section 7.7    Compensation and Indemnity.

(a)    The Company shall pay to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services under this Indenture as the Company and the Trustee shall from time to time agree in writing.  The Company shall pay the reasonable fees and expenses of the Trustee's counsel, incurred in the review, negotiation and delivery of this Indenture and related documentation, in connection with any amendments or supplements hereto and otherwise in connection with the performance of its services under this Indenture.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it, including, without limitation, costs of collection, costs of preparing and reviewing reports, certificates and other documents, costs of preparation and mailing of notices to Holders and reasonable fees and expenses of counsel retained by the Trustee, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts.

(b)    The Company and each of the Subsidiary Guarantors shall jointly and severally indemnify the Trustee against any and all loss, liability, damage, claim, cost or expense

- 79 -

(including, without limitation, reasonable attorneys' fees and expenses) incurred by it without negligence, willful misconduct or bad faith on its part in connection with its acceptance and administration of this trust and the performance of its duties under this Indenture and the exercise of its rights, including the costs and expenses of enforcing this Indenture (including this Section 7.7) and of defending itself against any claims (whether asserted by any Holder, the Company, any Subsidiary Guarantor or any other Person).  The Trustee shall notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations under this Indenture except to the extent the Company or any Subsidiary Guarantor has been prejudiced thereby.  The Company shall defend the claim and the Trustee may have separate counsel and the Company shall pay the reasonable fees and expenses of such counsel.  The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own negligence, willful misconduct or bad faith, as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment.

(c)     To secure payment obligations of the Company and the Subsidiary Guarantors in this Section 7.7, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.  The Trustee's right to receive payment of any reasonable amounts due under this Section 7.7 shall not be subordinated to any other liability or Indebtedness of the Company.

(d)     The indemnification and payment obligations of the Company and the Subsidiary Guarantors pursuant to this Section 7.7 shall survive the payment of the Notes, termination or the discharge of this Indenture and/or the resignation or removal of the Trustee.  When the Trustee incurs expenses after the occurrence of a Bankruptcy Law Event of Default, the expenses are intended to constitute expenses of administration under any Bankruptcy Law; *provided*, *however*, that this shall not affect the Trustee's rights as set forth in this Section 7.7 or Section 6.10.

Section 7.8     Replacement of Trustee.

(a)     The Trustee may resign at any time by so notifying the Company.  The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee reasonably acceptable to the Company.  The Company shall remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged bankrupt or insolvent;

(3)     a receiver or other public officer takes charge of the Trustee or its property; or

(4)     the Trustee otherwise becomes incapable of acting.

(b)     If the Trustee resigns or is removed by the Company or by the Holders of a majority in principal amount of the Outstanding Notes and such Holders do not reasonably

- 80 -

promptly appoint a successor Trustee, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to in this Indenture as the retiring Trustee), the Company shall promptly appoint a successor Trustee.

(c)    A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall give notice of its succession to Holders. The retiring Trustee, upon payment of its charges, shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.7.

(d)    If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of 10% in principal amount of the Outstanding Notes may petition, at the Company's expense, any court of competent jurisdiction for the appointment of a successor Trustee.

(e)    If the Trustee fails to comply with Section 7.10, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    Notwithstanding the replacement of the Trustee pursuant to this Section 7.8, the Company's obligations under Section 7.7 shall continue for the benefit of the retiring Trustee.

Section 7.9    Successor Trustee by Merger.

(a)    If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business (including this transaction) or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

(b)    In case at the time such successor or successors to the Trustee by consolidation, merger, conversion shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor under this Indenture or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

Section 7.10    Eligibility; Disqualification. The Trustee shall at all times satisfy the requirements of TIA § 310(a). The Trustee shall have a combined capital and surplus of at least U.S.$150.0 million as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or

certificates of interest or participation in other securities of the Company are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 7.11    Preferential Collection of Claims Against Company.  The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 7.12    Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions in this Indenture, at any time, solely for the purpose of meeting the legal requirements of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as separate trustee or trustees or as co-trustee or co-trustees, and to vest in such Person or Persons, in such capacity and subject to the other provisions of this Indenture, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable.  No co-trustee under this Indenture shall be required to meet the terms of eligibility as a successor trustee under this Indenture and no notice to Holders of Notes of the appointment of a separate trustee or co-trustee shall be required under this Indenture.

(b)    Every separate trustee or co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such co-trustee, but solely at the direction of the Trustee;

(ii)    no trustee under this Indenture shall be personally liable by reason of any act or omission of any other trustee under this Indenture; and

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees or co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VII.  Each separate trustee or co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification under this Indenture) to, the Trustee.  Every such instrument shall be filed with the Trustee.

- 82 -

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee or its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 7.13    The Agents.  The rights, protections, immunities and indemnities granted to the Trustee under this Article VII shall apply *mutatis mutandis* to each of the Agents.

ARTICLE VIII

DEFEASANCE; DISCHARGE OF INDENTURE

Section 8.1    Legal Defeasance and Covenant Defeasance.

(a)     The Company may, at its option and at any time, elect to have either paragraph (b) or (c) of this Section 8.1 be applied to its obligations with respect to the Outstanding Notes and all obligations of the Subsidiary Guarantors under the Note Guarantees upon compliance with the conditions set forth in Section 8.2.

(b)     Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (b), the Company shall, subject to the satisfaction of the conditions set forth in Section 8.2, be deemed to have paid and discharged the entire Indebtedness represented by this Indenture, the Outstanding Notes and Note Guarantees after the deposit specified in Section 8.2(a) (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be Outstanding only for the purposes of Section 8.3 and the other Sections of this Indenture referred to in clause (i) or (ii) of this paragraph (b) and to have satisfied all its other obligations under such Notes and under this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions, which shall survive until otherwise terminated or discharged under this Indenture:

(i)     the rights of Holders to receive payments, solely from the trust described below, in respect of the principal of, premium, if any, and interest on the Notes when such payments are due,

(ii)     the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments,

(iii)     the rights, powers, trusts, duties and immunities of the Trustee under this Indenture and the Company's and the Subsidiary Guarantors' obligations in connection therewith, and

(iv)     this Article VIII.

- 83 -

Subject to compliance with this Article VIII, the Company may exercise its option under this paragraph (b) notwithstanding the prior exercise of its option under paragraph (c) of this Section 8.1.

(c) Upon the Company's exercise under paragraph (a) of this Section 8.1 of the option applicable to this paragraph (c), the Company may, at its option and at any time, elect to have its obligations and the obligations of the Subsidiary Guarantors, subject to the satisfaction of the applicable conditions set forth in Section 8.2, released under the covenants (set forth in Sections 3.5, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16, 3.17, 3.18 and 4.1(a)(2)) with respect to the Outstanding Notes on and after the date the conditions set forth below are satisfied (hereinafter, "Covenant Defeasance"), and the Notes shall thereafter be deemed not Outstanding for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be Outstanding for all other purposes under this Indenture. For this purpose, such Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere in this Indenture to any such covenant or by reason of any reference in any such covenant to any other provision in this Indenture or in any other document and such omission to comply shall not constitute a Default or an Event of Default with respect to the Notes or the Note Guarantees under Section 6.1(a) but the remainder of this Indenture and such Notes shall be unaffected thereby.

Section 8.2    Conditions to Defeasance.  The Company may exercise its Legal Defeasance option or its Covenant Defeasance option only if:

(a) the Company has irrevocably deposited with the Trustee, in trust, for the benefit of the Holders U.S. Legal Tender, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the Notes on the stated date for payment thereof or on the applicable Redemption Date (provided that any redemption before Stated Maturity has been irrevocably provided for under arrangements satisfactory to the Trustee), as the case may be;

(b) in the case of Legal Defeasance, the Company has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that:

(1) the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(2) since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

- 84 -

and in either case to the effect that, and based thereon such Opinion of Counsel shall state that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)    in the case of Covenant Defeasance, the Company has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)    in the case of Legal Defeasance or Covenant Defeasance, the Company has delivered to the Trustee:

(1)    an Opinion of Counsel from counsel in Mexico reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that, based upon Mexican law then in effect, Holders will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same time as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred, or

(2)    a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (1) above;

(e)    no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to <u>Section 8.2(a)</u> (except any Default or Event of Default resulting from the failure to comply with <u>Section 3.9</u> as a result of the borrowing of the funds required to effect such deposit);

(f)    the Trustee has received an Officers' Certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a Default under this Indenture or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(g)    the Company has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or any Subsidiary of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(h)    the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company, each

- 85 -

stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with (subject to customary exceptions and exclusions); and

(i)    the Company has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Company to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally (subject to customary exceptions and exclusions).

Section 8.3    <u>Application of Trust Money</u>.  The Trustee shall hold in trust U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) deposited with it pursuant to this <u>Article VIII</u>.  It shall apply the deposited U.S. Legal Tender and/or U.S. Government Obligations (including in each case proceeds thereon) through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes.

Section 8.4    <u>Repayment to Company</u>.

(a)    Subject to <u>Sections 7.7</u>, <u>8.1</u> and <u>8.2</u>, the Trustee and the Paying Agent shall promptly turn over to the Company upon written request any excess U.S. Legal Tender and/or U.S. Government Obligations held by them upon payment of all the obligations under this Indenture and shall thereupon be relieved from all liability with respect to such U.S. Legal Tender and/or U.S. Government Obligations.

(b)    Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal of or interest on the Notes that remains unclaimed for two years, and, thereafter, *provided* that before making such payment the Trustee may at the expense of the Company publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such money, notice that the money remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Company. After payment to the Company, Holders entitled to the money must look to the Company for payment as general creditors.

Section 8.5    <u>Indemnity for U.S. Government Obligations</u>.  The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 8.6    <u>Reinstatement</u>.  If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender and/or U.S. Government Obligations in accordance with this <u>Article VIII</u> by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this <u>Article VIII</u> until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender and/or U.S. Government Obligations in accordance with this <u>Article VIII</u>; *provided*, *however*, that, if the Company has made any

- 86 -

payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

Section 8.7    <u>Satisfaction and Discharge</u>.  This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for in this Indenture) as to all Outstanding Notes when:

(a)    either:

(1)    all the Notes theretofore authenticated and delivered (except (i) lost, stolen or destroyed Notes which have been replaced or paid and (ii) Notes for whose payment U.S. Legal Tender and/or U.S. Government obligations have theretofore been deposited in trust (or segregated and held in trust by the Company) and thereafter repaid to the Company or discharged from such trust pursuant to <u>Section 8.3</u> or <u>8.4</u>, as applicable) have been delivered to the Trustee for cancellation; or

(2)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, or will become due and payable within one year, including as a result of a redemption notice given or to be properly given pursuant to this Indenture under arrangements satisfactory to the Trustee for giving the notice of redemption, and the Company has irrevocably deposited or caused to be deposited with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient without reinvestment to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit, together with irrevocable written instructions from the Company directing the Trustee to apply such funds to the payment;

(b)    the Company has paid all other sums payable under this Indenture and the Notes by it; and

(c)    the Company has delivered to the Trustee an Officers' Certificate and Opinion of Counsel each stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

ARTICLE IX

AMENDMENTS

Section 9.1    <u>Without Consent of Holders</u>.

(a)    From time to time, the Company, the Subsidiary Guarantors (except that it shall not be necessary for any existing Subsidiary Guarantor to approve an amendment or execute a Supplemental Indenture for the purpose of adding or releasing any Subsidiary

- 87 -

Guarantors with respect to the Notes) and the Trustee, without the consent of the Holders, may amend or supplement this Indenture, the Notes or the Note Guarantees for certain specified purposes, including:

> (1)     to cure any ambiguities, defects or inconsistencies in this Indenture or the Notes;

> (2)     to provide for uncertificated Notes in addition to or in place of Certificated Notes;

> (3)     to provide for the assumption of the Company's or a Subsidiary Guarantor's obligations in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Subsidiary Guarantor's assets, as applicable, to the extent permitted under this Indenture;

> (4)     to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

> (5)     to conform the text of this Indenture, the Note Guarantees or the Notes to any provision of the "Description of Notes" contained in the Offering Circular to the extent that such provision in such "Description of Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Note Guarantees or the Notes;

> (6)     to allow any Subsidiary Guarantor to execute a Supplemental Indenture in order to provide a Note Guarantee with respect to the Notes and to release a Subsidiary Guarantor from its Note Guarantee in accordance with the terms of this Indenture;

> (7)     to comply with the requirements of any applicable securities depositary;

> (8)     to provide for a successor Trustee in accordance with the terms of this Indenture;

> (9)     to otherwise comply with any requirement of this Indenture;

> (10)     to issue Additional Notes as permitted by Section 2.2(c) and Section 2.13, which will have terms substantially identical to the other Outstanding Notes except as specified in Section 2.13, and which will be treated, together with any other Outstanding Notes, as a single issue of securities; and

> (11)     to make any other changes which do not adversely affect the rights of any of the Holders of the Notes in any material respect;

(b)     After an amendment under this Section 9.1 becomes effective, the Company shall give to Holders a notice briefly describing such amendment. The failure to give

such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this <u>Section 9.1</u>.

Section 9.2     <u>With Consent of Holders</u>.

(a)     The Company, the Subsidiary Guarantors and the Trustee may amend this Indenture, the Notes or the Note Guarantees without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).  However, without the consent of each Holder affected thereby, no amendment may:

(1)     reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)     reduce the rate of or change or have the effect of changing the time for payment of interest, including Defaulted Interest, on any Notes;

(3)     reduce the principal of or change or have the effect of changing the fixed maturity of any Notes, or change the date on which any Notes may be subject to redemption, or reduce the redemption price therefor;

(4)     make any Notes payable in money other than that stated in the Notes;

(5)     make any change in provisions of this Indenture entitling each Holder to receive payment of principal of, premium, if any, and interest on such Note on or after the due date thereof or to bring suit to enforce such payment, or permitting Holders of a majority in principal amount of Notes to waive Defaults or Events of Default;

(6)     amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer in respect of a Change of Control that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7)     eliminate or modify in any manner a Subsidiary Guarantor's Obligations with respect to its Note Guarantee, which adversely affects Holders in any material respect, except as contemplated in this Indenture or Note Guarantee;

(8)     make any change to <u>Section 3.20</u> that adversely affects the rights of any Holder or amends the terms of the Notes in a way that would result in a loss of exemption from taxes; and

(9)     make any change to the provisions of this Indenture or the Notes that adversely affects the ranking of the Notes.

NAI-1502882142v7

(b)     It shall not be necessary for the consent of the Holders under this Section 9.2 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.  The Trustee will be entitled to rely on such evidence as it deems appropriate, including an Opinion of Counsel and an Officers' Certificate, and the Trustee shall have no liability whatsoever in reliance upon the foregoing.

(c)     After an amendment, supplement or waiver under this Section 9.2 becomes effective, the Company shall give to Holders a notice briefly describing such amendment, supplement or waiver.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment, supplement or waiver under this Section 9.2.

Section 9.3     Revocation and Effect of Consents and Waivers.

(a)     A consent to an amendment, supplement or waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.  After an amendment, supplement or waiver becomes effective, it shall bind every Holder, except as otherwise provided in this Article IX.  An amendment, supplement or waiver shall become effective upon receipt by the Trustee of the requisite number of written consents under Section 9.2.

(b)     The Company may, but shall not be obligated to, fix a record date, which need not be the date provided in TIA § 316(c) to the extent it would otherwise be applicable, for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 90 days after such record date if the requisite consent is not obtained from Holders of the applicable principal amount of Notes.

Section 9.4     Notation on or Exchange of Notes.  If an amendment or supplement changes the terms of a Note, the Company may require the Holder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Company so determines, the Company in exchange for the Note will execute and upon Company Order the Trustee will authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment or supplement.

Section 9.5     Trustee to Sign Amendments and Supplements.  The Trustee shall sign any amendment or supplement authorized pursuant to this Article IX if the amendment or

- 90 -

supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If the proposed amendment or supplement does adversely affect the rights, duties, liabilities or immunities of the Trustee, the Trustee may but need not sign it.  In signing such amendment or supplement the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and shall be fully protected in relying upon, in addition to the documents required pursuant to Section 11.3, an Opinion of Counsel and an Officers' Certificate opining or certifying, as the case may be, to the effect that such amendment is permitted or authorized by the terms and conditions of this Indenture.

ARTICLE X

NOTE GUARANTEES

Section 10.1    Note Guarantees.

(a)    Subject to Section 10.2(a), each Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder and the Trustee the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations of the Company under the Notes and this Indenture (such guaranteed Obligations, the "Guaranteed Obligations").  Each Subsidiary Guarantor further agrees (to the extent permitted by law) that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from it, and that it will remain bound under this Article X notwithstanding any such extension or renewal.  Each Subsidiary Guarantor hereby agrees to pay, in addition to the amounts stated above, any and all expenses (including reasonable counsel fees and expenses) incurred by the Trustee or the Holders in enforcing any rights under any Note Guarantee.

(b)    Notwithstanding anything in this Indenture to the contrary, the Company shall cause any existing or future Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary) that (A) as of the last date of any fiscal quarter and with respect to the Company and its Subsidiaries, individually represents at least 5% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, or (B) for any twelve-month period ending as of the last day of any fiscal quarter, individually represents at least 5% of the Consolidated  EBITDA of the Company, to become a Subsidiary Guarantor, in accordance with Section 10.6. Notwithstanding the foregoing, the Company shall at all times cause the Company and the then-existing Subsidiary Guarantors, collectively, to represent (y) as of the last date of each fiscal quarter, at least 85% of the consolidated total assets of the Company and its Subsidiaries, as determined in accordance with IFRS, and (z) for the twelve-month period ending as of the last day of each fiscal quarter, at least 85% of Consolidated EBITDA.

(c)    Each Subsidiary Guarantor waives to the extent permitted by law presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives to the extent permitted by law notice of protest for nonpayment. Each Subsidiary Guarantor waives to the extent permitted by law notice of any Default under the Notes or the Guaranteed Obligations.  The Guaranteed Obligations of each Subsidiary Guarantor

- 91 -

under this Indenture shall not, to the extent permitted by law, be affected by (i) the failure of the Trustee or any Holder to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of the Trustee or any Holder to exercise any right or remedy against any other Subsidiary Guarantor; or (vi) any change in the ownership of the Company.

(d)    Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture constitutes a guarantee of payment when due (and not a guarantee of collection) and waives any right to require that any resort be had by the Trustee or any Holder to any security held for payment of the Guaranteed Obligations.

(e)    Each of the Subsidiary Guarantors further expressly waives irrevocably and unconditionally:

(i)    any right it may have to first require the Trustee or any Holder to proceed against, initiate any actions before a court of law or any other judge or authority, or enforce any other rights or security or claim payment from the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) before claiming from it under this Indenture;

(ii)    any right to which it may be entitled to have the assets of the Company or any other Person (including any Subsidiary Guarantor or any other guarantor) first be used, applied or depleted as payment of the Company's or the Subsidiary Guarantors' obligations under this Indenture, prior to any amount being claimed from or paid by any of the Subsidiary Guarantors under this Indenture;

(iii)    any right to which it may be entitled to have claims under this Indenture divided between the Subsidiary Guarantors; and

(iv)    to the extent applicable, the benefits of *orden*, *excusión*, *division*, *quita* and *espera* and any right specified in articles 2814, 2815, 2817, 2818, 2819, 2820, 2821, 2822, 2823, 2826, 2837, 2838, 2839, 2840, 2845, 2846, 2847 and any other related or applicable articles that are not explicitly set forth in this Indenture because of Subsidiary Guarantor's knowledge thereof of the *Código Civil Federal* of Mexico, and the *Código Civil* of each State of the Mexican Republic and the Federal District of Mexico.

(f)    The obligations assumed by each Subsidiary Guarantor under this Indenture shall not be affected by the absence of judicial request of payment by the Trustee or a Holder to the Company or by whether any such person takes timely action pursuant to articles 2848 and 2849 of the *Código Civil Federal of Mexico* and the *Código Civil* of each State of Mexico and the Federal District of Mexico and each Subsidiary Guarantor hereby expressly waives the provisions of such articles.

(g)     The obligations of each Subsidiary Guarantor under this Indenture shall not be subject to any reduction, limitation, impairment or termination for any reason (other than payment of the Guaranteed Obligations in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Subsidiary Guarantor in this Indenture shall not be discharged or impaired or otherwise affected by the failure of the Trustee or any Holder to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Subsidiary Guarantor or would otherwise operate as a discharge of such Subsidiary Guarantor as a matter of law or equity.

(h)     Each Subsidiary Guarantor further agrees that its Note Guarantee in this Indenture shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any of the Guaranteed Obligations is rescinded or must otherwise be restored by the Trustee or any Holder upon the bankruptcy or reorganization of the Company or otherwise.

(i)     In furtherance of the foregoing and not in limitation of any other right which any Holder has at law or in equity against each Subsidiary Guarantor by virtue hereof, upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, each Subsidiary Guarantor hereby promises to and will, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Trustee or the Holders an amount equal to the sum of:

(i)     the unpaid amount of such Guaranteed Obligations then due and owing; and

(ii)     accrued and unpaid interest on such Guaranteed Obligations then due and owing (but only to the extent not prohibited by law).

(j)     Each Subsidiary Guarantor further agrees that, as between such Subsidiary Guarantor, on the one hand, and the Trustee and the Holders, on the other hand:

(i)     the maturity of the Guaranteed Obligations may be accelerated as provided in this Indenture for the purposes of its Note Guarantee in this Indenture, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations; and

(ii)     in the event of any such declaration of acceleration of the Guaranteed Obligations, the Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Subsidiary Guarantor for the purposes of its Note Guarantee.

Section 10.2    <u>Limitation on Liability; Termination, Release and Discharge</u>.

(a)    The Guaranteed Obligations of each Subsidiary Guarantor in respect of its Note Guarantee under this Indenture shall be limited to the maximum amount as shall not result in the Guaranteed Obligations constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law.

(b)    Each Subsidiary Guarantor shall be released and relieved of its obligations (or in the case of Covenant Defeasance, certain of its obligations) under its Note Guarantee in the event:

      i.    there is a Legal Defeasance or a Covenant Defeasance of the Notes pursuant to <u>Article VIII</u>;

      ii.    there is a sale or other disposition of (y) Capital Stock of such Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a direct or indirect Subsidiary of the Company or (z) all or substantially all of the assets of the Subsidiary Guarantor (other than to the Company or a Subsidiary Guarantor) otherwise permitted by and in accordance with this Indenture;

      iii.    such Subsidiary Guarantor is designated as an Unrestricted Subsidiary in accordance with <u>Section 3.13</u>; or

      iv.    if the Note Guarantee was required pursuant to the terms of this Indenture, the cessation of the circumstances requiring the Note Guarantee;

*provided* that the transaction is carried out pursuant to and in accordance with all other applicable provisions hereof.

Section 10.3    <u>Right of Contribution</u>.  Each Subsidiary Guarantor that makes a payment or distribution under a Note Guarantee will be entitled to a contribution from each other Subsidiary Guarantor in a *pro rata* amount, based on the net assets of each Subsidiary Guarantor determined in accordance with IFRS.  The provisions of this <u>Section 10.3</u> shall in no respect limit the obligations and liabilities of each Subsidiary Guarantor to the Trustee and the Holders and each Subsidiary Guarantor shall remain liable to the Trustee and the Holders for the full amount guaranteed by such Subsidiary Guarantor under this Indenture.

Section 10.4    <u>No Subrogation</u>.  Each Subsidiary Guarantor agrees that it shall not be entitled to any right of subrogation in respect of any Guaranteed Obligations until payment in full in cash of all Guaranteed Obligations.  If any amount shall be paid to any Subsidiary Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full in cash, such amount shall be held by such Subsidiary Guarantor in trust for the Trustee and the Holders, segregated from other funds of such Subsidiary Guarantor, and shall, forthwith upon receipt by such Subsidiary Guarantor, be turned over to the Trustee in the exact form received by such Subsidiary Guarantor (duly

- 94 -

endorsed by such Subsidiary Guarantor to the Trustee, if required), to be applied against the Guaranteed Obligations.

Section 10.5   <u>Execution and Delivery of Note Guarantee</u>.  The execution by each Subsidiary Guarantor of this Indenture (or, a Supplemental Indenture in accordance with <u>Section 10.6</u>, if applicable) evidences the Note Guarantee of such Subsidiary Guarantor, whether or not the Person signing as an Officer of such Subsidiary Guarantor still holds that office at the time of authentication of any Note.

Section 10.6   <u>Additional Note Guarantees</u>.  The Company covenants and agrees that, if at any time after the date hereof any Person becomes a Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary), the Company shall, after becoming aware of such event, if required pursuant to <u>Section 10.1</u>, cause such Restricted Subsidiary promptly to become a Subsidiary Guarantor on a senior basis by executing a Supplemental Indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel pursuant to <u>Section 11.4</u> hereof and to comply in all respects with the provisions of this Indenture and the Notes, as applicable; *provided*, *however*, that each Subsidiary Guarantor will be automatically and unconditionally released and discharged from its obligations under such additional Note Guarantee only in accordance with <u>Section 10.2</u>.

ARTICLE XI

MISCELLANEOUS

Section 11.1   <u>Notices</u>.

(a)      Any notice, demand, request, instruction or communication shall be in English and in writing and delivered in person, by mailed by first-class mail, postage prepaid, overnight courier, or by facsimile, addressed as follows:

if to the Company and the Subsidiary Guarantors:

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México
Attention: Rodrigo Pliego

with a copy to:

Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166-4193
Attention: Allen Miller, Esq.

if to the Trustee:

- 95 -

The Bank of New York Mellon
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.:  (212) 815-5603

if to the Principal Paying Agent:

The Bank of New York Mellon, London Branch
Attention: Global Corporate Trust
101 Barclay Street, 7th Floor East
New York, NY 10286
U.S.A.
Fax No.:  (212) 815-5603

The Company or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)      Any notice or communication in writing to the Company will be deemed given upon the earlier of (x) actual receipt or (y) (i) when delivered in person or (ii) 10 days after mailing when mailed by registered first class mail, or (iii) when sent by facsimile transmission, with transmission confirmed or PDF format, or (iv) three days when delivered by international courier. Any notice to the Trustee will be effective only upon receipt.

(c)      Any notice or communication given to (i) a registered Holder of a Certificated Note shall be mailed to the Holder at the Holder's address as it appears in the Note Register and shall be sufficiently given if so mailed within the time prescribed or (ii) a registered Holder of a Global Note shall be given to the applicable Clearing Agency in accordance with its applicable procedures.

(d)      Failure to give a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

(e)      Any notice or communication delivered to the Company under the provisions in this Indenture shall constitute notice to the Subsidiary Guarantors.

(f)      The Trustee shall accept electronic transmissions; *provided* (i) the Trustee shall not have any duty or obligation to verify or confirm that the Person sending instructions, directions, reports, notices or other communications or information by electronic transmission is, in fact, a Person authorized to give such instructions, directions, reports, notices or other communications or information on behalf of the party purporting to send such electronic transmission; and the Trustee shall not have any liability for any losses, claims, damages, liabilities, costs or expenses incurred or sustained by any party as a result of such reliance upon or compliance with such instructions, directions, reports, notices or other communications or information and (ii) each other party agrees to assume all risks arising out of the use of electronic

- 96 -

methods to submit instructions, directions, reports, notices or other communications or information to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, notices, reports or other communications or information, and the risk of interception and misuse by third parties.

Section 11.2    Communication by Holders with Other Holders.  Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture (including the Note Guarantees) or the Notes.  The Company, the Subsidiary Guarantors, the Trustee, the Agents and anyone else shall have the protection of TIA § 312(c).

Section 11.3    Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture, the Company shall furnish to the Trustee:

> (1)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

> (2)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 11.4    Statements Required in Certificate or Opinion.  Each certificate or opinion, including each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

> (1)    a statement that the individual making such certificate or opinion has read such covenant or condition;

> (2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

> (3)    a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

> (4)    a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

In giving an Opinion of Counsel, counsel may rely as to factual matters on an Officers' Certificate or on certificates of public officials.

Section 11.5    Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by, or a meeting of, Holders.  The Agents may make reasonable rules for their functions.

- 97 -

Section 11.6  <u>Payment Date Other than a Business Day</u>.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any Redemption Date or date fixed for purchase of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period. If a regular Record Date or a Special Record Date falls on a day that is not a Business Day, such record date shall not be affected.

Section 11.7  <u>Governing Law, etc</u>.

(a)  THIS INDENTURE (INCLUDING EACH NOTE GUARANTEE) AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, EACH NOTE GUARANTEE OR THE NOTES OR ANY TRANSACTION RELATED HERETO OR THERETO TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

(b)  Each of the parties hereto:

(i)  agrees that any suit, action or proceeding against it arising out of or relating to this Indenture (including the Note Guarantees) or the Notes, as the case may be, may be instituted in any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(ii)  waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason,

(iii)  irrevocably consents and submits to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof,

(iv)  agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding and may be enforced in the courts of the jurisdiction of which it is subject by a suit upon judgment, and

(v)  agrees that service of process by mail to the Authorized Agent at the address specified in this Indenture shall constitute personal service of such process on it in any such suit, action or proceeding.

(c)    The Company and the Subsidiary Guarantors have each appointed Law Debenture Corporate Services Inc. with offices currently at 801 2nd Avenue, Suite 403, New York, NY 10017, as their authorized agent for service (the "Authorized Agent") upon whom all writs, process and summonses may be served in any suit, action or proceeding brought in connection with this Indenture, the Notes or any Note Guarantee which may be instituted in any state or federal court in The City of New York, Borough of Manhattan.  The Company and the Subsidiary Guarantors hereby represent and warrant that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and the Company and the Subsidiary Guarantors agree to take any and all action, including the filing of any and all documents, that may be necessary to continue each such appointment in full force and effect as aforesaid so long as the Notes remain Outstanding.  The Company and the Subsidiary Guarantors agree that the appointment of the Authorized Agent shall be irrevocable so long as any of the Notes remain Outstanding or until the irrevocable appointment by the Company and the Subsidiary Guarantors of a successor agent in The City of New York, New York as each of their authorized agent for such purpose and the acceptance of such appointment by such successor.  Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon the Company and the Subsidiary Guarantors.

(d)    To the extent that any of the Company and the Subsidiary Guarantors have or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or any of its property, the Company and the Subsidiary Guarantors hereby irrevocably waive and agree not to plead or claim such immunity in respect of their obligations under this Indenture, the Notes or any Note Guarantee.

(e)    Nothing in this Section 11.7 shall affect the right of the Trustee or any Holder of the Notes to serve process in any other manner permitted by law.

Section 11.8    No Recourse Against Others.  An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company or any Subsidiary Guarantor shall not have any liability for any obligations of the Company or such Subsidiary Guarantor under the Notes or this Indenture (including the Note Guarantees) or for any claims based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

Section 11.9    Successors.  All agreements of the Company and the Subsidiary Guarantors in this Indenture and the Notes shall bind their respective successors.  All agreements of the Trustee in this Indenture shall bind its successors.

Section 11.10    Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Indenture.  One signed copy is enough to prove this Indenture.  This Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

Section 11.11  Severability.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 11.12  Currency Indemnity

(a)  U.S. Legal Tender is the sole currency of account and payment for all sums payable by the Company or any Subsidiary Guarantor under or in connection with the Notes, this Indenture or any Note Guarantee, including damages.  Any amount received or recovered in currency other than U.S. Legal Tender (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company, any Subsidiary or otherwise) by any Holder of the Notes in respect of any sum expressed to be due to it from the Company or any Subsidiary Guarantor shall only constitute a discharge of them under the Notes, this Indenture and any Note Guarantee only to the extent of the U.S. Legal Tender amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Legal Tender amount is less than the U.S. Legal Tender amount expressed to be due to the recipient under the Notes or this Indenture, to the extent permissible under applicable law, the Company and the Subsidiary Guarantors shall jointly and severally indemnify and hold harmless the recipient against any loss sustained by it in making any such purchase.  In any event, the Company and the Subsidiary Guarantors shall jointly and severally indemnify the Holder against the cost of making any purchase of U.S. Legal Tender.  For the purposes of this Section 11.12, it will be sufficient for the Holder of a Note to certify in a satisfactory manner that it would have suffered a loss had an actual purchase of U.S. Legal Tender been made with the amount received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Legal Tender on such date had not been practicable, on the first date on which it would have been practicable) and that the change of the purchase date was needed.

(b)  The indemnities of the Company and the Subsidiary Guarantors contained in this Section 11.12, to the extent permitted by law:  (i) constitute a separate and independent obligation from the other obligations of the Company and the Subsidiary Guarantors under this Indenture and the Notes; (ii) shall give rise to a separate and independent cause of action against the Company and the Subsidiary Guarantors; (iii) shall apply irrespective of any indulgence granted by any Holder of the Notes from time to time; and (iv) shall continue in full force and effect notwithstanding any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the Notes.

Section 11.13  Table of Contents; Headings.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 11.14  USA Patriot Act.  The parties hereto acknowledge that, in accordance with Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law on October 26, 2001)) (as amended, modified or supplemented from time to time, the "USA Patriot Act"), the Trustee, like all financial institutions, is required to obtain, verify, and record information that

- 100 -

identifies each person or legal entity that opens an account.  The parties to this Indenture agree that they will provide the Trustee with such information as the Trustee may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

Section 11.15  Foreign Account Tax Compliance Act (FATCA). In order to comply with applicable tax laws, rules and regulations (inclusive of directives, guidelines and interpretations promulgated by competent authorities) in effect from time to time (including, without limitation, Sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended, "Applicable Law"), the Company agrees (i) to provide to the Trustee sufficient information about Holders or other applicable parties and/or transactions (including any modification to the terms of such transactions) so the Trustee can determine whether it has tax related obligations under Applicable Law, (ii) that the Trustee shall be entitled to make any withholding or deduction from payments under the Indenture to the extent necessary to comply with Applicable Law for which the Trustee shall not have any liability, and (iii) to hold the Trustee harmless for any losses it may suffer due to the actions it takes to comply with such Applicable Law.  The terms of this section shall survive the termination of this Indenture.

Section 11.16  Anti-Money Laundering, Terrorism and Economic Sanctions.

(a)    The Trustee or any Agent may take and instruct any delegate to take any action which it reasonably considers appropriate so as to comply with any applicable law, regulation, request of a public or regulatory authority or any internal group policy (including any "Know Your Client" and/or other compliance policy) which relates to the prevention of fraud, money laundering, terrorism or other criminal activities or the provision of financial and other services to sanctioned persons or entities.  Such action may include but is not limited to the interception and investigation of transactions on the Company's accounts (particularly those involving the international transfer of funds) including the source of the intended recipient of funds paid into or out of the Company's accounts.  None of the Trustee, any Agent or any delegate will be liable for any loss (whether direct or consequential and including, without limitation, loss of profit or interest) caused in whole or in part by any actions which are taken by the Trustee, any Agent or any delegate in good faith pursuant to this Section 11.16.

(b)    The Company covenants and represents that neither it nor, to its knowledge, any of its affiliates, subsidiaries, directors or officers are the target or subject of any sanctions enforced by the US Government, (including, without limitation, the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or the US Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively "Sanctions").

(c)    The Company covenants and represents that neither it nor any of its affiliates, subsidiaries, directors or officers will directly or indirectly use any repayments/reimbursements made pursuant to this agreement, (i) to fund or facilitate any activities of or business with any person who, at the time of such funding or facilitation, is the subject or target of Sanctions, (ii) to fund or facilitate any activities of or business with any country or territory that is the target or subject of sanctions, or (iii) in any other manner that will result in a violation of Sanctions by any person.

*[Signature pages follow]*

- 101 -

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _____
Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer

By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A.
    DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE
    C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A.
    DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A.
    DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS
    DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE
    C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE
    C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE
    TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN
    SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**TV AZTECA, S.A.B. DE C.V.**, as Issuer

By: _____
Name: Esteban Galíndez Aguirre
Title: Chief Financial Officer

By: _____
Name: Rafael Rodríguez Sánchez
Title: General Counsel and Legal Director

ADMINISTRADORA GRUPO TVA, S.A. DE C.V.
ALTA EMPRESA, S.A. DE C.V.
ASESORÍA ESPECIALIZADA EN AVIACIÓN, S.A. DE C.V.
ATLÉTICO MORELIA, S.A. DE C.V.
AZTECA CONECTA PRODUCCIONES, S.A. DE C.V.
AZTECA NOVELAS, S.A.P.I. DE C.V.
AZTECA RECORDS, S.A. DE C.V.
AZTECA TELECASTING, S. DE R.L. DE C.V.
AZTECA WEB, S.A. DE C.V.
CLUB DE FUTBOL ROJINEGROS, S.A. DE C.V.
COMERCIACOM, S.A. DE C.V.
ESTUDIOS AZTECA, S.A. DE C.V.
FINBOR MÉXICO, S.A. DE C.V.
GANADOR AZTECA, S.A.P.I. DE C.V.
GRUPO TV AZTECA, S.A. DE C.V.
INVERSORA MEXICANA DE PRODUCCIÓN, S.A. DE C.V.
OPERADORA MEXICANA DE TELEVISIÓN, S.A. DE C.V.
ORGANIZACIÓN DE TORNEOS Y EVENTOS DEPORTIVOS, S.A. DE C.V.
PRODUCCIONES AZTECA DIGITAL, S.A. DE C.V.
PRODUCCIONES ESPECIALIZADAS, S.A. DE C.V.
PRODUCTORA DE TELEVISIÓN REGIONAL DE TV AZTECA, S.A. DE C.V.
PROFESIONALES Y ADMINISTRATIVOS EN SERVICIOS INMOBILIARIOS, S.A. DE C.V.

*[Signature Page to Indenture]*

PROMOTORA DE  FUTBOL ROJINEGROS, S.A.
DE C.V.
PROMOTORA DE FUTBOL MORELIA, S.A. DE
C.V.
PUBLICIDAD ESPECIALIZADA EN MEDIOS DE
COMUNICACIÓN DE TV AZTECA, S.A.
DE C.V.
S.C.I. DE MÉXICO, S.A. DE C.V.
SERVICIOS AÉREOS  NOTICIOSOS, S.A. DE C.V.
SERVICIOS ESPECIALIZADOS TAZ, S.A. DE C.V.
SERVICIOS Y MANTENIMIENTO DEL FUTURO
EN TELEVISIÓN, S.A. DE C.V.
TELEVISIÓN AZTECA, S.A. DE C.V.
TV AZTECA COMERCIALIZADORA, S.A. DE
C.V.
CORPORACIÓN DE ASESORÍA TÉCNICA Y DE
PRODUCCIÓN, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Rafael Rodríguez Sánchez
Title:  Attorney-in-fact


COMERCIALIZADORA DE PUBLICIDAD
AZTECA, S.A. DE C.V.
COMERCIALIZADORA EN MEDIOS DE
COMUNICACIÓN DE TV AZTECA, S.A.
DE C.V.
EDITORIAL MANDARINA, S.A. DE C.V.
MULTIMEDIA, ESPECTÁCULOS Y
ATRACCIONES, S.A. DE C.V.
RED AZTECA INTERNACIONAL, S.A. DE C.V.
SERVICIOS FORÁNEOS DE ADMINISTRACIÓN,
S.A. DE C.V.
SERVICIOS LOCALES DE PRODUCCIÓN, S.A.
DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Félix Vidal Mena Tamayo
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By:
Name: Horacio Medal Ordóñez
Title:

By:
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By:
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Olira
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: LUIS J. Echarte
Title: Attorney in fact

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISION DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title:

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Remiery Candles Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERU, S.A.C.

a Subsidiary Guarantor

By: _____
Name: Froncisco madrazo
Title: CEO

By: _____
Name: Jose montes dePeroito
Title: General Counsel

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
Name: Rocío Castillo
Title: CEO

By: _____
Name: Rafael Rodriguez
Title: Attorney-In-fact.

TELEVISORA DEL VALLE DE MEXICO, S.A. DE C.V.

a Subsidiary Guarantor

By: _____
Name: Reyna Adriana Amador Sanchez
Title: Attorney-in-fact

*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERU, S.A.C

a Subsidiary Guarantor

By:
Name: Froncisco madrazu
Title: CEO

By:
Name: José montes de Peroito
Title: General Counsel

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By:
Name: Rocío Castilla
Title: CEO

By:
Name: Rafael Rodriguez
Title: Attorney-In-fact.

TELEVISORA DEL VALLE DE MEXICO, S.A. DE C.V.

a Subsidiary Guarantor

By:
Name:   Reyna Adriana Amador Sanchez
Title:    Attorney-in-fact

*[Signature Page to Indenture]*

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor


By: _____
  Name: Guillermo Wilkins González
  Title: Attorney-in-fact


LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor


By: _____
  Name: Pedro Martín Molina Reyes
  Title: Attorney-in-fact


*[Signature Page to Indenture]*

AZTECA COMUNICACIONES PERÚ, S.A.C.

a Subsidiary Guarantor

By: _____
 Name:
Title:

By: _____
Name:
Title:

REDES OPTICAS, S.A.C.

a Subsidiary Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

TELEVISORA DEL VALLE DE MÉXICO, S.A. DE
C.V.

a Subsidiary Guarantor

By: _____
 Name: Reyna Adriana Amador Sánchez
 Title: Attorney-in-fact

*[Signature Page to Indenture]*

AGENCIA AZTECA, INC.
AZTECA AMERICA TV SPOT SALES
AZTECA INTERNATIONAL CORPORATION
AZTECA STATIONS, LLC
STATIONS GROUP, LLC
SCTV, INC.
KAZA AZTECA AMERICA INC
SOUTHERN CALIFORNIA TV LLC

each a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name: Ernesto Ortega Oltra
Title: CFO

FUNDACION AZTECA AMERICA, LLC

a Subsidiary Guarantor

By: _____
Name: Horacio Medal Ordóñez
Title:

By: _____
Name:
Title:

TV AZTECA HONDURAS, S.A. DE C.V.
COMERCIALIZADORA DE TELEVISIÓN DE
HONDURAS, S.A. DE C.V.

each a Subsidiary Guarantor

By: _____
Name: Melvin Reniery Canales Espinal
Title: Attorney-in-fact

*[Signature Page to Indenture]*

INCOTEL S.A.
TVA GUATEMALA S.A.

each a Subsidiary Guarantor

By: _____
  Name: Guillermo Wilkins González
  Title: Attorney-in-fact

LASIMEX, S.A. DE C.V.
TV AZTECA GLOBAL, S.L.U.

a Subsidiary Guarantor

By: _____
  Name: Pedro Martín Molina Reyes
  Title: Attorney-in-fact

*[Signature Page to Indenture]*

THE BANK OF NEW YORK MELLON,
as Trustee and Registrar

By: _Wanda Camacho_
Name:
Title:     Wanda Camacho
           Vice President

*[Signature page to Indenture]*

THE BANK OF NEW YORK MELLON,
LONDON BRANCH,
as Principal Paying Agent

By: *Wanda Camacho*

Name:  Wanda Camacho
Title:  Vice President

*[Signature page to Indenture]*

**EXHIBIT A**

## FORM OF NOTE

[*Include the bracketed language for Global Notes only.*]

[THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR") OR CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM") TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY GLOBAL NOTE ISSUED IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITORY (NOMINEES) LIMITED, AS THE COMMON DEPOSITARY FOR EUROCLEAR AND CLEARSTREAM (THE "COMMON DEPOSITARY"), OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM (AND ANY PAYMENT IS MADE TO THE COMMON DEPOSITARY OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR AND CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, THE COMMON DEPOSITARY, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO THE COMMON DEPOSITARY (OR TO A SUCCESSOR THEREOF) OR TO A NOMINEE OF EUROCLEAR AND CLEARSTREAM (OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE).]

THIS NOTE (AND THE RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1)    REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2)    AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (D) PURSUANT TO AN EXEMPTION FROM THE

REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

**FORM OF FACE OF NOTE**

No. [____]                                                Principal Amount U.S.$[_____]

*[If the Note is a Global Note include the following two lines:*
as revised by the Schedule of Increases and
Decreases in Global Note attached hereto]

Common Code [•]
ISIN [•]

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation
(*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the
United Mexican States, promises to pay to The Bank of New York Depository (Nominees)
Limited, or registered assigns, the principal sum of U.S.$[                    ] [*If the Note is a
Global Note, add the following,* as revised by the Schedule of Increases and Decreases in Global
Note attached hereto], on August 9, 2024.

Interest Rate:                    8.250% per annum

Interest Payment Dates:           August 9 and February 9,
                                  commencing on [        ]¹

Record Dates:                     July 26 and January 26

Reference is hereby made to the further provisions of this Note set forth on the
reverse hereof, which will for all purposes have the same effect as if set forth at this place.

---

¹ February 9, 2018 for Initial Notes.

Additional provisions of this Note are set forth on the other side of this Note.

**TV AZTECA, S.A.B. DE C.V.**

By: _____

    Name:

    Title:


By: _____

    Name:

    Title:


TRUSTEE'S CERTIFICATE OF
 AUTHENTICATION

THE BANK OF NEW YORK MELLON,
as Trustee, certifies
that this is one of
the Notes referred
to in the Indenture.


By: _____

    Authorized Signatory             Date: _____

## FORM OF REVERSE SIDE OF NOTE

### 8.250% Senior Notes Due 2024

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      Interest

TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (and its successors and assigns under the Indenture hereinafter referred to, the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above.

The Company will pay interest semi-annually in arrears on each Interest Payment Date of each year commencing on [    ][2]; *provided* that, if any such Interest Payment Date is a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such Interest Payment Date, and no interest will accrue for the intervening period.

Interest on the Notes will accrue from, and include, the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from and including the [Issue Date][3]. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Company shall pay interest (including Post-Petition Interest in any proceeding under any Bankruptcy Law) on overdue principal and, to the extent such payments are lawful, interest on Defaulted Interest without regard to any applicable grace periods at the rate shown on this Note, as provided in the Indenture.

2.      Indenture; Note Guarantees

This is one of the Notes issued under an Indenture, dated as of August 9, 2017 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "Indenture"), between the Company, the Subsidiary Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA. The Indenture is not, and is not required to be, qualified under the applicable provisions of the TIA and does not incorporate by reference all provisions of the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of those terms. Each Holder by accepting a Note agrees to be bound by all of the terms and provisions of the Indenture, as amended or supplemented from time to time. To the

---

[2] February 9, 2018 for Initial Notes.

[3] For Additional Notes: insert the most recent date to which interest has been paid on outstanding Notes.

extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured obligations of the Company.  Subject to the conditions set forth in the Indenture and without the consent of the Holders, the Company may issue Additional Notes.  All Notes (including all Additional Notes) will be treated as a single class of securities under the Indenture and will vote together for all purposes. The Notes are not, and will not be, entitled to the benefit of any mandatory sinking fund.

This Note is guaranteed by the Subsidiary Guarantors, as set forth in the Indenture.

3.     <u>Redemption; Mandatory Redemption; Discharge Prior to Redemption or Maturity</u>

This Note is subject to optional redemption, and may be the subject of a Change of Control Offer or an Asset Sale Offer, in each case, as further described in the Indenture.

If the Company deposits with the Trustee U.S. Legal Tender and/or U.S. Government Obligations sufficient to pay the then outstanding principal of, premium, if any, and accrued interest on the Notes to redemption or Stated Maturity, the Company may in certain circumstances be discharged from the Indenture and the Notes or may be discharged from certain of its obligations under certain provisions of the Indenture..

4.     <u>Denominations; Transfer; Exchange</u>

The Notes are in fully registered form without coupons, and only in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to register the transfer of or exchange any Note or certain portions of a Note.

5.     <u>Persons Deemed Owners</u>

The registered Holder of this Note may be treated as the owner of it for all purposes.

6.     <u>Defaults and Remedies</u>

If an Event of Default, as defined in the Indenture, occurs and is continuing and has not been waived, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding may declare all the Notes to be due and payable. If a Bankruptcy Law Event of Default with respect to a Bankruptcy Party occurs and is continuing, the Notes automatically become due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity reasonably satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

7.    Amendment and Waiver

Subject to certain exceptions, the Indenture and the Notes may be amended, and Defaults may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes. Without notice to or the consent of any Holder, the Company and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguities, defects or inconsistencies in the Indenture or this Note.

8.    Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an Authenticating Agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

9.    Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/G/M/A (=Uniform Gift to Minors Act).

10.    Common Code and ISIN

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures the Company has caused the Common Code and ISIN to be printed on the Notes and has directed the Trustee to use the Common Code and ISIN in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

11.    Governing Law

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

The Company will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note.  Requests may be made to:

TV Azteca, S.A.B. de C.V.
Insurgentes Sur 3579
Col. Tlalpan la joya
14000, México, D.F.
México

A-5

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's Social Security or Tax I.D. Number)

and irrevocably appoint _____
as agent to transfer this Note on the books of the Company.  The agent may substitute another to
act for him.

Date:_____        Your Signature:_____

Sign exactly as your name appears on the other
side of this Note.

Signature            _____
Guarantee*:          (Signature must be guaranteed)

_____


*        The signature(s) should be guaranteed by an eligible guarantor institution (banks,
stockbrokers, savings and loan associations and credit unions with membership in an approved
signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other
signature guarantor acceptable to the Trustee).

[*To be attached to Global Notes only*]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of increase or decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
| --- | --- | --- | --- | --- |
| _____ | _____ | _____ | _____ | _____ |

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, check either box:

☐                    ☐
Section 3.12          Section 3.8

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 3.12 or Section 3.8 of the Indenture, state the principal amount (which must be U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof) that you want to have purchased by the Company: U.S.$

Date: _____          Your Signature _____
                           (Sign exactly as your name appears on the
                           other side of the Note)

Signature                  _____
Guarantee*:                (Signature must be guaranteed)

\*       The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to Exchange Act Rule 17Ad-15 (or other signature guarantor acceptable to the Trustee).

**EXHIBIT B**

FORM OF SUPPLEMENTAL INDENTURE
FOR ADDITIONAL NOTE GUARANTEE

This Supplemental Indenture, dated as of [_____] (this "Supplemental Indenture"), is by and among [name of additional Subsidiary Guarantor], a [_____] [corporation][limited liability company] (the "New Subsidiary Guarantor"), TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (*sociedad anónima bursátil de capital variable*) organized and existing under the laws of the United Mexican States (together with its successors and assigns, the "Company"), and The Bank of New York Mellon, as trustee (the "Trustee") under the Indenture referred to below.

W I T N E S S E T H :

WHEREAS, the Company, the Subsidiary Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of August 9, 2017 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of 8.250% Senior Notes Due 2024 of the Company;

WHEREAS, pursuant to Sections 10.1 and 10.6 of the Indenture, the Company is required to cause certain Restricted Subsidiaries created or acquired by the Company to execute and deliver to the Trustee this Supplemental Indenture providing an additional Note Guarantee pursuant to which such Restricted Subsidiaries will unconditionally guarantee, jointly and severally with the other Subsidiary Guarantors, the Company's full and prompt payment of the Obligations in respect of the Indenture and the Notes; and

WHEREAS, pursuant to Section 9.1 of the Indenture, the New Subsidiary Guarantor, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Subsidiary Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE I
DEFINITIONS

Section 1.1.  Defined Terms.  Unless otherwise defined in this Supplemental Indenture, terms defined in the Indenture are used herein as therein defined.

ARTICLE II
AGREEMENT TO BE BOUND; GUARANTEE

Section 2.1.  Agreement to be Bound.  The New Subsidiary Guarantor hereby becomes a party to the Indenture as a Subsidiary Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Subsidiary Guarantor under the

Indenture.  The New Subsidiary Guarantor hereby agrees to be bound by all of the provisions of the Indenture applicable to a Subsidiary Guarantor and to perform all of the obligations and agreements of a Subsidiary Guarantor under the Indenture.

Section 2.2.  Guarantee.  The New Subsidiary Guarantor hereby fully, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, jointly and severally with each other Subsidiary Guarantor, to each Holder of the Notes and the Trustee, the full and punctual payment when due, whether at maturity, by acceleration, by redemption or otherwise, of the Obligations, all of the foregoing to the extent set forth in Article X of the Indenture.

Section 2.3.  Waivers.  The New Subsidiary Guarantor hereby expressly affirms each of the agreements and waivers of the Subsidiary Guarantors set forth in Article X of the Indenture.

ARTICLE III
MISCELLANEOUS

Section 3.1.  Notices.  Any notice or communication delivered to the Company under the provisions of the Indenture shall constitute notice to the New Subsidiary Guarantor.

Section 3.2.  Parties.  Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.3.  Governing Law, etc.  This Supplemental Indenture shall be governed by and subject to the provisions set forth in Section 11.7 of the Indenture.

Section 3.4.  Severability.  In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.5.  Ratification of Indenture; Supplemental Indenture Part of Indenture; No Liability of Trustee.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.  The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture or any Note Guarantee.

Section 3.6.  Duplicate and Counterpart Originals.  The parties may sign any number of copies of this Supplemental Indenture.  One signed copy is enough to prove this Supplemental Indenture.  This Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement.

Section 3.7.  <u>Headings</u>.  The headings of the Articles and Sections in this Supplemental Indenture have been inserted for convenience of reference only, are not intended to be considered as a part hereof and shall not modify or restrict any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

**TV AZTECA, S.A.B. DE C.V.**

By:  _____
     Name:
     Title:

By:  _____
     Name:
     Title:

**[NAME OF NEW SUBSIDIARY GUARANTOR]**,
    as a New Subsidiary Guarantor

By:  _____
     Name:
     Title:

By:  _____
     Name:
     Title:

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____
        Name:
        Title: