# Exhibit 1

BÉLA KÁLLOI ROMERO  28/04/27 15:57:49
30800001309080040803519935273630257

TV AZTECA, S.A.B. DE C.V.
VS.
CYRUS 1740 MASTER FUND, L.P.; CANARY SC MASTER FUND, L.P.; CYRUS OPPORTUNITIES MASTER FUND II, LTD; CRESCENT 1, L.P.; CRS MASTER FUND, L.P.; CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD; CYRUS SELECT OPPORTUNITIES MASTER FUND II, L.P.; PC INVESTORS III, LLC; PETERSON CAPITAL INVESTORS, LLC Y OTROS.

JUICIO: ORDINARIO MERCANTIL.

EXPEDIENTE NÚMERO: 749/2022.

**C. JUEZ NOVENO DE LO CIVIL DEL TRIBUNAL SUPERIOR DE JUSTICIA DE LA CIUDAD DE MÉXICO.**

**BÉLA KÁLLOI ROMERO**, en representación de **TV AZTECA, S.A.B. DE C.V.** (en lo sucesivo y por economía procesal "**TV AZTECA**"), personalidad que tengo debidamente reconocida en los autos del Juicio al rubro citado, ante Usted respetuosamente expongo:

Que por medio del presente escrito, vengo a hacer del conocimiento de su Señoría que, con fecha 22 de septiembre de 2025, el H. Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York (*United States District Court Southern District Of New York*), derivado de un diverso procedimiento seguido en el extranjero en el que mi representada figura como parte, dictó un *Anti Suit Injunction* – medida anti demanda –, lo anterior tal y como se desprende de las documentales que se exhiben como **anexos números 1)** y **2),** consistentes en la orden de fecha 22 de septiembre de 2025, en su idioma inglés, así como una traducción simple de la misma.

Lo anterior para todos los efectos legales conducentes.

**Por lo expuesto;**
**A USTED C. JUEZ,** atentamente pido se sirva:

**ÚNICO.-** Tener a mi representada en términos del presente escrito exhibiendo las documentales que han quedado debidamente identificadas en el cuerpo del mismo.

**PROTESTO LO NECESARIO.**
**Ciudad de México a 14 de octubre de 2025.**

[*Firmado Electrónicamente*]

**BÉLA KÁLLOI ROMERO.**

BÉLA KÁLLOI ROMERO 04/23/27 3:37:49 PM
30806081360060000800851939532730d237

TV AZTECA, S.A.B. DE C.V.
VS.
**CYRUS 1740 MASTER FUND, L.P.;
CANARY SC MASTER FUND, L.P.; CYRUS
OPPORTUNITIES MASTER FUND II, LTD;
CRESCENT 1, L.P.; CRS MASTER FUND,
L.P.; CYRUS SELECT OPPORTUNITIES
MASTER FUND, LTD; CYRUS SELECT
OPPORTUNITIES MASTER FUND II, L.P.;
PC INVESTORS III, LLC; PETERSON
CAPITAL INVESTORS, LLC AND
OTHERS.**

**PROCEEDINGS: ORDINARY COMMERCIAL.**

**CASE NUMBER: 749/2022.**

**NINTH CIVIL JUDGE OF THE SUPERIOR
COURT OF JUSTICE OF MEXICO CITY.**

**BÉLA KÁLLOI ROMERO**, representing **TV AZTECA, S.A.B. DE
C.V.** (hereinafter and for procedural economy **"TV** AZTECA"), a personality that I have
duly recognized in the proceedings of the Trial under the aforementioned heading,
respectfully state before you:

That by means of this brief, I hereby inform Your Honor that, on September
22, 2025, the Honorable *United States* District Court for the *Southern District of New York,*
arising from a separate proceeding abroad in which my client is a party, issued an *Anti Suit
Injunction*, as evidenced by the documents exhibited as **Annexes
1)** and **2),** consisting of the order dated September 22, 2025, in its English language, as well
as a simple translation thereof.

The foregoing is for all legal purposes.

**For the reasons stated above;**
I respectfully request that **YOU, YOUR HONOR,** kindly:

2

**SOLE.-** To have my client represented in accordance with this document, presenting the documents that have been duly identified in the body of the same.

**I PROTEST AS NECESSARY.**
**Mexico City, October 14, 2025.**

[*Signed electronically*]

**BÉLA KÁLLOI ROMERO.**

BELLA KALLO ROMERO 2304.27 15:37:49 30303031303030303053319953237363237

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON,

Plaintiff,

- against -

TV AZTECA, S.A.B. DE C.V. ET AL.,

Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Civ. 8164 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff The Bank of New York Mellon – in its capacity as
indenture trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024 – alleges that
Defendant TV Azteca, S.A.B. de C.V. and thirty-four TV Azteca subsidiary guarantors (together,
"Defendants") are in default on $400 million in unsecured notes (the "Notes"). (MSJ in Lieu of
Cmplt. (Dkt. No. 1-1); Pltf. Br. (Dkt. No. 47) at 9 n.3)[1] As a result of the alleged default, owners
of more than 25% of the aggregate principal amount of the outstanding Notes (the
"Noteholders") authorized the issuance of a notice of acceleration to TV Azteca on May 3, 2022,
which declared "the unpaid principal of (and premium, if any) and accrued and unpaid interest
on all the Notes to be due and payable immediately as provided under" the August 9, 2017
indenture (the "Indenture") governing the Notes. (Jun. 28, 2024 Qureshi Decl., Ex. 3 (May 3,
2022 Acceleration Notice) (Dkt. No. 48-3) at 2-3; id. (Dkt. No. 48) ¶ 4)

On August 5, 2022 – at the direction of the Noteholders – Plaintiff transmitted a
notice of acceleration to TV Azteca, and on August 8, 2022, Plaintiff transmitted to TV Azteca a

---

[1] Page number citations reflect the pagination generated by this District's Electronic Case Files
("ECF") system.

4

BELA KALLOI ROMERO : 2k94r27 15:37:49
303030301303030303033031995323756037

supplement to the August 5, 2022 notice of acceleration that declared "the unpaid principal of $400,000,000, premium, accrued and unpaid interest, and any other amounts owed on the Notes, and under the Indenture, to be due and payable immediately as provided . . . under the Indenture." (See Jun. 28, 2024 Qureshi Decl., Ex. 4 (Aug. 5, 2022 Acceleration Notice) (Dkt. No. 48-4) at 2; id., Ex. 5 (Aug. 8, 2022 Supp. Acceleration Notice) (Dkt. No. 48-5) at 2)

On July 8, 2022, TV Azteca filed a complaint in the Ninth Superior Court of Mexico against certain Noteholders, claiming "that the document called 'Notice of Acceleration' dated May 3, 2022, . . . is not legally valid and has no legal effect whatsoever," and requesting that "[t]he court order that the payment of the unpaid principal of the Bonds issued under the Indenture . . . is not due and payable." (Jun. 28, 2024 Castillo Decl., Ex. 2 (Jul. 8, 2022 Mexican Cmplt.) (Dkt. No. 49-2) at 4-5 (emphasis omitted); id. (Dkt. No. 49) ¶ 9)

On July 12, 2022, the Ninth Superior Court issued an injunction prohibiting the Noteholders from making any effort to collect the unpaid principal and interest due on the Notes. (Id., Ex. 3 (Jul. 12, 2022 Mexican Court Injunction) (Dkt. No. 49-3))

Plaintiff initiated the instant action by filing a motion for summary judgment in lieu of complaint in Supreme Court of the State of New York, New York County, on August 26, 2022. (MSJ in Lieu of Cmplt. (Dkt. No. 1-1))

On September 22, 2022, TV Azteca filed a complaint against Bank of New York Mellon, as Trustee, Bank of New York Mellon, London Branch, as Principal Paying Agent, and certain Noteholders in the Sixty-Third Superior Court of Mexico, seeking a ruling that – due to "**acts of God or force majeure events**" related to the COVID-19 pandemic – "the performance of the obligations assumed in the [Indenture]" was a "**material and legal impossibility**" and, as a result, TV Azteca "**did NOT fail to perform the contractual obligations** assumed in the

5

BELA KALLO I ROMERO : 2504/27 15:37:49
303000301303030030303531395533736237

[Indenture]." (See Jun. 28, 2024 Castillo Decl., Ex. 7 (Sept. 22, 2022 Mexican Court Cmplt.) (Dkt No. 49-7) at 4, 7 (emphasis in original); id. (Dkt No. 49) ¶¶ 16-17) TV Azteca asked the Mexican court to "decree that, as acts of God and force majeure event[s] took place which prevented the performance of the obligations assumed by [TV Azteca] as they were beyond their control, during the health emergency, the Early Maturity of the principal payment or the premium was not to take place, nor is the payment of interest on [certain dates specified in the Indenture to take place]; nor delinquency or interest on arrears or any other additional amount, if any, established in the [Indenture]." (See id., Ex. 7 (Sept. 22, 2022 Mexican Court Cmplt.) (Dkt No. 49-7) at 7 (emphasis omitted))

On September 23, 2022, Defendants removed the instant action to this Court on the basis of diversity jurisdiction. (Notice of Removal (Dkt. No. 1))

On September 27, 2022, the Sixty-Third Superior Court issued an injunction (see Jun. 28, 2024 Castillo Decl. (Dkt. No. 49) ¶ 20) that barred TV Azteca from making payments due under the Indenture until the World Health Organization decreed that the COVID-19 pandemic had ended. (Id., Ex. 8 (Sept. 27, 2022 Mexican Court Injunction) (Dkt No. 49-8) at 7, 19)

On June 28, 2024, Plaintiff moved in the instant action for an order enjoining TV Azteca from continuing to prosecute or initiating any actions or claims in Mexico in connection with the Indenture. (Pltf. Mot. (Dkt. No. 46))

For the reasons stated below, Plaintiff's request for an injunction will be granted.

## BACKGROUND

### I. FACTS

Defendant TV Azteca, one of the largest producers of Spanish-language television content in the world, is incorporated in Mexico and has its principal office in Mexico City,

BELA KALLO ROMERO : 20/04/27 15:37:49
3030030013030030030005319955376037

6

Mexico. (Jun. 28, 2024 Qureshi Decl., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶¶ 1-2)[2] TV Azteca's stock is publicly traded on the Mexican Stock Exchange and on the Spanish Latibex Exchange. (Id. ¶ 4) A Mexican citizen and two affiliated Mexican corporations hold a majority interest in TV Azteca's shares. (Id.)

TV Azteca has 50 direct and indirect subsidiaries. (Id. ¶ 5) Six of those subsidiaries are organized under United States law, while the remaining subsidiaries are organized under the law of other countries, including Mexico. (Id. ¶ 5) Thirty-four of TV Azteca's subsidiaries are guarantors of the Notes under the Indenture. (Id. ¶ 6)

On August 9, 2017, pursuant to the Indenture, TV Azteca issued $400 million in unsecured notes, which were set to mature in 2024. (Id. ¶ 18; see also Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2)) Under the Indenture, TV Azteca is obligated to make interest payments at the rate of 8.250% per annum on the $400 million principal sum on August 9 and February 9 of each year during the term of the Indenture. (Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2) at 126; id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 19)

The Indenture contains choice of law and forum selection provisions. Those provisions state, inter alia, that each party to the Indenture

(1) "agrees that any suit, action or proceeding against it arising out of or relating to this Indenture (including the Note Guarantees) or the Notes . . . may be instituted in any court of the State of New York or any United States court sitting, in each case, in the

---

[2] Plaintiff has submitted as an exhibit to its motion a joint stipulation of uncontested facts that was filed in the United States Bankruptcy Court for the Southern District of New York after certain Noteholders filed involuntary Chapter 11 petitions against Defendants. (See Jun. 28, 2024 Qureshi Decl., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11); Oct. 16, 2023 Order (Dkt. No. 28) at 1; In re TV Azteca, S.A.B. de C.V., No. 23-10385 (LGB) (Bankr. S.D.N.Y.), Dkt. No. 61) Defendants do not object to Plaintiff's use of this exhibit (see Def. Opp. (Dkt. No. 52)), and the Court cites to it for purposes of providing background information.

4

BELA KALLOI ROMERO : 2804/27 15:37:49 30300003 003003000006051953523756237

Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof" (id., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106; see also id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 20);

(2) "waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason" (id., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106; see also id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 20);

(3) "irrevocably consents and submits to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof" (id., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106; see also id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 20);

(4) "agrees that final judgment in any such suit, action or proceeding brough in such a court shall be conclusive and binding and may be enforced in the courts of the jurisdiction of which it is subject by a suit upon judgment[.]" (Id., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106; see also id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 20)

"Prior to February 9, 2021, TV Azteca paid interest when due under the Notes."

"On February 9, 2021, [however,] TV Azteca publicly announced that it would 'defer' the interest payment due on that date" (id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 23; see also id., Ex. 7 (Feb. 9, 2021 TV Azteca Press Release) (Dkt. No. 48-7)), and TV Azteca did not make the required interest payments due on August 9, 2021, February 9, 2022, August 9, 2022, and in February 2023. (Id., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) ¶ 24)

BELA KALLOI ROMERO 2024.27 15:37:49
30300001303003005000553195553273603

On May 3, 2022, holders of more than 25% of the aggregate principal amount of the outstanding Notes at issue (the "Noteholders") authorized the issuance of a notice of acceleration to TV Azteca, which declared "the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the Notes to be due and payable immediately as provided under" the Indenture. (Id., Ex. 3 (May 3, 2022 Acceleration Notice) (Dkt. No. 48-3) at 3) At the direction of the Noteholders, Plaintiff issued a notice of acceleration to TV Azteca on August 5, 2022, and issued a supplement to the August 5, 2022 notice of acceleration to TV Azteca on August 8, 2022. The supplemental notice declared "the unpaid principal of $400,000,000, premium, accrued and unpaid interest, and any other amounts owed on the Notes, and under the Indenture, to be due and payable immediately as provided . . . under the Indenture." (See id., Ex. 4 (Aug. 5, 2022 Acceleration Notice) (Dkt. No. 48-4) at 2; id., Ex. 5 (Aug. 8, 2022 Supp. Acceleration Notice) (Dkt. No. 48-5) at 2)

## II.   PROCEDURAL HISTORY

### A.   Foreign Litigation

#### 1.   The July 2022 Mexican Action

As noted above, on July 8, 2022, TV Azteca filed a complaint in the Ninth Superior Court of Mexico against certain Noteholders (the "July 2022 Mexican Action"), asserting "that the document called 'Notice of Acceleration' dated May 3, 2022, . . . is not legally valid and has no legal effect whatsoever," and asking that "[t]he court order that the payment of the unpaid principal of the Bonds issued under the Indenture . . . is not due and payable." (Jun. 28, 2024 Castillo Decl., Ex. 2 (Jul. 8, 2022 Mexican Cmplt.) (Dkt. No. 49-2) at 4-5 (emphasis omitted); id. (Dkt. No. 49) ¶ 9) While Plaintiff is not named as a defendant in this action, TV Azteca requested that Plaintiff "be called as [a] third part[y], by virtue of the capacity [it has] in relation to the Indenture, namely, [it was] appointed as Trustee . . . in relation to the Agreement

BELA KALLO ROMERO, 2304.27 15:37:49
303030301303030300030533199535375603237

and Bonds issued thereunder, for which reason it is considered that [it] should be bound by the judgment, if any, that may be issued in this proceeding." (Id., Ex. 2 (Jul. 8, 2022 Mexican Cmplt.) (Dkt. No. 49-2) at 77-78)

On July 12, 2022, the Ninth Superior Court of Mexico issued an ex parte injunction (see id. (Dkt. No. 49) ¶ 12) granting "the precautionary measures requested by TV Azteca," including (1) "[t]he suspension of the effects and consequences that could derive from the document dated May 3, 2022, to which it was intended to give the character of 'Notice of Early Maturity,' presumably signed by the [Noteholders], by virtue of which they sought the 'Acceleration' and/or early maturity of principal and accrued and unpaid interest of all the bonds subscribed under the Indenture Agreement," and (2) "[t]he prohibition of the [Noteholders] to file and initiate any procedure aimed at the collection and/or payment of the unpaid capital of the bonds issued under the Indenture Agreement dated August 9, 2017, in execution or materialization of the document dated August 3, two thousand twenty-two, which was intended to be given the character of 'Notice of Early Maturity,' against [TV Azteca] or subsidiaries, including the subsidiary guarantors." (Id., Ex. 3 (Jul. 12, 2022 Mexican Court Injunction) (Dkt. No. 49-3) at 3 (emphasis omitted)) The July 12, 2022 injunction further provides that the "requested precautionary measures will be valid until the final and enforceable judgment is issued. . . ." (Id. at 4)

On August 17, 2022, the Ninth Superior Court extended the July 12, 2022 injunction "for the purpose of suspending the effects and consequences that may derive from the documents dated August 5 and 8, both of August 2022, referred to as 'Notice of Early Maturity'; The [Noteholders] and the trustee are prohibited from initiating and or initiating any procedure aimed at the collection and/or payment of the unpaid capital of the bonds issued under the

BELA KALLOI ROMERO 2004/27 15:37:49
303000001303000003053159053237360237

issuance contract dated August 9, 2017, in execution or materialization of the documents dated 5 and 8, both of August of the year 2022." (Id., Ex. 4 (Aug. 17, 2022 Mexican Court Injunction Extension) (Dkt. No. 49-4) at 2 (emphasis omitted))

Litigation remains ongoing in the July 2022 Mexican Action, and no final judgment has been issued in that case. (See Sept. 12, 2025 Joint Status Rpt. (Dkt. No. 96))

### 2. The September 2022 Mexican Action

As discussed above, on September 22, 2022, TV Azteca filed an ex parte complaint (see Jun. 28, 2024 Castillo Decl. (Dkt. No. 49) ¶¶ 16, 19) against the Bank of New York Mellon, as Trustee, and Bank of New York Mellon, London Branch, as Principal Paying Agent, and certain Noteholders in the Sixty-Third Superior Court of Mexico, asserting that due to "**acts of God or force majeure events**" related to the COVID-19 pandemic, "the performance of the obligations assumed in the [Indenture]" was a "**material and legal impossibility**," and that, as a result, TV Azteca "**did NOT fail to perform the contractual obligations** assumed in the [Indenture]." (See Jun. 28, 2024 Castillo Decl., Ex. 7 (Sept. 22, 2022 Mexican Cmplt.) (Dkt No. 49-7) at 4, 7; id. (Dkt No. 49) ¶¶ 16-17) (emphasis in original) TV Azteca asked the court to "decree that, as acts of God and force majeure event[s] took place which prevented the performance of the obligations assumed by [TV Azteca] as they were beyond their control, during the health emergency, the Early Maturity of the principal payment or the premium was not to take place, nor is the payment of interest on February 9, 2021, August 9, 2021 and February 9, 2022; nor delinquency or interest on arrears or any other additional amount, if any, established in the [Indenture]." (See id., Ex. 7 (Sept. 22, 2022 Mexican Cmplt.) (Dkt No. 49-7) at 7 (emphasis omitted)) TV Azteca further requested that the court "decree the legal ineffectiveness of the document entitled 'Notice of Early Maturity' dated May 3, 2022," and rule that "the Early Maturity of the principal payment or the premium [did] not take place," and thus

8

BELA KALLOI ROMERO 2024-09-27 15:37:49
30300300130300300300531395532736237

that "it is not appropriate to require the payment of the premium, the accrued and unpaid interest, and other amounts owed under certain 8.250% Senior Bonds maturing in 2024." TV Azteca also asked the court to rule that "the [Indenture] agreement, dated August 9, 2017, [is] null and void." (Id. at 7-8 (emphasis omitted))

On September 27, 2022, the Sixty-Third Superior Court issued an ex parte injunction (see id. (Dkt. No. 49) ¶ 22) ordering that "until such time as the World Health Organization decrees the extinction of the pandemic known as SARS-CoV2 (COVID 19), [TV Azteca] is prohibited to make payments of obligations" under the Indenture "due prior to the present lawsuit." (Id., Ex. 8 (Sept. 27, 2022 Mexican Court Injunction) (Dkt No. 49-8) at 7, 19) The September 27, 2022 injunction also includes "a prohibition [as] to the [Noteholders] to initiate and/or file any proceeding for the collection and/or payment of the unpaid principal of the Bonds issued under the [Indenture], in execution or materialization of the document dated May 3, 2022, which was intended to be a 'Notice of Anticipated Maturity,'" and orders the "suspension of all enforcement proceedings and the prohibition of the securing of assets to the detriment of [TV Azteca] until the issuance of the judgment that becomes enforceable in the present proceeding." (Id. at 19) The September 27, 2022 injunction further orders "the suspension of the effects and consequences that could derive from the early maturity of the principal and accrued and unpaid interest of all the bonds subscribed under the [Indenture,]" and "the suspension of all payment obligations arising from the [Indenture]. . . ." (Id.)

Litigation in the September 2022 Mexican Action – as well as litigation in a related action challenging the constitutionality of the September 27, 2022 injunction under

9

BELA KALLOI ROMERO 2804/27 15:37:49
30J00J00J30J00J00J00J00J531395532736237

Mexican law[3] – remains ongoing, and no final judgment has been issued. (See Sept. 12, 2025 Joint Status Rpt. (Dkt. No. 96))

## B.    The Instant Action

Plaintiff initiated the instant action on August 26, 2022, by filing a motion for summary judgment in lieu of complaint in Supreme Court of the State of New York, New York County. (MSJ in Lieu of Cmplt. (Dkt. No. 1-1)) On September 23, 2022, Defendants removed the action to this Court on the basis of diversity jurisdiction. (Notice of Removal (Dkt. No. 1))

In an October 16, 2023 order, this Court stayed the instant action pursuant to 11 U.S.C. § 362, pending resolution of involuntary Chapter 11 petitions filed against the Defendants by certain Noteholders in the United States Bankruptcy Court for the Southern District of New York. (Oct. 16, 2023 Order (Dkt. No. 28) at 1-3) That same day, this Court directed the parties to "file a joint letter updating the Court as to the status of the bankruptcy petition and the Mexican litigations every 30 days, and in any event, within three days of the resolution of any of those actions." (Id. at 3)

On June 28, 2024, Plaintiff moved for an order enjoining TV Azteca from "continuing to prosecute, or initiating any claims in, any action in Mexico in connection with the [Indenture]. . . ." (Pltf. Mot. (Dkt. No. 46) at 2)

Defendants filed their opposition to Plaintiff's motion on July 29, 2024 (Def. Opp. (Dkt. No. 52)), and Plaintiff filed its reply on August 14, 2024. (Pltf. Reply (Dkt. No. 54))

---

[3] On March 15, 2023, Plaintiff filed an "Amparo" action in Mexico, which "is a separate proceeding in a separate court to seek relief available in Mexican Courts to protect fundamental constitutional rights." (Jun. 28, 2024 Castillo Decl. (Dkt No. 49) ¶ 23 n.1) In its Amparo action, Plaintiff contends "that the September [27, 2022] [i]njunction violate[s] [Plaintiff's] due process rights." (Id. ¶ 23; see also id., Ex. 9 (Amparo Filing) (Dkt No. 49-9))

10

BELA KALLOI ROMERO 2024/27 15:37:49
3030030013030030030033319953237363237

13

On October 10, 2024, the stay in the instant action was lifted after the parties

informed the Court that the United States Bankruptcy Court for the Southern District of New

York had dismissed the bankruptcy action brought against the Defendants. (Oct. 10, 2024 Order

(Dkt. No. 61))

## DISCUSSION

## I.   LEGAL STANDARDS

"It is beyond question that a federal court may enjoin a party before it from

pursuing litigation in a foreign forum." Paramedics Electromedicina Comercial, Ltda. v. GE

Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004). "[P]rinciples of comity

counsel[,] [however,] that injunctions restraining foreign litigation be 'used sparingly' and

'granted only with care and great restraint.'" Id. (quoting China Trade & Dev. Corp. v. M.V.

Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)).

Before imposing an anti-suit injunction, a court must first find that the following

threshold requirements are met: "[1.] the parties are the same in both matters, and [2.] resolution

of the case before the enjoining court is dispositive of the action to be enjoined." Id. (citing

China Trade, 837 F.2d at 35).

Where the threshold requirements for enjoining foreign litigation are satisfied, a

court must go on to consider whether "'(1) [absent an injunction,] frustration of a policy in the

enjoining forum [would ensue]; (2) [absent an injunction,] the foreign action would be vexatious;

(3) [the foreign proceedings present] a threat to the issuing court's . . . jurisdiction; (4) the

proceedings in the other forum prejudice equitable considerations; [and] (5) adjudication of the

same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a

race to judgment'" (the "China Trade factors"). China Trade, 837 F.2d at 35 (quoting American

Home Assurance Corp. v. The Insurance Corp. of Ireland, Ltd., 603 F.Supp. 636, 643 (S.D.N.Y.

11

BELA KALLOI ROMERO : 2304:27 15:37:49
30/30/001/30/30/00/30/00531395532730237

14

1984)); see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 119 (2d Cir. 2007) (applying the same five factors).

Where a "court has addressed the propriety of imposing an anti-suit injunction under the China Trade test [and determined that an anti-suit injunction is warranted], the . . . court must then make findings on whether it is appropriate to enter a preliminary injunction. . . ." In re Millenium Seacarriers, Inc., 458 F.3d 92, 98 (2d Cir. 2006) (emphasis omitted); see also Dandong v. Pinnacle Performance Ltd., No. 10 CIV. 8086 LBS, 2011 WL 6156743, at *3 (S.D.N.Y. Dec. 12, 2011), aff'd in part, remanded in part on other grounds sub nom. Lam Yeen Leng v. Pinnacle Performance Ltd., 474 F. App'x 810 (2d Cir. 2012) ("In addition to satisfying the China Trade test, recent Second Circuit case law has held that a party seeking a preliminary anti-suit injunction must also satisfy the traditional test for a preliminary injunction." (citing Software A.G., Inc. v. Consist Software Solutions, Inc., 323 Fed. Appx. 11, 12 (2d Cir. 2009) (summary order); In re Millenium Seacarriers, 458 F.3d at 98)). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).

## II. ANALYSIS

Noting that "the Indenture's forum selection clause . . . confers *exclusive* jurisdiction on New York courts to adjudicate all disputes arising under or related to the Indenture," Plaintiff contends that "TV Azteca's litigation in Mexico expressly seeks . . . to avoid its obligations under its [New York]-law governed Indenture and to evade the exclusive

12

BELA KALLO ROMERO   2024:27 15:37:49
30300001303000000005319953237360237

jurisdiction of New York courts to which TV Azteca irrevocably submitted when it entered into

the Indenture." (Pltf. Br. (Dkt. No. 47) at 6-7 (emphasis in original)) According to Plaintiff,

> TV Azteca's . . . attempt to undermine the jurisdiction of this Court and to evade its
> contractual obligations under [New York] law [constitutes]. . . . conduct [that] strikes at
> the heart of our judicial system and violates the strong public policy that supports
> enforcement of forum selection clauses and jurisdiction of federal courts in the United
> States.

(Id. at 7) Plaintiff "requests that this Court immediately enjoin TV Azteca from continuing or

initiating any further proceedings in Mexico that arise under or relate to the Indenture. . . ." (Id.)

In opposing Plaintiff's motion for an anti-suit injunction, Defendants argue that

principles of international comity control here, and that the request for an anti-suit injunction

should be denied because it "would impinge upon [TV Azteca's] fundamental constitutional and

other rights under Mexican law." (Def. Opp. (Dkt. No. 52) at 5) Defendants also note that

"[l]itigation here and in Mexico [has] been proceeding simultaneously for a year-and-a-half and

[that] Plaintiff has participated actively in both," demonstrating that "this Court does not need to

act to protect its jurisdiction." "The Mexican litigations are not interfering with the jurisdiction

of this Court" or "impeding the progress of [the instant] case." (Id.) As to irreparable harm,

Defendants assert that Plaintiff "litigated in Mexico for eighteen months without ever claiming

an irreparable injury," and that accordingly Plaintiff has not made the showing necessary to

justify the "drastic remedy" of an anti-suit injunction. (Id. at 6)

## A.     Threshold Requirements

As noted above, "[a]n anti-suit injunction against parallel [foreign] litigation may

be imposed only if [1.] the parties are the same in both matters, and [2.] resolution of the case

before the enjoining court is dispositive of the action to be enjoined." Paramedics, 369 F.3d at

652 (citing China Trade, 837 F.2d at 35).

13

16

BELA KALLO ROMERO : 2024:27 15:37:49
303030303 393030303003531995352736237

      Plaintiff argues that both of these threshold requirements are met here. (Pltf. Br. (Dkt. No. 47) at 18-21) As to "[t]he first threshold requirement," Plaintiff points out that "[t]he 'parties need not be identical in both matters so long as the "real parties in interest" are the same'" (id. at 18 (quoting Deutsche Mexico Holdings S.a.r.l. v. Accendo Bank, S.A., Case No. 19 Civ. 8692 (AKH), 2019 WL 5257995, at *5 (S.D.N.Y. Oct. 17, 2019))), and that "[c]ourts have found the parties to be the same 'real parties in interest' where their interests are aligned and/or the non-identical parties are superfluous to the action." (Id. at 18-19 (citing Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006); Motorola Credit Corp. v. Uzan, Case No. 02 Civ. 666 (JSR), 2003 WL 56998, at *2 (S.D.N.Y. Jan. 7, 2003)))

      Here, Plaintiff "is the Trustee [for the Notes], [and] is effectively a proxy for, and acting at the express direction of, the Noteholders seeking to enforce their interests with respect to the Indenture [as] against the defendant, TV Azteca, and its Guarantors. In the [f]oreign [a]ctions, the plaintiff is TV Azteca, [which] is seeking to enjoin acceleration and payments of the Notes under the *same Indenture* through litigation against the *same Trustee* safeguarding the rights of the *same Noteholders*." (Id. at 19 (emphasis in original)) The first threshold requirement is thus met because "[t]he [f]oreign and [d]omestic Actions all involve the same Indenture, the 'real' parties in interest in all these actions are clearly the same – TV Azteca and the Trustee acting at the direction of the Noteholders – and the non-overlapping parties (the Guarantors and the individual Noteholders) are superfluous in that they are not necessary to the requested relief." (Id.)

      As to the second threshold requirement, Plaintiff argues that "'[t]he relevant inquiry is "whether the substance of the claims and arguments raised in the two actions is the

14

BELA KALLOI ROMERO 2004.27 15:37:49 30.00.00.01.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.00.05319955327363237

same.""" (Id. at 20 (quoting AU New Haven, LLC v. YKK Corp., Case No. 15-cv-3411 (GHW) (SN), 2018 WL 2128373, at *3 (S.D.N.Y. May 8, 2018) (quoting In re Vivendi Universal, S.A. Sec. Litig., No. 02-CV-5571 (RJH)(HBP), 2009 WL 3859066, at *6 (S.D.N.Y. Nov. 19, 2009)))) And according to Plaintiff, "[t]his Court's decision in the [d]omestic [a]ction, which is entirely about TV Azteca's obligations under the Indenture regarding unpaid interest and principal, would resolve entirely the underlying dispute [in] the [f]oreign [a]ctions (seeking non-enforcement of the very same Indenture)." (Id. at 21)

Defendants do not address whether the threshold requirements for issuance of an anti-suit injunction are met here. (See Def. Opp. (Dkt. No. 52))

As to the first threshold factor, Plaintiff is correct that "[d]ecisions interpreting China Trade have held that . . . the parties need not be identical in both matters, so long as the 'real parties in interest' are the same. . . ." Deutsche Mexico Holdings S.a.r.l., 2019 WL 5257995, at *5 (citing Motorola Credit Corp. v. Uzan, No. 02-CV-666, 2003 WL 56998 (S.D.N.Y. Jan. 7, 2003)); see also Paramedics, 369 F.3d at 652-53 (first threshold requirement satisfied where "[t]he record supports the district court's finding of substantial similarity and affiliation between [the parties in the New York action] and [the parties in the foreign action]" (citing Motorola Credit Corp. v. Uzan, No. 02 CIV. 666 (JSR), 2003 WL 56998, at *2 (S.D.N.Y. Jan. 7, 2003) ("finding sufficient similarity between parties, even though not all parties to the two actions were identical, because 'the real parties in interest are the same in both matters'"); MasterCard Int'l Inc. v. Argencard Sociedad Anonima, No. 01 CIV. 3027 (JGK), 2002 WL 432379, at *10 (S.D.N.Y. Mar. 20, 2002) ("finding sufficient similarity between parties despite intervention in foreign action" by an entity that was "'not a necessary party to that action'"))); see also Int'l Equity Invs., Inc., 441 F. Supp. 2d at 562 ("Where parties to the two actions are

15

18

BELA KALLO1 ROMERO 2004/27 15:37:49
30000001303000000000531993323736237

affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met.").

As to the second threshold factor, "[c]ourts in this Circuit have found anti-suit injunctions appropriate even when the claims in the foreign and domestic actions were not precisely identical, but were at least based on the same underlying dispute." Bailey Shipping Ltd. v. Am. Bureau of Shipping, No. 12 CIV. 5959 KPF, 2013 WL 5312540, at *10 (S.D.N.Y. Sept. 23, 2013) (citing Suchodolski Assocs., Inc. v. Cardell Fin. Corp., No. 03 Civ. 4148(WHP), 2006 WL 10886, at *3 (S .D.N.Y. Jan. 3, 2006), aff'd in relevant part, dismissed in part on other grounds, 261 F. App'x 324 (2d Cir.2008) (summary order); SG Avipro Fin. Ltd. v. Cameroon Airlines, No. 05 Civ. 655(LTS)(DFE), 2005 WL 1353955, at *3 (S.D.N.Y. June 8, 2005)). "The relevant inquiry [as to the second threshold factor] is 'whether the substance of the claims and arguments raised in the two actions is the same.'" AU New Haven, LLC, 2018 WL 2128373, at *3 (quoting In re Vivendi Universal, S.A. Sec. Litig., 2009 WL 3859066, at *6). "Thus, 'the "dispositive" criterion may be satisfied when a foreign proceeding will necessarily render a determination of the "core issue" at the heart of a claim appropriately decided only in a pending domestic action.'" Id. (quoting Bailey Shipping, 2013 WL 5312540, at *9).

Here, this Court finds that TV Azteca is a party to the July 2022 Mexican Action, the September 2022 Mexican Action, and the instant action. In all three cases, TV Azteca contends that it need not satisfy certain financial obligations under the Indenture arising out of its alleged default on $400 million in unsecured notes. (See Jun. 28, 2024 Castillo Decl., Ex. 2 (Jul. 8, 2022 Mexican Cmplt.) (Dkt. No. 49-2); id., Ex. 7 (Sept. 22, 2022 Mexican Cmplt.) (Dkt No. 49-7); Def. Br. (Dkt. No. 9) at 19-21 (outlining Defendants' arguments in opposition to Plaintiff's motion for summary judgment in lieu of complaint)) Moreover, Defendants in the

16

19

BELA KALLO ROMERO 2004/27 15:37:49
30J0J0J01 3030J0J0J0J0J0533119953237363237

instant action – TV Azteca and its subsidiary guarantors – "are affiliated or substantially similar" to TV Azteca in the two Mexican actions, "such that their interests are represented by one another." Int'l Equity Invs., 441 F. Supp. 2d at 562.

The Bank of New York Mellon – in its capacity as indenture trustee for the Notes – is a party to both the instant domestic action and the September 2022 Mexican Action. In both actions, The Bank of New York Mellon seeks to assert the Noteholders' interests against TV Azteca arising out of TV Azteca's alleged default on $400 million in unsecured notes under the Indenture. (See MSJ in Lieu of Cmplt. (Dkt. No. 1-1); Jun. 28, 2024 Castillo Decl., Ex. 7 (Sept. 22, 2022 Mexican Cmplt.) (Dkt No. 49-7)) And while The Bank of New York Mellon is not a party to the July 2022 Mexican Action, the defendants in that action are Noteholders who similarly seek to enforce their interests against TV Azteca related to TV Azteca's alleged default on $400 million in unsecured notes under the Indenture. (See Jun. 28, 2024 Castillo Decl., Ex. 2 (Jul. 8, 2022 Mexican Cmplt.) (Dkt. No. 49-2)) And TV Azteca has requested in its complaint in the July 2022 Mexican Action that The Bank of New York Mellon "be called as [a] third part[y], by virtue of the capacity [it has] in relation to the Indenture, namely, [it was] appointed as Trustee . . . in relation to the Agreement and Bonds issued thereunder, for which reason it is considered that [it] should be bound by the judgment, if any, that may be issued in this proceeding." (Id. at 77-78) The Court concludes that Plaintiff is "affiliated or substantially similar" to the defendants in the two Mexican actions, "such that their interests are represented by one another. . . ." Int'l Equity Invs, 441 F. Supp. 2d at 562.

In sum, while the parties in the instant domestic action are not identical to the parties in the two Mexican actions, the "real parties in interest" are the same in all three cases. The first threshold factor is therefore satisfied. See, e.g., AU New Haven, 2018 WL 2128373, at

17

BELA KALLO ROMERO 2504/27 15:37:49
3030/0801303000000003519953276037

*2 (While party in domestic action was not identical to party in foreign action, the court concluded that both parties' "interests in the two actions are undoubtedly aligned. Both seek to demonstrate that YKK's products were covered by the Japanese Patent. . . . [Accordingly,] [t]he parties in the two actions are the same for purposes of the anti-suit injunction."); see also Eastman Kodak Co. v. Asia Optical Co., 118 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) (holding that "[t]he first [threshold] requirement is satisfied," and noting that "[t]he presence of . . . an additional plaintiff [in the foreign action] does not alter this conclusion.").

As to the second threshold factor, this Court concludes that a decision in the instant domestic action would be dispositive of the Mexican actions, because all three cases concern Defendants' financial obligations arising out of TV Azteca's alleged default on $400 million in unsecured notes issued under the Indenture. As discussed above, both the July 2022 Mexican Action and the September 2022 Mexican Action concern TV Azteca's obligations related to its alleged default on the same unsecured notes issued under the Indenture. See, e.g., AU New Haven, 2018 WL 2128373, at *3 (finding the second threshold factor met because "[r]esolution of the present action will require the Court to decide the same underlying dispute – whether the products YKK sold in Japan were covered by the Japanese Patent and the [executive licensing agreement] – and thus will be dispositive of the Japanese action.")

For all these reasons, both threshold requirements are satisfied here.

## B.    *China Trade* Factors Bearing on the Propriety of Granting Injunctive Relief

Where, as here, the threshold requirements for enjoining foreign litigation are satisfied, a court must go on to consider whether "(1) [absent an injunction,] frustration of a policy in the enjoining forum [will ensue]; (2) [absent an injunction,] the foreign action would be vexatious; (3) [the foreign proceedings present] a threat to the issuing court's . . . jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; [and] (5)

18

BELA KALLO ROMERO 2004.27 15:37:49 3030300013030300300055319953237360237

adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment.'" China Trade, 837 F.2d at 35 (quoting American Home Assurance, 603 F.Supp at 643).

Plaintiff contends that all of these factors weigh in its favor, arguing that (1) absent an injunction, the Mexican actions will frustrate this nation's public policy of enforcing forum selection clauses; (2) the ex parte injunctions obtained by TV Azteca in the Mexican actions have been vexatious; (3) the forum selection clause grants this Court exclusive jurisdiction over any dispute related to the Indenture, and this Court's exclusive jurisdiction is threatened by the Mexican actions; (4) equitable considerations support the issuance of an anti-suit injunction, given that TV Azteca has engaged in forum shopping in violation of the forum selection clause; and (5) allowing the Mexican actions to proceed in violation of the forum selection clause would cause further delay, inconvenience, expense, and risk inconsistent rulings. (See Pltf. Br. (Dkt. No. 47) at 21-28)

In response, Defendants argue that analysis of the first and third China Trade factors here – whether the Mexican actions frustrate this nation's public policy interests, and whether the Mexican actions threaten this Court's jurisdiction – "weigh[s] against the issuance of an injunction," as does the equitable consideration of international comity. (Def. Opp. (Dkt. No. 52) at 11-12) Defendants do not substantively address the second and fifth China Trade factors – vexatiousness and delay, inconvenience, and expense – contending that although "courts typically consider [these] additional factors . . . , [they] are of lesser importance because they will likely 'be present whenever parallel actions are proceeding concurrently,' and so 'an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that

19

BELA KALLO ROMERO : 2004/27 15:37:49
3030D03013030D03030D035319935237363237

allows parallel proceedings to continue and disfavors anti-suit injunctions.'" (Id. at 12 (quoting China Trade, 837 F.2d at 36))

Although "[t]he first and third [China Trade] factors . . . are of increased importance," Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V., No. 23-CV-11168 (JGLC), 2024 WL 1743109, at *5 (S.D.N.Y. Apr. 23, 2024) (citing China Trade, 837 F.2d at 36), and while "principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint,'" Paramedics, 369 F.3d at 653 (quoting China Trade, 837 F.2d at 36), the Second Circuit has made clear "that all of the [China Trade] factors should be considered when determining whether an anti-suit injunction is warranted." Karaha Bodas, 500 F.3d at 119 (emphasis in original).

Accordingly, this Court analyzes below each of the China Trade factors.

### 1. Frustration of a Domestic Public Policy

In determining whether to issue an anti-suit injunction, a court must consider "whether the foreign proceeding threatens a strong public policy . . . of the domestic forum." Paramedics, 369 F.3d at 654.

Plaintiff argues that "[i]t is well established that 'there is a strong public policy in enforcing forum selection clauses'" (Pltf. Br. (Dkt. No. 47) at 21 (quoting Forbes, 2024 WL 1743109, at *5)), and "[h]ere[] there is no dispute that the Indenture contains a valid forum selection clause whereby each party 'irrevocably consents and submits to the exclusive jurisdiction of the New York courts' regarding 'any suit, action or proceeding . . . arising [from] or relating to this Indenture.'" (Id. at 22 (quoting Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106)) Plaintiff further contends that "through the [f]oreign [a]ctions – where TV Azteca argues that it does not have to make any payment under the Indenture and that no such payments can be compelled – TV Azteca seeks to litigate in Mexico issues that are plainly

BELA KALLO ROMERO · 2024.02.7 15:37:49
30J0J0501J0J0J0J0J0J0531J935321736237

'arising from or relating to' the Indenture." (Id.) According to Plaintiff, the Mexican actions thus constitute "a clear violation of the [f]orum [s]election [c]lause and undermine this Court's strong public policy in ensuring that such forum selection clauses are enforced." (Id.)

Defendants respond that "the majority of cases relied upon by Plaintiff for the issuance of an anti-suit injunction involved an arbitration clause." According to Defendants, these cases are distinguishable because "[t]he enforceability of arbitration clauses is the subject of a federal statute and international treaties to which the United States is a party, and the Second Circuit has been consistent and clear that a foreign litigation cannot disrupt arbitration proceedings that parties had validly agreed to." (Def. Opp. (Dkt. No. 52) at 14 (citing Karaha Bodas Co., 500 F.3d at 126; Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd., No. 1:10-cv-01853-PGG-JCF, 2010 WL 1050988, at *6 (S.D.N.Y. Mar. 23, 2010))) Here, by contrast, "there has been no . . . ongoing frustration of any 'strong' public policy of this forum." (Id. at 15)

Defendants do not dispute, however, that the Indenture contains a forum selection clause that clearly states that each party "irrevocably consents and submits to the exclusive jurisdiction" of New York courts regarding "any suit, action or proceeding . . . arising out of or relating to this Indenture. . . ." (Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106) And contrary to Defendants' argument, it is this nation's strong public policy to favor enforcement of forum selection clauses. Martinez v. Bloomberg LP, 740 F.3d 211, 218 (2d Cir. 2014) ("The presumptive enforceability of forum selection clauses reflects a strong federal public policy . . . which would . . . be undermined if another body of law were allowed to govern the enforceability of a forum selection clause."); Lipson v. Birch, 46 F. Supp. 3d 206, 213–14 (E.D.N.Y. 2014) ("As the Supreme Court and the Second Circuit have made clear, there is a strong federal policy in favor of enforcing forum selection clauses." (citing Roby v. Corp. of

24
BELA KALLOI ROMERO : 2024.07.15 17:49
3030D0301 303030303635319953537366237

Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993); Aguas Lenders Recovery Grp., LLC v. Suez, S.A.,

585 F.3d 696, 700 (2d Cir. 2009)); Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs.,

Inc., No. 2:23-CV-01268 (LDH) (ARL), 2024 WL 5213366, at *7 (E.D.N.Y. Dec. 24, 2024)

("There is a strong federal policy in favor of the enforcement of forum selection clauses." (citing

M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9-10 (1972); Roby, 996 F.2d at 1361)); Roby,

996 F.2d at 1361 (noting that parties' arguments about the scope of a forum selection clause

must be made "in the face of strong public policy in favor of forum selection . . . clauses").

Moreover, "[t]he need to enforce forum-selection clauses is perhaps greatest in the international

arena," CCM Pension-A, L.L.C. v. Republic of Argentina, No. 16-CV-1650 (TPG), 2016 WL

4154892, at *2 (S.D.N.Y. Aug. 2, 2016) (citing M/S Bremen v. Zapata Off-Shore Co., 407 U.S.

1, 9 (1972)), because "[t]he elimination of all such uncertainties by agreeing in advance on a

forum acceptable to both parties is an indispensable element in international trade, commerce,

and contracting." M/S Bremen, 407 U.S. at 13-14.

        Consistent with these precedents, courts in this Circuit have found the first China

Trade factor satisfied where a foreign suit is filed in violation of a forum selection clause. See,

e.g., Int'l Equity Invs., 441 F. Supp. 2d at 563 ("Such attempts to make end runs around the

forum selection clause and this Court's jurisdiction cannot be tolerated. Indeed, the justification

for an anti-suit injunction 'crests' when a party seeks the aid of a foreign proceeding 'in a blatant

attempt to evade the rightful authority of the forum court.'" (quoting Quaak v. Klynveld Peat

Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 20 (1st Cir. 2004))); Deutsche Mexico

Holdings S.a.r.l., 2019 WL 5257995, at *6 ("The Mexico Injunction plainly attempts to

'sidestep' or make an 'end run[ ]' around the Purchase Agreement's forum selection clause, and

that cannot be permitted." (quoting Storm LLC v. Telenor Mobile Comms. AS, No. 06-cv-

BELA KALLOI ROMERO 2504/27 15:37:49 30300/001/30300/000005519955237360237

13157, 2006 WL 3735656, at *9 (S.D.N.Y. Dec. 15, 2006))); JPMorgan Chase Bank, N.A. v. VTB Bank, P.J.S.C., No. 1:24 CIV. 02924 (LGS), 2024 WL 1833606, at *1-2 (S.D.N.Y. Apr. 26, 2024) (given forum selection clause providing that lawsuits arising out of an "Account Terms" agreement "governing [a particular] correspondent bank account held at JPMorgan" must proceed in New York state or federal courts, foreign action threatened the strong public policy of the United States, because "[b]oth the United States and New York strongly favor enforcement of forum selection clauses").

Here, both the July 2022 Mexican Action and the September 2022 Mexican Action concern TV Azteca's financial obligations arising out of its alleged default on notes issued under the Indenture. Both foreign suits thus "aris[e] [from] or relat[e] to [the] Indenture" (Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106), and both actions violate the Indenture's forum selection clause. Accordingly, analysis of the first China Trade factor indicates that an anti-suit injunction should issue. See, e.g., Forbes, 2024 WL 1743109 at *5 (finding that there is a strong public policy in favor of enforcing forum selection clauses, and concluding that first China Trade factor favored issuance of anti-suit injunction where applicable agreement designated New York state and federal courts as the "exclusive fora for 'any legal action or proceedings arising out of or in connection with [the agreement]'").

### 2. Vexatiousness

In determining whether to issue an anti-suit injunction, courts also consider whether – absent an injunction – "the foreign action would be vexatious." China Trade, 837 F.2d at 35 (internal quotations and citation omitted).

Here, Plaintiff argues that TV Azteca's conduct "at every stage" of the Mexican litigations "has been nothing but vexatious." (Pltf. Br. (Dkt. No. 47) at 24) In this regard, Plaintiff cites the multiple ex parte injunctions TV Azteca has sought and obtained in Mexican

23

26
BELA KALLO ROMERO 2024.27 15:37:49
3030030013030030030035319953237360237

courts. According to Plaintiff, TV Azteca provided "no notification of [the requested injunctions] . . . at the time they were sought," and "TV Azteca failed to inform either the bankruptcy court [in this District] or this Court [of the injunctions]." (Id.)

As noted above, Defendants do not substantively address vexatiousness, and instead merely assert that vexatiousness "will likely 'be present whenever parallel [foreign] actions are proceeding concurrently [with a domestic action]. . . .'" (Def. Opp. (Dkt. No. 52) at 12 (quoting China Trade, 837 F.2d at 36))

Courts have found foreign actions vexatious where they are filed ex parte or in violation of the parties' valid agreements. Jolen, Inc. v. Kundan Rice Mills, Ltd., No. 19-CV-1296 (PKC), 2019 WL 1559173, at *4 (S.D.N.Y. Apr. 9, 2019) ("The Indian suit is also vexatious because it was filed ex parte. . . . It is also the second such suit filed in India seeking an end run around the parties' agreement to arbitrate disputes." (internal citations omitted)); see also Storm LLC v. Telenor Mobile Communications AS, No. 06 CIV. 13157 GEL, 2006 WL 3735657, at *9 (S.D.N.Y. Dec. 15, 2006) ("The foreign litigation here has been conducted in the most vexatious way possible. Telenor has found its interests undermined by litigation to which it has not been made a party, and of which it has not even received notice until after orders have been entered.").

As discussed above, both the July 2022 Mexican Action and the September 2022 Mexican Actions were filed in violation of the parties' forum selection clause. Moreover, it is undisputed that in both Mexican actions TV Azteca sought and obtained injunctions on an ex parte basis and without notice to Plaintiff. (See Def. Opp. (Dkt. No. 52) at 7 ("[T]he Mexican complaints and preliminary injunctions were obtained on an ex parte basis without notice.")) Given these circumstances, the Mexican actions are vexatious. See, e.g., Forbes, 2024 WL

24

27

BELA KALLO1 ROMERO 28/04/27 15:37:49
30300003130300003035531995325736237

1743109, at *6 ("The Mexico Injunction is vexatious because it was filed ex parte. . . .

Additionally, allowing the Mexico Injunction to be maintained will force Petitioner to challenge

it in the Mexico courts, undermining Petitioner's rights to the agreed upon forum." (internal

citations omitted)).

Accordingly, the second China Trade factor weighs in favor of issuing an anti-suit

injunction.

### 3. Threat to Enjoining Court's Jurisdiction

Under the third China Trade factor, courts consider whether a foreign action is "a

threat to the [enjoining] court's . . . jurisdiction. . . ." China Trade, 837 F.2d at 35 (internal

quotations and citation omitted).

Plaintiff argues that here "[t]he [f]oreign [a]ctions are a clear threat to this Court's

exclusive jurisdiction to adjudicate disputes arising under the Indenture." (Pltf. Br. (Dkt. No. 47)

at 25)

In response, Defendants contend that the two Mexican actions are merely

"parallel proceedings that do not threaten this Court's exercise of jurisdiction." (Def. Opp. (Dkt.

No. 52) at 12) In this regard, Defendants note that the Mexican actions "have not reached any

final judgments and are being litigated on the merits" (id. at 12-13), and that "[l]itigation here

and in Mexico [has] been proceeding simultaneously for a year-and-a-half and Plaintiff has

participated actively in both [Mexican actions]. . . ." (Id. at 5) Defendants also assert that the

"Mexican injunctions do not have extraterritorial effect; they do not enjoin Plaintiff from taking

any actions in this Court (or elsewhere in the U.S.), and do not purport to limit any aspect of this

Court's jurisdiction." (Id. at 7)

Courts in this Circuit have found, however, that a foreign action threatens the

enjoining court's jurisdiction where the foreign action contravenes a forum selection clause that

25

BELA KALLOI ROMERO 28/04/27 15:37:49
30303031303030303035313935323736323

the parties agreed to. Int'l Equity Invs., 441 F. Supp. 2d at 563 ("Such attempts to make end runs around the forum selection clause and this Court's jurisdiction cannot be tolerated."); JPMorgan Chase Bank, N.A., 2024 WL 1833606, at *2 ("The Russian Action threatens the exclusive jurisdiction of this forum, which VTB agreed to in the parties' contract. . . ."); Forbes, 2024 WL 1743109, at *6 ("Because the Agreement provides for New York courts to have exclusive jurisdiction over any disputes raised under the Agreement, this factor weighs slightly in favor of an anti-suit injunction.").

As discussed above, it is undisputed here that the Indenture contains a forum selection clause providing that each party to the Indenture "irrevocably consents and submits to the exclusive jurisdiction" of New York courts regarding "any suit, action or proceeding . . . arising out of or relating to this Indenture. . . ." (Jun. 28, 2024 Qureshi Decl., Ex. 2 (Indenture) (Dkt. No. 48-2) at 106) The July 2022 Mexican Action and the September 2022 Mexican Action thus violate the Indenture's forum selection clause. And because the forum selection clause confers exclusive jurisdiction on this Court, Defendants – in pursuing the Mexican actions – are seeking to evade "the rightful authority of the forum court" and threatening "this Court's jurisdiction." See Int'l Equity Invs., 441 F. Supp. 2d at 563 (internal quotations and citations omitted).

For all these reasons, the third China Trade factor weighs in favor of enjoining the Mexican actions.

#### 4. Equitable Considerations

Under the fourth China Trade factor, courts consider whether the foreign proceedings "prejudice other equitable considerations. . . ." China Trade, 837 F.2d at 35 (internal quotations and citations omitted).

BELA KALLOI ROMERO 2024:27 15:37:49
3030000300300300030533100535237360237

Plaintiff argues that the equities weigh in its favor here because (1) despite "the fact that the Indenture clearly has a forum selection clause that requires *all* disputes surrounding the Indenture to be brought in New York, TV Azteca has filed multiple suits and multiple ex parte injunctions in Mexico with the goal of delaying any resolution of this matter"; and (2) "TV Azteca is making directly contradictory arguments in different fora" about the validity of the forum selection clause, the reach of this Court's jurisdiction, and whether TV Azteca owes interest or principal under the Indenture, and is thus engaged in "blatant and express forum shopping." (Pltf. Br. (Dkt. No. 47) at 26-27 (emphasis in original) (citing Jun. 28, 2024 Qureshi Decl., Ex. 11 (Bankruptcy Joint Stip. Uncontested Facts) (Dkt. No. 48-11) and Jun. 28, 2024 Castillo Decl. (Dkt No. 49) ¶¶ 17, 20-21))

Defendants do not substantively respond to Plaintiff's arguments, but instead assert that "[t]he Second Circuit has held that international comity typically 'allows parallel proceedings to continue and disfavors anti-suit injunctions.'" (Def. Opp. (Dkt. No. 52) at 11 (quoting China Trade, 837 F.2d at 36)) According to Defendants, "principles of comity apply with particular force here, because . . . the relief sought by Plaintiff would impinge upon fundamental constitutional and other rights under Mexican Law." (Id. at 5) In this regard, Defendants argue that "Mexican citizens have a constitutional right to have justice administered by Mexican courts, and that right may not be restricted or impinged." Because "TV Azteca is a public company that trades on the Mexican stock exchange," it "is accountable to public shareholders and regulators in Mexico." (Id. at 11-12 (citing Voigt Decl. (Dkt. No. 53) ¶¶ 5-8, 11))

While China Trade states that "international comity" requires that "an anti-foreign-suit injunction should be 'used sparingly,' and should be 'granted only with care and

30

BELA KALLO ROMERO 2024/27 15:37:49
3030030013030030300305319953537360237

great restraint,'" China Trade, 837 F.2d at 35-36 (internal citations omitted), "[f]ederal courts generally extend comity [only where] the foreign court has proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987). As discussed above, this Court has exclusive jurisdiction over suits arising from or related to the Indenture, and the Mexican actions initiated by TV Azteca violate this nation's strong policy of enforcing forum selection clauses. See Martinez, 740 F.3d at 218. Given these circumstances, international comity concerns do not justify denying a request for an anti-suit injunction.

Moreover, "equitable considerations such as deterring forum shopping favor [the imposition of foreign anti-suit injunctions]. . . ," Ibeto Petrochemical Indus. Ltd. v. M/T Beffen, 475 F.3d 56, 64 (2d Cir. 2007), particularly where "the timing of the foreign proceeding's commencement suggests that the party initiating that proceeding is seeking 'to distract the parties from litigating the claims here in favor of a more convenient forum.'"[4] AU New Haven, 2018 WL 2128373 at *4 (quoting Keep on Kicking Music, Ltd. v. Hibbert, 268 F. Supp. 3d 585, 591 (S.D.N.Y. 2017)).

And Defendants do not dispute Plaintiff's claim that they have made contradictory arguments before the U.S. Bankruptcy Court and the Mexican courts as to the validity of the forum selection clause, the reach of this Court's jurisdiction, and whether TV Azteca owes principal and interest under the Indenture.

---

[4] TV Azteca filed the September 2022 Mexican Action on September 22, 2022, about four weeks after Plaintiff filed the instant action in Supreme Court of the State of New York, New York County. (See MSJ in Lieu of Cmplt. (Dkt. No. 1-1); Jun. 28, 2024 Castillo Decl., Ex. 7 (Sept. 22, 2022 Mexican Cmplt.) (Dkt No. 49-7); Jun. 28, 2024 Castillo Decl. (Dkt No. 49) ¶ 16)

28

BELA KALLO ROMERO 2024/27 15:37:49
30303001303030005393199353736237

Given all of these circumstances, the fourth China Trade factor supports issuance

of an anti-suit injunction. See Alstom Chile S.A. v. Mapfre Compania De Seguros Generales

Chile S.A., No. 13 CIV. 2416 LTS DCF, 2013 WL 5863547, at *4 (S.D.N.Y. Oct. 31, 2013)

("[E]quitable considerations favor enjoining Defendant from pursuing the Chilean Action, as the

Court must deter forum shopping and it appears here that Defendant sought an alternative forum

to avoid the application of New York law."); Stolt Tankers BV v. Allianz Seguros, S.A., No. 11

CIV. 2331 SAS, 2011 WL 2436662, at *5 (S.D.N.Y. June 16, 2011) ("[T]he equitable

considerations involved, such as deterring forum shopping, also compel enjoining the foreign

action.").

## 5. Delay, Inconvenience, Expense, and Risk of Inconsistent Judgments

Under the fifth China Trade factor, courts consider whether "adjudication of the

same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a

race to judgment." China Trade, 837 F.2d at 35 (internal quotations and citations omitted).

Plaintiff argues that "[h]ere, as a result of the [f]oreign [a]ctions, [it] has been

forced to hire Mexican counsel, litigate in two different countries, and coordinate with two

different sets of opposing counsel. These inconveniences and additional expenses will only

continue if the [f]oreign [a]ctions are permitted to proceed." (Pltf. Br. (Dkt. No. 47) at 27)

Plaintiff further contends that "there is a risk of inconsistent rulings so long as the [d]omestic and

[f]oreign [a]ctions – both of which are adjudicating the same issues – proceed simultaneously, all

of which cuts in favor of granting an anti-suit injunction." (Id. at 27-28)

As discussed above, Defendants do not substantively address this factor, stating

merely that delay, inconvenience, added expense, and the potential for inconsistent results "will

likely be 'present whenever parallel actions are proceeding concurrently. . . .'" (Def. Opp. (Dkt.

No. 52) at 12 (quoting China Trade, 837 F.2d at 36))

32

In <u>Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.</u>, No. 10 CIV. 1853 (PGG), 2010

WL 1050988, (S.D.N.Y. Mar. 23, 2010), this Court considered a motion to enjoin litigation in

India, where the parties had agreed to submit any disputes to arbitration in New York. In

concluding that the fifth <u>China Trade</u> factor favored issuance of an anti-suit injunction, the Court

noted that "costs and . . . inconvenience will only increase if Amaprop is required to appear in

the Indian proceedings in order to attempt to persuade the Indian court that the arbitration clause

the parties agreed to should be honored. Parties enter into binding arbitration clauses –

particularly in the international setting – precisely in order to avoid such costs and

inconvenience." <u>Id.</u> at *7 (citing <u>Storm</u>, 2006 WL 3735657, at *9).

The logic of <u>Amaprop</u> applies with equal force here, where the parties entered

into a forum selection clause that provides for any disputes to be resolved in New York. And the

existence of the Mexican actions also presents a risk of inconsistent judgments. Accordingly, the

fifth <u>China Trade</u> factor weighs in favor of enjoining the Mexican actions. <u>See Ibeto</u>, 475 F.3d at

64-65 (affirming district court ruling enjoining Nigerian litigation where the parties had entered

into an arbitration provision providing for disputes to be resolved in London; "'it is likely that

adjudication of the same issues in two separate actions would result in inconvenience,

inconsistency, and a possible race to judgment'" (citations omitted)).

\*       \*       \*       \*

For the reasons stated above, all of the <u>China Trade</u> factors weigh in favor of

issuing an anti-suit injunction.

## C.     Whether the Requirements for a Preliminary Injunction Are Met

As discussed above, "[o]nce the . . . court has addressed the propriety of imposing

an anti-suit injunction under the <u>China Trade</u> test, the . . . court must then make findings on

whether it is appropriate to enter a <u>preliminary</u> injunction. . . ." <u>In re Millenium Seacarriers</u>, 458

BELA KALLOI ROMERO 2004/27 15:37:49
3030010130300030000531995323736323

F.3d at 98 (emphasis in original); Dandong, 2011 WL 6156743, at *3 ("In addition to satisfying the China Trade test, recent Second Circuit case law has held that a party seeking a preliminary anti-suit injunction must also satisfy the traditional test for a preliminary injunction." (citing Software A.G., 323 Fed. Appx. at 12 (summary order) and In re Millenium Seacarriers, Inc., 458 F.3d at 98)).

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." N. Am. Soccer League, 883 F.3d at 37.

Plaintiff contends that it has met the requirements for a preliminary injunction because (1) forcing Plaintiff to litigate in Mexican courts in violation of the forum selection clause constitutes irreparable harm; (2) Plaintiff has demonstrated a likelihood of success on the merits as to whether an anti-suit injunction should be issued; and (3) enforcing the forum selection clause through an anti-suit injunction is in the public interest. (Pltf. Br. (Dkt. No. 47) at 28-30)

Defendants respond that "Plaintiff has failed to show any imminent, irreparable harm," and note that "Plaintiff has actively participated in the Mexican Litigations for nearly eighteen months."[5] (Def. Opp. (Dkt. No. 52) at 16)

## 1.   Irreparable Harm

As to irreparable harm, Plaintiff argues that "[i]t is well established that 'dragging Petitioners into litigation in a court other than the court having exclusive jurisdiction under the

---

[5] Defendants do not address likelihood of success or the public interest. (See Def. Opp. (Dkt. No. 52))

34

BELA KALLOI ROMERO  28/04/27 15:37:49
30303030130300303030053315953325736237

[Indenture] constitutes irreparable harm.'" (Pltf. Br. (Dkt. No. 47) at 28 (quoting Deutsche
Mexico Holdings S.a.r.l., 2019 WL 5257995, at *7)) According to Plaintiff, it is "*currently
being irreparably harmed because [it is] being forced to defend [itself] in a forum other than the
one to which [it] contractually agreed.*" (Pltf. Reply (Dkt. No. 54) at 13 (emphasis in original))

Defendants respond that – given that Plaintiff waited eighteen months before
filing its motion – it cannot credibly contend that it faces "imminent" harm. (Def. Opp. (Dkt.
No. 52) at 16)

"To show irreparable harm under the first prong of the preliminary injunction test,
[a plaintiff] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is
neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a
court waits until the end of the trial to resolve the harm." AU New Haven, 2018 WL 2128373, at
*4 (internal quotations and citations omitted). Where a party faces foreign litigation in
contravention of a forum selection clause, and seeks an anti-suit injunction, courts in this Circuit
have found irreparable harm. See Deutsche Mexico Holdings S.a.r.l., 2019 WL 5257995, at *7
("[I]t is undeniable that dragging Petitioners into litigation in a court other than the court having
exclusive jurisdiction under the Purchase Agreement constitutes irreparable harm."); Forbes,
2024 WL 1743109, at *7 ("[I]rreparable harm is shown when a party violates the forum selection
clause of an agreement, thereby forcing the other party to litigate in an improper forum. . . . [I]f
litigation were permitted to proceed in the Mexican courts, the benefit of the forum selection
clause in the Agreement would be lost." (internal quotations and citations omitted)); Int'l
Fashion Prods., B.V. v. Calvin Klein, Inc., No. 95 CIV. 0982 (JFK), 1995 WL 92321, at *2
(S.D.N.Y. Mar. 7, 1995) ("[T]he agreement at issue clearly states that New York is the chosen

32

35

BELA KALLO ROMERO
3030030013030030013030033119955237363237
2504/27 15:37:49

forum for all disputes. The Court therefore finds that CKI would suffer irreparable harm by being forced to defend the writ in the Netherlands.").

As discussed above, here the Mexican actions were filed in violation of the Indenture's forum selection clause, indicating that Plaintiff is suffering irreparable harm by being forced to litigate these actions in Mexican courts.

Defendants argue, however, that "Plaintiff's delay in bringing this motion discredits any allegation of the 'imminence' of any harm." (Def. Opp. (Dkt. No. 52) at 16) And according to Defendants, "[i]t is well settled that '[e]quity counsels against granting an injunction when a Petitioner unreasonably and inexcusably delays seeking an injunction.'" (Id. at 17 (quoting Cybernaut Cap. Mgmt. Ltd. v. Partners Grp. Access Secondary 2008, L.P., No. 1:13-cv-05380-WHP, 2013 WL 4413754, at *6 (S.D.N.Y. Aug. 7, 2013)))

Plaintiff responds that "while [it] was on notice of the [f]oreign [a]ctions in 2023, the issue became more salient when the Sixty Third Superior Court [of Mexico issued a January 25, 2024 order denying a motion] to vacate the September [27, 2022] [i]njunction, notwithstanding that COVID-19" – the stated rationale for the injunction – "was no longer a health emergency. . . ." (Pltf. Br. (Dkt. No. 47) at 28 n.24 (citing Jun. 28, 2024 Castillo Decl. (Dkt. No. 49) ¶¶ 44, 47)) While Plaintiff appealed the January 25, 2024 order denying the motion to vacate the September 27, 2022 injunction, "[o]n July 8, 2024, the Third Superior Court of Appeals [in Mexico] affirmed the lower court's refusal to vacate the September [27, 2022] [i]njunction. . . ." (Aug. 14, 2024 Castillo Decl. (Dkt. No. 56) ¶ 4; see also Pltf. Reply (Dkt. No. 54) at 13) In sum, Plaintiff argues that, "[t]o the extent there has been any 'delay,' it is due to the ever-changing circumstances surrounding the [f]oreign [a]ctions." (Pltf. Reply (Dkt. No. 54) at 13 n.13) Plaintiff also argues that "other courts have ordered anti-suit injunctions following far

33

36

BELA KALLO ROMERO 2024.27 15:37:49
30300001303000000053195533736237

longer delays and when the foreign litigation was far closer to completion." (Pltf. Br. (Dkt. No. 47) at 28 n.24 (citing Bailey Shipping, 2013 WL 5312540, at *10, 17))

In Bailey Shipping, 2013 WL 5312540, the court considered an application to enjoin a Greek litigation in the face of a contractual provision providing that all disputes would be resolved in arbitration in New York. The parties seeking an injunction "permitted 13 months to elapse without seeking to prevent [their adversary] from pursuing its claims in Greece, during which time the parties conducted discovery and prepared for the Greek trial." Bailey Shipping, 2013 WL 5312540, at *7. The court concluded, however, that the thirteen-month gap did not preclude a finding of irreparable harm, because "[t]hough [movants] could have applied with more haste for the relief they seek here, the ongoing dispute over the arbitration throughout the late summer, and the parties' recent filing of their final submissions in the Greek court, provide adequate explanation for the delay in seeking this relief." Id. at *17 (internal citations omitted).

The Bailey Shipping court went on to say that it did not

approve[] of [movants'] decision to file this injunction one week prior to the Greek proceeding. . . . However, given the complex and extensive interactions between the parties and with the Greek court over the last year, the Court cannot conclude that [movants] were simply failing to defend their interests in a way that waived their right to seek injunctive relief.

Id. at *17 n.14.

Here, while Plaintiff "could have applied with more haste for the relief [it] seek[s]," id. at *17, "given the complex and extensive interactions between the parties and with the [Mexican courts] over the [eighteen months preceding the instant motion], the Court cannot conclude that [Plaintiff was] simply failing to defend [its] interests in a way that waived [its] right to seek injunctive relief." Id. at *17 n.14. Indeed, Plaintiff represents that it "has always maintained that Mexico is not the appropriate venue and has (and continues to) seek to contest

34

37

BELA KALLOI ROMERO 2004/27 15:37:49
30300301303003030003031393532736237

the jurisdiction of Mexican courts." (Pltf. Reply (Dkt. No. 54) at 14 (citing Jun. 28, 2024

Castillo Decl. (Dkt. No. 49) ¶¶ 29-36) (describing jurisdictional challenges Plaintiff has made to

the Mexican actions in Mexican courts))) The Court concludes that – given these circumstances

– Plaintiff's delay in filing the instant motion does not justify denying injunctive relief, and

further concludes that Plaintiff has demonstrated that it will continue to suffer irreparable harm

absent an injunction.

### 2.    Likelihood of Success on the Merits

As to the second element – likelihood of success on the merits – Plaintiff argues

that "[n]umerous courts have stated that the operative question is whether the petitioning party

can demonstrate success regarding *the anti-suit injunction, not the underlying claim*." (Pltf. Br.

(Dkt. No. 47) at 29 (emphasis in original) (citing Deutsche Mexico Holdings S.a.r.l., 2019 WL

5257995, at *6)) According to Plaintiff, "[i]t is clear that TV Azteca ignored and sought to avoid

the [f]orum [s]election [c]lause when it filed the [f]oreign [a]ctions, which are focused on TV

Azteca's payment obligations under the Indenture," and accordingly Plaintiff "can demonstrate a

likelihood of success on the merits." (Id.)

As noted above, Defendants have not substantively addressed the likelihood of

success on the merits element. (See Def. Opp. (Dkt. No. 52))

In the anti-suit injunction context, courts in this District have held that it is

"appropriate to consider the movant's likelihood of success on the merits by assessing whether it

can satisfy the China Trade test." Bailey Shipping, 2013 WL 5312540, at *18. In Bailey

Shipping, for example, the court found that this "narrower . . . approach" was appropriate,

because "[t]he 'merits' that [movants] seek to vindicate through this injunction are, properly

understood, their right to arbitrate the negligent misrepresentation issue without the impairment

of that right threatened by the claims in the Greek action whose legal substance is identical to the

BELA KALLOI ROMERO 2004.27 15:37:49 30300001303000000005351995352736023

negligent misrepresentation dispute." Id; see also WTA Tour, Inc. v. Super Slam Ltd., 339 F.

Supp. 3d 390, 406 (S.D.N.Y. 2018) ("As to the first prong, Petitioners are correct that the

relevant inquiry is the likelihood of success on the merits of their argument that the claims must

be submitted to arbitration – not, as respondents claim, on the merits of the substantive foreign

law claims."); Deutsche Mexico Holdings S.a.r.l., 2019 WL 5257995 at *6 (". . . as other courts

in this district have concluded, the correct question is whether Petitioners are likely to succeed on

their claim that obtaining the Mexico Injunction in the first instance ran afoul of the Purchase

Agreement, not who is likely to win the arbitration itself.").

Here, as in Bailey Shipping, the "merits" of the claim Plaintiff seeks to vindicate

through the instant motion is its right under the forum selection clause to litigate disputes arising

from or related to the Indenture in New York, rather than in Mexico. And for the reasons

discussed above, Plaintiff has satisfied all of the China Trade factors, and thus shown its

likelihood of success on the merits of that claim. See Int'l Fashion Prods., 1995 WL 92321 at *2

("The forum selection clause in the agreement underlying this action clearly specifies New York

as the only appropriate forum. The Court therefore finds that CKI has demonstrated a

probability of success on the merits of its claim that this action should be prosecuted here rather

than in the Netherlands."); Forbes, 2024 WL 1743109, at *7 ("Petitioner has also shown a

likelihood of success on the merits. In evaluating this element, 'the correct question is whether

Petitioner[ ] [is] likely to succeed on [its] claim that obtaining the Mexico Injunction in the first

instance ran afoul of the [Agreement]. . . .' By filing for the Mexico Injunction, Respondent

breached the forum selection clause of the Agreement, which unambiguously provides that 'the

New York State Supreme Court, New York County, and the United States District Court for the

39

BELA KALLOI ROMERO 2024.27 15.37.49
30360001030360000053195532736237

Southern District of New York' are the exclusive fora for 'any legal action or proceedings arising out of or in connection with this Agreement.'" (internal citations omitted)).

In sum, Plaintiff has shown a likelihood of success on the merits of its claim that the Mexican actions are barred under the forum selection clause in the Indenture.

**3. Public Interest**

As to the third element – whether an anti-suit injunction is in the public interest – Plaintiff argues that "the public interest and balance of equities weighs heavily in favor of injunctive relief," because "[t]here is a strong public policy of enforcing forum selection clauses," and "there is a 'strong public interest in enforcing contracts between sophisticated entities.'" (Pltf. Br. (Dkt. No. 47) at 29 (quoting Deutsche Mexico Holdings S.a.r.l., 2019 WL 5257995, at *6)) According to Plaintiff, "where sophisticated parties negotiated and agreed to an entirely valid [f]orum [s]election [c]lause, it is in the public interest to ensure its enforcement through an anti-suit injunction." (Id. at 29-30)

Defendants do not address whether an anti-suit injunction is in the public interest. (See Def. Opp. (Dkt. No. 52))

As discussed above, there is a strong public interest in enforcing forum selection clauses, and the Mexican actions filed by TV Azteca violate the Indenture's forum selection clause. Given these circumstances, it is in the public interest to issue an anti-suit injunction. See Forbes, 2024 WL 1743109, at *7 ("[T]he Court finds that the public interest and the balance of equities favor enforcement of the forum selection clause[,] . . . . [as] there is a strong public policy of enforcing forum selection clauses."); Deutsche Mexico Holdings S.a.r.l., 2019 WL 5257995, at *8 ("I find that public interest, specifically the strong public interest in enforcing contracts between sophisticated entities, favors granting the requested injunctive relief here." (internal quotations and citations omitted)).

37

BELA KALLOI ROMERO 2004/27 15:37:49
30J00J001J0J00J00J00J0053J190533736037

\*     \*     \*     \*

The Court concludes that the requirements for issuance of a preliminary
injunction have been met.

## D.     Scope of the Anti-Suit Injunction

As to the scope of the anti-suit injunction, Plaintiff seeks an "[o]rder enjoining
Defendant TV Azteca from continuing to prosecute, or initiating any claims in, any action in
Mexico in connection with [the Indenture]." (Pltf. Mot. (Dkt. No. 46) at 2)

Any anti-suit injunction must be properly limited, in recognition of the fact that
although it is "leveled against the party bringing the suit, it nonetheless 'effectively restricts the
jurisdiction of the court of a foreign sovereign.'" Paramedics, 369 F.3d at 655 (quoting China
Trade, 837 F.2d at 35). And in determining the scope of an anti-suit injunction, courts must give
"due regard for principles of international comity" and exercise a "delicate touch." Ibeto, 475
F.3d at 65.

Anti-suit injunctions should be issued only against the offending parties – here
Defendants and their subsidiaries, officers, agents, servants, employees, and attorneys, and all
other persons who are in active concert or participation with Defendants. See id. ("The
injunction should be directed specifically to the parties, for it is only the parties before a federal
court who may be enjoined from prosecuting a suit in a foreign country.").

The anti-suit injunction must also specify what activities are enjoined. Here,
Defendants will be enjoined from commencing or prosecuting any action in Mexico concerning
the Indenture. This form of relief is typical in cases where foreign anti-suit injunctions have
been granted. See, e.g., Amaprop, 2010 WL 1050988, at \*9 ("Here, Respondents will be
enjoined from commencing or prosecuting any action in India concerning the Agreement.").

BELA KALLO ROMERO 2304/27 15:37:49
30300/0011030300/00/0053139553273620237

        The injunction will also require Defendants to take all steps necessary, forthwith, to cause the pending Mexican actions to be dismissed. This form of relief is appropriate under the circumstances, and has been granted in other cases where pending foreign litigation threatens, hinders, or delays proceedings here. See Paramedics, 369 F.3d at 650 (affirming district court order directing defendant to "immediately take all steps necessary to cause dismissal of the [foreign] action" (internal quotations and citations omitted)); Suchodolski Assocs., Inc. v. Cardell Fin. Corp., No. 03 CIV. 4148 (WHP), 2006 WL 3327625, at *4 (S.D.N.Y. Nov. 16, 2006) ("Plaintiffs, their officers, directors, employees and agents, and all persons acting under their direction and control are directed to withdraw from and discontinue the Brazilian Action forthwith."). If Defendants' actions fall short of a full withdrawal or discontinuance of the two pending Mexican lawsuits, they will not be in compliance with the Court's order accompanying this opinion and will be subject to contempt sanctions. See Suchodolski, 2006 WL 3327625, at *4 ("[A]nything short of full withdrawal and discontinuance – for example, a stay or partial discontinuance – will constitute non-compliance with this Order, and Plaintiffs will be sanctioned accordingly.").

## CONCLUSION

        For the reasons stated above, Plaintiff's motion to enjoin TV Azteca from continuing to prosecute or initiating any claims related to the Indenture in Mexico is granted (Dkt. No. 46).

        Defendant TV Azteca and its subsidiaries, officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Defendant TV Azteca, are enjoined from prosecuting the July 2022 Mexican Action and the September 2022 Mexican Action; are instructed to take all steps necessary, forthwith, to dismiss or cause to be dismissed these actions and any other actions currently pending in Mexico arising from the

BELA KALLOI ROMERO 2504.27 15:37:49
303030301303030300006535190553237363237

Indenture; and are enjoined from prosecuting any legal actions in Mexico arising from the

Indenture, or commencing any new legal actions in Mexico arising from the Indenture. The

Clerk of Court is directed to terminate the motion (Dkt. No. 46).

Dated: New York, New York
September 22, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge

43

BELAKALLOI ROMERO  28/04/27 15:37:49
303000001303000000000531395532736237

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**

**DISTRITO SUR DE NUEVA YORK**

**THE BANK OF NEW YORK MELLON,**
**Demandante,**

**contra**

**TV AZTECA, S.A.B. DE C.V. y otros,**
**Demandados.**

**PAUL G. GARDEPHE, JUEZ DE DISTRITO:**

**MEMORÁNDUM, OPINIÓN Y RESOLUCIÓN**

**Expediente 22 Civ. 8164 (PGG)**

En la presente acción, la parte actora *The Bank of New York Mellon* —en su carácter de fiduciario conforme al contrato de emisión (*Indenture Trustee*) de los bonos senior de *TV Azteca, S.A.B. de C.V.* con cupón 8.25 % y vencimiento en 2024— sostiene que la demandada *TV Azteca, S.A.B. de C.V.* y treinta y cuatro subsidiarias garantes (conjuntamente, los "Demandados") incurrieron en incumplimiento respecto de 400 millones de dólares en bonos quirografarios (los "Bonos").

Como consecuencia del presunto incumplimiento, los tenedores de más del 25 % del monto principal total de los Bonos en circulación (los "Tenedores") autorizaron la emisión de un aviso de vencimiento anticipado el 3 de mayo de 2022, mediante el cual se declaró que "el principal no pagado (y, en su caso, la prima) y los intereses devengados y no pagados de todos los Bonos serán exigibles y pagaderos de inmediato conforme al contrato de emisión de 9 de agosto de 2017" (el "Contrato de Emisión" o "Indenture").

El 5 de agosto de 2022, siguiendo instrucciones de los Tenedores, el fiduciario remitió el aviso de vencimiento anticipado a TV Azteca, y el 8 de agosto de 2022 envió un suplemento que declaraba "exigibles y pagaderos de inmediato el principal de 400 millones de dólares, la prima, los intereses devengados y cualesquiera otras cantidades adeudadas conforme al Contrato de Emisión".

El 8 de julio de 2022, *TV Azteca* presentó una demanda ante el Noveno Juzgado Superior de México contra ciertos Tenedores, alegando que el documento denominado "Aviso de Vencimiento Anticipado" carecía de validez y efectos jurídicos, y solicitando que el tribunal declarara que "el pago del principal no pagado de los bonos emitidos bajo el Contrato de Emisión no es exigible".

El 12 de julio de 2022, dicho juzgado emitió una medida cautelar prohibiendo a los Tenedores realizar cualquier gestión de cobro de capital o intereses de los Bonos.

44
BELA KALLO I ROMERO : 230/4/27 15:37:49
303000003 130300003000531390535237360237

Posteriormente, *The Bank of New York Mellon* inició el presente procedimiento mediante moción de juicio sumario en lugar de demanda ante la *Supreme Court* del Estado de Nueva York el 26 de agosto de 2022.

El 22 de septiembre de 2022, *TV Azteca* interpuso otra demanda —ahora ante el Sexagésimo Tercer Juzgado Superior de México— contra el fiduciario, su sucursal de Londres y ciertos Tenedores, solicitando que, debido a "casos fortuitos o fuerza mayor" derivados de la pandemia COVID-19, se declarara que el cumplimiento de las obligaciones asumidas en el Contrato de Emisión resultó "material y legalmente imposible", y por tanto que *TV Azteca* "no incurrió en incumplimiento contractual".

El 27 de septiembre de 2022, el tribunal mexicano concedió otra medida cautelar que prohibía a TV Azteca efectuar pagos derivados del Contrato hasta que la OMS declarara terminada la pandemia.

El 28 de junio de 2024, la parte actora solicitó ante este Tribunal una orden de inhibición (anti-suit injunction) para impedir que TV Azteca continuara promoviendo o iniciando procesos en México relativos al Contrato de Emisión.

Por las razones que se exponen a continuación, dicha solicitud será concedida.

---

## ANTECEDENTES

## I. HECHOS RELEVANTES

El Demandado TV Azteca, uno de los mayores productores de contenido televisivo en español del mundo, está constituido en México y tiene su oficina principal en la Ciudad de México, México. (Declaración Qureshi del 28 de junio de 2024, Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11), ¶¶1-2). Las acciones de TV Azteca cotizan públicamente en la Bolsa Mexicana de Valores y en la Bolsa Latibex de España. (Id., ¶4). Un ciudadano mexicano y dos corporaciones mexicanas afiliadas poseen una participación mayoritaria en las acciones de TV Azteca. (Id.)

TV Azteca tiene 50 filiales directas e indirectas. (Id., ¶5). Seis de esas filiales están organizadas bajo la ley de los Estados Unidos, mientras que las filiales restantes están organizadas bajo la ley de otros países, incluido México. (Id., ¶5). Treinta y cuatro de las filiales de TV Azteca son garantes de las Notas bajo el Contrato de Emisión. (Id., ¶6).

El 9 de agosto de 2017, conforme al Contrato de Emisión, TV Azteca emitió $400 millones en notas no garantizadas, con vencimiento en 2024. (Id., ¶18; véase también Declaración Qureshi del 28 de junio de 2024, Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2)). Bajo el Contrato de Emisión, TV Azteca está obligada a realizar pagos de intereses a una tasa del 8.25% anual sobre el principal de $400 millones el 9 de agosto y el 9 de febrero de cada año durante la vigencia del Contrato de Emisión. (Declaración Qureshi del 28 de junio de 2024,

BELA KALLOI ROMERO · 28/04/27 15:37:49
30J000J001J0J0000J0J00J531J90535237J60237

Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 126; id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11), ¶19).

El Contrato de Emisión contiene disposiciones de elección de ley y selección de foro. Estas disposiciones establecen, entre otras cosas, que cada parte del Contrato de Emisión:

"acuerda que cualquier demanda, acción o procedimiento contra ella que surja de o esté relacionado con este Contrato de Emisión (incluidas las Garantías de las Notas) o las Notas... puede ser iniciado en cualquier tribunal del Estado de Nueva York o cualquier tribunal federal de los Estados Unidos ubicado, en cada caso, en el Distrito de Manhattan, Ciudad de Nueva York, Nueva York, Estados Unidos de América, y cualquier tribunal de apelación de dichos tribunales" (id., Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106; véase también id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶20);

"renuncia, en la mayor medida permitida por la ley aplicable, a cualquier objeción que pueda tener ahora o en el futuro respecto a la presentación de cualquier demanda, acción o procedimiento, cualquier inmunidad frente a la jurisdicción de dichos tribunales sobre cualquier demanda, acción o procedimiento, su derecho a iniciar una acción en cualquier otra jurisdicción que pueda aplicar por virtud de su domicilio presente o futuro o por cualquier otra razón, cualquier reclamo de que cualquier demanda, acción o procedimiento en dicho tribunal haya sido presentado en un foro inconveniente y cualquier derecho a cualquier otra jurisdicción a la que pueda tener derecho por motivo de lugar de residencia o domicilio, o por cualquier otra razón" (id., Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106; véase también id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶20);

"consiente y se somete irrevocablemente a la jurisdicción exclusiva de cualquier tribunal del Estado de Nueva York o cualquier tribunal federal de los Estados Unidos ubicado, en cada caso, en el Distrito de Manhattan, Ciudad de Nueva York, Nueva York, Estados Unidos de América, y cualquier tribunal de apelación de dichos tribunales" (id., Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106; véase también id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶20);

"acuerda que el juicio final en cualquier demanda, acción o procedimiento presentado en dicho tribunal será concluyente y vinculante y podrá ser ejecutado en los tribunales de la jurisdicción de la cual está sujeto mediante una demanda sobre el juicio" (Id., Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106; véase también id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶20).

"Antes del 9 de febrero de 2021, TV Azteca pagó los intereses adeudados bajo las Notas cuando correspondía." "El 9 de febrero de 2021, sin embargo, TV Azteca anunció públicamente que 'diferiría' el pago de intereses correspondiente a esa fecha" (Id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶23; véase también id., Anexo 7 (Comunicado de Prensa de TV Azteca del 9 de febrero de 2021) (Dkt. No. 48-7)), y TV Azteca no realizó los pagos de intereses requeridos correspondientes

al 9 de agosto de 2021, 9 de febrero de 2022, 9 de agosto de 2022 y en febrero de 2023. (Id., Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) ¶24).

El 3 de mayo de 2022, los tenedores de más del 25% del monto principal agregado de las Notas en circulación (los "Tenedores de Notas") autorizaron la emisión de un aviso de aceleración a TV Azteca, el cual declaró que "el principal no pagado (y la prima, si la hubiere) y los intereses acumulados y no pagados de todas las Notas serían exigibles y pagaderos de inmediato conforme a lo estipulado" en el Contrato de Emisión. (Id., Anexo 3 (Aviso de Aceleración del 3 de mayo de 2022) (Dkt. No. 48-3) en 3). Bajo la dirección de los Tenedores de Notas, el Demandante emitió un aviso de aceleración a TV Azteca el 5 de agosto de 2022, y emitió un suplemento al aviso de aceleración del 5 de agosto de 2022 a TV Azteca el 8 de agosto de 2022. El aviso suplementario declaró que "el principal no pagado de $400,000,000, la prima, los intereses acumulados y no pagados, y cualquier otro monto adeudado sobre las Notas, y bajo el Contrato de Emisión, serían exigibles y pagaderos de inmediato conforme a lo estipulado... en el Contrato de Emisión." (Véase id., Anexo 4 (Aviso de Aceleración del 5 de agosto de 2022) (Dkt. No. 48-4) en 2; id., Anexo 5 (Suplemento al Aviso de Aceleración del 8 de agosto de 2022) (Dkt. No. 48-5) en 2).

---

## II. HISTORIA PROCESAL

### A. Litigios en el Extranjero

#### 1. Demanda de julio de 2022 en México

El 8 de julio de 2022, TV Azteca presentó una demanda en el Noveno Tribunal Superior de México contra ciertos Tenedores de Notas (la "Acción Mexicana de Julio de 2022"), afirmando que "el documento denominado 'Aviso de Aceleración' con fecha del 3 de mayo de 2022... no es legalmente válido y no tiene ningún efecto legal," y solicitando que "[el tribunal] ordene que el pago del principal no pagado de los Bonos emitidos bajo el Contrato de Emisión... no es exigible ni pagadero." (Declaración Castillo del 28 de junio de 2024, Anexo 2 (Demanda Mexicana del 8 de julio de 2022) (Dkt. No. 49-2) en 4-5 (énfasis omitido); id. (Dkt. No. 49) ¶9). Aunque el Demandante no está nombrado como demandado en esta acción, TV Azteca solicitó que el Demandante "sea llamado como tercero, en virtud de la capacidad [que tiene] en relación con el Contrato de Emisión, es decir, [fue] designado como Fiduciario... en relación con el Acuerdo y los Bonos emitidos bajo el mismo, por lo que se considera que [debería] estar vinculado por el fallo, si lo hubiere, que pueda emitirse en este procedimiento." (Id., Anexo 2 (Demanda Mexicana del 8 de julio de 2022) (Dkt. No. 49-2) en 77-78).

El 12 de julio de 2022, el Noveno Tribunal Superior de México emitió una orden judicial ex parte (véase id. (Dkt. No. 49) ¶12) que otorgaba "las medidas cautelares solicitadas por TV Azteca," incluyendo (1) "[la] suspensión de los efectos y consecuencias que podrían derivarse del documento con fecha del 3 de mayo de 2022, al que se pretendía dar el carácter de 'Aviso de

47

BELA KALLOI ROMERO  2304/27 15:37:49
303003001303003003005331395532736237

Vencimiento Anticipado,' presuntamente firmado por los [Tenedores de Notas], por virtud del cual buscaban la 'Aceleración' y/o vencimiento anticipado del principal y los intereses acumulados y no pagados de todos los bonos suscritos bajo el Acuerdo de Emisión," y (2) "[la] prohibición de los [Tenedores de Notas] de presentar e iniciar cualquier procedimiento destinado a la cobranza y/o pago del capital no pagado de los bonos emitidos bajo el Acuerdo de Emisión con fecha del 9 de agosto de 2017, en ejecución o materialización del documento con fecha del 3 de agosto de dos mil veintidós, que se pretendía dar el carácter 'Aviso de Vencimiento Anticipado,' contra [TV Azteca] o sus filiales, incluidas las filiales garantes." (Id., Anexo 3 (Orden Judicial Mexicana del 12 de julio de 2022) (Dkt. No. 49-3) en 3 (énfasis omitido)). La orden judicial del 12 de julio de 2022 establece además que las "medidas cautelares solicitadas serán válidas hasta que se emita el fallo final y ejecutable" (Id. en 4).

El 17 de agosto de 2022, el Noveno Tribunal Superior extendió la orden judicial del 12 de julio de 2022 "con el propósito de suspender los efectos y consecuencias que podrían derivarse de los documentos con fecha del 5 y 8 de agosto de 2022, referidos como 'Aviso de Vencimiento Anticipado'; Los [Tenedores de Notas] y el fiduciario están prohibidos de iniciar y/o iniciar cualquier procedimiento destinado a la cobranza y/o pago del capital no pagado de los bonos emitidos bajo el contrato de emisión con fecha del 9 de agosto de 2017, en ejecución o materialización de los documentos con fecha del 5 y 8 de agosto de 2022." (Id., Anexo 4 (Extensión de la Orden Judicial Mexicana del 17 de agosto de 2022) (Dkt. No. 49-4) en 2 (énfasis omitido)).

El litigio continúa en curso en la Acción Mexicana de Julio de 2022, y no se ha emitido un fallo final en ese caso. (Véase Informe Conjunto de Estado del 12 de septiembre de 2025 (Dkt. No. 96)).

## 2. Demanda de septiembre de 2022 en México

Como se discutió anteriormente, el 22 de septiembre de 2022, TV Azteca presentó una demanda ex parte (véase Declaración Castillo del 28 de junio de 2024 (Dkt. No. 49), ¶¶16, 19) contra The Bank of New York Mellon, como Fiduciario, y The Bank of New York Mellon, Sucursal de Londres, como Agente Pagador Principal, y ciertos Tenedores de Notas en el Sexagésimo Tercer Tribunal Superior de México, afirmando que debido a "actos de fuerza mayor o eventos fortuitos" relacionados con la pandemia de COVID-19, "el cumplimiento de las obligaciones asumidas en el [Contrato de Emisión]" era una "imposibilidad material y legal," y que, como resultado, TV Azteca "NO incumplió con las obligaciones contractuales asumidas en el [Contrato de Emisión]." (Véase Declaración Castillo del 28 de junio de 2024, Anexo 7 (Demanda Mexicana del 22 de septiembre de 2022) (Dkt. No. 49-7) en 4, 7; id. (Dkt. No. 49), ¶¶16-17) (énfasis en el original). TV Azteca solicitó al tribunal que "declare que, debido a que ocurrieron actos de fuerza mayor y eventos fortuitos que impidieron el cumplimiento de las obligaciones asumidas por [TV Azteca] ya que estaban fuera de su control, durante la emergencia sanitaria, el Vencimiento Anticipado del pago del principal o la prima no debía tener lugar, ni el pago de intereses el 9 de febrero de 2021, el 9 de agosto de 2021 y el 9 de febrero de 2022; ni la morosidad o intereses sobre atrasos o cualquier otro monto adicional, si lo hubiere, establecido en el [Contrato de Emisión]." (Véase id., Anexo 7 (Demanda Mexicana del 22 de septiembre de 2022) (Dkt. No. 49-7) en 7 (énfasis

48

BELA KALLOI ROMERO - 28/04/27 15:37:49
303000001303000600000053133953523736023

omitido)). TV Azteca también solicitó al tribunal que "declare la ineficacia legal del documento titulado 'Aviso de Vencimiento Anticipado' con fecha del 3 de mayo de 2022," y que determine que "el Vencimiento Anticipado del pago del principal o la prima [no] tuvo lugar," y por lo tanto, "no es apropiado requerir el pago de la prima, los intereses acumulados y no pagados, y otros montos adeudados bajo ciertos Bonos Senior al 8.25% con vencimiento en 2024." TV Azteca también solicitó al tribunal que declare que "el acuerdo [del Contrato de Emisión], con fecha del 9 de agosto de 2017, [es] nulo y sin efecto." (Id. en 7-8 (énfasis omitido)).

El 27 de septiembre de 2022, el Sexagésimo Tercer Tribunal Superior emitió una orden judicial ex parte (véase id. (Dkt. No. 49) ¶22) ordenando que "hasta que la Organización Mundial de la Salud declare la extinción de la pandemia conocida como SARS-CoV2 (COVID-19), [TV Azteca] está prohibida de realizar pagos de obligaciones" bajo el Contrato de Emisión "adeudadas antes de la presente demanda." (Id., Anexo 8 (Orden Judicial Mexicana del 27 de septiembre de 2022) (Dkt. No. 49-8) en 7, 19). La orden judicial del 27 de septiembre de 2022 también incluye "una prohibición [para] los [Tenedores de Notas] de iniciar y/o presentar cualquier procedimiento para la cobranza y/o pago del principal no pagado de los Bonos emitidos bajo el [Contrato de Emisión], en ejecución o materialización del documento con fecha del 3 de mayo de 2022, que se pretendía dar el carácter de 'Aviso de Vencimiento Anticipado,'" y ordena la "suspensión de todos los procedimientos de ejecución y la prohibición de la garantía de activos en detrimento de [TV Azteca] hasta la emisión del fallo que se vuelva ejecutable en el presente procedimiento." (Id. en 19). La orden judicial del 27 de septiembre de 2022 también ordena "la suspensión de los efectos y consecuencias que se podrían derivarse del vencimiento anticipado del principal y los intereses acumulados y no pagados de todos los bonos suscritos bajo el [Contrato de Emisión]," y "la suspensión de todas las obligaciones de pago derivadas del [Contrato de Emisión]...." (Id.)

El litigio en la Acción Mexicana de Septiembre de 2022, así como en una acción relacionada que cuestiona la constitucionalidad de la orden judicial del 27 de septiembre de 2022 bajo la ley mexicana, permanece en curso, y no se ha emitido un fallo final. (Véase Informe Conjunto de Estado del 12 de septiembre de 2025 (Dkt. No. 96)).

**La Presente Acción** El Demandante inició la presente acción el 26 de agosto de 2022, al presentar una moción de juicio sumario en lugar de una demanda en el Tribunal Supremo del Estado de Nueva York, Condado de Nueva York. (Moción de Juicio Sumario en lugar de Demanda (Dkt. No. 1-1)). El 23 de septiembre de 2022, los Demandados trasladaron la acción a este Tribunal con base en la jurisdicción por diversidad. (Aviso de Traslado (Dkt. No. 1)).

En una orden del 16 de octubre de 2023, este Tribunal suspendió la presente acción conforme a 11 U.S.C. §362, en espera de la resolución de peticiones de bancarrota del Capítulo 11 presentadas contra los Demandados por ciertos Tenedores de Notas en el Tribunal de Bancarrota de los Estados Unidos para el Distrito Sur de Nueva York. (Orden del 16 de octubre de 2023 (Dkt. No. 28) en 1-3). Ese mismo día, este Tribunal ordenó a las partes que "presenten una carta conjunta actualizando al Tribunal sobre el estado de la

BELA KALLOI ROMERO · 2804/27 15:37:49
30300003130300000005315955323736037

petición de bancarrota y los litigios mexicanos cada 30 días, y en cualquier caso, dentro de los tres días posteriores a la resolución de cualquiera de esas acciones." (Id. en 3).

El 28 de junio de 2024, el Demandante solicitó una orden que prohibiera a TV Azteca "continuar con la prosecución, o iniciar cualquier reclamación en, cualquier acción en México en relación con el [Contrato de Emisión]..." (Moción del Demandante (Dkt. No. 46) en 2).

Los Demandados presentaron su oposición a la moción del Demandante el 29 de julio de 2024 (Oposición de los Demandados (Dkt. No. 52)), y el Demandante presentó su respuesta el 14 de agosto de 2024. (Respuesta del Demandante (Dkt. No. 54)).

El 10 de octubre de 2024, la suspensión en la presente acción fue levantada después de que las partes informaran al Tribunal que el Tribunal de Bancarrota de los Estados Unidos para el Distrito Sur de Nueva York había desestimado la acción de bancarrota presentada contra los Demandados. (Orden del 10 de octubre de 2024 (Dkt. No. 61)).

## III. DISCUSIÓN

## I. NORMAS JURÍDICAS APLICABLES

"Es incuestionable que un tribunal federal puede prohibir a una parte ante él perseguir un litigio en un foro extranjero." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004). "[S]in embargo, los principios de cortesía internacional aconsejan que las órdenes judiciales que restrinjan litigios extranjeros se usen con moderación y se otorguen solo con cuidado y gran restricción." Id. (citando China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)).

Antes de imponer una orden judicial antisuit, un tribunal debe primero determinar que se cumplen los siguientes requisitos umbral: "[1.] las partes son las mismas en ambos asuntos, y [2.] la resolución del caso ante el tribunal que emite la orden es determinante de la acción a ser prohibida." Id. (citando China Trade, 837 F.2d en 35).

Cuando se cumplen los requisitos umbral para prohibir un litigio extranjero, un tribunal debe considerar si "(1) [en ausencia de una orden judicial,] se frustraría una política en el foro que emite la orden; (2) [en ausencia de una orden judicial,] la acción extranjera sería vejatoria; (3) [los procedimientos extranjeros presentan] una amenaza a la jurisdicción del tribunal que emite la orden; (4) los procedimientos en el otro foro perjudican consideraciones equitativas; [y] (5) la adjudicación de los mismos asuntos en acciones separadas resultaría en demora, inconveniencia, gasto, inconsistencia, o una carrera hacia el juicio" (los "factores China Trade"). China Trade, 837 F.2d en 35 (citando American Home Assurance Corp. v. The Insurance Corp. of Ireland, Ltd., 603 F. Supp. 636, 643 (S.D.N.Y. 1984)); véase también Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 119 (2d Cir. 2007) (aplicando los mismos cinco factores).

Cuando un "tribunal ha abordado la pertinencia de imponer una orden judicial antisuit bajo la prueba de China Trade (y ha determinado que una orden judicial antisuit está justificada), el...

tribunal debe entonces hacer determinaciones sobre si es apropiado emitir una orden judicial preliminar." In re Millenium Seacarriers, Inc., 458 F.3d 92, 98 (2d Cir. 2006) (énfasis omitido); véase también Dandong v. Pinnacle Performance Ltd., No. 10 CIV. 8086 LBS, 2011 WL 6156743, en *3 (S.D.N.Y. Dec. 12, 2011), confirmado en parte, devuelto en parte por otros motivos bajo el nombre Lam Yeen Leng v. Pinnacle Performance Ltd., 474 F. App'x 810 (2d Cir. 2012) ("Además de satisfacer la prueba de China Trade, la jurisprudencia reciente del Segundo Circuito ha sostenido que una parte que busca una orden judicial preliminar antisuit también debe satisfacer la prueba tradicional para una orden judicial preliminar." (citando Software A.G., Inc. v. Consist Software Solutions, Inc., 323 Fed. Appx. 11, 12 (2d Cir. 2009) (orden sumaria); In re Millenium Seacarriers, 458 F.3d en 98)). "Una parte que busca una orden judicial preliminar debe demostrar (1) daño irreparable; (2) ya sea una probabilidad de éxito en los méritos o tanto preguntas serias sobre los méritos y un balance de dificultades que favorezca decididamente a la parte que solicita; y (3) que una orden judicial preliminar es de interés público." N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).

---

## II. ANÁLISIS

Señalando que "la cláusula de selección de foro del Contrato de Emisión... confiere jurisdicción exclusiva a los tribunales de Nueva York para adjudicar todas las disputas que surjan bajo o relacionadas con el Contrato de Emisión," el Demandante sostiene que "el litigio de TV Azteca en México busca expresamente... evitar sus obligaciones bajo su Contrato de Emisión regido por la ley de [Nueva York] y evadir la jurisdicción exclusiva de los tribunales de Nueva York a los que TV Azteca se sometió irrevocablemente cuando entró en el Contrato de Emisión." (Memorial del Demandante (Dkt. No. 47) en 6-7 (énfasis en el original)). Según el Demandante, la conducta de TV Azteca de intentar "socavar la jurisdicción de este Tribunal y evadir sus obligaciones contractuales bajo la ley de [Nueva York] constituye una conducta que ataca el corazón de nuestro sistema judicial y viola la fuerte política pública que apoya la ejecución de cláusulas de selección de foro y la jurisdicción de los tribunales federales en los Estados Unidos." (Id. en 7). El Demandante "solicita que este Tribunal prohíba de inmediato a TV Azteca continuar o iniciar procedimientos adicionales en México que surjan bajo o estén relacionados con el Contrato de Emisión" (Id.).

En oposición a la moción del Demandante para una orden judicial antisuit, los Demandados argumentan que los principios de cortesía internacional controlan aquí, y que la solicitud de una orden judicial antisuit debe ser denegada porque "afectaría los derechos fundamentales constitucionales y otros bajo la ley mexicana de [TV Azteca]." (Oposición de los Demandados (Dkt. No. 52) en 5). Los Demandados también señalan que "[el] litigio aquí y en México [ha] estado procediendo simultáneamente durante un año y medio y [que] el Demandante ha participado activamente en ambos," demostrando que "este Tribunal no necesita actuar para proteger su jurisdicción." "Los litigios mexicanos no están interfiriendo con la jurisdicción de este Tribunal" ni "impidiendo el progreso de [el presente] caso." (Id.). En cuanto al daño irreparable, los Demandados afirman que el Demandante "litigó en

BELA KALLO ROMERO : 28/04/27 15:37:49
303000003130300030030031930533730623

México durante dieciocho meses sin reclamar nunca una lesión irreparable," y que, por lo tanto, el Demandante no ha hecho la demostración necesaria para justificar el "remedio drástico" de una orden judicial antisuit. (Id. en 6).

---

## A. Requisitos Umbral

Como se señaló anteriormente, "[una] orden judicial antisuit contra un litigio paralelo [extranjero] puede imponerse solo si [1.] las partes son las mismas en ambos asuntos, y [2.] la resolución del caso ante el tribunal que emite la orden es determinante de la acción a ser prohibida." *Paramedics*, 369 F.3d en 652 (citando *China Trade*, 837 F.2d en 35).

El Demandante argumenta que ambos requisitos umbral se cumplen aquí. (Memorial del Demandante (Dkt. No. 47) en 18-21). En cuanto al "[primer] requisito umbral," el Demandante señala que "[las] partes no necesitan ser idénticas en ambos asuntos siempre que las 'partes reales interesadas' sean las mismas" (id. en 18 (citando *Deutsche Mexico Holdings S.a.r.l. v. Accendo Bank, S.A.*, Case No. 19 Civ. 8692 (AKH), 2019 WL 5257995, en *5 (S.D.N.Y. Oct. 17, 2019))), y que "[los] tribunales han encontrado que las partes son las mismas 'partes reales interesadas' cuando sus intereses están alineados y/o las partes no idénticas son superfluas para la acción." (Id. en 18-19 (citando *Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006); *Motorola Credit Corp. v. Uzan*, Case No. 02 Civ. 666 (JSR), 2003 WL 56998, en *2 (S.D.N.Y. Jan. 7, 2003))).

Aquí, el Demandante "es el Fiduciario [para las Notas], [y] es efectivamente un representante, y actúa bajo la dirección expresa de, los Tenedores de Notas que buscan hacer valer sus intereses con respecto al Contrato de Emisión [frente a] el demandado, TV Azteca, y sus Garantes. En las [a]cciones [e]xtranjeras, el demandante es TV Azteca, [que] busca prohibir la aceleración y los pagos de las Notas bajo el mismo Contrato de Emisión a través de un litigio contra el mismo Fiduciario que protege los derechos de los mismos Tenedores de Notas." (Id. en 19 (énfasis en el original)). Por lo tanto, se cumple el primer requisito umbral porque "[las] [a]cciones [e]xtranjeras y [d]omésticas involucran el mismo Contrato de Emisión, las 'partes reales' interesadas en todas estas acciones son claramente las mismas—TV Azteca y el Fiduciario actuando bajo la dirección de los Tenedores de Notas—y las partes no superpuestas (los Garantes y los Tenedores de Notas individuales) son superfluas en tanto no son necesarias para el alivio solicitado." (Id.).

En cuanto al segundo requisito umbral, el Demandante argumenta que "'[la] indagación relevante es 'si la sustancia de las reclamaciones y argumentos planteados en las dos acciones es la misma'"" (Id. en 20 (citando *AU New Haven, LLC v. YKK Corp.*, Case No. 15-cv-3411 (GHW) (SN), 2018 WL 2128373, en *3 (S.D.N.Y. May 8, 2018) (citando *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-CV-5571 (RJH) (HBP), 2009 WL 3859066, en *6 (S.D.N.Y. Nov. 19, 2009)))). Y según el Demandante, "[la] decisión de este Tribunal en la [a]cción [d]oméstica, que se trata enteramente de las obligaciones de TV Azteca bajo el Contrato de Emisión con respecto a los intereses y el principal no pagados, resolvería completamente la

52

BELA KALLOI ROMERO 250442715:37:49
3030003003030000000500331595352730627

disputa subyacente [en] las [a]cciones [e]xtranjeras (que buscan la no ejecución del mismo Contrato de Emisión)." (Id. en 21).

Los Demandados no abordan si los requisitos umbral para la emisión de una orden judicial antisuit se cumplen aquí. (Véase Oposición de los Demandados (Dkt. No. 52)).

En cuanto al primer factor umbral, el Demandante tiene razón en que "[las] decisiones que interpretan *China Trade* han sostenido que... las partes no necesitan ser idénticas en ambos asuntos, siempre que las 'partes reales interesadas' sean las mismas" *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *5 (citando *Motorola Credit Corp. v. Uzan*, No. 02-CV-666, 2003 WL 56998 (S.D.N.Y. Jan. 7, 2003)); véase también *Paramedics*, 369 F.3d en 652-53 (el primer requisito umbral se cumple cuando "[el] registro apoya el hallazgo del tribunal de distrito de una similitud sustancial y afiliación entre [las partes en la acción de Nueva York] y [las partes en la acción extranjera]" (citando *Motorola Credit Corp. v. Uzan*, No. 02 CIV. 666 (JSR), 2003 WL 56998, en *2 (S.D.N.Y. Jan. 7, 2003) ("encontrando suficiente similitud entre las partes, aunque no todas las partes en las dos acciones fueran idénticas, porque 'las partes reales interesadas son las mismas en ambos asuntos'"); *MasterCard Int'l Inc. v. Argencard Sociedad Anónima*, No. 01 CIV. 3027 (JGK), 2002 WL 432379, en *10 (S.D.N.Y. Mar. 20, 2002) ("encontrando suficiente similitud entre las partes a pesar de la intervención en la acción extranjera" por una entidad que "no era una parte necesaria para esa acción"))); véase también *Int'l Equity Invs., Inc.*, 441 F. Supp. 2d en 562 ("Cuando las partes en las dos acciones están afiliadas o son sustancialmente similares, de modo que sus intereses están representados por una otra, los tribunales han encontrado que se cumple el primer requisito.").

En cuanto al segundo factor umbral, "[los] tribunales en este Circuito han encontrado que las órdenes judiciales antisuit son apropiadas incluso cuando las reclamaciones en las acciones extranjeras y domésticas no eran precisamente idénticas, pero al menos se basaban en la misma disputa subyacente." *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, No. 12 CIV. 5959 KPF, 2013 WL 5312540, en *10 (S.D.N.Y. Sept. 23, 2013) (citando *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148 (WHP), 2006 WL 10886, en *3 (S.D.N.Y. Jan. 3, 2006), confirmado en parte relevante, desestimado en parte por otros motivos, 261 F. App'x 324 (2d Cir. 2008) (orden sumaria); *SGA Avipro Fin. Ltd. v. Cameroon Airlines*, No. 05 Civ. 655 (LTS) (DFE), 2005 WL 1353955, en *3 (S.D.N.Y. June 8, 2005)). "La indagación relevante [en cuanto al segundo factor umbral] es 'si la sustancia de las reclamaciones y argumentos planteados en las dos acciones es la misma.'" *AU New Haven, LLC*, 2018 WL 2128373, en *3 (citando *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 3859066, en *6). "Por lo tanto, 'el criterio de "determinante" puede cumplirse cuando un procedimiento extranjero necesariamente emitirá una determinación del "asunto central" en el corazón de una reclamación que solo debe decidirse apropiadamente en una acción doméstica pendiente.'" *Id.* (citando *Bailey Shipping*, 2013 WL 5312540, en *9).

Aquí, este Tribunal encuentra que TV Azteca es parte en la Acción Mexicana de Julio de 2022, la Acción Mexicana de Septiembre de 2022, y la presente acción. En los tres casos, TV Azteca sostiene que no necesita satisfacer ciertas obligaciones financieras bajo el Contrato

de Emisión derivadas de su presunto incumplimiento en $400 millones en notas no garantizadas. (Véase Declaración Castillo del 28 de junio de 2024, Anexo 2 (Demanda Mexicana del 8 de julio de 2022) (Dkt. No. 49-2); id., Anexo 7 (Demanda Mexicana del 22 de septiembre de 2022) (Dkt. No. 49-7); Memorial de los Demandados (Dkt. No. 9) en 19-21 (detallando los argumentos de los Demandados en oposición a la moción del Demandante para un juicio sumario en lugar de una demanda)). Además, los Demandados en la presente acción—TV Azteca y sus filiales garantes—"están afiliados o son sustancialmente similares" a TV Azteca en las dos acciones mexicanas, "de modo que sus intereses están representados por una otra." *Int'l Equity Invs.*, 441 F. Supp. 2d en 562.

The Bank of New York Mellon, en su calidad de fiduciario del contrato de emisión para las Notas, es parte tanto en la presente acción doméstica como en la Acción Mexicana de Septiembre de 2022. En ambas acciones, The Bank of New York Mellon busca hacer valer los intereses de los Tenedores de Notas contra TV Azteca derivados del presunto incumplimiento de TV Azteca en $400 millones en notas no garantizadas bajo el Contrato de Emisión. (Véase Moción de Juicio Sumario en lugar de Demanda (Dkt. No. 1-1); Declaración Castillo del 28 de junio de 2024, Anexo 7 (Demanda Mexicana del 22 de septiembre de 2022) (Dkt. No. 49-7)). Y aunque The Bank of New York Mellon no es parte en la Acción Mexicana de Julio de 2022, los demandados en esa acción son Tenedores de Notas que de manera similar buscan hacer valer sus intereses contra TV Azteca relacionados con el presunto incumplimiento de TV Azteca en $400 millones en notas no garantizadas bajo el Contrato de Emisión. (Véase Declaración Castillo del 28 de junio de 2024, Anexo 2 (Demanda Mexicana del 8 de julio de 2022) (Dkt. No. 49-2)). Y TV Azteca ha solicitado en su demanda en la Acción Mexicana de Julio de 2022 que The Bank of New York Mellon "sea llamado como [tercero], en virtud de la capacidad [que tiene] en relación con el Contrato de Emisión, es decir, [fue] designado como Fiduciario... en relación con el Acuerdo y los Bonos emitidos bajo el mismo, por lo que se considera que [debería] estar vinculado por el fallo, si lo hubiere, que pueda emitirse en este procedimiento." (Id. en 77-78). El Tribunal concluye que el Demandante está "afiliado o es sustancialmente similar" a los demandados en las dos acciones mexicanas, "de modo que sus intereses están representados por una otra" *Int'l Equity Invs.*, 441 F. Supp. 2d en 562.

En resumen, aunque las partes en la presente acción doméstica no son idénticas a las partes en las dos acciones mexicanas, las "partes reales interesadas" son las mismas en los tres casos. Por lo tanto, se cumple el primer factor umbral. Véase, p.ej., *AU New Haven*, 2018 WL 2128373, en *2 (Aunque la parte en la acción doméstica no era idéntica a la parte en la acción extranjera, el tribunal concluyó que los intereses de ambas partes en las dos acciones están indudablemente alineados. Ambas buscan demostrar que los productos de YKK estaban cubiertos por la patente japonesa [Por lo tanto,] las partes en las dos acciones son las mismas para los fines de la orden judicial antisuit."); véase también *Eastman Kodak Co. v. Asia Optical Co.*, 118 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) (sosteniendo que "[el] primer [requisito umbral] se cumple," y señalando que "[la] presencia de... un demandante adicional [en la acción extranjera] no altera esta conclusión.").

54

BELA KALLOI ROMERO  2004/27 15:37:49
3030003013030030030053319955325736023

En cuanto al segundo factor umbral, este Tribunal concluye que una decisión en la presente acción doméstica sería determinante de las acciones mexicanas, porque los tres casos conciernen a las obligaciones financieras de los Demandados derivadas del presunto incumplimiento de TV Azteca en $400 millones en notas no garantizadas emitidas bajo el Contrato de Emisión. Como se discutió anteriormente, tanto la Acción Mexicana de Julio de 2022 como la Acción Mexicana de Septiembre de 2022 conciernen a las obligaciones de TV Azteca relacionadas con su presunto incumplimiento en las mismas notas no garantizadas emitidas bajo el Contrato de Emisión. Véase, p.ej., *AU New Haven*, 2018 WL 2128373, en *3 (encontrando que el segundo factor umbral se cumple porque "[la] resolución de la presente acción requerirá que el Tribunal decida la misma disputa subyacente—si los productos que YKK vendió en Japón estaban cubiertos por la patente japonesa y el [acuerdo de licencia ejecutiva]—y, por lo tanto, será determinante de la acción japonesa.").

Por todas estas razones, ambos requisitos umbral se cumplen aquí.

---

## B. Factores del caso *China Trade*

Cuando, como aquí, se cumplen los requisitos umbral para prohibir un litigio extranjero, un tribunal debe considerar si "(1) [en ausencia de una orden judicial,] se frustrará una política en el foro que emite la orden; (2) [en ausencia de una orden judicial,] la acción extranjera sería vejatoria; (3) [los procedimientos extranjeros presentan] una amenaza a la jurisdicción del tribunal que emite la orden; (4) los procedimientos en el otro foro perjudican otras consideraciones equitativas; [y] (5) la adjudicación de los mismos asuntos en acciones separadas resultaría en demora, inconveniencia, gasto, inconsistencia, o una carrera hacia el juicio." *China Trade*, 837 F.2d en 35 (citando *American Home Assurance*, 603 F. Supp. en 643).

El Demandante sostiene que todos estos factores pesan a su favor, argumentando que (1) en ausencia de una orden judicial, las acciones mexicanas frustrarán la política pública de esta nación de hacer cumplir las cláusulas de selección de foro; (2) las órdenes judiciales ex parte obtenidas por TV Azteca en las acciones mexicanas han sido vejatorias; (3) la cláusula de selección de foro otorga a este Tribunal jurisdicción exclusiva sobre cualquier disputa relacionada con el Contrato de Emisión, y la jurisdicción exclusiva de este Tribunal está amenazada por las acciones mexicanas; (4) las consideraciones equitativas apoyan la emisión de una orden judicial antisuit, dado que TV Azteca ha incurrido en búsqueda de foro en violación de la cláusula de selección de foro; y (5) permitir que las acciones mexicanas prosigan en violación de la cláusula de selección de foro causaría más demora, inconveniencia, gasto y riesgo de fallos inconsistentes. (Véase Memorial del Demandante (Dkt. No. 47) en 21-28).

En respuesta, los Demandados argumentan que el análisis de los factores primero y tercero de *China Trade* aquí—si las acciones mexicanas frustran los intereses de política pública de esta nación, y si las acciones mexicanas amenazan la jurisdicción de este Tribunal—"pesa en contra de la emisión de una orden judicial," al igual que la consideración equitativa de la

55
BELA KALLOI ROMERO  2804/27 15:37-49
30300/001/30300/001005531395552736037

cortesía internacional. (Oposición de los Demandados (Dkt. No. 52) en 11-12). Los Demandados no abordan sustantivamente los factores segundo y quinto de *China Trade*— vejatoriedad y demora, inconveniencia y gasto—sosteniendo que aunque "los tribunales típicamente consideran [estos] factores adicionales..., [ellos] son de menor importancia porque probablemente 'estarán presentes siempre que las acciones paralelas estén procediendo simultáneamente,' y por lo tanto 'una orden judicial antisuit basada solo en estos factores adicionales tendería a socavar la política que permite que los procedimientos paralelos continúen y desfavorece las órdenes judiciales antisuit.'" (Id. en 12 (citando *China Trade*, 837 F.2d en 36)).

Aunque "[los] factores primero y tercero [de *China Trade*]... son de mayor importancia," *Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*, No. 23-CV-11168 (JGLC), 2024 WL 1743109, en *5 (S.D.N.Y. Apr. 23, 2024) (citando *China Trade*, 837 F.2d en 36), y aunque "los principios de cortesía internacional aconsejan que las órdenes judiciales que restrinjan litigios extranjeros se usen con moderación y se otorguen solo con cuidado y gran restricción," *Paramedics*, 369 F.3d en 653 (citando *China Trade*, 837 F.2d en 36), el Segundo Circuito ha dejado claro que "todos los factores [de *China Trade*] deben considerarse al determinar si una orden judicial antisuit está justificada." *Karaha Bodas*, 500 F.3d en 119 (énfasis en el original).

Por lo tanto, este Tribunal analiza a continuación cada uno de los factores de *China Trade*.

## 1. Frustración de una política pública del foro

Al determinar si emitir una orden judicial antisuit, un tribunal debe considerar "si el procedimiento extranjero amenaza una fuerte política pública... del foro doméstico." *Paramedics*, 369 F.3d en 654.

El Demandante argumenta que "[es] bien establecido que 'existe una fuerte política pública en hacer cumplir las cláusulas de selección de foro'" (Memorial del Demandante (Dkt. No. 47) en 21 (citando *Forbes*, 2024 WL 1743109, en *5)), y "[aquí] no hay disputa de que el Contrato de Emisión contiene una cláusula de selección de foro válida por la cual cada parte 'consiente y se somete irrevocablemente a la jurisdicción exclusiva de los tribunales de Nueva York' con respecto a 'cualquier demanda, acción o procedimiento... que surja [de] o esté relacionado con este Contrato de Emisión.'" (Id. en 22 (citando Declaración Qureshi del 28 de junio de 2024, Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106)). El Demandante sostiene además que "a través de las [a]cciones [e]xtranjeras—donde TV Azteca argumenta que no tiene que realizar ningún pago bajo el Contrato de Emisión y que dichos pagos no pueden ser compelidos—TV Azteca busca litigar en México cuestiones que claramente 'surgen de o están relacionadas con' el Contrato de Emisión." (Id.). Según el Demandante, las acciones mexicanas constituyen así "una clara violación de la [c]láusula de [s]elección de [f]oro y socavan la fuerte política pública de este Tribunal en asegurar que dichas cláusulas de selección de foro sean ejecutadas." (Id.).

Los Demandados responden que "la mayoría de los casos citados por el Demandante para la emisión de una orden judicial antisuit involucraban una cláusula de arbitraje." Según los

56

BELA KALLOI ROMERO · 2304/27 15:37:49
3030030013030030030033319553523736623

Demandados, estos casos son distinguibles porque "[la] ejecutabilidad de las cláusulas de arbitraje es objeto de una ley federal y tratados internacionales de los cuales los Estados Unidos es parte, y el Segundo Circuito ha sido consistente y claro en que un litigio extranjero no puede interrumpir procedimientos de arbitraje que las partes habían acordado válidamente." (Oposición de los Demandados (Dkt. No. 52) en 14 (citando *Karaha Bodas Co.*, 500 F.3d en 126; *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 1:10-cv-01853-PGG-JCF, 2010 WL 1050988, en *6 (S.D.N.Y. Mar. 23, 2010))). Aquí, por el contrario, "no ha habido... una frustración continua de ninguna política pública 'fuerte' de este foro." (Id. en 15).

Sin embargo, los Demandados no disputan que el Contrato de Emisión contiene una cláusula de selección de foro que establece claramente que cada parte "consiente y se somete irrevocablemente a la jurisdicción exclusiva" de los tribunales de Nueva York con respecto a "cualquier demanda, acción o procedimiento... que surja de o esté relacionado con este Contrato de Emisión...." (Declaración Qureshi del 28 de junio de 2024, Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106). Y contrario al argumento de los Demandados, es una fuerte política pública de esta nación favorecer la ejecución de las cláusulas de selección de foro. *Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) ("La ejecutabilidad presunta de las cláusulas de selección de foro refleja una fuerte política pública federal... que sería... socavada si se permitiera que otra rama del derecho gobernara la ejecutabilidad de una cláusula de selección de foro."); *Lipson v. Birch*, 46 F. Supp. 3d 206, 213-14 (E.D.N.Y. 2014) ("Como la Corte Suprema y el Segundo Circuito han dejado claro, existe una fuerte política federal en favor de la ejecución de las cláusulas de selección de foro." (citando *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993); *Aguas Lenders Recovery Grp., LLC v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009)); *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, No. 2:23-CV-01268 (LDH) (ARL), 2024 WL 5213366, en *7 (E.D.N.Y. Dec. 24, 2024) ("Existe una fuerte política federal en favor de la ejecución de las cláusulas de selección de foro." (citando *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-10 (1972); *Roby*, 996 F.2d en 1361)); *Roby*, 996 F.2d en 1361 (señalando que los argumentos de las partes sobre el alcance de una cláusula de selección de foro deben hacerse "frente a una fuerte política pública en favor de las cláusulas de selección de foro...").

Además, "[la] necesidad de hacer cumplir las cláusulas de selección de foro es quizás mayor en el ámbito internacional," *CCMPension-A, L.L.C. v. Republic of Argentina*, No. 16-CV-1650 (TPG), 2016 WL 4154892, en *2 (S.D.N.Y. Aug. 2, 2016) (citando *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972)), porque "[la] eliminación de todas esas incertidumbres al acordar de antemano un foro aceptable para ambas partes es un elemento indispensable en el comercio, el comercio internacional y la contratación." *M/S Bremen*, 407 U.S. en 13-14.

Consistente con estos precedentes, los tribunales en este Circuito han encontrado que el primer factor de *China Trade* se cumple cuando un litigio extranjero se presenta en violación de una cláusula de selección de foro. Véase, p.ej., *Int'l Equity Invs.*, 441 F. Supp. 2d en 563 ("Tales intentos de hacer maniobras para evitar la cláusula de selección de foro y la jurisdicción de este Tribunal no pueden ser tolerados. De hecho, la justificación para una

orden judicial antisuit 'alcanza su punto máximo' cuando una parte busca la ayuda de un procedimiento extranjero 'en un intento descarado de evadir la autoridad legítima del tribunal del foro.'" (citando *Ouaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004))); *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en \*6 ("La Orden Judicial Mexicana intenta claramente 'eludir' o hacer un 'rodeo' alrededor de la cláusula de selección de foro del Acuerdo de Compra, y eso no puede permitirse." (citando *Storm LLC v. Telenor Mobile Comms. AS*, No. 06-cv-13157, 2006 WL 3735656, en \*9 (S.D.N.Y. Dec. 15, 2006))); *JPMorgan Chase Bank, N.A. v. VTB Bank, P.J.S.C.*, No. 1:24 CIV. 02924 (LGS), 2024 WL 1833606, en \*1-2 (S.D.N.Y. Apr. 26, 2024) (dada la cláusula de selección de foro que estipula que las demandas derivadas de un acuerdo de "Términos de Cuenta" que rige una cuenta bancaria corresponsal mantenida en JPMorgan deben proceder en tribunales estatales o federales de Nueva York, la acción extranjera amenazaba la fuerte política pública de los Estados Unidos, porque "[t]anto los Estados Unidos como Nueva York favorecen fuertemente la ejecución de las cláusulas de selección de foro").

Aquí, tanto la Acción Mexicana de Julio de 2022 como la Acción Mexicana de Septiembre de 2022 conciernen a las obligaciones financieras de TV Azteca derivadas de su presunto incumplimiento en notas emitidas bajo el Contrato de Emisión. Ambas demandas extranjeras, por lo tanto, "surgen [de] o están relacionadas con [el] Contrato de Emisión" (Declaración Qureshi del 28 de junio de 2024, Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106), y ambas acciones violan la cláusula de selección de foro del Contrato de Emisión. En consecuencia, el análisis del primer factor de *China Trade* indica que debe emitirse una orden judicial antisuit. Véase, p.ej., *Forbes*, 2024 WL 1743109 en \*5 (encontrando que existe una fuerte política pública en favor de la ejecución de las cláusulas de selección de foro, y concluyendo que el primer factor de *China Trade* favorecía la emisión de una orden judicial antisuit donde el acuerdo aplicable designaba a los tribunales estatales y federales de Nueva York como los "foros exclusivos para 'cualquier acción legal o procedimiento que surja de o en conexión con [el acuerdo]'").

---

## 2. Naturaleza vejatoria de los procesos extranjeros

Al determinar si emitir una orden judicial antisuit, los tribunales también consideran si, en ausencia de una orden judicial, "la acción extranjera sería vejatoria." *China Trade*, 837 F.2d en 35 (citas internas y citación omitidas).

Aquí, el Demandante argumenta que la conducta de TV Azteca "en cada etapa" de los litigios mexicanos "no ha sido más que vejatoria." (Memorial del Demandante (Dkt. No. 47) en 24). En este sentido, el Demandante cita las múltiples órdenes judiciales ex parte que TV Azteca ha solicitado y obtenido en los tribunales mexicanos. Según el Demandante, TV Azteca no proporcionó "ninguna notificación de [las órdenes judiciales solicitadas]... en el momento en que se solicitaron," y "TV Azteca no informó ni al tribunal de bancarrota [en este Distrito] ni a este Tribunal [de las órdenes judiciales]." (Id.).

BELA KALLOI ROMERO · 28/04/27 15:37:49
303000001303000000000053319953523756237

Como se señaló anteriormente, los Demandados no abordan sustantivamente la vejatoriedad, y en cambio simplemente afirman que la vejatoriedad "probablemente 'estará presente siempre que las acciones [extranjeras] paralelas estén procediendo simultáneamente [con una acción doméstica]. ...'" (Oposición de los Demandados (Dkt. No. 52) en 12 (citando *China Trade*, 837 F.2d en 36)).

Los tribunales han encontrado que las acciones extranjeras son vejatorias cuando se presentan ex parte o en violación de los acuerdos válidos de las partes. *Jalen, Inc. v. Kundan Rice Mills, Ltd.*, No. 19-CV-1296 (PKC), 2019 WL 1559173, en *4 (S.D.N.Y. Apr. 9, 2019) ("La demanda india también es vejatoria porque fue presentada ex parte. También es la segunda demanda de este tipo presentada en India buscando un rodeo alrededor del acuerdo de las partes de arbitrar disputas." (citas internas omitidas)); véase también *Storm LLC v. Telenor Mobile Communications AS*, No. 06 CIV. 13157 GEL, 2006 WL 3735657, en *9 (S.D.N.Y. Dec. 15, 2006) ("El litigio extranjero aquí ha sido conducido de la manera más vejatoria posible. Telenor ha encontrado que sus intereses están siendo socavados por un litigio al que no ha sido hecho parte, y del que ni siquiera ha recibido notificación hasta después de que se hayan emitido órdenes.").

Como se discutió anteriormente, tanto la Acción Mexicana de Julio de 2022 como la Acción Mexicana de Septiembre de 2022 fueron presentadas en violación de la cláusula de selección de foro de las partes. Además, no se disputa que en ambas acciones mexicanas TV Azteca solicitó y obtuvo órdenes judiciales ex parte y sin notificación al Demandante. (Véase Oposición de los Demandados (Dkt. No. 52) en 7 ("[L]as demandas mexicanas y las órdenes judiciales preliminares fueron obtenidas ex parte sin notificación.")).

Dadas estas circunstancias, las acciones mexicanas son vejatorias. Véase, p.ej., *Forbes*, 2024 WL 1743109, en *6 ("La Orden Judicial Mexicana es vejatoria porque fue presentada ex parte.... Además, permitir que la Orden Judicial Mexicana se mantenga obligará al Peticionario a impugnarla en los tribunales mexicanos, socavando los derechos del Peticionario al foro acordado." (citas internas omitidas)).

En consecuencia, el segundo factor de *China Trade* pesa a favor de emitir una orden judicial antisuit.

---

### 3. Amenaza a la jurisdicción de este Tribunal

Bajo el tercer factor de *China Trade*, los tribunales consideran si una acción extranjera es "una amenaza a la jurisdicción del tribunal [que emite la orden]..." *China Trade*, 837 F.2d en 35 (citas internas y citación omitidas).

El Demandante argumenta que aquí "[las] [a]cciones [e]xtranjeras son una clara amenaza a la jurisdicción exclusiva de este Tribunal para adjudicar disputas que surjan bajo el Contrato de Emisión." (Memorial del Demandante (Dkt. No. 47) en 25).

BELA KALLOI ROMERO - 2304427 15:37:49
3030000013030000000053193955373630237

En respuesta, los Demandados sostienen que las dos acciones mexicanas son meramente "procedimientos paralelos que no amenazan el ejercicio de la jurisdicción de este Tribunal." (Oposición de los Demandados (Dkt. No. 52) en 12). En este sentido, los Demandados señalan que las acciones mexicanas "no han alcanzado ningún fallo final y están siendo litigadas en sus méritos" (id. en 12-13), y que "[el] litigio aquí y en México [ha] estado procediendo simultáneamente durante un año y medio y el Demandante ha participado activamente en ambas [acciones mexicanas]. ..." (Id. en 5). Los Demandados también afirman que las "órdenes judiciales mexicanas no tienen efecto extraterritorial; no prohíben al Demandante tomar ninguna acción en este Tribunal (o en otro lugar en los EE. UU.), y no pretenden limitar ningún aspecto de la jurisdicción de este Tribunal." (Id. en 7).

Sin embargo, los tribunales en este Circuito han encontrado que una acción extranjera amenaza la jurisdicción del tribunal que emite la orden cuando la acción extranjera contraviene una cláusula de selección de foro que las partes acordaron. *Int'l Equity Invs.*, 441 F. Supp. 2d en 563 ("Tales intentos de hacer maniobras para evitar la cláusula de selección de foro y la jurisdicción de este Tribunal no pueden ser tolerados."); *JPMorgan Chase Bank, N.A.*, 2024 WL 1833606, en *2 ("La Acción Rusa amenaza la jurisdicción exclusiva de este foro, que VTB acordó en el contrato de las partes..."); *Forbes*, 2024 WL 1743109, en *6 ("Debido a que el Acuerdo estipula que los tribunales de Nueva York tienen jurisdicción exclusiva sobre cualquier disputa planteada bajo el Acuerdo, este factor pesa ligeramente a favor de una orden judicial antisuit.").

Como se discutió anteriormente, no se disputa aquí que el Contrato de Emisión contiene una cláusula de selección de foro que estipula que cada parte "consiente y se somete irrevocablemente a la jurisdicción exclusiva" de los tribunales de Nueva York con respecto a "cualquier demanda, acción o procedimiento... que surja de o esté relacionado con este Contrato de Emisión" (Declaración Qureshi del 28 de junio de 2024, Anexo 2 (Contrato de Emisión) (Dkt. No. 48-2) en 106). La Acción Mexicana de Julio de 2022 y la Acción Mexicana de Septiembre de 2022 violan así la cláusula de selección de foro del Contrato de Emisión. Y debido a que la cláusula de selección de foro confiere jurisdicción exclusiva a este Tribunal, los Demandados—al perseguir las acciones mexicanas—están buscando evadir "la autoridad legítima del tribunal del foro" y amenazando "la jurisdicción de este Tribunal." Véase *Int'l Equity Invs.*, 441 F. Supp. 2d en 563 (citas internas y citaciones omitidas).

Por todas estas razones, el tercer factor de *China Trade* pesa a favor de prohibir las acciones mexicanas.

---

### 4. Consideraciones equitativas

Bajo el cuarto factor de *China Trade*, los tribunales consideran si los procedimientos extranjeros "perjudican otras consideraciones equitativas" *China Trade*, 837 F.2d en 35 (citas internas y citaciones omitidas).

BELA KALLOI ROMERO : 2804/27 15:37-49
303000001303000003053313953323736037

El Demandante argumenta que las consideraciones equitativas pesan a su favor aquí porque (1) a pesar de "el hecho de que el Contrato de Emisión claramente tiene una cláusula de selección de foro que requiere que todas las disputas relacionadas con el Contrato de Emisión sean presentadas en Nueva York, TV Azteca ha presentado múltiples demandas y múltiples órdenes judiciales ex parte en México con el objetivo de retrasar cualquier resolución de este asunto"; y (2) "TV Azteca está haciendo argumentos directamente contradictorios en diferentes foros" sobre la validez de la cláusula de selección de foro, el alcance de la jurisdicción de este Tribunal, y si TV Azteca debe principal e intereses bajo el Contrato de Emisión, y por lo tanto está participando en una "búsqueda de foro descarada y expresa." (Memorial del Demandante (Dkt. No. 47) en 26-27 (énfasis en el original) (citando Declaración Qureshi del 28 de junio de 2024, Anexo 11 (Estipulación Conjunta de Hechos No Controvertidos en Bancarrota) (Dkt. No. 48-11) y Declaración Castillo del 28 de junio de 2024 (Dkt. No. 49), ¶¶17, 20-21)).

Los Demandados no responden sustantivamente a los argumentos del Demandante, pero en cambio afirman que "[el] Segundo Circuito ha sostenido que la cortesía internacional típicamente 'permite que los procedimientos paralelos continúen y desfavorece las órdenes judiciales antisuit.'" (Oposición de los Demandados (Dkt. No. 52) en 11 (citando *China Trade*, 837 F.2d en 36)). Según los Demandados, "los principios de cortesía se aplican con especial fuerza aquí, porque... el alivio buscado por el Demandante afectaría los derechos fundamentales constitucionales y otros bajo la ley mexicana." (Id. en 5). En este sentido, los Demandados argumentan que "los ciudadanos mexicanos tienen un derecho constitucional a que la justicia sea administrada por tribunales mexicanos, y ese derecho no puede ser restringido o afectado." Porque "TV Azteca es una empresa pública que cotiza en la bolsa de valores mexicana," es "responsable ante los accionistas públicos y los reguladores en México." (Id. en 11-12 (citando Declaración Voigt (Dkt. No. 53), ¶¶5-8, 11)).

Aunque *China Trade* establece que la "cortesía internacional" requiere que "una orden judicial antisuit extranjera se use con moderación, y debe otorgarse solo con cuidado y gran restricción," *China Trade*, 837 F.2d en 35-36 (citas internas omitidas), "[los] tribunales federales generalmente extienden la cortesía [solo cuando] el tribunal extranjero tiene jurisdicción adecuada y la ejecución no perjudica los derechos de los ciudadanos de los Estados Unidos o viola la política pública doméstica." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987). Como se discutió anteriormente, este Tribunal tiene jurisdicción exclusiva sobre las demandas que surjan de o estén relacionadas con el Contrato de Emisión, y las **acciones iniciadas por TV Azteca violan la fuerte política de esta nación de hacer cumplir las cláusulas de selección de foro.** Véase *Martinez*, 740 F.3d en 218. Dadas estas circunstancias, las preocupaciones de cortesía internacional no justifican denegar una solicitud de orden judicial antisuit.

Además, "consideraciones equitativas como disuadir la búsqueda de foro favorecen [la imposición de órdenes judiciales antisuit extranjeras]..." *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007), particularmente cuando "el momento del inicio del procedimiento extranjero sugiere que la parte que inicia ese procedimiento busca

61

BELA KALLOI ROMERO - 28/04/27 15:37:49
303000003030000000605319953237363237

'distraer a las partes de litigar las reclamaciones aquí en favor de un foro más conveniente.'"
*AU New Haven*, 2018 WL 2128373 en *4 (citando *Keep on Kicking Music, Ltd. v. Hibbert*, 268
F. Supp. 3d 585, 591 (S.D.N.Y. 2017)).

Y los Demandados no disputan la afirmación del Demandante de que han hecho argumentos
contradictorios ante el Tribunal de Bancarrota de los EE. UU. y los tribunales mexicanos
respecto a la validez de la cláusula de selección de foro, el alcance de la jurisdicción de este
Tribunal, y si TV Azteca debe principal e intereses bajo el Contrato de Emisión.

**4**TV Azteca presentó la Acción Mexicana de Septiembre de 2022 el 22 de septiembre de
2022, aproximadamente cuatro semanas después de que el Demandante presentara la
presente acción en el Tribunal Supremo del Estado de Nueva York, Condado de Nueva York.
(Véase Moción de Juicio Sumario en lugar de Demanda (Dkt. No. 1-1); Declaración Castillo
del 28 de junio de 2024, Anexo 7 (Demanda Mexicana del 22 de septiembre de 2022) (Dkt.
No. 49-7); Declaración Castillo del 28 de junio de 2024 (Dkt. No. 49) ¶16)

Dadas todas estas circunstancias, el cuarto factor de *China Trade* apoya la emisión de una
orden judicial antisuit. Véase *Alstom Chile S.A. v. Mapfre Compania De Seguros Generales
Chile S.A.*, No. 13 CIV. 2416 LTS DCF, 2013 WL 5863547, en *4 (S.D.N.Y. Oct. 31, 2013)
("[L]as consideraciones equitativas favorecen prohibir al Demandado perseguir la Acción
Chilena, ya que el Tribunal debe disuadir la búsqueda de foro y parece aquí que el
Demandado buscó un foro alternativo para evitar la aplicación de la ley de Nueva York.");
*Stolt Tankers BV v. Allianz Seguros, S.A.*, No. 11 CIV. 2331 SAS, 2011 WL 2436662, en *5
(S.D.N.Y. June 16, 2011) ("[L]as consideraciones equitativas involucradas, como disuadir la
búsqueda de foro, también obligan a prohibir la acción extranjera.").

### 5. Riesgo de duplicidad, demora y decisiones inconsistentes

Bajo el quinto factor de *China Trade*, los tribunales consideran si "la adjudicación de los
mismos asuntos en acciones separadas resultaría en demora, inconveniencia, gasto,
inconsistencia, o una carrera hacia el juicio." *China Trade*, 837 F.2d en 35 (citas internas y
citaciones omitidas).

El Demandante argumenta que "[a]quí, como resultado de las [a]cciones [e]xtranjeras, [ha]
sido forzado a contratar abogados mexicanos, litigar en dos países diferentes, y coordinar
con dos conjuntos diferentes de abogados opuestos. Estas inconveniencias y gastos
adicionales solo continuarán si se permite que las [a]cciones [e]xtranjeras procedan."
(Memorial del Demandante (Dkt. No. 47) en 27). El Demandante sostiene además que
"existe un riesgo de fallos inconsistentes mientras las [a]cciones [d]oméstica y
[e]xtranjera—ambas de las cuales están adjudicando los mismos asuntos—procedan
simultáneamente, todo lo cual favorece otorgar una orden judicial antisuit." (Id. en 27-28).

Como se discutió anteriormente, los Demandados no abordan sustantivamente este factor,
afirmando meramente que la demora, inconveniencia, gasto adicional y el potencial de
resultados inconsistentes "probablemente estarán 'presentes siempre que las acciones

62

BELA KALLOI ROMERO   2304/27 15:37:49
303000001303000000005319953237360237

paralelas estén procediendo simultáneamente'" (Oposición de los Demandados (Dkt. No. 52) en 12 (citando *China Trade*, 837 F.2d en 36)).

En *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 10 CIV. 1853 (PGG), 2010 WL 1050988, (S.D.N.Y. Mar. 23, 2010), este Tribunal consideró una moción para prohibir un litigio en India, donde las partes habían acordado someter cualquier disputa a arbitraje en Nueva York. Al concluir que el quinto factor de *China Trade* favorecía la emisión de una orden judicial antisuit, el Tribunal señaló que "los costos y... la inconveniencia solo aumentarán si Amaprop se ve obligado a comparecer en los procedimientos indios para intentar persuadir al tribunal indio de que la cláusula de arbitraje que las partes acordaron debe ser honrada. Las partes entran en cláusulas de arbitraje vinculantes—particularmente en el contexto internacional—precisamente para evitar tales costos e inconveniencias." *Id.* en *7 (citando *Storm*, 2006 WL 3735657, en *9).

La lógica de *Amaprop* se aplica con igual fuerza aquí, donde las partes entraron en una cláusula de selección de foro que estipula que cualquier disputa debe resolverse en Nueva York. Y la existencia de las acciones mexicanas también presenta un riesgo de fallos inconsistentes. En consecuencia, el quinto factor de *China Trade* pesa a favor de prohibir las acciones mexicanas. Véase *Ibeto*, 475 F.3d en 64-65 (confirmando la decisión del tribunal de distrito que prohibía un litigio nigeriano donde las partes habían entrado en una disposición de arbitraje que estipulaba que las disputas se resolverían en Londres; "'es probable que la adjudicación de los mismos asuntos en dos acciones separadas resulte en inconveniencia, inconsistencia, y una posible carrera hacia el juicio'" (citas omitidas)).

---

Por las razones expuestas anteriormente, todos los factores de *China Trade* pesan a favor de emitir una orden judicial antisuit.

---

**Conclusión sobre los factores *China Trade***

Como se discutió anteriormente, "[u]na vez que... el tribunal ha abordado la pertinencia de imponer una orden judicial antisuit bajo la prueba de *China Trade*, el... tribunal debe entonces hacer determinaciones sobre si es apropiado emitir una orden judicial preliminar...." *In re Millenium Seacarriers*, 458 F.3d en 98 (énfasis en el original); *Dandong*, 2011 WL 6156743, en *3 ("Además de satisfacer la prueba de *China Trade*, la jurisprudencia reciente del Segundo Circuito ha sostenido que una parte que busca una orden judicial preliminar antisuit también debe satisfacer la prueba tradicional para una orden judicial preliminar." (citando *Software A.G.*, 323 Fed. Appx. en 12 (orden sumaria) y *In re Millenium Seacarriers, Inc.*, 458 F.3d en 98)).

"Una parte que busca una orden judicial preliminar debe demostrar (1) daño irreparable; (2) ya sea una probabilidad de éxito en los méritos o tanto preguntas serias sobre los méritos y un balance de dificultades que favorezca decididamente a la parte que solicita; y

(3) que una orden judicial preliminar es de interés público." *N. Am. Soccer League*, 883 F.3d en 37.

El Demandante sostiene que ha cumplido con los requisitos para una orden judicial preliminar porque (1) forzar al Demandante a litigar en tribunales mexicanos en violación de la cláusula de selección de foro constituye daño irreparable; (2) el Demandante ha demostrado una probabilidad de éxito en los méritos respecto a si debe emitirse una orden judicial antisuit; y (3) hacer cumplir la cláusula de selección de foro mediante una orden judicial antisuit es de interés público. (Memorial del Demandante (Dkt. No. 47) en 28-30).

Los Demandados responden que "el Demandante ha fallado en demostrar cualquier daño irreparable inminente," y señalan que "el Demandante ha participado activamente en los Litigios Mexicanos durante casi dieciocho meses."**5** (Oposición de los Demandados (Dkt. No. 52) en 16).

**5**Los Demandados no abordan la probabilidad de éxito ni el interés público. (Véase Oposición de los Demandados (Dkt. No. 52)).

---

### C. Requisitos para la medida cautelar preliminar

### 1. Daño irreparable

En cuanto al daño irreparable, el Demandante argumenta que "[e]s bien establecido que 'arrastrar a los Peticionarios a un litigio en un tribunal diferente al tribunal con jurisdicción exclusiva bajo el [Contrato de Emisión] constituye daño irreparable.'" (Memorial del Demandante (Dkt. No. 47) en 28 (citando *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *7)). Según el Demandante, está "actualmente sufriendo daño irreparable porque [está] siendo forzado a defender[se] en un foro diferente al que [contractualmente] acordó." (Respuesta del Demandante (Dkt. No. 54) en 13 (énfasis en el original)).

Los Demandados responden que—dado que el Demandante esperó dieciocho meses antes de presentar su moción—no puede credíblemente sostener que enfrenta daño "inminente." (Oposición de los Demandados (Dkt. No. 52) en 16).

"Para demostrar daño irreparable bajo el primer requisito de la prueba de orden judicial preliminar, [un demandante] debe demostrar que, en ausencia de una orden judicial preliminar, sufrirá una lesión que no es remota ni especulativa, sino actual e inminente, y una que no puede remediarse si un tribunal espera hasta el final del juicio para resolver el daño." *AU New Haven*, 2018 WL 2128373, en *4 (citas internas y citaciones omitidas). Cuando una parte enfrenta litigio extranjero en contravención de una cláusula de selección de foro, y busca una orden judicial antisuit, los tribunales en este Circuito han encontrado daño irreparable. Véase *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *7 ("[E]s indiscutible que arrastrar a los Peticionarios a un litigio en un tribunal diferente al tribunal con jurisdicción exclusiva bajo el Acuerdo de Compra constituye daño irreparable."); *Forbes*, 2024 WL 1743109, en *7 ("[E]l daño irreparable se demuestra cuando una parte viola la

64

BELA KALLOI ROMERO 28/04/27 15:37:49
303000001303000000000053319953237360237

cláusula de selección de foro de un acuerdo, forzando así a la otra parte a litigar en un foro inapropiado. [S]i se permitiera que el litigio procediera en los tribunales mexicanos, el beneficio de la cláusula de selección de foro en el Acuerdo se perdería." (citas internas y citaciones omitidas)); *Int'l Fashion Prods., B.V. v. Calvin Klein, Inc.*, No. 95 CIV. 0982 (JFK), 1995 WL 92321, en *2 (S.D.N.Y. Mar. 7, 1995) ("[E]l acuerdo en cuestión establece claramente que Nueva York es el foro elegido para todas las disputas. El Tribunal por lo tanto encuentra que CKI sufriría daño irreparable al ser forzado a defender el escrito en los Países Bajos.").

Como se discutió anteriormente, aquí las acciones mexicanas fueron presentadas en violación de la cláusula de selección de foro del Contrato de Emisión, indicando que el Demandante está sufriendo daño irreparable al ser forzado a litigar estas acciones en tribunales mexicanos.

Sin embargo, los Demandados argumentan que "la demora del Demandante en presentar esta moción desacredita cualquier alegación de la 'inminencia' de cualquier daño." (Oposición de los Demandados (Dkt. No. 52) en 16). Y según los Demandados, "[e]s bien establecido que '[l]a equidad aconseja en contra de otorgar una orden judicial cuando un Peticionario demora de manera irrazonable e inexcusable en buscar una orden judicial.'" (Id. en 17 (citando *Cybernaut Cap. Mgmt. Ltd. v. Partners Grp. Access Secondary 2008, L.P.*, No. 1:13-cv-05380-WHP, 2013 WL 4413754, en *6 (S.D.N.Y. Aug. 7, 2013))).

El Demandante responde que "aunque [estaba] notificado de las [a]cciones [e]xtranjeras en 2023, el asunto se volvió más relevante cuando el Sexagésimo Tercer Tribunal Superior [de México] emitió una orden del 25 de enero de 2024 denegando una moción] para vaciar la [o]rden [j]udicial de [s]eptiembre [27, 2022], a pesar de que COVID-19"—la justificación declarada para la orden judicial—"ya no era una emergencia sanitaria" (Memorial del Demandante (Dkt. No. 47) en 28 n.24 (citando Declaración Castillo del 28 de junio de 2024 (Dkt. No. 49), ¶¶44, 47)). Mientras el Demandante apeló la orden del 25 de enero de 2024 denegando la moción para vaciar la orden judicial del 27 de septiembre de 2022, "[e]l 8 de julio de 2024, el Tercer Tribunal Superior de Apelaciones [en México] confirmó la negativa del tribunal inferior a vaciar la [o]rden [j]udicial de [s]eptiembre [27, 2022]" (Declaración Castillo del 14 de agosto de 2024 (Dkt. No. 56), ¶4; véase también Respuesta del Demandante (Dkt. No. 54) en 13). En resumen, el Demandante argumenta que, "[e]n la medida en que ha habido alguna 'demora,' se debe a las circunstancias cambiantes que rodean las [a]cciones [e]xtranjeras." (Respuesta del Demandante (Dkt. No. 54) en 13 n.13). El Demandante también argumenta que "otros tribunales han ordenado órdenes judiciales antisuit tras demoras mucho más largas y cuando el litigio extranjero estaba mucho más cerca de completarse." (Memorial del Demandante (Dkt. No. 47) en 28 n.24 (citando *Bailey Shipping*, 2013 WL 5312540, en *10, 17)).

En *Bailey Shipping*, 2013 WL 5312540, el tribunal consideró una solicitud para prohibir un litigio griego frente a una disposición contractual que estipulaba que todas las disputas se resolverían en arbitraje en Nueva York. Las partes que buscaban la orden judicial "permitieron que transcurrieran 13 meses sin buscar prevenir que [su adversario]

65

BELA KALLO ROMERO · 2804/27 15:37:49
3030030013030030030053319953237560237

persiguiera sus reclamaciones en Grecia, durante los cuales las partes realizaron descubrimiento y se prepararon para el juicio griego." *Bailey Shipping*, 2013 WL 5312540, en *7. Sin embargo, el tribunal concluyó que la brecha de trece meses no impedía un hallazgo de daño irreparable, porque "[a]unque [los solicitantes] podrían haber solicitado con más prisa el alivio que buscan aquí, la disputa continua sobre el arbitraje a lo largo del verano tardío, y la presentación reciente de sus sumarios finales en el tribunal griego por las partes, proporcionan una explicación adecuada para la demora en buscar este alivio." *Id.* en *17 (citas internas omitidas).

El tribunal de *Bailey Shipping* continuó diciendo que no

"[a]prob[aba] la decisión de [los solicitantes] de presentar esta orden judicial una semana antes del procedimiento griego. Sin embargo, dadas las interacciones complejas y extensas entre las partes y con el tribunal griego durante el último año, el Tribunal no puede concluir que [los solicitantes] simplemente estaban fallando en defender sus intereses de una manera que renunciara a su derecho a buscar alivio injunctivo."

*Id.* en *17 n.14.

Aquí, aunque el Demandante "podría haber solicitado con más prisa el alivio que [busca]," *id.* en *17, "dadas las interacciones complejas y extensas entre las partes y con los [tribunales mexicanos] durante los [dieciocho meses anteriores a la moción instantánea], el Tribunal no puede concluir que [el Demandante] simplemente estaba fallando en defender [sus] intereses de una manera que renunciara a [su] derecho a buscar alivio injunctivo." *Id.* en *17 n.14. De hecho, el Demandante representa que "siempre ha mantenido que México no es el lugar apropiado y ha (y continúa) buscando impugnar la jurisdicción de los tribunales mexicanos." (Respuesta del Demandante (Dkt. No. 54) en 14 (citando Declaración Castillo del 28 de junio de 2024 (Dkt. No. 49) ¶¶29-36) (describiendo los desafíos jurisdiccionales que el Demandante ha hecho a las acciones mexicanas en tribunales mexicanos))). El Tribunal concluye que—dadas estas circunstancias—la demora del Demandante en presentar la moción instantánea no justifica denegar el alivio injunctivo, y concluye además que el Demandante ha demostrado que continuará sufriendo daño irreparable en ausencia de una orden judicial.

## 2. Probabilidad de éxito en el fondo

En cuanto al segundo elemento—probabilidad de éxito en los méritos—el Demandante argumenta que "[n]umerosos tribunales han declarado que la pregunta operativa es si la parte peticionaria puede demostrar éxito respecto a la orden judicial antisuit, no la reclamación subyacente." (Memorial del Demandante (Dkt. No. 47) en 29 (énfasis en el original) (citando *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *6)). Según el Demandante, "[e]s claro que TV Azteca ignoró y buscó evitar la [c]láusula de [s]elección de [f]oro cuando presentó las [a]cciones [e]xtranjeras, que se centran en las obligaciones de pago de TV Azteca bajo el Contrato de Emisión," y en consecuencia el Demandante "puede demostrar una probabilidad de éxito en los méritos." (Id.).

Como se señaló anteriormente, los Demandados no han abordado sustantivamente el elemento de probabilidad de éxito en los méritos. (Véase Oposición de los Demandados (Dkt. No. 52)).

En el contexto de orden judicial antisuit, los tribunales en este Distrito han sostenido que es "apropiado considerar la probabilidad de éxito en los méritos del solicitante evaluando si puede satisfacer la prueba de *China Trade.*" *Bailey Shipping*, 2013 WL 5312540, en *18. En *Bailey Shipping*, por ejemplo, el tribunal encontró que este "enfoque más estrecho... era apropiado, porque "[l]os 'méritos' que [los solicitantes] buscan vindicar a través de esta orden judicial son, propiamente entendidos, su derecho a arbitrar la cuestión de representación negligente sin el menoscabo de ese derecho amenazado por las reclamaciones en la acción griega cuya sustancia legal es idéntica a la disputa de representación negligente." *Id.*; véase también *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 406 (S.D.N.Y. 2018) ("En cuanto al primer requisito, los Peticionarios tienen razón en que la indagación relevante es la probabilidad de éxito en los méritos de su argumento de que las reclamaciones deben someterse a arbitraje—no, como reclaman los demandados, en los méritos de las reclamaciones de derecho extranjero sustantivo."); *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995 en *6 ("...como otros tribunales en este distrito han concluido, la pregunta correcta es si los Peticionarios probablemente tendrán éxito en su reclamación de que obtener la Orden Judicial Mexicana en primer lugar violó el Acuerdo de Compra, no quién probablemente ganará el arbitraje mismo.").

Aquí, como en *Bailey Shipping*, los "méritos" de la reclamación que el Demandante busca vindicar a través de la moción instantánea es su derecho bajo la cláusula de selección de foro a litigar disputas que surjan de o estén relacionadas con el Contrato de Emisión en Nueva York, en lugar de en México. Y por las razones discutidas anteriormente, el Demandante ha satisfecho todos los factores de *China Trade*, y por lo tanto ha demostrado su probabilidad de éxito en los méritos de esa reclamación. Véase *Int'l Fashion Prods.*, 1995 WL 92321 en *2 ("La cláusula de selección de foro en el acuerdo subyacente a esta acción especifica claramente Nueva York como el único foro apropiado. El Tribunal por lo tanto encuentra que CKI ha demostrado una probabilidad de éxito en los méritos de su reclamación de que esta acción debe ser procesada aquí en lugar de en los Países Bajos."); *Forbes*, 2024 WL 1743109, en *7 ("El Peticionario también ha demostrado una probabilidad de éxito en los méritos. Al evaluar este elemento, 'la pregunta correcta es si el Peticionario [es] probable que tenga éxito en [su] reclamación de que obtener la Orden Judicial Mexicana en primer lugar violó el [Acuerdo]'. Al presentar la solicitud para la Orden Judicial Mexicana, el Demandado violó la cláusula de selección de foro del Acuerdo, que inequívocamente estipula que 'el Tribunal Supremo del Estado de Nueva York, Condado de Nueva York, y el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York' son los foros exclusivos para 'cualquier acción legal o procedimiento que surja de o en conexión con este Acuerdo.'" (citas internas omitidas).

En resumen, el Demandante ha demostrado una probabilidad de éxito en los méritos de su reclamación de que las acciones mexicanas están prohibidas bajo la cláusula de selección de foro en el Contrato de Emisión.

### 3. Interés público

En cuanto al tercer elemento—si una orden judicial antisuit es de interés público—el Demandante argumenta que "el interés público y el balance de equidades pesan fuertemente a favor del alivio injunctivo," porque "[e]xiste una fuerte política pública de hacer cumplir las cláusulas de selección de foro," y "existe un 'fuerte interés público en hacer cumplir contratos entre entidades sofisticadas.'" (Memorial del Demandante (Dkt. No. 47) en 29 (citando *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *6)). Según el Demandante, "donde partes sofisticadas negociaron y acordaron una [c]láusula de [s]elección de [f]oro completamente válida, es de interés público asegurar su ejecución mediante una orden judicial antisuit." (Id. en 29-30).

Los Demandados no abordan si una orden judicial antisuit es de interés público. (Véase Oposición de los Demandados (Dkt. No. 52)).

Como se discutió anteriormente, existe un fuerte interés público en hacer cumplir las cláusulas de selección de foro, y las acciones mexicanas presentadas por TV Azteca violan la cláusula de selección de foro del Contrato de Emisión. Dadas estas circunstancias, es de interés público emitir una orden judicial antisuit. Véase *Forbes*, 2024 WL 1743109, en *7 ("[E]l Tribunal encuentra que el interés público y el balance de equidades favorecen la ejecución de la cláusula de selección de foro[,][ya que] existe una fuerte política pública de hacer cumplir las cláusulas de selección de foro."); *Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, en *8 ("Encuentro que el interés público, específicamente el fuerte interés público en hacer cumplir contratos entre entidades sofisticadas, favorece otorgar el alivio injunctivo solicitado aquí." (citas internas y citaciones omitidas)).

---

El Tribunal concluye que se han cumplido los requisitos para la emisión de una orden judicial preliminar.

---

### Alcance de la Orden Judicial Antisuit

En cuanto al alcance de la orden judicial antisuit, el Demandante busca una "[o]rden prohibiendo al Demandado TV Azteca continuar con la prosecución, o iniciar cualquier reclamación en, cualquier acción en México en conexión con [el Contrato de Emisión]." (Moción del Demandante (Dkt. No. 46) en 2).

Cualquier orden judicial antisuit debe estar debidamente limitada, en reconocimiento del hecho de que aunque está "dirigida contra la parte que presenta la demanda, sin embargo 'efectivamente restringe la jurisdicción del tribunal de un soberano extranjero.'"

BELA KALLOI ROMERO - 2304427 15:37:49
30J00J00J30J00J00J00J0053139553375J0237

*Paramedics*, 369 F.3d en 655 (citando *China Trade*, 837 F.2d en 35). Y al determinar el alcance de una orden judicial antisuit, los tribunales deben dar "debida consideración a los principios de cortesía internacional" y ejercer un "toque delicado." *Ibeto*, 475 F.3d en 65.

Las órdenes judiciales antisuit deben emitirse solo contra las partes ofensoras—aquí los Demandados y sus filiales, oficiales, agentes, sirvientes, empleados y abogados, y todas las demás personas que estén en concierto activo o participación con los Demandados. Véase *id.* ("La orden judicial debe dirigirse específicamente a las partes, ya que solo las partes ante un tribunal federal pueden ser prohibidas de procesar una demanda en un país extranjero.").

La orden judicial antisuit también debe especificar qué actividades están prohibidas. Aquí, los Demandados serán prohibidos de iniciar o procesar cualquier acción en México relacionada con el Contrato de Emisión. Esta forma de alivio es típica en casos donde se han otorgado órdenes judiciales antisuit extranjeras. Véase, p.ej., *Amaprop*, 2010 WL 1050988, en *9 ("Aquí, los Demandados serán prohibidos de iniciar o procesar cualquier acción en India relacionada con el Acuerdo.").

La orden judicial también requerirá que los Demandados tomen todos los pasos necesarios, de inmediato, para causar que las acciones mexicanas pendientes sean desestimadas. Esta forma de alivio es apropiada bajo las circunstancias, y ha sido otorgada en otros casos donde el litigio extranjero pendiente amenaza, obstaculiza o demora los procedimientos aquí. Véase *Paramedics*, 369 F.3d en 650 (confirmando la orden del tribunal de distrito dirigiendo al demandado a "inmediatamente tomar todos los pasos necesarios para causar la desestimación de la [acción extranjera]" (citas internas y citaciones omitidas)); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 CIV. 4148 (WHP), 2006 WL 3327625, en *4 (S.D.N.Y. Nov. 16, 2006) ("Los Demandantes, sus oficiales, directores, empleados y agentes, y todas las personas actuando bajo su dirección y control están dirigidos a retirarse y discontinuar la Acción Brasileña de inmediato."). Si las acciones de los Demandados no alcancen una retiro completo o discontinuación de las dos demandas mexicanas pendientes, no estarán en cumplimiento con la orden del Tribunal que acompaña esta opinión y estarán sujetos a sanciones por desacato. Véase *Suchodolski*, 2006 WL 3327625, en *4 ("[C]ualquier cosa menos que un retiro completo y discontinuación—por ejemplo, una suspensión o discontinuación parcial—constituirá incumplimiento de esta Orden, y los Demandantes serán sancionados en consecuencia.").

**CONCLUSIÓN**

Por las razones expuestas anteriormente, la moción del Demandante para prohibir a TV Azteca continuar con la prosecución o iniciar cualquier reclamación relacionada con el Contrato de Emisión en México es **CONCEDIDA** (Dkt. No. 46).

El Demandado TV Azteca y sus filiales, oficiales, agentes, sirvientes, empleados y abogados, y todas las demás personas que estén en concierto activo o participación con el Demandado TV Azteca, están **PROHIBIDOS** de procesar la Acción Mexicana de Julio de 2022 y la Acción Mexicana de Septiembre de 2022; están **INSTRUCTADOS** a tomar todos los pasos

69

BELA KALLOI ROMERO  28/04/27 15:37:49
30J00J001J00000000J00J00533199533279J0237

necesarios, de inmediato, para desestimar o causar que se desestimen estas acciones y cualquier otra acción actualmente pendiente en México que surja del Contrato de Emisión; y están **PROHIBIDOS** de procesar cualquier acción legal en México que surja del Contrato de Emisión, o iniciar cualquier nueva acción legal en México que surja del Contrato de Emisión. Se **DIRIGE** al Secretario del Tribunal a terminar la moción (Dkt. No. 46).

Firmado en Nueva York, Nueva York, el **22 de septiembre de 2025.**

**PAUL G. GARDEPHE**
*Juez de Distrito de los Estados Unidos*
*Distrito Sur de Nueva York*



**EVIDENCIA CRIPTOGRAFICA - TRANSACCION**

**Archivo Firmado: Informe AntiSuit 4.pdf**
**AUTORIDAD CERTIFICADORA**
**Firmante(s): 1**
**Hoja(s): 69**                                                                  **Folio: B762A5C0-F6D8-4E9D-9B68-A113E3207C63**

| Firmantes | | | | Firmas | |
|---|---|---|---|---|---|
| **Nombre(s):** | BELA KALLOI ROMERO | **Validez:** | Vigente | **No Serie:** | 30.30.30.30.31.30.30.30.30.30.30.35.31.39.35.32.37.36.32.37 |
| OCSP | | | | | |
| **Fecha: (UTC / CDMX)** | | 15/10/25 02:41:48 - 14/10/25 20:41:48 | | | |
| **Nombre del respondedor(es):** | | Servicio OCSP SAT | | | |
| **Emisor(es) del respondedor(es):** | | AUTORIDAD CERTIFICADORA | | | |
| **Numero(s) de serie:** | | 30.30.30.30.31.30.30.38.38.38.38.38.30.30.30.30.30.30.33.39 | | | |
| TSP | | | | | |
| **Fecha: (UTC / CDMX)** | | 15/10/25 02:42:25 - 14/10/25 20:42:25 | | | |
| **Nombre del emisor de la respuesta TSP:** | | Entidad Emisora de Sellos de Tiempo del Poder Judicial de la Ciudad de México | | | |
| **Emisor del certificado TSP:** | | Autoridad Certificadora del Poder Judicial de la Ciudad de México | | | |
| Sellos Digitales | | | | | |
| b0 b2 99 35 72 7e 64 7a 86 74 49 92 52 d4 9b 3a 08 1e 1c f8 98 b7 c3 8d 65 50 4e 15 66 19 48 4e fc 5e 58 b6 f2 65 cd 3a 20 92 5f | | | | | |



"2025, Año de la Mujer Indígena."

Datos personales del interesado o su representante legal

| | |
|---|---|
| Nombre completo | **BELA KALLOI ROMERO** |
| Correo para recibir notificaciones | **AVAZQUEZ@RIVERAGAXIOLA.COM** |
| Teléfono celular con lada | **5539961357** |

Datos del escrito

| | | | | | |
|---|---|---|---|---|---|
| Número de Folio: | **B2DYmb5F** | Fecha de recepción | **14/10/2025 20:42** | | |
| Materia | **C - CIVIL DE PROCESO ESCRITO** | Expediente | **749** | Año | **2022** |
| Órgano Jurisdiccional | **JUZGADO 9 DE LO CIVIL** | | | | |

Archivos adjuntos

Total de archivos: 1

Archivos:
- Informe AntiSuit 4.pdf

