# Exhibit 1

**IMPORTANT NOTICE**

**NOT FOR DISTRIBUTION TO ANY U.S. PERSON.**

**THIS OFFERING IS AVAILABLE ONLY TO NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OUTSIDE THE U.S.**

**IMPORTANT:  You must read the following before continuing.**  The following applies to the Offering Circular following this page, and you are advised to read this carefully before reading, accessing or making any other use of the Offering Circular.  In accessing the Offering Circular, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO.  THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

THE OFFERING CIRCULAR AND THE OFFER OF THE NOTES ARE ONLY ADDRESSED TO AND DIRECTED AT PERSONS IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA WHO ARE "QUALIFIED INVESTORS" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE (DIRECTIVE 2003/71/EC, AS AMENDED) AND RELATED IMPLEMENTATION MEASURES IN MEMBER STATES ("QUALIFIED INVESTORS").  IN ADDITION, IN THE UNITED KINGDOM THE OFFERING CIRCULAR IS ONLY BEING DISTRIBUTED TO QUALIFIED INVESTORS WHO HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLES 19(5) AND 19(2)(A) TO (D) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005, AND OTHER PERSONS TO WHOM IT MAY OTHERWISE LAWFULLY BE COMMUNICATED (ALL SUCH PERSONS TOGETHER REFERRED TO AS "RELEVANT PERSONS").  ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING CIRCULAR RELATES IS AVAILABLE ONLY TO (I) IN THE UNITED KINGDOM, RELEVANT PERSONS, AND (II) IN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA OTHER THAN THE UNITED KINGDOM, QUALIFIED INVESTORS, AND WILL BE ENGAGED IN ONLY WITH SUCH PERSONS.  IN ADDITION, NO PERSON MAY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY, WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (THE "FSMA"), RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF THE NOTES OTHER THAN IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO US.

THE FOLLOWING OFFERING CIRCULAR MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED.  FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:** In order to be eligible to view this Offering Circular or make an investment decision with respect to the securities, investors must be non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S. This Offering Circular is being sent at your request and by accepting the e-mail and accessing this Offering Circular, you shall be deemed to have represented to us that (1) you and any customers you represent are non-U.S. persons (within the meaning of Regulation S under the Securities Act) and that the electronic mail address that you gave us and to which this Offering Circular has been delivered is not located in the U.S., and (2) that you consent to delivery of such Offering Circular by electronic transmission.

You are reminded that this Offering Circular has been delivered to you on the basis that you are a person into whose possession this Offering Circular may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver this Offering Circular to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the Initial Purchasers or any affiliate of the Initial Purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the Initial Purchasers or such affiliate on behalf of the issuer in such jurisdiction.

This Offering Circular has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and consequently neither the Initial Purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person accept any liability or responsibility whatsoever in respect of any difference between this Offering Circular distributed to you in electronic format and the hard copy version available to you on request from the Initial Purchasers.

**OFFERING CIRCULAR**



# TV AZTECA, S.A.B. DE C.V.
## $400,000,000
## 8.250% Senior Notes due 2024

_____

TV Azteca, S.A.B. de C.V. is offering $400,000,000 aggregate principal amount of our 8.250% Senior Notes due 2024 (the "notes"). The notes will be issued under an indenture to be dated as of August 9, 2017 (the "Indenture").

The principal of the notes will mature on August 9, 2024. The notes will bear interest at a rate of 8.250%, payable semi-annually on August 9 and February 9 of each year, commencing on February 9, 2018.

The notes will be TV Azteca's senior unsecured general obligations. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees*" (collectively, the "Guarantors" and each a "Guarantor"). The notes and guarantees will rank equally in right of payment with all of our and the Guarantors' existing and future senior indebtedness and senior to all of our and the Guarantors' existing and future subordinated indebtedness, subject to certain statutory preferences under Mexican law (including tax, social security and labor obligations). The notes will effectively rank junior to all of our and the Guarantors' secured indebtedness to the extent of the value of the assets securing such indebtedness. The notes and guarantees will be structurally subordinated to the indebtedness and other liabilities, including trade payables, of our subsidiaries that are not Guarantors.

At our option, we may redeem the notes on or after August 9, 2021 at the redemption prices set forth in this offering circular ("Offering Circular"). Prior to August 9, 2021, we may redeem the notes, in whole or in part, by paying the principal amount of the notes plus the applicable "make whole" premium and accrued interest to, but excluding, the redemption date. Prior to August 9, 2021, we may also redeem up to 35% of the notes with the proceeds of certain equity offerings. If we experience a change of control, we will be required to make an offer to purchase the notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest to, but excluding, the repurchase date. If we sell assets under certain circumstances, we will be required to make an offer to purchase the notes at a purchase price equal to 100% of the principal amount, plus accrued and unpaid interest to, but excluding, the repurchase date. In addition, in the event of certain changes in the Mexican withholding tax treatment relating to payments on the notes, we may redeem all (but not less than all) of the notes at 100% of their principal amount, plus accrued and unpaid interest to, but excluding, the redemption date. There is no sinking fund for the notes.

No public market currently exists for the notes. Approval-in-principle has been received for the listing and quotation of the notes on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this Offering Circular. Approval-in-principle for the listing and quotation of the notes on the SGX-ST is not to be taken as an indication of the merits of the offering, the Company, its subsidiaries (including the Guarantors), their respective associated companies, their respective joint venture companies or the notes. The notes will be issued in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require. See "*Listing and General Information*."

**Investing in the notes involves risks. See "*Risk Factors*" beginning on page 20.**

**Price: 100.000%**

plus accrued interest, if any, from August 9, 2017.

Delivery of the notes in book-entry form will be made on or about August 9, 2017.

<span style="color:red">**THE NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE REGISTRO NACIONAL DE VALORES (THE "NATIONAL SECURITIES REGISTRY") MAINTAINED BY THE COMISION NACIONAL BANCARIA Y DE VALORES (THE NATIONAL BANKING AND SECURITIES COMMISSION, OR "CNBV"), AND MAY NOT BE OFFERED OR SOLD PUBLICLY, OR OTHERWISE BE THE SUBJECT OF BROKERAGE ACTIVITIES, IN MEXICO, EXCEPT THAT THE NOTES MAY BE OFFERED TO INVESTORS QUALIFYING AS INSTITUTIONAL AND QUALIFIED INVESTORS PURSUANT TO THE PRIVATE PLACEMENT EXEMPTION SET FORTH IN ARTICLE 8 OF THE LEY DEL MERCADO DE VALORES, AS AMENDED (THE "MEXICAN SECURITIES MARKET LAW," OR "LMV"). AS REQUIRED UNDER THE LMV, WE WILL NOTIFY THE CNBV OF THE ISSUANCE OF THE NOTES INCLUDING THE PRINCIPAL CHARACTERISTICS OF THE NOTES AND THE OFFERING OF THE NOTES OUTSIDE OF MEXICO. SUCH NOTICE WILL BE DELIVERED TO THE CNBV TO COMPLY WITH A LEGAL REQUIREMENT AND FOR INFORMATION PURPOSES ONLY, AND THE DELIVERY TO AND THE RECEIPT BY THE CNBV OF SUCH NOTICE, DOES NOT CONSTITUTE OR IMPLY ANY CERTIFICATION AS TO THE INVESTMENT QUALITY OF THE NOTES, OUR SOLVENCY, LIQUIDITY OR CREDIT QUALITY OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION PROVIDED IN THIS OFFERING CIRCULAR. THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS EXCLUSIVELY THE RESPONSIBILITY OF THE COMPANY AND HAS NOT BEEN REVIEWED OR AUTHORIZED BY THE CNBV. IN MAKING AN INVESTMENT DECISION, ALL INVESTORS, INCLUDING ANY MEXICAN INVESTORS WHO**</span>

**MAY ACQUIRE NOTES FROM TIME TO TIME, MUST RELY ON THEIR OWN REVIEW AND EXAMINATION OF THE COMPANY AND THE GUARANTORS.**

The notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"). The notes may not be offered or sold within the United States or to U.S. persons, and may only be sold to non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act. For certain restrictions on the transfer of the notes, see "*Notice to Investors*."

———————————————

*Joint Book-Runner*   *Joint Book-Runner*   *Joint Book-Runner and Global Coordinator*

**BCP Securities**   **Jefferies**   **Morgan Stanley**

*Co-Manager*



**The date of this Offering Circular is August 2, 2017.**

## TABLE OF CONTENTS

Page

Important Notice........................................................ 1
Disclosure Regarding Forward-Looking Statements...... 3
Presentation of Certain Financial and Other
    Information.............................................................. 4
Summary................................................................... 6
The Offering ............................................................. 12
Summary Historical and Other Financial Information . 16
Risk Factors.............................................................. 20
Use of Proceeds ........................................................ 31
Capitalization............................................................ 32
Exchange Rates ........................................................ 33
Selected Historical Financial Information .................. 34
Operating and Financial Review ................................ 37

Page

Our Business.............................................................. 58
Directors and Senior Management .............................. 83
Principal Shareholders............................................... 87
Related Party Transactions ........................................ 89
Description of Notes................................................... 91
Book-Entry; Delivery and Form................................. 134
Plan of Distribution ................................................... 136
Notice to Investors..................................................... 143
Taxation.................................................................... 145
Available Information................................................. 147
Listing and General Information................................. 148
Index to Consolidated Financial Statements...............F-1

_____

## IMPORTANT NOTICE

The terms "TV Azteca," "Company," "we," "us" and "our" in this Offering Circular refer to TV Azteca, S.A.B. de C.V. together with its subsidiaries on a consolidated basis except as otherwise specified.

This Offering Circular has been prepared solely by TV Azteca and the Guarantors, which have confirmed to BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc (the "Initial Purchasers") that, as of the date hereof, this Offering Circular does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein, in light of the circumstances under which they are made, not misleading. None of the Initial Purchasers has independently verified the information contained herein. Accordingly, no representation, warranty or undertaking, express or implied, is made and no responsibility or liability is accepted by the Initial Purchasers as to the accuracy or completeness of this Offering Circular or any supplement hereto.

This Offering Circular is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire these securities. Distribution of this Offering Circular to any person other than the offeree and any person retained to advise such offeree with respect to its purchase is unauthorized, and any disclosure of any of its contents, without TV Azteca's prior written consent, is prohibited. Each prospective investor, by accepting delivery of this Offering Circular, agrees to the foregoing and agrees to make no photocopies of this Offering Circular or any documents referred to in this Offering Circular.

TV Azteca and the Guarantors have appointed the Initial Purchasers, in such capacity with respect to the notes, and have authorized and requested the Initial Purchasers to circulate this Offering Circular in connection therewith. This Offering Circular does not obligate TV Azteca to accept any offer to subscribe for or purchase the notes. We have not, and the Initial Purchasers have not, authorized anyone to provide you with any information other than that contained in this Offering Circular or to which we have referred you. We take no responsibility for, and can provide no assurances as to the reliability of, any other information that others may give you.

The notes may not be publicly offered or traded in Mexico unless the same are offered or traded pursuant to the provisions of Article 8 of the LMV and regulations issued thereunder. The information contained in this Offering Circular is solely the responsibility of TV Azteca and the Guarantors. Neither the U.S. Securities and Exchange Commission (the "SEC"), the CNBV, nor any other regulatory authority has reviewed or approved these securities, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Offering Circular. Any representation to the contrary may constitute a criminal offense. The terms of the offering have been notified to the CNBV for information purposes only which does not constitute a certification as to the investment quality of the notes or of TV Azteca's solvency.

This Offering Circular is not intended to provide the basis of any credit, taxation, legal, investment or other evaluation and should not be considered as a recommendation by TV Azteca, any of the Guarantors or the Initial Purchasers that any recipient of this Offering Circular should purchase any of the notes. Each recipient contemplating

the purchase of any of the notes is advised to consult its own tax adviser, attorney and business adviser as to tax, business and related matters concerning the purchase of notes and to make, and shall be deemed to have made, its own independent investigation in relation to the notes and the financial condition and affairs of, and its own appraisal of the creditworthiness of, TV Azteca and each of the Guarantors.  None of TV Azteca, any of the Guarantors or the Initial Purchasers makes any comment about the treatment for taxation purposes of payments or receipts in respect of the notes to or by a holder of notes or the legality of the purchase of notes by an investor under applicable investment or similar laws.

Neither the delivery of this Offering Circular by any Initial Purchaser nor the offering, sale or delivery of any notes shall, in any circumstances, create any implication that the information contained herein is true subsequent to the date hereof or the date upon which this Offering Circular has been most recently amended or supplemented or that there has been no adverse change in the financial situation of TV Azteca or any of the Guarantors since the date hereof or, as the case may be, the date upon which this Offering Circular has been most recently amended or supplemented. You should not assume that the information contained in this Offering Circular is accurate as of any date other than the date on the front cover of this Offering Circular.

We are not, and the initial purchasers are not, making an offer to sell these securities in any jurisdiction where such offer is not permitted by applicable law. Any persons into whose possession this Offering Circular or any notes come are required by TV Azteca, each of the Guarantors and the Initial Purchasers to inform themselves of, and to observe, any such restrictions. See "*Notice to Investors*."

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable securities laws (or exemptions therefrom). As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment through its maturity. Please refer to the sections in this Offering Circular entitled "Plan of Distribution" and "Transfer Restrictions."

Unless otherwise noted, market and industry data and other information used throughout this Offering Circular are based on TV Azteca's estimates.  Such estimates are derived from TV Azteca's review of internal surveys and independent industry publications, government publications, and reports by market research firms or other published independent sources, which we believe to be accurate.  Although TV Azteca believes its sources, including its estimates, are reliable, it has not independently verified any third-party information and cannot guarantee its accuracy or completeness.  This data is subject to change and cannot always be verified with complete certainty due to limits on the availability and reliability of raw data, the voluntary nature of the data gathering process and other limitations and uncertainties inherent in any statistical survey of market or industry data. As a result, you should be aware that market and industry data set forth herein, and estimates and beliefs based on such data, may not be reliable.

Any information contained in this Offering Circular that has been sourced from a third party has been accurately reproduced and as far as TV Azteca or the Guarantors are aware or able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.  Any such third party information is identified in this Offering Circular with its source.

————————————————

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Offering Circular includes forward-looking statements.  These forward-looking statements include, without limitation, those regarding our future financial position and results of operations, our strategy, plans, objectives, goals and targets, future developments in the markets in which we participate or are seeking to participate or anticipated regulatory changes in the markets in which we operate or intend to operate.  In some cases, forward-looking statements can be identified by terminology such as "aim," "anticipate," "believe," "continue," "could," "estimate," "expect," "forecast," "guidance," "intend," "may," "plan," "potential," "predict," "project," "should" or "will" or the negative of such terms or other comparable terminology.

By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.  We caution potential investors that forward looking statements are not guarantees of future performance and are based on numerous assumptions and that our actual results of operations, including our financial condition and liquidity, may differ materially from (and be more negative than) those made in, or suggested by, the forward-looking statements contained in this Offering Circular.  In addition, even if our results of operations, including our financial condition and liquidity and the development of the industries in which we operate, are consistent with the forward-looking statements contained in this Offering Circular, those results or developments may not be indicative of results or developments in subsequent periods.  Important factors that could cause these differences include, but are not limited to:

- our ability to repay existing and future debt;
- risks related to the renewal of broadcast concessions;
- risks related to possible conflicts of interest;
- risks related to our competitive position;
- risks related to the seasonal and cyclical nature of our business;
- the absence, cancellation or non-broadcasting of major broadcast events;
- risks related to our material advertising agreements, including the loss of one or more of our key advertisers;
- the cost of producing and acquiring our programming;
- our reliance on key personnel of our subsidiaries;
- changes in regulatory, administrative or economic conditions affecting the media industry;
- risks related to our business, strategy, expectations about growth in demand for our products and services and business operations, financial condition and results of operations;
- risks related to Azteca International Corporation;
- foreign currency exchange fluctuations relative to the U.S. dollar against the peso;
- risks related to Mexico's social, political or economic environment;
- risks related to the development of new technologies;
- our ability to enter and integrate into new markets;
- the result of pending litigations;
- risks related to the ownership, payment and amount of cash dividends to shareholders; and
- risks associated with market demand for and liquidity of the notes.

Potential investors should read the sections of this Offering Circular entitled "*Risk Factors,*" "*Operating and Financial Review*" and "*Our Business*" for a more complete discussion of the factors that could affect our future performance and the markets in which we operate.  In light of these risks, uncertainties and assumptions, the forward-looking events described in this Offering Circular may not occur.  We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information or future events or developments.

## PRESENTATION OF CERTAIN FINANCIAL AND OTHER INFORMATION

In this Offering Circular, all references to "$" and "U.S. dollars" refer to the lawful currency of the United States of America (the "United States" or the "U.S."). All references to "Ps." or "pesos" refer to the lawful currency of the United Mexican States ("Mexico").

This Offering Circular contains TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016, including the notes thereto, and TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015, including the notes thereto. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, Sáinz-Grant Thornton, S.C. ("Salles"), a member of Grant Thornton International. Salles is a member of the Association of Public Accountants of Mexico (*Colegio de Contadores Públicos de México, A.C.*, or "CCPM"). As of December 28, 2016, TV Azteca's consolidated financial statements no longer include Azteca Comunicaciones Colombia's ("ACC") operations in Colombia. These operations qualify as those of an associate company and were recorded using the equity method for the six months ended June 30, 2017. For comparison purposes, ACC's operations in Colombia for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." Financial information for the years ended December 31, 2016 and 2015 consolidates ACC's operations in Colombia. Financial information for the last twelve months ended June 30, 2017 and 2016 do not consolidate ACC's operations in Colombia.

TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with International Financial Reporting Standards ("IFRS"), as issued by the International Accounting Standards Board ("IASB"). U.S. dollar amounts presented in this Offering Circular have been translated from peso amounts solely for the convenience of the reader. Unless otherwise indicated, the exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months ended June 30, 2017 and 2016 was determined by reference to the period-end exchange rate of Ps.17.8973 and Ps.18.9113 per U.S. dollar, respectively. Unless otherwise indicated, the exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 and 2015 was determined by reference to the period-end exchange rate of Ps.20.6640 and Ps.17.2065 per U.S. dollar, respectively. The exchange rates used are those published by the *Banco de México* in the Official Gazette of the Federation (*Diario Oficial de la Federación* or the "Official Gazette") as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico. For additional information see "*Exchange Rates*." No representation is being made that the peso or dollar amounts shown in this Offering Circular could have been or could be converted into U.S. dollars or pesos at the rates shown in this Offering Circular or at any other rate.

### Note Regarding Non-GAAP Financial Measures

A body of generally accepted accounting principles is commonly referred to as "GAAP." For this purpose, a non-GAAP financial measure is generally defined as one that purports to measure historical or future financial performance, financial position or cash flows, but excludes or includes amounts that would not be so adjusted in the most comparable GAAP measure.

TV Azteca discloses in this Offering Circular certain non-GAAP financial measures, including EBITDA. TV Azteca believes that EBITDA is useful for the purpose of understanding its financial performance as well as its ability to satisfy principal and interest obligations under its indebtedness and to fund capital expenditures and operations requirements. Even though commonly used as a financial indicator in Mexico and abroad, EBITDA is not a measure of financial performance under IFRS.

TV Azteca calculates EBITDA by adding to operating income: (i) depreciation and amortization and (ii) other expenses, net. Other expenses, net, reflects certain costs, expenses or other payments that are not representative of TV Azteca's operational performance, which may include legal expenses, charitable contributions and costs associated with the impairment of assets. TV Azteca's calculation of EBITDA may include or exclude certain items that may not be included or excluded in calculations of EBITDA provided by other companies. TV Azteca's calculation of EBITDA does not include any adjustments to exclude the impact of unusual or non-recurring events, restructuring or other one-time charges or discontinued operations.

EBITDA is provided for information purposes only and should not be considered in isolation, or as a substitute for operating income or net income, as a measure of operating performance, as a substitute for cash flows from operations or as a measure of liquidity. EBITDA has material limitations that impair its value as a measure of a company's overall profitability since it does not address certain financial figures. EBITDA and other non-GAAP financial measures included in this Offering Circular are not a substitute for IFRS measures of financial performance.

4

**Trademarks and Service Marks**

For convenience, the trademarks and service marks referred to in this Offering Circular are listed without the ®, TM and SM symbols, but TV Azteca intends to assert, and notify others of, its rights in and to these trademarks and service marks to the fullest extent under applicable law. Each trademark, trade name or service mark of any other company appearing in this Offering Circular belongs to its holder.

# SUMMARY

*This summary highlights selected information described in greater detail elsewhere in this Offering Circular. It does not contain all of the information that may be important to you. This Offering Circular describes the terms of the notes that we are offering, as well as information regarding our business and detailed financial information. You should read the entire Offering Circular carefully, including the risk factors and financial statements, before making an investment decision. The terms "TV Azteca," "Company," "we," "us" and "our" in this Offering Circular refer to TV Azteca, S.A.B. de C.V. together with its subsidiaries on a consolidated basis except as otherwise specified.*

## Overview

TV Azteca is one of the two largest producers of Spanish-language television content in the world and the second largest television broadcasting company in Mexico based on broadcast advertising market share.

TV Azteca holds 180 concessions granted by the Mexican government, enabling it to transmit up to 786 over-the-air broadcast signals. For the last twelve months ended June 30, 2017, TV Azteca reached an average of 93.1% of households in Mexico and captured 36% of the Mexican television broadcast advertising market.

TV Azteca owns and operates two high definition national television networks, "Azteca 7" and "Azteca 13." TV Azteca also operates two new over-the-air signals: "adn40," a local channel that reaches 84.5 million people in Mexico (previously Proyecto 40, which was broadcasted over-the-air in Mexico City), and "a+," a network of 35 local channels across the country that produce local news, sports and regional entertainment content. a+ has the capacity to broadcast different commercials in one or more cities simultaneously by way of its 422 antennas.

TV Azteca is widely recognized for its high quality original content. For the year ended December 31, 2016, its programming reached on average 88 million viewers in Mexico monthly and its original content represented approximately 48% of its total primetime programming on Azteca 7 and Azteca 13. It owns 54 state-of-the-art multi-level television production studios and in 2016 produced more than 30,000 hours of digital, HD, 4K and multi-platform television content, including reality shows, talk shows and news, sports, music, variety programs and traditional soap operas (*telenovelas*), some of which are progressively evolving into dynamic program series. TV Azteca's original content is aired on its networks in the United States, Guatemala and Honduras and it has been exported to more than 100 countries in the Americas, Europe, Asia and Africa. TV Azteca also owns a Spanish-language television broadcast network in the United States known as Azteca America that reaches more than 12.3 million viewers during primetime programming.

In addition to its content and broadcasting operations, TV Azteca owns a drama school, two Mexican professional soccer teams and Azteca Internet. TV Azteca is also engaged in other businesses through joint ventures and strategic partnerships, including a concession to operate and maintain a fiber optic network developed by TV Azteca in Peru and a 40% owned fiber optic network in Colombia.

TV Azteca's consolidated revenues for the six months ended June 30, 2017 and for the year ended December 31, 2016 was Ps.7,017.3 million ($392.1 million) and Ps.14,197 million ($687.0 million), respectively. For the six months ended June 30, 2017 and for the year ended December 31, 2016, TV Azteca had net income of Ps.451.5 million ($25.2 million) and net loss of Ps.3,172.9 million ($153.5 million), respectively. TV Azteca's EBITDA for the twelve months ended June 30, 2017 was Ps.4,044.1 million ($226.0 million).

*Corporate Structure*

The following structure chart shows a simplified organizational structure for TV Azteca as of June 30, 2017, including its principal subsidiaries, all of which are wholly owned by TV Azteca, and a description of their main business activities. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees.*"



## Business Strengths

*One of the Two Largest Spanish-Language Content Producers in the World and a Market Leader in Mexico*

TV Azteca is one of the two largest content producers of Spanish-language television content in the world (measured by revenue against comparable publicly traded companies) and the second largest television broadcasting company in Mexico (measured by broadcast advertising market share). It produces a variety of programs, including traditional soap operas (*telenovelas*), including in their newly evolved form as program series, as well as reality shows, talk shows and news, sports, music and variety programs. TV Azteca believes it is a leading producer of some of the most innovative, inspirational and popular Spanish-language content in the world, which has cultivated large and loyal audiences that attract diverse advertisers.  In the six months ended June 30, 2017, TV Azteca produced approximately 17,000 hours of original content. In each of 2016 and 2015, TV Azteca produced approximately 48% and 50%, respectively, of the Mexican national weekday primetime program hours aired on its networks (excluding programming produced by its local branches).

*Strong Industry Fundamentals in its Core Domestic Market*

TV Azteca's primary focus and vision is concentrated on the Mexican broadcast television market, where over-the-air television broadcasting continues to be the most efficient way to reach the Mexican population. For the year ended December 31, 2016, over-the-air television broadcasting captured the highest expenditure in advertising, representing 48.6% of the country's total advertising market. In addition, over-the-air television broadcasting has the highest household reach in the country with a 93.1% rate of penetration for the year ended December 31, 2016. This rate is significantly higher than that of any other advertising alternative, including radio, pay television and internet, which reached 61.5%, 52.1% and 47.0%, respectively, of households in Mexico for the year ended December 31, 2016. Further, over-the-air television broadcasting of advertisements requires significantly fewer advertising spots to reach a higher percentage of the population.

In Mexico, over-the-air television broadcasting continues to be a very efficient way to reach the greatest number of households: on average there are two television sets per household; the average head of household watches television for approximately five hours and forty-seven minutes per day; 61% of the population, or approximately 70 million people, watch television between one and four hours daily; six out of ten pay television subscribers continue to watch over-the-air television broadcast channels; only 4.5% of households have access to high speed internet, which is required to watch online video content; and only 6.7 million people subscribe to over-the-top ("OTT") services such as Netflix.

*Uniquely Positioned, Large Scale Infrastructure in Mexico*

The media and broadcasting industries in TV Azteca's core market require significant capital investment and technical expertise, which makes it difficult for new competitors to enter these businesses. Barriers to entry for potential broadcasters include an already-established extensive infrastructure, the limited availability of land to construct transmission sites, the existence of highly customized station facilities and a scarcity of engineers to design, operate and maintain television broadcast facilities. In addition, TV Azteca's position as one of the world's leading producers of Spanish-language programming, with nearly 60 long-term contractual relationships with major content providers (including Fox, Sony, Disney, the Mexican Soccer Federation (Mexican national soccer team) and a number of teams playing in the Mexican Soccer League) with an average term of three years, creates significant obstacles to the entry of other potential content providers.

Against this backdrop, TV Azteca benefits from a strong brand and an established operating history. TV Azteca's 458 transmission sites located throughout Mexico allow it to reach approximately 93.1% of households in Mexico at least 23.5 hours a day, seven days a week. In addition to its extensive and sophisticated transmission technology, TV Azteca has 54 state-of-the-art multi-level television production studios that facilitated TV Azteca's ability to produce over 30,000 hours of high quality content for the year ended December 31, 2016. Moreover, throughout its operating history, TV Azteca has developed the ability to effectively navigate the complex regulatory framework of the telecommunications industry.

*Broad Programming with Innovative Content, Driving a Diverse High-Quality Client Base*

Over the last few years, TV Azteca has redesigned its programming in an effort to respond to changing demands and to appeal to all viewers. As part of our programming efforts, TV Azteca has engaged in partnership with international first-class production companies to co-produce innovative content. TV Azteca's broad program offering has allowed it to reach a wide-range of viewers across all demographics through its national and local channels.

The broad reach of TV Azteca's program offerings has driven a diverse, high-quality client base. TV Azteca's client base includes numerous blue-chip companies spanning a wide range of industries, which allows it to better withstand downward swings in the economy. As of June 30, 2017, TV Azteca's 10 largest clients accounted for approximately 18% of its advertising revenues. See "*Our Business—Description of the Business—Television Advertising Sales*."

*Fully Integrated Company with the Ability to Leverage Core Capabilities*

TV Azteca is a fully integrated telecommunications company with a complete array of resources to source, produce and distribute television content. Moreover, TV Azteca is well-positioned to leverage these core capabilities toward reaching larger audiences across platforms and leveraging existing content to access new revenue streams. TV Azteca has resources dedicated to every stage of the television business and to the distribution of video content across new platforms. From the cultivation of creative talent at its drama school, to the production of national and local original content at its television studios throughout Mexico, to the broadcast and distribution of content across national and local channels and diverse platforms to increasingly large audiences, TV Azteca is able to cost effectively control each stage of the production, sale and distribution process. This business model allows TV Azteca to produce high quality content that is delivered to a large and loyal audience in a manner that increases the lifetime value of produced content.

*Strong Financial and Liquidity Profile*

TV Azteca maintains significant cash positions and targets long-term rather than short-term debt financing, which allows it to maintain financial stability and flexibility in a fast moving market. In addition, in connection with spectrum auctions by the U.S. Federal Communications Commission ("FCC") in the United States, Azteca International Corporation ("AIC"), which produces Azteca America content, received $156 million (pre-tax) in the third quarter of 2017 from spectrum sales by stations in Los Angeles and San Francisco that are related to AIC and Azteca America. TV Azteca currently intends to use a portion of the proceeds of this spectrum sale to repay existing indebtedness. TV Azteca's liquidity allows it to capture market opportunities that may require an initial cash investment, such as promotional packages for its advertising clients. As of the twelve months ended June 30, 2017 and the years ended Decembers 31, 2016 and 2015, TV Azteca's net debt to EBITDA ratio was 3.0x, 3.7x and 4.8x, respectively, and its total debt to EBITDA ratio was 3.8x, 5.0x and 6.0x, respectively. During the past five fiscal years, TV Azteca made large capital expenditures in non-core businesses that proved to be break-even or unprofitable ventures. Under its new leadership, TV Azteca has revised its strategy to focus on its core businesses and seek to maintain high EBITDA margins.

TV Azteca's revenues for the year ended December 31, 2016 increased by 10.4% compared to the year ended December 31, 2015, and during the six months ended June 30, 2017, TV Azteca's revenues increased by 14.5% compared to the same period in 2016, which is well above Mexican population and GDP growth for this period and, alongside strict control in operating expenditures, has allowed for steady cash flow generation.

*Talented and Renewed Management Team with Vast Industry Experience*

Over the last 25 years, TV Azteca's management has helped guide the company to a leading market position in Mexico and more broadly within the Spanish-speaking market. Recently, TV Azteca revamped its management under the direction of its Chief Executive Officer, Benjamin Salinas, who has redirected TV Azteca's strategy to focus on its core television broadcast business. In line with this strategy, TV Azteca's senior management, with an average of ten years of experience in the telecommunications industry, has focused on producing, co-producing and purchasing inspiring, creative, bold and innovative content such as "Rosario Tijeras," "MasterChef", "La Isla" and "Hasta Que Te Conocí," which drew in substantial audiences during the twelve months ended June 30, 2017. While TV Azteca actively recruits outside talent to manage the business, it also focuses on developing in-house talent by training and mentoring personnel, developing a talent pipeline to meet TV Azteca's future management needs.

## Business Strategies

*Focus on High-Quality Multi-platform Content*

TV Azteca believes the key to revenue generation in the television industry is a combination of the ability to anticipate and adapt to changes in consumer preferences and behavior on a timely basis and to consistently carry high quality content that is responsive to consumer tastes and behavior. TV Azteca's driving strategy to maintain and increase revenues is to produce and purchase the highest quality content that focuses on the evolving demands of viewers, including the Mexican broadcast television market that is now complemented by OTT services, the internet and other mobile platforms.

TV Azteca's strategy for producing inspiring, creative, bold and innovative content is based on a flexible approach to the television broadcast business that implements the vision of TV Azteca's new executive leadership and centers on diversifying talent and incorporating new forms of production. TV Azteca has steered away from the use of exclusivity contracts with its core talent, which has paved the way for TV Azteca to attract new audiences through the use of a variety of actors, writers, producers and directors. In addition, TV Azteca's use of new forms of production, including co-production arrangements, which allow TV Azteca to share the cost of production and maintain premium quality content, and selective work for hire production, where TV Azteca finances a third-party's production under TV Azteca's supervision and guidance, enables TV Azteca to obtain the rights to cutting-edge, innovative content. TV Azteca intends to continue to focus its resources on developing, maintaining and improving the high quality of its core over-the-air networks to continue attracting loyal audiences and advertising revenues.

TV Azteca's content strategy also includes a focus on acquiring the broadcast rights to television blockbusters and major special events, such as boxing matches, regular season NFL games and the Super Bowl, the FIFA World Cup and other international soccer championships, Mexican national team soccer games, some of the Mexican Soccer League games and golf tournaments. TV Azteca has long-term agreements for an average term of three years with major content providers such as Sony, Fox and Disney, which grant the right to broadcast film and television programs that have proven popular outside Mexico. TV Azteca believes it can improve profit margins by making partial purchases of certain sports broadcast rights at reduced rates and producing innovative and cost-efficient programming that is appealing to viewers.

*Expand Internet and Social Media Presence*

TV Azteca anticipates generating new sources of revenue by expanding its internet presence through enhancement of its own online platform for streaming video content and enlarging the availability of its video content on established third-party online platforms. TV Azteca's main strategy to increase internet revenues is to shift TV Azteca's focus from online pop-up ad displays to online video advertising.

TV Azteca's strategy for significantly expanding its online video advertising concentrates on consolidating its various websites and providing all its available video content on one main website and accompanying mobile apps, Azteca Internet, that is expected to launch in August 2017. TV Azteca is further expanding the availability of its video content to more online platforms through sales to popular OTT services, including Netflix and Hulu, in addition to its already strong presence on Facebook, YouTube and Twitter.

TV Azteca believes its strategic shift from online pop-up ad displays to online video advertising on Azteca Internet and other online platforms positions TV Azteca to be a key player in the digital space compared to its

competitors who do not have the same capacity to generate original video content or acquire the necessary broadcasting rights for purchased content and music. TV Azteca believes it can gain a strategic benefit by emerging as an early initiator of online video advertising, since it anticipates that the value of online pop-up ad displays will continue to decline due to the availability of ad blocks. As a result, TV Azteca believes its strategy places it in a superior position to its competitors in the long-term, as the currently dominant over-the-air television broadcast progressively shifts to an online market. During the time required for the Mexican market to develop the necessary infrastructure for broadband internet to penetrate the country and become readily available to the Mexican population at high quality, TV Azteca will be able to develop significant know-how that it believes will serve as an important competitive advantage. In the immediate future, TV Azteca anticipates its strategy will allow it to benefit simultaneously from incremental growth in digital advertising sales and from ancillary revenues from over-the-air television broadcasting as advertisers will be incentivized to use both mediums.

*Reach New Clients through Local Advertising Sales on a+ Platform*

TV Azteca is focused on offering local advertisers the most economical way to reach the largest number of potential customers. To benefit from this source of revenue, TV Azteca introduced a+, a network of 35 local channels that produce locally meaningful content such as news, sports and entertainment. TV Azteca's strategy for increasing local advertising sales through this expansive network is based on its unique position to geographically customize the transmission of local programming and advertisements in one or more cities simultaneously by way of its 458 transmission sites. TV Azteca aims to double its 8% local share of TV Azteca's total revenue over the next five years with a+'s launch by gaining new local and regional customers that traditionally advertise on the radio, press, internet and other local media. TV Azteca's strategy and technology offers local businesses the option to target the transmission of its advertisements to a specific city or cities, or within a particular region. No other television competitor in Mexico is able to offer its advertisers the same level of geographic customization of its target audience.

*Price Leading Rates for Advertisers*

Historically, TV Azteca has been a market price leader in advertising sales. In 2016, TV Azteca was able to increase prices at a double-digit rate, on average, for all customers, and in the six month period ended June 30, 2017, TV Azteca increased prices by a mid-single digit. TV Azteca believes that the value gained by customers historically through advertisements on over-the-air broadcast television provides significant opportunities to introduce further price increases going forward. TV Azteca plans to strategically and cumulatively increase prices over the next several years to compensate for the increase in costs to produce and acquire popular, high-quality content.

**Company Information**

TV Azteca is a *Sociedad Anónima Bursátil de Capital Variable*, publicly traded variable capital corporation organized under the laws of Mexico. Our deed of incorporation was executed on June 2, 1993, and was registered with the *Registro Público de Comercio* (the "Public Registry") of Mexico City on July 13, 1993 under the commercial file number 167346. Our deed of incorporation will expire in 2092. Our principal offices are located at Avenida Periférico Sur número 4121, Colonia Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico. Our telephone number is +52 (55) 1720-1313. Our website is located at www.irtvazteca.com. Information contained on, or accessible through, our websites, is not incorporated by reference herein and shall not be considered part of this Offering Circular.

**Recent Developments**

As part of TV Azteca's broader liability management strategies, on July 21, 2017, TV Azteca announced that it intends to redeem all of the outstanding 7.5% senior notes due 2018 (the "Medium Term Notes due 2018") that were issued pursuant to the Medium Term Notes Programme (the "MTN Programme") on August 21, 2017. The redemption is expected to be funded by cash generated from TV Azteca's operations and with a peso-denominated credit facility, which is in line with TV Azteca's strategy to substitute U.S. dollar-denominated liabilities for local currency debt and further strengthen its capital structure. TV Azteca has entered into this Ps.1,597.1 million credit facility with Banco Azteca, S.A., which has a term that extends to September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. It includes monthly interest payments, with all principal outstanding coming due at maturity in 2020.

TV Azteca is currently in the process of establishing a new program of *certificados bursátiles* (Mexican debt securities, referred to as "Cebures"), which TV Azteca intends to use to refinance a portion of its existing indebtedness. This program will be denominated in pesos (or an equivalent sum in U.S. dollars or *Unidades de Inversion*) and will permit TV Azteca to select from issuing short-term notes with amounts not exceeding Ps.3

billion ($168 million) with maturities of up to 364 days or issuing medium or long-term notes with amounts not exceeding Ps.10 billion ($559 million) with maturities from 365 days and a maximum of 30 years.

For further information on TV Azteca's indebtedness, see "*Operating and Financial Review—Management's Overview—Indebtedness.*"

## THE OFFERING

The following is a brief summary of some of the terms of this offering of the notes. For a more complete description of the terms of the notes, see "*Description of Notes*" in this Offering Circular.

| | |
|---|---|
| Issuer | TV Azteca, S.A.B. de C.V. |
| Notes Offered | $400,000,000 aggregate principal amount of 8.250% senior notes due 2024. |
| Offering Price | 100.000%, plus accrued interest, from August 9, 2017. |
| Maturity | August 9, 2024. |
| Interest payment dates | August 9 and February 9 of each year, commencing on February 9, 2018. Payments will be made to the persons who are registered holders at the close of business on July 26 and January 26, respectively, immediately preceding the applicable interest payment date, whether or not a Business Day. |
| Guarantees | The payment of principal, interest and premium on the notes will be fully and unconditionally guaranteed, jointly and severally, on a senior unsecured basis by each of the TV Azteca's existing and future material subsidiaries, as described in "*Description of Notes—Note Guarantees*." |
| Ranking | The notes and the guarantees will: |

- rank equal in right of payment with all of our and the Guarantors' other existing and future senior indebtedness;
- rank senior in right of payment to all of our and the Guarantors' existing and future subordinated indebtedness, if any, subject to certain statutory preferences under Mexican law (including tax, social security and labor obligations);
- be effectively subordinated to all of our and the Guarantors' existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness;
- be structurally subordinated to all existing and future indebtedness and other liabilities, including trade payables, of our subsidiaries that do not guarantee the notes; and
- rank junior to all of our obligations preferred by statute (such as tax and labor obligations).

As of June 30, 2017, TV Azteca and its subsidiaries had consolidated total indebtedness of Ps.15,234 million ($851.2 million), of which none was secured.

| | |
|---|---|
| Optional redemption | On or after August 9, 2021 we may redeem the notes, in whole or in part, at the redemption prices set forth under "*Description of Notes— Optional Redemption*," plus accrued and unpaid interest to, but excluding, the date of redemption. |

Prior to August 9, 2021, we may redeem the notes, in whole or in part, by paying the principal amount of the notes plus the applicable "make whole" premium, plus accrued and unpaid interest to, but excluding, the date of redemption. See "*Description of Notes—Optional Redemption*."

| | |
|---|---|
| Optional redemption upon equity offering ································· | Prior to August 9, 2021 we may use the net cash proceeds of certain equity offerings to redeem up to 35% of the aggregate principal amount of the notes issued under the indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the date of redemption; *provided* that: |

- after giving effect to any such redemption at least 65% of the aggregate principal amount of the notes initially issued under the indenture remains outstanding; and

- we make such redemption not more than 90 days after the consummation of such equity offering.

See "*Description of Notes—Optional Redemption—Optional Redemption Upon Equity Offerings*."

| | |
|---|---|
| Additional amounts ························ | All payments by us or the Guarantors in respect of the notes, whether of principal or interest, will be made without withholding or deduction for or on account of any Mexican taxes, unless required by law, in which case, subject to specified exceptions and limitations, we and the Guarantors will pay such additional amounts as may be required so that the net amount received by the holders of the notes in respect of principal, interest or other payments on the notes, after any such withholding or deduction, will not be less than the amount that would have been received by such holders in the absence of any such withholding or deduction. See "*Description of Notes— Additional Amounts*." |
| Optional redemption for changes in withholding taxes ························ | If, as a result of certain changes in Mexican tax laws applicable to payments under the notes, we become obligated to pay additional amounts in excess of amounts attributable to a Mexican withholding tax rate of 4.9% with respect to the notes, then we may redeem the notes, in whole but not in part, at any time at 100% of the outstanding principal amount, plus accrued and unpaid interest to, but excluding, the date of redemption. See "*Description of Notes—Optional Redemption— Optional Redemption for Changes in Withholding Taxes*." |
| Change of control and asset sales ········· | If a Change of Control (as defined in the "*Description of Notes*") occurs, we will be required to make an offer to purchase the notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest to, but excluding, the date of purchase. If we sell assets under certain circumstances, we will be required to make an offer to purchase the notes at a purchase price equal to 100% of the principal amount, plus accrued and unpaid interest to, but excluding, the date of purchase. See "*Description of Notes—Repurchase Upon a Change of Control*" and "*Description of Notes—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*." |
| Use of proceeds ····························· | We estimate that the net proceeds from this offering of the notes will be approximately $395.0 million. We expect to use the net proceeds for the partial repayment of TV Azteca's $500 million notes due 2020 ("Medium Term Notes due 2020") and for general corporate purposes, including the payment of fees and expenses related to this offering. See "*Use of Proceeds*." |

| Certain covenants············· | The indenture will contain certain covenants that, among other things, will limit our ability and the ability of our subsidiaries to: |

- incur additional indebtedness or issue disqualified or preferred stock;

- pay dividends on our capital stock, purchase, redeem or otherwise acquire or retire our capital stock or subordinated indebtedness, or make certain investments;

- sell assets, including capital stock of our subsidiaries;

- create limitations on the ability of our restricted subsidiaries to pay dividends, make loans or transfer property to us;

- create liens;

- consolidate, merge or transfer assets; and

- engage in transactions with affiliates.

These covenants are subject to important exceptions and qualifications. See "*Description of Notes—Certain Covenants*."

If the notes obtain investment grade ratings from at least two rating agencies and no default has occurred and is continuing, the foregoing covenants will be suspended and have no effect (with the exception of covenants that contain limitations on liens and certain consolidations, mergers and transfer of assets) for so long as two rating agencies maintain their investment grade rating.

| Events of default············· | For a discussion of certain events of default that will permit acceleration of the principal of the notes plus accrued interest, and any other amounts due with respect to the notes, see "*Description of Notes— Events of Default*." |

| Further issuances ············· | Subject to the limitations contained in the indenture, we may from time to time, without notice to or consent of the holders of the notes, create and issue an unlimited principal amount of additional notes of the same series as the notes offered pursuant to this Offering Circular. See "*Description of Notes—Additional Notes*." |

| Transfer restrictions ············· | We have not registered, and we are not required to and do not plan to register, the notes under the Securities Act and, unless so registered, the notes may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. See "*Notice to Investors*." |

The notes have not been and will not be registered in the National Securities Registry maintained by the CNBV and may not be offered or sold publicly or otherwise be subject to brokerage activities in Mexico, except that the notes may be offered to investors that qualify as institutional or qualified investors pursuant to the private placement exemption set forth in Article 8 of the LMV.

As required under the LMV, we will notify the CNBV of the offering of the notes outside of Mexico. Such notice will be delivered to the CNBV to comply with a legal requirement and for information purposes only, and the delivery to and the receipt by the CNBV of such notice, does not imply any certification as to the investment quality of the notes or

our solvency, liquidity or credit quality or the accuracy or completeness of the information contained in this Offering Circular.

Book-entry; form and denominations·······················The notes will be issued in the form of one or more global notes without coupons, registered in the name of the common depositary for Euroclear Bank S.A./N.V. ("Euroclear") and Clearstream Banking, *société anonyme*, Luxembourg ("Clearstream"). The notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof. See "*Book-Entry; Delivery and Form*."

Listing········································Approval-in-principle has been received for the listing and quotation of the notes on the SGX-ST. The notes will be in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require.

Risk factors·······························See "*Risk Factors*" and the other information in this Offering Circular for a discussion of factors you should carefully consider before deciding to invest in the notes.

Governing law ·······················New York.

Trustee and registrar ·················The Bank of New York Mellon.

Paying Agent·····························The Bank of New York Mellon, London Branch.

Singapore Listing Agent·················Norton Rose Fulbright (Asia) LLP.

## SUMMARY HISTORICAL FINANCIAL AND OTHER INFORMATION

The following tables present TV Azteca's summary historical financial and other information as of the dates and for the periods indicated. TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with IFRS, as issued by IASB. The summary historical financial and other information as of and for the six months ended June 30, 2017 and 2016 has been derived from TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016. The summary historical financial and other information as of and for the years ended December 31, 2016 and 2015 has been derived from TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015. See TV Azteca's consolidated financial statements beginning on page F-1 of this Offering Circular. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM. The summary historical financial and other information for the twelve month periods ended June 30, 2017 and June 30, 2016 have been derived by adding our results for the six month periods ended June 30, 2017 and June 30, 2016, respectively, to our results for the years ended December 31, 2016 and December 31, 2015, respectively, and then deducting therefrom our results for the six month periods ended June 30, 2016 and June 30, 2015, respectively. The summary historical financial and other information for the twelve months ended June 30, 2017 has been prepared for illustrative purposes only and is not necessarily representative of our results of operations for any future period or our financial condition at any future date.

U.S. dollar amounts presented in the following tables have been translated from peso amounts solely for the convenience of the reader. The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months and twelve months ended June 30, 2017 was determined by reference to the period-end exchange rate of Ps.17.8973 per U.S. dollar.  The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 was determined by reference to the period-end exchange rate of Ps.20.6640 per U.S. dollar.

For additional information regarding financial information presented in this Offering Circular, see "*Presentation of Certain Financial and Other Information*."

The summary historical financial and other information included herein is qualified in its entirety and should be read together with the other sections of this Offering Circular and the financial statements included herein and their related notes.

The following tables present summary historical financial and other information of TV Azteca as of and for the periods indicated:

| | Six months ended June 30[1] | | | Year ended December 31[1] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | | | |
| **Income Statement:** | | | | | | |
| Revenues.................................................................. | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting.............. | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses............................................ | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization.................................... | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net[2].......................................... | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income ...................................... | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Share of profit (loss) from equity accounted investments........ | (5.1) | (90.4) | 6.6 | 1.1 | 23.3 | (13.4) |
| Comprehensive gain (loss) on financing ..................................... | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings................................ | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings ............................................ | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations..................... | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operation.................................... | - | - | (370.9) | - | - | - |
| Net income (loss) ....................................... | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |
| EBITDA[3]........................................................ | 89.5 | 1,601.5 | 1,665.4 | 178.5 | 3,688.2 | 2,534.4 |
| | | | | | | |
| **Balance Sheet:** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents ........................................ | 169.0 | 3,024.5 | 2,754.8 | 216.3 | 4,470.3 | 2,938.4 |
| Trade and other receivables......................................... | 595.3 | 10,654.8 | 8,576.0 | 299.9 | 6,198.0 | 6,244.1 |
| Performance rights .................................................... | 148.9 | 2,665.0 | 2,303.4 | 107.0 | 2,210.6 | 2,082.5 |
| Other current assets[4]....................................... | 142.1 | 2,543.3 | 2,952.5 | 141.0 | 2,913.2 | 3,062.2 |
| Total current assets ...................................... | 1,055.3 | 18,887.6 | 16,586.7 | 764.2 | 15,792.1 | 14,327.2 |
| **Non-current Assets:** | | | | | | |
| Trade long-term............................................ | 28.4 | 507.7 | 86.1 | - | - | 165.4 |
| Performance rights ............................................ | 136.1 | 2,436.6 | 2,594.2 | 156.3 | 3,229.5 | 2,382.0 |
| Property and equipment, net......................................... | 215.5 | 3,856.2 | 4,105.3 | 198.9 | 4,111.1 | 4,192.5 |
| Television concessions, net......................................... | 375.7 | 6,723.8 | 10,241.0 | 521.9 | 10,785.5 | 9,933.6 |
| Deferred tax assets ................................................. | 86.4 | 1,546.1 | 2,404.3 | 88.3 | 1,825.1 | 2,524.3 |
| Other non-current assets[5] .......................... | 102.0 | 1,826.3 | 3,418.8 | 88.1 | 1,820.8 | 3,154.8 |
| Total non-current assets ................................. | 944.1 | 16,896.7 | 22,849.7 | 1,053.6 | 21,772.0 | 22,352.6 |
| **Total assets** ........................................ | 1,999.4 | 35,784.3 | 39,436.4 | 1,817.9 | 37,564.1 | 36,679.8 |
| **Short-term liabilities** | | | | | | |
| Trade and other payables......................................... | 204.2 | 3,654.5 | 5,602.6 | 174.9 | 3,614.8 | 4,103.8 |
| Financial debt[6] ............................................ | 259.1 | 4,637.0 | - | - | - | - |
| Deferred revenue [7] ............................................. | 450.8 | 8,068.5 | 6,359.9 | 319.1 | 6,593.8 | 4,956.3 |
| Other short-term liabilities [8] ................................. | 64.7 | 1,157.5 | 1,374.3 | 75.7 | 1,564.7 | 750.9 |
| Total short-term liabilities ..................................... | 978.8 | 17,517.5 | 13,336.8 | 569.7 | 11,773.3 | 9,811.0 |
| **Long-term liabilities** | | | | | | |
| Loans from American Tower Corporation -ATC-................... | 92.6 | 1,657.3 | 1,694.2 | 91.6 | 1,891.9 | 1,582.6 |
| Medium Term Notes Program -MTN- ......................... | 499.5 | 8,939.9 | 14,624.2 | 792.2 | 16,369.5 | 13,630.1 |
| Deferred revenue [7].............................................. | 71.9 | 1,287.7 | 1,939.8 | 52.0 | 1,075.5 | 1,902.5 |
| Deferred tax liabilities ............................................. | 17.4 | 310.9 | 548.2 | 29.1 | 601.6 | 1,041.2 |
| Employee benefits .................................................. | 10.5 | 188.0 | 197.2 | 9.1 | 188.0 | 197.2 |
| Total long-term liabilities ....................................... | 691.9 | 12,383.8 | 19,003.6 | 974.0 | 20,126.5 | 18,353.6 |
| **Total liabilities** .................................................. | 1,670.7 | 29,901.3 | 32,340.4 | 1,543.7 | 31,899.8 | 28,164.6 |
| **Total stockholders' equity** ...................................... | 328.7 | 5,883.1 | 7,096.1 | 274.1 | 5,664.4 | 8,515.3 |
| | | | | | | |
| **Cash Flow:** | | | | | | |
| Net cash from/(used) in: | | | | | | |
| Operating activities ............................................... | 15.2 | 271.9 | 892.9 | 190.6 | 3,939.0 | 1,173.5 |
| Investing activities ................................................. | (9.7) | (174.4) | (380.0) | (45.7) | (944.0) | (1,477.1) |
| Financing activities ............................................... | (86.2) | (1,543.3) | (696.5) | (70.8) | (1,463.2) | (2,287.1) |

| | Twelve months ended June 30[12] | | | Year ended December 31[12] | | |
|---|---|---|---|---|---|---|
| | **2017** | **2017** | **2016** | **2016** | **2016** | **2015** |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | | | |
| **Other Information:** | | | | | | |
| EBITDA [3] | 226.0 | 4,044.1 | 3,519.4 | 178.5 | 3,688.2 | 2,534.4 |
| Total debt [9] | 851.2 | 15,234.2 | 16,318.4 | 883.7 | 18,261.4 | 15,212.7 |
| Net debt [10] | 682.2 | 12,209.7 | 13,563.6 | 667.4 | 13,791.1 | 12,274.3 |
| Interest expense | 80.5 | 1,441.6 | 1,342.3 | 69.4 | 1,434.9 | 1,256.3 |
| Total debt / EBITDA | 3.8 | 3.8 | 4.6 | 5.0 | 5.0 | 6.0 |
| Net debt / EBITDA | 3.0 | 3.0 | 3.9 | 3.7 | 3.7 | 4.8 |
| EBITDA / interest expense | 2.8 | 2.8 | 2.6 | 2.6 | 2.6 | 2.0 |
| Free cash flow [11] | 180.5 | 3,230.4 | 2,519.3 | 129.8 | 2,681.4 | 1,153.7 |

| | Twelve months ended June 30, 2017 [12] | |
|---|---|---|
| | ($) | (Ps.) |
| | (in millions, except as otherwise indicated) | |
| **Pro Forma Other Information**[13]: | | |
| Total debt | 729.2 | 13,051.4 |
| Net debt | 582.6 | 10,426.9 |
| Total debt / EBITDA | 3.2 | 3.2 |
| Net debt / EBITDA | 2.6 | 2.6 |

---

(1)  The figures for the six months ended June 30, 2017 do not consolidate ACC's operations in Colombia, which were recorded using the equity method for the six months ended June 30, 2017. For comparison purposes, the results of ACC's operations for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." The figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(2)  "Other expenses, net" includes (i) donations, (ii) fees for legal advisory services, (iii) other non-operative expenses and (iv) non-cash charges such as impairment from Colombian and other telecommunication assets.

(3)  EBITDA is provided for information purposes only and should not be considered in isolation, or as a substitute for operating income or net income, as a measure of operating performance, as a substitute for cash flows from operations or as a measure of liquidity. TV Azteca calculates EBITDA by adding depreciation, amortization and other expenses, net to operating income. See "*Note Regarding Non-GAAP Financial Measures*" for important information regarding the limitations of EBITDA. The following tables set forth the reconciliation of EBITDA for the periods indicated:

| | Six months ended June 30[12] | | |
|---|---|---|---|
| | **2017** | **2017** | **2016** |
| | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | |
| **Reconciliation of EBITDA:** | | | |
| Operating income | 25.8 | 461.2 | 1,095.3 |
| (+) Depreciation and amortization | 22.9 | 409.6 | 345.3 |
| (+) Other expenses, net | 40.8 | 730.7 | 224.8 |
| EBITDA | 89.5 | 1,601.5 | 1,665.4 |

| | Twelve months ended June 30[12] | | | Year ended December 31[12] | | |
|---|---|---|---|---|---|---|
| | **2017** | **2017** | **2016** | **2016** | **2016** | **2015** |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | | | |
| **Reconciliation of EBITDA:** | | | | | | |
| Operating income........................................ | 126.2 | 2,259.1 | 1,820.6 | 44.2 | 913.1 | 595.8 |
| (+) Depreciation and amortization .................... | 45.0 | 806.0 | 690.8 | 44.8 | 924.9 | 910.2 |
| (+) Other expenses, net ................................. | 54.7 | 979.0 | 1,008.0 | 89.5 | 1,850.2 | 1,028.4 |
| EBITDA........................................................ | 226.0 | 4,044.1 | 3,519.4 | 178.5 | 3,688.2 | 2,534.4 |

(4)   Amounts listed for "other current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) current tax assets, (ii) related parties, (iii) other financial assets and (iv) inventories.

(5)   Amounts listed for "other non-current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) other intangible assets and (ii) investments accounted for using the equity method and other.

(6)   There will be no amounts under "financial debt" after giving effect to the redemption of all of the remaining outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017.

(7)   Figures included in "deferred revenue" correspond solely to advertising advances. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Recognition of Revenue*" and "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Advertising Advances.*"

(8)   Amounts listed for "other short-term liabilities" are the sum of the following line items on TV Azteca's balance sheet: (i) performance rights, (ii) related parties, and (iii) current tax liabilities.

(9)   Amounts listed for "total debt" in pesos are the sum of the following line items on TV Azteca's balance sheet: (i) loans from American Tower Corporation ("ATC"); and (ii) the MTN Programme. After giving effect to the redemption of all of the outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017, total debt will be Ps.12,194 million ($681.3 million). For further information on TV Azteca's redemption of the Medium Term Notes due 2018, see "*Summary—Recent Developments.*"

(10)  Amounts listed for "net debt" are equal to the result of netting total debt (see footnote 9 above) with the cash and cash equivalents on TV Azteca's balance sheet.

(11)  Free cash flow is calculated as EBITDA – Capex.

(12)  The figures for the six and twelve months ended June 30, 2017 and 2016 exclude ACC's operations while the figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(13)  Pro Forma to give effect to this offering and the use of proceeds therefrom (See "*Use of Proceeds*"), the July 14, 2017 redemption of $60.0 million of Medium Term Notes due 2018, and the refinancing of the remaining outstanding Medium Term Notes due 2018 with cash on hand and borrowings under the Banco Azteca term loan facility.  Pro Forma Other Information does not reflect the issuance of Cebures pursuant to the new program that TV Azteca is currently in the process of establishing.  See "*—Recent Developments*."

## RISK FACTORS

*Following are certain risks associated with our business and the investment in our securities. The risks and uncertainties described below are not the only risks that we face but represent some of the risks that our management considers important. Some of the risks of investing in our securities are general risks relating to entering into transactions in Mexico. Other risks are specific to our operations. Should any of the following risks materialize, they may materially and adversely affect operations, our financial condition or operating results. Should the foregoing happen, the trading price of the notes may diminish and investors may lose their investment in whole or in part.*

### Risks Related to TV Azteca's Operations

*TV Azteca's indebtedness and the payment of its debt may adversely affect its operations.*

As of June 30, 2017, TV Azteca has incurred indebtedness of Ps.15,234 million ($851.2 million). TV Azteca may not generate sufficient cash to pay the principal amount, interest and other amounts payable in respect of such indebtedness, and there is no guarantee that market conditions will allow TV Azteca to refinance its existing indebtedness to maturity. TV Azteca's indebtedness could have negative consequences, including:

- requiring the use of a substantial portion of its cash flow to pay its debt, reducing the available cash flow for other purposes, including capital investments, marketing efforts, plans for future growth and distributions payable to its stockholders;

- limiting its ability to obtain additional financing or refinance its existing debt;

- placing TV Azteca at a possible disadvantage relative to its competitors with lower levels of debt and competitors with greater access to capital resources; and

- increasing its vulnerability to less flexibility in its operations or the Mexican economy in general.

*TV Azteca's business is regulated by the Mexican government and its business may be harmed if its broadcast concessions, which expire in 2021, are not renewed or are revoked.*

To broadcast commercial television in Mexico, a broadcaster must have a concession granted by the Mexican government. Such concessions include one or more broadcast television channels and may only be revoked during their term under very limited circumstances. All of TV Azteca's concessions expire on December 31, 2021, since they were renewed by the Mexican government based on the agreement published in the Official Gazette on July 2, 2004, which adopted the ATSC A/53 technological standard for the transition to digital terrestrial television (the "DTT Agreement"). TV Azteca may seek the renewal of its concessions upon their expiration. In the past, the Mexican government has typically renewed the concessions of those concessionaires that comply with the requisite procedures set forth for renewal under Mexican law and on the respective concession title. However, if the Mexican government, through the IFT, does not renew one or more of TV Azteca's concessions in 2021, TV Azteca will not be able to operate the channels covered by such concessions. A failure to renew or a revocation of TV Azteca's concessions would have a material adverse effect on TV Azteca's business, financial condition and results of operations. See "*Our Business—Regulatory.*"

*Possible conflicts of interest may adversely affect TV Azteca's business, financial condition and results of operations.*

Approximately 64.8% of TV Azteca is owned directly or indirectly by Ricardo B. Salinas Pliego and his family. Consequently, Mr. Salinas Pliego has the power to elect a majority of TV Azteca's directors and determine the outcome of actions that require stockholder approval. The interests of Mr. Salinas Pliego could conflict with or differ from the interests of noteholders. For example, the concentration of ownership could delay, defer or prevent a change of control or impede a merger, takeover or other business combination that our management may otherwise view favorably. So long as Mr. Salinas Pliego continues to beneficially own the majority of our common stock, he will maintain the ability to strongly influence or effectively control our decisions. There can be no assurance that the interests of Mr. Salinas Pliego will coincide with those of the noteholders and that the interests of the noteholders will not be adversely affected as a result.

TV Azteca has engaged, and will likely continue to engage in the future, in a variety of transactions with related parties, including Grupo Elektra, S.A.B. de C.V. ("Grupo Elektra"), Banco Azteca, S.A., Institución de Banca Múltiple ("Banco Azteca"), Total Play Telecomunicaciones, S.A. de C.V., Arrendadora Internacional Azteca,

S.A. de C.V. ("Arrendadora Internacional Azteca") and other entities that are affiliates of TV Azteca or in which Ricardo B. Salinas Pliego and other shareholders who control TV Azteca hold shares. There can be no assurance that such transactions will not be affected by conflicts of interest between such related parties and TV Azteca.

*Television broadcasting in Mexico is highly competitive and TV Azteca can make no assurances about its ability to overcome competitive challenges.*

Television broadcasting in Mexico is highly competitive and the popularity of television shows, an important factor in advertising sales, is readily susceptible to change. TV Azteca faces competition from other television stations. In particular, we face substantial competition from Televisa, TV Azteca's principal competitor. Televisa is one of the leading producers of Spanish-language television programming in the world with over 40 years of experience producing *telenovelas* and entertainment programs. Televisa also has significant interests in other media, including cable television, satellite television, publishing, radio, movies, video, music and internet, which enable Televisa to offer its advertising clients competitive packages combining advertising in various media that TV Azteca is unable to replicate.

Additionally, TV Azteca expects increased competition from new entrants to the Mexican television broadcasting market. In March 2015, the Federal Telecommunications Institute ("IFT"), the Mexican regulatory body that oversees Mexican telecommunications and broadcasting, announced Grupo Radio Centro and Imagen Television ("Cadenatres") as the winning bidders of two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired. See "*Our Business—Competition—General Information—Two New Channels of Over-the-Air Television.*" Over time, such new entrants may capture market share in the Mexican market, which could adversely affect TV Azteca's business, financial condition and profitability.

TV Azteca cannot assure you that it will be able to maintain or improve its share of the Mexican television advertising or viewing markets, nor can it assure you that the costs of acquiring or producing programming through affiliated companies of TV Azteca and/or third-party companies unaffiliated with TV Azteca, or the prices at which it sells advertising time, will not be adversely affected by competition. In addition to competing with conventional, digital terrestrial television stations, including certain government-run stations and those owned by or affiliated with Televisa, Cadenatres or other new entrants, TV Azteca also competes for Mexican television viewers with cable television providers. Cable television, multi-channel multipoint distribution systems ("MMDS") and direct-to-home ("DTH") satellite services represent a further source of competition for TV Azteca's advertising sales, audiences and program rights. The IFT, in its 2016 Third Quarter Report, notes that there are 20.5 million cable television subscribers.

In addition, the United States and Mexico are parties to an agreement with respect to cross-border satellite television broadcasts. Under this agreement, the Mexican government allows U.S. satellite broadcasting companies to provide DTH satellite services to Mexican households. TV Azteca cannot assure you that cable television, MMDS and DTH services will not capture a more significant share of the Mexican television audience and television advertising market in the future.

*An increase in the popularity of alternative communication technology may cause a shift in demand for digital terrestrial broadcast television that may adversely affect TV Azteca's business, financial condition and results of operations.*

As new technologies and platforms for the distribution, sale and viewing of content are developed and increase in prevalence worldwide, TV Azteca expects that there will be an increase in the demand in Mexico for alternatives to broadcast television, including online platforms that allow content developers to deliver their programming directly to audiences.

The increasing prevalence of alternative communication technology and the development of new alternative communication technologies as well as expanding broadband service may change audience behavior by facilitating the ability of audiences to view video content online using their personal computers, televisions, phones, tablets, videogame consoles, and other devices. In addition, such alternative communication technology may increasingly enable advertisers to bypass the programming delivered by TV Azteca and deliver content directly to a consumer, which may impact TV Azteca's audience size and the rates TV Azteca receives from its advertisers.

TV Azteca believes that adoption and consumer acceptance of alternative communication technology will occur in Mexico at a moderate rate due to low broadband penetration rates in Mexico. However, there can be no assurance that the adoption of alternative communication technology will occur at a moderate pace in Mexico as TV Azteca expects. Although TV Azteca has adopted a strategy to accelerate the development of online platforms to allow TV Azteca to deliver its video content directly to viewers in an effort to capture incremental revenue to broadcast programming in the medium term, there can be no assurance that this strategy will be successful.

*The seasonal nature of TV Azteca's business affects TV Azteca's revenues and income and could impact TV Azteca's profitability.*

TV Azteca's business has experienced and is expected to continue to experience seasonality, which is common in the television industry. TV Azteca's advertising revenues, which are recognized when advertising goes on the air, are generally higher in the fourth quarter because of the high level of advertising during the holiday season. Consequently, TV Azteca's results of operations are largely dependent on revenues in the fourth quarter, and a decrease in revenue in the fourth quarter could adversely affect TV Azteca's results of operations for the year. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Seasonality of Sales.*"

*The absence, cancellation or non-broadcasting of major broadcast events could adversely affect TV Azteca's business, financial condition and profitability.*

In the past, TV Azteca has generated substantial advertising revenues from broadcasting recurring major sporting and entertainment events. TV Azteca's broadcasting of the Olympic Games, the World Cup, the UEFA Champions League, Mexican national soccer team games, boxing world championships and reality shows increased net income significantly during the periods in which they were aired. The absence or cancellation of major broadcast events in certain years could adversely affect TV Azteca's business, financial condition and profitability. Similarly, TV Azteca's financial results may be affected in years when an important broadcasting event is held that has a large television audience in Mexico and TV Azteca does not have the rights to broadcast such event.

*If TV Azteca loses one or more of its key advertisers, it may lose a significant source of income.*

For the six months ended June 30, 2017, the most significant advertisers for TV Azteca were: Grupo Elektra, Cervecería Cuauhtémoc Moctezuma, Procter & Gamble de México, Bayer de México, Frabel, Genomma Lab International, Cervecería Modelo de México, Havas Media, CPIF Venture, AT&T Comunicaciones Digitales, Radio Movil Dipsa, The Coca-Cola Export Corporation, Pegaso PCS, Bimbo and Mondelez México, among others. The top 10 advertisers (and their affiliates) for TV Azteca represented 18% of TV Azteca's net revenue. All contracts are non-refundable and paid in advance for fixed one year terms. The inability of TV Azteca to renew its relationships with any of its main advertisers could adversely affect its operating results.

*The cost of producing and acquiring TV Azteca's programming may increase.*

TV Azteca's variable operating costs include the production and acquisition of programming. The cost of producing original programming varies considerably depending on the type of program, and is generally more expensive than acquiring broadcast rights to externally produced programming. In general, the production of *telenovelas*—a key component of TV Azteca's program offerings—is more expensive relative to the production of other types of programming.

If TV Azteca fails to effectively anticipate and manage the costs of producing its original programming or of acquiring broadcast rights for externally produced programming, its programming costs may increase at a rate higher than its advertising revenues. If such costs increase substantially, TV Azteca's profitability may be negatively affected.

*TV Azteca is a holding company and can pay its liabilities only through the cash flow from its subsidiaries or out of the proceeds of its financings.*

TV Azteca is a holding company with no significant assets other than the stock of its subsidiaries. In order to pay its obligations, TV Azteca must rely on income from dividends, loans and other cash flow from its subsidiaries or debt or equity financings. Because TV Azteca is a holding company, the claims of its creditors are structurally subordinated to the claims of its subsidiaries' creditors with respect to the assets of such subsidiaries. As of June 30, 2017, TV Azteca's consolidated subsidiaries had no debt with third parties but this may change in the

future. For a description of certain of TV Azteca's obligations and liabilities, see "*Operating and Financial Review—Management's Overview—Indebtedness.*"

The ability of our subsidiaries to pay dividends or distributions is subject to Mexican legal requirements, which in general terms provide that a Mexican corporation may declare and pay dividends or distributions only out of the profits reflected in its year-end financial statements, if such payment is approved by its stockholders and is made after the creation of required legal reserves and the absorption or satisfaction of losses suffered in previous fiscal years.

*TV Azteca is dependent on key personnel of its subsidiaries and third-party companies not affiliated with TV Azteca, some of whom are represented by labor unions.*

TV Azteca has no direct employees and all personnel in the administration and operation of TV Azteca's business are supplied by TV Azteca's subsidiaries and third-party companies that are not affiliated with TV Azteca. TV Azteca's success depends in large part upon the abilities and efforts of the senior management and key employees of TV Azteca's subsidiaries.

Likewise, TV Azteca's future success depends on its continuing ability to identify, train and retain qualified management personnel who are hired by TV Azteca's affiliates and/or third-party companies unaffiliated with TV Azteca. There is significant competition for qualified personnel and there are no assurances that TV Azteca will be able to attract, integrate or retain them.

As of June 30, 2017, approximately 11.3% of TV Azteca's employees are represented by a television union, with a smaller number represented by the actors' guild or musicians' union. These contracts are reviewed annually with respect to salaries and every two years with respect to benefits.  Our inability to renegotiate such contracts could have an adverse effect on TV Azteca's operations.

*TV Azteca may experience liquidity difficulties.*

TV Azteca may experience liquidity difficulties in the event of an economic crisis in Mexico or in any other parts of the world. In addition, any significant decrease in TV Azteca's advertising revenue or a significant increase in its operating costs could cause TV Azteca to experience future liquidity difficulties. The same would happen with any significant increase in the cost of pesos for the payment of TV Azteca's debt denominated in U.S. dollars. However, TV Azteca intends to hedge its obligations on the notes to reduce its exposure to adverse movements in exchange rates using derivative financial instruments such as forward contracts, options, futures or other strategies with no exotic elements or variables or leverage. These hedging transactions may be closed in established markets such as Mexder (Mexican Derivatives Market), Chicago Board of Trade or with Financial Institutions in Over the Counter transactions. Although we currently intend to enter into these hedging transactions, there can be no assurance that we will do so in a timely manner or at all.  In the absence of such hedges, our liquidity position could be materially adversely affected by exchange rate fluctuations.

*Changes in telecommunications laws and regulations could adversely affect TV Azteca's business, financial condition and results of operations.*

TV Azteca is regulated by the Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones y Radiodifusión* or the "LFTR"), among others, which may be amended in a manner which could adversely affect the way that certain laws and regulations are enforced or interpreted, and new laws or regulations could be adopted. For example, on June 12, 2013, changes to the applicable legal framework related to telecommunications and broadcasting (the "Telecom Reform") came into force. As a result of the Telecom Reform, the LFTR was published in the Official Gazette, and became effective on August 13, 2014. The LFTR amends, supplements and repeals certain provisions related to previous telecommunications and broadcasting legislation, in order to be consistent with the Telecom Reform. The Telecom Reform, the LFTR and any regulations related thereto to be issued by the President and IFT, as applicable, and certain actions recently taken by IFT, or to be taken by IFT from time to time, affect or could significantly and adversely affect our business, results of operations and financial condition. There can be no assurance that there may be other changes to Mexican laws and regulations that could directly affect TV Azteca's business, financial condition and results of operations.  See "*Our Business—Regulatory.*"

*Disputes involving TV Azteca regularly result in, and in the future may result in, the need to use considerable financial resources and valuable management attention to resolve such disputes.*

TV Azteca is a defendant in various legal proceedings and claims and is a plaintiff in others. TV Azteca incurs significant legal expenses in connection with these disputes. In addition, the disputes may distract TV Azteca's management and staff, which are provided by TV Azteca's subsidiaries and/or unrelated third parties, from their usual responsibilities. While TV Azteca does not expect that the final disposition of any of these litigation matters will have a material adverse effect on its business, financial condition or results of operation, there can be no assurance that this will not be the case. See also, "*Our Business—Judiciary, Administrative or Arbitral Processes*."

**Risks Related to AIC**

*AIC is subject to risks related to its joint ventures with affiliated stations.*

AIC, a subsidiary of TV Azteca, is a U.S. based company that launched Azteca America, a Spanish-language television broadcast network with a nationwide reach within the United States.  AIC represents approximately 9% of the revenue of TV Azteca as of June 30, 2017.  See "*Our Business—Description of the Business—TV Azteca's International Television Networks—United States*."

Unlike TV Azteca whose strategy focuses on the Mexican market, AIC's future growth strategy focuses on entering into partnership agreements with existing digital terrestrial television broadcast stations that can enhance or expand its operations in the United States. Likewise, the growth strategy is enhanced by the execution of distribution contracts with cable and satellite television companies. The negotiation of partnership agreements for additional stations and television systems, as well as the integration of new stations in Azteca America may require stations to incur significant costs and utilize valuable management time and resources. The failure to achieve the expected benefits of any station partnership or to successfully integrate the operations of newly partnered stations may also adversely affect AIC's financial condition and results of operation.

If AIC cannot renew its partnership agreements with digital terrestrial television stations or restricted television systems or cannot enter into new partnership and/or distribution contracts, AIC's revenues may decline significantly.

The various partnership agreements with television stations and the distribution contracts with restricted television systems that AIC has executed will end or may end following a specified period. If AIC cannot agree on new terms to continue its partnership with a station operator or cable system, or find a comparable partnership or cable system in the designated market area served by the station, the revenue generated by Azteca America may decrease significantly and could have a materially adverse effect on TV Azteca's business, financial condition and results of operations.

*AIC's inability to sell advertising time on its channels would adversely affect its revenues and operations.*

AIC's operations depend on its ability to sell advertising time in the United States. AIC's ability to sell advertising time largely depends on ratings and the overall level of demand for television advertising in the United States. A decline in U.S. economic activity may reduce overall advertising demand and thus adversely affect AIC's ability to generate advertising revenue. A decline in audience ratings (because of competition, a lack of popular programming, or changes in viewers' preferences) would also adversely affect AIC's revenue as it directly depends on audience ratings. In addition, audience ratings for a new television network may take longer to develop given that there are multiple options available, in both English and Spanish, for American Spanish speakers. Additionally, because AIC focuses on a Spanish speaking audience, its level of audience will depend on:

- the desire of a Spanish speaking audience in the United States to see Spanish language programming; and

- the growth of a Spanish speaking audience due to constant migration and the continuous use of the Spanish language among Spanish speakers in the United States.

If any of these factors changes, Azteca America may lose some of its target audience, resulting in a decline in ratings and a loss of advertising revenue.

Because the Hispanic population in the United States is highly concentrated on a geographical basis, a regional decline in economic conditions or other negative developments in particular markets can have a significant adverse effect on Azteca America's operations.

As of January 19, 2016, approximately 61.4% of the Hispanic population in the United States lived in the states of California, Florida, New York, Texas and Illinois. The top 10 Hispanic markets, including the cities of Los Angeles, New York, Miami-Fort Lauderdale, Houston, Dallas and Chicago, together account for 50.64% of Spanish speaking households with a television. As a result, a significant decline in revenues from station operations in these markets, whether due to a decline in regional economic activity, increased competition or otherwise, may have a material adverse effect on the financial performance of Azteca America and could have a materially adverse effect on TV Azteca's business, financial condition and results of operations.

**Risks Related to Doing Business in Mexico**

*Depreciation of the peso relative to the U.S. dollar may adversely affect TV Azteca's ability to repay debt and other obligations as well as its business, financial condition and results of operations.*

Currently, TV Azteca does not hedge its exposure to currency risk. Declines in the value of the peso relative to the U.S. dollar will increase the interest and repayment costs in pesos of TV Azteca's existing U.S. dollar-denominated indebtedness, including the indebtedness incurred in this offering, and increase the cost in pesos of TV Azteca's other dollar-denominated expenditures. Such declines could also cause TV Azteca to recognize foreign exchange losses and could adversely affect its ability to meet its interest and principal obligations on its indebtedness. A significant portion of TV Azteca's operating costs and other expenditures are dollar-denominated. These costs include the payments TV Azteca makes for the programming broadcast rights, for the leasing of satellite transponders and for purchases of capital equipment. Since the majority of TV Azteca's revenue is denominated in pesos, the increased costs are not offset by any exchange-related increase in revenue.

Due to the significant economic relationship between Mexico and the United States, the value of the peso has been subject to significant fluctuations with respect to the U.S. dollar in the past and may be subject to significant fluctuations in the future. Any future devaluations of the peso could adversely affect TV Azteca's business, financial condition and results of operations. See "*Risk Factors—Risks Related to TV Azteca's Operations—TV Azteca may experience liquidity difficulties.*"

*TV Azteca's business, financial condition and results of operation are dependent on the Mexican economy, which may be adversely affected by developments in the United States.*

A decline in economic growth, high rates of inflation and high interest rates in Mexico generally have an adverse effect on TV Azteca's operations. Slower growth in the Mexican economy will generally result in reduced advertising spending. In the event that inflation returns to high levels while economic growth slows, TV Azteca's business, financial condition, results of operations, and the market price of its securities may be affected. Also, high interest rates and economic instability could increase TV Azteca's costs of financing.

In addition, the Mexican economy is heavily influenced by the U.S. economy and the U.S. government policies due to the North American Free Trade Agreement ("NAFTA") and high level of economic activity between the two countries. However, the election of Donald Trump as the president of the United States and the control of both the House of Representatives and Senate of the United States by the Republican Party may create uncertainty regarding the future of NAFTA and trade between the U.S. and Mexico as President Trump, on May 18, 2017, notified the U.S. Congress that he intends to initiate negotiations with Canada and Mexico to modernize NAFTA to better implement U.S. trade policy objectives. According to the Bipartisan Congressional Trade Priorities and Accountability Act of 2015, said notification formally launched a 90-day countdown before talks between the three countries can begin. The U.S. Trade Representative Robert Lighthizer announced that NAFTA negotiations among the United States, Mexico, and Canada will take place in Washington D.C. from August 16, 2017 through August 20, 2017. The re-negotiation or termination of NAFTA and/or other U.S. government policies that may be adopted under the Trump administration may have a material adverse effect on the Mexican economy, which, in turn, may adversely affect TV Azteca's business, financial condition and results of operations.

*Fluctuations in the U.S. economy or the global economy in general may adversely affect Mexico's economy and TV Azteca's business, financial condition and results of operations.*

Mexico's economy is vulnerable to market downturns and economic slowdowns in the United States and elsewhere in the world. Financial problems or an increase in risk related to investment in emerging economies could limit foreign investment in Mexico and adversely affect the Mexican economy. Mexico has historically experienced uneven periods of economic growth and was adversely affected by the global economic crisis that started in the late-2000s. Although Mexico, the U.S. and other governments have taken steps to increase liquidity in the financial markets, there can be no assurance that such measures will lead to sustained growth of the overall business

environment in which TV Azteca operates and any future economic downturn in the U.S. or global economy could adversely affect TV Azteca's business, financial condition and results of operations. For instance, demand for advertising may decrease because of reduced consumer spending on TV Azteca advertised products or because advertisers choose to reduce advertising costs. In addition, consumer demand generally decreases during economic crises.

*The Mexican government exercises significant influence over the economy.*

The Mexican federal government has exercised, and continues to exercise, significant influence over the Mexican economy. Mexican federal governmental actions and policies concerning the economy, state-owned enterprises and state controlled, funded or influenced financial institutions often fail to meet their objectives and TV Azteca cannot assure that their current or future governmental actions and policies will meet their objectives, which could have a significant impact on private sector entities in general, the market and on TV Azteca in particular.

*Fluctuations in interest rates and inflation may adversely affect TV Azteca's business, financial condition and results of operations.*

Any negative fluctuation in interest rates could have an adverse effect on TV Azteca's financial condition because the amount of interest may increase with regard to potential indebtedness incurred in the future, which could be owed under a variable rate. According to Banco de México, annual inflation was 2.1% and 3.4% for the years ended December 31, 2015 and 2016, respectively. Any significant increase in the inflation rate in Mexico could adversely affect TV Azteca's business, financial condition and results of operations because inflation can adversely affect consumer purchasing power, which may affect TV Azteca's advertisers and the sale by TV Azteca of advertising time on its networks.

*The political situation in Mexico may adversely affect TV Azteca's business, financial condition and results of operations.*

Political instability in Mexico has been a determining factor for investment. In recent years, the political situation has experienced major changes and political stability is not yet guaranteed. As a Mexican corporation with a significant percentage of its assets and operations in Mexico, TV Azteca's business, financial condition and results of operations may be adversely affected in the event of political change or instability.

*If the Mexican Government imposes restrictions and exchange controls, TV Azteca's ability to repay debt in U.S. dollars may be adversely affected.*

In the past, the Mexican economy has experienced balance of payments deficits and shortages in foreign exchange reserves. TV Azteca cannot guarantee that the Mexican federal government will not implement a restrictive exchange control policy in the future. A restrictive exchange control policy may prevent or restrict TV Azteca's access to U.S. dollars and limit its ability to repay its debt. In addition, TV Azteca cannot predict what impact a restrictive exchange control policy would have on the Mexican economy in general.

*Mergers in various economic sectors may result in highly concentrated advertising markets.*

Many companies in Mexico are subject to a worldwide trend of mergers and acquisitions, which may result in fewer companies competing in the market and, therefore, fewer companies advertising themselves on television. In recent years, this trend of mergers and acquisitions has been particularly significant in the telecommunications, financial, pharmaceutical and beverage sectors in Mexico, resulting in highly concentrated industries.

As a result of such mergers and acquisitions, the subsequent decrease in the number of companies advertising themselves on television may negatively impact TV Azteca's advertising sales and as a result could adversely affect TV Azteca's business, financial condition and results of operations.

### Risks Related to the Notes

*Payment on the notes may not be made or may be limited if TV Azteca or one or more of the Guarantors is declared bankrupt.*

If TV Azteca or any of the Guarantors is declared bankrupt by a Mexican Court or becomes subject to a reorganization or *concurso mercantil* proceeding in a Mexican court, the obligations of TV Azteca or such Guarantor (as the case may be) under the notes would:

- except in the case that the notes have become secured, be converted into pesos at the exchange rate prevailing at the time of a declaration of bankruptcy or reorganization or *concurso mercantil* and from

pesos into inflation indexed units at the exchange rate prevailing at that time and would not be adjusted to take into account any devaluation of the peso to the U.S. dollar after such conversion;

- be dependent upon the outcome of the bankruptcy or reorganization proceedings, and payment, if any, would be made after all of its unsecured creditors have properly filed claims and to the extent funds are sufficient;

- cease to accrue interest against the Issuer or the relevant Guarantor, as the case may be, except in the case that the notes have become secured, interest may accrue up to the value of the collateral; and

- be subject to certain statutory preferences including tax, social security and labor claims and, except in the case that the notes have become secured, claims of secured creditors.

There is also limited relevant related legal precedent or judicial history. For such reasons, the ability of the holders of the notes to effectively collect payments due under the notes may be compromised or subject to delay.

In addition, under Mexican law, it is possible that in the event TV Azteca or any of the Guarantors is declared insolvent, bankrupt or become subject to *concurso mercantil*, any amount by which the stated principal amount of the notes exceeds their accumulated value (which includes accumulated and unpaid interest) may be regarded as not matured and, therefore, claims of holders of the notes may be allowed only to the extent of the accumulated value of the notes. At present, there are very few Mexican legal precedents regarding bankruptcy or *concurso mercantil* in Mexico on this point and, accordingly, uncertainty exists as to how a Mexican court would measure the claims of holders of the notes.

*There is a limited market for the notes.*

There is currently no active secondary market for the notes and such a market may not develop once the offer has been made. The price at which the notes are traded may be subject to various factors, such as interest rates, market conditions for similar instruments, macroeconomic conditions in Mexico and abroad and TV Azteca's and the Guarantors' financial situation. If this secondary market does not develop, the liquidity of the notes may be negatively affected, the holders of the notes may not be able to sell the notes in the market and either (i) may be unable to recover all or part of the price initially paid for the notes or (ii) may have to sell the notes at prices far below the price initially paid.

Approval-in-principle has been received for the listing of the notes on SGX-ST. No assurance can be given that the notes, once listed, will continue to be listed and trade on SGX-ST.

We also can make no assurances that holders of notes will be able to sell their notes at a particular time or that the prices that such holders receive when they sell the notes will be equal to or more than the prices they paid for the notes. Future trading prices of the notes will depend on many factors, including:

- TV Azteca's operating performance and financial condition;

- ratings of TV Azteca's debt published by credit ratings agencies;

- the level, direction and volatility of market interest rates generally;

- the time remaining to maturity of the notes;

- the liquidity of the notes generally and the interest of securities dealers in making a market in the notes;

- the market for similar securities; and

- general economic and political conditions.

*TV Azteca is leveraged and its leverage and debt service obligations could adversely affect its business.*

As of June 30, 2017, TV Azteca had Ps.15,234 million ($851.2 million) of indebtedness. If TV Azteca is not able to generate enough cash to pay the principal, interest and other amounts due under its indebtedness, or if market conditions do not permit TV Azteca to repay or refinance its existing indebtedness at maturity, TV Azteca could suffer various negative consequences. These include:

- requiring the dedication of a substantial portion of its cash flow from operations to service indebtedness, thereby reducing the amount of cash flow available for other purposes, including capital expenditures, marketing efforts, future growth plans and distributions payable to its shareholders;

- limiting its ability to obtain additional financing or to refinance its existing indebtedness;

- placing it at a possible competitive disadvantage relative to less leveraged competitors and competitors with greater access to capital resources;

- increasing its vulnerability to downturns in its business or the Mexican economy generally; and

- limiting its ability to make cash distributions to its shareholders.

*Service of process must be effected in person.*

In connection with the notes, Law Debenture Corporate Services Limited has been appointed, designated and empowered as agent for service of process to be notified of any legal action related to the issuance of the notes. This type of notification must be made in person to be valid under Mexican law. Notice of legal action by mail does not constitute personal notification under Mexican law. Therefore, if any notification of legal action is made by mail or other means, other than in person, a final judgment rendered in the legal action may not be enforced in the courts of Mexico.

*Payment of judgments may be made in pesos.*

Under the Mexican Monetary Law (*Ley Monetaria de los Estados Unidos Mexicanos*), in the event that any proceedings are brought in Mexico seeking performance of TV Azteca's obligations under the notes TV Azteca may discharge its obligations denominated in any currency, other than pesos, by paying pesos converted at the prevailing exchange rate on the date payment is made. This rate is currently determined by *Banco de México* and published in the Official Gazette. If payment is made in Mexico and TV Azteca elects to make payments due on the notes in pesos in accordance with the Mexican Monetary Law, the amounts paid may be converted by the payee into the U.S. dollars or any other currency and, if converted, such amounts may not be sufficient at such time to purchase U.S. dollars or any other currency equal to the amount of the principal, interest or additional amounts due on the notes. As a result, there may be a shortfall for judgments obtained in Mexico. No separate action exists or is enforceable in Mexico for compensation of any shortfall.

*It may be difficult to enforce civil liabilities against TV Azteca, the Guarantors or TV Azteca's or the Guarantors' directors, officers and controlling persons.*

TV Azteca and the Guarantors other than AIC are organized under the laws of Mexico, and most of TV Azteca's and the Guarantors' directors, officers and controlling persons reside in Mexico. In addition, a substantial portion of the assets of TV Azteca, the Guarantors and the directors, officers and controlling persons of TV Azteca and the Guarantors, are located outside of the United States. As a result, it may be difficult for investors to effect service of process within the United States on such persons or to enforce any judgments rendered against them. There is doubt as to the enforceability against such persons in original actions in Mexican courts, of liabilities predicated solely on New York law as to the enforceability in Mexican courts of judgments obtained in the courts of the United States.

*TV Azteca may not have the ability to raise the funds necessary to finance the offer to purchase the notes required by the indenture upon a Change of Control.*

If there is a Change of Control (as defined in the indenture governing the notes), TV Azteca would be required by the indenture governing the notes to make an offer to purchase all outstanding notes at a price equal to 101% of the principal amount of the notes, plus any accrued and unpaid interest through the date of purchase.

The source of funds for any payment will be TV Azteca's available cash or cash generated from other sources, including borrowings, sales of assets or sales of equity. However, TV Azteca cannot guarantee that it will have sufficient funds to pay all of the debts that may be due and payable at that time. TV Azteca may not be able to repurchase the notes upon a change of control because it may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. TV Azteca's failure to repurchase the notes upon a change of control would be a default under the notes, which default may, in turn, trigger cross-acceleration provisions in other debt instruments.

*The notes and the guarantees by the Guarantors will be effectively subordinated to TV Azteca's secured debt and to certain claims preferred by statute.*

TV Azteca's obligations under the notes and the obligations of the Guarantors under the guarantees are unsecured. As a result, the notes and the guarantees will be effectively subordinated to all of TV Azteca's and the Guarantors' secured debt to the extent of the value of the collateral securing such debt. Although TV Azteca and the Guarantors do not have any secured debt outstanding as of the issue date of the notes, the indenture governing the

notes permits TV Azteca to incur secured debt in the future. In the event that TV Azteca or the Guarantors are not able to repay amounts due under any existing or future secured debt obligations, creditors could proceed against the collateral guaranteeing such indebtedness. In that event, any proceeds upon a realization of the collateral would be applied first to amounts due under the secured debt obligations before any proceeds would be available to make payments on the notes. If there is a default, the value of this collateral may not be sufficient to repay both TV Azteca's secured creditors and the holders of the notes.

*To the extent that certain of TV Azteca's subsidiaries are not Guarantors, TV Azteca's obligations with respect to the notes will be effectively subordinated to all liabilities of these non-Guarantor subsidiaries.*

Initially, all of TV Azteca's existing subsidiaries will be Guarantors of the notes.  However, with respect to future subsidiaries, only certain material subsidiaries will be required to become Guarantors, as described under "*Description of Notes*." To the extent that certain of TV Azteca's future subsidiaries that are not Guarantors or TV Azteca's current Guarantors are released from their guarantees, any right that TV Azteca or the Guarantors have to receive assets of any of the non-Guarantor subsidiaries upon the liquidation or reorganization of those subsidiaries, and the consequent rights of holders of notes to realize proceeds from the sale of any of those subsidiaries' assets, will be effectively subordinated to the claims of that subsidiary's creditors, including trade creditors and holders of debt of that subsidiary.

*The guarantees may not be enforceable.*

The guarantees provide a basis for a direct claim against the Guarantors; however, it is possible that the guarantees may not be enforceable. In the event that a Guarantor becomes subject to a reorganization or *concurso mercantil* or similar proceeding or to bankruptcy, the relevant guarantee may be deemed to have been a fraudulent transfer and declared void, based upon the Guarantor being deemed not to have received fair consideration or a direct benefit in exchange for such guarantee, or similar principles.

If a Guarantor's guarantee is voided as a fraudulent conveyance or found to be unenforceable for any reason, the holders of the notes will not have a claim against the Guarantor and will only be a creditor of TV Azteca or any other Guarantor whose obligation was not set aside or found to be unenforceable.

On the basis of historical financial information, recent operating history and other factors, TV Azteca believes that each Guarantor, after giving effect to its respective guarantee, will not be insolvent, will not have unreasonably small capital for the business in which it is engaged and will not have incurred debts beyond its ability to pay such debts as they mature. However, TV Azteca cannot assure the holders of the notes as to what standard a court would apply in making such determinations or that a court would agree with its conclusions in this regard.

*The credit rating of the notes may be subject to review.*

Credit ratings issued with respect to the notes may be subject to review for different reasons related to TV Azteca, Mexico, or other issues that in the opinion of the respective rating agencies may impact the possibility of repayment.

*Modifications to the current tax scheme may adversely affect the notes.*

There is no guarantee that the current tax scheme applicable to the notes will not be modified in the future, which may adversely affect (i) the tax rate; (ii) the interest accrued by the notes (including greater withholdings); (iii) transactions executed with the notes; and (iv) the holders of the notes.

*The provisions of the indenture generally will not apply to any unrestricted subsidiaries and therefore their ability to incur debt, encumber their assets and make payments and distributions, among other matters, is not limited thereby.*

Generally, the covenants and events of default included in the indenture do not apply to unrestricted subsidiaries. See "Description of Notes." As a result, the indenture imposes no limitations on the ability of any unrestricted subsidiaries to incur debt, make restricted payments, pledge their assets, make asset sales, and permit restrictions on their ability to pay dividends or make other distributions to us or issue their stock to third parties. While TV Azteca currently does not have any unrestricted subsidiaries, it will be permitted, subject to certain limitations, to designate new or existing subsidiaries as unrestricted subsidiaries.

*The indenture governing the notes imposes significant operating and financial restrictions, which may prevent TV Azteca from capitalizing on business opportunities.*

The indenture governing the notes imposes significant operating and financial restrictions on TV Azteca. These restrictions will, subject to certain exceptions, limit TV Azteca's ability, and the ability of its restricted subsidiaries, to, among other things:

- incur additional indebtedness;

- make restricted payments, including dividends or other distributions;

- make investments;

- sell capital stock of TV Azteca's subsidiaries;

- guarantee other indebtedness;

- create or assume liens;

- enter into agreements that restrict the ability of TV Azteca's restricted subsidiaries to pay dividends or make other distributions;

- enter into transactions with affiliates; and

- consolidate, merge or sell all or substantially all of TV Azteca's assets.

*There are restrictions on your ability to transfer the notes.*

The notes have not been and will not be at any time in the future registered under the U.S. Securities Act or any U.S. state securities laws and may not be offered or sold except pursuant to an exemption from the registration requirements of the Securities Act. Any resales of the notes will be subject to the transfer restrictions described under the section entitled "*Notice to Investors*."

**USE OF PROCEEDS**

We estimate that the net proceeds from the offering of these notes will be approximately $395.0 million.

We expect to use the net proceeds from the sale of notes for the partial repayment of TV Azteca's $500 million Medium Term Notes due 2020 and for general corporate purposes, including the payment of fees and expenses related to this offering.

# CAPITALIZATION

The following table sets forth the cash and cash equivalents and capitalization of TV Azteca and its subsidiaries (all of which shall initially be Guarantors) as of June 30, 2017 (i) on an actual basis and (ii) as adjusted to give effect to the issuance and sale of the notes in this offering and the use of the net estimated proceeds therefrom, and is derived from, and qualified in its entirety by reference to, TV Azteca's consolidated financial statements, which have been prepared in accordance with IFRS, as issued by IASB. This table should be read in conjunction with TV Azteca's consolidated financial statements included in the Offering Circular.

For convenience of the reader only, amounts as of June 30, 2017 have been translated into U.S. dollars at the exchange rate published by the *Banco de México* in the Official Gazette as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico as of June 30, 2017, of Ps.17.8973 per U.S. dollar. No representation is being made that the peso or dollar amounts shown herein could have been or could be converted into U.S. dollars or pesos at any rate. Except as set forth below or as otherwise disclosed in this Offering Circular, as of the date hereof there has been no material change in TV Azteca's capitalization since June 30, 2017.

| | As of June 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Actual | Actual | As adjusted [2] | As adjusted [2] |
| | ($) | (Ps.) | ($) | (Ps.) |
| | (in millions, except as otherwise indicated) | | | |
| Cash and cash equivalents .................. | 169.0 | 3,024.5 | 146.6 | 2,624.5[3] |
| **Short-term debt:** | | | | |
| Medium Term Notes due 2018[1] .......... | 259.1 | 4,637.0 | — | — |
| Total short-term debt[1] .................. | 259.1 | 4,637.0 | — | — |
| **Long-term debt:** | | | | |
| Medium Term Notes due 2020 ............ | 499.5 | 8,939.9 | 147.4 | 2,638.1 |
| 8.250% Senior Notes due 2024 offered hereby ..................................... | — | — | 400.0 | 7,158.9 |
| Credit Facility in Pesos[1] ..................... | — | — | 89.2 | 1,597.2 |
| ATC Long-Term Credit Facility .......... | 92.6 | 1,657.3 | 92.6 | 1,657.3 |
| Total long-term debt .................... | 592.1 | 10,597.2 | 729.2 | 13,051.4 |
| **Stockholders' equity:** | | | | |
| Total stockholders' equity ............ | 328.7 | 5,883.1 | 328.7 | 5,883.1 |
| Total capitalization .................................. | 1,179.9 | 21,117.3 | 1,057.9 | 18,934.5 |

———————————

(1) On July 14, 2017, TV Azteca redeemed $60 million. The remaining outstanding Medium Term Notes due 2018 are expected to be redeemed on August 21, 2017. The redemption is expected to be funded by cash on hand and with a Ps.1,597.1 million credit facility with Banco Azteca, S.A., which has a term through  September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. See "*Summary—Recent Developments*."

(2) As adjusted amounts do not reflect the issuance of Cebures pursuant to a new program that TV Azteca is currently in the process of establishing.  The new program, which TV Azteca intends to use to refinance a portion of its existing indebtedness, may be denominated in pesos, U.S. Dollars or Unidades de Inversion and is expected to permit TV Azteca to select from issuing short-term notes up to Ps. 3.0 billion ($168.0 million) with maturities of up to 364 days or issuing medium- or long-term notes with amounts not exceeding Ps.10.0 billion ($559.0 million) with maturities from 365 days and a maximum of 30 years.

(3) This amount includes the $156 million (pre-tax) received by AIC in the third quarter of 2017 from spectrum sales.

## EXCHANGE RATES

Mexico has a free market for foreign exchange, and the Mexican government allows the peso to float freely against the U.S. dollar. There can be no assurance that the Mexican government will maintain its current policies with regard to the peso or that the peso will not depreciate or appreciate significantly in the future.

The following table sets forth, for the periods indicated, the period-end and average exchange rate published by *Banco de México* expressed in pesos per U.S. dollar. The rates shown below are in nominal pesos that have not been restated in constant currency units. No representation is made that the peso amounts referred to in this Offering Circular could have been or could be converted into U.S. dollars at any particular rate or at all.

| | Exchange Rate [1] | |
|---|---|---|
| | **Period End** | **Average [2]** |
| **Year Ended December 31** | | |
| 2014 | 14.7180 | 13.2983 |
| 2015 | 17.2065 | 15.8542 |
| 2016 | 20.6640 | 18.6567 |
| **Six Months Ended** | | |
| June 30, 2016 | 18.9113 | 18.0341 |
| June 30, 2017 | 17.8973 | 19.4890 |
| **Monthly** | | |
| February 2017 | 19.8335 | 20.3525 |
| March 2017 | 18.8092 | 19.4165 |
| April 2017 | 19.0670 | 18.7812 |
| May 2017 | 18.5121 | 18.7997 |
| June 2017 | 17.8973 | 18.2081 |
| July 2017 | 17.6886 | 17.8365 |
| August 2017 (through August 2) | 17.8646 | 17.8041 |

_____

(1) The exchange rates are the exchange rates published by *Banco de México* in the Official Gazette as the rate for the payment of obligations denominated in non-Mexican currency payable in Mexico. The exchange rate is determined by *Banco de México* on banking days, by an average of quotations of the exchange market of wholesale operations to be settled on the second banking day of its determination. *Banco de México* announces the exchange rate after 12 noon Mexico City time on each banking day. Each listed exchange rate is published by *Banco de México* in the Official Gazette on the next banking day of its determination as a reference to settle operations the second working day following the settlement date.

(2) The average rate means the average of the daily exchange rate during the relevant period.

## SELECTED HISTORICAL FINANCIAL INFORMATION

**Selected Financial Data**

The following table presents TV Azteca's selected historical financial information as of the dates and for the periods indicated. TV Azteca's consolidated financial statements are stated in pesos and are prepared in accordance with IFRS, as issued by IASB. The selected historical financial information as of and for the six months ended June 30, 2017 and 2016 has been derived from TV Azteca's unaudited consolidated financial statements as of and for the six months ended June 30, 2017 and 2016. The selected historical financial information as of and for the years ended December 31, 2016 and 2015 has been derived from TV Azteca's audited consolidated financial statements as of and for the years ended December 31, 2016 and 2015. See TV Azteca's consolidated financial statements beginning on page F-1 of this Offering Circular. TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM.

U.S. dollar amounts presented in the following table have been translated from peso amounts solely for the convenience of the reader. The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the six months ended June 30, 2017 was determined by reference to the period-end exchange rate of Ps.17.8973 per U.S. dollar. The exchange rate used in converting pesos into U.S. dollars for amounts derived from the financial statements as of and for the year ended December 31, 2016 was determined by reference to the period-end exchange rate of Ps.20.6640 per U.S. dollar.

For additional information regarding financial information presented in this Offering Circular, see "*Presentation of Certain Financial and Other Information*."

The selected historical financial information included herein is qualified in its entirety and should be read together with the other sections of this Offering Circular and the financial statements included herein and their related notes.

The following table presents selected historical financial information of TV Azteca as of and for the periods indicated:

| | Six months ended June 30[1] | | | Year ended December 31[1] | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | | | (in millions, except as otherwise indicated) | | | |
| **Income Statement:** | | | | | | |
| Revenues | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net[2] | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Share of profit (loss) from equity accounted investments | (5.1) | (90.4) | 6.6 | 1.1 | 23.3 | (13.4) |
| Comprehensive gain (loss) on financing | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operation | - | - | (370.9) | - | - | - |
| Net income (loss) | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |
| | | | | | | |
| **Balance Sheet:** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | 169.0 | 3,024.5 | 2,754.8 | 216.3 | 4,470.3 | 2,938.4 |
| Trade and other receivables | 595.3 | 10,654.8 | 8,576.0 | 299.9 | 6,198.0 | 6,244.1 |
| Performance rights | 148.9 | 2,665.0 | 2,303.4 | 107.0 | 2,210.6 | 2,082.5 |
| Other current assets [3] | 142.1 | 2,543.3 | 2,952.5 | 141.0 | 2,913.2 | 3,062.2 |
| Total current assets | 1,055.3 | 18,887.6 | 16,586.7 | 764.2 | 15,792.1 | 14,327.2 |
| **Non-current Assets:** | | | | | | |
| Trade long-term | 28.4 | 507.7 | 86.1 | - | - | 165.4 |
| Performance rights | 136.1 | 2,436.6 | 2,594.2 | 156.3 | 3,229.5 | 2,382.0 |
| Property and equipment, net | 215.5 | 3,856.2 | 4,105.3 | 198.9 | 4,111.1 | 4,192.5 |
| Television concessions, net | 375.7 | 6,723.8 | 10,241.0 | 521.9 | 10,785.5 | 9,933.6 |
| Deferred tax assets | 86.4 | 1,546.1 | 2,404.3 | 88.3 | 1,825.1 | 2,524.3 |
| Other non-current assets [4] | 102.0 | 1,826.3 | 3,418.8 | 88.1 | 1,820.8 | 3,154.8 |
| Total non-current assets | 944.1 | 16,896.7 | 22,849.7 | 1,053.6 | 21,772.0 | 22,352.6 |
| **Total assets** | 1,999.4 | 35,784.3 | 39,436.4 | 1,817.9 | 37,564.1 | 36,679.8 |
| **Short-term liabilities** | | | | | | |
| Trade and other payables | 204.2 | 3,654.5 | 5,602.6 | 174.9 | 3,614.8 | 4,103.8 |
| Financial debt[5] | 259.1 | 4,637.0 | - | - | - | - |
| Deferred revenue [6] | 450.8 | 8,068.5 | 6,359.9 | 319.1 | 6,593.8 | 4,956.3 |
| Other short-term liabilities [7] | 64.7 | 1,157.5 | 1,374.3 | 75.7 | 1,564.7 | 750.9 |
| Total short-term liabilities | 978.8 | 17,517.5 | 13,336.8 | 569.7 | 11,773.3 | 9,811.0 |
| **Long-term liabilities** | | | | | | |
| Loans from American Tower Corporation -ATC- | 92.6 | 1,657.3 | 1,694.2 | 91.6 | 1,891.9 | 1,582.6 |
| Medium Term Notes Program -MTN- | 499.5 | 8,939.9 | 14,624.2 | 792.2 | 16,369.5 | 13,630.1 |
| Deferred revenue [6] | 71.9 | 1,287.7 | 1,939.8 | 52.0 | 1,075.5 | 1,902.5 |
| Deferred tax liabilities | 17.4 | 310.9 | 548.2 | 29.1 | 601.6 | 1,041.2 |
| Employee benefits | 10.5 | 188.0 | 197.2 | 9.1 | 188.0 | 197.2 |
| Total long-term liabilities | 691.9 | 12,383.8 | 19,003.6 | 974.0 | 20,126.5 | 18,353.6 |
| **Total liabilities** | 1,670.7 | 29,901.3 | 32,340.4 | 1,543.7 | 31,899.8 | 28,164.6 |
| **Total stockholders' equity** | 328.7 | 5,883.1 | 7,096.1 | 274.1 | 5,664.4 | 8,515.3 |
| | | | | | | |
| **Cash Flow:** | | | | | | |
| Net cash from/(used) in: | | | | | | |
| Operating activities | 15.2 | 271.9 | 892.9 | 190.6 | 3,939.0 | 1,173.5 |
| Investing activities | (9.7) | (174.4) | (380.0) | (45.7) | (944.0) | (1,477.1) |
| Financing activities | (86.2) | (1,543.3) | (696.5) | (70.8) | (1,463.2) | (2,287.1) |

_____

(1) The figures for the six months ended June 30, 2017 do not consolidate ACC's operations in Colombia, which were recorded using the equity method for the six months ended June 30, 2017.  For comparison purposes, the results of ACC's operations

for the six months ended June 30, 2016 were included under the heading "(Loss) from discontinued operations." The figures for the years ended December 31, 2016 and 2015 consolidate ACC's operations.

(2)  "Other expenses, net" includes (i) donations, (ii) fees for legal advisory services, (iii) other non-operative expenses and (iv) non-cash charges such as impairment from Colombian and other telecommunication assets.

(3)  Amounts listed for "other current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) current tax assets, (ii) related parties, (iii) other financial assets and (iv) inventories.

(4)  Amounts listed for "other non-current assets" are the sum of the following line items on TV Azteca's balance sheet: (i) other intangible assets and (ii) investments accounted for using the equity method and other.

(5)  There will be no amounts under "financial debt" after giving effect to the redemption of all of the remaining outstanding Medium Term Notes due 2018, which is expected to occur on August 21, 2017.

(6)  Figures included in "deferred revenue" correspond solely to advertising advances. See "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Recognition of Revenue*" and "*Operating and Financial Review—Management's Overview—Critical Accounting Policies and Estimates—Critical Accounting Policies—Advertising Advances*."

(7)  Amounts listed for "other short-term liabilities" are the sum of the following line items on TV Azteca's balance sheet: (i) performance rights, (ii) related parties, and (iii) current tax liabilities.

## OPERATING AND FINANCIAL REVIEW

*This Operating and Financial Review should be read together with TV Azteca's consolidated financial statements and related notes included in this Offering Circular. Please also see "Presentation of Certain Financial and Other Information."*

### Operating Results by Country

TV Azteca, though its subsidiaries and associates, primarily operates in Mexico, United States, Peru and Colombia. Prior to December 28, 2016, TV Azteca consolidated ACC, through which TV Azteca conducted operations in Colombia. For the year ended December 31, 2016, ACC generated net loss of Ps.2,081 million ($100.7 million), operating loss of Ps. 1,981 million ($95.8 million) and negative EBITDA of Ps.420.0 million ($20.3 million) and accounted for an impairment charge of Ps.1,376.5 million ($66.6 million). Following a private capitalization of ACC, as of December 28, 2016, ACC is no longer consolidated by TV Azteca, but is accounted for using the equity method with respect to TV Azteca's remaining 40% stake. See "*Our Business—Description of the Business—Other Operations—Colombia Project*" for further details. Below is a summary of the key operating results by country for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, which has been provided for the convenience of the reader. For a more detailed analysis of TV Azteca's consolidated operating results for such periods, see "*Operating and Financial Review—Management's Overview—Results of Operations*."

*Six Months Ended June 30, 2017 Compared to Six Months Ended June 30, 2016*

*Mexico*

Revenues

Revenues for the six months ended June 30, 2017 increased by 21%, or Ps.1,057 million ($73.9 million), to Ps.6,043 ($337.6 million) from Ps.4,986 million ($263.7 million) for the same period in 2016. This increase was mainly due to the popularity of entertainment and other programs broadcasted during the past six months ended June 30, 2017, which generated millions of viewers in Mexico and resulted in increased advertising sales, as well as revenue from the World Golf Championships-Mexico Championship tournament (the "WGC Mexico Championship") organized by TV Azteca.

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 22%, or Ps.759 million ($52.9 million), to Ps.4,268 million ($238.5 million) from Ps.3,509 million ($185.6 million) for the same period in 2016. This increase was mainly due to costs related to the organization of the WGC Mexico Championship.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the six months ended June 30, 2017 decreased 5%, or Ps.24 million ($0.2 million), to Ps.507 million ($28.3 million) from Ps.531 million ($28.1 million) for the same period in 2016 mainly due to lower advisory fees and charitable donations.

Operating Income

As a result of the above, operating income for the six months ended June 30, 2017 increased 34%, or Ps.322 million ($20.8 million), to Ps.1,268 million ($70.8 million) from Ps.946 million ($50.0 million) for the same period in 2016.

EBITDA

EBITDA for the six months ended June 30, 2017 increased 20%, or Ps.298 million ($21.1 million), to Ps.1,775 million ($99.2 million) from Ps.1,477 million ($78.1 million) for the same period in 2016.

*United States*

Revenues

Revenues for the six months ended June 30, 2017 increased by 9%, or Ps.56 million ($5.0 million) to Ps.666 million ($37.2 million) from Ps.610 million ($32.2 million) for the same period in 2016. This increase was primarily due to exchange rate fluctuations, as well as the monetization of content that is popular among Hispanic audiences in the United States.

37

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 22%, or Ps.147 million ($10.2 million), to Ps.802 million ($44.8 million) from Ps.655 million ($34.6 million) for the same period in 2016. This increase was mainly due to exchange rate fluctuations and increased costs and expenses in connection with expansion of geographic coverage in the east coast of the United States.

Depreciation and amortization and other expenses

Depreciation and amortization and other expenses for the six months ended June 30, 2017 increased 2,055%, or Ps.596 million ($33.4 million), to Ps.625 million ($34.9 million) from Ps.29 million ($1.5 million) for the same period in 2016. This increase was primarily the result of impairment of telecommunications assets during 2017, including, among other things, equipment and assets that became obsolete due to technology changes and expired broadcasting rights.

Operating Loss

As a result of the above, operating loss for the six months ended June 30, 2017 was Ps.761 million ($42.5 million) as compared to an operating loss of Ps.74 million ($3.9 million) for the same period in 2016.

EBITDA

TV Azteca's operations in the United States generated a negative EBITDA of Ps.136 million ($7.6 million) for the six months ended June 30, 2017 as compared to a negative EBITDA of Ps.45 million ($2.4 million) for the same period in 2016.

*Peru*

Revenues

Revenues for the six months ended June 30, 2017 decreased by 45%, or Ps.227 million ($11.1 million) to Ps.275 million ($15.4 million) from Ps.502 million ($26.5 million) for the same period in 2016. This decrease was mainly due to lower reimbursements from the Peruvian government during 2017 for payments made by Azteca Comunicaciones Perú ("ACP") for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru as the construction of the network and related reimbursements were completed in 2016.

Costs and expenses

Costs and expenses for the six months ended June 30, 2017 increased by 26%, or Ps.60 million ($4.1 million), to Ps.295 million ($16.5 million) from Ps.235 million ($12.4 million) for the same period in 2016. This increase was primarily due to the increased cost of maintaining the Red Dorsal Nacional de Fibra Óptica fiber optic network, which was not fully present during 2016 when the network was under construction.

Depreciation and amortization and other expenses

Negative depreciation and amortization and other expenses for the six months ended June 30, 2017 was Ps.4 million ($0.2 million), which did not change from the same period in 2016.

Operating Loss

As a result of the above, TV Azteca's operations in Peru generated an operating loss of Ps.24 million ($1.3 million) for the six months ended June 30, 2017 as compared to an operating income of Ps.263 million ($13.9 million) for the same period in 2016.

EBITDA

TV Azteca's operations in Peru generated a negative EBITDA of Ps.20 million ($1.1 million) for the six months ended June 30, 2017 as compared to an EBITDA of Ps.267 million ($14.1 million) for the same period in 2016.

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

*Mexico*

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 4%, or Ps.449 million ($82.9 million), to Ps.11,214 ($542.7 million) from Ps.10,765 million ($625.6 million) for 2015. This increase was mainly due to increased advertising sales resulting from the popularity of TV Azteca's programming with large audiences that constitute the target market of numerous Mexican advertisers.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 decreased by 8%, or Ps.600 million ($106.6 million), to Ps.7,370 million ($356.6 million) from Ps.7,970 million ($463.2 million) for 2015. This decrease was mainly attributable to (i) efficiency gains in production through co-productions that allowed cost sharing with other producers, and (ii) reduction in selling and administrative expenses due to increased operating efficiencies.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 decreased 29%, or Ps.465 million ($38.1 million), to Ps.1,133 million ($54.8 million) from Ps.1,598 million ($92.9 million) for 2015. This decrease was mainly as a result of the provision for impairment of assets made in 2015, which reflected lower value of certain transmission assets.

<u>Operating Income</u>

As a result of the above, operating income for the year ended December 31, 2016 increased 126%, or Ps. 1,514 million ($61.5 million), to Ps.2,711 million ($131.1 million) from Ps.1,197 million ($69.6 million) for 2015.

<u>EBITDA</u>

EBITDA for the year ended December 31, 2016 increased 38%, or Ps.1,049 million ($23.6 million), to Ps.3,844 million ($186.0 million) from Ps.2,795 million ($162.4 million) for 2015.

*United States*

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 20%, or Ps.228 million ($0.1 million) to Ps.1,370 million ($66.3 million) from Ps.1,142 million ($66.4 million) for 2015. This increase was mainly due to the depreciation of the peso versus the U.S. dollar during 2016.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 increased by 20%, or Ps.227 million ($0.1 million), to Ps.1,339 million ($64.7 million) from Ps.1,112 million ($64.6 million) for 2015. This increase was primarily attributable to the depreciation of the peso versus the U.S. dollar during 2016.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 11%, or Ps.6 million ($0.2 million), to Ps.61 million ($3 million) from Ps.55 million ($3.2 million) for 2015, mainly as a result of an increase in the peso amount of U.S. dollar denominated fixed assets, attributable to the depreciation of the peso versus the U.S. dollar in the period.

<u>Operating Income</u>

As a result of the above, operating income for the year ended December 31, 2016 increased 20%, or Ps.5 million ($0.1 million), to Ps.30 million ($1.5 million) from Ps.25 million ($1.5 million) for 2015.

<u>EBITDA</u>

EBITDA for the year ended December 31, 2016 increased 3%, or Ps.1 million ($0.05 million), to Ps.31 million ($1.5 million) from Ps.30 million ($1.7 million) for 2015.

*Peru*

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 202%, or Ps.520 million ($22.7 million) to Ps.777 million ($37.6 million) from Ps.257 million ($14.9 million) for 2015.  This increase was mainly attributable to increased reimbursements from the Peruvian government for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 increased by 205%, or Ps.345 million ($15 million), to Ps.513 million ($24.8 million) from Ps.168 million ($9.8 million) for 2015. This increase was primarily due to higher  costs  related to the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 40%, or Ps.2 million ($0.1 million), to Ps.7 million ($0.3 million) from Ps.5 million ($0.3 million) for 2015, mainly as a result of higher depreciation from increased furniture and office equipment.

<u>Operating Income</u>

As a result of the above, operating income for the year ended December 31, 2016 increased 206%, or Ps.173 million ($7.5 million), to Ps.257 million ($12.4 million) from Ps.84 million ($4.9 million) for 2015.

<u>EBITDA</u>

EBITDA for the year ended December 31, 2016 increased 197%, or Ps.175 million ($7.6 million), to Ps.264 million ($12.8 million) from Ps.89 million ($5.2 million) for 2015.

*Colombia*

Prior to December 28, 2016, TV Azteca consolidated ACC, through which TV Azteca conducted operations in Colombia. As of December 28, 2016, ACC is no longer consolidated by TV Azteca, but is accounted for using the equity method with respect to TV Azteca's remaining 40% stake.

<u>Revenues</u>

Revenues for the year ended December 31, 2016 increased by 23%, or Ps.142 million ($0.9 million) to Ps.749 million ($36.2 million) from Ps.607 million ($35.3 million) for 2015. This increase was primarily attributable to increased revenue from telecommunications services through the fiber-optic network operated by ACC.

<u>Costs and expenses</u>

Costs and expenses for the year ended December 31, 2016 increased by 20%, or Ps.198 million ($0.2 million), to Ps.1,169 million ($56.6 million) from Ps.971 million ($56.4 million).  Costs during the period include rent paid for transmission towers and space to operate telecommunications nodes, as well as the maintenance and operation of the network.

<u>Depreciation and amortization and other expenses</u>

Depreciation and amortization and other expenses for the year ended December 31, 2016 increased 480%, or Ps.1,292 million ($59.9 million), to Ps.1,561 million ($75.5 million) from Ps.269 million ($15.6 million) for 2015, mainly a result of provision for impairment charges in 2015.

<u>Operating Loss</u>

As a result of the above, operating loss for the year ended December 31, 2016 was Ps.1,981 million ($95.8 million) as compared to an operating loss of Ps.633 million ($36.8 million) for 2015.

<u>EBITDA</u>

TV Azteca's operations in Colombia generated a negative EBITDA of Ps.420 million ($20.3 million) for the year ended December 31, 2016 as compared to a negative EBITDA of Ps.364 million ($21.2 million) for 2015.

40

**Management's Overview**

*Critical Accounting Policies and Estimates*

TV Azteca's critical accounting policies and estimates are described in detail in the notes to its financial statements (see Note 4 to the consolidated financial statements as of and for the years ended December 31, 2016 and 2015).

*Critical Accounting Policies*

TV Azteca believes that the following are some of the most critical accounting policies applied in the preparation of its consolidated financial statements.

<u>Recognition of Revenue</u>

TV Azteca's revenue is derived primarily from the sale of advertising time at the national and local levels minus sales commissions.

Most advertising agreements are entered into during the last quarter of each year for commercials to be broadcasted in the next year. Upon signing (or tacit acceptance by the clients, as the case may be) of the advertising agreements, TV Azteca records the cash or other assets, as the case may be, received as advertising advances (see "*Our Business—Description of the Business—Television Advertising Sales*" and *"—Results of Operations—Advertising Advances*") as an asset in its balance sheet, and its obligation to broadcast the advertisement as deferred revenue in its balance sheet. Advertising advances are non-monetary liabilities, as they represent TV Azteca's obligation to provide services in the future.

The advertising advances registered in the balance sheet as deferred revenue at the end of each year, are recognized as revenue in the income statement for the following year, only when, and to the extent that, the commercials are broadcasted.

TV Azteca maintains reserves for doubtful accounts that are the result of clients' inability to make the required payments. Each client is analyzed individually. If the financial condition of TV Azteca's clients worsens, thus affecting their ability to make payments, additional estimates may be required.

For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, approximately 63%, 70%, 54% and 53%, respectively, of TV Azteca's net revenues, was attributable to advertising advances made before the relevant year.

<u>Broadcast Rights</u>

The cost of broadcast rights is amortized in different ways, depending on the license period, the use of the programs, and management's estimate of revenues that will be re-obtained by each on-air broadcast of the programs. The cost of acquired broadcast rights is amortized as the program and events are aired, and in advance when the rights pertain to multiple broadcasts. Since September 2011, broadcast rights for internally produced contents are amortized in their entirety as they are broadcasted, except in the case of soap operas, which are amortized 90% when they air in Mexico and the remaining 10% when they are sold in other countries, and specials, which are amortized 80% when they air in Mexico and 20% when they are sold in the United States. TV Azteca bases its estimates on historical experience and on other assumptions. If actual results differ from these estimates, there may be an adverse effect on TV Azteca's financial results. See "*Our Business—Description of the Business— Principal Business, Distribution Channels*."

<u>Intangible Assets</u>

*Initial recognition*. The costs attributed directly to the development phase of a project are recorded as intangible assets, to the extent that they meet the following requirements for recognition:

- the costs can be measured reliably;

- the project is technically and commercially viable;

- there are sufficient resources to complete the project;

- the intangible asset can be used or sold; and

- the intangible asset is likely to produce future economic benefits.

Development costs that do not meet these criteria for capitalization are recorded as costs of programming, production and broadcasting as they are incurred.

Costs directly attributable to the development phase include employee costs incurred during software development, in addition to the appropriate percentage of overhead expenses and the cost of loans.

*Subsequent calculations.* Intangible assets, including internally developed capitalized software, are accounted for using the cost model, whereby capitalized costs are amortized on a straight-line basis over their estimated useful lives, as these assets are considered to have a definite life. Intangible assets with a definite life are amortized over the course of the period in which future economic benefits are expected to be obtained, using the straight-line method. The residual value and the estimated useful life are reviewed annually. Intangible assets with an indefinite life are not amortized, given that it is not possible to specify when future economic benefits will end. These assets are subject to evaluation for potential impairment on an annual basis or earlier if circumstances warrant it.

As of June 30, 2017 and December 31, 2016, the Company recorded an impairment reserve of Ps.595 million (Azteca Americas' spectrum sales) and Ps.1,377 million (Colombia's assets), respectively.

Deferred Taxes

As part of the process of preparing the consolidated financial statements, both the assessed and deferred income tax needs to be determined. This process is conducted by applying the relevant tax rate to all the time differences between the accounting and tax balances of assets and liabilities expected to be materialized in the future. It also includes accounting for the treatment of items such as advertising advances, broadcasting rights and inventories, assets, machinery and equipment and tax losses to be amortized, provisions, and estimates for bad debts. These differences produce deferred tax assets and liabilities that are included in the consolidated balance sheet. TV Azteca must then determine the possibility that its deferred tax assets may be recovered from future taxable income and, to the extent recovery is not deemed possible, establish a valuation reserve. As a valuation reserve is established or increased during a period, an expenditure within the reserve for deferred tax income must be included in the income statement.

Recognition of the Effects of the Tax Consolidation Regime Derived from the 2010 Tax Reform.

On December 7, 2009, a decree amending, adding and repealing various tax provisions was published in the Official Gazette, which went into effect on January 1, 2010 (the "2010 Tax Reform").

The 2010 Tax Reform modifies the tax consolidation regime to establish that the payment of income tax related to the benefits of tax consolidation must be made in installments within the sixth to tenth years after the year in which those benefits are used.

The 2010 Tax Reform establishes, in general terms, the benefits of the tax consolidation regime of prior years may be derived from the following items:

- Tax losses taken advantage of in the tax consolidation.

- Losses on disposal of shares individually pending deduction by the entity that generated them.

- Special items of consolidation arising from transactions between the consolidating companies.

- Dividends distributed by the consolidating subsidiaries that did not come from the balance of the Net Tax Profit Account (CUFIN) or the Reinvested Net Tax Profit Account (CUFINRE) distributed since 1999.

- Differences between the registers, consolidated and individual Net Tax Profit Accounts, and Reinvested Net Tax Profit Accounts.

These provisions were applied for the first time in 2010 on the benefits accumulated for the years 2004 and earlier, with the pertinent tax payment made as of 2010 and until 2014.

Against this payment, on the accumulated profits of 2004 and previous years, *amparo* proceeding 323/2010 was filed. Currently and prior to various stages of the proceedings, the Fifth Circuit Court on Administrative Matters of the First Circuit resolved that it was appropriate to dismiss the matter regarding the controlled companies, and denied the constitutional relief known as an *amparo* and protection of federal justice to TV Azteca.

Based on the criteria issued by the Supreme Court of Justice of the Nation (*Suprema Corte de Justicia de la Nación*), in which it was determined that Articles 64, 65, 68, 70-A, 71-A, 78 and Transitory Fourth, Section IV of the Income Tax Law that are related to the changes to the tax consolidation regime in effect as of 2010, the above does not contravene the fundamental rights of tax legality, legal certainty, proportionality, equality, equity and non-retroactivity provided for in the Mexican Constitution.

Likewise, the 2010 Tax Reform has had a second, third and fourth application on the benefits related to fiscal years 2005, 2006 and 2007, and the reasons for which the respective payments were made from 2011 to 2015, and from 2013 to 2017, respectively.

These payments were also contested through the filing of *amparo* proceeding 46/2011. The Fifth Collegiate Court on Administrative Matters of the First Circuit dismissed the suit on the grounds that the same companies were disputing the same issue as in the *amparo* proceeding 323/2010.

Based on the above, the present case has been definitively concluded.

Recognition of the Effects of the Tax Consolidation Regime Derived from the 2014 Tax Reform.

On December 11, 2013, decree amending, adding and repealing various tax provisions was published in the Official Gazette, which went into effect on January 1, 2014 (the "2014 Tax Reform").

On the occasion of the repeal of the Income Tax Law published in the Official Gazette on January 1, 2002 and in effect until December 31, 2013, the parent company that was authorized to determine its consolidated tax result deconsolidated all the companies of the group, including itself, for which it will pay the tax that it has deferred under the tax consolidation regime derived from the 2014 Tax Reform.

The benefits of the tax consolidation regime for which the deconsolidation tax will have to be paid may be derived from the following items:

- Special consolidation items.

- Tax losses taken advantage of in the fiscal consolidation.

- Losses arising from the disposal of shares of controlled companies and that could not be deducted by the company that generated them.

- By dividends or profits not deriving from their net tax profit account, which the controlled companies paid to other companies in the same consolidation group.

- By comparing the individual net tax profit accounts of the controlled companies and the same account of the parent company with the record of the consolidated net tax profit account, when the latter is lower than the former.

The payments for income tax for deconsolidation may be made for a period of 5 years or 10 years, depending on the option chosen for its payment. TV Azteca chose to pay the deferred tax in 5 years. Payments have been made as follows: 25% in May 2014; 25% in April 2015; 20% in April 2016; and 15% in April 2017. A payment of 15% is expected to be made in April 2018.

Contingent Liabilities

Contingent liabilities may not evolve as expected. Therefore, they are subject to constant assessment in order to determine the likelihood of an actual future expense. If it is likely that resources will be spent on an item treated as a contingent liability, the corresponding provision must be recorded in the financial statements for the period in which the change in likelihood of occurrence has occurred.

TV Azteca is a party in various legal proceedings and lawsuits during the normal course of its operations. Based on the legal advice that TV Azteca has received from its legal counsel, as well as from additional information, TV Azteca has not identified any provision in its financial statements as a result of the aforementioned legal proceedings.

Effects of the Devaluation of the Peso and Inflation

*General Information*. For the fiscal year ended December 31, 2016 and 2015, the gross domestic product growth of Mexico was 2.3% and 2.5%, respectively. Interest rates on Mexican government treasury certificates to 28 days (CETES) averaged 4.15% and 2.98% in 2016 and 2015, respectively.

Inflation for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015 was 3.2%, 0.3%, 3.4% and 3.1%, respectively.

As of December 31, 2016, the peso depreciated to Ps.20.6640 per U.S. dollar, a decrease of 20.1% in value as compared to December 31, 2015.

*Operating Costs in U.S. Dollars.* TV Azteca has significant operating costs in U.S. dollars, attributable largely to the cost of purchased programming and the rental of satellite transponder capabilities, which for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, accounted for approximately 26%, 19%, 20% and 19%, respectively, of TV Azteca's total costs and expenses.

*Comprehensive gain or loss on financing.* TV Azteca registers a foreign exchange gain or loss on its monetary assets and liabilities denominated in U.S. dollars when the peso appreciates or depreciates in relation to the U.S. dollar.

As of June 30, 2017 and December 31, 2016, almost all of TV Azteca's debt was denominated in U.S. dollars. As of June 30, 2017 and December 31, 2016, TV Azteca had approximately $872.0 million and $961.0 million, respectively, of monetary liabilities denominated in U.S. dollars, which accounted for approximately 53% and 62%, respectively, of its total debt. TV Azteca's dollar-denominated monetary assets as of June 30, 2017 and December 31, 2016 amounted to approximately $96.0 million and $126.6 million, respectively. In 2016 and 2015, exchange losses were generated as a result of the combination of a liability position during the year and a depreciation of the peso against the U.S. dollar (see Notes 17 and 18 to the consolidated financial statements as of and for the years ended December 31, 2016 and 2015). TV Azteca's interest income is positively affected by inflation, as TV Azteca receives higher returns on its temporary investments, which are primarily short-term fixed deposits in pesos at Mexican banks.

During 2015, the other financial expenses increased compared to 2014, mainly due to the payment of surety bonds for the construction of the fiber optic network in Peru. During 2016, the other financial expenses experienced a decrease compared to 2015, mainly due to the decrease in amortization of expenses of the line of credit in Peru.

### Advertising Advances

Advertising advances are non-monetary liabilities because they represent TV Azteca's obligation to provide services in the future. The amount of advertising advances on the balance sheet is credited when the commercials are broadcasted.

### Advertising Time Presales

For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, 48%, 44%, 57% and 48%, respectively, of TV Azteca's net revenues were attributable to advertising time presales made before that fiscal year. As of December 31, 2016, advertising time presales amounted to Ps.7,669.0 million, representing an increase of 11.82% over the advertising time presales recorded in 2015. The advertising time presales recorded at the end of each fiscal year represent the revenues that TV Azteca will recognize during the following calendar year.

### Other Sales

*Advertising barter arrangements.* Advertising barter arrangements (see "*Our Business—Description of the Business—Television Advertising Sales*") are accounted for in the same way as other advertising advances, and the amounts owed to TV Azteca are determined based on the fair market value of the goods, services, or other assets received by TV Azteca. For the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, revenue from advertising barter arrangements represented Ps.96.0 million, Ps.163.8 million, Ps.364.0 million and Ps.403.0 million, respectively, which represented approximately 1%, 3%, 3% and 3% of TV Azteca's net sales for the same periods.

*Infomercials, Shared-Risk Advertisements and Integrated Advertising.* TV Azteca sells part of the unsold advertising time to infomercial producers and shared-risk advertisers (see "*Our Business—Description of the Business—Television Advertising Sales*"). In the case of infomercials, TV Azteca charges a fee for the advertisement air time but does not participate in the proceeds of the sale of the products shown during the infomercial; whereas in the case of shared-risk advertising, TV Azteca charges no (or a minimum) advertising fee, but instead receives a percentage of the gross sales of the product or products offered occurred within a specific period after the advertisement is aired. For example, TV Azteca broadcasts advertisements of musical recordings, at minimal or no cost, under contracts that entitle TV Azteca to receive a share of the sales of the recordings for a certain time after the airing of the advertisements. TV Azteca also receives revenues from "integrated advertising," which consists in the exhibition of products during the transmission of internally produced contents.

For the six months ended June 30, 2017 and June 30, 2016, revenues from infomercials and integrated advertising, amounted to Ps.53.0 million and Ps.839.0 million (totaling Ps.892.0 million) and Ps.85 million and Ps.832 million (totaling Ps.917 million), respectively. For the year ended December 31, 2016, revenues from infomercials and integrated advertising, these revenues amounted to Ps.167.0 million and Ps.1,838.0 million, respectively, totaling Ps.2,005.0 million. For the year ended December 31, 2015, revenues from infomercials and integrated advertising, amounted to Ps.147.0 million and Ps.2,075.0 million, respectively, totaling Ps.2,222.0 million.

Infomercials, shared-risk advertisements and integrated advertising accounted, on an aggregate basis, for approximately 13%, 15%, 14% and 17% of TV Azteca's net income for the six months ended June 30, 2017 and June 30, 2016 and the years ended December 31, 2016 and 2015, respectively.

<u>Seasonality of Sales</u>

TV Azteca's television broadcasting operations are seasonal. Advertising revenues, which are accrued when the advertising airs, are usually higher in the fourth quarter due to the high level of advertising that is broadcasted as a result of the holiday season.

<u>Regularity of Important Broadcast Events</u>

TV Azteca's net income fluctuates as a result of the frequency with which TV Azteca broadcasts important events. Historically, the broadcasting of important events by TV Azteca has increased advertising sales during the period in which these were on air. This reflects the larger audiences during the hours that these important events are broadcast and the fact that advertisers pay a premium related to these important broadcast events.

*Critical Accounting Estimates*

Beginning January 1, 2012, TV Azteca adopted IFRS as issued by the IASB for the preparation of its financial statements, to comply with the regulations established by the CNBV. The preparation of its consolidated financial statements requires TV Azteca to make critical estimates that affect the amount of assets, liabilities, income, and expenditures reported, as well as disclosure related to contingent assets and liabilities. TV Azteca considers an accounting estimate critical if:

- it requires to make assumptions about the information, due to the fact that the relevant information was not available on time or because it included matters that were highly uncertain at the time that it was made; and

- there are changes in the estimates or there are different estimates that could have been selected and that would have had a material impact on the financial condition or results of operations.

TV Azteca makes estimates in order to calculate, for example, internally generated costs of software and development, deferred taxes on earnings, impairment, useful lives of depreciable assets, broadcast rights, business combinations, allowances for doubtful accounts, defined benefit obligations, fair value of financial instruments, and fair value of derivative financial instruments. TV Azteca continually evaluates its estimates based on historical experience and other factors that are believed to be reasonable under the circumstances. Actual results may differ, perhaps significantly, from these estimates under different assumptions or conditions.

*Key Factors Affecting TV Azteca's Results of Operations*

 *Revenue Generation*

  TV Azteca's revenue is mainly generated by its sales of advertising air time and its exports of original programming.

  The following chart depicts TV Azteca's revenue generation breakdown by country for the last twelve months ended June 30, 2017:



  The following chart depicts TV Azteca's revenue generation breakdown by country for the six months ended June 30, 2017:



  Revenues from Mexico accounted for 86%, 81%, 83% and 88% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

  Revenues from United States accounted for 9%, 10%, 10% and 9% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

  Revenues from Peru accounted for 4%, 8%, 6% and 2% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Other sources of revenue for TV Azteca accounted, on an aggregate basis, for 0%, 1%, 1% and 1% of TV Azteca's consolidated revenues for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively (see "*The Business—Description of the Business—Other Operations*").

<u>Key Factors Affecting TV Azteca's Revenue Generation</u>

Key factors affecting TV Azteca's revenue generation include content quality and programming decisions and strategies. High-quality content combined with effective programming strategies generally translate into higher ratings and therefore, increased revenue generation. Conversely, if TV Azteca's television content ceases to be widely accepted by audiences or is not continuously replenished with popular content, TV Azteca's revenues could be adversely affected.

In addition, TV Azteca's business has experienced and is expected to continue to experience seasonality due to, among other things, seasonal advertising patterns and seasonal influences on people's viewing habits. TV Azteca typically recognizes a disproportionately large percentage of its revenue from advertising sales in the fourth quarter because of the high level of advertising during the holiday season.

TV Azteca's revenue generation is also affected by infrequently recurring major broadcast events, such as the FIFA World Cup, the UEFA Champions League, the Mexican national soccer team games and major boxing matches and other extraordinary events. These events tend to have a positive effect on TV Azteca's revenue generation during the period in which they occur, to the extent that TV Azteca is able to acquire the relevant broadcast rights. On the other hand, the lack of special events in a given period or the inability to acquire the relevant broadcast rights may translate into decreased revenue generation. In order to increase revenue generation during periods where there are no major special events or when TV Azteca is not able to avail itself of the relevant broadcast rights, TV Azteca manages programming strategies by introducing alternative new high-quality content, including soap operas (*telenovelas*), series, blockbuster movies and reality shows.

TV Azteca's revenues are affected by competition for advertising revenues with other television broadcasters and other advertising media. TV Azteca's principal competitor in Mexico is Televisa. TV Azteca's revenues are also affected by changes in clients' advertising expenditures related to economic prospects of advertisers or industries, increased competition for the leisure time of audiences and audience fragmentation, the growing use of new technologies, or the economy in general. Any of these or other factors may cause advertisers to alter their spending priorities. In addition, advertisers' willingness to purchase advertising from TV Azteca may be adversely affected by lower audience ratings. Advertising sales and rates also are dependent on audience measurement and could be affected by changes in audience measurement methodologies.

*Costs of programming, production and broadcasting*

For the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, costs of programming, production and broadcasting accounted for 88%, 85%, 84% and 83%, respectively, of TV Azteca's consolidated total operating costs and expenses.

TV Azteca's most significant variable operating costs relate to the production and acquisition of content.

The following chart depicts TV Azteca's costs of programming, production and broadcasting for the six months ended June 30, 2017:



Costs related to production accounted for 79%, 73%, 73% and 75% of TV Azteca's consolidated total costs of programming, production and broadcasting for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Costs related to programming accounted for 21%, 26%, 26% and 24% of TV Azteca's consolidated total costs of programming, production and broadcasting for the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015, respectively.

Costs related to broadcasting accounted for 1% of TV Azteca's consolidated total costs of programming, production and broadcasting in each of the six months ended June 30, 2017 and 2016, and the years ended December 31, 2016 and 2015.

<u>Key Factors Affecting TV Azteca's Costs of Operations</u>

The cost of producing original programming varies considerably depending on the type of program, and is generally more expensive than acquiring broadcast rights to externally produced programming. In addition, producing soap operas (*telenovelas*) is more expensive than other types of programming. TV Azteca manages the impact of these production costs on its operating margin mainly by increasing sales efforts to ensure sufficient advertising revenue for costly productions and reducing its production costs on other productions.

With respect to content purchased from other producers, even if TV Azteca is not outbid by its competitors for the rights to new, popular programming or in connection with the renewal of popular programming currently licensed by TV Azteca, intense competition for popular programming licensed from third parties puts pressure on license prices which increases costs.

TV Azteca has implemented, and plans to continue to implement, strict cost control initiatives in connection with its internally produced programming and the purchase of externally produced programming. With respect to TV Azteca's internally produced programming, these cost control initiatives include establishing clearly defined profitability targets for each stage of the production process, maintaining strict controls on hiring decisions, and controlling the costs of talent through the hiring of members of the TV Azteca acting school. With respect to the purchase of externally produced programming, TV Azteca focuses on acquiring programs that it believes will generate a greater number of viewers in its target audience and thereby generate significant advertising revenues as compared to the purchase costs.

*Results of Operations*

The following table sets forth, for the periods indicated, selected results of operations data for TV Azteca:

| | Six months ended June 30 | | | Year ended December 31 | | |
|---|---|---|---|---|---|---|
| | 2017 | 2017 | 2016 | 2016 | 2016 | 2015 |
| | (Unaudited) | | | (Audited) | | |
| | ($) | (Ps.) | (Ps.) | ($) | (Ps.) | (Ps.) |
| | (in millions) | | | | | |
| Revenues | 392.1 | 7,017.3 | 6,128.7 | 687.0 | 14,196.6 | 12,859.5 |
| Costs of programming, production and broadcasting | (266.0) | (4,760.4) | (3,791.8) | (435.0) | (8,988.8) | (8,719.8) |
| Selling and administrative expenses | (36.6) | (655.4) | (671.5) | (73.5) | (1,519.6) | (1,605.2) |
| Depreciation and amortization | (22.9) | (409.6) | (345.3) | (44.8) | (924.9) | (910.2) |
| Other expenses, net | (40.8) | (730.7) | (224.8) | (89.5) | (1,850.2) | (1,028.4) |
| Operating income | 25.8 | 461.2 | 1,095.3 | 44.2 | 913.1 | 595.8 |
| Comprehensive gain (loss) on financing | 34.5 | 617.9 | (1,197.5) | (153.2) | (3,164.7) | (2,514.3) |
| Income (loss) before taxes on earnings | 55.2 | 988.6 | (95.7) | (107.8) | (2,228.2) | (1,931.9) |
| Taxes on earnings | (30.0) | (537.1) | (622.0) | (45.7) | (944.7) | (715.7) |
| Income (loss) from continuing operations | 25.2 | 451.5 | (717.7) | (153.5) | (3,172.9) | (2,647.6) |
| (Loss) from discontinued operations | - | - | (370.9) | - | - | - |
| Net income (loss) | 25.2 | 451.5 | (1,088.6) | (153.5) | (3,172.9) | (2,647.6) |

The following table sets forth, for the periods indicated, results of operations data for TV Azteca as a percentage of TV Azteca's revenues:

| | Six months ended June 30 | | Year ended December 31 | |
|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 |
| | (Unaudited) | | (Audited) | |
| Revenues | 100.0 | 100.0 | 100.0 | 100.0 |
| Costs of programming, production and broadcasting | (67.8) | (61.9) | (63.3) | (67.8) |
| Selling and administrative expenses | (9.3) | (11.0) | (10.7) | (12.5) |
| Total costs and expenses | (77.2) | (72.8) | (74.0) | (80.3) |
| Depreciation and amortization | (5.8) | (5.6) | (6.5) | (7.1) |
| Other expenses, net | (10.4) | (3.7) | (13.0) | (8.0) |
| Operating income | 6.6 | 17.9 | 6.4 | 4.6 |

*Six Months Ended June 30, 2017 Compared to Six Months Ended June 30, 2016*

<u>Revenues</u>

Revenues for the six months ended June 30, 2017 increased by 14%, or Ps.889 million ($68.1 million), to Ps.7,017 million ($392.1 million) from Ps.6,129 million ($324.1 million) for the same period in 2016. This increase was mainly due to the popularity of entertainment and other programs broadcasted during the six months ended June 30, 2017, which generated millions of viewers in Mexico and resulted in increased advertising sales, as well as revenue related to the WGC Mexico Championship golf tournament, organized by TV Azteca, and exchange rate fluctuations, as well as the monetization of content that is popular among Hispanic audiences in the United States, which was partially offset by the lower reimbursements from the Peruvian government during the six months ended June 30, 2017 for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

<u>Costs of programming, production and broadcasting</u>

Costs of programming, production and broadcasting for the six months ended June 30, 2017 increased by 26%, or Ps.969 million ($65.5 million), to Ps.4,760 million ($266.0 million) from Ps.3,792 million ($200.5 million) for the same period in 2016. This increase was primarily attributable to increased costs of programming, production and broadcasting, costs related to the organization of the WGC Mexico Championship golf tournament, exchange rate fluctuations and increased costs and expenses in connection with the expansion of geographic coverage in the U.S. east coast, and to the increased cost of maintaining the Red Dorsal Nacional de Fibra Óptica fiber optic network, which was not fully present during the six months ended June 30, 2016 when the network was under construction.

Selling and administrative expenses

Selling and administrative expenses for the six months ended June 30, 2017 decreased by 2%, or Ps.16 million ($1.1 million), to Ps.655 million ($36.6 million) from Ps.672 million ($35.5 million) for the same period in 2016.  This decrease was mainly due to operating efficiency gains attributable to strict budgeting.

Depreciation and amortization

Depreciation and amortization for the six months ended June 30, 2017 increased by 19%, or Ps.64 million ($4.6 million), to Ps.410 million ($22.9 million) from Ps.345 million ($18.2 million) for the same period in 2016, largely due to the acquisition of assets to operate high definition equipment, as well as maintenance and improvement of buildings during 2016 and 2015, which has increased the basis of assets that can be depreciated.

Other expenses, net

Other expenses, net for the six months ended June 30, 2017 increased by 225%, or Ps.506 million ($28.9 million), to Ps.731 million ($40.8 million) from Ps.225 million ($11.9 million) for the same period in 2016. This increase was mostly due to the impairment of Azteca America's spectrum. In 2017, stations in Los Angeles and San Francisco related to Azteca America won a spectrum auction designed by the FCC. The book value recorded by Azteca America for the spectrum of these stations was higher than the value determined by the FCC, which required that the book value be adjusted.

Operating income

As a result of the above, operating income for the six months ended June 30, 2017 decreased by 58%, or Ps.634 million ($32.1 million), to Ps.461 million ($25.8 million) from Ps.1,095 million ($57.9 million) for the same period in 2016.

Comprehensive gain or loss on financing

Comprehensive gain on financing for the six months ended June 30, 2017 was Ps.618 million ($34.5 million) as compared to a comprehensive loss on financing of Ps.1,198 million ($63.3 million) for the same period in 2016. This change was primarily attributable to (i) a gain in net foreign exchange of Ps.1,782 million ($99.6 million) derived from a net liability position in U.S. dollars and an appreciation of the peso against the U.S. dollar at the end of the six month period ended June 30, 2017; (ii) a gain of Ps.31 million ($1.7 million) in other financial expenses; (iii) an increase of Ps.11 million ($0.6 million) in interest earned due to a period-to-period decrease in cash and cash equivalents, which were partially offset by an increase of Ps.8 million ($0.5 million) in interest paid due to the effect of exchange rate depreciation on the peso equivalent of TV Azteca's debt, which is denominated in U.S. dollars (see "—*Critical Accounting Policies and Estimates—Critical Accounting Policies—Effects of the Devaluation of the Peso and Inflation*").

Income before taxes on earnings

Income before taxes on earnings for the six months ended June 30, 2017 increased by Ps.1,084 million ($50.2 million), to Ps.989 million ($55.2 million from a loss of Ps.96 million ($5.0 million) for the same period in 2016.

Taxes on earnings

Taxes on earnings for the six months ended June 30, 2017, decreased by 14%, or Ps.85 million ($2.9 million), to Ps.537 million ($30.0 million) from Ps.622 million ($32.9 million) for the same period in 2016 (see "—*Critical Accounting Policies and Estimated—Critical Accounting Policies—Deferred Taxes*").

Net income or loss

As a result of the above, net income for the six months ended June 30, 2017 increased by 141% or Ps.1,540 million ($82.8 million), to a net income of Ps.452 million ($25.2 million) from a net loss of Ps.1,089 million ($57.6 million) for the same period in 2016.

Free cash flow

Free cash flow for the six months ended June 30, 2017 increased by 10%, or Ps.129 million ($11 million), to Ps.1,399 million ($78 million) from Ps.1,270 million ($67 million) for the same period in 2016.

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

Revenues

Revenues for the year ended December 31, 2016 increased by 10.4% or Ps.1,337 million ($60.3 million), to Ps.14,197 million ($687.0 million) from Ps.12,859 million ($747.3 million) for 2015. The increase was mainly due to increased advertising sales resulting from the popularity of TV Azteca's programming with large audiences that constitute the target market of numerous Mexican advertisers and revenues derived from the reimbursements from the Peruvian government for payments made by ACP for the construction and maintenance of the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru.

For the year ended December 31, 2016, revenues from Mexico, United States, and export of internally generated content to other countries, other businesses and the fiber optic business accounted for 69.2%, 9.8%, 2.0%, 8.2% and 10.8% of TV Azteca's total revenue, respectively.

The revenues generated in Mexico come from clients who advertise their products throughout the country in TV Azteca's national broadcasting programming, as well as local clients that are announced regionally through TV Azteca's 35 local branches, where local ads can be inserted. National advertising accounted for approximately 70% of TV Azteca's total revenue in 2016 and 71% in 2015. TV Azteca considers that the performance of national advertising sales is to some extent a function of Mexican national economic activity, particularly consumer demand.

Revenues in the United States are derived mainly from Azteca America, as well as from the KAZA–TV Los Angeles station, which TV Azteca started to operate under a multi-year local marketing contract that came into effect on July 1, 2003. Revenues in the United States accounted for 9.8% and 10.9% of TV Azteca's total revenue in the fiscal years ending on December 31, 2016 and 2015.

TV Azteca has exported its internally generated content to more than 100 countries. In 2016, programming exports accounted for 2.0% of TV Azteca's total revenue. TV Azteca considers that Mexico's cultural ties with other countries and the quality of TV Azteca's programming content are key factors for further growth of programming exports in the coming years.

In 2016, revenues generated by the operation relating to the fiber optic businesses in Colombia and Peru accounted for 10.8% of TV Azteca's total revenue.

Costs of programming, production and broadcasting

Costs of programming, production and broadcasting for the year ended December 31, 2016 increased by 3%, or Ps.269 million ($71.8 million), to Ps.8,989 million ($435.0 million) from Ps.8,720 million ($506.8 million) for 2015. The increase was mainly attributable to the incurrence of significant costs in 2016 in connection with the purchase of broadcast rights for Atlas F.C. soccer team, the construction costs related to ACC and ACP's fiber optic networks, and the depreciation of the peso versus the U.S. dollar during 2016.

Selling and administrative expenses

Selling and administrative expenses for the year ended December 31, 2016 decreased by 5%, or Ps.86 million ($19.7 million), to Ps.1,520 million ($73.6 million) from Ps.1,605 million ($93.3 million) for 2015. The decrease was mainly attributable to decrease in personnel expenses, operating expenses and travel expenses.

Depreciation and amortization

Depreciation and amortization for the year ended December 31, 2016 increased by 2%, or Ps.15 million ($8.1 million), to Ps.925 million ($44.8 million) from Ps.910 million ($52.9 million) for 2015, largely due to the acquisition of equipment necessary to operate in high definition due to the switch from analog to digital broadcasting.

Other expenses, net

Other expenses, net for the year ended December 31, 2016 increased by 80%, or Ps.822 million ($29.8 million), to Ps.1,850 million ($89.5 million) from Ps.1,028 million ($59.7 million) for 2015. This increase was primarily due to the provision for impairment of assets made in 2016 in the amount equal to Ps.1,377 million in connection with the impairment of assets of ACC, which reflects the reduction of value of the transmission assets of ACC.

Operating income

As a result of the above, operating income for the year ended December 31, 2016 increased by 53%, or Ps.317 million ($9.6 million), to Ps.913 million ($44.2 million) from Ps.596 million ($34.6 million) for 2015.

Comprehensive gain or loss on financing

Comprehensive loss on financing for the year ended December 31, 2016 increased by 26%, or Ps.651 million ($7.1 million), to a Ps.3,165 million ($153.2 million) loss from a Ps.2,514 million ($146.1 million) loss for 2015. This change was primarily due to (i) an increase in interest paid in 2016 of Ps.179 million ($8.7 million), mainly caused by the increase in the exchange rate as compared with the previous year; (ii) a decrease in interest earned of Ps.16 million ($0.8 million) due to lower yield levels in 2016; (iii) a foreign exchange loss in 2016 of Ps.1,651 million ($79.9 million), compared to a foreign exchange loss of Ps. 1,187 million ($68.9 million) for 2015, as a result of a net liability position in dollars and a depreciation of the peso against the U.S. dollar at the end of 2016; and (iv) a decrease in other financial expenses for Ps.9 million ($0.4 million), mainly due to the payment of sureties for the construction of the fiber optic network in Peru  (see "—*Critical Accounting Policies and Estimates—Critical Accounting Policies—Effects of the Devaluation of the Peso and Inflation*").

Loss before taxes on earnings

Loss before taxes on earnings for the year ended December 31, 2016 increased by 15%, or Ps.296 million ($4.5 million), to Ps.2,228 million ($107.8 million) from Ps.1,932 million ($112.3 million) for 2015. The income tax for the fiscal year ended December 31, 2016, increased by 32% or Ps.229 million ($4.1 million), to Ps. $945 million ($45.7 million) from Ps.716 million ($41.6 million) for 2015.

Net loss

As a result of the above, net loss for the year ended December 31, 2016 increased by 19.8%, or Ps.525 million ($0.3 million), to Ps.3,173 million ($153.6 million) from Ps.2,648 million ($153.9 million) for 2015.

Free cash flow

Free cash flow for the year ended December 31, 2016 increased by 132%, or Ps.1,528 million ($63 million), to Ps.2,681 million ($130 million) from Ps.1,154 million ($67 million) for 2015.

*Liquidity and Capital Resources*

*Liquidity*

Factors that may influence TV Azteca's liquidity and capital resources as discussed below include:

- TV Azteca's ability to generate sufficient free cash flow;

- the ability of TV Azteca's subsidiaries to make distributions;

- factors that affect the results of operations of TV Azteca, including general economic conditions, demand for commercial advertising, the competitive environment, the relative popularity of TV Azteca's programs, demographic changes in TV Azteca's market areas and regulation; and

- factors that affect TV Azteca's access to bank financing and capital markets, including interest rate and exchange rate fluctuations, availability of credit and operational risks of TV Azteca.

TV Azteca's principal sources of liquidity include cash and cash equivalents on hand, advance sales of advertising time (see "—*Advertising Advances*") and uncommitted sources of short-term financing. The sources of short- and medium-term funding for TV Azteca include: a $130 million Euro Commercial Paper Program (the "ECP Program") and a medium-term Euro Notes Program for $1 billion. Under the ECP Program, TV Azteca periodically issues promissory notes with maturities not exceeding 365 days. Under the medium-term Euro Notes Program, TV Azteca may issue periodic promissory notes with maturities greater than 360 days and a maximum of 10 years. In addition, TV Azteca is currently in the process of establishing a new Mexican debt securities (*Certificados Bursatiles*) program for Ps.10 billion ($559 million) under which TV Azteca may issue short-term notes with amounts not exceeding Ps.3 billion ($168 million) and maturities up to 364 days or medium or long-term notes with amounts not exceeding Ps.10 billion ($559 million) and maturities from 365 days and a maximum of 30 years. Preliminary terms and conditions are subject to approval by the CNBV (*Comisión Nacional Bancaria y de Valores*).

TV Azteca's net working capital decreased by 66% to Ps.1,370 million ($77 million) as of June 30, 2017 from Ps.4,019 million ($194 million) as of December 31, 2016. This was mainly due to recognition of TV Azteca's $300 million Medium Term Notes due 2018 as a short-term liability and a 32% decrease in cash to Ps.3,025 million ($169 million) as of June 30, 2017, from Ps.4,470 million ($216 million) as of December 31, 2016 mainly due to a partial cancelation on this bond (see " —*MTN Programme*").

TV Azteca's net working capital decreased by 11% to Ps.4,019 million ($171 million) as of December 31, 2016 from Ps.4,516 million ($262 million) as of December 31, 2015. This was mainly due to an increase of TV Azteca's cash, which was offset  by an increase of TV Azteca's deferred income and performance rights.

Cash and marketable financial instruments for TV Azteca decreased by 32% to Ps.3,025 million ($169 million) as of June 30, 2017 from Ps.4,470 million ($216 million) as of December 31, 2016.  This change was due principally to a $42.5 million partial cancelation of TV Azteca's $300 million Medium Term Notes due 2018, which was paid with cash generated by the operation of the company (see "—*MTN Programme*").

TV Azteca and the Guarantors had consolidated total indebtedness of Ps.15,234 million ($851.2 million) as of June 30, 2017 compared to Ps.18,261 million ($884 million) as of December 31, 2016. This decrease was largely due to the partial cancelation mentioned above and by a 13% appreciation of the Mexican currency against the U.S. dollar.

Cash and cash equivalents increased by 52% to Ps.4,470 million ($216 million) as of December 31, 2016 from Ps.2,938 million ($171 million) as of December 31, 2015. This change was due principally to (i) collection of accounts receivable; (ii) a $75 million payment under the ECP Program on August, 26, 2015; and (iii) a 27% decrease in capital expenditures to Ps.1,007 million ($48.7 million) at the end of 2016 from Ps.1,381 million ($80.2 million) the previous year.

TV Azteca and the Guarantors had consolidated total indebtedness of Ps.18,261 million ($884 million) as of December 31, 2016 compared to Ps.15,213 million ($884 million) as of December 31, 2015. This 20% increase was largely due to a 20% depreciation of the Mexican currency against the U.S. dollar.

The following chart sets forth TV Azteca's generation and application of cash for the periods indicated:

| | Six months ended June 30 | | | | Year ended December 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | **2017** | **2017** | **2016** | **2016** | **2016** | **2016** | **2015** | **2015** |
| | (IFRS Unaudited) | | | | | (IFRS Audited) | | |
| | **($)** | **(Ps.)** | **($)** | **(Ps.)** | **($)** | **(Ps.)** | **($)** | **(Ps.)** |
| | | | | | (in millions) | | | |
| Net cash provided by (used in): | | | | | | | | |
| Operating activities ................................ | 15.2 | 272 | 47.2 | 893 | 190.6 | 3,939 | 68.2 | 1,173 |
| Investing activities................................. | (9.7) | (174) | (20.1) | (380) | (45.7) | (944) | (85.8) | (1,477) |
| Financing activities ............................... | (86.2) | (1,543) | (36.8) | (697) | (70.8) | (1,463) | (132.9) | (2,287) |
| Cash and cash equivalents at period end.. | 169.0 | 3,025 | 145.7 | 2,755 | 216.3 | 4,470 | 170.8 | 2,938 |

Net cash provided by operating activities for the six months ended June 30, 2017 decreased by 70%, or Ps.621 million ($32.0 million), to Ps.272 million ($15.2 million) from Ps.893 million ($47.2 million) for the same period in 2016. This decrease was mainly due to the purchase of broadcasting rights for sports events such as international soccer matches, boxing matches and football games as well as program series and blockbuster movies and a decrease in supplier accounts payable.

Net cash used in investing activities for the six months ended June 30, 2017 decreased by 54%, or Ps.206 million ($10.4 million), to Ps.174 million ($9.7 million) from Ps.380 million ($20.1 million) for the same period in 2016. This decrease was mainly due to the acquisition of players for Atlas F.C. and Monarcas Morelia.

Net cash used in financing activities for the six months ended June 30, 2017 increased by 122%, or Ps.847 million ($49.4 million), to Ps.1,543 million ($86.2 million) from Ps.697 million ($36.8 million) for the same period in 2016. This increase was mainly due to partial cancellation of $42.5 million of TV Azteca's $300 million Medium Term Notes due 2018 and higher interest expenses as a result of depreciation of the peso versus the U.S. dollar.

Net cash provided by operating activities for the year ended December 31, 2016 increased by 236%, or Ps.2,766 million ($122.4 million), to Ps.3,939 million ($190.6 million) from Ps.1,173 million ($68.2 million) for 2015. This increase was mainly due to higher revenues from advertising sales, reduction of costs for talent, reduction of operating expenses and collection of accounts receivable, including reimbursement from the Peruvian

government of the expenses incurred in connection with the Red Dorsal Nacional de Fibra Óptica fiber optic network in Peru and collection for transmission rights of Azteca America.

Net cash used in investing activities for the year ended December 31, 2016 decreased by 36%, or Ps.533 million ($40.1 million), to Ps.944 million ($45.7 million) from Ps.1,477 million ($85.8 million) for 2015. This decrease was mainly due to acquisition of high definition equipment and intangible assets.

Net cash used in financing activities for the year ended December 31, 2016 decreased by 36%, or Ps.824 million ($62.1 million), to Ps.1,463 million ($70.8 million) from Ps.2,287 million ($132.9 million) for 2015. This decrease was mainly due to a non-recurring $75 million payment under the ECP Program on August, 26, 2015.

For more detail, see "*Consolidated Statements of Cash Flows*" set forth in TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015.

*Advertising Advances*

Under TV Azteca's "Azteca Plan," advertisers generally are required to pay their advertising commitment in full within four months of the date they sign an advertising contract. TV Azteca also offers flexibility to advertisers by providing them an option to pay for advertising by making a cash deposit ranging from 10% to 20% of their advertising commitment, with the balance payable in installments over the term of the advertising contract, typically one year. No adjustments are made for inflation during the term of a contract.

Since pre-sales of advertising time are generally made in the last quarter of the year, TV Azteca's cash and marketable securities are normally at their highest level in December and at their lowest level in the third quarter of a calendar year. Generally, as the proceeds generated from pre-sales of advertising time are depleted (together with other sources of cash flow), TV Azteca relies upon sources of short-term financing, which are subsequently repaid, typically in the fourth quarter of a calendar year with the proceeds from the pre-sales of advertising time for the following year. As of December 31, 2016, TV Azteca had generated Ps.7,669 million ($371.1 million) in pre-sales of advertising time to be aired in 2017.

*Indebtedness*

The following chart sets forth TV Azteca's indebtedness as of June 30, 2017:

| Description | ($)[1] | (Ps.) | Rate | Maturity |
|---|---|---|---|---|
| | **TV Azteca Indebtedness as of June 30, 2017** | | | |
| | **(in millions)** | | | |
| Medium Term Notes due 2018[2] | 259.1 | 4,637 | 7.500% | 2018 |
| Medium Term Notes due 2020 | 499.5 | 8,940 | 7.625% | 2020 |
| ATC Long-Term Credit Facility | 92.6 | 1,657 | 13.109% | 2069 |
| **Total Indebtedness** | **851.2** | **15,234** | | |

(1)  The exchange rate used in converting pesos into U.S. dollars for amounts derived from the balance sheet as of June 30, 2017 was determined by reference to the period-end exchange rate of June 30, 2017 (Ps.17.8973 per U.S. dollar). The amounts shown are presented net of issuance costs.

(2)  All of the outstanding Medium Term Notes due 2018 is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments*."

TV Azteca's total debt as of June 30, 2017 matures on the dates set forth below:

| Date Due | Total TV Azteca Indebtedness as of June 30, 2017 | |
| | ($)[1] | (Ps.) |
| --- | --- | --- |
| | (in millions) | |
| 2017 | 0 | 0 |
| 2018[2] | 259.1 | 4,637 |
| 2019 | 0 | 0 |
| 2020 | 499.5 | 8,940 |
| 2069 | 92.6 | 1,657 |
| **Total** | **851.2** | **15,234** |

(1) The exchange rate used in converting pesos into U.S. dollars for amounts derived from the balance sheet as of June 30, 2017 was determined by reference to the period-end exchange rate of June 30, 2017 (Ps.17.8973 per U.S. dollar). The amounts shown are presented net of issuance costs.

(2) All of the outstanding Medium Term Notes due 2018 is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments*."

*MTN Programme*

On June 1, 2005, TV Azteca established the MTN Programme for $200 million with Geronimo Capital Markets Ltd. as the negotiator and principal operator. The MTN Programme allowed TV Azteca to issue and have unpaid balances of up to $200 million in promissory notes on any date with a term of one to seven years.

On May 25, 2011, TV Azteca amended the existing MTN Programme to, among other things, increase its capacity to $500 million and include BCP Securities, LLC and Jefferies & Company, Inc., as negotiators and operators along with Geronimo Capital Markets Ltd. On the same day, TV Azteca issued the Medium Term Notes due 2018 under the MTN Programme in the amount of $300 million at an annual rate of 7.5%, whose interest payment dates are on May and November 25 of each year until its maturity on May 25, 2018. In November 2011, the first interest payment was made for an amount of $11.25 million.

On September 4, 2013, TV Azteca again modified the existing MTN Programme to, among other things, increase its capacity to $1 billion. On September 19, 2013, TV Azteca issued Medium Term Notes due 2020 under the MTN Programme in the amount of $500 million at an annual rate of 7.625%, whose interest payment dates are March and September 18 of each year until its maturity on September 18, 2020. In March 2014, the first interest payment was made in the amount of $19.06 million.

On March 15, 2017, TV Azteca redeemed $42.5 million of its Medium Term Notes due 2018. This cancellation was carried out through a repurchase operation that the company previously performed with cash generated by its operations. On June 14, 2017, TV Azteca announced that it will redeem another $60 million of the Medium Term Notes due 2018, which resulted in an aggregate debt reduction of $102.5 million as of July 14, 2017. On July 21, 2017, TV Azteca announced that it intends to redeem all of the remaining outstanding Medium Term Notes due 2018 on August 21, 2017.

Pursuant to the terms and conditions of the MTN Programme documents, TV Azteca shall comply with certain restrictive covenants, among others, in connection with: (i) limitations with respect to the incurrence of additional indebtedness, (ii) limitations on guarantees, (iii) limitations on certain restricted payments, (iv) limitations on the sale of assets or capital stock of its subsidiaries, (v) limitations on the establishment of liens or other encumbrances on its assets, (vi) limitations on mergers, spin-offs or the transfer of all or a substantial part of its assets, and (vii) limitations on transactions with related parties. In addition, TV Azteca may only participate in businesses similar or complementary to those carried out before the issue and TV Azteca must provide the holders of the issue and the Bank of New York Mellon (as trustee) with its quarterly financial statements, its annual financial statements, and any other relevant information that TV Azteca submits to the CNBV or the Mexican Stock Exchange.

*ATC Long-Term Credit Facility*

In February 2000, TV Azteca entered into a credit agreement with a Mexican subsidiary of ATC, pursuant to which TV Azteca was granted two long-term loans for an aggregate amount of $119.8 million (the "ATC Long-Term Credit Facility").

The ATC Long-Term Credit Facility consists of a $91.8 million unsecured loan and a $28.0 million loan that was secured by certain TV Azteca properties. The $28.0 million secured term loan expired in February 2005, but was renewed annually for successive one-year periods due to the fact that the ATC Towers Lease remained in effect. On November 27, 2013, the $28.0 million loan was fully repaid in advance with funds obtained from the issuance of the Medium Term Notes due 2020. The remaining ATC Long-Term Credit Facility accrues interest at a rate of 13.109% per year and is guaranteed by certain subsidiaries of TV Azteca.

The remaining ATC Long-Term Credit Facility is due in 2020 and will automatically be extended for an additional 50-year term to the extent that the ATC Towers Lease remains in effect (see "*Our Business—Property—Transmission Sites*"). TV Azteca may prepay the loan after 2020, in whole or in part, and with no applicable penalty. The loan is subject to a total or partial mandatory prepayment in the event TV Azteca terminates all or some of the leases under the ATC Towers Lease.

*Capital Expenditures*

Capital expenditures for the six months ended June 30, 2017 was Ps.202.7 million ($11.3 million), and for the years ended December 31, 2016 and 2015 was Ps.1,007 million ($48.7 million), Ps.1,381 million ($80.2 million), respectively. Such capital expenditures were primarily related to the expansion and improvements made to the television production and broadcasting facilities of TV Azteca (see "*Our Business—Property*"), including acquisition of transmitters to expand the coverage of TV Azteca's channels and improve the quality and operation of its broadcasting signal, renovation of its production facilities and maintenance, remodeling and renovation of its buildings and office facilities. Most of the capital expenditures made by TV Azteca are payable in U.S. dollars. The following summarizes TV Azteca's capital expenditures by category for the six months ended June 30, 2017 and for the years ended December 31, 2016 and 2015:

| | Six months ended June 30 | Year ended December 31 | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| | (Ps.) | (Ps.) | (Ps.) |
| | (in millions) | | |
| Broadcast & Maintenance | 147 | 631 | 353 |
| HD CAPEX | 56 | 287 | 831 |
| Colombia | 0 | 89 | 197 |
| **Total** | 203 | 1,007 | 1,381 |

As a result of TV Azteca's operating strategy, TV Azteca does not expect, for the foreseeable future, to make major capital expenditures outside the scope of its core television broadcasting business, which would include loans, credit support and capital investments in its affiliates.

*Contractual and Other Obligations*

The following summarizes TV Azteca's contractual obligations as of June 30, 2017, and the effect such obligations are expected to have on its liquidity and cash flows in future periods:

**Contractual Obligations**

**Payments due by year**

| Description | Total | | 2017 | | 2018[1] | | 2019 | | 2020 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) |
| | | | | | (in millions) | | | | | |
| Principal amount of indebtedness | 14,317.8 | 800.0 | - | - | 5,369.2 | 300.0 | - | - | 8,948.7 | 500.0 |
| Interest payable | 3,840.8 | 214.6 | 1,297.6 | 72.5 | 1,095.3 | 61.2 | 894.9 | 50.0 | 553.0 | 30.9 |
| Satellite transponders | 162.9 | 9.1 | 39.4 | 2.2 | 41.2 | 2.3 | 41.2 | 2.3 | 41.2 | 2.3 |
| Equipment lease | 7.2 | 0.4 | 1.8 | 0.1 | 1.8 | 0.1 | 1.8 | 0.1 | 1.8 | 0.1 |
| Broadcasting rights | 2,326.6 | 130.0 | 841.2 | 47.0 | 728.4 | 40.7 | 579.9 | 32.4 | 177.2 | 9.9 |
| **Total** | **20,655.3** | **1,154.1** | **2,180.0** | **121.8** | **7,235.9** | **404.3** | **1,517.8** | **84.8** | **9,721.9** | **543.2** |

_____

(1)  The amounts shown in this table does not take into account the redemption of all of the outstanding Medium Term Notes due 2018, which is expected to be redeemed on August 21, 2017. See "*Summary—Recent Developments*."

*Internal Control*

TV Azteca has an internal control system that is based on the updating, observance and fulfillment of policies, codes and guidelines that provide certainty to the operations performed. Those responsible for the internal control system are the Chief Executive Officer and the Chief Financial Officer in coordination with TV Azteca's Board of Directors and the Audit Committee.

## OUR BUSINESS

**General**

TV Azteca is one of the two largest producers of Spanish-language television content in the world and the second largest television broadcasting company in Mexico based on broadcast advertising market share.

TV Azteca holds 180 concessions granted by the Mexican government, enabling it to transmit up to 786 over-the-air broadcast signals. For the last twelve months ended June 30, 2017, TV Azteca reached an average of 93.1% of households in Mexico and captured 36% of the Mexican television broadcast advertising market.

TV Azteca owns and operates two high definition national television networks, "Azteca 7" and "Azteca 13." TV Azteca also operates two new over-the-air signals: "adn40," a local channel that reaches 84.5 million people in Mexico (previously Proyecto 40, which was broadcasted over-the-air in Mexico City), and "a+," a network of 35 local channels across the country that produce local news, sports and regional entertainment content. a+ has the capacity to broadcast different commercials in one or more cities simultaneously by way of its 422 antennas.

TV Azteca is widely recognized for its high quality original content. For the year ended December 31, 2016, its programming reached on average 88 million viewers in Mexico monthly and its original content represented approximately 48% of its total primetime programming on Azteca 7 and Azteca 13. It owns 54 state-of-the-art multi-level television production studios and in 2016 produced more than 30,000 hours of digital, HD, 4K and multi-platform television content, including reality shows, talk shows and news, sports, music, variety programs and traditional soap operas (*telenovelas*), some of which are progressively evolving into dynamic program series. TV Azteca's original content is aired on its networks in the United States, Guatemala and Honduras and it has been exported to more than 100 countries in the Americas, Europe, Asia and Africa. TV Azteca also owns a Spanish-language television broadcast network in the United States known as Azteca America that reaches more than 12.3 million viewers during primetime programming.

In addition to its content and broadcasting operations, TV Azteca owns a drama school, two Mexican professional soccer teams and Azteca Internet. TV Azteca is also engaged in other businesses through joint ventures and strategic partnerships, including a concession to operate and maintain a fiber optic network developed by TV Azteca in Peru and a 40% owned fiber optic network in Colombia.

TV Azteca's consolidated revenues for the six months ended June 30, 2017 and for the year ended December 31, 2016 was Ps.7,017.3 million ($392.1 million) and Ps.14,197 million ($687.0 million), respectively. For the six months ended June 30, 2017 and for the year ended December 31, 2016, TV Azteca had net income of Ps.451.5 million ($25.2 million) and net loss of Ps.3,172.9 million ($153.5 million), respectively. TV Azteca's EBITDA for the twelve months ended June 30, 2017 was  Ps.4,044.1 million ($226.0 million).

*Corporate Structure*

The following structure chart shows a simplified organizational structure for TV Azteca as of June 30, 2017, including its principal subsidiaries, all of which are wholly owned by TV Azteca, and a description of their main business activities. The notes will be fully and unconditionally guaranteed on a joint and several basis by all of TV Azteca's existing subsidiaries and certain future material subsidiaries, as described under "*Description of Notes—Note Guarantees.*"



**Business Strengths**

*One of the Two Largest Spanish-Language Content Producers in the World and a Market Leader in Mexico*

TV Azteca is one of the two largest content producers of Spanish-language television content in the world (measured by revenue against comparable publicly traded companies) and the second largest television broadcasting company in Mexico (measured by broadcast advertising market share). It produces a variety of programs, including traditional soap operas (*telenovelas*), including in their newly evolved form as program series, as well as reality shows, talk shows and news, sports, music and variety programs. TV Azteca believes it is a leading producer of some of the most innovative, inspirational and popular Spanish-language content in the world, which has cultivated large and loyal audiences that attract diverse advertisers.  In the six months ended June 30, 2017, TV Azteca produced approximately 17,000 hours of original content. In each of 2016 and 2015, TV Azteca produced approximately 48% and 50%, respectively, of the Mexican national weekday primetime program hours aired on its networks (excluding programming produced by its local branches).

*Strong Industry Fundamentals in its Core Domestic Market*

TV Azteca's primary focus and vision is concentrated on the Mexican broadcast television market, where over-the-air television broadcasting continues to be the most efficient way to reach the Mexican population. For the year ended December 31, 2016, over-the-air television broadcasting captured the highest expenditure in advertising, representing 48.6% of the country's total advertising market. In addition, over-the-air television broadcasting has the highest household reach in the country with a 93.1% rate of penetration for the year ended December 31, 2016. This rate is significantly higher than that of any other advertising alternative, including radio, pay television and internet, which reached 61.5%, 52.1% and 47.0%, respectively, of households in Mexico for the year ended December 31, 2016. Further, over-the-air television broadcasting of advertisements requires significantly fewer advertising spots to reach a higher percentage of the population.

In Mexico, over-the-air television broadcasting continues to be a very efficient way to reach the greatest number of households: on average there are two television sets per household; the average head of household watches television for approximately five hours and forty-seven minutes per day; 61% of the population, or approximately 70 million people, watch television between one and four hours daily; six out of ten pay television subscribers continue to watch over-the-air television broadcast channels; only 4.5% of households have access to high speed internet, which is required to watch online video content; and only 6.7 million people subscribe to OTT services such as Netflix.

*Uniquely Positioned, Large Scale Infrastructure in Mexico*

The media and broadcasting industries in TV Azteca's core market require significant capital investment and technical expertise, which makes it difficult for new competitors to enter these businesses. Barriers to entry for potential broadcasters include an already-established extensive infrastructure, the limited availability of land to construct transmission sites, the existence of highly customized station facilities and a scarcity of engineers to design, operate and maintain television broadcast facilities. In addition, TV Azteca's position as one of the world's leading producers of Spanish-language programming, with nearly 60 long-term contractual relationships with major content providers (including Fox, Sony, Disney, the Mexican Soccer Federation (Mexican national soccer team) and a number of teams playing in the Mexican Soccer League) with an average term of three years, creates significant obstacles to the entry of other potential content providers.

Against this backdrop, TV Azteca benefits from a strong brand and an established operating history. TV Azteca's 458 transmission sites located throughout Mexico allow it to reach approximately 93.1% of households in Mexico at least 23.5 hours a day, seven days a week. In addition to its extensive and sophisticated transmission technology, TV Azteca has 54 state-of-the-art multi-level television production studios that facilitated TV Azteca's ability to produce over 30,000 hours of high quality content for the year ended December 31, 2016. Moreover, throughout its operating history, TV Azteca has developed the ability to effectively navigate the complex regulatory framework of the telecommunications industry.

*Broad Programming with Innovative Content, Driving a Diverse High-Quality Client Base*

Over the last few years, TV Azteca has redesigned its programming in an effort to respond to changing demands and to appeal to all viewers. As part of our programming efforts, TV Azteca has engaged in partnership with international first-class production companies to co-produce innovative content. TV Azteca's broad program offering has allowed it to reach a wide-range of viewers across all demographics through its national and local channels.

The broad reach of TV Azteca's program offerings has driven a diverse, high-quality client base. TV Azteca's client base includes numerous blue-chip companies spanning a wide range of industries, which allows it to better withstand downward swings in the economy. As of June 30, 2017, TV Azteca's 10 largest clients accounted for approximately 18% of its advertising revenues. See "*Our Business—Description of the Business—Television Advertising Sales*."

*Fully Integrated Company with the Ability to Leverage Core Capabilities*

TV Azteca is a fully integrated telecommunications company with a complete array of resources to source, produce and distribute television content. Moreover, TV Azteca is well-positioned to leverage these core capabilities toward reaching larger audiences across platforms and leveraging existing content to access new revenue streams. TV Azteca has resources dedicated to every stage of the television business and to the distribution of video content across new platforms. From the cultivation of creative talent at its drama school, to the production of national and local original content at its television studios throughout Mexico, to the broadcast and distribution of content across national and local channels and diverse platforms to increasingly large audiences, TV Azteca is able to cost effectively control each stage of the production, sale and distribution process. This business model allows TV Azteca to produce high quality content that is delivered  to a large and loyal audience in a manner that increases the lifetime value of produced content.

*Strong Financial and Liquidity Profile*

TV Azteca maintains significant cash positions and targets long-term rather than short-term debt financing, which allows it to maintain financial stability and flexibility in a fast moving market.  In addition, in connection with spectrum auctions by the FCC in the United States, AIC, which produces Azteca America content, received $156 million (pre-tax) in the third quarter of 2017 from spectrum sales by stations in Los Angeles and San Francisco that are related to AIC and Azteca America. TV Azteca currently intends to use a portion of the proceeds of this spectrum sale to repay existing indebtedness. TV Azteca's liquidity allows it to capture market opportunities that may require an initial cash investment, such as promotional packages for its advertising clients. As of the twelve months ended June 30, 2017 and the years ended Decembers 31, 2016 and 2015, TV Azteca's net debt to EBITDA ratio was 3.0x, 3.7x and 4.8x, respectively, and its total debt to EBITDA ratio was 3.8x, 5.0x and 6.0x, respectively. During the past five fiscal years, TV Azteca made large capital expenditures in non-core businesses that proved to be break-even or unprofitable ventures. Under its new leadership, TV Azteca has revised its strategy to focus on its core businesses and seek to maintain high EBITDA margins.

TV Azteca's revenues for the year ended December 31, 2016 increased by 10.4% compared to the year ended December 31, 2015, and during the six months ended June 30, 2017, TV Azteca's revenues increased by 14.5% compared to the same period in 2016, which is well above Mexican population and GDP growth for this period and, alongside strict control in operating expenditures, has allowed for steady cash flow generation.

*Talented and Renewed Management Team with Vast Industry Experience*

Over the last 25 years, TV Azteca's management has helped guide the company to a leading market position in Mexico and more broadly within the Spanish-speaking market. Recently, TV Azteca revamped its management under the direction of its Chief Executive Officer, Benjamin Salinas, who has redirected TV Azteca's strategy to focus on its core television broadcast business. In line with this strategy, TV Azteca's senior management, with an average of ten years of experience in the telecommunications industry, has focused on producing, co-producing and purchasing inspiring, creative, bold and innovative content such as "Rosario Tijeras," "MasterChef", "La Isla" and "Hasta Que Te Conocí," which drew in substantial audiences during the twelve months ended June 30, 2017. While TV Azteca actively recruits outside talent to manage the business, it also focuses on developing in-house talent by training and mentoring personnel, developing a talent pipeline to meet TV Azteca's future management needs.

## Business Strategies

*Focus on High-Quality Multi-platform Content*

TV Azteca believes the key to revenue generation in the television industry is a combination of the ability to anticipate and adapt to changes in consumer preferences and behavior on a timely basis and to consistently carry high quality content that is responsive to consumer tastes and behavior. TV Azteca's driving strategy to maintain and increase revenues is to produce and purchase the highest quality content that focuses on the evolving demands of viewers, including the Mexican broadcast television market that is now complemented by OTT services, the internet and other mobile platforms.

TV Azteca's strategy for producing inspiring, creative, bold and innovative content is based on a flexible approach to the television broadcast business that implements the vision of TV Azteca's new executive leadership and centers on diversifying talent and incorporating new forms of production. TV Azteca has steered away from the use of exclusivity contracts with its core talent, which has paved the way for TV Azteca to attract new audiences through the use of a variety of actors, writers, producers and directors. In addition, TV Azteca's use of new forms of production, including co-production arrangements, which allow TV Azteca to share the cost of production and maintain premium quality content, and selective work for hire production, where TV Azteca finances a third-party's production under TV Azteca's supervision and guidance, enables TV Azteca to obtain the rights to cutting-edge, innovative content. TV Azteca intends to continue to focus its resources on developing, maintaining and improving the high quality of its core over-the-air networks to continue attracting loyal audiences and advertising revenues.

TV Azteca's content strategy also includes a focus on acquiring the broadcast rights to television blockbusters and major special events, such as boxing matches, regular season NFL games and the Super Bowl, the FIFA World Cup and other international soccer championships, Mexican national team soccer games, some of the Mexican Soccer League games and golf tournaments. TV Azteca has long-term agreements for an average term of three years with major content providers such as Sony, Fox and Disney, which grant the right to broadcast film and television programs that have proven popular outside Mexico. TV Azteca believes it can improve profit margins by making partial purchases of certain sports broadcast rights at reduced rates and producing innovative and cost-efficient programming that is appealing to viewers.

*Expand Internet and Social Media Presence*

TV Azteca anticipates generating new sources of revenue by expanding its internet presence through enhancement of its own online platform for streaming video content and enlarging the availability of its video content on established third-party online platforms. TV Azteca's main strategy to increase internet revenues is to shift TV Azteca's focus from online pop-up ad displays to online video advertising.

TV Azteca's strategy for significantly expanding its online video advertising concentrates on consolidating its various websites and providing all its available video content on one main website and accompanying mobile apps, Azteca Internet, that is expected to launch in August 2017. TV Azteca is further expanding the availability of its video content to more online platforms through sales to popular OTT services, including Netflix and Hulu, in addition to its already strong presence on Facebook, YouTube and Twitter.

TV Azteca believes its strategic shift from online pop-up ad displays to online video advertising on Azteca Internet and other online platforms positions TV Azteca to be a key player in the digital space compared to its

competitors who do not have the same capacity to generate original video content or acquire the necessary broadcasting rights for purchased content and music. TV Azteca believes it can gain a strategic benefit by emerging as an early initiator of online video advertising, since it anticipates that the value of online pop-up ad displays will continue to decline due to the availability of ad blocks. As a result, TV Azteca believes its strategy places it in a superior position to its competitors in the long-term, as the currently dominant over-the-air television broadcast progressively shifts to an online market. During the time required for the Mexican market to develop the necessary infrastructure for broadband internet to penetrate the country and become readily available to the Mexican population at high quality, TV Azteca will be able to develop significant know-how that it believes will serve as an important competitive advantage. In the immediate future, TV Azteca anticipates its strategy will allow it to benefit simultaneously from incremental growth in digital advertising sales and from ancillary revenues from over-the-air television broadcasting as advertisers will be incentivized to use both mediums.

*Reach New Clients through Local Advertising Sales on a+ Platform*

TV Azteca is focused on offering local advertisers the most economical way to reach the largest number of potential customers. To benefit from this source of revenue, TV Azteca introduced a+, a network of 35 local channels that produce locally meaningful content such as news, sports and entertainment. TV Azteca's strategy for increasing local advertising sales through this expansive network is based on its unique position to geographically customize the transmission of local programming and advertisements in one or more cities simultaneously by way of its 458 transmission sites. TV Azteca aims to double its 8% local share of TV Azteca's total revenue over the next five years with a+'s launch by gaining new local and regional customers that traditionally advertise on the radio, press, internet and other local media. TV Azteca's strategy and technology offers local businesses the option to target the transmission of its advertisements to a specific city or cities, or within a particular region. No other television competitor in Mexico is able to offer its advertisers the same level of geographic customization of its target audience.

*Price Leading Rates for Advertisers*

Historically, TV Azteca has been a market price leader in advertising sales. In 2016, TV Azteca was able to increase prices at a double-digit rate, on average, for all customers, and in the six month period ended June 30, 2017, TV Azteca increased prices by a mid-single digit. TV Azteca believes that the value gained by customers historically through advertisements on over-the-air broadcast television provides significant opportunities to introduce further price increases going forward. TV Azteca plans to strategically and cumulatively increase prices over the next several years to compensate for the increase in costs to produce and acquire popular, high-quality content.

**Description of the Business**

*TV Azteca's Mexican Television Networks*

TV Azteca's core business in Mexico is the content production and operation of its over-the-air television networks, which are broadcast throughout Mexico.

*Azteca 13*

Azteca 13 targets women of different backgrounds by focusing on promoting female empowerment. TV Azteca produces or co-produces all of the content for Azteca 13, with TV Azteca producing 60% of programming hours during 2016. The network's programming consists primarily of program series, reality shows, news programs, talk shows, musical variety programs and sports broadcasts, principally soccer.

*Azteca 7*

Azteca 7 primarily targets young families, with programming consisting mainly of newscasts, program series, sports and community social service, among others. During 2016, TV Azteca produced 23% of Azteca 7's total programming hours.

*adn40*

In March 2017, TV Azteca announced the rebranding of Proyecto 40 as "adn40," to satisfy the public's demand for agile and timely information. adn40 is the only 24 hour news and opinion channel on Mexican over-the-air television, currently reaching a potential 84.5 million people in Mexico with a goal of reaching the entire country in the near future.

adn40 features some of the most talented and popular news presenters in Mexico, covering sports and other popular topics. adn40 primarily targets upper middle class adults, allowing TV Azteca to target advertisers with a national reach looking to reach viewers in this upper middle class market.

*a+*

In March 2017, TV Azteca launched a network of local channels called "a+". With a focus on regional markets, TV Azteca's local channels aim to double its 8% share of TV Azteca's total revenue – which was equivalent to Ps.1,127 million ($54.5 million) in 2016 – within five years. a+ looks to achieve this through the production of popular regionally focused content in order to draw in advertisers away from local radio, local press and the internet.

TV Azteca currently owns 458 transmission sites that allow it to simultaneously air different commercials in the various cities in which a+ airs. TV Azteca has 35 local stations that produce local news, sports and regional entertainment programming that is aired in certain time slots designated for such local programming. In total, approximately 20% of the programming on these channels is locally focused, including programs that are produced and financed by TV Azteca's local stations or by other local producers. In 2015, 2016 and for the six months ended June 30, 2017, TV Azteca's local television stations produced approximately 9.0%, 8.0% and 8.6% of the programming broadcast on local channels, respectively.

*TV Azteca's International Television Networks*

TV Azteca exports its programming to countries outside of Mexico in three different ways: (i) TV Azteca produces cable networks that are available for distribution by cable providers throughout the world, (ii) TV Azteca has a television concession through which it operates various internationally based television networks, and (iii) TV Azteca licenses original content and related intellectual property relating to specific programs to television producers throughout the world.

*Channels for broadcast in restricted television systems*

In addition to its over-the-air television networks, TV Azteca produces four non-broadcast cable networks in Mexico. Cable distributors can acquire the broadcast rights to include any of these 24-hour networks in their channel lineup, but TV Azteca does not broadcast them on any of its channels. In April 2013, under the commercial brand of AZ TV de Paga, TV Azteca created a business unit for the purpose of managing, producing and distributing the channels and their content, which is offered to the different pay-TV platforms in the national and international market.

*National and International Portfolio*

Currently, the national and international portfolio is made up of the following channels:

| NATIONAL | INTERNATIONAL |
|---|---|
| 13-1 | |
| 13-2 | |
| AZ Mundo | AZ Mundo |
| AZ Clic | AZ Clic |
| AZ Corazón MX | AZ Corazón |
| AZ Cinema | AZ Cinema |
| a+ | |

AZ Mundo provides coverage in 22 countries including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Canada, Costa Rica, Guatemala, Panama, Dominican Republic, Equatorial Guinea, Germany, Austria, Switzerland and Spain, reaching an estimated 12.8 million television households.

AZ Corazón is currently distributed internationally to 21 countries, including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, the Dominican Republic, Equatorial Guinea, Germany, Switzerland, Austria and Spain, reaching an estimated 12.2 million television households. This channel is also available on the AT&T platform in the United States, with about 200,000 subscribers.

AZ Clic offers its viewers lifestyle content, music and shows as part of a portfolio of pay-TV platform channels that are not broadcast on over-the-air television. It currently reaches more than 700,000 subscribers within

the national territory of Mexico, and is being offered in international markets including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, the Dominican Republic, Switzerland, Austria and the African continent, reaching 3.8 million subscribers.

AZ Cinema Portfolio Channel offers the national and international markets the most comprehensive film catalog from the golden age of Mexican cinema until the 1980's, with 100% refurbished films offered in HD format. AZ Cinema is broadcast internationally and is currently offered in 18 countries including Mexico, Argentina, Chile, Ecuador, Honduras, Peru, Uruguay, Bolivia, Colombia, El Salvador, Nicaragua, Puerto Rico, Costa Rica, Guatemala, Panama, Dominican Republic, Switzerland, Austria and the African continent, reaching over 3.7 million households since its launch in May 2015.

Channels 13-1 and 13-2 are transmitted through the SKY, Izzi and Total Play platforms, as well as other regional platforms in Mexico. The programming is the same as that of Azteca 13, but transmitted with a one and two hour delay in transmission, respectively.

*Licensed content*

AZ Contenidos, as part of AIC, is a catalog created for the sale of TV Azteca produced content that is distributed internationally. Through the website tvaztecainternational.com and the AZ Content App on iOS and Android, viewers can review the content that TV Azteca has to offer and purchase such content through the catalog.

In addition to selling broadcast rights to its television networks around the world, TV Azteca has licensed original content and related intellectual property to television producers in over 100 countries throughout the world. The sale of the right to broadcast or develop its original content allows TV Azteca to leverage its library of programming already broadcast in Mexico. In 2015, 2016 and the six months ended June 30, 2017, TV Azteca exported 6,879, 5,994, and 2,653 hours of programming, respectively.

*United States*

TV Azteca operates the Azteca America network through its subsidiary, AIC. Azteca America is a Spanish-language over-the-air television network broadcast throughout the United States. The network broadcasts *telenovelas*, program series, reality programs, sports and news broadcasts, and other entertainment programming, including specialized content aimed at U.S. Hispanic audiences. Azteca America is available over-the-air through television broadcast stations and cable and satellite television distributors that operate in 69 markets throughout the United States, reaching an aggregate 88% of the U.S. Hispanic population. During primetime, TV Azteca reaches more than 12.3 million viewers. Revenues in the United States accounted for 9.5%, 9.8% and 10.9% of TV Azteca's total revenue in the six months ended June 30, 2017 and the fiscal years ended December 31, 2016 and 2015, respectively.

Through stations owned by AIC, TV Azteca competed in a spectrum auction process organized by the FCC, which offered concessionaires of "*full power*" and "*Class A*" frequency stations the opportunity to participate in the sale of their frequencies. The AIC-affiliated stations in Los Angeles and San Francisco won the auction, which is now complete. As a result of the auction, AIC received $156 million (pre-tax) in the third quarter of 2017. This sum is the result of certain AIC investments in and programing relationships with KAZA-TV in Los Angeles and KEMO-TV in San Francisco. The US licensees of these stations chose to surrender the stations' spectrum in the auction and AIC's relationship with these stations for the right to share in the proceeds of the sales. In addition, the licensees of KAZA-TV and KEMO-TV retained the ability to share a channel with another U.S. television station and continue broadcasting. AIC's relationship with these stations continues, with the potential for additional revenue in the future.

Additionally, in accordance with partnership agreements signed with other broadcasters, AIC was granted exclusive licenses to televise AIC programming in its respective markets. These agreements have terms of two to ten years. In exchange for providing this programming, AIC receives 50% of available advertising time.

*Guatemala*

TV Azteca has a television concession in Guatemala through which it operates three networks broadcast in several cities throughout Guatemala. The three channels, 31 Azteca Guate, Canal 35 and Canal 22, each broadcast local programming produced by TV Azteca.

*Honduras*

On November 4, 2013, TV Azteca was granted a 15 year concession to render broadcasting services to the Republic of Honduras through digital technology. The service consists of a digital channel with coverage in the complete territory of Honduras.

Broadcasting transmitters are currently located in the cities of Tegucigalpa, San Pedro Sula and La Ceiba. Additional transmitters will soon be installed in different cities of the country.

*Programming*

TV Azteca is one of the two largest producers of Spanish-language television content in the world. TV Azteca believes that its ability to provide a diverse mixture of quality programming has been, and will remain, one of its principal assets. TV Azteca focuses on producing and acquiring content that attracts viewers from its many target audiences. TV Azteca also believes that the development of distinct identities for each of its channels has helped TV Azteca capture a growing share of the television viewing public in Mexico, providing advertisers the ability to target specific demographic groups in their advertising.

In order to maintain the high quality of its programming, TV Azteca gathers focus groups and conducts surveys to evaluate the expected popularity of new programming ideas. TV Azteca also uses some of its unsold advertising time to aggressively promote both its internally produced programming and the programming it purchases, in order to generate and maintain the interest of viewers.

### Programming produced by TV Azteca

TV Azteca produces a variety of programs, including program series, reality shows, news, sports transmissions, music programs, contest programs, talk shows and variety programs. In 2015, 2016 and the six months ended June 30, 2017, TV Azteca produced approximately 50%, 55% and 41%, respectively, of the primetime programming during weekdays that aired on its channels (excluding programming produced by its local branches).

On weekends in 2015, 2016 and the six months ended June 30, 2017, TV Azteca produced approximately 65%, 53% and 55%, respectively, of the hours of programming aired during primetime hours (excluding programming produced by its local branches).

TV Azteca produced four *telenovelas* in 2015, which represented 383 hours of programming, five program series (formerly *telenovelas*) in 2016 that represented 197 hours of programming and four program series during the six months ended June 30, 2017, which represented 153 hours of programming.

In 2015, TV Azteca produced MasterChef, the successful world-class cuisine reality show, for the Mexican market and achieved record viewership rates for Sunday primetime. In 2016, MasterChef Junior, the version of the program featuring children, was launched to further MasterChef's position as one of the most successful television franchises in the country.

TV Azteca's news programming includes evening primetime newscasts aimed at target audiences on their television channels. *Hechos,* a news program broadcast on Azteca 13, presents a deeper analysis of daily news, both within the country and internationally, and is one of the most relevant nationwide newscasts in Mexico.

In addition, new news materials are produced to be broadcast within local programming, including: informative spaces, ranging from morning news to mid-day and night-time news, with regional information. In addition, it generates informative news features and special programs for local contingencies.

The sports programming produced internally by TV Azteca focuses on broadcasting premier division tournament matches for professional Mexican soccer, sports commentary programs and producing programs to broadcast various sports events such as international soccer matches, boxing matches and football games. Soccer is the most popular sport in Mexico, and broadcasts of Mexico's LigaMX premier division matches generate large audiences. TV Azteca has the broadcast rights for local matches of six teams from the premier division, known as the "Liga MX" ("MX league"), including Monarcas Morelia and Atlas F.C.

### Purchased programming

TV Azteca obtains programming from approximately 59 different distributors. TV Azteca's investment in purchased content has been reoriented so that in the coming years, a greater investment share will be allocated to the generation of original and internally produced content. A substantial part of its purchased programming comes from strategic alliances with major studios such as: Buena Vista Internacional (Disney), 20th Century Fox, Sony Pictures, as well as different independent vendors such as Gussi, among others. The programming purchased by TV Azteca mainly consists of films and program series recognized worldwide. In acquiring content, new formats have been

added, which allow TVAzteca to improve its offering to its viewers. Any programs purchased by TV Azteca that are not in Spanish are then dubbed into Spanish prior to delivery. TV Azteca pays the distributor an additional fee for this service. In the years 2015 and 2016, purchased programming constituted approximately 50%, and 51%, respectively, of the combined weekday hours of primetime programming broadcasted by TV Azteca channels. TV Azteca has also entered into contracts to broadcast sports programming, including the EuroCup, the FIFA World Cup, and the National Football League ("NFL"). TV Azteca generally uses its own commentators to broadcast international sporting events. Also, TV Azteca has entered into contracts for broadcasting special events, such as Miss Universe and the Oscars.

TV Azteca has a license to broadcast the World Cup 2018, which will be held in Russia, and also holds the broadcast rights for certain games in the EuroCup and other events organized by the *Union des Associations Européennes de Football* ("UEFA"). Also, TV Azteca holds the broadcast rights for the UEFA Champions League and UEFA Supercup, for the 2016-2017 season.

### Strategic Alliances

TV Azteca has produced and will continue to co-produce different genres of programs with many leading companies in the field. The search for new business models with prominent producers will continue in the near future. TV Azteca enters into strategic alliances for the acquisition and production of content. Examples include:

Buena Vista Contract. Since 1998, TV Azteca has had exclusive license agreements with Buena Vista International, Inc., a subsidiary of The Walt Disney Company, to broadcast the programming of Buena Vista on various TV Azteca channels. In 2013, Azteca Novelas renewed the Buena Vista International, Inc. contract for another five years. TV Azteca has maintained a strong relationship with Buena Vista as a result of the co-development of new projects such as the program series "Hasta Que Te Conocí," "El César" and "Selena." TV Azteca expects to renew these agreements in 2018.

Contract with Fox. In December 2009, TV Azteca signed an exclusive license agreements for five years through its content distributor, Twentieth Century Fox International Televisión, Inc. ("Fox"), to broadcast diverse content, including movies and program series on the channels that TV Azteca operates. This contract was renewed in December 2015 for a term of five years.

Contract with Sony. In December 2009, TV Azteca signed an exclusive licensing contract for four years through one of its subsidiaries with CPT Holdings, Inc. ("Sony"), to broadcast various content, including movies and program series, on the programming of the channels that TV Azteca operates. In 2014, this contract was renewed for a five year term. In 2016, the contract was renegotiated and was broadened to cover the co-production of new programs between Sony and TV Azteca, such as "Rosario Tijeras" and "Escape Perfecto."

Contract with Telefilms. In 2012, TV Azteca signed a licensing agreement with Telefilms to broadcast movies through over-the-air channels. In 2016, this contract was renewed for a seven year term.

*Television Advertising Sales*

### General

For the six months ended June 30, 2017 and the years ended December 31, 2016 and December 31, 2015, approximately 62.4%, 71.8% and 70.8% of TV Azteca's net revenue was derived from the sale of national and local advertising. TV Azteca offers advertising payment plans to its advertisers. Sales are made throughout the year via signed contracts between TV Azteca and its customers for advertising over an agreed period. TV Azteca offers its clients the option to buy a fixed amount of advertising time for a set price. In setting advertising rates, TV Azteca considers, among other factors, the rates offered by its competitors and the likely effects of an increase in rates on advertising volume.

TV Azteca sold approximately 89% of the advertising time on its channels during primetime on weekdays during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015. TV Azteca signed advertising contracts with some of its subsidiaries, to whom it makes a certain amount of unsold advertising time available each year. In addition, TV Azteca sells a portion of its unsold advertising time to shared-risk advertisers and to companies that produce infomercials to improve its operating results and cash flow. TV Azteca also uses unsold advertising time to broadcast promotional programming and to broadcast government notifications and public service announcements.

### Integrated Advertising

TV Azteca receives revenues for "integrated advertising," which involves the placement of products during the programs internally produced by TV Azteca. Total revenues for this type of advertising represented 13%, 14%

and 17% of TV Azteca's net revenue during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively.

### Barter Sales

Periodically, TV Azteca carries out barter sales with third parties, with which it exchanges advertising time for goods and services. These types of advertising sales represented 1%, 3% and 3% during the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively. TV Azteca has also signed barter contracts, particularly with some of its subsidiaries, to obtain value from its unsold advertising time.

## Other Operations

### Internet Operations

TV Azteca is improving its online strategy to provide all its available video content on one main website and accompanying mobile apps that focuses on user experience. TV Azteca will provide all of its internally generated content to website visitors and app users along with exclusive materials relating to TV Azteca's most successful programs. In particular, TV Azteca will focus its efforts on online video advertising as opposed to pop-up ad displays, as TV Azteca believes that online video advertising functions as a stronger complement to over-the-air broadcasting, both in terms of sales and audience experience.

TV Azteca believes that internet operations do not represent a significant threat to broadcast television in Mexico due to the demographics of the country, low broadband penetration rates in Mexico and the quality of internet services. Nevertheless, TV Azteca believes it is ready to be a multi-platform company that will soon able to broadcast its premium content on every single platform.

The internet revenues for the six months ended June 30, 2017 and for the years ended December 31, 2016 and 2015, totaled Ps.64 million ($3.6 million), Ps.108 million ($5.2 million) and Ps.118 million ($6.8 million), respectively.

### Soccer Teams

TV Azteca owns two soccer teams in the premier league of professional soccer in Mexico, known as the Liga MX: Monarcas Morelia (since 1996) and Atlas F.C. (since 2014).

### WGC Mexico Championship

In March 2017, TV Azteca organized the WGC Mexico Championship, one of the most popular golf events in the world. The revenue generated from this tournament amounted to Ps.556 million ($31.1 million).

### Colombia Project

In November 2011, the Unión Temporal Fibra Óptica Colombia ("UT"), a joint venture of ACC, a subsidiary of TV Azteca, and Total Play Telecomunicaciones, S.A. de C.V., entered into an agreement with the Ministry of Information of Technologies and Communications of the Republic of Colombia (*Ministerio de Tecnologías de la Información y las Comunicaciones de Colombia*, or "MINTIC") to build (over a 30 month period) and operate (for a 15 year period) a fiber optic network that would cover 753 municipalities and 2,000 institutions. The construction was completed and covers almost 80% of Colombia, making it the largest fiber optic network in Latin America. Pursuant to the agreement, the government of Colombia was required to commit $235 million toward the construction of the network and UT is responsible for all maintenance and other capital expenditures relating to the network during the 15 years UT operates it.

At the Ordinary Shareholders' Meeting held on November 16, 2016, it was resolved that all shareholders of TV Azteca would have the option to participate in the private capitalization of ACC through a mechanism established by TV Azteca for that purpose. The mechanism allowed for a capitalization of up to 60% of ACC, and each shareholder could invest to receive its *pro rata* share of its interest in TV Azteca.

As a result, shareholders agreed to invest $60 million, and TV Azteca, which had invested $40 million during the year, continues to hold a 40% stake in ACC.

TV Azteca consolidated ACC's financial statements through December 27, 2016. Since TV Azteca was diluted by another investor and is no longer the major shareholder of ACC, TV Azteca ceased consolidating ACC's financial statements as of December 31, 2016. Instead, as of December 28, 2016, TV Azteca began valuing ACC using the equity method.

*Peru Project*

On December 23, 2013, TV Azteca participated and won a public bid to build a national fiber optic network in Peru. The goal was to design, construct and maintain a fiber optic network nationally on routes defined by the government of Peru, as well as to render data transmission services to other telecommunication operators and the entities and bodies of the government of Peru.

In June 2014, ACP, a subsidiary of TV Azteca, executed a 20-year concession agreement with the government of Peru for the design, financing, construction, operation and maintenance of a 13,400 km fiber optic network connecting 23 regions, 180 cities and 136 municipalities. The construction of the fiber optic network was completed at the end of 2016, and the total cost of construction totaled approximately $323 million, an amount that was reimbursed to TV Azteca by the government of Peru (the "Investment Retribution").

In April 2015, ACP, together with a group of international institutional investors, participated in a securitization of the collection rights to be received from the government of Peru as part of the Investment Retribution for an amount of $ 241 million, with an implied annual discount rate of 5.875%. The Peruvian operation is under analysis and evaluation by TV Azteca's management.

**Competition**

*General Information*

Television stations compete for revenue with other television stations in their markets and other forms of media such as radio, newspapers, magazines, external publicity, roadside advertising and internet. Television stations also face competition from cable television, MMDS and DTH satellite services. These other programming, entertainment and video distribution services can increase competition for television stations through transmission signals not otherwise available for the audience.

*Televisa*

The main competitor of TV Azteca is Televisa. Televisa is the owner and operator of channels 48, 49, 50 and 44 with digital transmissions, which were previously channels 2, 4, 5 and 9, respectively, with digital transmissions. Each channel is transmitted throughout Mexico with varying levels of coverage. Televisa generated the majority of Mexican television advertising sales in each one of the last three years.

*Two New Channels of Over-the-Air Television*

On March 7, 2014, the IFT published in the Official Gazette an invitation to a public auction for the concessions of two new national digital networks. The invitation provided that the concessions for the national digital networks would be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

In March 2015, IFT announced Grupo Radio Centro and Cadenatres as the winning bidders of the two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired.

Cadenatres, a subsidiary of Grupo Empresarial Ángeles, has less experience in the television industry and its only experience in the over-the-air television industry prior to the auction was through its broadcast of channel 28 with analog transmissions and broadcast signal coverage in Mexico City and the surrounding area, which was later replaced by a mirror digital channel after analog transmissions shutdown. Cadenatres also has experience in broadcasting cable television in the rest of the country. Nevertheless, Grupo Empresarial Ángeles, the group to which Cadenatres belongs, has extensive experience in the financial, healthcare, hotel, publishing and radio sectors in Mexico.

On November 25, 2016, the IFT published in the Official Gazette the invitation for the public auction of the concessions for the use, utilization and commercial exploitation of the 148 transmission channels for the provision of over-the-air television broadcasting ("Bid No. IFT-6"). The auction is ongoing and is expected to conclude in December 2017 with the announcement of concession title winners.

*Providers of DTH*

Pay television services in general require an initial connection fee as well as a periodic subscription fee, and offer a higher number of channels. According to the General Guidelines Regarding the Provisions of Section 1

of the Eight Article of the Transitory Decree Amending and Supplementing a Number of Provisions of Articles 6, 7, 27, 28, 73, 78, 94 and 105 of the Mexican Constitution in Telecommunications, (*Acuerdo mediante el cual el Pleno del Instituto Federal de Telecomuncaciones emite los Lineamientos generals en relación con lo dispuesto por la fracción I del artículo octavo transitorio del Decreto por el que se reforman y adicionan diversas disposiciones de los artículos 6o., 7o., 27, 28, 73, 78, 94 y 105 de la Constitución Política de los Estados Unidos Mexicanos, en Materia de Telecomunicaciones*, or the "Guidelines"), cable television services and satellite services of DTH or MMDS must include over-the-air television channels, taking into account the modalities set forth in the Guidelines. SKY, a DTH service provider, transmits the channels commercially known as Azteca 7 and Azteca 13 throughout Mexico in accordance with an arrangement with TV Azteca. Many pay television services are offered by companies that are supported by multi-national media conglomerates with substantial resources. Televisa is a partner of the multi-national company that provides DTH services in Mexico and other parts of the world. In its 2016 quarterly statistical report, the IFT indicated that as of the third quarter of 2016, there were 20.5 million pay television subscribers. TV Azteca believes that a significant number of pay television consumers are concentrated in the metropolitan area of Mexico City and along the Mexico-United States boarder.

*Univisión and Telemundo*

Univisión and Telemundo are the main competitors of Azteca America in the Spanish-language television broadcast market in the United States. Both Univisión and Telemundo have established networks in many of the United States television markets that Azteca America targets or intends to target. In addition, in January 2002, Univisión launched the Telefutura network (now Unimas), a network in Spanish that can be seen on several over-the-air television transmission stations in addition to national cable systems.

Telemundo and Univisión each have a higher network of partners and greater financial resources than AIC. In addition, each one of these competitors has certain programming advantages over AIC. In 2002, NBC bought out Telemundo. As a part of the buyout, NBC provided Telemundo the rights to transmit certain NBC programming in the Spanish-language television broadcast market in the United States. In addition, Univisión has entered into long-term program license agreements with Televisa and Corporación Venezolana de Televisión, C.A., another prominent producer of Spanish programming. These contracts provide Univisión a significant amount of quality programming that can be used to attract and retain United States Spanish speaking viewers.

Azteca America also competes with several English operators that transmit Spanish signals and simultaneously transmit certain programming in English and Spanish for their United States Spanish speaking viewers.

## Property

TV Azteca's properties include two television stations in Mexico City and 35 television stations in other urban areas throughout Mexico, including Monterrey, Guadalajara and Veracruz, where it produces and broadcasts television content. TV Azteca's national networks are broadcast from one of the two Mexico City television stations through satellite transponders and then to TV Azteca's 458 transmission sites (each of which is comprised of a transmission tower, antennas and transmitters) located throughout Mexico. These transmission sites in turn broadcast the signals to viewers nationwide.

*Television Stations*

TV Azteca owns its two Mexico City television stations: the Ajusco station and the Azteca Novelas station, which are comprised of offices and production facilities.

The Ajusco station includes TV Azteca's corporate offices, nine television studios that are mainly used for the production of live content and the transmission facilities where national content is broadcast from.

The Azteca Novelas station includes a total of 12 television studios, seven of which are new state-of the-art television studios with multilevel sound stages for high definition and 4K television production, which were originally constructed in 2012 and recently renovated. In addition, TV Azteca owns 33 local television studios located throughout the country.

The Ajusco and Azteca Novelas stations comprise an aggregate of approximately 72,595 square meters of land and 96,119 square meters of constructed space.

Most of TV Azteca's other 35 television stations in other urban areas are leased for terms ranging from three to five years.

*Transmission Sites*

TV Azteca owns and operates all of its 458 transmission sites (each of which is comprised of a transmission tower, antennas and transmitters). Approximately 28% of the property on which these transmission sites are located is owned by TV Azteca. Approximately 60% are used by TV Azteca pursuant to leases with terms ranging from five to ten years.  The remaining sites are used by TV Azteca pursuant to easements granted by owners of the land.

Each of TV Azteca's 458 transmission sites contains one transmission tower. Each of these towers and transmitters are owned and operated by TV Azteca.

In February 2000, TV Azteca entered into a transmission tower space lease agreement (the "ATC Towers Lease") with a Mexican subsidiary of ATC. Pursuant to the ATC Towers Lease, TV Azteca has leased unused space in its transmission towers to ATC (which ATC then rents to third-parties, including, on occasion, TV Azteca or its affiliates) for a 20-year term that expires in 2020. Unless the lease is terminated by the parties, it will automatically be extended for an additional 50-year term. In consideration for the lease, ATC is required to make annual payments of $1.5 million to TV Azteca. ATC also granted TV Azteca a $91.8 million unsecured loan (see "*Operating and Financial Review—Management Overview—Liquidity—ATC Long-Term Credit Facility*"), under which TV Azteca must make yearly principal payments of $1.5 million, that are offset with the payments due by ATC to TV Azteca under the ATC Towers Lease. The loan is due in 2020 and will automatically be extended for an additional 50-year term, to the extent that the ATC Towers Lease remains in effect.  If TV Azteca terminates the lease in whole or in part after 2020, the termination triggers a mandatory prepayment (total or partial, as the case may be) under the loan agreement.

*Satellites*

To broadcast content from its Mexico City television station to its transmission sites throughout Mexico, TV Azteca uses satellite transponders which receive the signal from the Mexico City television station and reroute it to the transmission sites.

TV Azteca has entered satellite capacity agreements with Panamsat de México, S. de R.L., de C.V. ("Panamsat") and with Satelites Mexicanos, S.A. de C.V. ("SatMex").

Under the agreement with Panamsat, TV Azteca has access to signal line services through two satellite transponders: a 16 MHz satellite transponder for a term that expires in 2022 and a 36 MHz satellite transponder for a term that expires in August 2024. In 2016, TV Azteca paid approximately Ps.6.2 million ($0.3 million) for these services.

Under the agreement with SatMex, TV Azteca has access to signal line services through a 36MHz satellite transponder. The agreement expires in January 2021. In 2016, TV Azteca paid approximately Ps.20.7 million ($1.0 million) for this service.

Upon expiration of these agreements, TV Azteca will either negotiate an extension or find another satellite capacity services provider in its ordinary course of business.

**Patents, Licenses, Brands and Other Contracts**

TV Azteca owns a large number of brands. Among those that TV Azteca considers the most important are the institutional brands such as TV Azteca, Azteca, Azteca Novelas, Azteca Trece, Azteca Siete, a+, Fundacion Azteca, Azteca Internet, Proyecto 40, adn40, Grupo Salinas and Monarcas Morelia.

Likewise, TV Azteca owns diverse reservations of rights of exclusive use of television program titles and fictional characters, as well as musical works and television programs. Additionally, all the programs and *telenovelas* produced by TV Azteca have their own brands and music.

**Employees**

As of June 30, 2017, 6,165 individuals provided services to TV Azteca. Of these, 1,638 were independent contractors. 3,039 of TV Azteca's personnel performed administrative duties, 302 were managers or executive managers, 489 were employed in sales and 697 were union members.

Approximately 11.3% of TV Azteca's employees are represented by a television union, with a smaller number represented by the actors' guild or musicians' union. Under Mexican law, the terms of compensation for contracts entered into by TV Azteca and its unionized employees are subject to annual renegotiation. All other contract terms are renegotiated every two years.

TV Azteca has not experienced any labor strikes and it maintains good relationships with the unions representing its employees.

**Main Customers**

For the six months ended June 30, 2017, the most significant advertisers for TV Azteca were: Grupo Elektra, Cervecería Cuauhtémoc Moctezuma, Procter & Gamble de México, Bayer de México, Frabel, Genomma Lab International, Cervecería Modelo de México, Havas Media, CPIF Venture, AT&T Comunicaciones Digitales, Radio Movil Dipsa, The Coca-Cola Export Corporation, Pegaso PCS, Bimbo, Mondelez México, among others. For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, the top 10 advertisers for TV Azteca and their affiliates represented 18%, 18% and 16% of TV Azteca's net revenue, respectively.

**Legislation and Regulatory**

*Restrictions that affect the Holders of Securities*

The ownership of shares of Mexican companies by foreigners is regulated in a general manner by the Foreign Investment Law (*Ley de Inversión Extranjeras*) and the Regulation of the Foreign Investment Act, and of the National Register of Foreign Investments (*Reglamento de la Ley de Inversión Extranjera y del Registro Nacional de Inversiones Extranjeras*, or the "Foreign Investment Regulation").

In addition, the Constitutional Reform on Matters of Telecommunications (*Reforma Constitucional en Materia de Telecomunicaciones*) allows foreign investment in broadcasting for up to 49%, whenever there is reciprocity in the country that the investor or financial agent that controls the latter instance is in. The corporate bylaws of TV Azteca contain a foreigner exclusion clause (the "Eligible Mexican Holders"). TV Azteca has "neutral" investment shares and other "neutral" investment securities.

TV Azteca has limited the ownership of its Series A shares and Series D-A shares to Eligible Mexican Holders and the credit institutions that act as trustees according to the Foreign Investment Law and Regulation. In addition, TV Azteca has obtained authorization by the General Directorate of Foreign Investments to issue Series D-L shares, Series L shares and the CPOs, all of which qualify as neutral investment shares.

A holder not considered an Eligible Mexican Holder who directly purchases Series A shares or Series D-A shares in violation of TV Azteca corporate by-laws will not have any right as a shareholder with respect to said shares.

The foreign investors of Series A shares and Series D-A shares represented by the CPOs, are the holders of "neutral investment" and do not affect the control of TV Azteca.

The Law and the Foreign Investment Regulation also requires that TV Azteca register any foreign owner of CPOs before the National Foreign Investment Register. A foreign owner of CPOs that has not been registered has no right to vote on any of the underlying shares of the CPOs that, being registered, would have a right to vote on or to receive dividends with respect to the underlying shares of the CPOs. TV Azteca has registered Nacional Financiera S.N.C., Institución de Banca de Desarrollo, as the depository of the CPOs to comply with this requirement.

The corporate bylaws of TV Azteca prohibit foreign states and/or governments from being the owners of shares of TV Azteca, with the understanding that the ownership of shares of TV Azteca or CPOs by pension or retirement funds organized for the benefit of employees of state and municipal government dependencies, or other non-Mexican government dependencies, does not violate the corporate bylaws.

*Concessions*

The LFTR regulates, on a convergent basis, the use and exploitation of the radio-electric spectrum, and the telecommunications networks, as well as the rendering of broadcasting, cable, satellite pay-TV and telecommunications services.

Concessions for the commercial use of spectrum are granted through public bid processes. Such concessions are granted for a fixed term, subject to renewal in accordance with LFTR. Renewal of concessions for the use of spectrum require, among others: (i) the request of such renewal to IFT in the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by IFT that it is not in the public interest to recover the spectrum granted under the related concession; and (iv) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT, including the payment of a related fee.

TV Azteca has been granted 12 concession titles to commercially operate and exploit 180 broadcast television channels, including channel 26 of Mexico City, which transmits the programming of adn40 (previously Proyecto 40); as well as 278 complementary authorizations, which enable the efficient reception of signals in their respective coverage areas.

From 2005 to 2008, the Federal Commission of Telecommunications (*Comisión Federal de Telecomunicaciones* or the "COFETEL"), a decentralized entity of the Secretariat of Communications and Transport (*Secretaría de Comunicaciones y Transportes*, or "SCT"), granted TV Azteca authorization to install and operate second digital transmission channels, accessories to the primary concessions, in fulfillment of the implementation policy of the DTT in Mexico, which are channels 24 and 25 of Mexico City; 31 and 33 of Guadalajara, Jal, 39 and 43 of Monterrey, N.L.; and ten channels more to be installed on the northern border of the country, which were installed during 2005 and 2006, which are: 28 and 29 from Tijuana, B.C.; 34 and 36 from Juárez City, Chihuahua; 51 and 50 from Nuevo Laredo Tamaulipas; 28 and 25 from Mexicali, B.C.; 36 from Reynosa, Tamaulipas; 33 from Matamoros, Tamaulipas, 12 from Matamoros, Tamaulipas; 41 and 43 from Celaya, Guanajuato; 27 and 35 from Toluca, State of Mexico; 33 and 31 from Perote, Veracruz; 27 and 24 from Puebla, Puebla; 26 and 43 from Querétaro, Querétaro.

During 2009, the COFETEL granted TV Azteca digital channels for simultaneous transmissions with their respective similar channels in the followings states: State of Mexico (7 channels), Guanajuato (2 channels), Hidalgo (1 channel), Puebla (2 channels) and Veracruz (2 channels), as a part of the transition process to the DTT.

During 2010, the COFETEL granted TV Azteca digital channels in the following states: Coahuila (1 channel), Jalisco (1 channel), Michoacán (1 channel), Morelos (2 channels) and Nuevo León (10 channels), as a part of the transition process to the DTT.

In 2011, the COFETEL granted TV Azteca digital channels in the following states: Aguascalientes (3 channels), Baja California Sur (5 channels), Campeche (3 channels), Chiapas (9 Channels), Chihuahua (2 channels), Colima (6 channels), Durango (3 channels), Guerrero (8 channels), Hidalgo (3 channels), Jalisco (3 channels), Michoacán (5 channels), Nayarit (2 channels), Oaxaca (9 channels), Puebla (1 channel), Quintana Roo (4 channels), San Luis Potosí (5 channels), Sinaloa (6 channels), Sonora (3 channels), Tabasco (3 channels), Tamaulipas (2 channels), Veracruz (2 channels), Yucatán (4 channels) and Zacatecas (4 channels), as a part of the transition process to the DTT.

In 2012, the COFETEL granted TV Azteca digital channels in the following states: Baja California (5 channels), Baja California Sur (7 channels), Campeche (1 channel), Chihuahua (6 channels), Coahuila (8 channels), Durango (5 channels), Guerrero (1 channel), Jalisco (1 channel), Oaxaca (1 channel), Puebla (1 channel), Quintana Roo (1 channel), San Luis Potosí (2 channels),Sonora (6 channels), Tamaulipas (5 channels) and Veracruz (3 channels), as a part of the transition process to the DTT.

In 2013 the COFETEL granted TV Azteca two digital channels in Ciudad del Carmen, Campeche, as a part of the transition process to the DTT.

In 2014 the IFT granted TV Azteca a digital channel in Sabinas Nueva Rosita, Coahuila, as a part of the transition process to the DTT.

In 2015, the IFT granted TV Azteca a digital channel in Ojinaga, Chihuahua, and another in Puerto Escondido, Oaxaca, as well as several complementary channels in gray areas that were detected when turning on the main channels, as a part of the transition process to the DTT. The process of requesting complementary stations in the gray areas that are going to be detected in the concession coverage areas occurs continuously.

Pursuant to the LFTR, concessionaires will now only have one integrated multiservice concession to provide telecommunication and, possibly broadcasting services. Integrated multiservice concessions will be granted for a term of up to 30 years with the possibility to renew them, for the same term originally granted. Renewal of integrated multiservice concessions require, among others: (i) to request its renewal from the IFT within the year prior to the last five year period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; and (iii) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT. IFT shall resolve any request for renewal of the telecommunications concessions within 180 business days of its request. Failure by IFT to respond within such period of time shall be interpreted as if the request for renewal has been granted.

On March 7, 2014, IFT published in the Official Gazette an invitation to a public auction for the concession for the two new national digital networks. The invitation provided that the concessions for the national digital

networks would be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

The Company was prevented from participating as a bidder in this public auction. In March 2015, IFT announced Grupo Radio Centro and Cadenatres as the winning bidders of the two over-the-air broadcasting licenses with separate national coverage. Cadenatres completed the process and received its license. However, because Grupo Radio Centro failed to pay the amount they bid for their over-the-air broadcasting license, the IFT declared their bid null and void. As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is under auction once more. The new bid is for 148 channels for digital terrestrial television to be licensed individually or in packages, depending on the coverage area desired.

As a result of the Telecom Reform, certain provisions of the LFTR and Guidelines related to the distribution of more than one channel of programming on the same transmission channel, or multiplexing, were passed. Such provisions optimize the use of the spectrum; for example, where the 6MHz spectrum was used entirely to broadcast only one channel of programming in analog, new technologies now allow for more than one channel of programming to be broadcast digitally on the same transmission channel.

*Renewal process for TV Azteca concessions*

TV Azteca has two concessionaires that hold concessions granted by the SCT: (i) Televisión Azteca, S.A. de C.V. ("Televisión Azteca"), which has 11 concessions, consisting of 179 TV channels that were renewed on August 25, 2004 and are valid until December 31, 2021; and (ii) Televisora del Valle de México, S.A.P.I. de C.V. ("TVM"), which has one concession, consisting of one channel in Mexico City that was renewed on December 13, 2006 and is valid until December 31, 2021.

Renewing concessions for the use of spectrum require, among others: (i) the submission of a request to the IFT during the year prior to the remaining one-fifth of the term of the relevant concession; (ii) compliance with the concessionaire obligations enumerated under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by the IFT that it is not in the public's interest to recover the spectrum granted under the relevant concession; and (iv) the acceptance by the concessionaire of any new conditions for the renewal of the concession as set forth by the IFT, including the payment of a renewal fee.

The term for renewing Televisión Azteca's concessions commenced on July 13, 2017 and will commence for TMV on December 28, 2017.

*Supervision of Operations*

To ensure that broadcasting is performed in accordance with the provisions established in the concession title, the LFTR and Guidelines, IFT is entitled to monitor compliance by exercising powers of supervision and verification: for example, the IFT can perform technical inspections of the television stations and the concessionaire must file annual reports with IFT.

On February 15, 2017, the Mexican Ministry of Interior (*Secretaría de Gobernación*) published in the Official Gazette an amendment to the regulations of broadcast television programming guidelines that provides for different age classifications for programming (*Lineamientos de clasificación de contenidos audiovisuales de las transmisiones radiodifundidas y del servicio de television y audio restringidos* or the "Programming Guidelines Amendment"), which became effective on February 16, 2017, substituting in full force and effect the previous amendment published on November 4, 2015. The Programming Guidelines Amendment for broadcast television is as follows: (i) programs classified "D" exclusively for adults only may broadcast after midnight to 5:00 am; (ii) programs classified "C" for adults may broadcast only after 9:00 p.m. to 5:59 am; (iii) programs classified "B15" for adults and teenagers over 15 years old may be broadcast only after 7:00 p.m. to 5:59 am; (iv) programs classified "B" for teenagers and adults may be broadcast only after 4:00 p.m. to 5:59 am; (v) programs classified "A" for all the public and programs classified "AA" for child audience may be broadcast at any time.

*Content for Children and Teenagers*

The LFTR includes new criteria for programming addressed for children and teenagers. Each concessionaire is also required to transmit each day, free of charge, up to 30 minutes of programming promoting cultural, educational, family counseling and other social matters, using programming provided by the Mexican government.

*Restrictions on Advertising*

Mexican law regulates the type and content of advertising broadcast on television. In order to prevent the transmission of misleading advertising, without affecting freedom of expression and dissemination, the broadcasting of advertisements presented as journalistic news or information is prohibited. Under current law, advertisements of

alcoholic beverages (other than beer and wine) may be broadcast only after 10:00 p.m. and advertisements for tobacco products are prohibited. Advertising for alcoholic beverages must not be excessive and must be combined with general promotions of nutrition and general hygiene. Health Law Guidelines were published in the Official Gazette on April 15, 2014 and became effective on July 7, 2014 for the advertisement of the following products: snacks, flavored drinks, candies, chocolates, or foods similar to chocolates and became effective for the remaining products on January 1, 2015.

TV advertisement will not take up more than 18% of broadcast time on any day in TV. However, this percentage can be increased by an additional 2% when at least 20% of the content programmed is a national production. Another 5% of advertisement time can be added when at least 20% of the content programmed is an independent national production. There are no restrictions on maximum rates.

*Additional Rights for Audiences*

Among others, the LFTR imposes new obligations on concessionaires. Under the LFTR, concessionaires must have a code of ethics and appoint an Ombudsman, whom shall not have been employed by the respective concessionaire or concessionaires during a period of two years prior to his/her appointment. The Ombudsman can be appointed (i) individually by the relevant concessionaire, (ii) jointly by several concessionaires or (iii) by a body or chamber which represents concessionaires. The *Cámara Nacional de la Industria de Radio y Televisión* ("CIRT") or Mexican Chamber of Television and Radio Broadcasters, has appointed a person who is authorized to act as an Ombudsman for all of its concessionaire members who decide to retain him. On November 29, 2016, IFT issued the Guidelines for the Defense of the Audiences, which were published on December 21, 2016 in the Official Gazette. These guidelines and some related provisions of the LFTR were constitutionally challenged by the Executive Branch and the Senate particularly for concerns that they restrict freedom of speech. The resolution of the procedures is pending and they will be resolved by the Supreme Court of Justice. In addition to the obligations established in the LFTR, such guidelines emphasize that the concessionaires must (i) make sure that when broadcasting news, the reporting of factual material is clearly distinguished from commentaries and personal analysis, (ii) submit electronic, online and telephone programming guides for people with disabilities, (iii) establish specific actions to distinguish between advertising and content, (iv) offer programming that is subtitled and dubbed in Spanish; and (v) provide sign language for the hearing impaired in at least one of their most-watched nationwide news programs. These guidelines establish the procedure before the Ombudsman for the defense of the rights of the audiences. The obligations imposed by the guidelines will become effective on August 14, 2017 unless they are further postponed by IFT or the Supreme Court resolves them otherwise.

*Government Broadcast Time*

Television stations must provide to the government of Mexico up to 18 minutes per day of television broadcast time and 35 minutes per day of radio broadcast time between 6:00 a.m. and midnight, in each case distributed in an equitable and proportionate manner and as agreed by both parties. Any time not used by the government of Mexico on any day is forfeited. Generally, the government of Mexico uses all or substantially all of the broadcast time available to it under this tax.

*Mexican Electoral Amendment*

In 2007, the Mexican Federal Congress published an amendment to the Mexican Constitution (the "2007 Constitutional Amendment"), pursuant to which, among other things, the *Instituto Federal Electoral*, or the Federal Electoral Institute ("IFE"), has the exclusive right to manage and use the Official Television Broadcast Time and the Official Radio Broadcast Time (together with the Official Television Broadcast Time, the "Official Broadcast Time"). In February 2014, the Mexican Federal Congress approved a constitutional amendment creating the *Instituto Nacional Electoral*, or the National Electoral Institute ("INE"), which replaced the IFE. The INE has the same functions and powers as the former IFE and regulates the services of radio and television in the same manner, except that the INE participates in the electoral campaigns in federal, state and local procedures by distributing the Official Broadcast Time among the political parties. The INE has the exclusive right to use Official Broadcast Time for its own purposes and for the use of political parties in Mexico (as provided for in the Mexican Constitution) for self promotion and, when applicable, to promote their electoral campaigns during election day, pre-campaign and campaign periods.

The INE and the political parties must comply with certain requirements of the 2007 Constitutional Amendment for the use of Official Broadcast Time. During federal electoral periods, the INE will be granted, per the 2007 Constitutional Amendment, 48 minutes per day on each radio station and television channel, to be used during pre-campaign periods from two to three minutes per broadcast hour on each radio station and television channel, of which all political parties in Mexico will be jointly entitled, to use one minute per broadcast hour. During campaign periods, at least 85% of the 48 minutes per day shall be allocated among the political

parties, and the remaining 15% may be used by the INE or by any other electoral authority for its own purposes. During non-electoral periods, the INE will be assigned up to 12% of the Official Broadcast Time, half of which shall be allocated among the political parties. In the event that local elections are held simultaneously with federal elections, the broadcast time granted to the INE shall be used for the federal and the local elections. During any other local electoral periods, the allocation of broadcast time will be made pursuant to the criteria established by the 2007 Constitutional Amendment and as such criteria is described in applicable law.

In addition to the foregoing and pursuant to the 2007 Constitutional Amendment, political parties are forbidden to purchase or acquire advertising time directly or through third parties, from radio or television stations; likewise, third parties shall not acquire advertising time from radio or television stations for the broadcasting of advertisements which may influence the electoral decisions of Mexican citizens, nor in favor or against political parties or candidates to offices elected by popular vote.

*Regulation of the participation of minors in Communicational media*

On December 4, 2014, the General Law regarding the Rights of Girls, Boys and Teenagers (*Ley General de los Derechos de Niñas, Niños y Adolescents*) was published on the Official Gazette, which addresses certain scenarios where the consent of the parental or tutelage authority of the minors must be obtained, in the case of interviews; it also establishes a series of principles and measures to consider on behalf the media to protect the intimacy of the minors.

*Stations on the Border*

Broadcasts from television stations located on the Mexican-United States border are governed by a bilateral treaty signed by the governments of both countries. The Agreement Relating to Assignments and Usage of Television Broadcasting Channels in the Frequency Range 470-806 MHz Along the United States-Mexico Border established criteria that all stations on the border must comply with regarding broadcasting power, antenna height and the allowable distance from the border. TV Azteca believes that it is in compliance with all aspects of the treaty.

*United States*

The U.S. communications industry, including the operation of broadcast television networks and stations, is subject to federal regulation, particularly pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder by the FCC (the "Communications Act"). The Communications Act empowers the FCC to, among other things, regulate certain aspects of broadcast programming and the relationship between broadcast television networks and their affiliated broadcast television stations.

*Foreign Ownership of Broadcast Television Stations in the United States*

The Communications Act prohibits the issuance of a broadcast license to, or the holding of a broadcast license by a foreign corporation, which is any corporation of which more than 20% of the capital stock is beneficially or nominally owned or voted by non-U.S. citizens or their representatives or by a foreign government or a representative thereof, or by any corporation organized under the laws of a foreign country. The Communications Act also authorizes the FCC, if the FCC determines that it would be in the public interest, to prohibit the issuance of a broadcast license to, or the holding of a broadcast license by, any corporation directly or indirectly controlled by any other corporation of which more than 25% of the capital stock is beneficially or nominally owned or voted by foreign entities. The FCC has issued interpretations of existing law under which these restrictions in modified form apply to other forms of business organizations, including partnerships.

*Other Broadcast Television Regulation in the United States*

The FCC regulates television broadcast stations, which generally must apply to the FCC for renewal of their licenses every eight years. Renewal will be granted to the extent that the FCC finds that (i) the station has served the public interest; (ii) there have been no serious violations by the licensee under the Communications Act described above or the FCC rules; and (iii) there have been no other violations by the licensee of the Communications Act or the FCC rules which, taken together, indicate a pattern of abuse. The FCC also administers other aspects of broadcast television regulation, including the following: restrictions on the ownership of multiple media outlets in one market, or on a national basis; limits on the amount of commercial advertising during children's programming; requirements that stations air a certain amount of informational or educational programming directed at children; restrictions on "indecent" programming; and requirements affecting the availability and cost of political advertising time. In addition, FCC rules governing network affiliation agreements mandate that a television broadcast station licensee retain the right to reject or refuse network programming under certain circumstances, or substitute programming that the licensee reasonably believes to be of greater local or national importance.

Violations of FCC rules and regulations can result in substantial monetary forfeitures, periodic reporting conditions, short-term license renewal and, in egregious cases, denial of license renewal or revocation of license.

> *Other Regulatory Considerations in the United States*

The foregoing does not purport to be a complete discussion of all provisions of the Communications Act referenced or other acts of the U.S. Congress or of the rules, regulations and policies of the FCC. For further information, reference should be made to the Communications Act itself, to other congressional acts, and rules, regulations and public notices promulgated periodically by the FCC. There are additional regulations and policies of the FCC and other federal agencies that govern political broadcasts, public affairs programming, broadcast advertising and other matters affecting TV Azteca's U.S. business and operations.

**Regulatory Changes**

Existing Mexican laws and regulations applicable to TV Azteca have, from time to time, been amended in a manner in which the way that such laws are enforced or interpreted could change, and new laws and regulations have been enacted, which may have an impact on TV Azteca's business, financial condition and results of operations. Some of these laws and regulations include:

*Telecom Reform and Broadcasting Regulations*

On June 12, 2013, the Telecom Reform came into force. The Telecom Reform, the LFTR and secondary regulations issued by the President and IFT, as applicable, and certain actions recently taken by IFT, an organization with constitutional autonomy responsible for overseeing the radio and television broadcasting industries and telecommunications, including all aspects of economic competition, affect or could significantly and adversely affect our business, results of operations and financial position.

The Telecom Reform created two regulatory bodies that are independent from the executive branch of government: COFECE (which assumed the functions of the former Mexican Antitrust Commission, except in the areas of telecommunications and broadcasting (television and radio), and IFT (which oversees the Mexican telecommunications and broadcasting (television and radio) industries, including all antitrust matters relating to those industries). In addition, specialized federal courts empowered to review all rulings, actions and omissions of these independent regulatory bodies were created. No stay or injunction will suspend any measure or action taken by these regulatory bodies. Therefore, subject to limited exceptions, until any decision, action or omission by these regulatory bodies is declared void by a competent court through a binding and final judgment, COFECE's or IFT's decision, action or omission will be valid and will have full force and legal effect.

IFT is empowered, among other things, to (i) oversee the Mexican telecommunications (including cable and satellite pay-TV) and broadcasting (television and radio) industries, including all antitrust matters related to these industries; (ii) set limits to national and regional frequencies that can be exploited by a concession holder, or to the cross-ownership of telecommunications, television or radio businesses that serve the same market or geographical zone that may include the divestment of certain assets to comply with such limits; (iii) issue asymmetric regulation; (iv) grant and revoke telecommunications, television and radio concessions; (v) approve any assignment or transfer of control of such concessions; (vi) revoke a concession for various reasons, including in the case of a breach by a concessionaire of a non-appealable decision confirming the existence of illegal antitrust conduct ("*practica monopólica*"); and (vii) determine the payment to be made to the government for the granting of concessions.

Concessions for the use of spectrum will only be granted through public bid processes. On March 7, 2014, IFT published in the Official Gazette an invitation to a public auction for the concession for the two national digital networks which will be granted for a term of 20 years for the operation of stations with, among other characteristics, mandatory geographic coverage in 123 locations corresponding to 246 channels within the Mexican territory.

In March 2015, IFT issued its ruling announcing Grupo Radio Centro and Imagen Television as winning bidders for two free to air broadcasting licenses with separate national coverage.  However, since Grupo Radio Centro failed to pay the amount they bid for their free to air broadcasting license, the IFT's ruling announcing them as a winning bidder was declared null and void and they will not receive the license.  As a result, the portion of the spectrum that was going to be assigned to Grupo Radio Centro is in an auction process. The new bid is for 148 channels on broadcast television.

Access to information and communication technologies, as well as broadcasting and telecommunications services (including broadband), is established as a constitutional right. The Telecom Reform further requires that such information be diverse and timely, and that any person may search, receive and disclose information and ideas of any kind through any media. Among other things, the LFTR contemplates the right of audiences to be able to

receive content that reflects ideological pluralism, that the news is distinguishable from the reporter's opinions, and to have the right to replicate the news.

The Telecom Reform permits 100% foreign ownership in satellite and telecommunications services and increases to up to 49% the level of permitted foreign ownership in television and radio services, subject to reciprocity of the originating foreign investment country.

As a result of the Telecom Reform and LFTR, starting on September 10, 2013, concessionaries of broadcast services have been required to permit pay-TV concessionaries to retransmit broadcast signals, free of charge and without discrimination, within the same geographic coverage area simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal, except in certain specific cases provided in the LFTR. Also, since September 10, 2013, our pay-TV licensees are required to retransmit broadcast signals of others, free of charge and on a non-discriminatory basis, subject to certain exceptions and additional requirements provided for in the Telecom Reform.

On February 27, 2014, the Guidelines were published in the Official Gazette, which include, among other obligations, the obligation of concessionaries of broadcast television licenses to permit the retransmission of their broadcast signals and the obligation of pay-TV concessionaries to allow such retransmission (without requiring the prior consent of the broadcast television concessionaries) in the same geographic coverage zone for free (subject to certain exceptions) and in a non-discriminatory manner in its entirety, simultaneously and without modifications by the broadcasting concessionaire, including advertising, and with the same quality of the broadcast signal without requiring consent from the broadcast television concessionaries.

The Telecom Reform calls for the National Development Plan. The National Development Plan includes a program for installing broadband connections in public facilities, which would identify the number of sites to be connected per year to promote access to broadband in public buildings dedicated to investigation, health, education, social services and in other facilities owned by the government.

Mexico's transition to digital television was completed on December 31, 2015. Frequencies released as a consequence of such digitalization were transferred back to the Mexican State.

The LFTR establishes a renewal procedure that will result in the granting of a renewal of an integrated multiservice concession (when involving radio-electric spectrum or orbital resources, a concession to exploit such spectrum is required) in order to provide telecommunications and possibly, broadcasting services. The integrated multiservice concession will be awarded for renewable 30 year terms. Renewal of integrated multiservice concessions require, among others: (i) to request its renewal to IFT within the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; and (iii) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT. IFT shall resolve any request for renewal of the telecommunications concessions within 180 business days of its request. Failure by IFT to respond within such period of time shall be interpreted as if the request for renewal has been granted.

The LFTR also contemplates that concession holders that operate a public network of telecommunications must (i) abstain from charging long distance fees for calls made by users to any national destination; (ii) if there was no other concession holder providing similar services in a certain territory, the concession holder providing the service in such territory shall have to continue providing the services; and (iii) concession holders must adopt the open architecture designs for the network to guarantee the interconnection and interoperation of their network.

The LFTR establishes the maximum amount of time that a concession holder providing broadcasting services with commercial purposes can use for commercial advertising. The maximum amount of advertising time is set at 18% of the total broadcasting time for each television channel, and the maximum amount for radio stations shall not exceed 40% of the total broadcasting time for each channel.

The LFTR establishes that those concession holders providing broadcasting services shall offer broadcasting services and advertising spaces to any person or corporation that requires them on a non-discriminatory basis and on market terms granting the terms, packages, conditions, and rates in force at the time of the request. Additionally, the law provides that balance shall be maintained between advertising and programming. Advertising shall be subject to several rules, including the maximum time allowed for advertising (i.e. 18% of the total available time per channel in free to air television; 40% in radio; and 6 minutes per hour on pay-television and audio).

*Other recent regulatory changes*

As a result of the amendments to the Mexican Constitution and the must-offer and must-carry regulations issued by IFT, starting on September 10, 2013, concessionaires of broadcast services have been required to permit pay-TV concessionaires to retransmit broadcast signals, free of charge and on a non-discriminatory basis, within the same geographic coverage area simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal, except in certain specific cases provided in the Telecom Reform. Also, since September 10, 2013, pay-TV concessionaires are required to retransmit broadcast signals of free television concessionaires, free of charge and on a non-discriminatory basis, subject to certain exceptions and additional requirements provided for in the Telecom Reform.

On February 27, 2014, the "General Guidelines Regarding the Provisions of Section 1 of the Eight Article of the Transitory Decree Amending and Supplementing a Number of Provisions of Articles 6, 7, 27, 28, 73, 78, 94 and 105 of the Mexican Constitution in Telecommunications," or the Guidelines, were published in the Official Gazette, which include, among other obligations, the obligation of concessionaires of broadcast television licenses to permit the retransmission of their broadcast signals and the obligation of pay-TV concessionaires to perform such retransmission (without requiring the prior consent of the broadcast television concessionaires) in the same geographic coverage zone for free (subject to certain exceptions) and in a non-discriminatory manner in its entirety, simultaneously and without modifications, including advertising, and with the same quality of the broadcast signal without requiring consent from the broadcast television concessionaires.

On April 3, 2014, TV Azteca filed an amparo proceeding challenging the constitutionality of the Guidelines. On February 2015, certain amendments to the Guidelines were published in the Official Gazette, which among other provisions, require pay-TV concessionaires to retransmit the broadcast signals on all the commercial packages they offer to their subscribers and not only on their basic packages.

The Telecom Reform provided for a public bid or auction to grant licenses to establish the national digital networks. The "Auction Program for Digital Television Broadcast Frequencies" took place in 2014 and the first part of 2015.

The LFTR provides that integrated multiservice concessions will be renewed for terms equal to the maximum terms for which they could be granted, namely, up to 30 years. To request the renewal of a concession, a concession holder must (i) file its request with IFT one year prior to the beginning of the fifth period of the term of the concession; (ii) comply with its obligations established in the applicable laws and in the concession title; and (iii) accept the new conditions that IFT may impose. In such cases, IFT will issue its ruling within 180 days following the date the concession holder files the renewal request. If IFT does not issue its ruling within 180 days the renewal will be automatically granted.

In the case of concessions for the use of radio-electric spectrum, the maximum term of renewal is 20 years. Renewal of concessions for the use of spectrum require, among others: (i) to request such renewal to IFT in the year prior to the last fifth period of the fixed term of the related concession; (ii) to be in compliance with the concession holder's obligations under the LFTR, other applicable regulations, and the concession title; (iii) a declaration by IFT that there is no public interest in recovering the spectrum granted under the related concession; and (iv) the acceptance by the concession holder of any new conditions for renewing the concession as set forth by IFT, including the payment of a related fee. To our knowledge, no spectrum granted for broadcasting services in Mexico has been recovered by the Mexican government in the past several years for public interest reasons; however, the Company is unable to predict the outcome of any action by IFT in this regard.

Overall, the Telecom Reform, the LFTR and secondary regulations already issued and to be issued by the executive power or IFT, as applicable, as well as any actions taken by IFT, may increase our operating costs. Moreover, the entry of new market participants and the introduction of new products could result in an impairment to the prices of some of our products and/or costs and adversely affect our results in some business segments in future periods. See also, "*Our Business—Applicable Legislation and Tax Positions—Concessions*".

**Environmental Performance**

In mid-2008, jointly with our related companies, we created an business unit specialized in the efficient use of energy and natural resources, with its main objective being the reduction of the environmental impact of TV Azteca's operations and the improvement of energy management and natural resources within the organization. TV Azteca created this business unit to help transform TV Azteca into a sustainable company in order to become more competitive in global markets.

As part of an institutional framework plan, we have implemented several strategies, which include searching for the best use of energy and to care for the environment in an organized and permanent manner. TV Azteca has sought to evolve and remain on the forefront of topics relevant to the environment and to corporate social responsibility. As a result, through specific actions taken in order to increase TV Azteca's energy efficiency and other actions done through Fundación Azteca, TV Azteca will put itself on the cutting edge on environmental matters.

*Programs in Mexico*

- **Un Nuevo Bosque (A New Forest).** This is a TV Azteca project that started in July 2002 by local station TV Azteca Jalisco with the support of the National Forest Commission, local councils and the Government of Jalisco. This project aims to preserve the Mexico's natural reserves through reforestation. In 13 years, more than 1.5 million trees have been planted, and more than 300 reforestations have been performed in 33 cities throughout Mexico, with the support of more than 150,000 volunteers.

- **Limpiemos Nuestro México (Let's Clean Up Our Mexico).** This is the campaign of awareness, action and education that aims to create a change in the environmental and sustainability culture in our country. Since 2009, more than 8.8 million volunteers have joined in the task of picking up more than 188.5 thousand tons of garbage all over the country.

- **Waste Separation Program.** Internally, Grupo Salinas created a program for waste separation in all the companies of the group, including TV Azteca, which consists of the separation of waste and it temporary storage and recovery. This program is promoted through internal awareness campaigns promoted within through companies' communication platforms such as portals and magazines.

- **Energy efficiency programs.** This is a program created to improve energy efficiency. This program includes the management, monitoring, awareness and communication, technology changes (when cost-effective), and research and implementation of new technologies.

- **Energy conservation and efficiency campaign with focus on gender.** Throughout 2015, TV Azteca worked together with the *Deutsche Gesellschaft für Internationale Zusammenarbeit* (GIZ) in Mexico, with the goal of training and empowering both female and male employees of TV Azteca, and all of society in general regarding the use of energy from a gender perspective. This initiative earned international recognition from the German press.

- **Renewable Energy Program:** Starting from June 2012, TV Azteca started a self-sufficiency electrical project, by using wind generated power and geothermal energy at different facilities owned by Grupo Salinas. Approximately 52% of the energy used by TV Azteca is generated by renewable energy sources.

*Achievements in energy conservation and environment 2016*

Along with the production and broadcast of programs that foster social participation in environmental matters, TV Azteca, through the specialized business group at Grupo Salinas focusing on energy and the environment, has established strategies to reduce the environmental impact of its operations on different environmental matters.

TV Azteca is aiming its efforts on environmental matters and has dedicated to investment for the research and development of energy efficiency processes; separation and final disposal of urban solid waste; measurement of greenhouse effect gas emissions (GEI); and education and training for environmental restoration.

In order to correctly manage its energy consumption, TV Azteca bases its operations on:

• The Energy Management System, which verifies that energy consumption matches the billing produced by the Comisión Federal de Electricidad (CFE).

• The Energy Savings Seal, an internal tool used by all Grupo Salinas companies to evaluate, validate and certify purchases of efficient lighting equipment, air conditioning and any other electrical equipment.

In addition, it complies with the provisions set forth by the following Mexican standards:

• NOM-001-SEDE-2012, Electrical installation safety.

• NOM-030 y 031-ENER-2012, Energy efficiency and minimum parameters for LED lighting.

• NOM-025-STPS-2008, Lighting conditions for work centers.

• NMX-AA-164-SCFI-2013, Minimum environmental criteria for sustainable buildings.

• National Emissions Registry (RENE) of the General Law for Climate Change.

Compliance with these standards guarantees employee safety, comfortable work centers and efficient use of electrical energy of all processes; in order to guarantee this, in 2015 Grupo Salinas implemented its Energy Management System, a platform for comprehensive energy management whose objectives —based on the results of the period— are:

• Facilitate auditable data for information management

• Analyze trends, issue reports, generate alarms and automatize calculations

• Enable transparent traceability of information regarding consumption, self-supply and billing of energy for any period and business unit

• Function as a decision-making tool

• Detect potential savings in technological and operating projects

The methodology used to calculate the energy consumption of TV Azteca is the international protocol developed by the Efficiency Valuation Organization (EVO), whose objective is to measure and guarantee energy savings, reduce costs and systematize the process for measuring and verifying energy performance.

During 2016, TV Azteca consumed 245,000 gigajoules, of which 31% came from renewable sources such as wind and geothermal energy which helped to reduce electrical energy consumption by 76,000 gigajoules. The evolution of TV Azteca's consumption practices transformed its environmental commitment:



In compliance with the *Ley General de Cambio Climático*, TV Azteca updates its National Emissions Registry annually, by which TV Azteca reports CO2 and greenhouse effect gas emissions.

The National Emissions Registry focuses on the identification of the main sources of emissions and the establishment of programs for consumption reduction and mitigation of environmental impact. TV Azteca uses the methodology produced and disseminated by the National Emissions Registry to calculate the Company's emissions, which are then included in the indicators published by SEMARNAT as emission factors.

In 2016, TV Azteca released 3,582 tons of $CO_2$ and stopped the emission of 9,240 tons of $CO_2$.

TV Azteca, through its content, is able to raise social awareness about the responsible use of natural resources, such as water, while also raising awareness amongst its employees on a daily basis. In accordance to the environmental policy of TV Azteca, no water sources are affected, whether through overexploitation for consumption or by discharge of toxic substances.

TV Azteca has created a manual for classifying solid waste that is used for improving the company's management of the waste it generates. To achieve this, the company has established a program at all its corporate facilities calling for separation of waste into four groups: organic, inorganic, recyclable, and hazardous. In 2016, close to a million kilograms of waste were generated, of which approximately 19,000 kilograms were recycled.

**Judiciary, Administrative or Arbitral Processes**

*Proyecto 40 (now adn40)*

TV Azteca has engaged in a number of disputes with Mr. Javier Moreno Valle ("Moreno Valle"), Corporación de Noticias e Información, S.A. de C.V. ("CNI") and Televisora del Valle de México ("TVM") , the company that holds the Proyecto 40 concession, in connection with the operation of Proyecto 40 and various shareholders meetings of TVM.

TV Azteca currently operates Proyecto 40 pursuant to an operating agreement dated December 10, 1998, among TV Azteca, CNI and TVM.

In 2000, CNI suspended TV Azteca´s broadcasting rights on Proyecto 40.  TV Azteca sued CNI, TVM and Moreno Valle for breach of the operating agreement.  In 2005, a final and non-appealable ruling was made in favor of TV Azteca.  TV Azteca currently operates Proyecto 40 pursuant to the operating agreement.

In connection with a credit agreement entered into in 1998 between TV Azteca as creditor and CNI as borrower, Moreno Valle pledged over 51% of the shares of TVM capital stock to TV Azteca.

When TV Azteca failed to hold an annual shareholders' meeting for four consecutive years, TV Azteca sued for the right, as creditor of CNI and potential future shareholder of TVM, to convene a TVM shareholders' meeting. A court ruled in favor of TV Azteca, and in one of the TVM shareholders' meetings, shareholders authorized a capital increase by means of which TV Azteca acquired a controlling interest in TVM.

Although there can be no assurance that TV Azteca will prevail in its disputes with CNI, TVM and Moreno Valle regarding TV Azteca's controlling interest in TVM, TV Azteca's management believes that its position will ultimately be upheld and therefore, TV Azteca has not set aside any related reserves.

### Legal actions and proceedings promoted against the Federal Code of Electoral Institutions and Procedures

In January 2008, a Decree was published in the Official Gazette where the Federal Code of Electoral Institutions and Procedures ("COFIPE") would come into effect, which would be abolished in 2014 and replaced by the General Law of Electoral Institutions and Procedures *(Ley General de Instituciones y Procedimientos Electorales)*.

At the time, the IFE (now known as the INE) sanctioned TV Azteca for alleged breaches in the transmission of a number of promotional spots associated with political parties and electoral authorities, in an amount of approximately Ps.200 million ($11.2 million). These fines were confirmed by the Electoral Tribunal of the Federation Judiciary Power, the Supreme Court of Justice and district judges.

On the other hand, the IFE had imposed sanctions against TVAzteca in amounts totaling approximately Ps.16.5 million ($0.9 million), for the alleged breach of several provisions of the COFIPE due to airing advertisements for politically focused magazines on television, due to the ads allegedly containing political propaganda. These fines were confirmed by the Electoral Tribunal of the Federation Judiciary Power.

Additionally, the IFE imposed a sanction of approximately Ps.22 million ($1.2 million) for TV Azteca's alleged breach of COFIPE due to TV Azteca's failure to transmit promotional ads of political parties and electoral authorities on restricted television systems, SKY and Cablevisión. These fines were disputed through a writ of amparo and the suits were dismissed.

Finally, the IFE had imposed sanctions against TV Azteca for an amount of approximately Ps.1.7 million, related to a number of alleged infractions within the COFIPE, which were confirmed by the Electoral Tribunal of the Federation Judiciary Power.

### The IFT issues the Guidelines.

On February 27, 2014, the Guidelines were published in the Official Gazette, which have been the subject of later modifications.

In June 2013, the Constitutional Reform established that broadcasting signals with coverage of 50% or more of the national territory must allow free retransmission on satellite restricted television. In February 2014, the IFT declared "Azteca Siete" and "Azteca trece" signals with coverage of more than 50% of the national territory.  As a result, TV Azteca must allow the retransmission of its signals for free.

TV Azteca believes that the February 2014 determination was incorrect, and as a result has instituted several indirect mechanisms to protect itself against the Guidelines and its amendments, since none of the 178 signals that are being licensed by TV Azteca fulfills the requirement of coverage of 50% or more of the national territory. These protection mechanisms were based on pronouncements made by the District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence.

In 2015 and 2016, the District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence pronounced the dismissal of these trials, finding that, even if the act was not constitutional, the protection mechanisms were found unconstitutional, a result that TV Azteca is currently appealing with a final resolution still pending.

Recently, with respect to one protection mechanism, the court determined that the Guidelines did not result in damages to TV Azteca due to the fact that TV Azteca did not have a claim to royalties for transmissions regulated under the Guidelines, a result that TV Azteca is currently evaluating.

Three additional protection mechanisms utilized by TV Azteca are pending definitive resolution.

*Legal actions and proceedings promoted against the "Decree issuing the Federal Law of Telecommunications and Radio Broadcasting and the Public System of Radio Broadcasting of the Mexican State Law; which also amends, adds and abolishes several rulings regarding telecommunications and radio broadcasting," published in the Official Gazette on July 14, 2014.*

On July 14, 2014, a decree was published in the Official Gazette called the "Decree issuing the Federal Law of Telecommunications and Radio Broadcasting and the Public System of Radio Broadcasting of the Mexican State Law; which also amends, adds and abolishes several rulings regarding telecommunications and radio broadcasting."

TV Azteca took several indirect measures to protect itself from certain provisions of such decree, not in respect to its entirety of the legislation but only related to certain specific provisions that TV Azteca considered to be in violation of the Constitution of Mexico. These measures of protection were based on findings of the second and first District Tribunals of Administrative Matters Specialized in Economical, Radio Broadcast and Telecommunication Competence.

These measures challenged, among other topics, the regulation of the retransmission of radio broadcast signals by restricted television licensees.

In 2015 and 2016, the trials concluded without having obtained the protection from Federal Justice.

The rest of the promoted measures are still pending, without a sentence of a definitive resolution by this date.

*Law of Commercial Bankruptcy*

TV Azteca is not subject to Articles 9 and 10 of the Law of Commercial Bankruptcy of Mexico (*Ley de Concursos Mercantiles*).

## DIRECTORS AND SENIOR MANAGEMENT

**Directors**

TV Azteca's board of directors (the "Board") is comprised of 11 members, out of which 4 are independent directors, who are elected for one-year terms by TV Azteca's general ordinary shareholders' meeting. The current term of office of each director will expire on April 25, 2018. The address of each director is Periférico Sur 4121, Col. Fuentes del Pedregal, Tlalpan, 14141, Mexico City, Mexico.

The following table sets forth the names of TV Azteca's current directors, their ages as of June 30, 2017 and their positions and year of appointment:

| Name | Age | Position | Director Since |
|------|-----|----------|----------------|
| Ricardo B. Salinas Pliego [1][2] | 61 | Chairman of the Board/Non-independent Director/Significant Shareholder | 1993 |
| Pedro Padilla Longoria [2] | 51 | Non-independent Director | 1993 |
| Guillermo E. Salinas Pliego [1] | 57 | Non-independent Director | 1998 |
| Mario San Román Flores [2] | 58 | Non-independent Director/Director General | 2004 |
| Luis Jorge Echarte Fernández [2] | 71 | Non-independent Director | 1999 |
| Joaquín Arrangoiz Orvañanos [2] | 60 | Non-independent Director | 1998 |
| Francisco X. Borrego Hinojosa Linage [2] | 52 | Non-independent Director | 2004 |
| Francisco Javier Murguía Díaz | 77 | Independent Director | 2004 |
| Ignacio Cobián Villegas | 53 | Independent Director | 2006 |
| Sergio Manuel Gutiérrez Muguerza | 66 | Independent Director | 2000 |
| José Ignacio Sánchez Conde | 62 | Independent Director | 2010 |

(1)   Ricardo B. Salinas Pliego and Guillermo E. Salinas Pliego are brothers.

(2)   Alternate directors for these persons are: Carlos Díaz Alonso and Rodrigo Fernández Capdevielle.

The following provides biographical information about the directors of TV Azteca.

*Ricardo B. Salinas Pliego*. Mr. Salinas Pliego has been Chairman of the Board of TV Azteca since 1993 and Chairman of the Board of Grupo Elektra since 1993. Mr. Salinas Pliego also serves on the board of directors of numerous other Mexican companies. Mr. Salinas Pliego received a degree in accounting from the Instituto Tecnológico de Estudios Superiores de Monterrey and received a Master of Finance degree from the Freeman School of Business at Tulane University in 1979. In 2015, Mr. Salinas Pliego was distinguished as *Doctor Honoris Causa* by the Universidad Autónoma de Guadalajara.

*Pedro Padilla Longoria*. Mr. Padilla has served as a director of TV Azteca since 1993 and was the Chief Executive Officer of Grupo Elektra between 1993 and 2000. Mr. Padilla served as Chief Executive Officer of TV Azteca from October 2001 to July 2004, and from July 14, 2004 as Chief Executive Officer of Grupo Salinas. Mr. Padilla also serves on the board of directors of Grupo Elektra and Banco Azteca. Mr. Padilla received a law degree from the Universidad Nacional Autónoma de México.

*Guillermo E. Salinas Pliego*. Mr. Salinas has served as director of TV Azteca since 1998 and serves as member of the Board of Banco Azteca since 2002. He also co-founded the Universidad CNCI and acts as Chairman of Grupo Avalanz. Mr. Salinas is a Certified Public Accountant, holding an undergraduate degree in accounting from the Instituto Tecnológico de Estudios Superiores de Monterrey in Monterrey.

*Mario San Román Flores*. Mr. San Román is responsible for the execution of strategic projects and is an advisor to the Chief Executive Officer of TV Azteca since 2015. Previously, he served as Chief Executive Officer of TV Azteca from 2004 to 2015. Mr. San Román served as Chief Operations Officer of TV Azteca from 2002 to July 2004, as Marketing Vice President from August 1998 to March 1999, as Director of Azteca 13 from March 1999 to June 2000 and as Director of Channels from June 2000 to 2002. Mr. San Román received a bachelor's degree in communication sciences from the Universidad Iberoamericana.

*Luis Jorge Echarte Fernández*. Mr. Echarte has served as a director of TV Azteca since November 1999. Currently, he serves as Chairman of the Board of Azteca America Network, after being Chairman and Chief Executive Officer of the same company. Prior to joining TV Azteca as Chief Financial Officer, he was Vice President of Finance and Administration at Grupo Elektra. Mr. Echarte holds undergraduate degrees from Memphis State University and the University of Florida and has completed the Executive Management Program at Stanford University.

*Joaquín Arrangoiz Orvañanos*. Mr. Arrangoiz has served as a director of TV Azteca since 1998 and also serves as Director of Sales and Corporate Relations of Grupo Salinas. His functions include sales, business development, strategic management, exchanges, acquisitions, real estate and synergies. Mr. Arrangoiz has served on the board of directors of prominent Mexican companies, such as Grupo Eusebio Gayosso, Grupo ARSACO, Grupo Osiris, and Salinas y Rocha. Mr. Arrangoiz received a degree in Business Administration from Universidad Nacional Autónoma de Mexico. Later, he pursued a postgraduate on marketing in University of California Los Angeles and received a master's degree in Instituto Panamericano de Alta Dirección de Empresas. He is member of the Young Presidents Organization (YPO).

*Francisco X. Borrego Hinojosa Linage*. Mr. Borrego has served as the General Counsel and Legal Director of TV Azteca since August 1993. Mr. Borrego also serves as Vice President of legal matters on Grupo Salinas. Mr. Borrego received a degree in law from the Escuela Libre de Derecho.

*Francisco Javier Murguía Díaz*. Mr. Murguía has served as an independent director of TV Azteca since April 2004. Mr. Murguía is a leading producer of commercial and short-length films in Latin America, and has served as President of the Mexican Association of Filmmakers, the National Council of Advertising and the Mexican Association of Advertising.

*Ignacio Cobián Villegas.* Mr. Cobián has served as independent director of TV Azteca since 2006. He is the founding member and has been Chief Executive Officer of Timbermart, S.A., a company specializing in marketing timber products, from 1999 to the present. Mr. Cobián formerly served as founding member and Chief Executive Officer of Corteza, S.A. de C.V., a company specializing in producing and marketing timber furniture and other timber products from 1998 to 1999. Mr. Cobián received a bachelor's degree in Business Administration from the Universidad de las Américas and obtained a professional certificate in Business Administration from the University of California in San Diego.

*Sergio Manuel Gutiérrez Muguerza*. Mr. Gutiérrez has served as independent director of TV Azteca since April 2000. He serves as independent director and Chairman of the audit committee of TV Azteca, in his capacity of expert in finance. Mr. Gutiérrez has served as Chief Executive Officer of Deacero, S.A., a steel and wire company, since 1981. He has also served as a director of Alpek, S.A. de C.V., a petrochemical company, and ING Comercial América, an insurance company, since 1997. Mr. Gutiérrez received a degree in Industrial Engineering from Purdue University.

*José Ignacio Sánchez Conde.* Mr. Sánchez Conde has served as independent director of TV Azteca since 2010. He also serves as Chief Executive Officer of the lighting company Sánchez Conde Iluminación; he previously served as Director of Advertising and Marketing for the Grupo CIFRA (Aurrera) from 1979 to 1982. From 1982 to 1991, he acted as Chief Executive Officer General of LSI de Mexico, a lighting company, and from 1992 to 2001as Finance Officer for Grupo ARSACO. He is currently a member of the board of GMD Resorts and Grupo Mexicano de Desarrollo, and served as independent director of Grupo Móvil Access. Mr. Sánchez Conde has a bachelor's degree in Communication Sciences from the Universidad Anáhuac, with Advertising and Television as his special subject.

*Board Practices*

TV Azteca's by-laws require at least 25% of the Board members to be independent, who are not employed by or affiliated with TV Azteca's controlling shareholders. Mr. Sergio Manuel Gutiérrez Muguerza, Francisco Javier Murguía Díaz, Ignacio Cobián Villegas and José Ignacio Sánchez Conde are TV Azteca's current independent directors. Holders of TV Azteca's Series A shares are entitled to elect at least 60% of TV Azteca's board of directors members and each holder of at least 10% of TV Azteca's capital stock with limited vote (Series "D-A" and "D-L" shares, and after conversion, Series "L" shares) are entitled to appoint one director to the Board.

TV Azteca's by-laws require the Board to maintain committees comprised of at least three directors, all of them must be independent, to cover each of the following matters: related party transactions, capital transactions, audit and compensation. All members of the audit committee must be independent. The current audit committee is comprised of three independent members.

The audit committee operates independently from any other committee that the Board may decide to form, provided that, as of the date of this Offering Circular such committee also complies with the corporate practices obligations set forth in the LMV. In addition to any other obligations conferred by the board of directors, TV Azteca's corporate by-laws and the LMV, such committee has, among others, the following obligations:

- Opining on all transactions that require Board approval, provided that the value of the transactions under review, individually or in the aggregate, is equal to or greater than five percent of TV Azteca's consolidated assets, as reported in the immediately previous quarter.

- Recommending the appointment of independent experts as and when it is considered appropriate, for their opinion on transactions which require Board approval.

- Reviewing financial statements, internal control and internal audit systems, as well as the activities and independence of the external auditors and the activities of the Committee itself.

- Referring to TV Azteca's Legal Director any legal proceedings of which they have knowledge that may have been initiated against TV Azteca's employees.

- Recommending to the board the appointment, compensation and maintenance of an accounting firm and setting forth procedures to resolve any disputes between TV Azteca's Board and its external auditors related to the preparation of TV Azteca's financial statements.

- Notifying the Board of material irregularities detected relating to the exercise of their functions and, if applicable, notifying the appropriate corrective action, or recommending the action to be taken.

- Ensuring compliance by the Chief Executive Officer of the resolutions approved by the shareholders' meetings and the Board meetings, in accordance with the instructions of such corporate bodies.

- Preparing an annual report related to its obligations, to be submitted to the Board and distributed to the TV Azteca shareholders at the general ordinary shareholders' meeting.

The members of the audit committee are Mr. Francisco Javier Murguía Díaz, Ignacio Cobián Villegas and Sergio Manuel Gutiérrez Muguerza, who serves as Chairman of the committee.

*Oversight*

Oversight of management and the conduct and performance of TV Azteca's business is the responsibility of the audit committee and the third party auditor that conducts TV Azteca's external audit.

**Executive Officers**

The following table sets forth the names of TV Azteca's executive officers, their ages as of June 30, 2017 and their positions and year of appointment as an executive officer:

| Name | Age | Position | Executive Officer Since |
|---|---|---|---|
| Ricardo B. Salinas Pliego | 61 | Chairman of the Board | 1993 |
| Benjamin Francisco Salinas Sada | 33 | Chief Executive Officer | 2015 |
| Esteban Galindez Aguirre | 52 | Chief Financial Officer | 2000 |
| Joaquín Arrangoiz Orvañanos | 60 | Co-Director of Sales | 1997 |
| Rafael Rodríguez Sánchez | 40 | General Counsel and Legal Director | 2013 |
| Carlos Díaz Alonso | 51 | Co-Director of Sales | 2004 |

The following provides biographical information about TV Azteca's executive officers. See "*Directors and Senior Management—Directors*" for biographical information on Ricardo B. Salinas Pliego and Joaquín Arrangoiz Orvañanos.

*Benjamin Francisco Salinas Sada*. Mr. Salinas Sada serves as TV Azteca's Chief Executive Officer since 2015, and has previously worked over a decade in industries such as media, media production, marketing of goods, services and energy. Mr. Salinas Sada has been a member of the Strategic Executive Committee of Grupo Salinas

during the last five years, and has a bachelor's degree in Financial Management from the Instituto Tecnológico y de Estudios Superiores de Monterrey.

*Esteban Galindez Aguirre*. Mr. Galindez Aguirre serves as TV Azteca's Chief Financial Officer since 2015, and has broad experience in different strategic positions since 2000 at Grupo Elektra, where he served as Chief Financial Officer and performed positions on planning, financial strategy, budgetary control, and treasury as well as the design and implementation of programs aimed to drive operational efficiency. He has a bachelor's degree on Business Management at the Universidad Iberoamericana, and holds a masters' degree in Management at the McGill University, in Canada. Mr. Galindez Aguirre is also a Chartered Financial Analyst (CFA).

*Rafael Rodríguez Sánchez*. Mr. Rodríguez has served as TV Azteca's General Counsel since May 1, 2013. From July 2003 until April 2013, he served as legal counsel for corporate, regulatory and special projects at Iusacell. Since 2014, Mr. Rodríguez was appointed Secretary non-member of the Board of Directors of TV Azteca. From December 2000 to July 2003 was a legal manager for TV Azteca's sports, news and entertainment division. Prior to that, he worked in the corporate law area at PricewaterhouseCoopers in Mexico City. Mr. Rodríguez received his Law degree from Universidad La Salle. He also completed a seminar program on telecommunications at the Instituto Tecnológico Autónomo de México and a seminar program on International Sports Law at the Institute of Directors in London, UK.

*Carlos Díaz Alonso*. Mr. Díaz has served as TV Azteca's Director of Sales since 2004. Mr. Díaz received a bachelor's degree in Business Administration from the Universidad Anáhuac.

86

## PRINCIPAL SHAREHOLDERS

**Principal Shareholders**

As of June 30, 2017, CASA, which is controlled by Mr. Ricardo Benjamín Salinas Pliego, is the owner of the majority 64.9% of the outstanding shares of TV Azteca and Arrendadora Internacional Azteca, which is a subsidiary of CASA by 99.81%, owns the (3.10%) of the total outstanding shares of TV Azteca, which have full voting rights. TV Azteca has seven main subsidiaries controlled by 99.99% comprised by AIC, a business in Delaware, United States, and six Mexican businesses: Televisión Azteca, S.A. de C.V., Azteca Novelas, S.A.P.I. de C.V., Red Azteca Internacional, S.A. de C.V., Comerciacom, S.A. de C.V., Estudios Azteca, S.A. de C.V. and Operadora Mexicana de Televisión, S.A. de C.V. Likewise, TV Azteca has a subsidiary in Guatemala, named TVA Guatemala, S.A., two subsidiaries in Honduras, named TV Azteca Honduras, S.A. de C.V. and Comercializadora de TV de Honduras, S.A. de C.V., as well as a branch in Colombia, named TV Azteca sucursal Colombia, a subsidiary in Peru named Azteca Comunicaciones Perú, S.A.C., and it counts with 56 additional subsidiaries, both direct and indirect.

**Capital Stock**

TV Azteca's capital stock is comprised of Series A shares, Series D-A shares and Series D-L shares as of the date of this Offering Circular. Holders of Series A shares have voting rights at TV Azteca's general shareholders' meetings. Holders of Series D-A and D-L shares have voting rights only in limited circumstances, and have a preferential dividend right.

In August 2017, Series D-A shares will become eligible to be exchanged for Series A shares, and Series D-L shares will become eligible to be exchanged for Series L shares. Series L shares will be granted voting rights under limited circumstances.

TV Azteca is working with the National Banking Commission and the National Foreign Investments Commission in order to extend the conversion term of Series D-A into Series A and Series D-L into Series L, all of them representative of TV Azteca's capital stock, to forty years counted from the constitution of the irrevocable trust identified with the number 987-8. It is expected to extend the term before its expiration. TV Azteca expects that such extension will occur in August 2017.

In connection with the foregoing, on July 12, 2017, TV Azteca held: (i) General Extraordinary Shareholders' meeting; (ii) Special meetings for Series D-A and D-L; and (iii) CPO's holders meeting, through the common representative.

Authorized, issued, and paid-in capital stock of TV Azteca as of December 31, 2016 is summarized as follows:

| Shares Series | Authorized (in thousands) | Paid (in thousands) | Total ($) |
|---|---|---|---|
| A | 5,318,079 | 4,633,711 | 370,957 |
| D-A | 2,613,878 | 2,163,829 | 172,132 |
| D-L | 2,613,878 | 2,163,829 | 172,132 |
| **Total** | **10,545,835** | **8,961,369** | **715,221** |

As of December 31, 2016, TV Azteca's shares were listed on the following securities exchanges:

| Characteristics of the securities | Country of Stock Exchange | Ticker symbol | Stock Exchange |
|---|---|---|---|
| Series A, Series -A, Series-L and Certificates of Common Participation (CPOs), each one represents one A Share, one D-A share, and one D-L share. | Mexico | TVAZTCA | Mexican Stock Exchange |
| 10 CPO Units. | Spain | XTZA | Latin American Securities Market |

**Dividends**

The approval, amount and payment of dividends is determined by shareholders at TV Azteca's general ordinary shareholders' meeting. Resolutions shall be valid only if adopted by the affirmative vote of the majority of the Series A shares, in general, but not necessarily based on the recommendation of the Board of Directors. Dividends are declared based on the audited financial statements for the previous fiscal year, considering TV Azteca's operating results, financial condition and capital requirements, and on general business conditions. Under TV Azteca's by-laws and the LGSM, the gross profits of TV Azteca are applied as described below.

At the general annual ordinary shareholders' meeting of TV Azteca, the Board of Directors submits for the approval of the holders of the Series A shares, the financial statements of TV Azteca for the previous fiscal year, together with the report thereon by the Board. If the general annual ordinary shareholders' meeting approves the financial statements, then it will determine the allocation of TV Azteca's net profits for the preceding year. LGMS require allocating at least 5% of such net profits to a legal reserve, which is not thereafter available for distribution except as a stock dividend, until the amount of the legal reserve equals 20% of TV Azteca's historical capital stock (before restatement effect). Thereafter, the general annual ordinary shareholders' meeting may determine and allocate a certain percentage of net profits to any general or special reserve, including a reserve for open-market purchases of TV Azteca's shares. The remainder of net profits is available for distribution in the form of dividends to all the shareholders.

Holders of Series D-A shares and Series D-L shares (directly or through CPO's) are entitled to receive an annual, cumulative preferred dividend. Following payment in full of this preferred dividend, holders of Series A shares may determine the payment of ordinary dividends to holders of Series A shares, Series D-A shares and Series D-L shares. After the conversion of the Series D-A shares into Series A shares and the Series D-L shares into Series L shares, all shares of TV Azteca will participate on a pro rata basis in dividend distributions.

TV Azteca has also entered into certain financial agreements, which contain terms and conditions that may restrict or limit the payment of dividends.

For the past three years, we have paid the following dividends to the Series D-A and Series D-L shareholders:

| Year | Dividend in Ps. Per Share D-A | Dividend in Ps. Per Share D-L | Date of Payment |
|------|------|------|------|
| 2014 | 0.00399 | 0.00399 | 12/05/2013 |
| 2015 | 0.00399 | 0.00399 | 05/29/2015 |
| 2016 | 0.00399 | 0.00399 | 05/31/2016 |

## RELATED PARTY TRANSACTIONS

Historically, TV Azteca has engaged, and expects to continue to engage, in a variety of transactions with its affiliates, including entities owned or controlled by TV Azteca or its controlling shareholders. TV Azteca has an audit committee comprised of three independent directors who review certain of its proposed transactions, including transactions with affiliates, to determine whether these transactions are related to its business and, in the case of a transaction with an affiliate, to determine whether such transaction is consummated on terms that are at least as favorable to TV Azteca as terms that would be obtainable at the time for a comparable transaction or series of similar transactions in arm's-length dealings with an unrelated third person.

The LMV requires the audit committee to review and make recommendations on any transaction with an affiliate with the exception of (i) transactions that do not involve a material amount, (ii) transactions entered into in the ordinary course of business and (iii) transactions made on an arm's-length basis. Notwithstanding the foregoing, the transactions described in (i) to (iii) require audit committee and Board approval if they relate to the purchase or sale of assets, granting of a guarantee or incurrence of debt involving an amount equal to or greater than 5% of TV Azteca's consolidated assets. For further information on the role of the audit committee, see "*Directors and Senior Management—Directors—Board Practices.*" In addition, the provisions of the LMV require that prior to Board approval of the transaction, a fairness opinion must be delivered with respect to the purchase or sale of assets, granting of a guarantee or incurrence of debt involving an amount equal to or greater than 10% of its consolidated assets. The fairness opinion must be provided by an independent advisor that meets the criteria set forth in the LMV, which includes being financially and economically independent from TV Azteca, providing no other services except audit services to TV Azteca and other criteria that generally result in a requirement that the advisor be a partner of a recognized audit firm.

TV Azteca has outstanding receivables and payables, and undertook transactions with related parties as described below:

| | Six months ended June 30 | | | | Year ended December 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2016 | | 2015 | |
| | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) | ($) | (Ps.) |
| | | | | | (in millions) | | | |
| **Accounts Receivable:** | | | | | | | | |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) ................................................ | 30.5 | 545.6 | 28.8 | 544.0 | 28.3 | 584.9 | 29.7 | 510.5 |
| Organizacion de Torneos y Eventos Deportivos, S.A. de C.V. ................................................ | - | - | - | - | 5.5 | 113.7 | - | - |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries ................ | 13.5 | 241.8 | 9.1 | 172.0 | 5.1 | 105.7 | 5.1 | 88.5 |
| Total Play Telecomunicaciones, S.A. de C.V. ................ | 1.7 | 31.0 | 1.5 | 29.0 | 1.5 | 31.9 | 0.8 | 13.2 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. ................................................ | - | - | 1.8 | 34.0 | 1.7 | 34.3 | 2.0 | 34.3 |
| Arrendadora Internacional Azteca, S.A. de C.V. ................ | 3.7 | 66.8 | 2.4 | 45.0 | 1.1 | 22.5 | 1.8 | 30.5 |
| Adamantium Private Security Services, S. de R.L. de C.V. ................................................ | 0.3 | 5.0 | 3.5 | 66.0 | 0.1 | 2.8 | 4.2 | 71.9 |
| Other ................................................ | 4.6 | 82.1 | 2.6 | 49.0 | 2.2 | 45.0 | 1.9 | 31.9 |
| **Total** ................................................ | **54.3** | **972.2** | **49.7** | **939.0** | **45.5** | **940.8** | **45.5** | **780.8** |
| | | | | | | | | |
| **Accounts Payable:** | | | | | | | | |
| Selabe Diseños, S.A. de C.V. (Selabe) ................ | 7.3 | 131.3 | 2.6 | 49.0 | 4.3 | 88.2 | - | - |
| Globo Re, S.A. ................................................ | - | - | 9.4 | 177.0 | - | - | 9.3 | 160.1 |
| Procesos Boff, S. de R.L. de C.V. ................ | - | - | - | - | 0.5 | 9.3 | - | - |
| Other related parties ................................................ | - | - | 4.9 | 92.0 | - | - | - | - |
| **Total** ................................................ | **7.3** | **131.3** | **16.9** | **318.0** | **4.8** | **97.5** | **9.3** | **160.1** |

TV Azteca's most significant related party transactions are described below:

*Advertising Revenue*

TV Azteca's advertising revenue from related parties amounted to Ps.343.4 million ($19.2 million), Ps.660.1 million ($31.9 million) and Ps.430 million ($25.0 million) for the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, respectively.

*Grupo Elektra*

TV Azteca and Grupo Elektra have annual advertising contracts and the rights under these contracts may not be assigned by Grupo Elektra to third parties. As of June 30, 2017, December 31, 2016 and 2015 revenue from Grupo Elektra amounted to Ps.287.8 million ($16.1 million), Ps.584 million ($28.3 million) and Ps.412.5 million ($24.0 million), respectively.

*Total Play Telecomunicaciones, S.A. de C.V (*"Total Play")

In each of the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca and Total Play had annual advertising contracts and the rights under these contracts may not be assigned by Total Play to third parties. As of June 30, 2017, December 31, 2016 and 2015, revenue from Total Play amounted to Ps.55.6 million ($3.1 million), Ps.76.1 million ($3.7 million) and Ps.17.7 million ($1.0 million), respectively.

*Interest Income*

In the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca made short-term loans to related parties and interest income for these loans amounted to Ps.1.8 million ($0.1 million), Ps.16.2 million ($0.8 million) and Ps.18.1 million ($1.1 million), respectively.

*Marketing and Production Revenue*

TV Azteca and Banco Azteca entered into various contracts for the production and marketing of the products and services of Banco Azteca on the over-the-air television channels 7 and 13. For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, revenue from these contracts amounted to Ps.38.1 million ($2.1 million), Ps.98.0 million ($4.7 million) and Ps.22.9 million ($1.3 million), respectively.

*Equipment Leasing Contracts*

TV Azteca has leased from Arrendadora Internacional Azteca transportation and computing equipment with an option to buy. Most of the terms of the lease agreements are three to four years. At the end of the term, TV Azteca may opt to acquire the leased goods, extend the leasing term or return the leased goods, by notification at least 90 days prior to the expiration of the contract. For the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, assets acquired under these contracts amounted to Ps.0.0 million ($0.0 million), Ps.0.6 million ($0.0 million) and Ps.1.0 million ($0.1 million), respectively, and the payments made by TV Azteca under these contracts amounted to $0.03 million, $2.0 million and $2.5 million, respectively.

*Donations*

In the six months ended June 30, 2017 and the years ended December 31, 2016 and 2015, TV Azteca donated funds to its related parties Fundación TV Azteca, A. C., Asociación Azteca Amigos de la Cultura y las Artes, A.C, and Caminos de la Libertad, Ideas y Debates, A.C., for an aggregate amount equal to Ps.22.5 million ($1.3 million), Ps.155.1 million ($7.5 million) and Ps.145.8 million ($8.5 million), respectively. These related parties are authorized by the tax authorities to receive donations and issue the respective supporting documentation.

*Recovery of other receivables from other related parties*

TV Azteca periodically evaluates the recoverability of other receivables from related parties and when it is determined that these accounts are not recoverable, they are charged to other expenses.

As of June 30, 2017, December 31, 2016 and 2015, all receivables from related parties of TV Azteca and its subsidiaries have been reviewed with respect to impairment indicators. As of December 31, 2015, certain receivables were impaired and, therefore, an allowance for doubtful accounts from related parties was recorded in the amount of Ps.92.5 million ($5.4 million), which was accounted for under the line item "other expenses" of TV Azteca's statement of comprehensive income. Part of these accounts were recovered in the amount of Ps.86.4 million ($4.2 million) in 2016; therefore, the impairment recognized was reversed in the amount recovered.

*Banco Azteca Credit Facility*

TV Azteca has entered into a loan agreement with Banco Azteca, S.A., which has provided TV Azteca with a peso-denominated credit facility. This Ps.1,597.1 million credit facility has a term that extends to September 30, 2020 and accrues interest at a floating interest rate of TIIE plus 2.0%. It includes monthly interest payments, with all principal outstanding coming due at maturity in 2020.

## DESCRIPTION OF NOTES

We will issue the notes under an Indenture (the "*Indenture*"), to be dated the Issue Date, between us, the Subsidiary Guarantors and The Bank of New York Mellon, as Trustee (the "*Trustee*").  We summarize below certain provisions of the Indenture, but do not restate the Indenture in its entirety.  We urge you to read the Indenture because it, and not this description, defines your rights.  You can obtain a copy of the Indenture in the manner described under "*Available Information*."

You can find the definition of capitalized terms used in this section under "—*Certain Definitions*." Unless otherwise specified, when we refer to:

- the "Issuer" in this section, we mean TV Azteca, S.A.B. de C.V., and not its Subsidiaries, and

- "notes" in this section, we mean the notes originally issued on the Issue Date and any additional notes, collectively.

### General

The notes will:

- be general unsecured obligations of the Issuer,

- rank equal in right of payment with all other existing and future Senior Indebtedness of the Issuer,

- rank senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer, if any,

- be effectively subordinated to all existing and future secured Indebtedness of the Issuer and the Subsidiary Guarantors to the extent of the assets securing such Indebtedness,

- be unconditionally guaranteed on a general unsecured senior basis by all of the Issuer's existing and certain future Restricted Subsidiaries,

- be structurally subordinated to all existing and future Indebtedness and other liabilities, including trade payables, of the Issuer's Subsidiaries that do not guarantee the notes, and

- rank junior to all obligations preferred by statute (such as tax, social security and labor obligations).

As of June 30, 2017, on a pro forma basis after giving effect to this offering, the transactions described under "*Use of Proceeds,*" the July 14, 2017 redemption of $60 million of Medium Term Notes due 2018, and the refinancing of the remaining outstanding Medium Term Notes due 2018 with cash on hand and borrowings under the Banco Azteca term loan facility :

- the Issuer and its Subsidiaries would have had consolidated total indebtedness of Ps.13,051.4 million ($729.2 million),

- the Issuer and the Subsidiary Guarantors would have had consolidated total indebtedness of Ps.13,051.4 million ($729.2 million), of which none would have been secured,

- because all of the Issuer's existing Subsidiaries will be Subsidiary Guarantors on the Issue Date, the Issuer's Subsidiaries that are not Subsidiary Guarantors would have had consolidated total indebtedness of Ps.0.0 million ($0.0 million).

The above figures do not reflect the issuance of Cebures pursuant to the new program that TV Azteca is currently in the process of establishing.  See "*Summary—Recent Developments*."

### Additional Notes

Subject to the limitations set forth under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness,*" the Issuer and its Subsidiaries may incur additional Indebtedness.  At the Issuer's option, this additional Indebtedness may consist of additional notes ("*additional notes*") issued by the Issuer in one or more transactions, which have identical terms (other than issue date and issue price) as notes issued on the Issue Date. The notes and any additional notes will be treated as a single class for all purposes under the Indenture, and holders of additional notes would have the right to vote together with holders of notes issued on the Issue Date as one class.

### Principal, Maturity and Interest

The notes will be general unsecured obligations of the Issuer and the Subsidiary Guarantors.

On the Issue Date, the Issuer will issue notes initially in an aggregate principal amount of $400,000,000. The Issuer will issue notes in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof. The notes will mature on August 9, 2024. The notes will not be entitled to the benefit of any mandatory redemption or sinking fund.

Interest on the notes will accrue at the rate of 8.250% per annum and will be payable semi-annually in arrears on each August 9 and February 9, commencing on February 9, 2018. Payments will be made to the persons who are registered holders at the close of business on July 26 and January 26, respectively, immediately preceding the applicable interest payment date, whether or not a Business Day, until the date of maturity or earlier redemption. The Trustee shall not be required to register the transfer of, or exchange of, any note for a period beginning (i) 15 days prior to the giving of a notice of redemption or an offer to repurchase notes, and ending at the close of business on the day such notice is given or (ii) 15 days before an interest payment date and ending on such interest payment date.

Interest on the notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the date of issuance. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months. The redemption of notes with unpaid and accrued interest to the redemption date will not affect the right of holders of record on a record date to receive interest due on an interest payment date.

If the Stated Maturity or any interest payment or redemption date falls on a day which is not a Business Day, payment of interest, principal and premium, if any, with respect to the notes will be made on the next succeeding Business Day with the same force and effect as if made on the due date, and no interest on such payment will accrue from and after such due date.

Initially, The Bank of New York Mellon London Branch, the London branch of the Trustee will act as paying agent and the Trustee will act as registrar for the notes. The Issuer may change any paying agent or registrar without notice to holders of notes. If at any time certificated notes have been issued and are outstanding and a holder of certificated notes has given wire transfer instructions to the Issuer and the Trustee in writing at least 10 days in advance of the due date for a payment, the Issuer will make all principal, premium and interest payments on those notes in accordance with those instructions. All other payments on the notes will be made at the office or agency of the paying agent and registrar in New York City unless the Issuer elects to make interest payments by check mailed to the registered holders of notes at their registered addresses. Payments made with respect to notes held in registered global form will be made in accordance with the applicable procedures of the depositary.

Approval-in-principle has been received from the Singapore Exchange Securities Trading Limited (the "SGX-ST") for the listing and quotation of the notes on the Official List of the SGX-ST. In addition, in the event that the global note(s) is exchanged for certificated notes, an announcement of such exchange will be made by or on behalf of the Issuer through the SGX-ST. Such announcement will include all material information with respect to the delivery of the certificated notes including details of the paying agent in Singapore.

Subject to any applicable abandoned property law, the Trustee and the paying agents shall pay to the Issuer upon written request any money held by them for the payment of interest, principal and premium, if any, on the notes that remains unclaimed for two years, and, thereafter, holders of notes entitled to any such money must look to the Issuer for payment as general creditors.

**Additional Amounts**

The Issuer will be required by Mexican law to deduct Mexican withholding taxes, and pay such taxes to the Mexican tax authorities, from payments of interest, and amounts deemed interest, on the notes made to investors who are not residents of Mexico for tax purposes, and will pay additional amounts on those payments of interest to the extent described below ("*Additional Amounts*").

The Issuer or, as the case may be, the Subsidiary Guarantors will pay such Additional Amounts as may be necessary in order to ensure that the net amounts received by the holders of notes after any withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "*Taxes*") of whatever nature imposed or levied by Mexico or any authority in Mexico shall equal the respective amounts of principal and interest which would have been received in respect of the notes in the absence of such withholding or deduction, and the delivery by the Issuer, or as the case may be, the Subsidiary Guarantors of any such Additional Amounts to the appropriate Mexican authorities shall constitute receipt by the relevant holders of such Additional Amounts so delivered; except that no such Additional Amounts shall be payable with respect to:

(a) any Taxes imposed solely because at any time there is or was a connection between the holder or beneficial owner of the note (or between a fiduciary, settlor, beneficiary, member or owner of, or

holder of power over, such holder or beneficial owner, if such holder or beneficial owner is an estate, trust, partnership or corporation) and Mexico (or any political subdivision or territory or possession thereof), including such holder or beneficial owner (or such fiduciary, settlor, beneficiary, member, owner or holder of a power) (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the mere receipt of payments under, or the ownership or holding of, a note);

(b)    any estate, inheritance, gift, sales, stamp, personal property, transfer or similar Tax, assessment or other governmental charge imposed with respect to the notes;

(c)    any Taxes imposed solely because the holder of the notes or any other person having an interest in the notes fails to comply with any certification, identification, information, documentation or other reporting requirement concerning the nationality, residence, identity or connection with Mexico of the holder or any beneficial owner of the note, if compliance is required by statute, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty, which is in effect and to which Mexico is a party, as a precondition to exemption from, or reduction in the rate of, the Tax and at least 30 days' prior to the first payment date with respect to which the Issuer or a Subsidiary Guarantor shall apply this clause, the Issuer or, as the case may be, the relevant Subsidiary Guarantor shall have notified the holder of such note that such holder or beneficial owner will be required to comply with such certification, identification, information, documentation or other reporting requirement;

(d)    any note presented for payment more than 15 days after the Relevant Date (as defined below) except to the extent that the holder of the note would have been entitled to such Additional Amounts on presenting such note for payment on the last day of such 15-day period ("*Relevant Date*" in respect of any payment being the date on which such payment first becomes due except that, if the full amount of the monies payable has not been received by the paying agent on or prior to such due date, being the date on which, the full amount of such monies having been so received, notice to that effect is duly given to the holders in accordance with the Indenture);

(e)    any Taxes required to be deducted or withheld by any paying agent from a payment on a note, if such payment can be made without such deduction or withholding by any other paying agent who can make such payment in accordance with the terms of the Indenture and the notes;

(f)    any Taxes which are payable otherwise than by deduction or withholding from payments on or in respect of any note (other than stamp, transfer or other similar taxes);

(g)    any payment on a note to any holder of such note who is a fiduciary or partnership or other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the holder of such note;

(h)    any Taxes payable otherwise than by deduction or withholding from payments on the notes;

(i)    any Taxes withheld or deducted on or in respect of any note under Section 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended as of the issue date (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement; or

(j)    any combination of (a) through (i) above.

The limitations on our obligations to pay Additional Amounts set forth in clause (c) above shall not apply if (i) the provision of information, documentation or other evidence described in such clause (c) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a note, than comparable information or other reporting requirements imposed under U.S. tax law (including the United States-Mexico income tax treaty), regulations (including temporary or proposed regulations) and administrative practice, or (ii) Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (Ley del Impuesto Sobre la Renta) (or a substitute or equivalent provision, whether included in any law, rule or regulation) is in effect, unless (A) the provision of the information, documentation or other evidence described in such clause (c) above is

expressly required by the applicable Mexican laws and regulations in order to apply Article 166, Section II, paragraph (a) of the Mexican Income Tax Law (or substitute or equivalent provision), (B) we cannot obtain the information, documentation or other evidence necessary to comply with the applicable Mexican laws and regulations on our own through reasonable diligence and (C) we otherwise would meet the requirements for application of the applicable Mexican laws and regulations.

In addition, such clause (c) above does not require, and shall not be construed to require, that any holder, including any non-Mexican pension fund, retirement fund, tax-exempt organization or financial institution, register, to the extent applicable, with the Tax Management Service (Servicio de Administracion Tributaria) or the Mexican Ministry of Finance and Public Credit (Secretaria de Hacienda y Credito Público) to establish eligibility for an exemption from, or a reduction of, Mexican withholding taxes, or take any other action different from providing periodic information thereto.

Upon request, the Issuer and the Subsidiary Guarantors will provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Mexican taxes in respect of which the Issuer has paid any Additional Amount. The Issuer will make copies of such documentation available to the holders of the notes or the paying agent upon request.

The Issuer shall pay all stamp and other duties, if any, which may be imposed by Mexico or any political subdivision thereof or taxing authority of or in the foregoing with respect to the execution and delivery of the Indenture or the issuance of the notes.

Any reference in this Offering Circular, the Indenture or the notes to principal, premium, interest or any other amount payable in respect of the notes by the Issuer or any Subsidiary Guarantor be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this subsection.

In the event of any merger or other transaction described and permitted under "Limitation on Merger, Consolidation and Sale of Assets," then all references to Mexico, Mexican law or regulations, and Mexican taxing authorities under this section (other than the paragraph directly following (j) above, which relates to an exception to the obligation to pay Additional Amounts under clause (c) above) and under "Optional Redemption—Optional Redemption for Changes in Withholding Taxes," shall be deemed to also include the United States, the European Union, any jurisdiction through which payment is made and any political subdivision in or of the foregoing, laws or regulations of the United States, European Union or such jurisdiction through which payment is made, and any taxing authority of the United States, the European Union, any jurisdiction through which payment is made or any political subdivision in or of the foregoing, respectively.

**Note Guarantees**

Each Subsidiary Guarantor will, jointly and severally, unconditionally guarantee the performance of all Obligations of the Issuer under the Indenture and the notes. The Obligations of each Subsidiary Guarantor in respect of its Note Guarantee will be limited to the maximum amount as will result in such Obligations not constituting a fraudulent conveyance, fraudulent transfer or similar illegal transfer under applicable law. See "*Risk Factors—Risks Related to the Notes—The guarantees may not be enforceable*."

Each Subsidiary Guarantor will be released and relieved of its obligations (or in the case of Covenant Defeasance, certain of its obligations) under its Note Guarantee in the event:

(1)     there is a Legal Defeasance or a Covenant Defeasance of the notes as described under "*—Legal Defeasance and Covenant Defeasance*";

(2)     there is a sale or other disposition of (i) Capital Stock of such Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a direct or indirect Subsidiary of the Issuer or (ii) all or substantially all of the assets of the Subsidiary Guarantor (other than to the Issuer or a Subsidiary Guarantor) otherwise permitted by and in accordance with the Indenture;

(3)     such Subsidiary Guarantor is designated as an Unrestricted Subsidiary in accordance with "*—Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries*"; or

(4)     if the Note Guarantee was required pursuant to the terms of the Indenture, the cessation of the circumstances requiring the Note Guarantee;

*provided* that the transaction is carried out pursuant to and in accordance with all other applicable provisions of the Indenture.

The Issuer will cause any existing or future Restricted Subsidiary (including upon a Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary) that (A) as of the last date of any fiscal quarter and with respect to the Issuer and its Subsidiaries, individually represents at least 5% of the consolidated total assets of the Issuer and its Subsidiaries, as determined in accordance with IFRS, or (B) for any twelve-month period ending as of the last day of any fiscal quarter, individually represents at least 5% of the Consolidated EBITDA of the Issuer, to become a Subsidiary Guarantor, execute a supplemental indenture and deliver to the Trustee an Officers' Certificate and an Opinion of Counsel. Notwithstanding the foregoing, the Issuer shall at all times cause the Issuer and the then-existing Subsidiary Guarantors, collectively, to represent (Y) as of the last date of the each fiscal quarter, at least 85% of the consolidated total assets of the Issuer and its Subsidiaries, as determined in accordance with IFRS, and (Z) for the twelve-month period ending as of the last day of each fiscal quarter, at least 85% of Consolidated EBITDA.

On the Issue Date, all of the Issuer's existing Subsidiaries will be Subsidiary Guarantors.

As of the Issue Date, there will be no Unrestricted Subsidiaries. The Issuer's Unrestricted Subsidiaries will not guarantee the notes. In the event of a *concurso mercantil*, bankruptcy, liquidation or reorganization of these non-guarantor Subsidiaries, these non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer. In addition, holders of minority equity interests in Subsidiaries of the Issuer may receive distributions prior to or pro rata with the Issuer depending on the terms of the equity interests. See "*Risk Factors—Risks Related to the Notes—To the extent that Certain of TV Azteca's subsidiaries are not Guarantors, TV Azteca's obligations with respect to the notes will be effectively subordinated to all liabilities of these non-Guarantor subsidiaries*."

**Optional Redemption**

*Optional Redemption.* Except as stated below, the Issuer may not redeem the notes prior to August 9, 2021. On and after August 9, 2021, the Issuer may redeem the notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at the following redemption prices, expressed as percentages of the principal amount thereof, if redeemed during the twelve-month period commencing on August 9 of any year set forth below, plus accrued and unpaid interest to, but not including, the redemption date:

| Year | Percentage |
|------|-----------|
| 2021 .............................................. | 104.125% |
| 2022 ............................................ | 102.063% |
| 2023 and thereafter ....................... | 100.000% |

Prior to August 9, 2021, the Issuer may redeem the notes, at its option, in whole at any time or in part from time to time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium, plus accrued and unpaid interest to, but not including, the redemption date.

"*Applicable Premium*" means, with respect to any note on any applicable redemption date, the excess, if any, of (a) the present value at such redemption date of (i) the redemption price of the note, at August 9, 2021 (such redemption price being set forth in the table appearing above) *plus* (ii) all required interest payments due on the note through August 9, 2021 (excluding accrued but unpaid interest to the redemption date), computed in each case using a discount rate equal to the Treasury Rate as of such redemption date *plus* 50 basis points over (b) the outstanding principal amount of such note.

"*Comparable Treasury Issue*" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the notes through August 9, 2021 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to August 9, 2021.

"*Comparable Treasury Price*" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation, or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Independent Investment Banker*" means one of the Reference Treasury Dealers appointed by the Issuer.

"*Reference Treasury Dealer*" means BCP Securities, LLC, Jefferies LLC and Morgan Stanley & Co. International plc or their respective affiliates which are primary United States government securities dealers and not

less than one other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided*, *however*, that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "*Primary Treasury Dealer*"), the Issuer will substitute therefor another Primary Treasury Dealer.

"*Reference Treasury Dealer Quotation*" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Issuer, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference Treasury Dealer at 3:30 pm New York City time on the third Business Day preceding such redemption date.

"*Treasury Rate*" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

*Optional Redemption upon Equity Offerings*.  Prior to August 9, 2021, the Issuer may, at its option, at any time or from time to time, upon at least 30 days' but not more than 60 days' notice, use the net cash proceeds of one or more Equity Offerings to redeem in the aggregate up to 35.0% of the aggregate principal amount of the notes issued under the Indenture at a redemption price equal to 108.250% of the principal amount thereof, plus accrued and unpaid interest to, but not including, the redemption date ; *provided* that:

(1)    after giving effect to any such redemption at least 65.0% of the aggregate principal amount of the notes issued under the Indenture remains outstanding; and

(2)    the Issuer shall make such redemption not more than 90 days after the consummation of such Equity Offering.

"*Equity Offering*" means (i) a primary public offering of Qualified Capital Stock of the Issuer in accordance with applicable Mexican or other laws, rules and regulations, (ii) a primary rights offering of Qualified Capital Stock of the Issuer made generally to the holders of such Qualified Capital Stock or (iii) any primary private placement of Qualified Capital Stock of the Issuer to any Person, in each case other than issuances upon exercise of options by employees of the Issuer or any of its Subsidiaries.

*Optional Redemption for Changes in Withholding Taxes*.  If, as a result of any amendment to, or change in, the laws (or any rules or regulations thereunder) of Mexico or any political subdivision or taxing authority thereof, or any amendment to or change in an official interpretation or application of such laws, rules or regulations, which amendment to or change of such laws, rules or regulations becomes effective on or after the Issue Date, the Issuer or the Subsidiary Guarantors have become obligated or will become obligated, in each case, after taking all reasonable measures to avoid this requirement, to pay Additional Amounts in excess of 4.9% with respect to the notes (see "*—Additional Amounts*" and "*Taxation—Mexican Taxation*"), then the Issuer may redeem the notes, at its option, in whole but not in part at any time, upon at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100.0% of the outstanding principal amount, plus accrued and unpaid interest and any Additional Amounts due thereon to, but not including, the redemption date; *provided*, *however*, that (1) no notice of redemption for tax reasons may be given earlier than 90 days prior to the earliest date on which the Issuer or the Subsidiary Guarantors would be obligated to pay these Additional Amounts if a payment on the notes were then due, and (2) at the time such notice of redemption is given such obligation to pay such Additional Amounts remains in effect.

Prior to the publication or delivery to holders of any notice of redemption pursuant to this provision, the Issuer will deliver to the Trustee:

• an Officers' Certificate stating that the Issuer is entitled to effect the redemption and setting forth a statement of facts showing that the conditions precedent to the Issuer's right to redeem have occurred, and

• an opinion of Mexican legal counsel (which may be the Issuer's outside counsel) of recognized standing to the effect that the Issuer has or will become obligated to pay such Additional Amounts as a result of such change or amendment.

The Issuer will give notice of any redemption to the Trustee and the applicable depositary pursuant to the provisions described under "*—Certain Covenants—Notices*" at least 30 days (but not more than 60 days) before the redemption date.

*Optional Redemption Procedures*.  In the event that less than all of the notes are to be redeemed at any time, selection of notes for redemption will be made by the Trustee in compliance with the requirements of the

principal securities exchange, if any, on which notes are listed or, if the notes are not then listed on a securities exchange, on a pro rata basis, by lot or by any other method as the Trustee shall deem fair and appropriate (subject, in each case, to the applicable procedures of the depositary). If a partial redemption is made with the proceeds of an Equity Offering, selection of the notes or portions thereof for redemption will, subject to the preceding sentence, be made by the Trustee only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to the applicable procedures of the depositary), unless the method is otherwise prohibited. No notes of a principal amount of $200,000 or less may be redeemed in part, and notes of a principal amount in excess of $200,000 may be redeemed in part in multiples of $1,000 only.

Notice of any redemption will (i) in the case of holders of certificated notes, be mailed by first-class mail, postage prepaid, at least 30 but no more than 60 days before the redemption date to each holder of notes to be redeemed at its registered address and (ii) in the case of the holders of global notes, be given in accordance with the customary procedures of the applicable depositary. If notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed. Notice of redemption, once given to the holders of the notes, will be irrevocable. The Issuer will give notice of any redemption to the Trustee and the applicable depositary pursuant to the provisions described under "—*Certain Covenants—Notices*" at least 30 days (but not more than 60 days) before the redemption date.

If notes are redeemed in part, a new note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note will be made, as appropriate, in accordance with the applicable procedures of the depositary).

On the redemption date, the Issuer will pay the redemption price for any note to be redeemed, together with accrued and unpaid interest thereon to, but not including, the redemption date. On and after the redemption date, interest will cease to accrue on notes or portions thereof called for redemption, as long as the Issuer has deposited with the paying agent funds in satisfaction of the applicable redemption price pursuant to the Indenture. Upon redemption of any notes by the Issuer, such redeemed notes will be cancelled and cannot be reissued.

The Issuer and its affiliates may, at any time and from time to time, purchase notes in the open market, in privately negotiated transactions or otherwise.

**Repurchase Upon a Change of Control**

Upon the occurrence of a Change of Control, each holder of notes will have the right to require that the Issuer purchase, at such holder's option, all or a portion (in minimum principal amounts of $200,000 or an integral multiple of $1,000 in excess thereof) of the holder's notes at a purchase price equal to 101.0% of the principal amount thereof, plus accrued and unpaid interest thereon to, but not including, the date of purchase (the "*Change of Control Payment*").

The Issuer shall notify the Trustee in writing promptly upon the occurrence of a Change of Control.

Within 30 days following the date upon which the Change of Control occurred, the Issuer must give written notice to each holder, with a copy to the Trustee, offering to purchase the notes as described above (a "*Change of Control Offer*"). The Change of Control Offer shall state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the notice, other than as may be required by law (the "*Change of Control Payment Date*"), and instructions and materials necessary to enable holders of the notes to tender notes pursuant to the Change of Control Offer.

On the Business Day immediately preceding the Change of Control Payment Date, the Issuer will, to the extent lawful, deposit with the paying agent funds in an amount equal to the Change of Control Payment in respect of all notes or portions thereof so tendered. On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1)    accept for payment all notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Offer; and

(2)    deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Issuer.

If only a portion of a note is purchased pursuant to a Change of Control Offer, a new note in a principal amount equal to the portion thereof not purchased (if any) will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note

will be made, as appropriate, in accordance with the applicable procedures of the depositary). Notes (or portions thereof) purchased pursuant to a Change of Control Offer will be cancelled and cannot be reissued.

The Issuer will not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Issuer and purchases all notes properly tendered and not withdrawn pursuant to the Change of Control Offer, or (2) notice of redemption has been given pursuant to the Indenture as described above under the caption "—*Optional Redemption*," unless and until there is a default in payment of the applicable redemption price.

A Change of Control Offer may be made in advance of a Change of Control, conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

In the event that holders of not less than 90.0% of the aggregate principal amount of the outstanding notes accept a Change of Control Offer and the Issuer or a third party purchases all of the notes held by such holders, the Issuer will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date pursuant to the Change of Control Offer described above, to redeem all of the notes that remain outstanding following such purchase at a purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, on the notes that remain outstanding, to, but not including, the payment date.

Other existing and future Indebtedness of the Issuer may contain prohibitions on the occurrence of events that would constitute a Change of Control or require that Indebtedness be repurchased upon a Change of Control. Moreover, the exercise by the holders of their right to require the Issuer to repurchase the notes upon a Change of Control could cause a default under such Indebtedness even if the Change of Control itself does not. If a Change of Control Offer occurs, there can be no assurance that the Issuer will have available funds sufficient to make the Change of Control Payment for all the notes that might be delivered by holders seeking to accept the Change of Control Offer. In the event the Issuer is required to purchase outstanding notes pursuant to a Change of Control Offer, the Issuer expects that it would seek third-party financing to the extent it does not have available funds to meet its purchase obligations and any other obligations in respect of Senior Indebtedness. However, there can be no assurance that the Issuer would be able to obtain necessary financing. The Change of Control purchase feature of the notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management.

Holders will not be entitled to require the Issuer to purchase their notes in the event of a takeover, recapitalization, leveraged buyout or similar transaction which does not result in a Change of Control. In addition, clause (2) of the definition of "Change of Control" includes the sale, conveyance, assignment, transfer, lease or other disposition of all or substantially all of the assets of the Issuer and its consolidated Subsidiaries. Although there is a limited body of case law interpreting the phrase "substantially all," there is no established definition of how this phrase is to be interpreted under applicable law. Accordingly, the application of this provision is uncertain.

To the extent applicable, the Issuer will comply with the requirements of all applicable securities laws and regulations in connection with the purchase of notes in connection with a Change of Control Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with the "Repurchase Upon a Change of Control" provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Indenture by doing so.

**Certain Covenants**

***Suspension of Covenants***

During any period of time that (i) the notes have Investment Grade Ratings from at least two Rating Agencies, and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "*Covenant Suspension Event*"), the Issuer and its Restricted Subsidiaries will not be subject to the provisions of the Indenture described under:

- "—*Limitation on Incurrence of Additional Indebtedness*";

- "—*Limitation on Guarantees*" (*provided* that such covenant shall apply to any Restricted Subsidiary that guarantees Indebtedness upon any Reversion Date (as defined below));

- "—*Limitation on Restricted Payments*";

- "—*Limitation on Asset Sales and Sales of Subsidiary Stock*";

- "—*Limitation on Designation of Unrestricted Subsidiaries*";

- "—*Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*";

- clause (b) of "—*Limitation on Merger, Consolidation and Sale of Assets*";

- "—*Limitation on Transactions with Affiliates*"; and

- "—*Conduct of Business*";

(collectively, the "*Suspended Covenants*").

In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "*Reversion Date*") the Covenant Suspension Event ceases to exist, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants. The period of time between the date of the Covenant Suspension Event and the Reversion Date is referred to as the "*Suspension Period.*" Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified to have been incurred pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*" below or one of the clauses set forth in paragraph (2) of "—*Limitation on Incurrence of Additional Indebtedness*" below (to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness would not be so permitted to be incurred pursuant to paragraph (1) or (2) of "—*Limitation on Incurrence of Additional Indebtedness*", such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause (d) of paragraph (2) of "—*Limitation on Incurrence of Additional Indebtedness*". Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—*Limitation on Restricted Payments*" will be made as though the covenant described under "—*Limitation on Restricted Payments*" had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph of "—*Limitation on Restricted Payments.*" For purposes of "—*Limitation on Asset Sales,*" on the Reversion Date, the amount of Net Cash Proceeds of Asset Sales will be reset to the amount of Net Cash Proceeds in effect as of the first day of the Suspension Period ending on such Reversion Date.

The Issuer will give the Trustee written notice of any Covenant Suspension Event and in any event not later than ten Business Days after such Covenant Suspension Event has occurred. In the absence of such notice, the Trustee shall assume the Suspended Covenants apply and are in full force and effect. The Issuer will give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after it becomes aware of such Reversion Date. After any such notice of the occurrence of the Reversion Date, the Trustee shall assume the Suspended Covenants apply and are in full force and effect. In the absence of such notice of a Reversion Date, the Trustee may assume that the Suspended Covenants continue to be suspended.

### *Limitation on Incurrence of Additional Indebtedness*

(1)     The Issuer (i) will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, (ii) will not, and will not cause or permit any of its Restricted Subsidiaries to, Incur any Disqualified Capital Stock (other than Disqualified Capital Stock of Restricted Subsidiaries held by the Issuer or a Wholly Owned Restricted Subsidiary, so long as it is so held), and (iii) will not cause or permit any of its Restricted Subsidiaries that is not a Subsidiary Guarantor to Incur any Preferred Stock (other than Preferred Stock of Restricted Subsidiaries held by the Issuer or a Wholly Owned Subsidiary, so long as it is so held), except, in each case, that the Issuer and any Subsidiary Guarantor may Incur Indebtedness or Disqualified Capital Stock and any Restricted Subsidiary that is not a Subsidiary Guarantor may Incur Preferred Stock if, at the time of and immediately after giving pro forma effect to the Incurrence thereof and the application of the proceeds therefrom, the Consolidated Leverage Ratio would not have been greater than 3.5 to 1.0.

(2)     Notwithstanding paragraph (1) above, the Issuer and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("*Permitted Indebtedness*"):

(a)     Indebtedness in respect of the notes issued on the Issue Date and the Note Guarantees in respect thereof;

(b)     Guarantees by any Subsidiary Guarantor of Indebtedness of the Issuer or any other Subsidiary Guarantor permitted under the Indenture; *provided* that if any such Guarantee is of Subordinated Indebtedness, then the Note Guarantee of such Subsidiary Guarantor shall be senior to such Subsidiary Guarantor's Guarantee of such Subordinated Indebtedness;

(c)     Indebtedness Incurred by the Issuer or any Subsidiary Guarantor under Credit Facilities (including Guarantees in respect thereof) in an aggregate principal amount at any time outstanding not to exceed the greater of (x) $ 100.0 million and (y) 10.0% of Consolidated Tangible Assets;

(d)     other Indebtedness of the Issuer and its Restricted Subsidiaries outstanding on the Issue Date (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (c) above);

(e)     Hedging Obligations entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes, including, without limitation, Hedging Obligations in respect of the notes;

(f)     intercompany Indebtedness between the Issuer and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

    (A)     if the Issuer or any Subsidiary Guarantor is the obligor on such Indebtedness and the payee is not the Issuer or any Subsidiary Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all Obligations under the notes and the Indenture, in the case of the Issuer, or such Subsidiary Guarantor's Note Guarantee, in the case of any such Subsidiary Guarantor;

    (B)     in the event that at any time any such Indebtedness ceases to be held by the Issuer or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (f) at the time such event occurs; and

    (C)     the Issuer and any Restricted Subsidiary shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Mexican Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the notes and other unaffiliated creditors of the same class as the notes;

(g)     Indebtedness of the Issuer or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of Incurrence;

(h)     Indebtedness of the Issuer or any of its Restricted Subsidiaries represented by letters of credit for the account of the Issuer or any Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance or similar requirements in the ordinary course of business;

(i)     Indebtedness of the Issuer or any Restricted Subsidiary constituting Capitalized Lease Obligations or Purchase Money Indebtedness, in each case Incurred for the purpose of acquiring or financing all or any part of the purchase price or cost of construction or improvement of property or equipment used in the business of the Issuer or such Restricted Subsidiary in an aggregate amount at any time outstanding not to exceed the greater of (x) $25.0 million and (y) 2.5% of Consolidated Tangible Assets;

(j)     Indebtedness in respect of bid, performance or surety bonds in the ordinary course of business for the account of the Issuer or any of its Restricted Subsidiaries, including Guarantees or obligations of the Issuer or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(k)     Refinancing Indebtedness in respect of:

    (A)     Indebtedness (other than Indebtedness owed to the Issuer or any Subsidiary of the Issuer) Incurred pursuant to paragraph (1) above (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such paragraph (1) above), or

(B)     Indebtedness Incurred pursuant to clause (a), (d) (excluding Indebtedness outstanding on the Issue Date deemed to be incurred under clause (c) above or Indebtedness owed to the Issuer or a Subsidiary of the Issuer) or (k) of this covenant;

(l)     additional Indebtedness of the Issuer or any Restricted Subsidiary in an aggregate principal amount not to exceed $20.0 million at any one time outstanding (which amount may, but need not, be Incurred, in whole or in part, under Credit Facilities);

(m)     the Guarantee by the Issuer of any Indebtedness Incurred by a Subsidiary Guarantor in accordance with the terms of the Indenture and the notes;

(n)     Guarantees by the Issuer or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Issuer and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Issuer or a Restricted Subsidiary, and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of $50 million at any one time outstanding; and

(o)     Permitted Acquisition Indebtedness.

(3)     For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with, this covenant:

(a)     The amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with GAAP.

(b)     The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on preferred stock or Disqualified Capital Stock in the form of additional preferred stock or Disqualified Capital Stock with the same terms will not be deemed to be an Incurrence of Indebtedness or issuance of preferred stock or Disqualified Capital Stock for purposes of this covenant; *provided* that any such outstanding additional Indebtedness or preferred stock or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of paragraph (2) of this covenant will be counted as Indebtedness outstanding thereunder for purposes of any future Incurrence under such provision.

(c)     In the event that Indebtedness meets the criteria of more than one of the clauses of Permitted Indebtedness described above, or is entitled to be Incurred pursuant to paragraph (1) of this covenant, the Issuer, in its sole discretion, will be permitted to classify such Indebtedness at the time of its Incurrence in any manner that complies with this covenant. In addition, any Indebtedness originally classified as Incurred pursuant to any clause of Permitted Indebtedness or clause (l) of this covenant may later be reclassified by the Issuer, in its sole discretion, such that it will be deemed to be Incurred pursuant to another of such clauses or clause (l) of this covenant to the extent that such reclassified Indebtedness could be Incurred pursuant to such other clause or clause (l) of this covenant at the time of such reclassification (provided that Indebtedness outstanding on the Issue Date under Credit Facilities shall at all times be deemed incurred under clause (c) above).

(d)     For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, principal amount of Indebtedness denominated in a currency other than U.S. dollars shall be the U.S. Dollar Equivalent thereof. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Issuer or any Restricted Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(e)     For purposes of determining any particular amount of Indebtedness: (i) Guarantees, Liens or obligations with respect to letters of credit supporting Indebtedness otherwise included in the determination of such particular amount shall not be included and (ii) any Liens granted, together with an equal and ratable Lien to secure the notes and the Note Guarantees, pursuant to provisions of the Indenture and the notes shall not be treated as Indebtedness.

*Limitation on Guarantees*

The Issuer will not permit any Restricted Subsidiary of the Issuer that is not a Subsidiary Guarantor to Guarantee any Indebtedness of the Issuer or to secure any Indebtedness of the Issuer with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the notes, as the case may be, on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured. Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Issuer will be subordinated and junior in right of payment to the contemporaneous Guarantee of the notes by such Restricted Subsidiary.

*Limitation on Restricted Payments*

The Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "*Restricted Payment*"):

(a)    declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Issuer or any Restricted Subsidiary to holders of such Capital Stock, other than:

- dividends, returns of capital or distributions payable in Qualified Capital Stock of the Issuer,

- dividends, returns of capital or distributions payable to the Issuer and/or a Restricted Subsidiary, or

- dividends, distributions or returns of capital made on a pro rata basis to the Issuer and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than pro rata basis to any minority holder);

(b)    purchase, redeem or otherwise acquire or retire for value:

- any Capital Stock of the Issuer, or

- any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Issuer (other than a Restricted Subsidiary) or any Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Issuer or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a *pro rata* basis from the Issuer and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(c)    make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness (excluding (x) any intercompany Indebtedness between or among the Issuer and/or any Restricted Subsidiaries or (y) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinated to the notes or any Note Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(d)    make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(1)    a Default or an Event of Default shall have occurred and be continuing;

(2)    the Issuer is not able to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*"; or

(3)    the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof shall exceed the sum of:

(A)     50% of cumulative Consolidated Net Income of the Issuer or, if such cumulative Consolidated Net Income of the Issuer is a loss, minus 100% of the loss, accrued during the period, treated as one accounting period, beginning in the fiscal quarter immediately preceding the fiscal quarter in which the Issue Date occurs, to the end of the most recent fiscal quarter for which consolidated financial information of the Issuer is available; plus

(B)     100% of the aggregate net cash proceeds received by the Issuer or any Restricted Subsidiary from any Person (other than, in the case of any Restricted Subsidiary, from the Issuer or another Restricted Subsidiary) from any:

- contribution to the equity capital of the Issuer (not representing an interest in Disqualified Capital Stock) or issuance or sale of Qualified Capital Stock of the Issuer, in each case, subsequent to the Issue Date, or

- issuance or sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Issuer or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Issuer,

  excluding, in each case, any net cash proceeds:

(x)     received from a Subsidiary of the Issuer;

(y)     used to redeem notes under "—*Optional Redemption—Optional Redemption Upon Equity Offerings*"; or

(z)     applied in accordance with clause (2) or (3) of the second paragraph of this covenant below; *plus*

(B)     any Investment Return.

Notwithstanding the preceding paragraph, this covenant does not prohibit:

(1)     the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)     the acquisition of any shares of Capital Stock of the Issuer,

(x)     in exchange for Qualified Capital Stock of the Issuer, or

(y)     through the application of the net proceeds received by the Issuer from a substantially concurrent sale of Qualified Capital Stock of the Issuer or a contribution to the equity capital of the Issuer (not representing an interest in Disqualified Capital Stock), in each case not received from a Subsidiary of the Issuer;

*provided* that the value of any such Qualified Capital Stock issued in exchange for such acquired Capital Stock and any such net proceeds shall be excluded from clause (3)(B) of the first paragraph of this covenant (and were not included therein at any time);

(3)     the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Issuer, of:

(x)     Qualified Capital Stock of the Issuer or

(y)     Refinancing Indebtedness for such Subordinated Indebtedness;

*provided* that the value of any Qualified Capital Stock issued in exchange for Subordinated Indebtedness and any net proceeds referred to above shall be excluded from clause (3)(B) of the first paragraph of this covenant (and were not included therein at any time);

(4)     if no Default or Event of Default shall have occurred and be continuing, repurchases by the Issuer of Common Stock of the Issuer or options, warrants or other securities exercisable or convertible into Common Stock of the Issuer from any current or former employees, officers, directors or

consultants of the Issuer or any of its Subsidiaries or their authorized representatives estates, heirs, family members, spouses or former spouses upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed $5.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years) plus the cash proceeds of key man life insurance policies received by the Issuer and its Restricted Subsidiaries in such calendar year;

(5)     the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)     the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Issuer or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant set forth under "— *Limitation on Incurrence of Additional Indebtedness*";

(7)     upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the notes pursuant to the covenant described under "—*Repurchase Upon a Change of Control*" above, any repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Issuer or any Subsidiary Guarantor required pursuant to the terms thereof as a result of such Change of Control; *provided* that (A) the terms of such purchase or redemption are substantially similar in all material respects to the comparable provision included in the Indenture, and (B) at the time of such purchase or redemption no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

(8)     if no Default or Event of Default shall have occurred and be continuing, the purchase by the Issuer of fractional shares arising out of stock dividends, splits or combinations or business combinations;

(9)     payments or distributions in the nature of satisfaction of statutory redemption or dissenters' rights under Mexican law; and

(10)    if no Default or Event of Default shall have occurred and be continuing, the payment of cash dividends on or in respect of Capital Stock of the Issuer or the repurchase of Capital Stock of the Issuer in an aggregate amount not to exceed $10.0 million in any calendar year.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4) and (7) above shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (6), (8), (9) and (10) above shall not be included in such calculation.

### *Limitation on Asset Sales and Sales of Subsidiary Stock*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(a)     the Issuer or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(b)     at least 75.0% of the consideration received for the assets or Capital Stock sold by the Issuer or the Restricted Subsidiary, as the case may be, in the Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

For purposes of this clause (b), each of the following will be deemed to be cash:

(i)      any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent consolidated balance sheet) of the Issuer or any of its Restricted Subsidiaries (other than contingent liabilities and liabilities that constitute Subordinated Indebtedness or are otherwise subordinated to the notes) that are assumed by the transferee of any such assets and as a result of which the Issuer and its Restricted Subsidiaries are no longer responsible for such liabilities; and

(ii)     the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current

assets as determined in accordance with GAAP or Capital Stock) to be used by the Issuer or any Restricted Subsidiary in a Permitted Business; and

(iii)    any securities, notes or other obligations received by the Issuer or any such Restricted Subsidiary from such transferee that are converted, sold for or exchanged by the Issuer or such Restricted Subsidiary into cash or Cash Equivalents within 120 days (180 days in the case of land sales) of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion, sale or exchange,

*provided* that amounts received pursuant to clauses (i) and (ii) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

The Issuer or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(a)    repay any Senior Indebtedness of the Issuer or a Subsidiary Guarantor secured by a Lien,

(b)    make capital expenditures in a Permitted Business, or

(c)    purchase

(1)    assets (other than current assets as determined in accordance with GAAP or Capital Stock) to be used by the Issuer or any Restricted Subsidiary in a Permitted Business, or

(2)    all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary

from a Person other than the Issuer and its Restricted Subsidiaries; *provided* that, in the case of clauses (1) and (2), the Issuer will have complied with its obligations if (i) it enters into a binding commitment to acquire such assets or such Capital Stock within 365 days after receipt of such Net Cash Proceeds, (ii) such binding commitment is subject only to customary conditions and (iii) such acquisition is consummated within 180 days from the date of signing such binding commitment.

To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within 365 days of the Asset Sale as set forth in clause (a) or (b) (or, in the case of clause (c) only, within such longer period set forth therein) of the immediately preceding paragraph, the Issuer will make an offer to purchase notes (the "*Asset Sale Offer*"), at a purchase price equal to 100% of the principal amount of the notes to be purchased, plus accrued and unpaid interest thereon, to, but not including, the date of purchase (the "*Asset Sale Offer Amount*"). The Issuer will purchase pursuant to an Asset Sale Offer from all tendering holders on a pro rata basis (subject to any necessary rounding), and, at the Issuer's option, on a pro rata basis with the holders of any other Senior Indebtedness with similar provisions requiring the Issuer to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds. The Issuer may satisfy its obligations under this covenant with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period (or, if applicable, such longer period set forth above with respect to clause (c) only).

The Issuer may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of $15.0 million. At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of $15.0 million, will be applied as required pursuant to this covenant. Pending application in accordance with this covenant, Net Cash Proceeds will be applied to temporarily reduce revolving credit borrowings that can be reborrowed or Invested in Cash Equivalents.

Each notice of an Asset Sale Offer will be made by written notice to each record holder of notes as shown on the register of holders, with a copy to the Trustee, within 20 days following such 365th day (or, if applicable, such longer period set forth above with respect to clause (c) only), offering to purchase the notes as described above. Each notice of an Asset Sale Offer will state, among other things, the purchase price, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date of the notice, other than as may be required by law (the "*Asset Sale Offer Payment Date*"), and instructions and materials necessary to enable holders of the notes to tender notes pursuant to the Asset Sale Offer. Upon receiving notice of an Asset Sale Offer, holders of notes may elect to tender their notes in whole or in part in amounts of $200,000 or integral multiples of $1,000 in excess thereof in exchange for cash.

On the Business Day immediately preceding the Asset Sale Offer Payment Date, the Issuer will, to the extent lawful, deposit with the paying agent funds in an amount equal to the Asset Sale Offer Amount in respect of all notes or portions thereof so tendered.  On the Asset Sale Offer Payment Date, the Issuer will, to the extent lawful:

(1)     accept for payment all notes or portions thereof properly tendered and not withdrawn pursuant to the Asset Sale Offer; and

(2)     deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Issuer.

To the extent holders of notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender (and do not withdraw notes or the other Senior Indebtedness) in an aggregate amount exceeding the amount of unapplied Net Cash Proceeds, the Issuer will purchase the notes and the other Senior Indebtedness on a *pro rata* basis (subject to any necessary rounding) based on amounts tendered.  If only a portion of a note is purchased pursuant to an Asset Sale Offer, a new note in a principal amount equal to the portion thereof not purchased will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note will be made, as appropriate, in accordance with the applicable procedures of the depositary).  Notes (or portions thereof) purchased pursuant to an Asset Sale Offer will be cancelled and cannot be reissued.

To the extent applicable, the Issuer will comply with the requirements of all applicable securities laws and regulations in connection with the purchase of notes in connection with an Asset Sale Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with the "Asset Sale" provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Indenture by doing so. Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero.  Accordingly, to the extent that the aggregate amount of notes and other Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Issuer and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by the Indenture.   In the event of the transfer of substantially all (but not all) of the property and assets of the Issuer and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under "—Limitation on Merger, Consolidation and Sale of Assets," the Surviving Entity will be deemed to have sold the properties and assets of the Issuer and its Restricted Subsidiaries not so transferred for purposes of this covenant and will comply with the provisions of this covenant with respect to the deemed sale as if it were an Asset Sale.  In addition, the Fair Market Value of properties and assets of the Issuer or its Restricted Subsidiaries so deemed to be sold will be deemed to be Net Cash Proceeds for purposes of this covenant.

### *Limitation on Designation of Unrestricted Subsidiaries*

The Issuer may designate after the Issue Date any Subsidiary of the Issuer as an "Unrestricted Subsidiary" under the Indenture (a "*Designation*") only if:

(1)     no Default or Event of Default shall have occurred and be continuing at the time of or after giving effect to such Designation and any transactions between the Issuer or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with "—*Limitation on Transactions with Affiliates*";

(2)     at the time of and after giving effect to such Designation, the Issuer could Incur $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*"; and

(3)     the Issuer would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted Payment pursuant to the first paragraph of "—*Limitation on Restricted Payments*" or as a Permitted Investment  in an amount (the "*Designation Amount*") equal to the Issuer's Investment in such Subsidiary on such date; and

(4)     at the time of such Designation, neither the Issuer nor any Restricted Subsidiary will:

(a)     provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(b)     be directly or indirectly liable for any Indebtedness of such Subsidiary; or

(c)     be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non-recourse Guarantee given solely to support the pledge by the Issuer or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

The Designation of a Subsidiary of the Issuer as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.

Upon a Designation, (i) all existing Investments of the Issuer and its Restricted Subsidiaries in such Subsidiary will be deemed to be made at that time, (ii) all existing transactions between such Subsidiary and the Issuer or its Restricted Subsidiaries will be deemed entered into at that time, (iii) such Subsidiary will be released, if applicable, from its Note Guarantee, and (iv) such Subsidiary will cease to be subject to the provisions of the Indenture as a Restricted Subsidiary.

The Issuer may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "*Revocation*") only if:

(1)     no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2)     all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of the Indenture.

Upon a Revocation, (i) all of such Subsidiary's Indebtedness and Disqualified Capital Stock or Preferred Stock will be deemed Incurred at that time for purposes of "—*Limitation on Incurrence of Additional Indebtedness*," (ii) Investments in such Subsidiary previously charged under "—*Limitation on Restricted Payments*" will be credited thereunder, (iii) it may be required to issue a Note Guarantee pursuant to "—*Note Guarantees*," and (iv) it will thereafter be subject to the provisions of the Indenture as a Restricted Subsidiary.

All Designations and Revocations must be evidenced by resolutions of the Board of Directors of the Issuer, delivered to the Trustee certifying compliance with the preceding provisions.

### *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

(a)  Except as provided in paragraph (b) below, the Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on or in respect of its Capital Stock to the Issuer or any other Restricted Subsidiary or pay any Indebtedness owed to the Issuer or any other Restricted Subsidiary;

(2)     make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Issuer or any other Restricted Subsidiary; or

(3)     transfer any of its property or assets to the Issuer or any other Restricted Subsidiary.

(b)  Paragraph (a) above will not apply to encumbrances or restrictions existing under or by reason of:

(1)     applicable law, rule, regulation or order;

(2)     the Indenture, the notes and the Note Guarantees;

(3)     the terms of any Indebtedness or other agreement outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or Refinancing thereof; *provided* that any such amendment, modification, restatement, renewal, restructuring, replacement or Refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

(4)     customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or

otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under the Indenture;

(5)    (x) any existing instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation, or (y) existing under any other existing agreement or instrument binding upon a Person acquired or its assets or properties which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(6)    restrictions with respect to a Restricted Subsidiary of the Issuer imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; *provided* that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(7)    customary restrictions imposed on the transfer of copyrighted or patented materials;

(8)    an agreement governing Indebtedness of the Issuer or any Restricted Subsidiaries permitted to be Incurred subsequent to the date of the Indenture in accordance with the covenant set forth under "*—Limitation on Incurrence of Additional Indebtedness*"; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are not materially more restrictive than those contained in the Indebtedness or agreements referred to in clause (3);

(9)    Purchase Money Indebtedness for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (3) of paragraph (a) above;

(10)    Liens permitted to be incurred under the provisions of the covenant described below under the caption "*—Limitation on Liens*" that limit the right of the debtor to dispose of or otherwise transfer the assets subject to such Lien or securing such Indebtedness and any proceeds thereof;

(11)    organizational documents, shareholders' agreements, joint venture agreements or similar documents of, or related to, Restricted Subsidiaries that are not Wholly Owned Subsidiaries and which have been entered into with the approval of the Issuer's Board of Directors.

### *Limitation on Liens*

The Issuer will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets (including without limitation Capital Stock of any Restricted Subsidiaries), whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made:

(1)    in the case of the Issuer or any Restricted Subsidiary other than a Subsidiary Guarantor, to secure the notes and all other amounts due under the Indenture; and

(2)    in the case of a Subsidiary Guarantor, to secure such Subsidiary Guarantor's Note Guarantee of the notes and all other amounts due under the Indenture;

in each case, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the notes or such Note Guarantee, as the case may be, prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien.

### *Limitation on Merger, Consolidation and Sale of Assets*

The Issuer will not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Issuer is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Issuer's properties and assets (determined on a consolidated basis for the Issuer and its Restricted Subsidiaries), to any Person unless:

(a)    either:

(1)    the Issuer (in the case of a consolidation or merger with or into any Person) shall be the surviving or continuing corporation; or

(2)    the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Issuer and of the Issuer's Restricted Subsidiaries substantially as an entirety (the "*Surviving Entity*"):

    (A)    shall be a corporation organized and validly existing under the laws of Mexico or the United States of America, any State thereof or the District of Columbia or any member state of the European Union, and

    (B)    shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the notes and the performance and observance of every covenant of the notes and the Indenture on the part of the Issuer to be performed or observed;

(b)    immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred in connection with or in respect of such transaction), the Issuer or such Surviving Entity, as the case may be, will be able to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (1) of "—*Limitation on Incurrence of Additional Indebtedness*";

(c)    immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including, without limitation, giving effect on a pro forma basis to any Indebtedness, including any Acquired Indebtedness, Incurred or anticipated to be Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(d)    each Subsidiary Guarantor (including Persons that become Subsidiary Guarantors as a result of the transaction) has confirmed by supplemental indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of the Indenture and the notes;

(e)    if the Issuer is organized under Mexican law and merges with a corporation, or the Surviving Entity is, organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union or the Issuer is organized under the laws of the United States, any State thereof or the District of Columbia or any member state of the European Union and merges with a corporation, or the Surviving Entity is, organized under the laws of Mexico, the Issuer or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of (x) Mexico and (y) the United States or the applicable European Union member state, to the effect that, as applicable:

    (i)    the holders of the notes will not recognize income, gain or loss for United States or European Union, as applicable, or Mexican income tax purposes as a result of the transaction and will be taxed in the holder's home jurisdiction in the same manner and on the same amounts (assuming solely for this purpose that no Additional Amounts are required to be paid on the notes) and at the same time as would have been the case if the transaction had not occurred;

    (ii)    no other taxes on income, including capital gains, will be payable by holders of the notes under the laws of the United States or the European Union, as applicable, or Mexico relating to the acquisition, ownership or disposition of the notes, including the receipt of interest or principal thereon; *provided* that the holder does not use or hold, and is not deemed to use or hold the notes in carrying on a business in the United States or the European Union, as applicable, or Mexico; and

(f)    the Issuer or the Surviving Entity has delivered to the Trustee an Officers' Certificate and Opinions of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of the Indenture and that all conditions precedent in the Indenture relating to the transaction have been satisfied.

For purposes of this covenant, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or

more Restricted Subsidiaries of the Issuer, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Issuer (determined on a consolidated basis for the Issuer and its Restricted Subsidiaries), will be deemed to be the transfer of all or substantially all of the properties and assets of the Issuer.

Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Issuer and its Restricted Subsidiaries in accordance with this covenant, in which the Issuer is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Issuer is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Issuer under the Indenture and the notes with the same effect as if such Surviving Entity had been named as such and the Issuer shall be released from its obligations under the notes and the Indenture. For the avoidance of doubt, compliance with this covenant will not affect the obligations of the Issuer (including a Surviving Entity, if applicable) under "—*Repurchase Upon a Change of Control*," if applicable.

Each Subsidiary Guarantor will not, and the Issuer will not cause or permit any Subsidiary Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Issuer) that is not a Subsidiary Guarantor unless such transaction is otherwise in compliance with the Indenture and:

(1)     such Person (if such Person is the surviving entity) assumes all of the obligations of such Subsidiary Guarantor in respect of its Note Guarantee by executing a supplemental indenture and providing the Trustee with an Officers' Certificate and Opinions of Counsel from the relevant jurisdictions, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and the supplemental indenture comply with the applicable provisions of the Indenture and all conditions precedent in the Indenture relating to the transaction have been satisfied;

(2)     such Note Guarantee is to be released as provided under "—*Note Guarantees*"; or

(3)     such sale or other disposition of substantially all of such Subsidiary Guarantor's assets is made in accordance with "—*Limitation on Asset Sales and Sales of Subsidiary Stock*."

The provisions of this covenant will not apply to:

(1)     any transfer of the properties or assets of a Restricted Subsidiary to the Issuer, a Subsidiary Guarantor or another Restricted Subsidiary;

(2)     any merger of a Restricted Subsidiary into the Issuer, a Subsidiary Guarantor or another Restricted Subsidiary; or

(3)     any merger of the Issuer into a Wholly Owned Subsidiary of the Issuer;

so long as, in each case the Indebtedness of the Issuer and its Restricted Subsidiaries taken as a whole is not increased thereby.

***Limitation on Transactions with Affiliates***

(1)     The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "*Affiliate Transaction*"), unless:

(a)     the terms of such Affiliate Transaction are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Issuer;

(b)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of $7.5 million, the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Issuer (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with the preceding provisions; and

(c)     in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with Fair Market Value in excess of $15.0 million, the Issuer will, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such Affiliate Transaction to the Issuer and the relevant Restricted Subsidiary (if any) from a financial point of view from an

Independent Financial Advisor and deliver the same to the Trustee, upon which the Trustee shall be entitled to rely without liability to any Person.

(2)    Paragraph (1) above will not apply to:

(a)    Affiliate Transactions with or among the Issuer and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(b)    reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Issuer or any Restricted Subsidiary as determined in good faith by the Issuer's Board of Directors;

(c)    Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment, modification, extension or replacement of such agreement (so long as such amendment, modification, extension or replacement is not materially more disadvantageous to the holders of notes, taken as a whole, than the original agreement as in effect on the Issue Date);

(d)    any Restricted Payments made in compliance with "—*Limitation on Restricted Payments*" or any Permitted Investments;

(e)    loans and advances to officers, directors and employees of the Issuer or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding $3.0 million outstanding at any one time;

(f)    any issuance of Capital Stock (other than Disqualified Capital Stock) of the Issuer to Affiliates of the Issuer or to any director, officer, employee or consultant of the Issuer or any Restricted Subsidiary, and the granting and performance of registration rights;

(g)    the sale of advertising by the Issuer or any Restricted Subsidiary on terms that are no less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Issuer; and

(h)    any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar agreement entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto.

### Conduct of Business

The Issuer and its Restricted Subsidiaries will not engage in any business other than a Permitted Business.

### Reports to Holders

So long as any notes are outstanding, the Issuer will furnish to the Trustee:

(a)    within 120 days following the end of each of the Issuer's fiscal years, an annual report containing an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of this Offering Circular (after taking into consideration any changes to the business and operations of the Issuer after the Issue Date) for the periods covered by the financial information to be delivered pursuant to this clause (a), consolidated audited income statements, statements of shareholders equity, balance sheets and cash flow statements and the related notes thereto for the Issuer for the two most recent fiscal years in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission, together with an audit report on such financial statements by the Issuer's independent auditors (in each case, presented in the English language);

(b)    within 60 days following the end of the first three fiscal quarters in each of the Issuer's fiscal years, quarterly reports containing unaudited consolidated balance sheets, statements of income, statements of shareholders equity and statements of cash flows and the related notes thereto for the Issuer and the Subsidiaries on a consolidated basis, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission, together with an "Operating and Financial Review" section with scope and content substantially similar to the corresponding section of this Offering Circular (after taking into consideration any changes to the business and operations of the Issuer after the Issue Date) for the periods covered by the financial

information to be delivered pursuant to this clause (b), (in each case, presented in the English language); and

(c)  within 20 days following such filing, copies (including English translations thereof), if applicable, of public filings which reasonably would be material to the holders of notes made with any securities exchange or securities regulatory agency or authority, *provided*, that the Issuer will not be required to so provide copies or English translations of (a) public filings which may be obtained from the U.S. Securities and Exchange Commission (the "SEC") via the EDGAR system or its success or (b) except to the extent required by paragraphs (a) and (b), annual or quarterly and other reports or other documents filed (in Spanish) with the CNBV and the Mexican Stock Exchange (*Bolsa Mexicana de Valores*).

In addition, each of the reports provided pursuant to the prior sentence shall include the Consolidated Leverage Ratio for such period, together with an appropriate footnote or other disclosure providing in reasonable detail the calculation of such ratio.

None of the information provided pursuant to the preceding paragraph shall be required to comply with Regulation S-K as promulgated by the SEC.

Delivery of such reports, information and documents to the Trustee shall be for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of the covenants contained in the Indenture (as to which the Trustee will be entitled to conclusively rely upon an officer's certificate).

*Listing*

Approval-in-principle has been received for the listing and quotation of the notes on the Official List of the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this offering circular. Approval-in-principle from and admission of the notes to the Official List of the SGX-ST and quotation of the notes on the SGX-ST are not to be taken as an indication of the merits of the offering, the Issuer, and its subsidiaries (including the Subsidiary Guarantors), their respective associated companies, their respective joint venture companies or the notes. The notes will be in denominations of $200,000 each or integral multiples of $1,000 in excess thereof. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the notes are listed on the SGX-ST and the rules of the SGX-ST so require. The SGX-ST is not a regulated market for the purposes of Directive 2004/39/EC.

So long as the notes are listed on the SGX-ST and the rules of the SGX-ST so require, we shall appoint and maintain a paying agent in Singapore, where such notes may be presented or surrendered for payment or redemption in the event that the global notes representing such notes are exchanged for certificated notes. In addition, in the event that the global notes are exchanged for certificated notes, an announcement of such exchange will be made by, or on behalf of, the Issuer through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive notes, including details of the paying agent in Singapore.

**Events of Default**

The following are "Events of Default":

(1)  default in the payment when due of the principal of or premium, if any, on any notes, including the failure to make a required payment to purchase notes tendered or to redeem notes pursuant to an optional redemption, Change of Control Offer or an Asset Sale Offer;

(2)  default for 30 consecutive days or more in the payment when due of interest, or Additional Amounts, if any, on any notes;

(3)  the failure to perform or comply with any of the provisions described under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*" for 20 consecutive days or more following written notice of such failure (i) to the Issuer from the Trustee (at the direction of the requisite amount of holders) or (ii) to the Issuer and the Trustee from holders of at least 25.0% in aggregate principal amount of the outstanding notes;

(4)  the failure by the Issuer or any Restricted Subsidiary to comply with any other covenant or agreement contained in the Indenture or in the notes for 45 consecutive days or more after written notice to the Issuer from the Trustee or to the Issuer and the Trustee from holders of at least 25.0% in aggregate principal amount of the outstanding notes;

(5)    default by the Issuer or any Restricted Subsidiary under any Indebtedness which:

    (A)    is caused by a failure to pay principal of or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period and which failure shall not have been cured or waived; or

    (B)    results in the acceleration of such Indebtedness prior to its Stated Maturity;

    and in either case the principal or accreted amount of Indebtedness covered by subclause (A) or (B) at the relevant time, aggregates $25.0 million or more;

(6)    failure by the Issuer or any of its Restricted Subsidiaries to pay one or more final judgments not subject to appeal against any of them, aggregating $25.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more and which are not covered by insurance or bonds;

(7)    the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for any substantial part of its property, or (D) makes a general assignment for the benefit of its creditors, or takes any comparable action under any comparable laws relating to insolvency;

(8)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary in an involuntary case, (B) appoints a Custodian of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary or for any substantial part of its property, or (C) orders the winding up or liquidation of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, or any similar relief is granted under any comparable laws and the order or decree remains unstayed and in effect for 60 consecutive days; or

(9)    except as permitted by the Indenture, any Note Guarantee is held to be unenforceable or invalid in a judicial proceeding or ceases for any reason to be in full force and effect or any Subsidiary Guarantor, or any Person acting on behalf of any Subsidiary Guarantor, denies or disaffirms such Subsidiary Guarantor's obligations under its Note Guarantee.

If an Event of Default (other than an Event of Default specified in clauses (7) or (8) above with respect to the Issuer) shall occur and be continuing, the Trustee or holders of at least 25.0% in principal amount of outstanding notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes to be immediately due and payable by notice in writing to the Issuer and the Trustee specifying the Event of Default and that it is a "notice of acceleration." If an Event of Default specified in clauses (7) or (8) above occurs with respect to the Issuer, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holder of notes.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) an authorized officer of the Trustee with direct responsibility for administration of the Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Issuer or any holder of notes.

At any time after a declaration of acceleration with respect to the notes as described in the preceding paragraph, holders of a majority in principal amount of the outstanding notes may rescind and cancel such declaration and its consequences:

    (1)    if the rescission would not conflict with any judgment or decree;

    (2)    if all existing Events of Default have been cured or waived, except nonpayment of principal, interest or premium that has become due solely because of the acceleration;

    (3)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(4)      if the Issuer has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses, disbursements and advances.

No rescission will affect any subsequent Default or impair any rights relating thereto. Holders of a majority in principal amount of the notes may waive any existing Default or Event of Default under the Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any notes.

The Trustee is under no obligation to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the holders of notes, unless such holders have offered to the Trustee indemnity reasonably satisfactory to it. Subject to all provisions of the Indenture and applicable law, holders of a majority in aggregate principal amount of the then outstanding notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

No holder of any notes will have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless:

(1)      such holder gives to the Trustee written notice of a continuing Event of Default;

(2)      holders of at least 25.0% in principal amount of the then outstanding notes make a written request to pursue the remedy;

(3)      such holders of notes provide to the Trustee satisfactory indemnity;

(4)      the Trustee does not comply within 60 days; and

(5)      during such 60 day period holders of a majority in principal amount of the outstanding notes do not give the Trustee a written direction which is inconsistent with the request;

*provided* that a holder of a note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such note on or after the respective due dates expressed in such note.

The Issuer is required to deliver to the Trustee written notice of any event which would constitute certain Defaults or Events of Default, their status and what action the Issuer is taking or proposes to take in respect thereof. In addition, the Issuer and each Subsidiary Guarantor is required to deliver to the Trustee, within 120 days after the end of each fiscal year of the Issuer, an Officers' Certificate certifying compliance with all of their respective obligations under the Indenture and stating whether or not any Default or Event of Default has occurred during the previous fiscal year.

The Indenture will provide that if a Default or Event of Default occurs, is continuing and is actually known to a responsible officer of the Trustee, the Trustee must give to each holder of notes notice of the Default or Event of Default within 90 days after the Trustee has knowledge thereof. Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any note, the Trustee may withhold notice if and so long as a responsible trust officer in good faith determines that withholding notice is in the interests of the holders of notes.

**Legal Defeasance and Covenant Defeasance**

The Issuer may, at its option and at any time, elect to have its obligations discharged with respect to the outstanding notes and all obligations of the Subsidiary Guarantors under the Note Guarantees discharged ("*Legal Defeasance*"). Such Legal Defeasance means that the Issuer will be deemed to have paid and discharged the entire indebtedness represented by the outstanding notes and Note Guarantees after the deposit specified in clause (1) of the second following paragraph, except for:

(1)          the rights of holders of notes to receive payments, solely from the trust described below, in respect of the principal of, premium, if any, and interest on the notes when such payments are due;

(2)          the Issuer's obligations with respect to the notes concerning issuing temporary notes, registration of notes, mutilated, destroyed, lost or stolen notes and the maintenance of an office or agency for payments;

(3)           the rights, powers, trust, duties and immunities of the Trustee and the Issuer's and the Subsidiary Guarantors' obligations in connection therewith; and

(4)          the Legal Defeasance provisions of the Indenture.

In addition, the Issuer may, at its option and at any time, elect to have its obligations and the obligations of the Subsidiary Guarantors released with respect to most of the covenants (including, without limitation, obligations to make Change of Control Offers, Asset Sale Offers and certain of the obligations described under "—*Certain Covenants*") that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations will not constitute a Default or Event of Default with respect to the notes or the Note Guarantees.  In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, reorganization and insolvency events) described under "—*Events of Default*" will no longer constitute an Event of Default with respect to the notes.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1)      the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the holders of notes cash in U.S.  dollars, certain direct non-callable obligations of, or guaranteed by, the United States, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the notes on the stated date for payment thereof or on the applicable redemption date, as the case may be;

(2)      in the case of Legal Defeasance, the Issuer has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Issuer to the effect that:

(a)      the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling; or

(b)      since the Issue Date, there has been a change in the applicable U.S.  federal income tax law,

and in either case, based thereon, such Opinion of Counsel shall state that, the holders of notes will not recognize income, gain or loss for U.S.  federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S.  federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)      in the case of Covenant Defeasance, the Issuer has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the holders of notes will not recognize income, gain or loss for U.S.  federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S.  federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)      in the case of Legal Defeasance or Covenant Defeasance, the Issuer has delivered to the Trustee:

(a)      an Opinion of Counsel from counsel in Mexico reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Issuer to the effect that, based upon Mexican law then in effect, holders of notes will not recognize income, gain or loss for Mexican tax purposes, including withholding tax except for withholding tax then payable on interest payments due, as a result of Legal Defeasance or Covenant Defeasance, as the case may be, and will be subject to Mexican taxes on the same amounts and in the same manner and at the same time as would have been the case if such Legal Defeasance or Covenant Defeasance, as the case may be, had not occurred, or

(b)      a ruling directed to the Trustee received from the tax authorities of Mexico to the same effect as the Opinion of Counsel described in clause (a) above;

(5)      no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to clause (1) of this paragraph (except any Default or Event of Default resulting from the failure to comply with "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*" as a result of the borrowing of the funds required to effect such deposit);

(6)      the Trustee has received an officer's certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the Indenture or any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound;

(7)         the Issuer has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuer with the intent of preferring holders of notes over any other creditors of the Issuer or any Subsidiary of the Issuer or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Issuer or others;

(8)         the Issuer has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Issuer, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with (subject to customary exceptions and exclusions); and

(9)         the Issuer has delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee and independent of the Issuer to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally (subject to customary exceptions and exclusions).

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the notes, as expressly provided for in the Indenture) as to all outstanding notes when:

(1)    either:

    (a)    all the notes theretofore authenticated and delivered (except lost, stolen or destroyed notes which have been replaced or paid and notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation; or

    (b)    all notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, or will become due and payable within one year, including as a result of a redemption notice given or to be properly given pursuant to the Indenture, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds or certain direct, non-callable obligations of, or guaranteed by, the United States sufficient without reinvestment to pay and discharge the entire Indebtedness on the notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the notes to the date of deposit, together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment;

(2)    the Issuer has paid all other sums payable under the Indenture and the notes by it; and

(3)    the Issuer has delivered to the Trustee an Officers' Certificate and Opinion of Counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

**Modification of the Indenture**

From time to time, the Issuer, the Subsidiary Guarantors (except that no existing Subsidiary Guarantor need agree to an amendment or execute a supplemental indenture to add Subsidiary Guarantors with respect to the notes) and the Trustee, without the consent of the holders, may amend or supplement the Indenture, the notes or the Note Guarantees for certain specified purposes, including:

(1) to cure any ambiguities, defects or inconsistencies in the Indenture or the notes;

(2) to provide for uncertificated notes in addition to or in place of certificated notes;

(3) to provide for the assumption of the Issuer's or a Subsidiary Guarantor's obligations in the case of a merger or consolidation or sale of all or substantially all of the Issuer's or such Subsidiary Guarantor's assets, as applicable, to the extent permitted under the Indenture;

(4) to make any change that would provide any additional rights or benefits to the holders of the notes or that does not adversely affect the legal rights under the Indenture of any such holder;

(5) to conform the text of the Indenture, the Note Guarantees or the notes to any provision of this "Description of Notes" to the extent that such provision in this "Description of Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Note Guarantees or the notes;

(6) to allow any Subsidiary Guarantor to execute a supplemental indenture and/or a Note Guarantee with respect to the notes and to release Subsidiary Guarantors from the Note Guarantee in accordance with the terms of the Indenture;

(7) to comply with the requirements of any applicable securities depositary;

(8) to provide for a successor Trustee in accordance with the terms of the Indenture;

(9) to otherwise comply with any requirement of the Indenture;

(10) to issue additional notes; and

(11) to make any other changes which do not adversely affect the rights of any of the holders of the notes in any material respect.

The Trustee will be entitled to rely on such evidence as it deems appropriate, including on an Opinion of Counsel and Officers' Certificate, and shall have no liability whatsoever in reliance upon the foregoing.

Other modifications and amendments of the Indenture or the notes may be made with the consent of the holders of a majority in principal amount of the then outstanding notes issued under the Indenture, except that, without the consent of each holder affected thereby, no amendment may (with respect to any notes held by a non-consenting holder):

(1)     reduce the principal amount of notes whose holders must consent to an amendment, supplement or waiver;

(2)     reduce the rate of, or change or have the effect of changing the time for payment of, interest, including defaulted interest, on any notes;

(3)     reduce the principal of, or change or have the effect of changing the fixed maturity of, any notes, or change the date on which any notes may be subject to redemption, or reduce the redemption price therefor;

(4)     make any notes payable in money other than that stated in the notes;

(5)     make any change in provisions of the Indenture entitling each holder of notes to receive payment of principal of, premium, if any, and interest on such note on or after the due date thereof or to bring suit to enforce such payment, or permitting holders of a majority in principal amount of notes to waive Defaults or Events of Default;

(6)     amend, change or modify in any material respect the obligation of the Issuer to make and consummate a Change of Control Offer in respect of a Change of Control that has occurred or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7)     eliminate or modify in any manner a Subsidiary Guarantor's obligations with respect to its Note Guarantee which adversely affects holders of notes in any material respect, except as contemplated in the Indenture or Note Guarantee;

(8)     make any change in the provisions of the Indenture described under "—*Additional Amounts*" that adversely affects the rights of any holder or amends the terms of the notes in a way that would result in a loss of exemption from taxes; and

(9)     make any change to the provisions of the Indenture or the notes that adversely affect the ranking of the notes.

**Governing Law; Jurisdiction; Waiver of Stay, Extension and Usury Laws**

The Indenture and the notes will be governed by and construed in accordance with the law of the State of New York. Each of the parties to the Indenture consents to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof. Each of the parties to the Indenture agrees that final judgment in any suit, action or proceeding brought in such courts shall be conclusive and binding upon such party and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment.

Each of the parties to the Indenture waives, to the fullest extent permitted by law, any objection to any suit, action or proceeding that may be brought in connection with the Indenture, the notes or any Note Guarantee in such courts on the grounds of venue, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason and any right to which it may be entitled on account of place of residence or domicile, and further waives and agrees not to plead or claim in any such court that such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Each of the Issuer and the Subsidiary Guarantors have appointed an agent for service in The City of New York of all writs, process and summonses in any suit, action or proceeding brought in connection with the Indenture, the notes or any Note Guarantee in such courts. Each of the Issuer and the Subsidiary Guarantors agrees that such appointment shall be irrevocable so long as any of the notes remain outstanding or until the irrevocable appointment by each of the Issuer and the Subsidiary Guarantors of a successor in The City of New York as its authorized agent for such purpose and the acceptance of such appointment by such successor. Each of the Issuer and the Subsidiary Guarantors further agrees to take any and all action, including the filing of any and all documents and instruments that may be necessary to continue such appointment in full force and effect as aforesaid.

The Issuer and each Subsidiary Guarantor covenants (to the fullest extent permitted by applicable law) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or such Subsidiary Guarantor from paying  all  or any portion  of the principal of or interest  on the notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of the notes. The Issuer and each Subsidiary Guarantor hereby expressly waives (to the fullest extent permitted by applicable law) all benefit or advantage of any such law, and covenants that it will suffer and permit the execution of every such power as though no such law had been enacted.

**The Trustee**

Except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it by the Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.  The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuer, to obtain payments of claims in certain cases or to realize on certain property received in respect of any such claim as security or otherwise.

**No Personal Liability**

An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Issuer or any Subsidiary Guarantor shall not have any liability for any obligations of the Issuer or such Subsidiary Guarantor under the notes (including the Note Guarantees) or the Indenture or for any claims based on, in respect of or by reason of such obligations or their creation.  By accepting a note, each holder waives and releases all such parties from such liability.

**Currency Indemnity**

The Issuer and each Subsidiary Guarantor will pay all sums payable under the Indenture or the notes solely in U.S. dollars. Any amount that you receive or recover in a currency other than U.S. dollars in respect of any sum expressed to be due to you from the Issuer or any Subsidiary Guarantor will only constitute a discharge to us to the extent of the U.S. dollar amount which you are able to purchase with the amount received or recovered in that other currency on the date of the receipt or recovery or, if it is not practicable to make the purchase on that date, on the first date on which you are able to do so. If the U.S. dollar amount is less than the U.S. dollar amount expressed to be due to you under any note, to the extent permissible under applicable law, the Issuer and the Subsidiary Guarantors will jointly and severally indemnify you against any loss you sustain as a result. In any event, the Issuer

and the Subsidiary Guarantors will jointly and severally indemnify you against the cost of making any purchase of U.S. dollars.  For the purposes of this paragraph, it will be sufficient for you to certify in a satisfactory manner that you would have suffered a loss had an actual purchase of U.S. dollars been made with the amount received in that other currency on the date of receipt or recovery or, if it was not practicable to make the purchase on that date, on the first date on which you were able to do so.  In addition, you will also be required to certify in a satisfactory manner the need for a change of the purchase date.

The indemnities described above:

- constitute a separate and independent obligation from the other obligations of the Issuer and the Subsidiary Guarantors;

- will give rise to a separate and independent cause of action;

- will apply irrespective of any indulgence granted by any holder of notes; and

- will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any note.

## The Global Notes and the Clearing Systems

Except as set forth below, the notes will be issued in registered, global form without interest coupons (the "global notes") in denominations of $200,000 or integral multiples of $1,000 in excess thereof. The global notes will be deposited with, or on behalf of, a common depositary for Euroclear and Clearstream and registered in the name of the common depositary or its nominee.  See "*Book-Entry; Delivery and Form*."

## Certain Definitions

Set forth below is a summary of certain of the defined terms used in the Indenture.  Reference is made to the Indenture for a full definition of all such terms, as well as any other terms used herein for which no definition is provided.

"*Acquired Indebtedness*" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Issuer or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person.  Such Indebtedness will be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges or consolidates with the Issuer or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

"*Additional Amounts*" has the meaning set forth under "—*Additional Amounts*" above.

"*additional notes*" has the meaning set forth under "—*Additional Notes*" above.

"*Affiliate*" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"*Asset Sale*" means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer, including a Sale and Leaseback Transaction (each, a "*disposition*") by the Issuer or any Restricted Subsidiary of:

(a)     any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Issuer); or

(b)     any property or assets (other than cash, Cash Equivalents or Capital Stock of the Issuer) of the Issuer or any Restricted Subsidiary.

Notwithstanding the preceding, the following items will not be deemed to be Asset Sales:

(1)     the disposition of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries as permitted under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*";

(2)     sales, leases, conveyances or other dispositions of real or personal property, including, without limitation, exchanges or swaps of real estate, for the development of the Issuer's or any of its Restricted Subsidiaries' projects in the ordinary course of business;

(3)     for purposes of "*—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*" only, the making of Restricted Payments permitted under "*—Certain Covenants—Limitation on Restricted Payments*" or any Permitted Investment;

(4)     a disposition to the Issuer or a Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

(5)     any single transaction or series of related transactions that involves assets or Capital Stock of the Issuer or a Restricted Subsidiary having a Fair Market Value of less than $10.0 million;

(6)     a transfer of assets between or among the Issuer and any of its Restricted Subsidiaries;

(7)     an issuance or sale of Capital Stock by a Restricted Subsidiary of the Issuer to the Issuer or any of its Restricted Subsidiaries;

(8)     any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(9)     any sale of assets received by the Issuer or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(10)    the good faith surrender or waiver of contract rights, tort claims or statutory rights in connection with a settlement; and

(11)    sales or other dispositions of inventory, advertising time (including barter transactions), receivables and current assets in the ordinary course of business.

"*Asset Sale Offer*" has the meaning set forth under "*—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*."

"*Average Quarterly Balance*" means, with respect to any Indebtedness incurred by the Issuer or its Restricted Subsidiaries under a revolving facility or line of credit, the quotient of (x) the sum of each Individual Quarterly Balance for each fiscal quarter ended on or prior to such date of determination and included in the Reference Period divided by (y) 4.

"*Bankruptcy Law*" means any bankruptcy, *concurso mercantil*, insolvency or other similar laws now or hereafter in effect.

"*Board of Directors*" means, as to any Person, the board of directors, management committee, sole administrator or similar governing body of such Person or any duly authorized committee thereof.

"*Board Resolution*" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City, Mexico or London.

"*Capitalized Lease Obligations*" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP. For purposes of this definition, the amount of such obligations at any date will be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"*Capital Stock*" means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2)     with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"*CASA*" means Comunicaciones Avanzadas, S.A. de C.V.

"*Cash Equivalents*" means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)     *Certificados de la Tesoreria de la Federacion (Cetes) or Bonos de Desarrollo del Gobierno Federal (Bondes)*, in each case, issued by the government of Mexico and maturing not later than one year after the acquisition thereof;

(3)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Moody's, S&P or Fitch or any successor thereto;

(4)     commercial paper maturing no more than one year from the date of creation thereof and at the time of acquisition, having a rating of at least F-1 from Fitch, at least P-1 from Moody's, or at least A-1 from S&P;

(5)     demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than $500 million, (c) Nacional Financiera S.N.C., Banco Nacional de Comercio Exterior, S.N.C., Banco Nacional de Obras y Servicios Públicos, S.N.C. or Banco Azteca, S.A., Institución de Banca Múltiple or (d) in the case of Mexican peso deposits, Banco Azteca, S.A., Institución de Banca Múltiple or any of the five top-rated banks (as evaluated by any Rating Agency) organized under the laws of Mexico;

(6)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above; and

(7)     investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (6) above.

"*Change of Control*" means the occurrence of one or more of the following events:

(1)     any Person or Group other than the Permitted Holders is or becomes the beneficial owner (as defined below), directly or indirectly, in the aggregate of more than 50% of the total voting power of the Voting Stock of the Issuer (including a Surviving Entity, if applicable);

(2)     during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Issuer, together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Issuer was approved by a vote of a majority of the directors of the Issuer then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors of the Issuer then in office;

(2)     the Issuer consolidates with, or merges with or into, another Person, or the Issuer sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Issuer, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Issuer are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect Wholly Owned Subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with the Indenture; or

(3)     the approval by the holders of Capital Stock of the Issuer of any plan or proposal for the liquidation or dissolution of the Issuer, whether or not otherwise in compliance with the provisions of the Indenture.

For purposes of this definition:

(a)   "beneficial owner" will have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group will be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition;

(b)   "Person" and "Group" will have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the U.S. Securities Exchange Act of 1934, as amended; and

(c)   the Permitted Holders or any other Person or Group will be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "*parent entity*") so long as the Permitted Holders or such other Person or Group, as the case may be, beneficially own, directly or indirectly, in the aggregate at least 50% of the voting power of the Voting Stock of the parent entity and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent entity.

"*Change of Control Payment*" has the meaning set forth under "—*Repurchase Upon a Change of Control*."

"*Change of Control Payment Date*" has the meaning set forth under "—*Repurchase Upon a Change of Control*."

"*CNBV*" means the *Comision Nacional Bancaria y de Valores*, the Mexican National Banking and Securities Commission.

"*Commodity Agreement*" means any commodity or raw material futures contract, commodity or raw materials option, or any other agreement designed to protect against or manage exposure to fluctuations in commodity or raw material prices.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"*Consolidated EBITDA*" means, for any Person for any period, Consolidated Net Income for such Person for such period, plus the following, without duplication, to the extent deducted or added in calculating such Consolidated Net Income:

(1)   Consolidated Income Tax Expense for such Person for such period;

(2)   Consolidated Interest Expense for such Person for such period;

(3)   Consolidated Non-cash Charges for such Person for such period; and

(4)   any income or loss from discontinued operations,

in each case as shown on such Person as set forth in the most recent financial statements of such Person, prepared in accordance with GAAP.

"*Consolidated Income Tax Expense*" means, with respect to any Person for any period, the provision for federal, state, local and non-U.S. income taxes, and any applicable statutorily mandated employee profit sharing tax or similar payments, payable by such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period as determined on a consolidated basis in accordance with GAAP.

"*Consolidated Interest Expense*" means, for any Person for any period, the sum of, without duplication determined on a consolidated basis in accordance with GAAP:

(1)   the aggregate of cash and non-cash interest expense of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period determined on a consolidated basis in accordance with GAAP; and

(2)   the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person or its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) during such period.

"*Consolidated Leverage Ratio*" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness at the time of determination to (2) the Issuer's and the Restricted Subsidiaries' Consolidated EBITDA for the most recently ended four full fiscal quarters for which financial statements are

available immediately preceding the date on which such event for which such calculation is being made shall occur; *provided* that:

(1)     if the Issuer or any Restricted Subsidiary has Incurred, repaid, repurchased, redeemed, retired, defeased or otherwise discharged any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio involves an Incurrence, repayment, repurchase, redemption, retirement, defeasement or other discharge of Indebtedness, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving effect on a pro forma basis to such Incurrence, repayment, repurchase, redemption, retirement, defeasement or other discharge of Indebtedness as if such Indebtedness had been Incurred or repaid, repurchased, redeemed, retired, defeased or otherwise discharged on the first day of such period:

(2)     if since the beginning of such period the Issuer or any Restricted Subsidiary will have made any Asset Sale or disposed of or discontinued any company, division, operating unit, segment, business, group of related assets or line of business or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio includes an Asset Sale, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Asset Sale, disposition or discontinuation occurred on the first day of such period.

(3)     if since the beginning of such period the Issuer or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary or is merged with or into the Issuer or a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of a company, division, operating unit, segment, business or group of related assets or line of business, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

(4)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) will have Incurred any Indebtedness or discharged any Indebtedness or made any disposition or any Investment or acquisition of assets that would have required an adjustment

        pursuant to clause (1), (2) or (3) above if made by the Issuer or a Restricted Subsidiary during such period, Consolidated EBITDA, Consolidated Interest Expense and Indebtedness for such period will be calculated after giving pro forma effect thereto as if such transaction occurred on the first day of such period.

The pro forma calculations will be determined in good faith by a responsible financial or accounting Officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person (Restricted Subsidiaries in the case of the Issuer)) for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)     net after-tax items classified as extraordinary gains or losses;

(2)     the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Issuer) to the extent that (and only so long as) a corresponding amount could not be distributed or otherwise transferred to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted

Subsidiary in the case of the Issuer) or any law, regulation, agreement or judgment applicable to any such distribution;

(3)    any gain (or loss) from foreign exchange translation or change in net monetary position;

(4)    any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(5)    the cumulative effect of changes in accounting principles.

"*Consolidated Non-cash Charges*" means, for any Person for any period the aggregate depreciation, amortization and other non-cash expenses or losses, of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charge which constitutes an accrual of or a reserve for cash charges for any future period or the amortization of a prepaid cash expense paid in a prior period after the Issue Date).

"*Consolidated Tangible Assets*" means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Issuer) as set forth on the balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with GAAP, less (i) Intangible Assets and (ii) any assets securing Non-Recourse Indebtedness.

"*Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to the sum of the aggregate amount of all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments; *provided* that Indebtedness of the Issuer and its Restricted Subsidiaries under any revolving credit facility or line of credit as at any date of determination shall be determined using the Average Quarterly Balance of such Indebtedness for the applicable Reference Period.

"*Covenant Defeasance*" has the meaning set forth under "—*Legal Defeasance and Covenant Defeasance*."

"*Covenant Suspension Event*" has the meaning set forth under "—*Certain Covenants—Suspension of Covenants*."

"*Credit Facilities*" means one or more debt facilities, commercial paper facilities, structured notes, certificates or other similar instruments (including any Cebures), in each case with banks, investment banks, *sociedades financieras de objeto múltiple*, *sociedades financieras de objeto limitado*, insurance companies, mutual funds and/or other institutional lenders or institutional investors, in each case providing for revolving credit or term loans or letters of credit, and in each case, as amended, extended, renewed, restated, Refinanced, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time.

"*Currency Agreement*" means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

"*Custodian*" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"*Default*" means any condition, event or act, which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or request and/or the taking of any similar action and/or fulfillment of any similar condition would constitute, an Event of Default.

"*Designation*" and "*Designation Amount*" have the meanings set forth under "—*Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries*" above.

"*Disqualified Capital Stock*" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the notes; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the notes shall not constitute Disqualified Capital Stock if:

(1)    the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the notes and described under "—*Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock*" and "—*Repurchase Upon a Change of Control*"; and

(2)    any such requirement only becomes operative after compliance with such terms applicable to the notes, including the purchase of any notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.  The amount of any Disqualified Capital Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Capital Stock is to be determined pursuant to the Indenture; *provided*, *however*, that if such Disqualified Capital Stock could not be required to be redeemed, repaid or  repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Capital Stock as reflected in the most recent financial statements of such Person.

"*Equity Offering*" has the meaning set forth under "—*Optional Redemption*."

"*Event of Default*" has the meaning set forth under "—*Events of Default*."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"*Fair Market Value*" means, with respect to any asset, the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset or assets will be determined conclusively by the Board of Directors of the Issuer acting in good faith and will be evidenced by a Board Resolution.

"*Fitch*" means Fitch Ratings, Inc., and any successor to its rating agency business.

"*GAAP*" means IFRS, as in effect on the Issue Date.

"*Guarantee*" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)    to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

(2)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business. "Guarantee" used as a verb has a corresponding meaning.

"*Hedging Obligations*" means the obligations of any Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"*IFRS*" means International Financial Reporting Standards, as issued by the International Accounting Standards Board.

"*Incur*" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

"*Indebtedness*" means with respect to any Person, without duplication:

(1)    the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(2)    the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all Capitalized Lease Obligations of such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(5)     all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(6)     Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) and (9) below;

(7)     all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8)     all net payment obligations under Hedging Obligations of such Person; and

(9)     all Disqualified Capital Stock issued by such Person.

"*Independent Financial Advisor*" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in judgment of the Issuer's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction appointed by the Issuer at its own expense.

"*Individual Quarterly Balance*" means, with respect to any Indebtedness incurred by the Issuer or its Restricted Subsidiaries under a revolving credit facility or line of credit during any fiscal quarter of the Issuer, the quotient of (x) the sum of the aggregate outstanding principal amount of all such Indebtedness at the end of each day of such quarter divided by (y) the number of days in such fiscal quarter.

"*Intangible Assets*" means with respect to any Person all unamortized debt discount and expense, unamortized deferred charges, restricted cash, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with GAAP.

"*Interest Rate Agreement*" of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

"*Investment*" means, with respect to any Person, any:

(1)     direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

(2)     capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3)     any purchase or acquisition by such Person of any Capital Stock (but not including interests in bonds, notes, debentures or other securities or evidences of Indebtedness) issued by, any other Person.

"Investment" will exclude purchases and acquisitions of inventory, supplies, materials or equipment, accounts receivable or deposits, in each case arising in the ordinary course of business. "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of "—*Certain Covenants—Limitation on Restricted Payments*," the Issuer will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at the Fair Market Value of the sum of the Relevant Proportion of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary Guaranteed by the Issuer or any Restricted Subsidiary or owed to the Issuer or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of the transfer. If the Issuer or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the

Issuer, the Issuer will be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Issuer or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Issuer or any Restricted Subsidiary or owed to the Issuer or any other Restricted Subsidiary immediately following such sale or other disposition.

"*Investment Grade Rating*" means a rating equal to or higher than (i) Baa3 (or the equivalent) by Moody's, (ii) BBB- (or the equivalent) by Fitch, (iii) or BBB- (or the equivalent) by S&P, or (iv) if any of the foregoing entities cease to rate the notes for reasons outside of the control of the Issuer, the equivalent investment grade credit rating from any other Rating Agency.

"*Investment Return*" means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Issuer or any Restricted Subsidiary:

(1)    (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Issuer or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Issuer and its Restricted Subsidiaries in full, less any payments previously made by the Issuer or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distribution received by the Issuer or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

(2)    in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the least of:

(a)    the Issuer's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b)    that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Issuer's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c)    the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3)    in the event the Issuer or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Issuer and its Restricted Subsidiaries in such Person,

in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under "—*Certain Covenants—Limitation on Restricted Payments*" less the amount of any previous Investment Return in respect of such Investment.

"*Issue Date*" means the first date of issuance of notes under the Indenture.

"*Legal Defeasance*" has the meaning set forth under "—*Legal Defeasance and Covenant Defeasance.*"

"*Lien*" means any lien, mortgage, deed of trust, pledge, security trust (*Fidecomiso de Garantías*), security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder.

"*Mexican Restructuring*" means any case or other proceeding against the Issuer or any Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, *quiebra*, insolvency or other similar law now or hereinafter in effect or seeking the appointment of a trustee, receiver, conciliador, liquidator, custodian or other similar official of it or any substantial part of its property.

"*Moody's*" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"*Net Cash Proceeds*" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Issuer or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1)    reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)     taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)     repayment of Indebtedness secured by a Lien permitted under the Indenture that is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Issuer or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Issuer or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

"*Non-Recourse Indebtedness*" with respect to any Person means Indebtedness of such Person for which

(1)     the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 365 days after the acquisition or construction of such property and

(2)     no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"*Note Guarantee*" means any guarantee of the Issuer's Obligations under the notes and the Indenture provided by a Restricted Subsidiary pursuant to the Indenture.

"*Obligations*" means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including, in the case of the notes and the Note Guarantees, the Indenture.

"*Officer*" means, when used in connection with any action to be taken by the Issuer or a Subsidiary Guarantor, as the case may be, the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, the Controller, the Secretary or sole administrator of the Issuer or such Subsidiary Guarantor, as the case may be.

"*Officers' Certificate*" means, when used in connection with any action to be taken by the Issuer or a Subsidiary Guarantor, as the case may be, a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Issuer or a Subsidiary Guarantor, as the case may be, and delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion of counsel, who may be an employee of or counsel for the Issuer (except as otherwise provided in the Indenture) and which opinion shall be acceptable to the Trustee.

"*Permitted Acquisition Indebtedness*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries to the extent such Indebtedness was Indebtedness of (i) a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary or (ii) a Person that was merged or amalgamated into the Issuer or a Restricted Subsidiary, *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged or amalgamated into the Issuer or a Restricted Subsidiary, as applicable, after giving pro forma effect thereto, (a) the Issuer would be permitted to Incur at least \$1.00 of additional Indebtedness pursuant to paragraph (1) under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*," or (b) the Consolidated Leverage Ratio of the Issuer and the Restricted Subsidiaries would be less than the Consolidated Leverage Ratio immediately prior to such transaction.

"*Permitted Business*" means the business or businesses conducted by the Issuer and its Restricted Subsidiaries as of the Issue Date and any business ancillary or complementary thereto.

"*Permitted Holders*" means (i) RBSP, (ii) any trust for the benefit of RBSP, his spouse, issue or immediate family, (iii) CASA or (iv) any Person directly or indirectly controlled by RBSP.

"*Permitted Indebtedness*" has the meaning set forth under clause (2) of "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*."

"*Permitted Investments*" means:

(1)     Investments by the Issuer or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Issuer or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor;

(2)     Investments by any Restricted Subsidiary in the Issuer;

(3)     Investments in cash and Cash Equivalents;

(4)     any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(5)     Investments permitted pursuant to clause (2)(b) or (e) of "—*Certain Covenants—Limitation on Transactions with Affiliates*";

(6)     Investments received as a result of the bankruptcy or reorganization of any Person or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(7)     Investments made by the Issuer or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with the covenant described under "—*Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock*";

(8)     Investments in the form of Hedging Obligations permitted under clause (2)(e) of "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*;"

(9)     Investments in a Persons engaged in a Permitted Business (or a Person intending to engage in a Permitted Business immediately following such Investment) not to exceed the greater of (x) $100.0 million or (y) 10.0% of Consolidated Tangible Assets of the Issuer and its Restricted Subsidiaries at any one time outstanding;

(10)    receivables owing to the Issuer or any Restricted Subsidiary (including advances from advertisers) if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(11)    payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12)    loans or advances to employees made in the ordinary course of business consistent with past practices of the Issuer or such Restricted Subsidiary, not to exceed $5.0 million at any one time outstanding;

(13)    cash deposits with banks made in the ordinary course of business of the Issuer and its Restricted Subsidiaries, consistent with past practice, to secure payment of trade payables;

(14)    Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Issuer or any Restricted Subsidiary;

(15)    any Investment, to the extent the consideration therefor consists entirely of Qualified Capital Stock; and

(16)    Guarantees by the Issuer or any Restricted Subsidiary of any Obligations of CASA made in connection with the purchase of property or other assets to be used in a Permitted Business (so long as, if CASA completes such purchase of property or other assets, then (x) each of the Issuer and CASA exercises commercially reasonable efforts to transfer such property or other assets to the Issuer or a Restricted Subsidiary and (y) such transfer is completed within one year of the Incurrence of such Indebtedness), not to exceed an aggregate of $50.0 million at any one time outstanding,

*provided, however*, that with respect to any Investment, the Issuer may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (16) so that the entire Investment would be a Permitted Investment.

"*Permitted Liens*" means any of the following:

(1)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2)    Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, contracts, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3)    Liens upon specific items of inventory or other goods of any Person and any proceeds thereof securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(5)    Liens encumbering deposits (including in favor of financial institutions or governmental authorities) made to secure obligations arising from statutory, regulatory, contractual, or insurance or warranty requirements of the Issuer or a Restricted Subsidiary, including rights of offset and set-off;

(6)    Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*";

(7)    Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness below which has been secured by a Lien permitted under the covenant described under "—*Certain Covenants—Limitation on Liens*," not incurred pursuant to clause (9) of the definition of "Permitted Liens" and which Indebtedness has been Incurred in accordance with the covenant described under "—*Certain Covenants—Limitation on Incurrence of Additional Indebtedness*"; *provided* that such new Liens:

(a)    are no materially less favorable to the holders of notes and are not materially more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced and

(b)    do not extend to any property or assets (or type of assets or property) other than the property or assets (or type of assets or property) securing the Indebtedness Refinanced by such Refinancing Indebtedness and the proceeds thereof;

(8)    purchase money Liens securing Purchase Money Indebtedness, Non-Recourse Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property and assets of the Issuer or a Restricted Subsidiary used in a Permitted Business, any improvements thereon and the reasonable costs and expenses incurred in connection therewith; *provided* that:

(a)    the related Purchase Money Indebtedness or Non-Recourse Indebtedness does not exceed the cost of such property, assets, and improvements thereon and the reasonable costs and expenses incurred in connection therewith and shall not be secured by any property or assets of the Issuer or any Restricted Subsidiary other than the property and assets so acquired or financed and the proceeds thereof; and

(b)    the Lien securing such Indebtedness will be created within 365 days of such acquisition or financing;

(9)    Liens securing an amount of Indebtedness under Credit Facilities outstanding at any one time not to exceed the greater of (x) $100.0 million or (y) 10.0% of the Consolidated Tangible Assets of the Issuer at such time;

130

(10)     any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(11)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12)     Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligation and forward contracts, options, futures contracts, futures options or similar agreements or arrangement designed to protect the Issuer and its Restricted Subsidiaries from fluctuations in the price of commodities;

(13)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(14)     licenses and sub-licenses of intellectual property in the ordinary course of business;

(15)     easements, rights of way zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Issuer or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Issuer and its Restricted Subsidiaries;

(16)     Liens on Capital Stock of an Unrestricted Subsidiary; and

(17)     Liens in favor of the Issuer or any Subsidiary Guarantor.

"*Person*" means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"*Post-Petition Interest*" means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

"*Preferred Stock*" of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

"*Purchase Money Indebtedness*" means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property or asset; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"*Qualified Capital Stock*" means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock and that are not convertible into or exchangeable into Disqualified Capital Stock.

"*RBSP*" means Mr. Ricardo B. Salinas Pliego.

"*Rating Agencies*" means (i) Fitch, (ii) Moody's, (iii) S&P, and (iv) if any of Fitch, Moody's or S&P shall not make a rating of the notes publicly available for reasons outside the control of the Issuer, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Issuer, which shall be substituted for Fitch, Moody's and/or S&P, as the case may be.

"*Reference Period*" means the most recently ended four fiscal quarters for which  internal financial statements are available as of such date of determination.

"*Refinance*" means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part.  "*Refinanced*" and "*Refinancing*" will have correlative meanings.

"*Refinancing Indebtedness*" means Indebtedness of the Issuer or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Issuer or a Restricted Subsidiary so long as:

(1)    the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Issuer or such Restricted Subsidiary in connection with such Refinancing);

(2)    such new Indebtedness has:

(a)    a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

(b)    a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

(3) if the Indebtedness being Refinanced is:

(a)    Indebtedness of the Issuer, then such Refinancing Indebtedness will be Indebtedness of the Issuer and/or a Subsidiary Guarantor,

(b)    Indebtedness of a Subsidiary Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Issuer and/or such Subsidiary Guarantor, and

(c)    Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinate to the notes or the relevant Note Guarantee, if applicable, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"*Relevant Proportion*" means, with respect to the net assets of any Unrestricted Subsidiary, a percentage equal to the aggregate ownership interest that the Issuer and its Restricted Subsidiaries own, directly or indirectly, in such Unrestricted Subsidiary.

"*Restricted Subsidiary*" means any Subsidiary of the Issuer which at the time of determination is not an Unrestricted Subsidiary.

"*Revocation*" has the meaning set forth under "—*Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries.*"

"*S&P*" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Issuer or a Restricted Subsidiary of any property, whether owned by the Issuer or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced to the Issuer or a Restricted Subsidiary on the security of such property.

"*Securities Act*" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

"*Senior Indebtedness*" means the notes and the note guarantees and any other Indebtedness of the Issuer or any Subsidiary Guarantor that ranks equal in right of payment with the notes or the relevant Note Guarantee, as the case may be.

"*Significant Subsidiary*" means a Subsidiary of the Issuer constituting a "Significant Subsidiary" of the Issuer in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the Issue Date.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"*Subordinated Indebtedness*" means, with respect to the Issuer or any Subsidiary Guarantor, any Indebtedness of the Issuer or such Subsidiary Guarantor, as the case may be which is expressly subordinated in right of payment to the notes or the relevant Note Guarantee, as the case may be.

"*Subsidiary*" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50% of the voting power of the other Person's outstanding Voting Stock.

"*Subsidiary Guarantor*" means any Restricted Subsidiary which provides a Note Guarantee pursuant to the Indenture until such time as its Note Guarantee is released in accordance with the Indenture.

"*Surviving Entity*" has the meaning set forth under "—*Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets*."

"*Unrestricted Subsidiary*" means any Subsidiary of the Issuer designated as such pursuant to "—*Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries*." Any such Designation may be revoked by a Board Resolution of the Issuer, subject to the provisions of such covenant.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such non-U.S. dollar currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable non-U.S. dollar currency as published in The Wall Street Journal in the "Exchange Rates" column under the heading "Currency Trading" (or, if no longer so published, from an appropriate publicly available source of such market data) on the date two Business Days prior to such determination.

"*Voting Stock*" with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1)     the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2)     the sum of the products obtained by multiplying:

(a)     the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b)     the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"*Wholly Owned Subsidiary*" means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Issuer) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person or any other Person that satisfies this definition in respect of such Person.

## BOOK-ENTRY; DELIVERY AND FORM

Notes sold in offshore transactions in reliance on Regulation S will be represented by a permanent global note in fully registered form without interest coupons (the "global note") in denominations of $200,000 or integral multiples of $1,000 in excess thereof, and will be registered in the name of a common depositary (the "Common Depositary") for the accounts of Euroclear and Clearstream and deposited with a Common Depositary. The notes are not issuable in bearer form.

The notes will be subject to certain restrictions on transfer as described in "*Notice to Investors*."

**Global Note**

Upon the issuance of the global note, Euroclear or Clearstream will credit, on its internal system, the respective principal amount of the individual beneficial interests represented by such global notes to the accounts of persons who have accounts with Euroclear or Clearstream ("Clearing System Participants"). Ownership of beneficial interests in the global note will be limited to Clearing System Participants or persons who hold interests through Clearing System Participants. Ownership of beneficial interests in the global note will be shown on, and the transfer of that ownership will be effected only through, records maintained by Euroclear or Clearstream or its nominee (with respect to interests of Clearing System Participants) and the records of Clearing System Participants (with respect to interests of persons other than Clearing System Participants).

So long the notes are held in the form of a global note, the Common Depositary, or its nominee, will be the sole registered owner or holder of a global note, and will be considered the sole owner or holder of the notes represented by such global note for all purposes under the Indenture and the notes. Except in the limited circumstances described below under "—*Individual Definitive Notes*," owners of beneficial interests in a global note will not be entitled to have any portions of such global note registered in their names, will not receive or be entitled to receive physical delivery of notes in individual definitive form and will not be considered the owners or holders of the global note (or any notes represented thereby) under the Indenture or the notes.

In addition, no beneficial owner of an interest in a global note will be able to transfer that interest except in accordance with Euroclear or Clearstream's applicable procedures (in addition to the requirements set forth in the Indenture). The registrar or the Trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of notes. Holders will be required to pay all taxes and fees due on transfer.

Payments of the principal of, premium (if any) on, and interest on the global note will be made to the Common Depositary or its nominee, as the registered owner thereof. None of us, the Trustee, the registrar, any paying agent, any other agent of the Company or the Initial Purchasers will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a global note or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

We anticipate that upon receipt of any payment of principal, premium or interest in respect of a global note, the Common Depositary will promptly credit Clearing System Participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of the global note as shown on its records. We also expect that payments by Clearing System Participants to owners of beneficial interests in the global note held through such Clearing System Participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments will be the responsibility of such Clearing System Participants.

Transfers between Clearing System Participants will be effected in accordance with Euroclear or Clearstream's procedures, and will be settled in same-day funds. The laws of some jurisdictions may require that certain persons take physical delivery of securities in definitive form. Consequently, the ability to transfer beneficial interests in a global note to such persons may be limited. Because Euroclear or Clearstream can only act on behalf of Clearing System Participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person having a beneficial interest in a global note to pledge such interest to persons or entities that do not participate in the Euroclear or Clearstream system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical individual definitive certificate in respect of such interest. Transfers between accountholders in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Euroclear and Clearstream have advised that the Common Depositary will take any action permitted to be taken by a registered holder of notes only at the direction of one or more Clearing System Participants to whose account or accounts with Euroclear or Clearstream interests in a global note are credited and only in respect of such portion of the aggregate principal amount of the notes as to which such Clearing System Participant(s) has or have

given such direction. However, in the limited circumstances described below, Euroclear or Clearstream will exchange the global note for individual definitive notes bearing a restrictive legend, which will be distributed to the Clearing System Participants. Holders of indirect interests in the global notes through Clearing System Participants have no direct rights to enforce such interests while the notes are in global form.

The giving of notices and other communications by Euroclear or Clearstream to Clearing System Participants, by Clearing System Participants to persons who hold accounts with them and by such persons to holders of beneficial interests in a global note will be governed by arrangements between them, subject to any statutory or regulatory requirements as may exist from time to time.

None of us, the Trustee, the registrar, any paying agent, or any other agent of the Company, or the Initial Purchasers will have any responsibility for the performance of Euroclear or Clearstream or their respective participants, the Common Depositary, Clearing System Participants, other indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations.

**Individual Definitive Notes**

If (1) Euroclear or Clearstream, or any successor to Euroclear or Clearstream, notifies us in writing that it is unwilling or unable to continue as a clearing system for a global note, or becomes ineligible to serve as such a clearing system, and a successor clearing system (which could be either Euroclear or Clearstream alone) is not appointed by us within 90 days or (2) the Trustee has instituted or has been directed to institute any judicial proceeding in a court to enforce the rights of the noteholders under the notes and the Trustee has been advised by counsel that in connection with such proceeding it is necessary or appropriate for the Trustee to obtain possession of the notes, we will issue individual definitive notes in registered form in exchange for the global note. Upon receipt of such notice from Euroclear or Clearstream, we will use our reasonable best efforts to make arrangements with Euroclear or Clearstream, as the case may be, for the exchange of interests in the global note for individual definitive notes and cause the requested individual definitive notes to be executed and delivered to the registrar in sufficient quantities and authenticated by the registrar for delivery to holders. Persons exchanging interests in a global note for individual definitive notes will be required to provide the registrar with written instruction and other information required by us and the registrar to complete, execute and deliver such individual definitive notes. Individual definitive notes delivered in exchange for the global note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by Euroclear or Clearstream.

Before any individual definitive note may be transferred to a person who takes delivery in the form of an interest in any global note, the transferor will be required to provide the Trustee with written instrument of transfer as provided in the form attached to the Indenture, duly executed by the individual or his duly authorized attorney in writing.

Individual definitive notes will not be eligible for clearing and settlement through Euroclear or Clearstream.

## PLAN OF DISTRIBUTION

Subject to the terms and conditions set forth in the purchase agreement, among us and BCP Securities, LLC, Jefferies LLC, and Morgan Stanley & Co. International plc, as initial purchasers of the notes, we have agreed to sell to the initial purchasers principal amounts of the notes indicated in the table below opposite their respective names:

| Initial purchasers | Principal Amount |
|---|---|
| BCP Securities, LLC .................................................................................. | $133,333,333.33 |
| Jefferies LLC ............................................................................................. | $133,333,333.33 |
| Morgan Stanley & Co. International plc.................................................... | $133,333,333.34 |
| Total.......................................................................................... | $400,000,000.00 |

Subject to the terms and conditions set forth in the purchase agreement, the initial purchasers have agreed, severally and not jointly, to purchase all of the notes sold under the purchase agreement if any of these notes are purchased. If an initial purchaser defaults, the purchase agreement provides that the purchase commitments of the non-defaulting initial purchasers may be increased or the purchase agreement may be terminated.

The purchase agreement provides that the obligations of the initial purchasers are subject to certain conditions, including the receipt by the initial purchasers of officers' certificates and legal opinions and approval of certain legal matters by their counsel. Under the purchase agreement, we and the Guarantors have agreed, jointly and severally, to indemnify the initial purchasers and their controlling persons against certain liabilities in connection with this offering, and to contribute to payments that the initial purchasers may be required to make in respect of those liabilities.

The notes have not been and will not be registered under the Securities Act or any U.S. state securities laws. The initial purchasers propose to resell the notes outside the United States to non-U.S. persons in reliance on Regulation S ("Regulation S") under the Securities Act. In connection with such sales, the initial purchasers have agreed that they will not offer or sell, any notes within the United States except in accordance with Rule 903 of Regulation S under the Securities Act. Accordingly, neither the initial purchasers nor their affiliates or any persons acting on their behalf have engaged or will engage in any directed selling efforts with respect to the notes.

The notes will initially be offered at the price indicated on the cover page of this Offering Circular. After the initial offering of the notes, the offering price and other selling terms of the notes may be changed at any time without notice.

We have agreed that for a period of 90 days after the date of this Offering Circular, without the prior written consent of the initial purchasers, we will not offer, sell, pledge, contract to sell or otherwise dispose of or transfer any debt securities issued or guaranteed by us or any of our subsidiaries that has a term of more than one year.

Actinver Securities, Inc. acted as a member of the selling group in the distribution of the notes.

### Transfer Restrictions and Liquidity

The notes will be subject to significant restrictions on resale and transfer as described under "*Notice to Investors*."

No market for the notes currently exists. Approval-in-principle has been received to admit the notes for the listing and quotation of the notes on the SGX-ST. The initial purchasers have advised us that, following the completion of this offering, they currently intend to make a market in the notes as permitted by applicable laws and regulations. However, the initial purchasers are not obligated to do so, and the initial purchasers may discontinue any market making activities with respect to the notes at any time in their sole discretion. Accordingly, no assurance can be given that there will be a liquid trading market for the notes, that you will be able to sell any of the notes held by you at a particular time or that the prices that you receive when you sell will be favorable. Each purchaser of the notes, by its purchase of the notes, will be deemed to have made certain acknowledgements, representations, warranties and agreements as set forth under "*Notice to Investors*."

**Stabilization**

The initial purchasers have advised us that certain persons participating in the offering may engage in transactions, including overallotment, stabilizing bids, syndicate covering transactions or the imposition of penalty bids, which may have the effect of stabilizing or maintaining the market price of the notes at a level above that which might otherwise prevail in the open market. Overallotment involves syndicate sales in excess of the offering size, which creates a syndicate short position. A stabilizing bid is a bid for the purchase of notes on behalf of the initial purchasers for the purpose of fixing or maintaining the price of the notes. A syndicate covering transaction is the bid for or the purchase of notes on behalf of the initial purchasers to reduce a short position incurred by the initial purchasers in connection with the offering. A penalty bid is an arrangement permitting the initial purchasers to reclaim the selling concession otherwise accruing to a syndicate member in connection with the offering if the notes originally sold by such syndicate member are purchased in a syndicate covering transaction and therefore have not been effectively placed by such syndicate member. Neither we nor the initial purchasers make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the notes. The initial purchasers are not obligated to engage in these activities and, if commenced, any of the activities may be discontinued at any time.

**Electronic Distribution**

An offering circular in electronic format may be made available by e-mail or through other online services maintained by the initial purchasers or their affiliates. In those cases, prospective investors may view offering terms online and may be allowed to place orders online. The initial purchasers may agree with us to allocate a specific number of notes for sale to online brokerage account holders. Any such allocation for online distributions will be made by the initial purchasers on the same basis as other allocations. Other than the offering circular in electronic format, the information on the initial purchasers' web site and any information contained in any other web site maintained by the initial purchasers is not part of the offering circular, has not been approved and/or endorsed by us or the initial purchasers and should not be relied upon by investors.

**Affiliations**

The initial purchasers and certain of their affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. The initial purchasers and certain of their affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the issuer, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the initial purchasers and certain of their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities and/or instruments of the issuer. The initial purchasers and certain of their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Disclaimers About Jurisdictions**

Neither we nor the initial purchasers are making an offer to sell, or seeking offers to buy, the notes in any jurisdiction where the offer and sale is not permitted. You must comply with all applicable laws and regulations in force in any jurisdiction in which you purchase, offer or sell the notes or possess or distribute this Offering Circular, and you must obtain any consent, approval or permission required for your purchase, offer or sale of the notes under the laws and regulations in force in any jurisdiction to which you are subject or in which you make such purchases, offers or sales. Neither we nor the initial purchasers will have any responsibility therefor.

The notes have not been, and will not be, registered under the Securities Act, and may not be offered or sold in the United States except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. The notes are being offered and sold only in offshore transactions outside the United States in reliance on Regulation S. Accordingly, none of TV Azteca and the initial purchasers has engaged, or will engage, in any directed selling efforts in the United States with respect to the notes. Resales of the notes are restricted as described under "*Notice to Investors*".

**Notice to Prospective Investors in the European Economic Area**

In relation to each member state of the European Economic Area, which has implemented the Prospectus Directive, or "Relevant Member States," with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, or the Relevant Implementation Date, an offer to the public of any notes which are the subject of the offering contemplated by this offering circular may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any notes may be made at any time with effect from and including the Relevant Implementation Date under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;
- to fewer than 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant dealer or dealers nominated by us for any such offer; or
- in any other circumstances falling within Article 3(2) of the Prospectus Directive;

provided that no such offer of notes shall result in a requirement for the publication by us, the initial purchasers or any representative of a prospectus pursuant to Article 3 of the Prospectus Directive.

Any person making or intending to make any offer of notes within the European Economic Area should only do so in circumstances in which no obligation arises for us or the initial purchasers to produce a prospectus for such offer. Neither we nor the initial purchasers have authorized, nor do they authorize, the making of any offer of notes through any financial intermediary, other than offers made by the initial purchasers which constitute the final offering of notes contemplated in this offering circular.

For the purposes of this provision, and your representation below, the expression an "offer to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any notes to be offered so as to enable an investor to decide to purchase any notes, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State. The expression "2010 PD Amending Directive" means Directive 2010/73/EU.

Each person in a Relevant Member State who receives any communication in respect of, or who acquires any notes under, the offer of notes contemplated by this offering circular will be deemed to have represented, warranted and agreed to and with us and the initial purchasers that:

1) it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive; and

2) in the case of any notes acquired by it as a financial intermediary, as that term is used in Article 3(2) of the Prospectus Directive, (a) the notes acquired by it in the offering have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Relevant Member State other than "qualified investors" (as defined in the Prospectus Directive), or in circumstances in which the prior consent of the representatives has been given to the offer or resale; or (b) where notes have been acquired by it on behalf of persons in any Relevant Member State other than qualified investors, the offer of those notes to it is not treated under the Prospectus Directive as having been made to such persons.

**Notice to Prospective Investors in United Kingdom**

This communication is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or the Order, or (iii) high net worth companies, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). The notes are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such notes will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this offering circular or any of its contents.

Each of the initial purchasers has advised that:

   1)  it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the United Kingdom FSMA) received by it in connection with the issue or sale of any notes in circumstances in which Section 21(1) of the FSMA does not, or would not, apply to us; and

   2)  it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

**Notice to Prospective Investors in Switzerland**

This offering circular, as well as any other material relating to the notes which are the subject of the offering contemplated by this offering circular, do not constitute an issue prospectus pursuant to Article 652a of the Swiss Code of Obligations. The notes will not be listed on the SWX Swiss Exchange and, therefore, the documents relating to the notes, including, but not limited to, this offering circular, do not claim to comply with the disclosure standards of the listing rules of SWX Swiss Exchange and corresponding prospectus schemes annexed to the listing rules of the SWX Swiss Exchange. The notes are being offered in Switzerland by way of a private placement, i.e., to a small number of selected investors only, without any public offer and only to investors who do not purchase the notes with the intention to distribute them to the public. The investors will be individually approached by us from time to time. This offering circular, as well as any other material relating to the notes, is personal and does not constitute an offer to any other person. This offering circular may only be used by those investors to whom it has been handed out in connection with the offering described herein and may neither directly nor indirectly be distributed or made available to other persons without our express consent. It may not be used in connection with any other offer and shall in particular not be copied and/or distributed to the public in (or from) Switzerland.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This offering circular relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or the DFSA. This offering circular is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this offering circular nor taken steps to verify the information set forth herein and has no responsibility for this offering circular. The notes to which this offering circular relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the notes offered should conduct their own due diligence on the notes. If you do not understand the contents of this offering circular you should consult an authorized financial advisor.

**Notice to Prospective Investors in Hong Kong**

The notes may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the notes may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Japan**

The notes offered in this offering circular have not been and will not be registered under the Financial Instruments and Exchange Law of Japan. The notes have not been offered or sold and will not be offered or sold, directly or indirectly, in Japan or to or for the account of any resident of Japan (including any corporation or other entity organized under the laws of Japan), except (i) pursuant to an exemption from the registration requirements of the Financial Instruments and Exchange Law and (ii) in compliance with any other applicable requirements of Japanese law.

**Notice to Prospective Investors in Singapore**

This Offering Circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Offering Circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor (as defined in Section 4A of the Securities and Futures Act ( Chapter 289 of Singapore) (the "**SFA**")) pursuant to Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire capital stock of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferable for six months after that corporation or that trust has acquired the notes pursuant to an offer made under Section 275 except:

(1)     to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(2)     where no consideration is or will be given for the transfer;

(3)     where the transfer is by operation of law;

(4)     as specified in Section 276(7) of the SFA; or

(5)     as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

**Notice to Prospective Investors in Canada**

The notes may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations.  Any resale of the notes must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this offering circular (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory.  The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the initial purchasers are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

**Notice to Prospective Investors in Mexico**

The notes have not been and will not be registered with the Mexican National Securities Registry (*Registro Nacional de Valores*) maintained by the CNBV, and, therefore, may not be offered or sold publicly or otherwise be the subject of brokerage activities in Mexico.  The notes may only be offered in Mexico pursuant to the exemptions

to registration provided in article 8 of the Mexican Securities Market Law (*Ley del Mercado de Valores*). As required under the Mexican Securities Market Law, we will notify the CNBV of the terms and conditions of this offering of the notes outside of Mexico, for informational and statistical purposes only. The delivery to, and the receipt by, the CNBV of such notice does not constitute or imply a certification as to the investment quality of the notes, our or the subsidiary guarantor's solvency, liquidity or credit quality or the accuracy or completeness of the information set forth in this offering circular. This offering circular is solely our responsibility and has not been reviewed or authorized by the CNBV. The acquisition of the notes by investors, including Mexican investors, will be made under their own responsibility.

**Notice to Prospective Investors in Chile**

Pursuant to Law No. 18,045 of Chile (the securities market law of Chile) and Rule (*Norma de Carácter General*) No. 336, dated June 27, 2012, issued by the Superintendency of Securities and Insurance of Chile (*Superintendencia de Valores y Seguros de Chile*, or the SVS), the notes may be privately offered in Chile to certain "qualified investors" identified as such by Rule No. 336 (which in turn are further described in Rule No. 216, dated June 12, 2008, of the SVS).

Rule No. 336 requires the following information to be provided to prospective investors in Chile:

1) Date of commencement of the offer: June 20, 2017. The offer of the notes is subject to Rule No. 336, dated June 27, 2012, issued by the SVS;

2) The notes and this offering circular are not registered with the Securities Registry (*Registro de Valores*) of the SVS, nor with the foreign securities registry (*Registro de Valores Extranjeros*) of the SVS and as such are not subject to the oversight of the SVS;

3) Since the notes are not registered in Chile, there is no obligation by the issuer to make publicly available information about the notes in Chile;

4) The notes shall not be subject to a public offering in Chile unless registered with the relevant Securities Registry of the SVS.

*La oferta de los valores comienza el 20 de Junio de 2017 y está acogida a la Norma de Carácter General 336 de la Superintendencia de Valores y Seguros de Chile (la "SVS"). La oferta versa sobre valores no inscritos en el Registro de Valores o en el Registro de Valores Extranjeros que lleva la SVS, por lo que los valores no están sujetos a la fiscalización de dicho organismo. Por tratarse de valores no inscritos, no existe obligación por parte del emisor de entregar en Chile información pública respecto de los valores. Estos valores no pueden ser objeto de oferta pública a menos que sean inscritos en el registro de valores correspondiente.*

**Notice to Prospective Investors in France**

Neither this offering circular nor any other offering material relating to the notes described in this offering circular has been submitted to the clearance procedures of the *Autorité des Marchés Financiers* or of the competent authority of another member state of the European Economic Area and notified to the *Autorité des Marchés Financiers*. The notes have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this offering circular nor any other offering material relating to the notes has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or

- used in connection with any offer for subscription or sale of the notes to the public in France. Such offers, sales and distributions will be made in France only:

- to qualified investors (*investisseurs qualifiés*) and/or to a restricted circle of investors (*cercle restreint d'investisseurs*), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French *Code Monétaire et Financier*;

- to investment services providers authorized to engage in portfolio management on behalf of third parties; or

- in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French *Code Monétaire et Financier* and article 211-2 of the General Regulations (*Règlement Général*) of the *Autorité des Marchés Financiers*, does not constitute a public offer (*appel public à l'épargne*).

The notes may *be* resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French *Code Monétaire et Financier*.

**Notice to Prospective Investors in Colombia**

The notes will not be authorized by the *Superintendencia Financiera de Colombia* (Colombian Superintendency of Finance) and *will* not be registered under the *Registro Nacional de Valores y Emisores* (Colombian National Registry of Securities and Issuers), and, accordingly, the notes will not be offered or sold to persons in Colombia except in circumstances which do not result in a public offering under Colombian law.

**Notice to Prospective Investors in Peru**

The offer of the notes, this offering circular and the notes have not been, and will not be, registered with the *Comisión Nacional Supervisora de Empresas y Valores* (the Peruvian Securities and Exchange Commission). The offer of the notes in Peru is not considered a public offering and will not be launched in Peru except in circumstances which do not constitute public offering or distribution under Peruvian laws and regulations. This notice is for informative purposes and it does not constitute public offering of any kind.

## NOTICE TO INVESTORS

The notes (and the guarantees) have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only in offshore transactions outside the United States to persons other than U.S. persons, or foreign purchasers, which term shall include dealers or other professional fiduciaries in the United States acting on a discretionary basis for foreign beneficial owners (other than an estate or trust), in reliance upon Regulation S under the Securities Act.

By its purchase of notes, each purchaser of notes will be deemed to:

(1)    represent that it is purchasing the notes for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a foreign purchaser that is outside the United States (or a foreign purchaser that is a dealer or other fiduciary as referred to above);

(2)    acknowledge that the notes (and the guarantees) have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except as set forth below;

(3)    agree that it will deliver to each person to whom it transfers notes notice of any restriction on transfer of such notes;

(4)    if it is a foreign purchaser outside the United States, (a) understand that the notes will be represented by the Regulation S global note and that transfers are restricted as described below and (b) represent and agree that it will not sell short or otherwise sell, transfer or dispose of the economic risk of the notes into the United States or to a U.S. person; and

(5)    understand that until registered under the Securities Act, the notes (other than those issued to foreign purchasers or in substitution or exchange therefor) will bear a legend to the following effect unless otherwise agreed by us and the holder thereof:

THIS NOTE (AND RELATED NOTE GUARANTEES) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1)    REPRESENTS THAT IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2)    AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY

(A) TO THE COMPANY,

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT,

(C) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT; and

(6)     acknowledge that we and the initial purchasers will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and agree that if any of the acknowledgements, representations or warranties deemed to have been made by it by its purchase of notes are no longer accurate, it shall promptly notify us and the initial purchasers; and if it is acquiring notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

Notes sold outside of the United States to persons other than U.S. persons, will be freely transferable to persons other than U.S. persons.

# TAXATION

*This summary is general information only. Prospective purchasers of notes should consult their tax advisors as to the Mexican or other tax consequences of the purchase, ownership and disposition of the notes, including the effect of any foreign, state, municipal or local tax laws to which they are subject.*

## Mexican Taxation

This summary of certain Mexican tax considerations deals only with holders of the Notes that are not residents of Mexico for Mexican tax purposes and that do not conduct a trade or business through a permanent establishment for tax purposes in Mexico (a "Foreign Holder"), but does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to purchase, hold or dispose of the Notes.

This summary is based on the federal tax laws of Mexico as in effect on the date of this Offering Circular (including the Tax Treaty described below), as well as on federal rules and regulations of Mexico in effect on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the continued validity of this summary.

For purposes of Mexican taxation, an individual is a resident of Mexico if he has established his domicile in Mexico, unless he has a domicile in a foreign country and his personal and economic relations (center of vital interest) are not in Mexico (except for Mexican public officers or governmental employees). Under the *Código Fiscal de la Federación* (the Mexican Tax Code, or "MTC"), the center of vital interest of an individual is deemed to be located in Mexico if: (i) the source of wealth income in respect of more than 50% of the total income obtained by the individual in a calendar year is derived from Mexican sources, or (ii) the individual's principal place of business is located within Mexican territory. An individual of Mexican nationality is presumed to be a resident of Mexico for tax purposes unless such person demonstrates otherwise. A legal entity is a resident of Mexico if its main administration or effective management is located in Mexico. If a non-Mexican tax resident has a permanent establishment for tax purposes in Mexico, such permanent establishment shall be required to pay taxes in Mexico on taxable income attributable to such permanent establishment in accordance with relevant Mexican tax provisions.

### Taxation of Interest and Principal

Under the Ley del Impuesto Sobre la Renta (the Mexican Income Tax Law, or "MITL"), payments of interest made by TV Azteca or any Guarantor in respect of the Notes (including payments of principal in excess of the issue price of such Notes, which, under Mexican law, are deemed to be interest) to a Foreign Holder will generally be subject to Mexican Income Tax (the "Withholding Tax") assessed at a rate of 4.9% because the Notes will be placed, through banks or brokerage houses, in a country which has entered into a treaty to avoid double taxation with Mexico which is in effect, the notice set forth in Article 7, second paragraph, of the LMV will be filed with the CNBV, describing the most relevant terms and conditions of the offer of the Notes (the "CNBV Notice") and the relevant requirements set forth in the MITL and by the SAT through general rules (the "Rules") are expected to be complied with, including that the persons or entities referred to in sections (x) and (y) below are not the effective beneficiaries of 5.0% or more of the aggregate amount of each interest payment. If the requirements under such Rules are not complied with, withholding tax on the payment of interest on the Notes will be assessed at a rate of 10%. The Rules, together with other tax regulations, are enacted on an annual basis, and therefore, no assurances can be given that the Rules will be extended or that equivalent Rules will be enacted.

The withholding tax rates of 4.9% and 10% mentioned above will not be applicable if the effective beneficiaries that receive, either directly or indirectly, individually or in conjunction with related parties, more than 5% of the interest derived from the Notes are: (x) shareholders of TV Azteca or the relevant Guarantor, as the case may be, that own, directly or indirectly, individually or collectively, with related persons more than 10% of TV Azteca's or the relevant Guarantor's, as the case may be, voting stock or (y) corporations more than 20% of the stock of which is owned, directly or indirectly, individually or collectively, with related persons of TV Azteca or the relevant Guarantor, as the case may be. For such purposes, parties are considered to be related parties when one of them holds interest in the business of the other, when they have common interests, or when a third person has an interest in their business or assets. In this case, the interest will be subject to Withholding Tax at a general tax rate of 35%.

Payments of interest made by TV Azteca or any Guarantor with respect to the Notes to non-Mexican pension or retirement funds will be exempt from Mexican withholding taxes, *provided* that any such fund (i) is the effective beneficiary of the interest, (ii) is duly incorporated pursuant to the laws of its country of origin (regardless of the type of organization), (iii) is exempt from income tax in such country, and according to the general rules issued by the SAT, (iv) the pension or retirement funds deliver the necessary documentation to the Company accrediting its nature as a pension or retirement fund.

TV Azteca and the Guarantors have agreed, subject to specified exceptions and limitations, to pay additional amounts to the holders of the Notes in respect of the Withholding Tax described above.

Under the MITL and regulations thereunder, a Foreign Holder will not be subject to any Mexican taxes in respect of payments of principal made by TV Azteca or any Guarantor with respect to the Notes (except to the extent such payments of principal are in excess of the issue price of the Notes).

*Taxation of Dispositions of Notes*

Payments in excess of the issue price of the Notes resulting from the sale made by a Foreign Holder of the Notes, are deemed to be interest for Mexican tax purposes, to the extent the purchaser of the Notes is a Mexican resident or a foreign resident with a permanent establishment for tax purposes in Mexico. In addition, purchases of the Notes by a non-Mexican tax resident below par value may be subject to Withholding Tax if the seller of the Notes is either a Mexican resident or a foreign resident with a permanent establishment for tax purposes in Mexico.

Capital gains resulting from the sale or other disposition of the Notes by a Foreign Holder to another Foreign Holder will not be subject to Mexican income or other similar taxes.

*Transfer and Other Taxes*

There are no Mexican stamp, registration of similar taxes payable by a Foreign Holder in connection with the purchase, ownership or disposition of any Notes. A Foreign Holder of Notes will not be liable for Mexican estate, gift, inheritance or similar tax with respect to the Notes.

**Payments of Interest**

Under Council Directive 2003/48/EC on the taxation of savings income (the "Savings Directive"), each Member State of the European Union, or EU, is required to provide to the tax authorities of another Member State details of payments of interest or other similar income paid by a person within its jurisdiction to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, that other Member State; however, for a transitional period, Austria and Luxembourg will (unless during such period they elect otherwise) instead apply a withholding system in relation to such payments. Under such withholding system, the beneficial owner of the interest payment must be allowed to elect that certain provision of information procedures should be applied instead of withholding. The current rate of withholding is 35%. The transitional period is to terminate at the end of the first full fiscal year following the conclusion of agreements by certain non-EU countries to exchange of information procedures relating to interest and other similar income.

A number of non-EU countries, and certain dependent or associated territories of certain Member States, have adopted or agreed to adopt similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, a Member State. In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or secured by such a person for, an individual beneficial owner resident in, or certain limited types of entities established in, one of those countries or territories.

A proposal for amendments to the Savings Directive has been published, including a number of suggested changes which, if implemented, would broaden the scope of the rules described above. No Additional Amounts will be payable with respect to a note where withholding or deduction is imposed or levied on a payment pursuant to the Savings Directive or any other EU directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income, or any law implementing or complying with, or introduced in order to conform to, such a directive. If any Definitive Notes are issued, the Issuer will, to the extent permitted by law, maintain a paying agent in a Member State that will not be obliged to withhold or deduct tax pursuant to the Savings Directive or any such directive or law. Holders should consult their tax advisors regarding the implications of the Savings Directive in their particular circumstances.

**AVAILABLE INFORMATION**

For so long as notes are listed on the Official List of the SGX-ST, copies of the following items will be available in physical form at the offices of TV Azteca, located at Avenida Periférico Sur número 4121, Col. Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico:

- this Offering Circular;

- the Indenture governing the notes;

- the constitutional documents of TV Azteca and the guarantors;

- consolidated audited financial statements of TV Azteca and its subsidiaries as of and for the years ended December 31, 2016 and 2015, in each case together with the audit reports prepared in connection therewith;

- consolidated unaudited interim financial statements of TV Azteca and its subsidiaries as of and for the six months ended June 30, 2017 and 2016;

- the most recently published audited consolidated financial statements (if any) of TV Azteca and its subsidiaries, in each case together with any audit reports prepared in connection therewith;

- the most recently published unaudited interim financial statements (if any) of TV Azteca and its subsidiaries, in each case together with any review reports prepared in connection therewith; and

- any other documents relating to the offering of notes referred to herein.

## LISTING AND GENERAL INFORMATION

The information contained in this Offering Circular is solely the responsibility of TV Azteca. TV Azteca, having taken all reasonable care, confirms that the information contained in this Offering Circular is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Since June 30, 2017, there has been no significant change in the financial or trading position of TV Azteca or TV Azteca and its consolidated subsidiaries (including each of the Guarantors) ("TV Azteca's Group") and since December 31, 2016 there has been no material adverse change in the financial position or prospects of TV Azteca or TV Azteca's Group which is not otherwise disclosed in this Offering Circular.

The notes may at any time, but are not required to, be listed on one or more stock exchanges. Approval-in-principle has been received for the listing and quotation of the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained in this Offering Circular. Approval in-principle for the listing and quotation of the notes on the SGX-ST is not to be taken as an indication of the merits of the offering, TV Azteca, its subsidiaries (including the Guarantors), their respective associated companies, their respective joint venture companies or the notes. The notes will be traded on the SGX-ST in a minimum board lot size of $200,000 for so long as any of the Notes are listed on the SGX-ST.

For so long as the notes are listed on the SGX-ST and the rules of the SGX-ST so require, TV Azteca shall appoint and maintain a paying agent in Singapore, where such notes may be presented or surrendered for payment or redemption in the event that the global note(s) representing such notes is exchanged for definitive notes. In addition, in the event that the global note(s) is exchanged for certificated notes, an announcement of such exchange will be made by or on behalf of TV Azteca through the SGX-ST. Such announcement will include all material information with respect to the delivery of the definitive notes including details of the paying agent in Singapore.

The global notes will be deposited upon issuance with a common depositary for Euroclear and Clearstream, Luxembourg.

TV Azteca estimates that it will incur approximately $18,400 in costs related to the approval of this Offering Circular by the SGX-ST.

Except as disclosed in this Offering Circular, within the 12 months preceding the date of this Offering Circular neither TV Azteca nor TV Azteca's Group is or has been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which TV Azteca or TV Azteca's Group is aware) which may have, or have in such period had, significant effects on the financial position or profitability of TV Azteca and/or TV Azteca's Group.

The price and amount of notes to be issued will be determined by TV Azteca and the initial purchasers at the time of issue in accordance with prevailing market conditions.

TV Azteca has obtained all necessary consents, approvals and authorizations in connection with the issuance of notes. The issuance of the notes was authorized by resolutions of the board of directors of TV Azteca passed on July 19, 2017.

Certain legal matters in connection with the offering of the notes will be passed upon for TV Azteca by Winston & Strawn LLP, New York, New York. The initial purchasers have been represented by Jones Day, New York, New York.

TV Azteca's consolidated financial statements as of and for the years ended December 31, 2016 and 2015 have been audited by its independent auditors, Salles, a member of Grant Thornton International. Salles is a member of the CCPM and its address is Periférico Sur 4348, Colonia Jardines del Pedregal, 04500, Mexico City, Mexico.

TV Azteca is a publicly held corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico. The public deed containing TV Azteca's deed of incorporation was executed on June 2, 1993 and the same was registered in the Public Registry on July 13, 1993 under the commercial file 167346. The term of TV Azteca's incorporation is 99 years beginning on the date of TV Azteca's incorporation. TV Azteca's principal executive offices are located at Avenida Periférico Sur número 4121, Colonia Fuentes del Pedregal, Mexico City, C.P. 14141, Mexico. TV Azteca's telephone number at that location is +1 (52) (55) 1720-1313. TV Azteca's Internet addresses are www.irtvazteca.com and www.tvazteca.com. Information available on TV Azteca's websites is not a part of, nor is it incorporated by reference into, this Offering Circular.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

**Page**

**Unaudited Condensed Interim Consolidated Financial Statements of TV Azteca as of June 30, 2017 and 2016**..............................................................................................................................................F-2

Condensed consolidated statements of financial position as of June 30, 2017 and 2016............................F-3

Condensed consolidated statements of comprehensive income for the six months ended June 30, 2017 and 2016......................................................................................................................................................F-4

Condensed consolidated statements of changes in equity for the six months ended June 30, 2017 and 2016........................................................................................................................................................F-5

Condensed consolidated statements of cash flows for the six months ended June 30, 2017 and 2016.........F-6

Notes to the condensed interim consolidated financial statements ............................................................F-7

**Audited Consolidated Financial Statements and Independent Auditor's Report of TV Azteca as of December 31, 2016 and 2015**.....................................................................................................................F-15

Consolidated statements of financial position as of December 31, 2016 and 2015 ....................................F-23

Consolidated statements of comprehensive income for the years ended December 31, 2016 and 2015 ......F-24

Consolidated statements of changes in equity for the years ended December 31, 2016 and 2015................F-25

Consolidated statements of cash flows for the years ended December 31, 2016 and 2015..........................F-26

Notes to the consolidated financial statements ..........................................................................................F-27

Condensed Interim Consolidated Financial Statements

TV Azteca, S.A.B. de C.V. and subsidiaries

(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

June 30, 2017 and 2016



**TV Azteca, S.A.B. de C.V. and Subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Condensed consolidated statements of financial position
**As of June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

| | June 2017 | June 2016 | December 2016 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash and cash equivalents | $ 3,024,538 | $ 2,754,841 | $ 4,470,314 |
| Trade and other receivables | 10,654,792 | 8,575,950 | 6,197,984 |
| Current tax assets | 671,521 | 728,245 | 764,868 |
| Related parties | 972,223 | 938,587 | 940,735 |
| Other financial assets | 755,529 | 815,959 | 1,005,345 |
| Performance rights | 2,665,036 | 2,303,448 | 2,210,591 |
| Inventories | 143,997 | 469,698 | 202,304 |
| **Total current assets** | 18,887,646 | 16,586,728 | 15,792,141 |
| | | | |
| **Non-current** | | | |
| Trade long-term | 507,680 | 86,075 | - |
| Performance rights | 2,436,567 | 2,594,242 | 3,229,525 |
| Property and equipment, net | 3,856,229 | 4,105,334 | 4,111,107 |
| Television concessions, net | 6,723,812 | 10,240,989 | 10,785,466 |
| Other intangible assets | 1,477,851 | 3,007,002 | 1,488,596 |
| Investments accounted for using the equity method and other | 348,461 | 411,821 | 332,180 |
| Deferred income taxes | 1,546,117 | 2,404,283 | 1,825,118 |
| **Total non-current assets** | 16,896,717 | 22,849,746 | 21,771,992 |
| **Total assets** | $ 35,784,363 | $ 39,436,474 | $ 37,564,133 |
| | | | |
| **Liabilities** | | | |
| **Short-term** | | | |
| Medium Term Note Program -MTN- | $ 4,636,975 | $ - | $ - |
| Trade and other payables | 3,654,521 | 5,602,574 | 3,614,804 |
| Performance rights | 425,980 | 646,993 | 1,087,327 |
| Related parties | 131,297 | 318,452 | 97,571 |
| Current tax liabities | 600,184 | 408,921 | 379,731 |
| Deferred revenue | 8,068,515 | 6,359,908 | 6,593,844 |
| **Total short-term liabilities** | 17,517,472 | 13,336,848 | 11,773,277 |
| | | | |
| **Long-term** | | | |
| Loans from American Tower Corporation -ATC- | 1,657,276 | 1,694,161 | 1,891,869 |
| Medium Term Note Program -MTN- | 8,939,850 | 14,624,210 | 16,369,456 |
| Deferred revenue | 1,287,700 | 1,939,803 | 1,075,503 |
| Employee benefits | 188,035 | 197,187 | 188,035 |
| Deferred income taxes, 2010 and 2014 tax reforms | 310,935 | 548,177 | 601,622 |
| **Total long-term liabilities** | 12,383,796 | 19,003,538 | 20,126,485 |
| **Total liabilities** | 29,901,268 | 32,340,386 | 31,899,762 |
| | | | |
| **Equity** | | | |
| Capital stock | 716,884 | 717,057 | 715,229 |
| Premium on stock issued | 207,419 | 207,419 | 207,419 |
| Legal reserve | 153,229 | 153,229 | 153,229 |
| Reserve for stock repurchases | 605,653 | 619,328 | 600,584 |
| Other components of equity | (219,849) | (1,296,489) | (201,976) |
| Retained earnings | 4,408,100 | 6,667,677 | 4,165,317 |
| **Equity attributable to owners of the parent** | 5,871,436 | 7,068,221 | 5,639,802 |
| Non-controlling interest | 11,659 | 27,867 | 24,569 |
| **Total equity** | 5,883,095 | 7,096,088 | 5,664,371 |
| **Total liabilities and equity** | $ 35,784,363 | $ 39,436,474 | $ 37,564,133 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Condensed consolidated statements of comprehensive income
**For the six month periods ended June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

|  | 2017 | 2016 |
|---|---|---|
| **Revenue** | $ 7,017,303 | $ 6,128,711 |
|  |  |  |
| Cost of programming, production, and broadcasting | 4,760,399 | 3,791,801 |
| Selling and administrative expenses | 655,413 | 671,547 |
| **Total costs and expenses** | 5,415,812 | 4,463,348 |
|  |  |  |
| **Operating profit before depreciation and amortization and other expenses** | 1,601,491 | 1,665,363 |
|  |  |  |
| Depreciation and amortization | 409,616 | 345,272 |
| Other expenses, net | 730,715 | 224,818 |
| **Operating profit** | 461,160 | 1,095,273 |
|  |  |  |
| **Share of profit from equity accounted investments** | (90,387) | 6,599 |
|  |  |  |
| Comprehensive gain or loss on financing: |  |  |
| Interest expense | (697,036) | (688,605) |
| Interest income | 52,833 | 41,942 |
| Other financial expenses | (20,835) | (51,440) |
| Exchange gain (loss), net | 1,282,890 | (499,419) |
|  | 617,852 | (1,197,522) |
| **Profit (loss) before taxes on earnings** | 988,625 | (95,650) |
| Taxes on earnings | 537,108 | 622,037 |
| **Profit (loss) from continuing operations** | 451,517 | (717,687) |
|  |  |  |
| **Loss from discontinued operations** | - | (370,923) |
|  |  |  |
| **Profit (loss) for the year** | $ 451,517 | $ (1,088,610) |
|  |  |  |
| Other comprehensive income: |  |  |
| *Items that will be reclassified subsequently to profit or loss* |  |  |
| Exchange differences on translating foreign operations | (680,850) | 318,746 |
| Loss on avaible-for-sale financial assets | (249,815) | (132,328) |
| Cash flow hedging, gains (losses) | 710,792 | (505,022) |
| **Other comprehensive loss for the year** | (219,873) | (318,604) |
| **Total comprehensive income (loss) for the year** | $ 231,644 | $ (1,407,214) |
|  |  |  |
| Net profit (loss) for the year attributable to: |  |  |
| Non-controlling interest | (10,688) | (13,138) |
| Owners of the parent | 462,205 | (1,075,472) |
|  | $ 451,517 | $ (1,088,610) |
|  |  |  |
| Total comprehensive income (loss) for the year attributable to: |  |  |
| Non-controlling interest | (10,688) | (13,138) |
| Owners of the parent | 242,332 | (1,394,076) |
|  | $ 231,644 | $ (1,407,214) |

The accompanying condensed notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**    3
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Condensed consolidated statements of changes in equity
**For the six month periods ended June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

| | Capital stock | Premium on stock issued | Legal reserve | Reserve for stock repurchases | Other components of equity | Retained earnings | Total attributable to owners of parent | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| **Balances as of January 1, 2016** | $ 716,436 | $ 207,419 | $ 153,229 | $ 614,617 | $ (1,620,645) | $ 8,403,215 | $ 8,474,271 | $ 41,005 | $ 8,515,276 |
| Preferred dividends paid | - | - | - | - | - | (17,306) | (17,306) | - | (17,306) |
| Sale of treasury stock | 17,108 | - | - | 134,989 | - | - | 152,097 | - | 152,097.00 |
| Stock repurchase | (16,487) | - | - | (130,278) | - | - | (146,765) | - | 146,765.00 |
| Transactions with owners | 621 | - | - | 4,711 | - | (17,306) | (11,974) | - | (11,974) |
| Net loss for the period | - | - | - | - | - | (1,075,472) | (1,075,472) | (13,138) | (1,088,610) |
| Appropriation to retained earnings | - | - | - | - | 642,760 | (642,760) | - | - | - |
| Other comprehensive loss | - | - | - | - | (318,604) | - | (318,604) | - | (318,604) |
| Total comprehensive loss for the period | - | - | - | - | 324,156 | (1,718,232) | (1,394,076) | (13,138) | (1,407,214) |
| **Balances as of June 30, 2016** | $ 717,057 | $ 207,419 | $ 153,229 | $ 619,328 | $ (1,296,489) | $ 6,667,677 | $ 7,068,221 | $ 27,867 | $ 7,096,088 |
| **Balances as of January 1, 2017** | $ 715,229 | $ 207,419 | $ 153,229 | $ 600,584 | $ (201,976) | $ 4,165,317 | $ 5,639,802 | $ 22,347 | $ 5,662,149 |
| Preferred dividends paid | - | - | - | - | - | (17,422) | (17,422) | - | (17,422) |
| Sale of treasury stock | 15,921 | - | - | 172,142 | - | - | 188,063 | - | 188,063 |
| Stock repurchase | (14,266) | - | - | (167,073) | - | - | (181,339) | - | (181,339) |
| Transactions with owners | 1,655 | - | - | 5,069 | - | (17,422) | (10,698) | - | (10,698) |
| Net loss for the period | - | - | - | - | - | 462,205 | 462,205 | (10,688) | 451,517 |
| Appropriation to retained earnings | - | - | - | - | 202,000 | (202,000) | - | - | - |
| Other comprehensive loss | - | - | - | - | (219,873) | - | (219,873) | - | (219,873) |
| Total comprehensive loss for the period | - | - | - | - | (17,873) | 260,205 | 242,332 | (10,688) | 231,644 |
| **Balances as of June 30, 2017** | $ 716,884 | $ 207,419 | $ 153,229 | $ 605,653 | $ (219,849) | $ 4,408,100 | $ 5,871,436 | $ 11,659 | $ 5,883,095 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                    4
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

# Condensed consolidated statements of cash flows
**For the six month periods ended June 30, 2017 and 2016**
(Stated in thousands of Mexican pesos)

|  | 2017 | 2016 |
|---|---|---|
| **OPERATING ACTIVITIES:** | | |
| Profit (loss) before taxes on earnings | $ 988,625 | $ (95,650) |
| | | |
| Items related to investing activities | | |
| Depreciation and amortization | 409,616 | 415,744 |
| Impairment of long-lived assets | 594,628 | - |
| Share of profit from equity accounted investments | 90,387 | (6,599) |
| Gain on sale of property and equipment | (8,849) | (305) |
| Profit loss from discontinued operations | - | (357,945) |
| Items related to financing activities: | | |
| Unrealized exchange loss | (2,437,125) | 410,572 |
| Interest expense | 697,036 | 688,605 |
| | 334,318.00 | 1,054,422 |
| | | |
| Accounts receivable | (1,486,824) | (2,939,172) |
| Related parties | 2,228 | 573 |
| Inventories | 58,307 | 197,303 |
| Performance rights | (322,834) | (165,424) |
| Accounts payable and accrued expenses | 290,546 | 1,797,329 |
| Deferred revenue | 1,686,865 | 1,440,879 |
| Deferred income taxes, 2010 and 2014 tax reforms | (290,687) | (492,974) |
| Net cash flows from operating activities | 271,919 | 892,936 |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisitions of property and equipment | (202,781) | (223,624) |
| Proceeds from disposals of property and equipment | 28,429 | 18,148 |
| Investments accounted for using the equity method and other | - | (1,703) |
| Investments in intangibles | - | (172,832) |
| Net cash flows from investing activities | (174,352) | (380,011) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Repayment of borrowings, net | (832,053) | - |
| Interest paid | (695,523) | (684,535) |
| Preferred dividends paid | (17,422) | (17,306) |
| Net cash flows from financing activities | (1,543,343) | (696,501) |
| | | |
| Decrease in cash and cash equivalents | (1,445,776) | (183,576) |
| Cash and cash equivalents at beginning of year | 4,470,314 | 2,938,417 |
| Cash and cash equivalents at end of year | $ 3,024,538 | $ 2,754,841 |

The accompanying condensed notes are an integral part of these consolidated financial statements.

# TV Azteca, S.A.B de C.V. and Subsidiaries

## Notes to the condensed interim consolidated financial statements

## June 30, 2017 and 2016

(Stated in thousands of Mexican pesos and thousands of U.S. dollars, except where stated otherwise, as well as per share amounts and exchange rates)

### 1.    NATURE OF OPERATIONS

TV Azteca, S.A.B. de C.V. (the Company or TVA) was acquired by its present stockholders in July 1993. The main business of TV Azteca, S.A.B. de C. V. and its subsidiaries include: (i) the transmission and production of television programs; (ii) sale of advertising time; and (iii) operating a fiber optic network in Colombia (until December 2016) and Perú.

### 2.    GENERAL INFORMATION AND BASIS OF PREPARATION

The interim consolidated condensed financial statements (the interim financial statements) apply to the six months ended at June 30, 2017 and are presented in Mexican pesos, the Company's functional currency. These interim financial statements have been prepared in accordance with International Accounting Standard (IAS) 34 "Interim Financial Reporting" and do not include all the information required for annual financial statements, in accordance with International Financial Reporting Standards (IFRS). They should be taken as a whole with the consolidated financial statements ended at December 31, 2016.

The Company is the holding company of the Group ultimately. The Company is a Publicly Held Variable Capital Corporation (S.A.B. de C.V., for its acronym in Spanish), with a duration of 99 years beginning 1993. Its main offices are located at Periférico Sur 4121, Colonia Fuentes del Pedregal, Postal Code 14141, Mexico City, Mexico.

The interim financial statements are unaudited and have been approved and authorized to be issued by the Board of Directors on July 19, 2017.

### 3.    SIGNIFICANT ACCOUNTING POLICIES

The interim financial statements have been prepared in accordance with the accounting policies described in Note 4 to the audited financial statements at December 31, 2016, except for the following IFRS´s amendments beginning January 1, 2017:

- Recognition of deferred tax assets for unrealized losses (Amendments to IAS 12)
- Disclosure initiative (Amendments to IAS 7)
- Annual improvements 2014-2016 (IFRS 12 Disclosure of interests in other entities: Clarification of the scope of the Standard).

Adoption of the above exceptions had no impact on the consolidated financial statements of the Group.

### 4.    ESTIMATES

Upon preparing the financial statements, Management realizes several judgments, estimates, and assumptions for the recognition and measurement of assets, liabilities, revenues, and expenses. Actual results can differ from judgments, estimates, and assumptions made by Management, and they will seldom be equal to estimated results.

The judgments, estimations and assumptions used in the interim financial statements are the same criteria used by Management in applying accounting policies and uncertainty in estimates in the annual financial statements ended at December 31, 2016, except for those used in the estimate of the provision of taxes on earnings, which were determined in the interim financial statements using the best information available for their calculation.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                              8
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

### 5.    MAIN EVENTS AND TRANSACTIONS

#### a)    Fiber optic network Colombia

During 2016, pursuant to the analyses and evaluations performed by Management with respect to impairment indicators, the Group recognized an impairment charge amounting in its intangible assets to $1,376,526, which is presented in "other expenses" of the accompanying consolidated statements of comprehensive income.

Moreover, the Group analyzed the perspectives and valuation of its investment in the telecommunications business in Colombia to define the long-term approach more accurately, and determined that this business would require an additional investment of capital amounting to US$100 million in the short-term to develop last mile infrastructure; therefore, it entered into an agreement with the shareholders which set forth that the Group would contribute US$40 million and the remaining US$60 million would be contributed by another group of shareholders.

On December 27, 2016, the shareholder agreement was concluded and the capitalizations discussed were formalized; therefore, beginning that date, the Group stopped having control over the telecommunications business in Colombia, and consequently: (i) the assets and liabilities of the companies involved stopped being consolidated; and (ii) the investment in those companies qualifies as an associate and are valued by using the equity method.

As a result of the foregoing and for comparison purposes, Management restated the statement of comprehensive income for the period from January 1 to June 30, 2017, to present the results of operating the business in Colombia under the heading "Discontinued operations".

#### b)    Debt prepayment

On March 2017, the Group prepaid a portion of its long-term debt in the amounts of US$42.5 million, due May 2018, pursuant to the issue of US$300 million of the MTN Program.

#### c)    Golf tournament

Derived from a collaboration agreement of the "PGA Tour Golf Tournament" held between the PGA Tour, Inc., Chapultepec Golf Club and a subsidiary of the Company, the Group undertakes to make all necessary disbursements and arrangements to carry out the golf tournament to be held in Mexico in March of each year, during the seven years following the date of signature of the contract.

On March 2017, the Company held the First International Golf Tournament of the "PGA Tour", whose organization rights for the next 7 years were awarded to the Company.

#### d)    New television channels

On March 2017, TVA announced: (i) the transformation of image and content of Channel 40, now known as "ad40", which will be a dynamic channel focused on news and live sports 24 hours a day on open television in Mexico. Its signal will be transmitted through channels 1.2 of open television in México and 40.1 in the Valley of Mexico, in addition to being available on the main pay television systems; and (ii) the startup of the new "a+" television channel, television signal that offers a network of local channels that will produce contents for the needs and preferences of each community, and it will be transmitted through channel 7.2 of open television in Mexico, and it will start with local signals in Mexico City, Guadalajara, León, Monterrey, and Toluca.

Auction process of the spectrum
On April, 2017, the Company participated and won the auction for the sale of spectrum and transmission licenses held through its subsidiaries in the United States of America, organized by the FCC, achieving a sale price of USD$156 million, and recognized an impairment charge in amount of USD$32.9 million (equivalents to $595 million), wich is presented in "other expenses, net" within the condensed consolidated statement of comprehensive income.

The FCC will award the frequencies and make the payments to the winners within ninety days subsequent to the date published.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                    9
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

## 6.    ACCOUNTS RECEIVABLE

|  | 2017 | 2016 |
|---|---|---|
| Trade and other receivables | $ 11,162,472 | $ 8,662,025 |
| Related parties | 972,233 | 938,587 |
| Taxes recoverable | 671,521 | 728,245 |
|  | $ 12,806,226 | $ 10,328,857 |

## 7.    RELATED PARTY BALANCES AND TRANSACTIONS

|  | 2017 | 2016 |
|---|---|---|
| **Accounts receivable:** | | |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) | $ 545,603 | $ 544,346 |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra) | 241,806 | 172,455 |
| Arrendadora Internacional Azteca, S.A. de C.V. | 66,788 | 45,156 |
| Total Play Telecomunicaciones, S.A. de C.V. | 30,978 | 28,511 |
| Adamantium Private Security Services, S. de R.L. de C.V. | 4,961 | 66,239 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. | - | 34,000 |
| Other | 82,097 | 47,880 |
|  | $ 972,233 | $ 938,587 |
| **Accounts payable:** | | |
| Selabe Diseños, S.A. de C.V. (Selabe) | $ 131,297 | $ 49,165 |
| Globo Re, S.A. | - | 176,964 |
| Other | - | 92,323 |
|  | $ 131,297 | $ 318,452 |

## 8.    PROPERTY AND EQUIPMENT

| | Balance at January 1, 2017 | Additions | Disposals | Depreciation for the year | Balance at June 30, 2017 | Estimated useful life (Years) |
|---|---|---|---|---|---|---|
| Buildings | $1,422,605 | $ 57,439 | $ 7,750 | $ 71,259 | $ 1,401,035 | 33 |
| Operating equipment | 1,326,033 | 82,061 | 18,245 | 200,944 | 1,188,905 | 6 & 20 |
| Furniture and office equipment | 49,882 | 3,446 | 107 | 5,698 | 47,523 | 10 |
| Transportation equipment | 279,712 | 81,298 | 84,056 | 40,037 | 236,917 | 5 |
| Other fixed assets | 290,358 | 37,032 | 293 | 71,746 | 255,351 | 4 |
| Land | 681,395 | - | - | - | 681,395 | - |
| Construction-in-progress | 61,122 | 220,210 | 236,229 | - | 45,103 | - |
| | $4,111,107 | $ 481,486 | $ 346,680 | $ 389,684 | $ 3,856,229 | |

| | As of June 30, 2016 | | | | | |
|---|---|---|---|---|---|---|
| Buildings | $1,350,775 | $ 17,266 | $ - | $ 43,696 | $1,324,345 | 33 |
| Operating equipment | 1,419,621 | 108,537 | 759 | 189,709 | 1,337,690 | 6 & 20 |
| Furniture and office equipment | 52,068 | 6,024 | - | 5,146 | 52,946 | 10 |
| Transportation equipment | 314,995 | 61,371 | 61,570 | 44,076 | 270,720 | 5 |
| Fiber Optic Network | 27,012 | - | 27,012 | - | - | - |
| Other fixed assets | 268,998 | 65,947 | 1,633 | 60,695 | 272,617 | 4 |
| Land | 688,131 | 1,052 | - | - | 689,183 | - |
| Construction-in-progress | 70,855 | 366,261 | 279,283 | - | 157,833 | - |
| | $4,192,455 | $ 626,458 | $ 370,257 | $ 343,322 | $4,105,334 | |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                10
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

### 9.    OTHER INTANGIBLE ASSETS

As of June 30, 2017 and 2016, this caption is summarized as follows:

|  | 2017 | 2016 |
|---|---|---|
| Payments to Corporación de Noticias e Información, S.A. de C.V. | $  374,852 | $  374,852 |
| Players' registration costs and affiliation rights | 799,666 | 682,752 |
| Fiber optic network Colombia | - | 1,479,062 |
| Atlas Soccer Team acquisition | 188,579 | 188,579 |
| Fiber optic network Peru | 41,054 | 74,916 |
| Other assets, net | 73,700 | 206,841 |
|  | $  1,477,851 | $  3,007,002 |

### 10.   EQUITY

a)  Stockholders resolutions

At the General Stockholders' Meeting held on April 25, 2017 and April 27, 2016, a dividend was declared in the amount of $17,267 and $17,304, respectively, which corresponds to preferred stock dividends for series D-A and series D-L shareholders. Those dividends were paid out of the Net Taxable Income Account (CUFIN for its acronym in Spanish). Moreover, it was resolved to transfer the amount of ($202,000) and ($642,760), respectively, recorded in other capital components to retained earnings, as shown in the consolidated statement of changes in stockholders' equity.

b)  Resolutions adopted on the year ended December 31, 2010

On April 30, 2010, a cash reimbursement was approved in proportion to the stockholdings of each stockholder at the General Extraordinary Stockholders' Meeting, up to the amount of $322,000, payable in the amounts and on the dates determined by Management, in accordance with the Company's economic capacity. This reimbursement implied a fixed minimum capital stock decrease of the Company in the amount of $9,944. As of June 30, 2017 and 2016, the balance payable of this reimbursement amounted to $238,358, and it is presented in the consolidated statement of financial position within accounts payable and accrued liabilities.

c)  Stock repurchase

For the period ended June 30, 2017 and 2016, the Company decreased its capital stock in the amount of $14,266 and $16,487, respectively, on the repurchase of 66,789 thousand shares and 25,070 thousand shares in each year. Shares were repurchased in the amount of $181,339 and $146,765, respectively. The value thereof was charged to capital stock, and the difference was charged to the reserve for stock repurchases.

d)  Other capital components

|  | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2017 | $ 1,843,067 | $  (52,735) | $ (1,992,308) | $ (201,976) |
| Exchange differences on translating foreign operations | (680,850) | - | - | (680,850) |
| Cash flow hedges | - | - | 710,792 | 710,792 |
| Loss on investment available-for-sale | - | (249,815) | - | (249,815) |
| Reclassifications to retained earnings | - | 202,000 |  | 202,000 |
| Balance as of June 30, 2017 | $ 1,162,217 | $  (100,550) | $ (1,281,516) | $  (219,849) |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                11
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

|  | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2016 | $   621,573 | $   (642,361) | $(1,599,865) | $(1,620,653) |
| Exchange differences on translating foreign operations | 318,746 | - | - | 318,746 |
| Cash flow hedges | - | - | (505,022) | (505,022) |
| Loss on investment available-for-sale | - | (132,328) | - | (132,328) |
| Reclassifications to retained earnings | - | 642,768 | - | 642,768 |
| Balance as of June 30, 2016 | $   940,319 | $   (131,921) | $ (2,104,887) | $ (1,296,489) |

## 11.    FINANCIAL INFORMATION BY SEGMENT

Management currently identifies five lines of service of the Group as operating segments. These operating segments are supervised by the person who makes strategic decisions, which are made based on the adjusted operating results of the segment.

National Television

This segment is comprised of television services in Mexican territory, including local stations. Income is derived mainly from the sale of time on screen nation wide and locally less commissions on sales.

Azteca America

This segment consists of television services in the territory of the United States of America, directed primarily for the Hispanic community that resides in that territory.

Exports

This segment is comprised mainly of the exports of programs that were of wide interest for global audiences primarily in the countries of Latin America and Europe.

Fiber optic network

This segment is derived mainly from the transactions related to Azteca Comunicaciones Colombia and Azteca Comunicaciones Peru in charge of construction, operation, and maintenance of the fiber-optic network in Colombia and Peru, respectively.

Tournament Golf

This segment corresponds mainly to the operation of the organization of the golf tournament of the PGA tour mentioned in note 5 above.

As of June 30, 2017

|  | National Television | Azteca America | Guatemala y Honduras | Exports | Fiber optic | Golf | Consolidated total |
|---|---|---|---|---|---|---|---|
| Net sales | $ 5,373,128 | $ 666,457 | $   29,588 | $ 117,636 | $ 274,513 | $ 555,981 | $ 7,017,303 |
| Costs | 3,051,423 | 802,365 | 56,606 | - | 295,093 | 554,912 | 4,760,399 |
| Gross profit (loss) | 2,321,705 | (135,908) | (27,018) | 117,636 | (20,580) | 1,069 | 2,256,904 |
| Operating expenses | 1,386,128 | - | - | - | - | - | 1,386,128 |
| Depreciation and amortization | 374,507 | 26,841 | 4,439 | - | 3,829 | - | 409,616 |
| Operating income (loss) | $   561,070 | $ (162,749) | $ (31,457) | $ 117,636 | $ (24,409) | $   1,069 | $   461,160 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                12
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

|  | National Television | Azteca America | Guatemala y Honduras | Exports | Fiber optic | Golf | Consolidated total |
|---|---|---|---|---|---|---|---|
| | | | As of June 30, 2016 | | | | |
| Net sales | $ 4,933,977 | $ 609,542 | $ 24,300 | $ 8,598 | $ 502,294 | $ - | $ 6,128,711 |
| Costs | 2,845,931 | 655,123 | 55,289 | - | 235,458 | - | 3,791,801 |
| Gross profit (loss) | 2,088,046 | (45,581) | (30,989) | 58,598 | 266,836 | - | 2,336,910 |
| Operating expenses | 896,365 | - | - | - | - | - | 896,365 |
| Depreciation and amortization | 310,510 | 26,979 | 4,527 | - | 3,256 | - | 345,272 |
| Operating income (loss) | $ 881,171 | $ (72,560) | $ (35,516) | $ 58,598 | $ 263,580 | $ - | $ 1,095,273 |

## 12.    SEASONALITY

The Company's television transmission operations are seasonal. Advertising revenues, which are recognized when the advertisement comes out on the air, are generally higher in the fourth quarter, due to the high level of advertising that comes out on the air as a result of the Christmas season.

The Company's revenues fluctuate as a result of the frequency with which the Company transmits significant events (Olympic Games, World Soccer Cups, among other things). Historically, the transmission of significant events by the Company has increased advertising sales during the periods in which they came out on the air. This reflects higher audiences during the hours in which those significant events were transmitted, and the fact that advertisers pay a premium related to those significant transmission events.

## 13.    FINANCIAL ASSETS AND LIABILITIES

The fair values of financial instruments were determined by using information available on the market and other valuation techniques that require judgment by Management. Moreover, the use of different assumptions and valuation methods can have a material effect on the estimated amounts of fair value.

The financial instruments, which after their initial recognition are quantified at their fair value, are grouped in levels from 1 to 3 based on the degree to which fair value is observed, as shown below:

- Level 1 – valuation based on prices quoted on the market (unadjusted) for identical assets or liabilities;

- Level 2 – valuation with indicators other than the quoted prices included in Level 1, but include observable indicators for an asset or liability, either directly (quoted prices) or indirectly (derivations of these prices); and

- Level 3 – valuation techniques are applied that include indicators for assets and liabilities that are not based on observable market information (unobservable indicators).

a.    Financial assets and liabilities are classified as follows:

| Financial assets: | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total | Available-for-sale *at fair value* | Loans and accounts receivable and other liabilities *at amortized cost* | Total |
|---|---|---|---|---|---|---|
| | As of June 30, 2017 | | | As of June 30, 2016 | | |
| Cash and cash equivalents | $ – | $ 3,024,538 | $ 3,024,538 | $ – | $ 2,754,841 | $ 2,754,841 |
| Short and long-term trade and other receivables | – | 11,608,527 | 11,608,527 | – | 9,039,200 | 9,039,200 |
| Related parties | – | 840,936 | 840,936 | – | 620,135 | 620,135 |
| Available-for-sale assets | 755,529 | – | 755,529 | 815,959 | – | 815,959 |
| | $ 755,529 | $ 15,474,001 | $ 16,229,530 | $ 815,959 | $ 12,414,176 | $ 13,230,135 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                    13
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

**Financial liabilities:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Accounts payable | $ | – | $ 4,080,501 | $ 4,080,501 | $ | – | $ 6,249,567 | $ 6,249,567 |
| Short and long-term debt | | – | 15,234,101 | 15,234,101 | | – | 16,318,371 | 16,318,371 |
| | $ | – | $ 19,314,602 | $ 19,314,602 | $ | – | $22,567,938 | $ 22,567,938 |

b.   Financial debt

Loans include the following short- and long-term financial liabilities:

| | Short-term | | | | Long-term | | |
|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 |
| **Financial liabilities:** | | | | | | | |
| American Tower Corporation -ATC- | $ | - | $ | - | $ | 1,657,276 | $ 1,694,161 |
| Program Medium Term Note -MTN- | | 4,636,975 | | - | | 8,939,850 | 14,624,210 |
| | $ | 4,636,975 | $ | - | $ 10,597,126 | | $ 16,318,371 |

Long-term financial liabilities fair values were determined by calculating their present values at the reporting date, by using fixed effective market interest rates available to the Group. Changes in fair value that go to profit or loss have not been included since financial assets are carried at amortized cost in the consolidated statement of financial position.

## 14.   EARNINGS PER SHARE

Both basic and diluted earnings per share have been calculated by using earnings attributable to the stockholders of the Holding Company (TV Azteca, S.A.B. de C.V.) as the numerator, that is, it was not necessary to make adjustments to earnings in 2017 and 2016.

The weighted average number of shares for purposes of diluted earnings per share can be reconciled with the weighted number of ordinary shares used in the calculation of basic earnings per share as follows:

| | 2017 | 2016 |
|---|---|---|
| Amounts stated in thousands of shares: | | |
| Weighted average of the number of shares used in the base of earnings per share | 8,958,394 | 8,967,085 |
| Shares considered issued without taking into account share based payments | 1,587,441 | 1,578,749 |
| Weighted average of the number of shares used in diluted earnings per share | 10,545,835 | 10,545,834 |

## 15.   CONTINGENCIES

For the period ended at June 30, 2017, there have been no significant changes in the legal course of the litigations.

## 16.   COMMITMENTS

a   Leases

The Company rents the use of satellite transponders for the service of receipt and conduction of the satellite signal. It has the commitment of paying US$25 (IS21 satellite) and US$74 (Galaxy 19 satellite) every month, for the three contracts entered into with Panamsat de México, S. de R.L. de C.V. The expenses include a monthly fixed payment and others based on the use thereof. The lease agreements have a one-year mandatory duration, automatically and successively renewable for identical periods up to 2021, and 2024, respectively.

The Company has entered into a contract with Satélites Mexicanos, S.A. de C.V., for the rental and use of satellite transponders (Satmex 6 satellite) for the service of receipt and conduction of the signal. It has the commitment of paying a monthly amount of US$86.4 every month. This amount will increase 5% annually up to the date of expiration of the contract, which is not until 2021.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                          14
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the condensed interim consolidated financial statements as of June 30, 2017 and 2016

b    Performance rights

The Company has entered into license agreements with its performance rights suppliers for the long-term acquisition of materials of programs when such programs are available for their first broadcast. As of June 30, 2017, the commitments for the acquisition of materials amount to US$47,000, US$40,721, and US$32,370, with due dates in 2017, 2018 and 2019, respectively. Moreover, some of these contracts do not show a current obligation due to their uncertain nature. Further, some can be marketed in accordance with their specific characteristics.

c    Advertising rights

In June 2010, the Company entered into an advertising rights assignment contract with Super Publicidad, S.A. de C.V., which sets forth that effective 2012 and up to 2022, the rights of spaces are obtained for exhibiting advertising, as well as the use of part of the facilities of the Mexico City Arena. The total value of the consideration amounts to US$3,500, which has been paid in full.

d    Fiber optic network Peru

On December 23, 2013, the Company participated in and was awarded the bid of the National Dorsal Fiber Optic Network in Peru. The purpose of this bidding is to design, build, and maintain a Dorsal Fiber Optic Network in routes already defined by the Government of Peru, as well as to render data transmission services to other telecommunications operators, as well as the entities and agencies of that government.

The main characteristics of that contract are the following:

1.  **Signatories:**

    Ministry of Transportation and Communications (Grantor) and Azteca Comunicaciones Perú, S.A.C. (Concessionaire)

2.  **Subject matter of the contract:**

    The grantor establishes a juridical relationship of public law with the Concessionaire whereby the Concessionaire is granted the right to economically operate the National Fiber Optic Backbone Network (RDNFO). The Concessionaire binds itself to design, finance, display, operate, and maintain the assets of the Concession, and to render the services through the RDNFO during the term of the concession, and that of its eventual renewals, subject to the tariff regime.

3.  **Value of the Contract:**

    A concession agreement was signed with the Peruvian Government for 20 years through the Ministry of Transportation and Communication (MTC) in June 2014. That agreement set forth the bases for the design, financing, construction, operation, and maintenance of 13,400 km of Fiber Optic Network that will connect 23 regions, 180 cities, and 136 municipalities. The minimum execution term of the work should be completed in 24 months, through six delivery stages in June 2016.

As of June 30, 2016, the Company had met the obligations set forth in the concession agreement.

## 17.    EVENTS SUBSEQUENT TO THE REPORTING DATE

On July 14, 2017, the Group prepaid a portion of its long-term debt in the amounts of US$60 million, pursuant to the issue of US$300 million of the MTN Program.

Salles Sainz
# Grant Thornton

Consolidated Financial Statements and Independent Auditor's Report

TV Azteca, S.A.B. de C.V. and subsidiaries

(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

December 31, 2016 and 2015



# Table of Contents

**Independent auditor's report**                                                                                            **1**

**Consolidated statements of financial position**                                                       **7**

**Consolidated statements of comprehensive income**                                        **8**

**Consolidated statements of changes in equity**                                                  **9**

**Consolidated statements of cash flows**                                                               **10**

**Notes to the consolidated financial statements**                                               **11**

1    Nature of operations and general information                                                       11
2    Basis of preparation and statement of compliance with IFRSs                         11
3    Changes in accounting policies                                                                            11
4    Summary of accounting policies                                                                          13
5    Cash and cash equivalents                                                                                  32
6    Trade and other receivables                                                                               32
7    Inventories                                                                                                           32
8    Property and equipment                                                                                      33
9    Other intangible assets                                                                                       34
10   Investments accounted for using the equity method and other              36
11   Trade and other payables                                                                                  37
12   Related party balances and transactions                                                          37
13   Financial debt                                                                                                     39
14   Employee benefits                                                                                             40
15   Taxes on earnings                                                                                              41
16   Financial assets and liabilities                                                                          43
17   Financial instruments risk                                                                                 45
18   Equity                                                                                                                 46
19   Earnings per share                                                                                             49
20   Capital management policies and procedures                                                 49
21   Financial income and costs                                                                              49
22   Other expenses, net                                                                                          49
23   Financial information by segment                                                                     50
24   Contingencies                                                                                                    51
25   Commitments                                                                                                     52
26   Telecommunications reform                                                                              55
27   Seasonality                                                                                                          55
28   Events subsequent to the reporting date                                                         55

Salles Sainz
Grant Thornton

# Independent auditor's report

To the Stockholders of

TV Azteca, S.A.B. de C.V. and Subsidiary Companies
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.):

## Opinion

We have audited the consolidated financial statements of TV Azteca, S.A.B. de C.V. and Subsidiary Companies (the Group), a subsidiary of Comunicaciones Avanzadas, S.A. de C.V., which comprise the consolidated statements of financial position as of December 31, 2016 and 2015, and the consolidated statements of comprehensive income, consolidated statements of changes in equity and consolidated statements of cash flows for the years then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of TV Azteca, S.A.B. de C.V. and Subsidiary Companies (a subsidiary of Comunicaciones Avanzadas, S.A. de C.V.), as of December 31, 2016 and 2015, and their consolidated financial performance and their consolidated cash flows for the years then ended in accordance with International Financial Reporting Standards (IFRSs), as issued by the International Accounting Standards Board (IASB).

## Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the "Auditor's responsibilities for the audit of the consolidated financial statements" section of our report. We are independent of the Group in accordance with the Code of Ethics as issued by the Instituto Mexicano de Contadores Públicos, A.C., and we have fulfilled our other ethical responsibilities applicable to our audits of consolidated financial statements in Mexico in accordance with such code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## Key audit matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. For each key audit matter, we describe how it was addressed in our audit.

Salles Sainz
GrantThornton

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Impairment of intangible assets – Fiber optic network Colombia. (See note 9).** | |
| Pursuant to the analyses and evaluations performed by the Group with respect to impairment indicators of non-current assets related to the foreign subsidiary in charge of the project named "Fiber optic network Colombia", a charge was recognized in income in the amount of $1,377 million, which is presented in Other expenses in the accompanying consolidated statements of comprehensive income. Consequently, the long-lived value of the respective Cash Generating Unit (CGU) was reduced to zero. | Our audit procedures were performed mainly by the audit teams of the Group and of the component in Colombia, and included the review of the assumptions used by Management in its impairment analysis models of the relevant CGUs. We verified the historical data and external benchmarks used for assuring ourselves that they were in acceptable ranges. |
| In addition, the Group analyzed the perspectives and valuation of its investment in this business with a long-term approach and determined that this business would require an additional short-term investment amounting to 100 million U.S. dollars to develop last mile infrastructure; therefore, pursuant to a resolution adopted by the stockholders dated December 27, 2016, the contribution of the Group was formalized in the amount of 40 million U.S. dollars, as well as the remaining contribution amounting to 60 million U.S. dollars made by another group of shareholders. Accordingly, the investment is classified as an investment in an associated company beginning that date. | We tested the integrity of the models supported by our own specialists and we carried out audit procedures on the calculations prepared by Management. We responded to the valuation drawn up by Management, considering the models and premises used for the determination of the fair values of long-lived assets, and verified the financial information included in the models.

We considered that the disclosures related to the impairment analysis determined, which are presented in the financial statements of the Group, are appropriate. |
| Evaluate the perspectives of the investments held abroad for defining the long-term approach of the Group more accurately, considering the current economic scenarios of the jurisdictions in which it operates implies significant legal actions on future results of the business and the discount rates applied to expected future cash flows estimates. | |

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Revenue recognition of advertising services. (See note 4y).** | |
| Advertising service revenues represent around 80% of the consolidated net sales. Their recognition is based on the information reported by the system developed by the Group for such | We evaluated the policy established by the Group to recognize advertising service revenues, and we verified that the policy was in line with the relevant accounting standards and guidelines. |

Salles Sainz
Grant Thornton
1

| | |
|---|---|
| purposes. The data of the "spots" or commercials that are transmitted daily, audience reports, amounts of contracts, and other information are inputted into the system to generate that information, as described in note 4y to the accompanying consolidated financial statements.<br><br>The manual data input and information transmission processes carried out in and between the different systems up to the book entry recorded of revenues might generate risks of error in the recognition of revenues from advertising transmitted. | Moreover, we tested that the policy implemented was functioning.<br><br>Our procedures included the understanding and testing of the operating effectiveness of the controls established for revenue recognition, evaluation and review of the reconciliation processes between those systems and the general accounting system, visualization and management of relationships with the customer of the Group (advertising contracts).<br><br>This verification of the controls is supported by substantive audit procedures that include, among other things, the reconciliation of cash flows received with the revenues recorded in a sample of customers, audit tests of deferred and cumulative revenue balances, including the total invoices issued during the period, as well as verifying that the contractual terms with customers coincide with the information inputted into the systems.<br><br>Our intervention in the systems consisted in performing tests of the general Information Technology (IT) control environment of the systems used to record revenues, followed by tests of the processes to evaluate the integrity and accuracy of the information processed in those systems. |

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| **Property and equipment, and Concessions. (See notes 8 and 4p)** | |
| The nature of the business model implies that the Group maintains significant investments in property and equipment, as well as in intangible assets, the evaluation of their capitalization and the determination of their useful lives require significant judgments by Management. In addition, these assets are required to be evaluated periodically to determine if they will be entirely recoverable and, if applicable, identify the existence of impairment indicators.<br><br>Uncertainty partially emerges due to the unpredictable impact of factors relative to | We evaluated the policies for the recognition of assets of property and equipment, as well as intangible assets, in accordance with the regulatory guidelines of International Accounting Standards: IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets.<br><br>Our audit procedures included, among other things, the understanding of the relevant business projects, documentary review of a sample of the capitalization of non-current assets, verification of the authorizations by Management for their capitalization, as well as |

Salles Sainz

Grant Thornton

2

| competition, technological, political and economic environment in the commercial performance, but also to regulatory changes required by the Governments of the locations where the operations of the Group are undertaken. | the reasonableness of the useful life allotted to capitalized non-current assets.<br><br>In addition, we examined if there were impairment indicators in non-current assets, considering our understanding of the business, as well as the validation of the impairment analysis models drawn up by Management. |
|---|---|

### Information other than the financial statements and Auditor's report thereon

Management is responsible for the other information, which is comprised of financial and non-financial information other than the consolidated financial statements and our audit report, which will be included in the annual Report and the annual Report filed with the National Banking and Securities Commission (NBSC) and the shareholders, respectively, since those reports will be issued after the date of this report.

Our opinion on the consolidated financial statements does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated.

If, based on the work we have performed, we conclude that there is a material misstatement of that other information, we are required to report that fact to those charged with governance.

### Responsibilities of Management and those charged with governance for the consolidated financial statements.

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, Management is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting principle unless Management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

### Auditor's responsibilities for the audit of the consolidated financial statements

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an

Salles Sainz
**Grant**Thornton

audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by Management.

- Conclude on the appropriateness of Management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and significant events in a manner that achieves fair presentation.

- Obtain sufficient appropriate audit evidence regarding the financial information of the subsidiaries or business activities within the Group to express an opinion on the consolidated financial statements of the Group. We are responsible for the direction, supervision and performance of the Group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

Salles Sainz
Grant Thornton

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report.

The engagement partner on the audit resulting in this independent auditor´s report is:

SALLES, SAINZ – GRANT THORNTON, S.C.

C.P.C. José Franco Minero

Mexico City, Mexico.
March 24, 2017

**TV Azteca, S.A.B. de C.V. and subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Consolidated statements of financial position

**As of December 31, 2016 and 2015**

(Stated in thousands of Mexican pesos)

| | Notes | 2016 | 2015 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash and cash equivalents | 5 | $ 4,470,314 | $ 2,938,417 |
| Trade and other receivables | 6 | 6,197,984 | 6,244,083 |
| Current tax assets | | 764,868 | 831,496 |
| Related parties | 12 | 940,735 | 780,769 |
| Other financial assets | 16 | 1,005,345 | 782,956 |
| Performance rights | 4l | 2,210,591 | 2,082,524 |
| Inventories | 7 | 202,304 | 667,001 |
| **Total current assets** | | 15,792,141 | 14,327,246 |
| | | | |
| **Non-current** | | | |
| Trade long-term | 6 | - | 165,375 |
| Performance rights | 4l | 3,229,525 | 2,381,973 |
| Property and equipment, net | 8 | 4,111,107 | 4,192,455 |
| Television concessions, net | | 10,785,466 | 9,933,622 |
| Other intangible assets | 9 | 1,488,596 | 2,795,464 |
| Investments accounted for using the equity method and other | 10 | 332,180 | 359,404 |
| Deferred income taxes | 15 | 1,825,118 | 2,524,283 |
| **Total non-current assets** | | 21,771,992 | 22,352,576 |
| **Total assets** | | $ 37,564,133 | $ 36,679,822 |
| | | | |
| **Liabilities** | | | |
| **Short-term** | | | |
| Trade and other payables | 11 | $ 3,614,804 | $ 4,103,839 |
| Performance rights | 4l | 1,087,327 | 379,224 |
| Related parties | 12 | 97,571 | 160,061 |
| Current tax liabilities | | 379,731 | 211,577 |
| Deferred revenue | | 6,593,844 | 4,956,303 |
| **Total short-term liabilities** | | 11,773,277 | 9,811,004 |
| | | | |
| **Long-term** | | | |
| Loans from American Tower Corporation -ATC- | 13 | 1,891,869 | 1,582,600 |
| Medium Term Note Program -MTN- | 13 | 16,369,456 | 13,630,083 |
| Deferred revenue | 4y | 1,075,503 | 1,902,529 |
| Employee benefits | 14 | 188,035 | 197,187 |
| Deferred income taxes, 2010 and 2014 tax reforms | 15 | 601,622 | 1,041,151 |
| **Total long-term liabilities** | | 20,126,485 | 18,353,550 |
| **Total liabilities** | | 31,899,762 | 28,164,554 |
| | | | |
| **Equity** | 18 | | |
| Capital stock | | 715,229 | 716,436 |
| Premium on stock issued | | 207,419 | 207,419 |
| Legal reserve | | 153,229 | 153,229 |
| Reserve for stock repurchases | | 600,584 | 614,617 |
| Other components of equity | | (201,976) | (1,620,653) |
| Retained earnings | | 4,165,317 | 8,403,215 |
| **Equity attributable to owners of the parent** | | 5,639,802 | 8,474,263 |
| Non-controlling interest | | 24,569 | 41,005 |
| **Total equity** | | 5,664,371 | 8,515,268 |
| **Total liabilities and equity** | | $ 37,564,133 | $ 36,679,822 |

The accompanying notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

## Consolidated statements of comprehensive income
### For the years ended December 31, 2016 and 2015
(Stated in thousands of Mexican pesos)

| | Notes | 2016 | 2015 |
|---|---|---|---|
| **Revenue** | 4y | $ **14,196,571** | $ 12,859,487 |
| | | | |
| Cost of programming, production, and broadcasting | | **8,988,756** | 8,719,773 |
| Selling and administrative expenses | | **1,519,593** | 1,605,226 |
| **Total costs and expenses** | | **10,508,349** | 10,324,999 |
| | | | |
| **Operating income before depreciation and amortization and other expenses** | | **3,688,222** | 2,534,488 |
| | | | |
| Depreciation and amortization | | **924,923** | 910,245 |
| Other expenses, net | 22 | **1,850,178** | 1,028,442 |
| **Operating income** | | **913,121** | 595,801 |
| | | | |
| **Share of profit from equity accounted investments** | 10 | **23,309** | (13,430) |
| | | | |
| **Comprehensive gain or loss on financing:** | | | |
| Interest expense | 13 | **(1,434,915)** | (1,256,342) |
| Interest income | 21 | **91,273** | 107,440 |
| Other financial expenses | 21 | **(169,565)** | (178,335) |
| Exchange loss, net | | **(1,651,447)** | (1,187,049) |
| | | **(3,164,654)** | (2,514,286) |
| **Loss before taxes on earnings** | | **(2,228,224)** | (1,931,915) |
| Taxes on earnings | 15 | **944,721** | 715,690 |
| **Loss for the year** | | $ **(3,172,945)** | $ (2,647,605) |
| | | | |
| **Other comprehensive income (loss) for the year** | | | |
| *Items that will not be reclassified subsequently to profit or loss* | | | |
| Effect from translation | 18g | **800,179** | 667,893 |
| Loss on financial assets available-for-sale | 18g | **(53,142)** | (643,105) |
| Cash flow hedge (loss) for the current year | 18g | **(392,443)** | (1,010,248) |
| **Other comprehensive income (loss) for the year** | | **354,594** | (985,460) |
| **Total comprehensive loss for the year** | 4cc | $ **(2,818,351)** | $ (3,633,065) |
| | | | |
| **Net loss for the year attributable to:** | | | |
| Non-controlling interest | | **(16,436)** | (13,804) |
| Owners of the parent | | **(3,156,509)** | (2,633,801) |
| | | $ **(3,172,945)** | $ (2,647,605) |
| | | | |
| **Total comprehensive loss for the year attributable to:** | | | |
| Non-controlling interest | | **(16,436)** | (13,804) |
| Owners of the parent | | **(2,801,915)** | (3,619,261) |
| | | $ **(2,818,351)** | $ (3,633,065) |
| | | | |
| **Loss per share** | | **Pesos** | Pesos |
| *Basic loss per share* | | | |
| Loss from continuing operations | 19 | $ **(0.35)** | $ (0.30) |
| | | | |
| *Loss earnings per share* | | | |
| Loss from continuing operations | 19 | $ **(0.29)** | $ (0.20) |

The accompanying notes are an integral part of these consolidated financial statements.

**TV Azteca, S.A.B. de C.V. and subsidiaries**
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

9

## Consolidated statements of changes in equity
**For the years ended December 31, 2016 and 2015**

(Stated in thousands of Mexican pesos)

| | Notes | Capital stock | Premium on stock issued | Legal reserve | Reserve for stock repurchases | Other components of equity | Retained earnings | Total attributable to owners of parent | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Balances as of January 1, 2015 | | $ 715,344 | $ 207,419 | $ 153,229 | $ 600,582 | $ (584,041) | $ 11,003,132 | $ 12,095,665 | $ 54,809 | $ 12,150,474 |
| Preferred dividends paid | 18 | - | - | - | - | - | (17,268) | (17,268) | - | (17,268) |
| Sale of treasury stock | | 3,233 | - | - | 41,466 | - | - | 44,699 | - | 44,699 |
| Stock repurchase | | (2,141) | - | - | (27,431) | - | - | (29,572) | - | (29,572) |
| Transactions with owners | | 1,092 | - | - | 14,035 | - | (17,268) | (2,141) | - | (2,141) |
| Net loss for the year | | - | - | - | - | - | (2,633,801) | (2,633,801) | (13,804) | (2,647,605) |
| Appropriation to retained earnings | 4i | - | - | - | - | (51,152) | 51,152 | - | - | - |
| Other comprehensive loss | 18 | - | - | - | - | (985,460) | - | (985,460) | - | (985,460) |
| Total comprehensive loss for the year | | - | - | - | - | (1,036,612) | (2,582,649) | (3,619,261) | (13,804) | (3,633,065) |
| Balances as of December 31, 2015 | | $ 716,436 | $ 207,419 | $ 153,229 | $ 614,617 | $ (1,620,653) | $ 8,403,215 | $ 8,474,263 | $ 41,005 | $ 8,515,268 |
| Preferred dividends paid | 18 | - | - | - | - | - | (17,306) | (17,306) | - | (17,306) |
| Sale of treasury stock | | 2,516 | - | - | 17,509 | - | - | 20,025 | - | 20,025 |
| Stock repurchase | | (3,723) | - | - | (31,542) | - | - | (35,265) | - | (35,265) |
| Transactions with owners | | (1,207) | - | - | (14,033) | - | (17,306) | (32,546) | - | (32,546) |
| Net loss for the year | | - | - | - | - | - | (3,156,509) | (3,156,509) | (16,436) | (3,172,945) |
| Appropriation to retained earnings | 4i | - | - | - | - | 1,064,083 | (1,064,083) | - | - | - |
| Other comprehensive loss | 18 | - | - | - | - | 354,594 | - | 354,594 | - | 354,594 |
| Total comprehensive loss for the year | | - | - | - | - | 1,418,677 | (4,220,592) | (2,801,915) | (16,436) | (2,818,351) |
| Balances as of December 31, 2016 | | $ 715,229 | $ 207,419 | $ 153,229 | $ 600,584 | $ (201,976) | $ 4,165,317 | $ 5,639,802 | $ 24,569 | $ 5,664,371 |

The accompanying notes are an integral part of these consolidated financial statements.

## TV Azteca, S.A.B. de C.V. and subsidiaries
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)

# Consolidated statements of cash flows
## For the years ended December 31, 2016 and 2015
(Stated in thousands of Mexican pesos)

|  | 2016 | 2015 |
|---|---|---|
| **OPERATING ACTIVITIES:** | | |
| Loss before taxes on earnings | $ (2,228,224) | $ (1,931,915) |
| | | |
| Items related to investing activities | | |
| Depreciation and amortization | 924,923 | 910,245 |
| Impairment of long-lived assets | 1,376,526 | 532,000 |
| Share of profit from equity accounted investments | (23,309) | 13,430 |
| Gain from the sale of associated company | (194,883) | - |
| Loss (gain) on sale of property and equipment | 603 | (7,316) |
| Other comprehensive loss | - | (1,980,865) |
| Items related to financing activities: | | |
| Unrealized exchange loss | 2,656,199 | 1,187,049 |
| Interest expense | 1,434,915 | 1,256,342 |
| | 3,946,750 | (21,030) |
| | | |
| Accounts receivable | 278,102 | (744,816) |
| Related parties | (274,121) | (331,562) |
| Inventories | 464,697 | (489,565) |
| Performance rights | (267,516) | 173,475 |
| Accounts payable and accrued expenses | (748,032) | 1,775,085 |
| Deferred revenue | 810,515 | 1,515,299 |
| Taxes on earnings | 221,600 | (102,450) |
| Deferred income taxes, 2010 and 2014 tax reforms | (492,975) | (600,955) |
| Net cash flows from operating activities | 3,939,020 | 1,173,481 |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Acquisitions of property and equipment | (685,684) | (1,128,053) |
| Proceeds from disposals of property and equipment | 92,989 | 152,516 |
| Investments accounted for using the equity method and other | (78,144) | 49,920 |
| Proceeds from disposals of associated company | 323,560 | - |
| Financial assets available-for-sale | (275,531) | (298,939) |
| Investments in intangibles | (321,141) | (252,591) |
| Net cash flows from investing activities | (943,951) | (1,477,147) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | - | (1,105,605) |
| Repayment of borrowings, net | (1,430,626) | (1,179,308) |
| Stock repurchases | (35,265) | (29,572) |
| Sale of treasury stock | 20,025 | 44,699 |
| Preferred dividends paid | (17,306) | (17,268) |
| Net cash flows from financing activities | (1,463,172) | (2,287,054) |
| | | |
| Increase (decrease) in cash and cash equivalents | 1,531,897 | (2,590,720) |
| Cash and cash equivalents at beginning of year | 2,938,417 | 5,529,137 |
| Cash and cash equivalents at end of year | $ 4,470,314 | $ 2,938,417 |

The accompanying notes are an integral part of these consolidated financial statements.

# TV Azteca, S.A.B de C.V. and Subsidiaries

Notes to the consolidated financial statements

## December 31, 2016 and 2015

(Stated in thousands of Mexican pesos and thousands of U.S. dollars, except where stated otherwise, as well as per share amounts and exchange rates)

1. **NATURE OF OPERATIONS AND GENERAL INFORMATION:**

TV Azteca, S.A.B. de C.V. was acquired by its present stockholders in July 1993. The main business of TV Azteca, S.A.B. de C. V. and its subsidiaries include: (i) the transmission and production of television programs; (ii) sale of advertising time; and (iii) operating a fiber optic network in Colombia (until December 2016) and Peru.

When the terms "the Company" or "the Holding company" are used in the notes to the financial statements, they refer to TV Azteca, S.A.B. de C.V. without its consolidated subsidiaries. When the terms "the Company and its subsidiaries" or "the Group" are used, it refers to TV Azteca, S.A.B. de C.V. together with its consolidated subsidiaries.

The common shares of the Company (AZTECA.CPO) are listed in the Mexican Stock Exchange (BMV, for its acronym in Spanish) and in Latibex, an international market dedicated to Latin American shares in Euros, regulated by the currently enacted laws of the Spanish Stock Market.

The Company is the holding company of the Group ultimately. The Company is a Publicly Held Variable Capital Corporation (S.A.B. de C.V., for its acronym in Spanish), with a duration of 99 years beginning 1993. Its main offices are located at: Periférico Sur 4121, Colonia Fuentes del Pedregal, Mexico City, Mexico, Postal Code 14141.

2. **BASIS OF PREPARATION AND STATEMENT OF COMPLIANCE WITH INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs):**

The accompanying consolidated financial statements of the Group have been prepared in accordance with International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board (IASB).

IFRSs are comprised of: a) IFRSs and International Accounting Standards (IASs), their Improvements and Interpretations of IFRSs and IASs (IFRIC and SIC).

The consolidated financial statements for the year ended December 31, 2016 and 2015 were approved and authorized to be issued by the Chief Executive Officer, Mr. Benjamín Salinas Sada, and the Director of Finance, Mr. Esteban Galíndez Aguirre.

The Mexican General Corporate Law and the by-laws of the Company, grant stockholders the possibility to amend the financial statements after they have been issued. The accompanying consolidated financial statements will be submitted for approval at the General Stockholders' Annual Meeting.

During 2016, the Group has not applied any new accounting policies (see note 3 below), or made other changes of retrospecitve application that have a material effect on the consolidated statement of financial position as of January 1, 2015. Accordingly, the Group is not required to present a third statement of financial position as of that date.

3. **CHANGES IN ACCOUNTING POLICIES:**

*New standards, interpretations, and amendments that went into effect beginning January 1, 2016*

The Group has not adopted any new standards or amendments that are already effective. The standards and amendments that are effective for the first time in 2016 (for entities with a December 31, 2016 year end) and are

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                    28
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

applicable to the Group are:

- Annual improvements to IFRS's 2012-2014 cycle

- Disclosure Initiative (Amendments to IAS 1)

- Clarification of Acceptable Methods of Depreciation and Amortisation (Amendments to IAS 16 and IAS 38)

- Accounting for Acquisitions of Interests in Joint Operations (Amendments to IFRS 11)

- Investment Entities: Applying the Consolidation Exception (Amendments to IFRS 10, IFRS 12 and IAS 27).

These amendments do not represent changes in the accounting policies and do not have a significant impact on the financial statements of the Group.

Annual improvements to IFRSs 2012-2014 cycle, published in September 2014, established improvements to some IFRSs; a summary of the issues addressed is as follows:

| IFRS | Standard affected | Summary of amendment |
|------|-------------------|----------------------|
| IFRS 5 | Non-current Assets Held for Sale and Discontinued Operations | Changes in methods of disposal |
| IFRS 7 | Financial Instruments: Disclosures | Servicing contracts and applicability of the amendments to IFRS 7 to condensed interim financial statements |
| IFRS 19 | Employee Benefits | Discount rate: regional market issue |
| IFRS 34 | Interim Financial Reporting | Disclosure of information 'elsewhere in the interim financial report' |

***New standards that are not yet effective and have not been adopted early by the Group***

New standards have been published by the IASB that are not yet effective, and have not been adopted early by the Group. Information on those expected to be relevant to the Group's financial statements is provided below.

    a.   IFRS 9 'Financial Instruments'

This new standard introduces extensive changes to IAS 39's guidance on the classification and measurement of financial assets and introduces a new 'expected credit loss' model for the impairment of financial assets. IFRS 9 also provides new guidance on the application of hedge accounting.

Group's Management has started to assess the impact of IFRS 9, but is not yet in a position to provide quantified information. At this stage, the main areas of expected impact are as follows:

- The classification and measurement of financial assets will need to be reviewed based on the new criteria that considers the assets' contractual cash flows and the business model in which they are managed;

- An expected credit loss-based impairment will need to be recognized on the Group's trade receivables and investments in debt-type assets currently classified as available-for-sale and held-to-maturity, unless classified at fair value through profit or loss, in accordance with the new criteria;

- It will no longer be possible to measure equity investments at cost less impairment and all such investments will instead be measured at fair value. Changes in fair value will be presented in profit or loss, unless an irrevocable designation is made to present them in other comprehensive income.

- The fair value option for certain financial liabilities implies that changes in fair value will be recognized in comprehensive income to the extent those changes relate to the Group's own credit risk.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                            29
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018. However, its early adoption is permitted.

The Group adopted this standard early in 2014, with respect to the option of the application that refers to the recognition of fair value of equity instruments in other comprehensive income that will not be transferred subsequently to profit or loss. However, the Group can make transfers from profit or loss to retained earnings within stockholders' equity.

    b.   IFRS 15 'Revenue from contracts with customers'

IFRS 15 presents new requirements for the recognition of revenue, replacing IAS 18 'Revenue', IAS 11 'Construction Contracts', and several revenue-related Interpretations. The new standard establishes a control-based revenue recognition model and provides additional guidance in many areas not covered in detail under existing IFRSs, including how to account for arrangements with multiple performance obligations, variable pricing, customer refund rights, supplier repurchase options, and other common complexities.

IFRS 15 is effective for reporting periods beginning on or after January 1, 2018. Management has started to assess the impact of IFRS 15, but is not yet in a position to provide quantified information. Its early application is permitted.

    c.   IFRS 16 'Leases'

IFRS 16 will replace IAS 17 and three related Interpretations. It completes the IASB's long-running project to overhaul lease accounting. Leases will be recorded on the statement of financial position in the form of a right-of-use asset and a lease liability.

IFRS 16 is effective from periods beginning on or after January 1, 2019. Management is yet to fully assess the impact of the standard and therefore is unable to provide quantified information.

The main impacts of the application of this IFRS are related to the lease contracts as discussed in note 25 a).

**4.      SUMMARY OF ACCOUNTING POLICIES:**

    a.   Overall considerations

The significant accounting policies used by the Group to prepare the accompanying consolidated financial statements are summarized below:

    b.   Basis for consolidation

The Group's financial statements consolidate those of the holding company and all its subsidiaries as of December 31, 2016 and 2015. The Group controls a subsidiary when that subsidiary is exposed or is entitled to variable returns derived from its involvement with the subsidiary, and it has the capacity to apply those returns through its power over the subsidiary. All the subsidiaries present their financial information for consolidation purposes as of December 31, 2016 and 2015, in compliance with the policies adopted by the Group.

All significant transactions and balances of the Group are eliminated in consolidation, including unrealized profit or loss in operations between them. In the cases in which there are unrealized losses on the sale of assets between the Group, consolidation is reversed so that the asset involved is also tested for impairment from a Group perspective. The amounts reported in the financial statements of the subsidiaries are adjusted when necessary to assure consistency with the Group's accounting policies.

The gains or losses and other comprehensive income items of the subsidiaries acquired or sold during the year are recognized as of the effective date of the acquisition or up to the effective date of the disposition, as appropriate, considering that control is obtained through the acquisition and lost at the time of the sale.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                    30
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

Non-controlling interests, presented as part of equity, represent the portion of a subsidiary's profit or loss and net assets that is not held by the Group. The Group attributes total comprehensive income or loss of subsidiaries between the owners of the parent and the non-controlling interests based on their respective ownership interests.

Changes in equity interest of a subsidiary, without loss of control, are accounted for as a capital transaction. If the Company loses control of a subsidiary, it:

    I.    Writes off assets (including goodwill) and liabilities of the subsidiary;

    II.    Writes off the carrying amount of the non-controlled equity interest;

    III.    Derecognizes the cumulative translation effect that has been recorded in stockholders' equity;

    IV.    Recognizes the fair value of the consideration received;

    V.    Recognizes the fair value of the retained investment;

    VI.    Recognizes any surplus or deficit in income (loss) for the period; and

    VII.    Reclassifies the equity interest previously recognized as other comprehensive income items to earnings, losses, or retained gains, as appropriate, as of the Company had directly sold the related assets or liabilities.

As discussed in note 10, beginning December 27, 2016, the Company stopped consolidating the investment in the subsidiary Companies that have the fiber optic operation in Colombia. Consequently, it stopped consolidating the assets and liabilities of those Companies as at that date, based on the procedure discussed in the foregoing paragraph.

The main subsidiary companies included in the consolidated financial statements, as well as the percentage of equity therein and their main business activity are as follows:

| Company | Country | Activity | % of share | |
|---|---|---|---|---|
| | | | 2016 | 2015 |
| Televisión Azteca, S.A. de C.V. | Mexico | Operation of radio stations and television channels. | 100.00 | 100.00 |
| TV Azteca Comercializadora, S.A. de C.V. | Mexico | Transmission and production of television programs and services rendered. | 100.00 | 100.00 |
| Red Azteca Internacional, S.A. de C.V. | Mexico | Transmission and production of television programs, mainly Channel 7. | 100.00 | 100.00 |
| Estudios Azteca, S.A. de C.V. | Mexico | Sale of advertising time. | 100.00 | 100.00 |
| Atlético Morelia, S.A de C.V. | Mexico | Sport activities | 100.00 | 100.00 |
| Club de Fútbol Rojinegros S.A. de C.V. | Mexico | Sport activities | 100.00 | 100.00 |
| Comerciacom, S.A. de C.V. | Mexico | Transmission and production of television programs, mainly Channel 7. | 100.00 | 100.00 |
| Comercializadora en Medios de Comunicación de TV Azteca, S.A. de C.V. | Mexico | Sale of advertising time. | 100.00 | 100.00 |
| Azteca Novelas, S.A.P.I. de C.V. | Mexico | Transmission and production of television programs. | 100.00 | 100.00 |
| Servicios Especializados TAZ, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Producciones Especializadas, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Corporación de Asesoría Técnica y de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Operadora Mexicana de Televisión, S.A. de C.V. | Mexico | Operation of radio stations and television channels. | 100.00 | 100.00 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                      31
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | | | | |
|---|---|---|---|---|
| Inversora Mexicana de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Servicios Aéreos Noticiosos, S.A. de C.V. | Mexico | Air taxi services | 100.00 | 100.00 |
| SCI de México, S.A. de C.V. | Mexico | Advisory and consulting services | 100.00 | 100.00 |
| Servicios Locales de Producción, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Servicios Foráneos de Administración, S.A. de C.V. | Mexico | Diverse services | 100.00 | 100.00 |
| Azteca International Corporation | United States of America | Transmission and production of television programs and sale of advertising time. | 100.00 | 100.00 |
| KAZA Azteca America, Inc. | United States of America | Transmission and production of television programs and sale of advertising time. | 100.00 | 100.00 |
| TVA Guatemala | Guatemala | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| Incotel | Guatemala | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| TV Azteca Global, S. L. U. | Spain | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |
| Televisora del Valle de México, S.A.P.I. de C.V. | Mexico | Operation of radio stations and television channels. | 51.01 | 51.01 |
| Azteca Comunicaciones Colombia[1] | Colombia | Construction and operation of fiber optic network | 100.00 | 100.00 |
| Azteca Telecomunicaciones Colombia[1] | Colombia | Diverse services | 100.00 | 100.00 |
| Azteca Comunicaciones Peru | Peru | Construction and operation of fiber optic network | 80.00 | 80.00 |
| Azteca Honduras | Honduras | Operation of radio stations and television channels and sale of advertising time. | 100.00 | 100.00 |

[1] Beginning December 27, 2016, the Company stopped controlling these subsidiary Companies (see note 10).

c.    Business combinations

The Group applies the acquisition method to account for business combinations. The consideration transferred by the Group to obtain control of a subsidiary is calculated as the sum of fair values as of the date of acquisition of the assets transferred, liabilities incurred or assumed, and equity interests issued by the Group, which includes the fair value of any asset or liability that emerges from the contingent payment agreement. Acquisition costs are expensed as incurred.

The Group recognizes identifiable assets acquired and liabilities assumed in the business combination, regardless of whether they were previously recognized in the financial statements of the party acquired prior to the acquisition. Assets acquired and liabilities assumed are generally issued at their fair value at the acquisition date.

Goodwill is determined after identifiable intangible assets are recognized individually. It is calculated as the excess of the sum of: a) the fair value of the payment transferred; b) the amount recognized of any non-controlled interest of the entity acquired; and c) the fair value at the date of acquisition of any existing capital equity in the acquired entity over the fair values as of the date of acquisition of the identifiable net assets. If the fair values of the identifiable net assets exceed the sum calculated above, this amount in excess (e.g. bargain purchase) is immediately recognized in income.

If the business combination is realized in stages, the carrying value of the prior interest of the acquirer in the acquiree

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                    32
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

as of the date of acquisition is adjusted to fair value as of the date of acquisition, and any difference is recognized in income.

The measurement period will not exceed one year, beginning the date of acquisition. During the measurement period, the acquirer will retroactively adjust the amounts recognized provisionally at the date of acquisition to reflect the new information obtained on events and circumstances existing at the measurement date and, if they had been known, they would have been applied to the measurement of the amounts recognized as of that date.

    d.   Investments accounted for using the equity method and other permanent investments

Associates are those entities on which the company can exercise significant influence, but they are neither subsidiaries nor joint venture

A joint venture is a joint arrangement whereby the parties that have joint control over the arrangement are entitled to the net assets of the arrangement. These parties are denominated participants in a joint venture.

Investments in associates and joint ventures are accounted for by using the equity method. Any goodwill or adjustment to fair value attributable to the equity of the Group in the associate or joint venture is not recognized separately, and it is included in the amount recognized as an investment.

The carrying value recorded in investments in associates and joint ventures is increased or decreased to recognize the Group's equity in earnings and other comprehensive items of the associate and joint venture, adjusted when it is necessary to assure the consistency of the Group's policies.

Unrealized gains and losses in the transactions between the Group, its associates, and joint ventures are eliminated in the proportion of equity of the Group in those entities. When unrealized losses are eliminated, the asset involved is also tested for impairment.

Investments in associates and joint and other permanent investments are reviewed for impairment at least at each reporting date to identify whether there is any objective evidence that those assets are impaired; if so, an impairment loss is recognised for the amount by which the asset's carrying amount exceeds its recoverable amount.

    e.   Translation of foreign currency

*Functional and presentation currency*

The items included in the financial statements of each one of the entities comprising the Group are measured in the currency of the primary economic environment where each entity operates, that is, its "functional currency". The consolidated financial statements are presented in the "Mexican peso" currency, which is also the functional currency of the holding company.

*Foreign currency balances and transactions*

Foreign currency operations are translated into the entity's functional currency, in this case, that of the Group, by using the exchange rates prevailing at the dates of the transactions (spot exchange rate). Foreign exchange gains and losses resulting from the liquidation of such operations and valuation of monetary items at the year-end exchange rate are recognized in the statement of comprehensive income, except those identified with the "Foreign transactions" paragraphs discussed herein below.

Nonmonetary captions are measured at historical cost (translated by using the exchange rates at the date of the transaction), except for nonmonetary captions measured at fair value, which are translated by using the exchange rates as of the date on which fair value was determined.

*Foreign transactions*

In the Group's financial statements, all assets, liabilities, and transactions of the entities of the Group realized with a

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                    33
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

functional currency other than the Mexican peso (Group's presentation currency) are translated into pesos at the time of consolidation. The functional currency of the entities of the Group has remained unchanged during the reporting period.

At the time of consolidation, assets and liabilities have been translated into Mexican pesos at the closing exchange rate at the date of the report. Revenues and expenses have been translated into the Group's presentation currency at an average exchange rate during the reporting period. Foreign exchange differences are charged/credited to other items of comprehensive income, and they are recognized as an effect of translation in other capital accounts. Likewise, the exchange differences generated by financial instruments that have been designated as hedges of a foreign business by Group Management are charged/credited to other items of comprehensive income. At the time of disposing of a foreign currency operation, the cumulative effects of translation recognized in capital are reclassified to income and recognized as part of the gain or loss on disposal. Goodwill and adjustments to fair value arising from the acquisition of a foreign entity have been treated as assets and liabilities of the foreign entity, and have been translated into pesos at the closing exchange rate.

*Hedged net investments in a foreign business.*

The Group applies hedge accounting to foreign currency differences generated between the functional currency of the foreign operation and the functional currency of the parent company, regardless if the net investment is maintained directly or through another holding company.

Foreign currency differences resulting from the remeasurement of a financial liability designated as a hedge of a net investment in a business abroad are recognized in other comprehensive income, to the degree in which the hedge is effective. Such differences are recorded in income to the degree in which the hedge is ineffective. When part of the hedge of a net investment is eliminated, the corresponding amount in other comprehensive income is transferred to income as part of the elimination gain or loss (see note 18g).

The accrued gain or loss on the hedge instrument related to the effective part of the hedge that has been accrued in the foreign currency translation provision, will be reclassified from equity to income for the period as a reclassification adjustment at the time of the disposition or partial disposition of the foreign business.

As of December 31, 2016, and 2015, the effect recognized by the Group on the hedge of net investments in a foreign business is shown within the accompanying consolidated statement of changes in stockholders' equity.

    f.   Financial information by segment

Operating segments are defined as the components of an entity, geared toward developing business activities on which revenues, costs, and expenses are generated. Moreover, its operating income or loss is reviewed regularly by the entity's maximum governing body to decide on the resources that should be allocated to the segment and evaluate their performance in connection with the segment itself by using specific financial information.

In connection with the years in which they are presented, the Group has operated in the following business segments: National television, Azteca America, Performance rights, and Other (see note 23).

    g.   Cash and cash equivalents

Cash and cash equivalents comprise cash on hand and bank deposits in checking accounts and investments available highly liquid that are readily convertible into cash and which are subject to an insignificant risk of changes in value.

    h.   Trade and other receivables

*Trade receivables*

Accounts receivable represent amounts owed by customers, derived mainly from sales of advertising services rendered in the normal course of the Group's operations. When they are expected to be collected in a period of one year or less from the closing date (or in the normal cycle of business operations in the event that this cycle should

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                                                34
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

exceed this period), are presented as current assets. In the event that the above should not be complied with, they are presented as non-current assets.

*Other receivables*

Other receivables apply mainly to loans and others that give the right to collect fixed or determinable amounts that are not listed on an active market. The assets of this category are classified as current assets; except if they are expected to be collected after a year has elapsed from the closing date. In that case, they are classified as non-current assets.

   i.    Financial instruments

*Recognition, initial measurement and de-recognition*

Financial assets and liabilities are recognized at the trading date, which is the date on which the Group commits itself to buy or sell the financial asset or liability. They are initially measured at fair value adjusted for operating costs, except financial assets and financial liabilities carried at fair value through profit or loss (FVTPL) that are initially measured at fair value.

Financial assets are de-recognized when contractual rights to the cash flows of a financial asset expire or when the financial asset and all the substantial risks and benefits have been transferred.

A financial liability is de-recognized when it is extinguished, discharged, written off or it expires. Financial assets and financial liabilities are potentially measured as described below:

*Classification and subsequent measurement of financial assets*

For purposes of subsequent measurements, financial assets that are not those designated and effective as hedging instruments are classified in the following categories, at the time of their initial recognition:

- loans and receivables

- financial assets at fair value through profit or loss

- held-to-maturity investments

- available-for-sale financial assets

The category determines the subsequent measurement, as well as if any resulting revenue or expense is recognized in income or other items of comprehensive income.

All financial assets except those that are carried at fair value through income or losses are subject to an impairment test at least on every report date.

All revenues and expenses related to financial assets recognized in income are presented in "financial costs", "financial revenues" or "other financial items", except for the impairment of trade accounts receivable which is presented in "other expenses".

*Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not listed on an active market. After the original recognition, they are assessed at amortized cost, by using the effective interest method, less the provision for impairment. The discount is omitted in the cases in which the effect of the discount is immaterial. The Group's cash and cash equivalents, as well as trade accounts receivable and most of the other accounts receivable are placed in this category of financial instruments.

Significant accounts receivable are considered individually for impairment when they are past due or when there is

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                35
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

objective evidence that a specific payment will fall into non-performance. Accounts receivable not considered impaired individually are reviewed for impairment in groups, which are determined by reference to the industry and region of the counterparty and other shared credit risk characteristics. The estimate of the impairment loss is then determined based on recent historical non-performance rates of the counterparty for each group identified.

*Financial assets at fair value through profit or loss (FVTPL)*

Financial assets at fair value through profit or loss include financial assets that are classified as held for trading or that meet certain conditions and are designated to FVTPL at the time of the initial recognition. All derivative financial instruments enter into this category, except those designated and effective as hedging instruments, to which hedge accounting requirements are applied.

Assets in this category are measured at fair value with the profit or loss recognized in the statement of comprehensive income. Fair values of derivative financial instruments are determined by reference to active market operations or by using a valuation technique when there is no active market.

*Investments held-to-maturity*

Investments held-to-maturity are non-derivative financial assets with fixed or determinable payments, and fixed maturities other than loans and accounts receivable. Investments are classified as held-to-maturity if the Group has the intent and capacity to hold them to maturity. As of December 31, 2016 and 2015, the Group has no investments classified with these characteristics.

Investments held-to-maturity are subsequently measured at amortized cost by using the effective interest method. In the event that there should be objective evidence that the investment is impaired, determined by reference to external credit classifications, the financial asset is measured at the present value of estimated future cash flows. Any change in the carrying amount of the investment including impairment losses is recognized in income or loss.

*Available-for-sale financial assets*

Financial assets available-for-sale are non-derivative financial assets that are designated in this category and do not qualify for being included in any of the other categories of financial assets. Financial assets available-for-sale include investments in securities managed by a foreign financial institution, securities listed in the stock market, and equity investments in Media Capital Investment (MCI), private equity fund, as discussed in note 16.

Equity investments in MCI are measured at cost less any impairment charge, since their fair value cannot be valued reliably at present. The Group recognized an impairment charge for the total of that investment in 2015, which is maintained as at the date of the report (see note 16).

Changes in fair value of financial assets available-for-sale are recognized in other comprehensive income, except for impairment losses and exchange differences in monetary assets, which are recognized in profit or loss. When an asset is disposed of or it is determined to be impaired, the accrued gain or loss that was recognized in other items of comprehensive income is reclassified from equity to income, and it is presented as a reclassification adjustment in other items of comprehensive income. Interest is calculated by using the effective interest method, and dividends are recognized in income under 'financial revenues' (see note 4aa).

The reversal of impairment losses is recognized in other items of comprehensive income, except financial assets that are debt securities, whose recognition in income is realized only if the reversal can be objectively related to an event that occurs after having recognized the impairment loss.

As of December 31, 2016 and 2015, the Group maintains investments in securities classified as available-for-sale financial assets as discussed in note 16. The effects of the changes in fair value of these investments are presented in other comprehensive income.

*Classification and subsequent measurement of financial liabilities*

The Group's financial liabilities include loans, trade payables, and other payables.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                    36
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

Financial liabilities are subsequently measured at amortized cost by using the effective interest method, except financial liabilities that are held for trading or have been designated at fair value through profit or loss, which are subsequently kept in books at fair value with the profit or loss recognized in income. As at December 31, 2016 and 2015, the Group does not maintain financial liabilities for trading or subsequently measured at fair value.

All derivative financial instruments not designated or ineffective as hedging instruments are accounted for at fair value through profit or loss. The effects of evaluation and assessment of the hedged item in fair value hedges are recorded in the statement of financial position in assets or liabilities, as applicable.

All charges related to interest and, if applicable, any change in the fair value of an instrument are reported in income and included in "financial costs" or "financial revenues".

*Derivative financial instruments*

A specific accounting treatment is required for derivatives designated as hedging instruments in all cash flow hedges. In order to qualify as hedge accounting, the hedge must meet certain strict conditions, with respect to the documentation, likelihood of occurrence of the hedge operation and hedge effectiveness. The remaining derivative financial instruments are accounted for at fair value through profit or loss.

As of December 31, 2016 and 2015, the Group neither has interest rate nor exchange rate hedge contracts.

j.    Bank loans and other loans

Net fair value is initially recognized net of any operating cost attributable directly to the issue of the instrument. Interest generating liabilities are subsequently calculated at amortized cost, by using the effective interest rate method, which assures that any interest expense during the period up to the complete payment is at a constant rate on the balance of the liability recorded in the statement of financial position. Interest expense includes initial operating costs and premiums payable at the time when they are amortized, as well as any interest or coupon payable while the liability is unpaid.

k.    Borrowings costs

The borrowings costs directly attributable to the acquisition, construction or production of an asset that qualifies are capitalized during the time period required to complete and prepare the asset for its intended use or sale. Other loan costs are expensed in the period in which they occur and reported in "financial costs" (see notes 13 and 21). During 2016 and 2015, the Group has not capitalized costs since they are not identified directly with the acquisition of assets.

l.    Performance rights

Performance rights represent the right acquired for broadcasting programs and events under license agreements, as well as the cost of internal productions.

Rights and obligations derived from performance rights acquired are originally recorded as an asset at their cost of acquisition when contracts are signed and the material is available. A liability is recognized on the unpaid part, if applicable. The portion of performance rights that is going to be used in the next twelve months is classified as a current asset. The cost of performance rights is amortized as programs and events are broadcasted.

As of December 31, 2016 and 2015, the balances of performance rights included internal productions in the amount of $508,050 and $566,331, respectively, as well in 2015 as advances for performance rights in the amount of $1,037,002. Third party rights are amortized at the time they are used which normally occurs in the current month. The performance rights of internal productions are amortized totally, except in the case of soap operas, of which 90% are amortized as broadcasted in Mexico, and the remaining 10% as sold in other countries.

Perpetual performance rights are amortized in a period in which the expected economic benefit is estimated to be obtained. As of December 31, 2016 and 2015, perpetual performance rights amounted to $487,196 and $481,869, respectively.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                      37
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

m.  Inventories

Inventories of merchandise and materials are originally valued at the lower of their acquisition cost or their net realization value. The costs of exchangeable items are ordinarily assigned by using the average cost formula. The net realization value is the estimated selling price in the normal course of business, less any applicable selling expense.

n.  Property and equipment

*Buildings, computer equipment and other operating equipment*

Buildings, computer equipment and other operating equipment (including accessories and furniture) are recorded at the cost of acquisition or manufacturing cost, including any cost directly attributable for transferring the assets to the location where they would be located, as well as to be in the necessary conditions for operating in the manner provided for by Management. All other minor repair and maintenance costs are recognized in the statement of comprehensive income during the period in which they are incurred.

These assets are measured by using the cost model that consists of cost less accumulated depreciation and impairment losses.

Depreciation is recognized based on the straight-line method, which is applied to the cost of the asset less its residual value and considering its estimated useful life at the following rates:

| | |
|---|---|
| Buildings | 3% |
| Operating equipment | 5% & 16% |
| Furniture and office equipment | 10% |
| Transportation equipment | 20% |
| Computer equipment | 25% |

Values and estimated useful life of assets are reviewed at least once a year, and they are updated as required.

Gains or losses derived from the disposal of property, plant and equipment are determined as differences between the proceeds of the disposal and the recorded value of assets, and recognized in income as part of "other income and expenses", in the item of "selling and administrative expenses", as appropriate.

o.  Leased assets

*Finance leases*

The economic ownership of the leased asset is transferred to the lessee if the lessee substantially assumes all the risks and rewards related to the ownership of the leased asset. The pertinent asset is recognized in the statement of financial position as an asset and a liability in the same amount, the lower between the fair value of the leased asset and the present value of the minimum lease payments. Payments are distributed in two parts, financial charges and debt reduction. That financial cost will be distributed among the periods comprising the lease term, so that a consistent interest rate is obtained in each period on the balance of the unamortized debt.

The Group maintains transportation equipment under financial lease agreements entered into with related companies as described in note 12. As of December 31, 2016 and 2015, the net carrying value of such equipment amounted to $1,956 and $2,942, respectively. Expected useful lives of these equipments are determined by reference to comparable owned assets or over the term of the lease, if shorter.

*Operating Leases*

Payments of operating lease agreements are recognized as an expense based on the straight-line method over the term of the lease. The associated costs such as maintenance and insurance are expensed as incurred.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                    38
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

During 2016 and 2015, payments were made on this item in the amount of $196,831 and $203,336, respectively, which are included in the caption of cost of programming, production, and transmission of the accompanying consolidated statement of comprehensive income.

p.  Television concessions

The television concessions that qualify as indefinite useful life intangible assets were determined in conformity with IAS 38. Accordingly, they are not subject to amortization. Instead, concessions are subject to annual impairment tests regardless of any impairment indicator of value.

As of December 31, 2016 and 2015, the concessions were considered under a single cash-generating unit. Its value amounted to $10,785,466 and $9,933,622, respectively. It is comprised mainly of the concessions of channel 7 and channel 13 in Mexico, Guatemala, Azteca America, and Honduras, as well as for the disbursements for the acquisition of Channel 40 in the amount of $374,852, are considered as part of the value of the concessions, wich are reported as part of other intangible assets, pursuant to the litigious matters described in note 9. During 2016 and 2015, the increase in the value of the concessions is due to the increase from the valuation in the closing exchange rate of the foreign concessions in the amount of $851,844 and $610,905, respectively.

*Red Azteca Concessions; channels 7 and 13*

In complying with the provisions set forth in the Mexican Federal Radio and Television Law and through the Ministry of Communications and Transportation (SCT for its acronym in Spanish), on August 25, 2004, all television concessions were extended through certificates of concession renewal for transmission of frequencies, which expire on December 31, 2021.

These certificates of renewal set forth the obligation of implementing land digital technology at television stations in an equal number to analogical stations, in conformity with the standards and policies set forth by the SCT. The Federal Telecommunications Institute (IFT for its acronym in Spanish) has been the competent authority since September 9, 2013 in the period, terms and conditions set forth in those certificates of renewal, as part of the transition process of analogous transmissions to those of high definition. That term expires on December 31, 2021. The certificates of renewal include calendars for the implementation described above which have been complied with by the Group as of December 31, 2015.

*Channel 40*

In the opinion of the Company's legal advisors, the right of expropriation of the concession of Channel 40 is owned by the Company. Pursuant to the foregoing, the disbursements realized to acquire Channel 40 were considered as part of the value of the Concessions. Pursuant to the issue described in note 9, the disbursements in the amount of $374,852 made for the acquisition of Channel 40 are presented as part of other intangible assets.

*Azteca America Concessions*

The ownership, operation, and sale of television stations in the United States of America are regulated by the Federal Communications Commission (FCC), which acts under the authority granted by the Communications Act of 1934 (the "Communications Act").

Television stations are governed by the broadcast licenses granted by the FCC for maximum eight year terms and are subject to renewal, upon petition filed with the FCC, which will generally grant a renewal application if it is proven that: (i) the station has served the public interest, advisability, and need; (ii) there have been no serious violations by the licensee of the Communications Act or the standards and regulations of the FCC; and (iii) there have been no other violations by the licensee of the Communications Act or the overall standards and regulations of the FCC, that constitute a pattern of bad behavior.

The Communications Act prohibits the assignment of a broadcast license or transfer of control of a broadcast license without prior approval of the FCC. Likewise the Communications Act prohibits the issuance of a broadcast license or

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                 39
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

holding a broadcast license by any company of which more than 20% of the capital stock belongs to non US citizens, a foreign government or any company organized under the laws of a foreign country.

As of December 31, 2016, Azteca International Corporation and its subsidiaries have no knowledge of any violation of the Communications Act.

**Northstar – UVM concession**

On January 6, 2014, based on the consent issued by the Federal Communications Commission (FCC) of the United States of America on December 24, 2015, Stations Group, LLC (a subsidiary of Azteca International Corporation) was merged with Una Vez Mas, LLP (UVM), with the participation of Northstar Media, LLC, as the License Holder of the stations owned by UVM.

From 2008 to 2013, Azteca International Corporation (AIC) made various loans to Una Vez Mas LLP (UVM) and Subsidiary Companies in an amount approximating US$76,421, at interest rates ranging between 7% and 9%. Various promissory notes were signed secured by the gains on the sale of the companies that held the licenses of the concessions for operating UVM television stations. Those concessions include three stations considered "full power", ten stations considered "Class A", and eighteen stations considered "low power", located in different cities in US territory.

As a result of the nonperformance by UVM, various legal actions were filed and as at January 31, 2013, AIC and UVM signed the following documents: Letter of intent, Distribution and Support Agreement, and the Term Sheet of the main terms and conditions of the UVM restructuring and the merger with a new subsidiary company of AIC.

AIC and UVM executed a Time Brokerage Agreement (TBA) with the merger agreement on June 30, 2013, since the parties agreed that AIC would operate UVM's stations and cover operating expenses up to the date of the merger. For purposes of the merger, AIC incorporated Stations Group, Inc. (SG) which is currently in charge of operating the stations.

In accordance with the purchase and assignment contract (purchase contract) entered into between Northstar Media, LLC (Associate of AIC) as the buyer on June 30, 2013, and Una Vez Mas, LLP, Una Vez Mas Dallas, LLC, Una Vez Mas Houston, LLC, and Una Vez Mas San Francisco, LLC, (subsidiaries of UVM and holders of the licenses as sellers), the amount of US$700 was set as the purchase price of their shares.

AIC and Northstar Media, LLC entered into an option contract in which AIC has an option to buy the stock of Northstar Media, LLC, in the amount of US$350, plus interest at a 6.5% annual rate during the time elapsed up to the stock call option. AIC has the right to assign the call option to a third party of US nationality in order to comply with the rules of FCC with regard to foreign investments.

Pursuant to the option that AIC has as discussed in prior paragraphs, AIC consolidates its financial statements with those of Northstar Media, LLC, and its subsidiary companies, which include all the license holding companies.

**Southern California TV LLC (SCTV) concession**

Due to the transactions and negotiations carried out by AIC with Grupo Pappas Telecasting, various debts were generated charged to Grupo Pappas Telecasting. In February 2003, Grupo Pappas issued a promissory note (the PTSC promissory note) in benefit of the Company in the amount of US $128,000. That promissory note was secured by the assets of the Pappas Telecasting station of Southern California (PTSC), currently Southern California License, LLC, in Los Angeles, California. Since Grupo Pappas did not settle the above promissory note, this was the reason for repeated renewals and even the amount increased due to new loans and capitalized interest, thereby reaching an amount of US$155,970. Pursuant to a contact, a new buy option was established of the capital of PTSC (the PTSC Option), in the event that the promissory note should not be settled.

In accordance with the option contract (the PTSC Option Contract) entered into between the Company and Dennis J. Davis (DD), LeBon G. Abercrombie (LA), Pappas Telecasting Companies, and Harry J. Pappas (HP) on December

TV Azteca, S.A.B. de C.V. and Subsidiaries    40
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

27, 2007, the Company exercised the call option to purchase the shares of PTSC (the PTSC Option) on December 30, 2009.

For purposes of exercising the PTSC Option, SCTV, Inc. (SCTV) was incorporated and had Azteca International Corporation and DD as stockholders. The latter contributed its equity in PTSC to SCTV. By the same token, the Company and DD entered into an option contract (the DD Option), whereby the Company will have an option to buy the DDs equity in SCTV in the amount of $5,500. The Company has the right to assign DDs Option to a third party of US nationality in order to comply with the rules of the United States (FCC) with regard to foreign investments.

On the other hand, LA assigned its equity interest in PTSC to SCTV, in exchange for a promissory note in the amount of $5,500. SCTV will make quarterly payments to LA for 5 years that will be applicable to the value of the promissory note. Also, in accordance with the PTSC Option Contract, the Company obtained the equity interest of HP and PTC in PTSC, and contributed that equity interest to SCTV in order for SCTV to have 100% of the shares of PTSC.

In October 2010, the date to enforce the PTSC's promissory note was extended up to 2022. The duration of the Local Market Contract (LMC), entered into originally between the Company and PTSC with respect to the Los Angeles station for three years in 2003, was also extended up to 2022. Furthermore, it went into effect since the promissory note had not been paid on or prior to its initial due date. Under the terms of this contract, the annual rent for the station in the amount of $17,907 continues to be in effect, which are offset dollar by dollar by the interest generated by the promissory note. Moreover, Pappas Telecasting of Southern California, LLC (PTSC) changed its corporate name to Southern California TV, LLC (SCTV LLC) in October 2010.

Finally, in the last quarter of 2010, the FCC approved the transfer of the shares of PTSC, now SCTV, LLC, to SCTV, Inc., thereby completing the exercise of the option.

Since SCTV, Inc. and its subsidiary Companies, including SCTV, LLC (SCTV, LLC), consolidate their financial statements with those of AIC and, in turn, AIC consolidates its financial statements with those of the Group, the amount of the promissory note receivable from SCTV, LLC is recognized as the value of the concession held indirectly by this company. As of December 31, 2016 and 2015, the promissory note receivable amounts to $155,970.

*Azteca Honduras Concession*

On November 4, 2013, the Group obtained a license of concession with duration of fifteen years, for rendering the radio broadcasting service through a digital channel with nationwide coverage in Honduras.

    q.   Governmental subsidies

Governmental subsidies are initially recognized as deferred income when there is reasonable certainty that they will be received and that the Company will meet the obligations associated with the subsidy. The subsidies that offset expenses incurred by the Company, are recognized in income systematically in the same period in which expenses were recognized. Subsidies whose primary condition is for the Company to build or acquire non-current assets are recognized as deferred income and transferred to income systematically and rationally over the useful life of the assets.

Subsidies related to assets are presented as deductions of the carrying amount of the asset in the statement of financial position. By the same token, the recognition of deferred revenue from subsidies is shown as a decrease in the depreciation expense of the asset in the statement of comprehensive income.

    r.   Other intangible assets

*Initial recognition*

Costs attributed directly to the development stage of a project are recognized as intangible assets as they meet the following requirements:

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                41
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

- costs can be measured reliably

- the project is technically and commercially viable

- the Group intends and has sufficient resources to complete the project

- the Group has the capacity to use or sell the intangible asset

- the intangible asset will generate probable future economic benefits

Development costs that do not meet these criteria for capitalization are expensed as incurred.

Costs directly attributable to the development stage include employee costs incurred in the development of software, in addition to the adequate portion of the pertinent fixed expenses and borrowings costs.

Fiber optic network Colombia

Costs and expenses incurred for the development of the fiber optic backbone network project directly attributable to the preparation of the asset for its use in accordance with Management's expectations are capitalized, which were totally impaired in 2016 pursuant to various analyses performed by Group Management. In addition, those analyses determined that this investment would require additional capitalization. Accordingly, the Group contributed 40% and the rest was contributed by other shareholders; therefore, beginning December 27, 2016, the Group participates in this investment with that percentage. As at December 27, 2016, the project had a 99% of completion, and the amortized amount is shown in the item of "depreciation and amortization" and its impairment amount is shown in the item "other expenses, net" within the consolidated statement of comprehensive income (see notes 9 and 22).

Fiber optic network Peru

Costs and expenses incurred during concession process were capitalized. Costs incurred for the development of the fiber optic backbone network project are recognized in income. As at December 31, 2016, the project is in progress, and it will be amortized when expected economic benefits start to be received. As of December 31, 2016, the construction stage and delivery of the optic fiber network has been entirely completed (see note 9).

Players' registration costs

Players' registration costs whose acquisition is considered final are amortized in accordance with the time that comprises the duration of the player's contract, when the offer of their services on the domestic football soccer market merits it as such, and the estimated time of the "Professional Life" of the player, which in no case exceeds the term of the contract. This is why the latter is the maximum amortization time. Player's registration costs acquired on loan (temporary) are amortized during the time comprising that loan. The cost for transferring players is not recognized until the time of the sale or retirement thereof.

Affiliation rights

The right of affiliation with the Mexican Soccer Federation (*Federación Mexicana de Fútbol*) by franchise of the First Division "A" was recognized at its acquisition cost. As of December 31, 2016 and 2015, the value of the right of affiliation did not exceed its recovery value. These affiliation rights are not amortized due to the impossibility of defining the termination of future economic benefits accurately. Those assets are subject to an annual assessment for possible impairment or before if merited by circumstances.

Acquisition of software

Software licenses acquired are capitalized considering the costs incurred for acquiring and installing specific software.

Software developed internally

Expenses of the research stage for computer and telecommunications systems are recognized as an expense when

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                    42
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

incurred, and expenses identified in the development stage are capitalized.

*Subsequent measurement*

Intangible assets including capitalized software developed internally are accounted for by using the cost model whereby capitalized costs are amortized on a straight-line basis over their estimated useful lives, since these assets are considered definite-lived assets. Residual values and useful lives are reviewed on each reporting date. They are currently subject to impairment tests as described in the following paragraph.

s.   Impairment of the value of assets

The Group periodically evaluates the recovery value of tangible and long-lived intangible assets, including goodwill to determine the existence of indicators that those values exceed their recovery value.

For purposes of evaluating impairment, assets are grouped on the lowest levels for which there is an independent adequate cash inflow (cash generating units). As a result, assets are tested individually for impairment and some are tested at cash generating unit level.

Cash generating units to which goodwill is assigned, indefinite-lived intangible assets, and intangible assets that are still not available for use undergo impairment tests at least once a year. The rest of the individual assets or cash generating units are tested for impairment, provided that there is an event or change in circumstances which indicates that the amount recorded cannot be recovered.

An impairment loss is recognized in the amount in which the recorded value of the asset or cash generating unit exceeds its recovery value, which applies to the higher amount between fair value less cost to sell and value in use. To determine the value in use, Management estimates the expected future cash flows of cash generating unit and determines an adequate interest rate to be able to calculate the present value of those cash flows. The data used for impairment testing procedures are directly linked to the most recent budget approved by the Group, adjusted as necessary to exclude the effects of future reorganizations and improvements of assets. Discount factors are determined individually for cash generating unit and reflect their respective risk profiles, as evaluated by Management.

Impairment losses for cash generating units reduce the amount recorded first of any goodwill assigned to that cash generating unit. The remaining impairment loss is charged to other long-lived assets on a prorated basis in the cash generating unit. Except for goodwill, all assets are evaluated subsequently to confirm that any impairment loss that has been previously recognized no longer exists. An impairment charge is reversed if the recoverable value of the cash generating unit exceeds the carrying book value.

*Impairment test*

For purposes of the annual impairment test, working capital assets, fixed assets, concessions, and other intangible assets are considered as a single cash generating unit (CGU), pursuant to the assumption that the Group has proprietary assets to operate independently as a going concern, which generates economic flows and its own financial information, which enables it to be analyzed individually at the date of the analysis.

Fair value, less disposition costs is the technique used to determine the recoverable amount. This fair value is calculated through the estimate of market capitalization, by multiplying the average closing price of the share of the last twelve months at the valuation date by the number of shares at the same date. The value of the total debt as well as minority interest, are subsequently aggregated to obtain total invested capital.

As at December 31, 2016, the Group recorded an impairment charge in its intangible assets (fiber optic network Colombia) as discussed in note 9.

t.   Income tax

IAS 12 "Income Taxes" sets forth that the tax due is determined based on currently enacted tax legislation and is

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                 43
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

recorded in income for the period to which it is attributable. The effects of deferred taxes consist of applying the tax rate applicable to all those temporary differences between book and tax balances of assets and liabilities that are expected to materialize in the future, related to: (i) deductible and taxable temporary differences; (ii) the offsetting of prior period tax loss carryforwards; and (iii) the offsetting of unused prior year credits (unused tax credit carryforwards)

Deferred income tax assets are recognized if it is likely that future tax benefits will be obtained against those that can be offset.

Deferred income tax liabilities derived from investments in subsidiaries and associates are recognized except when reversal of those temporary differences can be controlled by the Group, and it is likely that the temporary difference will be reversed in the foreseeable future.

Deferred tax assets and liabilities are offset only when the Group has the right and intent to offset current tax assets and liabilities of the same tax authority.

Deferred tax assets are recognized when it is more likely than not that they can be used against future taxable income. The foregoing is determined based on the Group's budget on future operating income, adjusted by significant items that are reconciled for taxable income and by the limits on the use of tax losses or other unappropriated tax assets. Deferred tax liabilities are always provided for entirely.

u.   Non-current assets and liabilities classified as held-for-sale

When the Group intends to sell a non-current asset or a group of assets (a group for disposal), and if the sale is highly likely in the next twelve months, the assets or group for disposal are classified as "held-for-sale" and they are presented separately in the statement of financial position. Liabilities are classified as "held-for-sale" and presented as such in the statement of financial position if they are directly associated with a group for disposal.

Assets classified as "held-for-sale" are measured at their carrying value immediately before their classification as the lower of held-for-sale or their fair value, less their cost to sell. However, some assets "held-for-sale" such as financial assets or deferred tax assets continue to be measured in conformity with the Group's accounting policy for those assets. No asset classified as "held-for-sale" is subject to depreciation or amortization after they are classified as "held-for-sale".

As of December 31, 2016, the Group did not intend to dispose of any asset or set of assets.

v.   Employee benefits

*Termination and retirement benefits*

The Group grants a benefit to personnel after their employment relationship is terminated either by dismissal or voluntary separation. In accordance with IAS 19 "Employee benefits", this practice constitutes an obligation assumed by the Company with its personnel, which is recorded based on annual calculations prepared by independent actuaries.

*Benefits for seniority bonuses and pensions*

The Group does not operate pension plans. However, there is a provision that recognizes the cost of the years of service of personnel, which was determined based on actuarial calculations.

The liability recognized in the statement of financial position for defined benefit plans is the present value of defined benefit obligations (DBO) at the reporting date, together with any adjustment on unrecognized actuarial gains or losses and prior service costs.

The liability also considers the Group's specific expectation of future salary increases. Discount factors are determined close to every fiscal year end in reference to the high quality government paper that is denominated in the

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                  44
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

currency in which benefits will be paid.

These assumptions were developed by Management with the expert advice furnished by independent actuarial appraisers. Other assumptions are based on Management's experience.

w.    Provisions, contingent liabilities and contingent assets

Provisions are recognized when current obligations as a result of a past event are likely to lead to an outflow of economic resources by the Group and the amounts can be estimated with certain reliability. The time or amount of that outflow can still be uncertain. A current obligation is derived from the presence of any legal or constructive commitment that has resulted from past events, for example: product warranties granted, legal disputes or onerous contracts.

Provisions for restructuring are recognized only if a formal detailed plan has been developed or implemented for restructuring, or management has at least announced the main characteristics of the plan for persons who are affected or it has started to be implemented. Provisions are not recognized on future operating losses.

Provisions are measured based on the estimated expense required to cancel the current obligation, pursuant to the most reliable evidence available at the date of presentation of the financial statements, including risks and uncertainties associated with the current obligation. In the cases in which there are a similar number of obligations, the possibility that a disbursement may be required for cancellation is determined through the consideration of that type of obligations as a whole. Provisions are discounted at their present values in the cases in which the value in time of the money is material.

Any reimbursements that the Group considers that it is going to be collected from a third party in connection with an obligation are recognized as a separate asset. However, this asset cannot exceed the amount of the related provision.

In those cases in which an outflow of economic resources is considered unlikely or remotely probable as a result of current obligations, no liability is recognized unless it is presumed in the course of a business combination (see note 4c). Contingent liabilities are recognized in a business combination at the date of acquisition when there is a current obligation that is derived from past events, and fair value can be recognized reliably, even if the outflow of economic resources is unlikely. They are subsequently measured based on the higher amount between a comparable provision as described above and the amount recognized at the date of acquisition, less any amortization.

x.    Equity, capital reserves and dividends payment

Capital stock represents the par value of shares issued.

*Premium on stock issued*

The premium on stock issued includes any premium received for the issue of share capital. Any operating cost associated with the issue of shares is deducted from the premium on stock issued, net of any benefit from the related tax on earnings.

*Reserve for stock repurchases*

In accordance with the Securities Market Law, the Company created a capital reserve by appropriating a Reserve for stock repurchases from retained earnings, in order to strengthen the offer and demand for its shares on the Securities Market. Shares acquired and temporarily withdrawn from the market are considered as treasury stock that are presented as a capital stock decrease, until placed again on the market. When repurchased stock is sold, a gain or loss is not recognized in income, but stockholders' equity is increased or decreased.

*Other components*

Other components of capital include the following:

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                    45
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

- Effects of translation - these include the effect of translation of currencies from the Group's foreign entities into pesos (see note 4e)

- Reserve for financial assets and liabilities available-for-sale and cash flow hedges -these include gains and losses related to this type of financial instruments (see note 4i).

*Retained earnings*

Retained earnings include all current and prior period earnings reduced, if applicable, by current and prior year losses, dividends paid, and transfers to other capital accounts.

All operations with owners of the parent are recorded separately in equity.

Distributions of dividends payable to stockholders are charged to retained earnings and included in "Other liabilities" when dividends have been declared, but have not been paid at the reporting date. As of December 31, 2016 and 2015, dividends declared were fully paid.

y.    Revenue recognition

Revenues are measured by reference to the fair value of the payment received or receivable by the Group of goods provided or services rendered, without counting sales taxes, rebates and commercial discounts.

Revenues on advertising contracts are recognized as the advertising contracted is broadcasted. Revenue consists of revenues obtained from advertisers less sales commissions. Sales commissions amounted to $1,173,853 and $950,459, for the years ended December 31, 2016 and 2015, respectively.

*Revenues from advertising contracts*

Revenues from advertising contracts are recognized as the advertising contracted is broadcasted.

*Income from unsold advertising time*

The Company recurrently markets unsold advertising time to infomercials, shared risk advertisers, and through integrated advertising. Infomercials are charged at a fee contracted for the time that the advertisement lasts. For shared risk advertisements, a percentage is received of gross sales of the products offered during the period of time negotiated after the advertisement is broadcasted. Integrated advertising revenue applies to the presentation and use of products during the broadcasting of internal programming. Revenue for these items accounted for 14.12% and 17.28% of net sales as of December 31, 2016 and 2015, respectively.

*Deferred income from advertising time*

The Group essentially handles two types of advertising advance contracts with its customers. On one hand, there are contracts in which advertisers choose to pay the total advertising contracted within the four months subsequent to the date on which the contract is signed. On the other hand, there are contracts in which the Group permits customers to make payments in installments, which are generally supported by notes over the period in which advertising is broadcasted. In both cases, the Company enters into some contracts with its customers for terms exceeding one year.

Cash or other assets received and the balance due from customers, as well as the obligation to provide advertising under any type of contracts entered into are recorded when those contracts are signed or the customer has tacitly accepted. Advertising advances or deferred obligations are credited to net sales when the advertising contracted is broadcasted. Revenue recognition is based on the information reported by the systems to those that incorporate the programming data transmitted daily, audience measurements, amounts of contracts, and other information.

Advances from advertisers or deferred obligations are valued at selling prices of services. Management estimates that approximately 51% of those obligations represent the cost of the service to be rendered.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                46
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

*Barter transactions*

Barter operations represent transactions that do not imply any cash flow whereby the Company sells advertising time to third or related parties, in exchange for certain assets or services. These transactions are originally recorded at the market value of the assets or services agreed upon in barter contracts in the caption of receivables from advertisers. In the years ended December 31, 2016 and 2015, net revenue derived from barter transactions amounted to $344,408 and $403,367, respectively.

z.   Operating expenses

Operating expenses are recognized in income at the time services are rendered.

aa.   Interest income and interest expenses and dividends received

Interest income and interest expenses are reported on an accrual basis, by using the effective interest method. Dividends income that is not from investments in associates is recognized at the time at which the Group is eligible to receive the payment.

bb.   Earnings per share

Ordinary basic earnings per share are calculated by dividing the holding Company's equity by the weighted average of ordinary shares outstanding during the fiscal year. Diluted earnings per share are determined by adjusting the holding Company's equity, under the assumption that the entity's commitments would be realized to issue or exchange its own shares. Basic earnings are equal to diluted earnings, since there are no transactions that might potentially dilute the earning.

cc.   Comprehensive loss

Comprehensive loss mainly consists of net loss, translation effects, and effects of valuation of financial instruments available-for-sale, which are reflected in equity and do not represent capital contributions, decreases, and distributions. The amounts of comprehensive loss of 2016 and 2015 are stated in historical pesos.

dd. Management's significant criteria upon applying accounting policies and uncertainty in estimates

The estimates and judgments used for the preparation of the financial statements are continually assessed and searched for in the historical experience and other factors, including projections of future events considered reasonable under current circumstances.

*Management's significant criteria*

Management's significant judgments in the application of the Group's accounting policies that have a significant effect on the financial statements are described below:

Internally generated costs of software and development

Significant judgment is required to distinguish the research stage from the development stage and determine if they meet the capitalization requirements of development costs. After capitalization, Management monitors to see if those requirements continue to be met and if there are indicators that such capitalized costs can be impaired.

Deferred tax assets

The amount on which a deferred tax asset can be recognized is based on the evaluation of the likelihood of having future taxable income on which the Group's deferred tax assets can be used. Significant judgment can further be required upon evaluating the impact of certain legal or economic limits or uncertainty in different tax jurisdictions.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                47
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

*Uncertainty of estimate*

Information on significant judgements, estimates and assumptions that have more significance on the recognition and measurement of assets, liabilities, revenues, and expenses is provided below. Actual results can be substantially different.

Non-financial asset impairment

In the evaluation of impairment, Management determines the recoverable value of each asset or cash generating unit, based on the expected cash flows and determines an adequate interest rate to be able to calculate the present value of those cash flows. Uncertainty of the estimate is related to the assumptions on future operating income and the determination of an adequate discount rate.

Useful lives of depreciable assets

Management reviews the useful lives of depreciable assets on each reporting date, based on the expected use of each asset. Uncertainty in these estimates is derived from the technical obsolescence that can modify the expected use of the asset, including software and computer equipment.

Performance rights

Management periodically evaluates the validity of the licenses of the titles for transmission and the capacity of these rights to generate future revenues.

Inventories

Management estimates the net realizable values of inventories, taking into consideration the most reliable evidence available at the reporting date. Future realization of these inventories can be affected by future technology or other changes on the market that can reduce selling prices.

Business combinations

Management uses valuation techniques to determine the fair values of the elements of a business acquisition. The fair value of the contingent payment is particularly dependent upon various results that can affect future earnings.

Allowance for doubtful accounts

The Company determines the allowance for doubtful accounts by studying factors such as: (i) the customer's financial position; (ii) the delay in collection; (iii) guarantees or warranties granted by the customer; and (iv) historical uncollectibility trends. This implies that Management makes allowances for uncollectibility at the date of preparation of the financial statements that will not necessarily behave as such in reality.

Defined benefit obligation

Management determines the DBO based on the number of critical assumptions, such as standard inflation rates, trends of health care service costs and mortality, discount rates, and future increases in expected salaries. Variations of these assumptions can impact the amount of the DBO and the pertinent annual expense on defined benefits (the analysis is furnished in note 14).

Fair value of financial instruments

Management uses valuation techniques to measure the fair value of financial instruments in which there are no active market quotes available. Consequently, Management considers estimates and assumptions based on market information and observable data that might be used by market participants upon setting a price on the instrument. In the cases in which there are no observable data, Management uses the best estimate on the assumptions that might be made by market participants. These fair value estimates of financial instruments can vary from actual prices that can be reached in arm's length transactions at the date of the report (see note 16).

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                48
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

## 5.    CASH AND CASH EQUIVALENTS:

Cash and cash equivalents are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Petty cash funds and checking accounts | $    2,322,290 | $    1,446,864 |
| Short-term investments | 2,148,024 | 1,491,553 |
| Total cash and cash equivalentss | $    4,470,314 | $    2,938,417 |

## 6.    TRADE AND OTHER RECEIVABLES:

Trade and other receivable balances, classified on financial and non-financial assets, are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Trade receivables | $    6,409,290 | $    6,213,297 |
| Allowance for doubtful accounts | (589,989) | (489,102) |
| Trade receivables, net | 5,819,301 | 5,724,195 |
| Other receivables | 263,489 | 565,489 |
| Financial assets | 6,082,790 | 6,289,684 |
| Prepaid expenses | 115,194 | 119,774 |
| Non-financial assets | 115,194 | 119,774 |
| Total trade and other receivables, short-term and long-term | $    6,197,984 | $    6,409,458 |

The net carrying value of short-term and long-term receivables is considered to approximate their fair value.

Trade accounts receivable as of December 31, 2016 and 2015, include: (i) barter transactions in the amount of $264,612 and $373,282, respectively; and (ii) related party balances in the amount of $453,080 and $573,282, respectively.

As of December 31, 2016 and 2015, trade accounts and other receivables were reviewed with respect to impairment indicators. Certain accounts were identified that were impaired and pursuant thereto, the allowance for doubtful accounts was increased in those years. Consequently, net income for the Group was affected as shown below:

|  | 2016 | 2015 |
|---|---|---|
| Opening balance January 1 | $    (489,102) | $    (406,874) |
| Increases | (201,900) | (88,097) |
| Write-offs | 101,013 | 5,869 |
| Ending balance December 31 | $    (589,989) | $    (489,102) |

## 7.    INVENTORIES:

As of December 31, 2016 and 2015, inventories are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Fiber optic materials, supplies and replacement parts in Peru | $    169,058 | $    479,462 |
| Fiber optic materials and replacement parts in Colombia | - | 161,553 |
| Other inventories | 33,246 | 25,986 |
|  | $    202,304 | $    667,001 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                    49
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

### 8.    PROPERTY AND EQUIPMENT:

Property and equipment are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Buildings | $  2,913,209 | $  2,755,349 |
| Operating equipment | 6,591,995 | 6,329,690 |
| Furniture and office equipment | 382,760 | 399,360 |
| Transportation equipment | 1,042,610 | 1,034,207 |
| Fiber optic | 1,276,978 | 1,189,545 |
|  | 12,207,552 | 11,708,151 |
| Less  – Accumulated depreciation | (8,838,960) | (8,274,682) |
|  | 3,368,592 | 3,433,469 |
| Land | 681,394 | 688,131 |
| Construction-in-progress | 61,121 | 70,855 |
|  | $  4,111,107 | $  4,192,455 |

The reconciliation of account activity for the years ended December 31, 2016, and 2015, is shown below:

### Reconciliation as of December 31, 2016

|  | Balance at beginning of year, net of accumulated depreciation | Additions | Disposals | Depreciation for the year | Balance at end of year, net of accumulated depreciation | Estimated useful life (years) |
|---|---|---|---|---|---|---|
| Buildings | $ 1,350,775 | $ 163,637 | $        102 | $       91,706 | $ 1,422,604 | 33 |
| Operating equipment | 1,419,621 | 279,261 | 1,135 | 371,714 | 1,326,033 | 6 & 20 |
| Furniture and office equipment | 52,068 | 5,708 | 2 | 7,892 | 49,882 | 10 |
| Transportation equipment | 314,995 | 186,776 | 137,803 | 84,255 | 279,713 | 5 |
| Other fixed assets | 296,010 | 141,015 | 28,794 | 117,873 | 290,358 | 4 |
| Land | 688,131 | - | 6,736 | - | 681,395 | - |
| Construction-in-progress | 70,855 | 618,811 | 628,544 | - | 61,122 | - |
|  | $ 4,192,455 | $1,395,208 | $ 803,116 | $      673,440 | $ 4,111,107 |  |

### Reconciliation as of December 31, 2015

|  | Balance at beginning of year, net of accumulated depreciation | Additions | Disposals | Depreciation for the year | Balance at end of year, net of accumulated depreciation | Estimated useful life (years) |
|---|---|---|---|---|---|---|
| Buildings | $ 1,363,912 | $    91,877 | $    13,746 | $       91,268 | $ 1,350,775 | 33 |
| Operating equipment | 850,216 | 901,247 | 1,654 | 330,188 | 1,419,621 | 6 & 20 |
| Furniture and office equipment | 55,637 | 6,054 | 3 | 9,620 | 52,068 | 10 |
| Transportation equipment | 364,596 | 178,510 | 132,748 | 95,363 | 314,995 | 5 |
| Fiber-optic network | 62,060 | - | 62,060 | - | - | - |
| Other fixed assets | 217,985 | 179,777 | 338 | 101,414 | 296,010 | 4 |
| Land | 689,130 | - | 999 | - | 688,131 | - |
| Construction-in-progress | 87,117 | 1,196,225 | 1,212,487 | - | 70,855 | - |
|  | $ 3,690,653 | $2,553,690 | $1,424,035 | $      627,853 | $ 4,192,455 |  |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                     50
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

*Components under construction – Construction-in-progress*

As of December 31, 2016 and 2015, constructions in progress corresponded mainly to the investment realized for the change from analogical transmission technology to digital technology.

All charges for depreciation and impairment are included as part of depreciation, amortization, and impairment of non-financial assets. As of December 31, 2016 and 2015, it was not necessary to make any impairment charges.

## 9.    OTHER INTANGIBLE ASSETS:

As of December 31, 2016 and 2015, this caption is summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Payments to Corporación de Noticias e Información, S.A. de C.V. | $ 374,852 | $ 374,852 |
| Players' registration costs and affiliation rights | 732,299 | 535,277 |
| Fiber optic Colombia | - | 1,397,298 |
| Atlas Soccer Team acquisition | 188,579 | 188,579 |
| Fiber optic Peru | 31,279 | 21,406 |
| Other assets, net | 161,587 | 278,052 |
|  | $ 1,488,596 | $ 2,795,464 |

The reconciliation of operations is as follows:

|  | CNI | Fiber optic Colombia | Fiber optic Peru | Players' registration costs | Franchise and Atlas Trademark | Others | Total |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2015 | $374,852 | $1,197,605 | $ 35,375 | $547,495 | $188,579 | $212,788 | $2,556,694 |
| Increases | - | 424,277 | - | 273,020 | - | 121,994 | 819,291 |
| Reclassifications | - | - | (12,891) | - | - | - | (12,891) |
| Sale of players | - | - | - | (162,778) | - | - | (162,778) |
| Amortization | - | (224,584) | (1,078) | (122,460) | - | (56,730) | (404,852) |
| Balance as of December 31, 2015 | $374,852 | $1,397,298 | $ 21,406 | $535,277 | $188,579 | $278,052 | $2,795,464 |
| | | | | | | | |
| Balance as of January 1, 2016 | $374,852 | $1,397,298 | $ 21,406 | $535,277 | $188,579 | $278,052 | $2,795,464 |
| Increases | - | - | 69,874 | 349,423 | - | 32,804 | 452,101 |
| Sale of players | - | - | - | (78,135) | - | - | (78,135) |
| Impairment | - | (1,376,526) | - | - | - | - | (1,376,526) |
| Amortization | - | (20,772) | (60,001) | (74,266) | - | (149,269) | (304,308) |
| Balance as of December 31, 2016 | $374,852 | $ - | $ 31,279 | $732,299 | $188,579 | $161,587 | $1,488,596 |

### Corporación de Noticias e Información, S.A. de C.V. (CNI)

On December 10, 1998, the Company and its subsidiary Operadora Mexicana de Televisión, S.A. de C.V. (OMT) signed a Joint Venture Agreement with CNI and Televisora del Valle de México, S.A.P.I. de C.V. (TVM), which establishes the bases for: (i) the possible acquisition by TVA of shares issued by TVM; (ii) the operation and marketing of Channel 40 by OMT; (iii) the programming of Channel 40; and (iv) a credit granted by TVA to CNI and the documents discussed below, among other things, were signed:

a)    A Loan Agreement signed on October 9, 1998, whereby the Company granted a loan in the amount of US$10,000 in favor of CNI over a ten year term, with a 3-year grace period as of the drawdown of the loan. Interest on the credit was equivalent to the highest rate paid by the Company plus 0.25 points. To secure the

TV Azteca, S.A.B. de C.V. and Subsidiaries                                    51
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

loan, a pledge was created applicable to 51% of the shares representative of the capital stock of TVM, held by Mr. Javier Moreno Valle Suarez. Those shares will be pledged until the loan and its related costs are paid in full. As of July 2000, CNI had drawn down US$10,000 of this loan.

b)  The Company entered into an assignment of rights and obligations contract (the "Assignment Contract") with CNI that CNI had with TVM under which the Company would market, program, and operate television Channel 40. Under that Contract, TVA delivered US$15,000 to CNI, which were considered as a 50% prepayment of the EBITDA for the first three years of the Contract. As of December 31, 1999, the Company delivered the total US$15,000 described, which will be amortized against the EBITDA generated in operating Channel 40 over a maximum 10-year period.

In July 2000, CNI suspended the transmission of the Company's signal, which was an obligation set forth in the joint venture agreement. As an answer to this and other actions, the Company has filed various lawsuits against CNI, TVM, and Mr. Moreno Valle.

In September 2005, the Seventh Civil Court handed down a ruling whereby; a) TVM and CNI nonperformed the Assignment Contract; b) TVM and CNI were ordered to perform the Assignment Contract; and c) TVM and CNI were ordered to pay damages and harm, as well as (legal) expenses and costs. The Fourth Civil Court confirmed the ruling handed down by the court of original jurisdiction, TVM and CNI filed appeals for constitutional relief against the rulings handed down by the fourth division in the appeal filed by the defendant, on which the final ruling was handed down by the First Civil Three-Judge Court, in the sense of confirming the judgment for the plaintiff that sentenced TVM and CNI, except for the sentence of the payment of expenses and costs.

In execution and performance of the final ruling handed down by the Seventh Civil Judge, Channel 40 again started to broadcast the programming furnished by the Company, in reliance on the contracts signed between TVM and the Company in 1998, which were restored and recognized by the person who acts as both sole director and CEO.

In spite of a lack of certainty, the Company considers that it will prevail in the various disputes it has with CNI, TVM, and Mr. Moreno Valle and, therefore, no provision has been made for this matter.

**Fiber optic network Colombia**

A branch of the Company in Colombia was awarded the bid for the construction of a fiber optic network (the network) in 753 municipalities and 2,000 public institutions in Colombia during 2011. The objective of this operation is to design, install, put into service, operate, manage, and maintain this telecommunications network. The Colombian branch has a 2.5-year period to build the network, and holds the concession to be operated for a 15-year period.

The resources for the construction of the network proceed from a subsidy granted by the Government of Colombia, supplemented by the Group's own resources. The Colombian branch is subject to certain conditions for obtaining the subsidy, among other things, is highlighted by the free service with certain limitations rendered for the use of the fiber optic network to 2,000 public institutions of the government of Colombia for a five year period, the construction in due time and proper form of the network and the operation and maintenance thereof for fifteen years. The commitments acquired by the Group are disclosed in note 25. All the stipulated conditions have been complied with during the validity of the contract.

At December 31, 2016, pursuant to the analyses and evaluations performed by Management with respect to impairment indicators, the Group recognized an impairment charge amounting to $1,376,526, which is presented in "other expenses" of the accompanying consolidated statements of comprehensive income (see note 22).

Moreover, the Group analyzed the perspectives and valuation of its investment in the telecommunications business in Colombia to define the long-term approach more accurately, and determined that this business would require an additional investment of capital amounting to US$100 million in the short-term to develop last mile infrastructure; therefore, it entered into an agreement with the shareholders which set forth that the Group would contribute US$40 million and the remaining US$60 million would be contributed by another group of shareholders.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                52
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

On December 27, 2016, the shareholder agreement was concluded and the capitalizations discussed were formalized; therefore, beginning that date, the Group stopped having control over the telecommunications business in Colombia, and consequently: (i) the assets and liabilities of the companies involved stopped being consolidated; and (ii) the investment in those companies will be valued by using the equity method.

**Governmental subsidies**

The subsidy granted by the Government of Colombia amounted to $415,000 million Colombian pesos (which were equivalent to approximately $2,000 million Mexican pesos at that time), and it was supplemented with its own funds. The Colombian branch was subject to meeting the conditions discussed in the foregoing paragraphs, which have been met as at December 31, 2016.

As of December 31, 2015, the assets generated by stages one and two of the fiber-optic network, amount to $132,875, and correspond to the fifteen undivided proportionate shares of ownership of the optical network accrued as at that date. The trustee fees corresponding to the unaccrued fifteen undivided proportionate shares of ownership amount to $2,837,943. Both amounts of the subsidy obligation are presented netted in the consolidated statement of financial position.

**Fiber optic network Peru**

In June 2014, Azteca Comunicaciones Perú, S.A.C. entered into a contract with the Peruvian government to carry out the project named "National Fiber Optic Backbone Network" (RDNFO for its acronym in Spanish) with a term of 20 years. That contract established the bases for the design, financing, construction, operation, and maintenance of 13,400 km of a fiber optic network through which 23 regions, 180 cities, and 136 municipalities will be connected. The execution time of the work is 24 months, and it should be completed through six delivery stages by June 2016. The total estimated investment amounts to US$323 million contributed by the Peruvian government.

As of December 31, 2016, all the stages of the fiber optic network were delivered to the Government of Peru. The stages already delivered generated the considerations corresponding to the redistributions on investment, which were discounted by the Group.

**10.    INVESTMENTS ACCOUNTED FOR USING THE EQUITY METHOD AND OTHER:**

The balance of the investment in associated companies is summarized as shown below:

|  | 2016 | 2015 |
|---|---|---|
| Súper Espectáculos, S.A. de C.V. (Arena Monterrey) | $    212,539 | $    191,439 |
| Azteca Comunicaciones Colombia | 60,879 | - |
| Globo Re, S.A. (Resident abroad) | - | 128,780 |
| Other investments | 58,762 | 39,185 |
|  | $    332,180 | $    359,404 |

Condensed information of assets, liabilities, revenues, and results of associated companies, as well as the percentage of equity of the Company as of December 31, 2016 and 2015, is presented below:

| Name | Assets | Liabilities | Revenues | Income/ (Loss) | % of equity |
|---|---|---|---|---|---|
| As of December 31, 2016- |  |  |  |  |  |
| Súper Espectáculos, S.A. de C.V. (Arena Monterrey) | $ 2,684,815 | $ 1,388,492 | $1,312,828 | $ 112,669 | 20% |
| Azteca Comunicaciones Colombia | 1,313,639 | 731,069 | 749,218 | (1,389,011) | 40% |
| As of December 31, 2015- |  |  |  |  |  |
| Súper Espectáculos, S.A. de C.V. | $ 2,710,142 | $ 1,532,832 | $1,245,026 | $    29,967 | 20% |
| Globo Re, S.A. | 704,036 | 160,754 | 1,026 | 1,330 | 27% |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                53
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

As indicated in note 9 above, beginning December 27, 2016, Azteca Colombia qualifies as an associate. The condensed information as of December 31, 2015, is included below:

| Name | Assets | Liabilities | Revenues | (Loss) |
|---|---|---|---|---|
| Azteca Comunicaciones Colombia | 2,233,877 | 1,424,875 | 607,206 | (588,273) |

On July 29, 2016, the Group disposed of the investment that it held in its associated company Globo Re, S.A., thereby generating a gain amounting to $194,883.

The Group disposed of equity in other permanent investments at a carrying value amounting to $38,946 in 2015.

As of December 31, 2016 and 2015, the Company recognized an increase in its investments in associates through the equity method in the amounts of $23,309 and $26,352, respectively, according to its percentage of equity in the comprehensive income of its associated companies. Those amounts are presented in the consolidated statement of comprehensive income within the line of Equity in earnings of associates, including an effect on that income due to an impairment in other permanent investments amounting to ($19,786) as a result of 2015.

As of December 31, 2016 and 2015, the Group holds other investments where it has no significant influence with a net book value amounting to $58,762 and $39,185, respectively, whose carrying value is similar to fair value.

**11.    TRADE AND OTHER PAYABLES:**

Trade accounts and other payables are summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Trade payables and creditors | $ 1,375,795 | $ 1,967,656 |
| Interest payable | 278,709 | 233,148 |
| Operating costs and expenses | 1,381,158 | 1,537,902 |
| Contributions and other payables | 579,142 | 365,133 |
|  | $ 3,614,804 | $ 4,103,839 |

**12.    RELATED PARTY BALANCES AND TRANSACTIONS:**

Related party balances, which are not guaranteed and will be settled in cash, are as follows:

|  | 2016 | 2015 |
|---|---|---|
| **Accounts receivable:** |  |  |
| Comunicaciones Avanzadas, S.A. de C.V. (Holding Company) | $ 584,860 | $ 510,526 |
| Organización de Torneos y Eventos Deportivos, S.A. de C.V. | 113,736 | - |
| Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra) | 105,654 | 88,471 |
| Total Play Telecomunicaciones, S.A. de C.V. | 31,880 | 13,209 |
| Desarrollos Infraestructura y Construcción G.S., S.A. de C.V. | 34,283 | 34,283 |
| Arrendadora Internacional Azteca, S.A. de C.V. | 22,485 | 30,479 |
| Adamantium Private Security Services, S. de R.L. de C.V. | 2,809 | 71,896 |
| Other | 45,028 | 31,905 |
|  | $ 940,735 | $ 780,769 |
| **Accounts payable:** |  |  |
| Selabe Diseños, S.A. de C.V. (Selabe) | $ 88,230 | $ - |
| Globo Re, S.A. | - | 160,061 |
| Procesos Boff, S. de R.L. de C.V. | 9,341 | - |
|  | $ 97,571 | $ 160,061 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                54
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

The most significant related party transactions carried out are described below, wich were carried out as if the terms of the considerations for related party transactions were equivalent to similar transactions carried out with independent third parties:

**Advertising income**

Income from advertising broadcasted contracted with related parties amounted to $660,112 and $429,953 for the years ended December 31, 2016 and 2015, respectively.

Grupo Elektra, S.A.B. de C.V. and subsidiaries (Grupo Elektra)

During 2016 and 2015, the Company and Grupo Elektra entered into annual advertising; the rights under the terms of these contracts cannot be transferred to third parties by Grupo Elektra. As of December 31, 2016 and 2015, revenues from Grupo Elektra amounted to $583,989 and $412,523, respectively.

Total Play Telecomunicaciones, S.A. de C.V. (Total Play)

The Company entered into annual advertising contracts in 2016 and 2015; the rights under the terms of these contracts cannot be transferred to third parties by Total Play. As at December 31, 2016 and 2015, revenues from Total Play amounted to $76,123 and $17,700, respectively.

**Interest earned**

During the years ended at December 31, 2016 and 2015, the Company granted short-term loans to related parties. In the years then ended, interest earned pursuant to these loans amounted to $16,225 and $18,117, respectively

**Revenues on productions and promotions**

Banco Azteca, S.A. (Affiliated Company, subsidiary of Grupo Elektra)

The Company and Banco Azteca have entered into various production and promotion contracts of the products and services of Banco Azteca on open television channels 7 and 13. As of December 31, 2016 and 2015, revenues from these contracts amounted to $98,033 and $22,969, respectively.

**Income from leasing property**

The Company (as a lessor), entered into a lease agreement of real property with a subsidiary of GSF Telecom Holdings, S.A.P.I. de C.V.; the amount of the rent is increased every year. As of December 31, 2016 and 2015, the lease revenue set forth in this agreement amounted to $9,412 and $5,396, respectively.

**Leased equipment**

The Company has entered into operating leasing agreements with a purchase option with AIA, an affiliated company. The Company is the lessee and AIA is the lessor. To date exhibits have been executed for leasing vehicles and computers. The term of those agreements is in effect over the terms set forth in each one of the exhibits of the equipment leased, which are generally from 3 to 4 years. The terms computed in those exhibits will be binding for both parties, except in the event that the lessor should terminate those agreements early if any of the assumptions set forth in the agreements should occur. At the end of the term of every exhibit, the Company may choose to acquire the assets under lease agreements, extend the term or return the leased assets, with a notification of at least 90 calendar days prior to its expiration. The monthly rent under the terms of the agreement is fixed, in conformity with each one of the exhibits.

Pursuant to the characteristics of the lease agreements discussed above and in conformity with currently enacted standards, they may be capitalized. For the years ended December 31, 2016 and 2015, the assets acquired under these agreements amounted to $602 and $1,046 respectively. During 2016 and 2015, lease payments were made amounting to $1,956 and $2,537, respectively.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                    55
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

**Donations**

In the years ended December 31, 2016 and 2015, the Company delivered donations to Fundación TV Azteca, A.C., Asociación Azteca Amigos de la Cultura y las Artes y Caminos de la Libertad, Ideas y Debate, A.C., related parties, in the amounts of $155,115 and $145,777, respectively. These related parties are authorized by the tax authorities to receive donations and issue the respective supporting documentation.

**Recovery of other receivables from related parties**

The Company periodically evaluates the recoverability of other receivables from related parties; when it is determined that these accounts are not recoverable, they are charged to other expenses.

As of December 31, 2016 and 2015, all receivables from related parties of the Group have been reviewed with respect to impairment indicators. As of December 31, 2015, due to the evaluation discussed above, certain receivables were impaired and, therefore, an allowance for doubtful accounts from related parties was recorded in the amount of $92,451, and it is presented in the item of "other expenses" of the accompanying statement of comprehensive income. Those impaired receivables correspond mainly to related parties with the investment in MCI discussed in note 16. Part of these accounts were recovered in the amount of $86,363 in 2016; therefore, the impairment recognized was reversed in the amount recovered.

**Employee benefits granted to key management personnel**

The benefits granted to the Company's executive personnel amounted to $65,000 in 2016 and 2015.

**13.    FINANCIAL DEBT:**

The company had the following financial debt:

|  | 2016 | | 2015 | |
|---|---|---|---|---|
| ATC Long-term loans | $ | 1,891,869 | $ | 1,582,600 |
| Long-term program MTN | | 16,369,456 | | 13,630,083 |
| | $ | 18,261,325 | $ | 15,212,683 |

**ATC long-term loans**

On February 11, 2000, the Company entered into a long-term loan agreement up to US$119,800 with a Mexican subsidiary of ATC (ATC Long-Term Loan). The loan is comprised: (i) an unsecured tranche of US$91,752 and (ii) a tranche of US$28,000 for working capital, secured by certain real property owned by the Company. In June 2003, the Company and the Mexican subsidiary of ATC amended the original agreement. Pursuant to the terms of the amended agreement, the annual interest rate of each of the loans is 13.109%. The Company's payment obligations pursuant to the ATC long-term loans are secured by three of the main subsidiaries of the Company. The initial maturity of the US$91,752 loan, pursuant to the ATC long-term loans is February 11, 2020, which can be extended while the contract of the overall tower project (which is described herein below) remains in effect. On November 27, 2013, the loan in the amount of US$28,000 was repaid early with funds obtained from the MTN Program.

In February 2000, the Company, together with its subsidiary Televisión Azteca, S.A. de C.V., executed a master tower project contract with a Mexican subsidiary company of ATC for duration of 70 years, for renting space not used by the Company in its operations up to 190 broadcasting towers of the Company. As a consideration of the payment of US$1,500 as an annual lease and, in turn, the Company granted ATC the right to market and lease the unused space in the Company's broadcasting towers to third parties, as well as to the Company's affiliated companies, and guaranteed the collection of all the relative revenues for account of ATC. The Company has the title deeds of the towers and is responsible for its operation and maintenance.

The SCT approved this contract on February 10, 2000. After the expiration of the 20 initial years of the ATC long-term loan, the Company has the right to purchase the total or a portion of the revenues and assets relative to marketing the rights at any time from ATC at fair market value, with the proportionate amount of the remaining principal of the ATC long-term loan.

TV Azteca, S.A.B. de C.V. and Subsidiaries
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015                    56

Accrued interest payable as of December 31, 2016 and 2015, on these loans received amounted to US$12,061 and US$12,028, equivalents to $226,298 and $192,043, respectively; and they are reported in the item "Interest expense" within the consolidated statements of comprehensive income.

**MTN Program**

On June 1, 2005, the Company established the Medium Term Notes Program (MTN) in an initial amount of US$200 million. On May 25, 2011, the program to increase its capacity up to US$500 million was modified, and an issue was made of US$300 million at a 7.5% annual interest rate. The due dates of interest are every May 25 and November 25, up to its maturity on May 25 2018.

On September 4, 2013, the Company modified the program to increase its capacity up to US$1,000 million again. Toward that end, an issue was carried out in the amount of US$500 million at a 7.625% annual rate on September 19, 2013. Its due dates on interest payments are March 18 and September 18 every year, up to its due date of September 18, 2020.

As of December 31, 2016 and 2015, the amount of MTN program issuance expenses pending amortization against income, which is presented decreasing the debt for said issuance amounts to $126,063 and $168,877, respectively.

Accrued interest payable as of December 31, 2016 and 2015, on these loans received amounted to US$63.7 millions and US$63.7 millions, equivalent to $1,194 millions and $1,018 millions, respectively; which are included in "Interest expense" within the consolidated statements of comprehensive income.

*Maturities of loans*

The maturities of portions of loans contracted by the Group as of December 31, 2016, are shown below:

| Year | Amount | |
|------|--------|---|
| 2018 | $ 6,159,832 | |
| 2020 | 12,101,493 | (*) |
| | $ 18,261,325 | |

(*) It includes US$91,752 (equivalent to $1,891,868) of the long-term loan from ATC, whose due date can be extended while the overall project contract of towers remains effective.

**14.    EMPLOYEE BENEFITS:**

a.    Employee benefits expense

The expense recognized for employee benefits are as follows:

| | 2016 | | 2015 | |
|---|---|---|---|---|
| Production cost: | | | | |
| Employee benefits expenses | $ | 815,027 | $ | 834,850 |
| Selling and administrative expenses: | | | | |
| Employee benefits expenses | | 240,733 | | 232,085 |
| | $ | 1,055,759 | $ | 1,066,935 |

b.    Seniority premium

| | 2016 | | 2015 | |
|---|---|---|---|---|
| Defined benefit obligations (DBO) | $ | 66,774 | $ | 64,588 |
| **Projected net liability** | | 66,774 | | 64,588 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                57
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | | | |
|---|---|---|---|
| Labor cost of present service | | 5,104 | 5,047 |
| Financial cost | | 4,776 | 4,547 |
| Prior service recognized in the period | | 318 | 95 |
| Actuarial immediate recognition (gains/losses) | | 33,088 | (6,550) |
| **Net cost for the period** | $ | 43,286 | $  3,139 |

c.    Separation upon retirement

| | | 2016 | 2015 |
|---|---|---|---|
| Defined benefit obligations (DBO) | $ | 121,261 | $  132,599 |
| **Projected net liability** | | 121,261 | 132,599 |
| Labor cost of present service | | 9,966 | 10,586 |
| Financial cost | | 9,751 | 10,311 |
| Prior service recognized in the period | | (17,303) | 316 |
| Actuarial immediate recognition (gains/losses) | | 23,126 | (27,950) |
| **Net cost for the period** | $ | 25,540 | $  (6,737) |

The projected net liability is summarized below:

| | | 2016 | 2015 |
|---|---|---|---|
| Seniority Premium | $ | 66,774 | $  64,588 |
| Separation upon retirement | | 121,261 | 132,599 |
| **Employee benefits** | $ | 188,035 | $  197,187 |

The Company enters into specialized contracts with different suppliers with companies that have the capacity to pay off credits derived from subordinated debentures contracted with their own personnel. These companies offer these services to the company and they have the capacity to offer the service to any third party. They are established companies that have their own domicile. They have their own, sufficient elements to be responsible for their obligations with the persons who they use for rendering their services. Likewise, the Company neither establishes nor supervises the work of the persons contracted by the provider to realize the service. This is done directly by the service company with its own personnel.

### 15.    TAXES ON EARNINGS:

a.    Provision for taxes on earnings

As of December 31, 2016 and 2015, the provision for income tax is as follows:

| | | 2016 | 2015 |
|---|---|---|---|
| Income tax expense– Integration regime | $ | 88,414 | $  98,340 |
| Income tax expense– General law regime | | 48,649 | 14,766 |
| Income tax expense– Foreign subsidiaries | | 54,826 | 47,741 |
| Deferred income tax | | 699,386 | 430,880 |
| Income tax up date pursuant to tax reform | | 53,446 | 130,841 |
| | $ | 944,721 | $  715,690 |

b.    Income tax

Integration Regime

On February 17, 2014, the Group filed a notice for purposes of the Optional Regime for Groups of Companies, effective January 1,2014.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                58
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

In general terms, the Optional Regime for Groups of Companies has the following characteristics:

a)  Income Tax is deferred for each company comprising the group of companies. The amount to be deferred is obtained by applying the Factor of Integrated Taxable Income that will be determined by the integrating company (the Company) based on the taxable income and tax losses of each one of the companies that form part of the Group. Consequently, there is no tax return per integration, since each company forming part of the group will file its annual tax return individually.

b)  The corresponding payment on Income Tax assessed on the Group and its subsidiaries will be deferred up to three years or before if any of the assumptions that bind them to break up or when the integrator no longer meets any of the requirements for comprising the group of companies.

For 2016 and 2015, the Company incurred a tax loss amounting to $1,172,759 and $368,525, respectively, which differs from its separate book loss, due mainly to the recognition of the equity method in income of subsidiary companies, annual cumulative adjustment, and nondeductible items.

During 2016 and 2015, pursuant to the integration regime, the Company and its subsidiaries that form part of that regime were subject to taxes on earnings amounting to $88,414 and $98,340, respectively. Integrated taxable income differs from book income, due mainly to those items that accrue over time and are deducted differently for book and tax purposes for the recognition of the impact of inflation for tax purposes, as well as those items that only affect book or integrated taxable income.

Income tax for Mexican subsidiaries

The Subsidiary companies that do not form part of the Integration Regime, determine its income tax based on their individual results under the General Law Regime; they were subject to taxes on earnings amounting to $48,649 and $14,766 in 2016 and 2015, respectively.

Income tax for foreign subsidiaries

Foreign subsidiaries determine its income tax based on their individual results, in accordance with the specific tax law of its country. Foreign companies, mainly Azteca America and Peru, were subject to taxes on earnings amounting to $54,826 and $47,741 in 2016 and 2015, respectively.

c.  Deferred income tax

As of December 31, 2016 and 2015, the asset on cumulative deferred income tax effect is summarized as follows:

|  | | 2016 | | 2015 |
|---|---|---|---|---|
| Excess of tax over book value of assets and liabilities, net | $ | 2,275,084 | $ | 2,781,116 |
| Add - Tax loss carryforwards | | 8,061,379 | | 8,450,169 |
| | | 10,336,463 | | 11,231,285 |
| Income tax rate | | 30% | | 30% |
| Deferred income tax asset | | 3,100,939 | | 3,369,385 |
| Add – Tax credits from subsidiaries abroad | | - | | 134,830 |
| Less - Valuation allowance | | (1,275,821) | | (979,932) |
| | $ | 1,825,118 | $ | 2,524,283 |

This deferred income tax asset is due basically to the accumulated tax loss carryforwards, the net effect of advances from advertisers, the valuation of financial instruments available-for-sale, the excess of tax value over book value of property and equipment, and the tax benefits generated by the operations in Colombia. Due to the uncertainty that part of the total of this deferred asset may not be recovered in its entirety, the Group has assumed a conservative position and has decided to create a valuation allowance of the deferred income tax asset, as shown in the above chart.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                59
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

As of December 31, 2016 and 2015, the effective tax rate is as follows:

|  | 2016 | 2015 |
|---|---|---|
|  | % | % |
| Income tax rate | 30 | 30 |
| Expenses and other nondeductible items | (56) | (46) |
| Differences between book and tax inflation | (15) | (20) |
| Equity in earnings (losses) of associated companies | (1) | (1) |
| Effective tax rate | (42) | (37) |

Recognition of the effects of the Tax Consolidation Regime derived from the 2014 Tax Reform:

On December 2013, the Federal Official Gazette published the Federal Government's "Decree that amends, adds, and withdraws various tax provisions", effective January 1, 2014 ("the 2014 Tax Reform"). The new income tax law sets forth new taxable items, eliminates some tax treatments, and amends some taxation and deduction schemes, which will arise significant effects in 2014, mainly related to elimination of the tax consolidation regime.

As a result of this decree, effective January 1 2014, the Company no longer determines the income tax on a consolidated basis. As at December 31, 2013, deferred income tax due to deconsolidation determined for the years from 2008 to 2013, in accordance with the 2014 fiscal reform and considered as final, amounts to $1,599,565, which will be settled in five years, and it was generated by tax loss carryforwards used in the tax consolidation regime of those years. As at December 31, 2016 and 2015, the outstanding amount for this item amounts to $420,797 and $853,214, respectively.

Recognition of the effects of the Tax Consolidation Regime derived from the 2010 Tax Reform:

In December 2009, Federal Government, published the executive order that amends, aggregates and repeals various tax provisions to Income Tax Law, effective January 1 2010 ("the 2010 Tax Reform"). These modifications included setting five years as a maximum deferred income tax due, which should be covered in five annual payments (25% in the first and second year, 20% in the third year, and 15% in the fourth and fifth year) beginning the sixth year subsequent to that year in which the tax benefits were used through the tax consolidation mechanism. Deferred income tax determined for 2007, 2006, 2005, 2004, and prior thereto, in accordance with the 2010 tax reform, will continue to be paid in the same terms and periods set forth up to the law in effect as of December 31, 2013. The remaining balance payable amounts to $563,954 as at December 31, 2013, which will be liquidated from 2015 to 2017. As at December 31, 2016 and 2015, the outstanding amount for this item amounts to $180,825 and $187,937, respectively

Reconciliation of deferred income tax assets and liabilities due to the 2010 and 2014 Tax Reforms:

|  | 2016 | 2015 |
|---|---|---|
| Opening balance | $ 1,041,151 | $ 1,511,265 |
| ( + ) Effect of restated losses subject to tax | 53,446 | - |
| ( - ) Payments | (492,975) | (600,955) |
| Ending balance | $ 601,622 | $ 1,041,151 |

As discussed in note 4t above, the effects of the Company's tax loss carryforwards and those of its subsidiaries, are presented as part of the comprehensive calculation, and the impairment of each one was assessed.

## 16.    FINANCIAL ASSETS AND LIABILITIES:

The fair values of financial instruments were determined by using information available on the market and other valuation techniques that require judgment by Management. Moreover, the use of different assumptions and valuation methods can have a material effect on the estimated amounts of fair value.

The financial instruments which after their initial recognition are quantified at their fair value are grouped in levels from

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                                    60
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

1 to 3 based on the degree to which fair value is observed, as shown below:

- Level 1 – valuation based on prices quoted on the market (unadjusted) for identical assets or liabilities;

- Level 2 – valuation with indicators other than the quoted prices included in Level 1, but include observable indicators for an asset or liability, either directly (quoted prices) or indirectly (derivations of these prices); and

- Level 3 – valuation techniques are applied that include indicators for assets and liabilities that are not based on observable market information (unobservable indicators).

a.  Financial assets and liabilities are classified as follows:

| | Note | Available-for-sale at fair value | Loans and accounts receivable and other liabilities at amortized cost | Total | Available-for-sale at fair value | Loans and accounts receivable and other liabilities at amortized cost | Total |
|---|---|---|---|---|---|---|---|
| | | | As of December 31, 2016 | | | As of December 31, 2015 | |
| **Financial assets:** | | | | | | | |
| Cash and cash equivalents | 5 | $ – | $ 4,470,314 | $ 4,470,314 | $ – | $ 2,938,417 | $ 2,938,417 |
| Short and long-term trade and other receivables | 6 | – | 6,672,779 | 6,672,779 | – | 6,289,684 | 6,289,684 |
| Related parties | 12 | – | 843,164 | 843,164 | – | 620,708 | 620,708 |
| Available-for-sale assets | 4i | 1,005,345 | – | 1,005,345 | 782,956 | – | 782,956 |
| | | $1,005,345 | $11,986,257 | $12,991,602 | $ 782,956 | $ 9,848,809 | $ 10,631,765 |
| | | | | | | | |
| **Financial liabilities:** | | | | | | | |
| Accounts payable | 11 | $ – | $ 4,702,131 | $ 4,702,131 | $ – | $ 4,483,063 | $ 4,483,063 |
| Short and long-term debt | 13 | – | 18,261,325 | 18,261,325 | – | 15,212,683 | 15,212,683 |
| | | $ – | $22,963,456 | $22,963,456 | $ – | $19,695,746 | $19,695,746 |

As of December 31, 2016 and 2015, available-for-sale assets correspond to investments in a securities portfolio managed by a foreign financial institution. These assets are presented in the consolidated statement of financial position in the item of other financial instruments.

As of December 31, 2016, assets available-for-sale correspond to: i) an investment amounting to $439,549 in a private equity fund named Media Capital Investment LP (MCI) domiciled in the United Kingdom, which mainly invests in telecommunications technology and other related companies. On December 31, 2015, the Group recorded an impairment allowance amounting to $439,549 correspond to the direct investment in MCI. That allowance is reported in the accompanying consolidated statement of comprehensive income in the item of other expenses.

In 2016 and 2015, the Group realized the total investments in capital securities listed in the New York Stock Exchange, which generated aggregated (loss) earnings amounting to ($642,768) and $51,152, and they were presented in other comprehensive income (OCI), and reclassified to retained earnings, as shown in the consolidated statement of changes in equity.

b.  Financial Debt

Loans include the following short- and long-term financial liabilities:

| | Short-term | | Long-term | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Financial liabilities:** | | | | |
| American Tower Corporation -ATC- | $          - | $          - | $ 1,891,869 | $ 1,582,600 |
| Program Medium Term Note -MTN- | - | - | 16,369,456 | 13,630,083 |
| | $          - | $          - | $18,261,325 | $15,212,683 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                61
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

Long-term financial liabilities fair values were determined by calculating their present values at the reporting date, by using fixed effective market interest rates available to the Group. Changes in fair value that go to profit or loss have not been included since financial assets are carried at amortized cost in the consolidated statement of financial position.

## 17.    FINANCIAL INSTRUMENTS RISK:

Activities with financial instruments presume the assumption or transfer of one or various types of risks by the entities that trade with them. The main risks associated with financial instruments are:

- Credit risk: likelihood that one of the parties to the financial instrument contract fails to meet his contractual obligations due to reasons of insolvency or inability to pay and results in a financial loss for the other party.

- Market risk: likelihood that losses are generated in the value of the positions maintained, as a result of changes in the market prices of financial instruments. In turn, it includes three types of risks:

  - Interest rate risk: this arises as a consequence of variations in market interest rates.
  - Foreign exchange rate risk: this arises as a consequence of variations in exchange rates between currencies.
  - Price risk: this arises as a consequence of changes in market prices, or due to specific factors of the instrument itself, or due to factors that affect all instruments traded on a concrete market.

- Liquidity risk: likelihood that an entity cannot meet its payment commitments or, in order to meet them, it has to resort to obtaining funds in encumbering conditions or placing its image and reputation at risk.

  a.  Credit risk management – it is caused mainly by liquid funds and trade accounts receivable.

  The Company's policy is to operate with banks and financial institutions with high credit ratings provided by credit rating agencies to reduce the possibility of default by their counterparties. With respect to trade accounts receivable, the Company grants commercial credit to companies or governmental entities that are financially sound, have a good reputation on the market, and many of them are recurring customers.

  The Company periodically evaluates the financial conditions of its customers and does not believe that there is a significant risk of loss, due to a concentration of credit in its customer portfolio. The allowance for doubtful accounts is considered to cover its potential credit risk adequately, which represents a calculation of losses incurred due to impairment of its accounts receivable. As of December 31, 2016, the receivables aged more than 90 days amount to $672,399, which are covered by the allowance for doubtful accounts.

  b.  Market risk management

  i.  Interest rate risk - As of December 31, 2016 and 2015, the Group has no exposure to variable interest rates, since its total debt accrues interest at fixed rates (see note 13).

  ii.  Exchange rate risk management - the Company realizes foreign currency transactions; therefore, it is exposed to fluctuations in the different exchange rates with which it operates. As of December 31, 2016 and 2015, the Company had not contracted hedging instruments against foreign exchange risks.

  At December 31, 2016 and 2015 the company had the following US dollar denominated assets and liabilities:

|  | Short-term | | Long-term | |
|---|---|---|---|---|
| **As of December 31, 2016** | | | | |
| Financial assets | US$ | 126,551 | US$ | - |
| Financial liabilities | | 75,397 | | 885,638 |
| **Total Exposure** | **US$** | **51,154** | **US$** | **(885,638)** |
| **As of December 31, 2015** | | | | |
| Financial assets | US$ | 151,730 | US$ | - |
| Financial liabilities | | 44,659 | | 881,960 |
| Total Exposure | US$ | 107,071 | US$ | (881,960) |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                    62
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

As of March 24, 2017, date of issuance of the accompanying consolidated financial statements, the unaudited foreign currency position is similar to the position held as of December 31, 2016.

As of December 31, 2016 and 2015, and as of March 24, 2017, the exchange rates for the US dollar were $20.6194, $17.2487 and $18.9877, respectively.

As of December 31, 2015, the Group presents a net short position in U.S. dollars; therefore, if the peso had strengthened (weakened) 10% against the dollar, and the rest of the variables had remained constant, net income for the year would have increased (decreased) in the amount of $1,720,655 as a result of the net exchange gain (loss) in the translation of monetary assets and liabilities in dollars not hedged with a derivative financial instrument.

c.   Liquidity risk management - The Company has established appropriate policies to mitigate the liquidity risk through: (i) the follow-up on working capital; (ii) the review of their actual and projected cash flows; and (iii) the reconciliation of profiles of maturities of their financial assets and liabilities. This allows the Group's Management to manage short- and long-term financing requirements, by maintaining reserves of cash and the disposition of credit lines.

**18.    EQUITY:**

a.   Capital stock

The Company's capital stock is comprised of Series "A" shares, Series "D-A" shares, and Series "D-L" shares. Holders of Series "A" shares have voting rights at the Company's General Stockholders' Meetings. Holders of Series "D-A-" and "D-L" have voting rights only in limited circumstances, and have a preferential dividend right.

The rights of all holders of all series of capital stock are identical, except for the limitations with respect to Series "A" and "D-A" shares held by persons other than eligible Mexican holders. Series "A" shares cannot be exchanged for any other type of securities of the Company. Series "D-A" shares may be exchanged for Series "A" shares on the tenth anniversary of their original issue; they will have the same characteristics of current Series "A" shares outstanding. Series "D- L" shares may be exchanged for Series "L" shares on the tenth anniversary of their original issue. Series "L" shares, which will be exchanged for Series "D-L" shares, will grant voting rights to their holders, only in limited circumstances.

The tenth anniversary for the exchange or swap of Series "D-A" and "D-L" shares for Series "A" and "L" shares, respectively, was completed in August 2007. However, on April 30, 2007, at the General Extraordinary Stockholders' Meeting, the stockholders resolved to extend the term referred to above to 20 years, as of their issuance date. Consequently, the date for the exchange or swap of stock will be in August 2017. This extension was authorized by the NBSC on November 9, 2007, subject to meeting all the pertinent requirements.

Authorized, issued, and paid-in capital stock of the Company as of December 31, 2016 and 2015 is summarized as follows:

|  | Authorized shares (thousands) | Shares paid (thousands) |  | Capital stock |
|---|---|---|---|---|
| Series "A" | 5,318,079 | 4,633,711 | $ | 370,959 |
| Series "D-A" | 2,613,878 | 2,163,829 |  | 172,135 |
| Series "D-L" | 2,613,878 | 2,163,829 |  | 172,135 |
|  | 10,545,835 | 8,961,369 | $ | 715,229 |

As of December 31, 2016 and 2015, the Company's shares are listed on the following securities exchanges:

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                            63
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| Characteristics of the securities | Country listed in | Ticket symbol | Stock exchange |
|---|---|---|---|
| Certificates of common participation (CPOs), each one represents one A Share, one D-A Share, and one D-L Share | Mexico | AZTECACPO | Mexican Stock Exchange |
| 10 CPO Units | Spain | XTZA | Latin American Securities Market |

Resolutions adopted on the year ended December 31, 2016 and 2015

At the General Stockholders' Meeting held on April 27, 2016 and April 29, 2015, a dividend was declared in the amount of $17,304 and $17,268, respectively, which corresponds to preferred stock dividends for series D-A and series D-L shareholders. Those dividends were paid out of the Net Taxable Income Account (CUFIN). Moreover, it was resolved to transfer the amount of ($643,848) and $51,152, respectively, recorded in other capital components to retained earnings, as shown in the consolidated statement of changes in stockholders' equity.

Resolutions adopted on the year ended December 31, 2010

On April 30, 2010, a cash reimbursement was approved in proportion to the stockholdings of each stockholder at the General Extraordinary Stockholders' Meeting, up to the amount of $322,000, payable in the amounts and on the dates determined by Management, in accordance with the Company's economic capacity. This reimbursement implied a fixed minimum capital stock decrease of the Company in the amount of $9,944. As of December 31, 2016 and 2015, the balance payable of this reimbursement amounted to $238,358, and it is presented in the consolidated statement of financial position within accounts payable and accrued liabilities.

    b.   Stock repurchase

For the years ended December 31, 2016 and 2015, the Company decreased its capital stock in the amount of $3,723 and $2,141, respectively, on the repurchase of 25,430 thousand shares and 25,070 thousand shares in each year. Shares were repurchased in the amount of $35,265 and $29,572, respectively. The value thereof was charged to capital stock, and the difference was charged to the reserve for stock repurchases.

    c.   Legal reserve

Net income for the year is subject to the legal provision which requires that at least 5% of that income be appropriated to increase the legal reserve until that reserve equals one-fifth of the total capital stock. As of December 31, 2016 and 2015 the balance of the legal reserve accounts for 21% of capital stock. The balance of the legal reserve may not be distributed to the stockholders during the existence of the Company, except as stock dividends.

    d.   Distribution of earnings

Net taxable income account (CUFIN for its *acronym* in Spanish):

As of December 31, 2016, the restated balance of the "net taxable income account" (CUFIN) amounts to $7,599,357. No income tax will be assessed in connection with the distribution of dividends or earnings to stockholders up to that amount. Legal entities that distribute dividends or earnings that are not drawn against the CUFIN should calculate and pay the applicable tax. Toward that end, the tax that should be paid on dividends or earnings distributed should be aggregated thereto.

The tax that should be aggregated in terms of the foregoing paragraph will be determined by multiplying the amount of the dividends or earnings by the 1.4286 factor, and a 30% tax rate will be applied to the result. The tax determined is considered final and it may be credited against income tax for the year in which such a tax is paid and in the two following fiscal years. This balance may be restated up to the date earnings are distributed by using the National Consumer Price Index (NCPI).

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                64
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

At the General Ordinary Stockholders' Meeting held on April 27, 2016 and April 29, 2015, the stockholders resolved to pay preferred dividends in the amount of $17,304 and $17,268, respectively. Those dividends are free of tax on dividends distributed, since they were paid out of the CUFIN balance.

Beginning 2014, dividends paid to individuals and foreign residents are subject to a 10% tax, which is a final payment. This rule applies only to the distributions of earnings generated beginning January 1, 2014.

e.    Capital reductions

As of December 31, 2016, the restated balance of the "restated contributed capital account" (CUCA, for its acronym in Spanish) amounts to $5,401,673. In the case of a reimbursement or capital decreases in favor of the stockholders, the excess of that reimbursement over this amount will be treated as a distributed earning for tax purposes.

Likewise, in the event that stockholders' equity should exceed the balance of the CUCA, the spread will be considered as a dividend or distributed earning subject to the payment of income tax. If the earnings referred to above are paid out of the CUFIN, there will be no corporate tax payable due to the capital decrease or reimbursement. Otherwise, it should be treated as dividends or earnings distributed, as set forth in the Income Tax Law.

f.    Employee stock option plan

Effective the fourth quarter of 1997, the Company adopted an employee stock option plan that was granted to employees who render their services to the Company and its subsidiaries, whereby options were granted to all employees contracted as of December 31, 1996. Prices set fluctuated from 0.29 dollars to 0.39 dollars per CPO, with a higher number of options for executive level employees, as well as the most creative actors, presenters, and creative personnel.

No options were exercised for this plan during 2016 and 2015. As of December 31, 2016 and 2015, options not yet exercised amount to 19 million CPOs of the 241 million authorized.

g.    Other capital components

An analysis of other capital components is shown below:

| | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2016 | $ 621,573 | $ (642,361) | $ (1,599,865) | $(1,620,653) |
| Exchange differences on translating foreign operations | 800,179 | - | - | 800,179 |
| Cash flow hedges | - | - | (392,443) | (392,443) |
| Loss on investment available-for-sale | - | (53,142) | - | (53,142) |
| Reclassifications to retained earnings | 421,315 | 642,768 | - | 1,064,083 |
| Balance as of December 31, 2016 | $1,843,067 | $ (52,735) | $ (1,992,308) | $ (201,976) |

| | Translation effect | Available-for-sale financial assets | Cash flow hedges | Total |
|---|---|---|---|---|
| Balance as of January 1, 2015 | $ (46,320) | $ 51,896 | $ (589,617) | $ (584,041) |
| Exchange differences on translating foreign operations | 667,893 | - | - | 667,893 |
| Cash flow hedges | - | - | (1,010,248) | (1,010,248) |
| Loss on investment available-for-sale | - | (918,577) | - | (918,577) |
| Reclassifications to retained earnings | - | (51,152) | - | (51,152) |
| Subtotal before taxes | 667,893 | (969,729) | (1,010,248) | (1,312,084) |
| Deferred tax benefit | - | 275,472 | - | 275,472 |
| Balance as of December 31, 2015 | $ 621,573 | $ (642,361) | $ (1,599,865) | $(1,620,653) |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                      65
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

## 19.  EARNINGS PER SHARE:

Both basic and diluted earnings per share have been calculated by using earnings attributable to the stockholders of the Holding Company (TV Azteca, S.A.B. de C.V.) as the numerator, that is, it was not necessary to make adjustments to earnings in 2016 and 2015.

The weighted average number of shares for purposes of diluted earnings per share can be reconciled with the weighted number of ordinary shares used in the calculation of basic earnings per share as follows:

|  | 2016 | 2015 |
|---|---|---|
| Amounts stated in thousands of shares: | | |
| Weighted average of the number of shares used in the base of earnings per share | 8,961,369 | 8,967,085 |
| Shares considered issued without taking into account share based payments | 1,584,465 | 1,578,749 |
| Weighted average of the number of shares used in diluted earnings per share | 10,545,834 | 10,545,834 |

## 20.  CAPITAL MANAGEMENT POLICIES AND PROCEDURES:

The objectives of the Group's capital management are to:

- Guarantee the Group's ability to continue as a going concern
- Provide an adequate return to stockholders by setting prices on products and services commensurate with the level of risk.

The Group's objective in capital management is to maintain a financial proportion of capital to financing.

The Group establishes the amount of capital in proportion with its general financial structure, that is, equity and financial liabilities that are not a loan. The Group manages its capital structure and makes adjustments thereto, due to changes in economic conditions and risk characteristics of the assets involved. In order to be able to maintain or adjust capital structure, the Group can adjust the amount of dividends paid to the stockholders, return capital to the stockholders, issue new shares or sell assets to reduce the debt.

The loan agreement related to the MTN Program sets forth certain financial limitations for the Group. Its capacity to obtain additional financing is limited as at December 31, 2016 and 2015. The additional affirmative and negative covenants set forth in that contract were complied with in their entirety.

## 21.  FINANCIAL INCOME AND COSTS:

Interest paid applies to amortizations of the financial debt. Interest income applies to investments in marketable securities listed on the stock exchange.

The caption of other expenses is summarized as shown below:

|  | 2016 | 2015 |
|---|---|---|
| Administration (Cebures Trusts) | $ 22,046 | $ 20,734 |
| Fees on financial operations | 11,061 | 11,744 |
| MTN program (bonds issuance) | 46,580 | 44,836 |
| Other | 89,878 | 101,021 |
|  | $ 169,565 | $ 178,335 |

## 22.  OTHER EXPENSES, NET:

This caption is summarized as shown below:

TV Azteca, S.A.B. de C.V. and Subsidiaries                                          66
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| Legal advisory services | $ 152,038 | $ 209,188 |
| Donations | 201,628 | 174,476 |
| Impairment of financial instruments and long-lived assets | 1,376,526 | 532,000 |
| Other | 119,986 | 112,778 |
|  | $ 1,850,178 | $ 1,028,442 |

## 23.  FINANCIAL INFORMATION BY SEGMENT:

Management currently identifies five lines of service of the Group as operating segments (see note 4f). These operating segments are supervised by the person who makes strategic decisions, which are made based on the adjusted operating results of the segment.

National Television

These segments are comprised of television services in Mexican territory, including local stations. Income is derived mainly from the sale of time on screen nationwide and locally, less commissions on sales.

Azteca America

This segment consists of television services in the territory of the United States of America, directed primarily for the Hispanic community that resides in that territory.

Programming rights

This segment is comprised mainly of the exports of programs that were of wide interest for global audiences primarily in the countries of Latin America and Europe.

Fiber-optic network

This segment is derived mainly from the transactions related to Azteca Comunicaciones Colombia and Azteca Comunicaciones Peru in charge of construction, operation, and maintenance of the fiber-optic network in Colombia and Peru, respectively.

Other segments

This segment consists mainly of operations relative to the promotion of billboard advertisements, soccer teams, concerts, and Internet, among other things.

| As at December 31, 2016 | National Television | Azteca America | Programming rights | Fiber optic | Other segments | Consolidated total |
|---|---|---|---|---|---|---|
| Net Sales | $9,828,223 | $1,391,213 | $ 290,015 | $ 1,526,975 | $1,160,145 | $ 14,196,571 |
| Costs and expenses | 7,519,847 | 1,092,304 | 88,089 | 2,590,234 | 1,068,053 | 12,358,527 |
| Depreciation and amortization | 678,242 | 54,822 | 3,555 | 178,898 | 9,406 | 924,923 |
| Operating income (loss) | $1,630,134 | $ 244,087 | $ 198,371 | $(1,242,157) | $ 82,686 | $ 913,121 |

| As at December, 2015 | National Television | Azteca America | Programming rights | Fiber optic | Other segments | Consolidated total |
|---|---|---|---|---|---|---|
| Net Sales | $9,140,049 | $1,402,779 | $ 436,290 | $ 863,964 | $1,016,405 | $ 12,859,487 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                                   67
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | | | | | | |
|---|---|---|---|---|---|---|
| Costs and expenses | 8,066,161 | 949,387 | 72,009 | 1,098,922 | 1,166,962 | 11,353,441 |
| Depreciation and amortization | 586,658 | 49,400 | 5,308 | 257,705 | 11,174 | 910,245 |
| Operating income (loss) | $ 487,230 | $ 403,992 | $ 358,973 | $ (492,663) | $ (161,731) | $ 595,801 |

## 24.    CONTINGENCIES:

Various legal suits and appeals for guarantees have been filed against the Group, and some of them are in proceedings as of December 31, 2016. Unless some of them have been recognized as a provision, Management considers that these lawsuits are unjustified and that the likelihood that they will require a liquidation to be made by the Group is remote. This evaluation is consistent with the independent advice of external advisors.

The main contingencies are described below:

    a    Federal Electoral Institute

***Legal actions and proceedings filed against the Federal Code of Electoral Institutions and Procedures.***

The Executive Order whereby the Federal Code of Electoral Institutions and Procedures (COFIPE for its acronym in Spanish), amended in 2007, was published in the Official Daily Gazette in January 2008.

The Group filed a series of appeals for constitutional relief against various provisions of that Code, for considering that it affected its legal jurisdiction by violating a series of individual guarantees, as well as imposing additional charges on the Company which it has maintained and operated as a radio and television licensee. The Supreme Court of Justice resolved to dismiss those appeals for constitutional relief.

Subsequently, the National Electoral Institute (INE, formerly Federal Electoral Institute) filed special punishable special proceedings against the Company for presumed nonperformances in the transmission of various promotional spots of political parties and Electoral Authorities which, at the issue date of these financial statements, amount to approximately $200 million. These fines were confirmed by the Federal Electoral Court, the Supreme Court, and District Courts.

On the other hand, the INE has imposed two sanctions on the Company in punishable special proceedings that amount to a total of $16,5 million approximately, for considering that they violated various provisions of the COFIPE by telecasting spots advertised in political magazines on television and for considering that those spots contained political propaganda. These fines were confirmed by the Federal Electoral Court.

Further, the INE imposed a sanction in the amount of $22 million approximately for considering that the COFIPE was being violated for not telecasting promotion of political parties and electoral authorities in the restricted television systems of SKY and Cablevision. These fines were challenged in an appeal for constitutional relief and the complaints were dismissed by those Judges.

Finally, the INE has imposed sanctions to Televisión Azteca, S.A. de C.V. in special sanctioning proceedings in an amount approximating $1.7 million, for various behaviors considered as violations in the COFIPE. These resolutions were confirmed by the Electoral Court of the Federal Judicial Branch.

In February 2014, the Company agreed with the Federal Tax Service (SAT *for its acronym in Spanish*) to realize the payment in the sum of $198,117 with related charges, under the installment payment scheme.

The Company concluded the partial payments to the SAT in February 2015.

    b    Corporación de Noticias e Información (CNI)

The Company has filed various lawsuits against CNI, TVM and Mr. Moreno Valle. In spite of a lack of certainty, Company's Management considers that it will prevail in the various disputes it has with CNI, TVM and Mr. Moreno

TV Azteca, S.A.B. de C.V. and Subsidiaries                                          68
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

Valle and, therefore, no provision has been made for this matter.

As of December 31, 2016 and 2015, the Company has a liquid credit and due and payable against CNI in the amount of US$10 million. Further, ordinary and default interest and trial expenses have not been quantified yet.

    c    Other litigations and lawsuits

The Company and its subsidiaries are parties to various legal actions and lawsuits during the normal course of their operations. The Company's legal advisors indicate that there are various trials and contingent demands at the issue date of these financial statements, whose related amounts cannot be reasonable estimated to date.

The proceedings and litigations involved that are quantified amount to $618,246. The Company's Management and its legal advisors consider that none of these legal actions against the Company, including those not quantifiable individually or on a consolidated basis, will have any significant adverse impact on their businesses or financial position. Consequently, no provision has been made for these purposes.

## 25.   COMMITMENTS:

    a    Leases

The Company rents the use of satellite transponders for the service of receipt and conduction of the satellite signal. It has the commitment of paying US$25 (IS21 satellite) and US$74 (Galaxy 19 satellite) every month, for the three contracts entered into with Panamsat de México, S. de R.L. de C.V. The expenses include a monthly fixed payment and others based on the use thereof. The lease agreements have a one year mandatory duration, automatically and successively renewable for identical periods up to 2021, and 2024, respectively.

The Company has entered into a contract with Satélites Mexicanos, S.A. de C.V., for the rental and use of satellite transponders (Satmex 6 satellite) for the service of receipt and conduction of the signal. It has the commitment of paying a monthly amount of US$86.4 every month. This amount will increase 5% annually up to the date of expiration of the contract which is not until 2021.

As of December 31, 2016, the Group had the following minimum annual commitments for the use of satellite transponders:

|                     |     | Thousands of dollars |
| ------------------- | --- | -------------------- |
| 2017                | US$ | 2,242                |
| 2018                |     | 2,285                |
| 2019                |     | 2,328                |
| 2020 and thereafter |     | 7,041                |
|                     | US$ | 13,896               |

    b    Performance rights

The Company has entered into license agreements with its performance rights suppliers for the long-term acquisition of materials of programs when such programs are available for their first broadcast. As at December 31, 2016, the commitments for the acquisition of materials amount to US$47,000, US$40,721, and US$32,370, with due dates in 2017, 2018 and 2019, respectively. Moreover, some of these contracts do not show a current obligation due to their uncertain nature. Further, some can be marketed in accordance with their specific characteristics.

    c    Advertising rights

In June 2010, the Company entered into an advertising rights assignment contract with Super Publicidad, S.A. de C.V., which sets forth that effective 2012 and up to 2022, the rights of spaces are obtained for exhibiting advertising, as well as the use of part of the facilities of the Mexico City Arena. The total value of the consideration amounts to US$3,500, which has been paid in full.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                69
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

    d    Colombia project

In September 2011, the Ministry of Information Technology and Communications of Colombia (MINTIC) published the terms of reference of the National Fiber Optic Project ("the Project"). The purpose of this technology is to spread or extend this technology to at least 400 municipalities of that country, in order to reach the goal of 753 municipalities connected to 2014. The Project will have an investment in the amount of $415,000 million Colombian pesos (equivalent to approximately $2,000 million Mexican pesos) by the government of Colombia.

In order to participate in that bidding, the Company, together with its related party Total Play Telecomunicaciones, S.A. de C.V., formed the Unión Temporal Fibra Óptica Colombia (the UT). On November 4, 2011, the MINTIC decided to award the contract to the UT to undertake the Project.

The characteristics of that contract are the following:

1. **Signatories:**

   UT and the Information Technology and Telecommunications Fund (TIC Fund).

2. **Subject matter of the contract:**

   The UT will develop a fiber optic network, operate it, maintain, and assume the management of the services in at least seven hundred and fifty-three (753) municipalities and 2,000 public institutions forming 4 groups. Toward that end, the TIC Fund will contribute certain resources ("Development Resources").

3. **Value of the contract:**

   $415,837,649,402 (four hundred and fifteen billion eight hundred and thirty-seven million six hundred and forty-nine thousand four hundred and two Colombian pesos, including Value Added Tax). The budget items allocated by the Colombian government are distributed as follows:

   | Years | Maximum amount (billions of Colombian pesos) |
   |-------|----------------------------------------------|
   | 2011  | 196.2                                        |
   | 2012  | 109.6                                        |
   | 2013  | 99.6                                         |
   | 2015  | 29.9                                         |

4. **Term:**

   Seventeen years and six months.

5. **Trust:**

   A management and payment trust was created between the MINTIC (trustor and primary beneficiary), the UT (secondary beneficiary), and Bancolombia S.A. (trustee). The purpose of the trust agreement is to create an autonomous patrimony for the management and administration of: (i) the Development Resources that the TIC Fund allocated to the UT in the conditions and for the purposes related to the execution of the agreement and the Project Documents; and (ii) the assets acquired with the Development Resources or with proprietary resources of the trustor for the execution of the contract.

6. **General scheme of the project:**

   The construction will last 30 months (2.5 years), and the network will operate for 180 months (15 years). During the construction stage, the trust will reimburse the UT for the amount of the costs and expenses incurred, subject to the authorization of the inspector designated by the MINTIC.

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                                70
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

**7. Stages and time schedule of the project:**

The Project will be executed in three stages, with three groups of municipalities for its execution that will determine the maximum performance terms of the stages included in the Project Time Schedule.

At the end of 2013, the Company participated and won the award of two additional biddings, whose services are installed on the network and the concession it already has there.

The first bidding awarded was named "Kioskos Vive Digital" and was awarded to the Company on December 19, 2013, and its purpose consists of installing and operating Internet access points at predetermined public institutions where users can have wireless access to the network.

The second bidding obtained is named "Digital Connections" and was awarded to the Company on December 27, 2013, which consists of installing last mile accesses to previously determined homes in which Internet service will be provided with a subsidized rate. Around 120,000 connections are calculated to be installed in homes throughout Colombia.

As at December 31, 2016, the Company has met the obligations of the bidding contract.

e    Fiber optic network Peru

On December 23, 2013, the Company participated in and was awarded the bid of the National Dorsal Fiber Optic Network in Peru. The purpose of this bidding is to design, build, and maintain a Dorsal Fiber Optic Network in routes already defined by the Government of Peru, as well as to render data transmission services to other telecommunications operators, as well as the entities and agencies of that government.

The characteristics of that contract are the following:

**1. Signatories:**

Ministry of Transportation and Communications (Grantor) and Azteca Comunicaciones Perú, S.A.C. (Concessionaire)

**2. Subject matter of the contract:**

The grantor establishes a juridical relationship of public law with the Concessionaire whereby the Concessionaire is granted the right to economically operate the National Fiber Optic Backbone Network (RDNFO). The Concessionaire binds itself to design, finance, display, operate, and maintain the assets of the Concession, and to render the services through the RDNFO during the term of the concession, and that of its eventual renewals, subject to the tariff regime.

**3. Value of the Contract:**

A concession agreement was signed with the Peruvian Government for 20 years through the Ministry of Transportation and Communication (MTC) in June 2014. That agreement set forth the bases for the design, financing, construction, operation, and maintenance of 13,400 km of Fiber Optic Network that will connect 23 regions, 180 cities, and 136 municipalities. The minimum execution term of the work should be completed in 24 months, through 6 delivery stages in June 2016.

The delivery dates of the Backbone Network are as follows:

| Delivery | Contractual delivery date | Region | Maximum amount (Thousands of millions of US$) |
|---|---|---|---|
| Delivery 1 | 17-Mar-15 | Huancavelica includes the interconnection in Lurín and to NAP Peru | 60.7 |
| Delivery 2 | June 17-15 | Ayacucho, Apurímac, Ica | 40.8 |

TV Azteca, S.A.B. de C.V. and Subsidiaries                                                               71
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
Notes to the consolidated financial statements as of December 31, 2016 and 2015

| | | | |
|---|---|---|---|
| Delivery 3 | Sept. 17-15 | Huánuco, Pasco | 18.6 |
| Delivery 4 | Dec. 17-15 | Cusco, Arequipa, Junín, Ancash, Lima, Callao, Moquegua, Tacna, Ucayali | 46.3 |
| Delivery 5 | 17-Mar-16 | Puno, Madre de Dios, La Libertad, Lambayeque, Piura, Cajamarca | 59.7 |
| Delivery 6 | June 17-16 | San Martin, Amazonas, Loreto | 15.5 |

The total estimated investment amounts to US$323 million contributed by the Peruvian government.

    **4.  Term:**

The concession is granted for a period of twenty (20) years, counted beginning 2014.

    **5.  Trust:**

The concessionaire will create the Backbone Network Trust in order to manage the total revenues and available revenues and, if appropriate, the payment of net excess funds and premium on income, among other things.

The Trustees of the Backbone Network Trust will be: (i) the Concessionaire for the quarterly payment of the RPI and RPMO, and eventual payment of the premium on income; and (ii) the Grantor for the eventual payment of net excess funds.

As at December 31, 2016, the Company had met the obligations set forth in the concession agreement.

**26.  TELECOMMUNICATIONS REFORM:**

On June 11, 2013, the Decree that amends and aggregates various provisions of Articles 6, 7, 27, 28, 73, 78, 94, and 105 of the Constitution of the Mexican United States in telecommunications matters (Constitutional Telecommunications Reform), was published in the Official Daily Gazette.

The "Decree on which the Federal Telecommunications and Broadcasting Law is issued and the Law of the Public Broadcasting system of the Mexican State and various provisions are amended, aggregated, and repealed in telecommunications and broadcasting matters" was published in the Official Daily Gazette on July 14, 2014.

As at December 31, 2016, the Company has implemented measures to comply with the new legal system.

**27.  SEASONALITY:**

The Company's television transmission operations are seasonal. Advertising revenues, which are recognized when the advertisement comes out on the air, are generally higher in the fourth quarter, due to the high level of advertising that comes out on the air as a result of the Christmas season.

The Company's revenues fluctuate as a result of the frequency with which the Company transmits significant events (Olympic Games, World Soccer Cups, among other things). Historically, the transmission of significant events by the Company has increased advertising sales during the periods in which they came out on the air. This reflects higher audiences during the hours in which those significant events were transmitted, and the fact that advertisers pay a premium related to those significant transmission events.

**28.  EVENTS SUBSEQUENT TO THE REPORTING DATE:**

Through its subsidiary Company AIC, the Group is competing in an auction process of the spectrum that operates in reliance on the transmission concessions held by AIC and its subsidiaries organized by the FCC, which consists of the opportunity that station concessionaires with "*Full Power*" and "*Class A*" frequencies have of participating in the sale of their frequencies, in order for the FCC to offer them to mobile technology companies to meet market needs. It is estimated that the FCC will publish the results between April and May 2017. The FCC will award the frequencies and make the payments to the winners within ninety days subsequent to the date published.

**TV Azteca, S.A.B. de C.V. and Subsidiaries**                                                             72
(Subsidiary of Comunicaciones Avanzadas, S.A. de C.V.)
**Notes to the consolidated financial statements as of December 31, 2016 and 2015**

On March 14, 2017, the Group prepaid a portion of its long-term debt in the amount of US$ 42.5 million, due May 2018, pursuant to the issue of US$300 million of the MTN Program (see note 13).

In March 2017, the Group announced: (i) the transformation of image and content of Channel 40, now known as "ad40", which will be a dynamic channel focused on news and live sports 24 hours a day on open television in Mexico. Its signal will be transmitted through channels 1.2 in the interior of Mexico and 40.1 in the Valley of Mexico, in addition to being available on the main pay television systems; and (ii) the startup of the new "a+" television channel, television signal that offers a network of local channels that will produce contents for the needs and preferences of each community, and it will be transmitted through channel 7.2 of open television in Mexico, and it will start with local signals in Mexico City, Guadalajara, León, Monterrey, and Toluca.

There has been no event that requires any adjustment or that does not require an adjustment, but is significant between the reporting date and authorization date.

**ISSUER**

**TV Azteca, S.A.B. de C.V.**
Periférico Sur 4121
Col. Fuentes del Pedregal
Tlalpan, 14141, Mexico City, Mexico

**PRINCIPAL GUARANTORS**

| | | |
|---|---|---|
| **Azteca International Corporation**<br>1139 Grand Central Ave.<br>Glendale, CA 91201, United States | **Azteca Novelas, S.A.P.I. de C.V.**<br>Calz. de Tlalpan No. 2818<br>Col. San Pablo Tepetlapa<br>04840, Mexico City, Mexico | **Estudios Azteca, S.A. de C.V.**<br>Calz. de Tlalpan No. 2818<br>Col. San Pablo Tepetlapa<br>04840, Mexico City, Mexico |
| **Inversora Mexicana de Producción,<br>S.A. de C.V.**<br>Periférico Sur 4121<br>Col. Fuentes del Pedregal<br>Tlalpan 14141, Mexico City, Mexico | **Operadora Mexicana de Televisión,<br>S.A. de C.V.**<br>Periférico Sur 4121<br>Col. Fuentes del Pedregal<br>Tlalpan 14141, Mexico City, Mexico | **Televisión Azteca, S.A. de C.V**<br>Periférico Sur 4121<br>Col. Fuentes del Pedregal<br>Tlalpan 14141, Mexico City, Mexico |

**PAYING AGENT**

**The Bank of New York Mellon, London Branch**
One Canada Square
London E14 5AL
England

**TRUSTEE AND REGISTRAR**

**The Bank of New York Mellon**
101 Barclay Street 7 E
New York, NY 10286

**LEGAL ADVISERS**

| | | |
|---|---|---|
| *To the Issuer*<br>**Winston & Strawn LLP**<br>200 Park Avenue<br>New York, NY 10166, United States | *To the Joint Book-Running Managers*<br>**Jones Day**<br>250 Vesey Street<br>New York, NY 10281, United States | *To the Trustee*<br>**Jones Walker LLP**<br>201 St. Charles Avenue<br>New Orleans, LA 70170 |

*To the Issuer and the Guarantors
as to Mexican Law*
**Nader, Hayaux y Goebel, S.C.**
Paseo de los Tamarindos 400 B, Bosques de las Lomas
Cuajimalpa, 05120 Mexico City, Mexico

**SINGAPORE LISTING AGENT**

**Norton Rose Fulbright (Asia) LLP**
1 Raffles Quay
#34-02 North Tower
Singapore 048583