# Exhibit 5

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

## ICSID Case No. ARB/23/33

---

**CYRUS CAPITAL PARTNERS, L.P.**
**CONTRARIAN CAPITAL MANAGEMENT, LLC**

<u>**Claimants**</u>

**vs.**

**THE UNITED MEXICAN STATES**

<u>**Respondent**</u>

---

COUNTER-MEMORIAL ON JURISDICTION

---

August 29, 2024

Jonathan C. Poling
Stephen S. Kho
Katherine P. Padgett
Lide Paterno
Hannes Sigurgeirsson
Shannon A. Jackenthal
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006

*Attorneys for Claimants*

**CONTENTS**

I.     INTRODUCTION AND EXECUTIVE SUMMARY .......................................................10
       A.   Introduction.........................................................................10
       B.   Executive Summary ................................................................12

II.    FACTUAL AND PROCEDURAL BACKGROUND .......................................................14
       A.   Claimants are U.S. Investors who Acquired and Control Investments in
            Mexico ...............................................................................14
            i.    Cyrus Capital Partners, L.P. ..........................................14
            ii.   Contrarian Capital Management, L.L.C. ................................16
       B.   TV Azteca Stopped Making Required Interest Payments on the Notes ..............18
       C.   Mexican Court Violates Claimants' Due Process Rights...........................19
       D.   Claimants Cannot Find Relief in Mexico's Justice System .......................25
       E.   Judge Robles is Known to Unfairly Favor TV Azteca and its Majority
            Owner, Grupo Salinas ..........................................................26
       F.   TV Azteca's Claims in the Secret Mexican Court Proceeding Were False
            and Claimants Could Have Demonstrated that to be the Case Before the
            Mexican Court if Permitted ....................................................27
       G.   Procedural History and Attempts to Negotiate .................................28

III.   BASED ON THE TEXT OF NAFTA AND THE USMCA, THE TRIBUNAL
       ABSOLUTELY HAS JURISDICTION OVER THIS DISPUTE....................................30

IV.    RESPONSE TO OBJECTION 1: CLAIMANTS SATISFIED ALL
       JURISDICTIONAL REQUIREMENTS TO SUBMIT THEIR CLAIMS UNDER
       NAFTA CHAPTER 11 ...................................................................34
       A.   Claimants have satisfied each of the procedures under Chapter 11 to
            submit their claims to arbitration. ..........................................35
       B.   Failure to satisfy the requirements of Article 1119 does not result in the
            loss of jurisdiction..........................................................37
       C.   Mexico's due process rights were not deprived.................................40
       D.   Claimants acted in good faith and are not at fault. ..........................41

V.     RESPONSE TO OBJECTION 2: CLAIMANTS ARE INVESTORS UNDER
       NAFTA ARTICLE 1116(1)..............................................................42
       A.   NAFTA covers investors who "own *or* control" investments "directly *or*
            indirectly."..................................................................42
       B.   Claimants control Notes issued by TV Azteca under the August 9, 2017
            Indenture. ...................................................................44
       C.   Claimants' direct economic interest in the Notes further establishes their
            standing as NAFTA investors. .................................................48

VI.    RESPONSE TO OBJECTION 3: CLAIMANTS HAVE VALID "LEGACY
       INVESTMENTS" UNDER ANNEX 14-C OF THE USMCA. ......................................50
       A.   The Notes issued by TV Azteca in 2017 qualify as an "investment" under
            NAFTA.........................................................................51

B.     Claimants are "investors" of "another Party," i.e., the United States, because they are organized under the laws of Delaware and have their principal places of business in New York and Connecticut, respectively. ............51

C.     Claimants' investments were "established" in 2017 when the debt was issued by TV Azteca. ............51

D.     Claimants' investments were in existence on July 1, 2020. ............53

VII.   RESPONSE TO OBJECTION 4: THE NAFTA VIOLATION GIVING RISE TO CLAIMANTS' CLAIM AROSE IN THE THREE-YEAR TRANSITION PERIOD UNDER WHICH MEXICO CONSENTED TO arbitrate "LEGACY INVESTMENT" CLAIMS UNDER ANNEX 14-C OF THE USMCA. ............53

A.     Mexico consented to arbitrate substantive Chapter 11 claims related to "legacy investments" that arose after NAFTA terminated and during the Transition Period. ............54

B.     The "ordinary meaning" of Annex 14-C compels the conclusion that Mexico agreed to extend the substantive obligations of Chapter 11 of NAFTA to the whole of the Transition Period. ............57

iii.    The terms of Annex 14-C read in context support the conclusion that the Parties' substantive obligations extend through the Transition Period. ............58

iv.    The object and purpose the USMCA compels the interpretation of the treaty that extend of the substantive obligations of NAFTA Chapter 11 through the Transition Period. ............61

C.     The USMCA Parties' negotiating history confirms the meaning of Annex 14-C ............63

VIII.  RESPONSE TO OBJECTION 5: THE TRIBUNAL HAS JURISDICTION RATIONE MATERIAE BECAUSE CLAIMANTS HAVE DEMONSTRATED THAT THEY HAVE A PROTECTED INVESTMENT UNDER NAFTA ARTICLE 1139. ............66

A.     The scope of the "Investment" definition under NAFTA Article 1139 is broad and exhaustive. ............68

B.     The reference of Article 25 of the ICSID Convention in Claimants' Request for Arbitration does not change the fact that NAFTA Article 1139 is the relevant provision in this dispute to the determine the existence of a protected investment. ............69

C.     Even under the so-called Salini test, a debt security is an investment that entails a "risk" per se and "contributes to the economic development" of the host State. ............72

IX.   RESPONSE TO OBJECTION 6: THE TRIBUNAL HAS RATIONE TEMPORIS JURISDICTION. ............74

X.    RESPONSE TO OBJECTION 7: THE CLAIMANTS SUBMITTED PROPER WAIVERS AS REQUIRED BY ARTICLE 1121 OF NAFTA. ............74

A.     The waivers meet the requirements of Article 1121(1) and (3). ............75

B.     Claimants have not initiated parallel proceedings in respect of the same measure. ............78

XI.     RESPONSE TO OBJECTION 8: THE TRIBUNAL HAS JURISDICTION OVER
        THE CLAIMS FROM CONTRARIAN AND THE NOTEHOLDER UNDER ITS
        CONTROL, SANDPIPER LIMITED. ...........................................................................78

XII.    CONCLUSION...................................................................................................................80

PUBLIC VERSION

# GLOSSARY

| Short name | Description |
|---|---|
| BNYM or The Trustee | Bank of New York Mellon |
| Contrarian | Contrarian Capital Management, L.L.C. |
| Cyrus | Cyrus Capital Partners, L.P. |
| Opps II Offshore Feeder | Cyrus Opportunities Fund II Ltd. |
| Opps II Domestic Feeder | Cyrus Opportunities Fund II, L.P. |
| Opps II Master | Cyrus Opportunities Master Fund II., Ltd., |
| Notes | Debt securities issued by TV Azteca on August 9 2017 |
| Noteholders | Holders of the Notes issued by TV Azteca on August 9 2017 |
| Indenture | Indenture agreement, August 9 2017 |
| Judge Robles | Judge Miguel Angel Robles Villegas |
| NAFTA | North American Free Trade Agreement |
| Opportunities Funds | Opps II Master, Opps II Domestic Feeder, and Opps II Offshore Feeder |
| USMCA Protocol | Protocol Replacing the North American Free Trade Agreement with the Agreement Between the United States of America, the United Mexican States, and Canada |
| Request for Arbitration | Request for arbitration filed on June 30, 2023 |
| Sixty-Third Superior Court | Sixty-Third Superior Civil Court in Mexico City |
| TV Azteca | TV Azteca S.A.B. de C.V. |
| USMCA | U.S.-Mexico-Canada Agreement |
| VCLT | Vienna Convention on the Law of Treaties |

**EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| C-0001 | Summary of Mexican Court Proceedings |
| C-0002 | 08.13.24 Mexican Billionaire Salinas Accused of Defaulting on $110 Million Loan - Bloomberg |
| C-0003 | Declaration of Maria Teresa Llantada Voigt in Opposition re Motion to Enjoin Defendant TV Azteca |
| C-0004 | 03.20.2024 Salinas Group Owes 3.8 Billion – Bloomberg |
| C-0005 | 08.28.2024 Last Crusade of Mexico's President_ A Drastic Redesign of the Judiciary - The New York Times |
| C-0006 | TV Azteca Indenture (August 9, 2017) |
| C-0007 | Cyrus State of Delaware and New York Registration Documents |
| C-0008 | Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Cyrus)) |
| C-0009 | Cyrus Opportunities Funds Investment Management Agreement |
| C-0010 | Opps II Master Fund Organizational Chart |
| C-0011 | Third Amended and Restated Operating Agreement of Cyrus Capital Advisors, LLC |
| C-0012 | Contrarian State of Connecticut Registration Certificate and 2023 Annual Report to Connecticut Secretary of the State |
| C-0013 | Sandpiper Limited Register of Members |
| C-0014 | Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.) |
| C-0015 | Sandpiper Limited Articles of Association |
| C-0016 | Injunction notification documents served to Cyrus on June 27, 2023 |
| C-0017 | Contrarian Emerging Markets, L.P.-Contrarian Investment Management Agreement |
| C-0018 | Contrarian Emerging Markets May 13, 2023 Transfer |

PUBLIC VERSION

| | |
|---|---|
| C-0019 | Feb. 9, 2021 TV Azteca Press Release Announcing Deferred Payment |
| C-0020 | March 22, 2021 Notice of Event of Default |
| C-0021 | August 5, 2022 and August 8, 2022 Notices of Acceleration |
| C-0022 | August 8, 2022 TV Azteca Press Release Acknowledging Acceleration |
| C-0023 | Motion for Summary Judgment in NY State Court Proceeding |
| C-0024 | TV Azteca Complaint in Mexican Court Proceeding (filed September 22, 2022) |
| C-0025 | September 27, 2022, Injunction in Mexican Court Proceedings |
| C-0026 | International Health Regulations (2005) – Third edition |
| C-0027 | 01.26.24 - Judge Robles Denial of Trustee´s Motion to Vacate |
| C-0028 | BNYM mailroom log for February 21, 2023 process of service of complaint and injunction |
| C-0029 | TV Azteca Notice to Holders 04.06.2023 |
| C-0030 | Cyrus communications re serving of Injunction on June 27 2023 |
| C-0031 | Injunction notification documents served to Cyrus on June 27 2023 |
| C-0032 | Contrarian communications re serving of Injunction on June 29 2023 |
| C-0033 | Injunction notification documents served to Contrarian on June 29 2023 |
| C-0034 | Internal communication from the Judiciary Council, Circular CJCDMX - 13/2022 from March 4, 2022 |
| C-0035 | 04.18.22 Decision of the Federal Judiciary Council repealing Covid-19 related measures |
| C-0036 | 10.28.22 Decision of the Federal Judiciary Council terminating sanitary contingency measures caused by Covid-19 |
| C-0037 | Amparo in Mexican Federal Court |
| C-0038 | March 23, 2023 Mexican Federal Court Order Dismissing the Amparo |
| C-0039 | March 30, 2023 Appeal of the Injunction |

| C-0040 | Trustee's April 20, 2023 Response in Mexican Court Proceedings |
|--------|---------------------------------------------------------------|
| C-0041 | May 2, 2023 Order Finding Response to Complaint in Mexican Court Proceeding Untimely |
| C-0042 | May 5, 2023 WHO Statement on COVID-19 |
| C-0043 | May 9, 2023 Mexican President Statement on COVID-19 |
| C-0044 | Trustee's Motion to Vacate the Injunction (filed May 15, 2023) |
| C-0045 | 01.08.24 Judge Robles order to U.S. federal district court |
| C-0046 | 07.08.24 - Third Superior Court of Appeals rejection of the appeal of denial of the motion to vacate |
| C-0047 | April 16, 2024 Amparo Ruling |
| C-0048 | July 3, 2024 overturn of Amparo |
| C-0049 | Diamond Films August 2020 Mexican Court Injunction Order |
| C-0050 | Diamond Films Bankruptcy Petition Filing |
| C-0051 | May 9, 2023 Injunction in Mexican Court Proceeding |
| C-0052 | May 12, 2023 Reforma Article: "TV Azteca Has its 'Judge Friend' |
| C-0053 | May 17 2023 Expansion Article: "TV Azteca Continues to be Protected from its Creditors Despite the End of the Pandemic |
| C-0054 | 03.09.24 Grupo Reforma news article on Judge Robles protection of TV Azteca |
| C-0055 | July 28, 2022 TV Azteca Press Release Announcing Additional Debt Purchases and Net Sales and EBITDA |
| C-0056 | Stamped Notice of Intent |
| C-0057 | 2023.07.05 – Respondent's Letter - Seeking Denial of Registration |
| C-0058 | 2023.07.25 – Respondent's Letter - Denial of Registration |
| C-0059 | 2023.07.18 – ICSID's Letter - Questions on the RFA |
| C-0060 | 2023.08.02 ICSID Second Letter - Questions on the RFA |

| C-0061 | 2023.07.24 – Claimants' Letter - Response to Questions on the RFA |
| C-0062 | 2023.08.08 – Claimants' Letter - Response to ICSID |
| C-0063 | 08.11.23 ICSID Notice of Registration |
| C-0064 | 08.17.23 - Claimants request for consultations |
| C-0065 | 08.30.24 Respondent rejects consultations |
| C-0066 | 09.11.23 Claimants' request for consultations |
| C-0067 | 2023.09.27 – Respondent's Letter - Nominates Professor Zachary Douglas |
| C-0068 | 2023.10.11 – Respondent's request for ICSID to appoint Claimants' arbitrator |
| C-0069 | 2023.10.13 - Claimants' Letter - Appoints Mr. David J. A. Cairns |
| C-0070 | 2023.01.24 ICSID's Letter – President Appointment Ack Receipt |
| C-0071 | Memorandum of Association of Cyrus Opportunities Master Fund II, Ltd., Adopted by special resolution passed on September 4, 2012 |
| C-0072 | Cyrus Investment Management Agreement |
| C-0073 | Cyrus Waiver |
| C-0074 | Contrarian Waiver |
| C-0075 | TV Azteca's September 22 2022 Injunction Request |

# I.   INTRODUCTION AND EXECUTIVE SUMMARY

## A.   Introduction

1.      This case arose because local courts in Mexico City have been taken over by a powerful Mexican media mogul and billionaire, Ricardo B. Salinas Pliego, and one of his main companies, TV Azteca, a prominent television network and leading global creator of Spanish-language content. Mexico's judiciary has consistently protected the private interests of Mr. Salinas and his companies and impeded any possible remedy against TV Azteca's blatant (and unlawful) refusal by TV Azteca to repay its financial debts.[1] Mr. Salinas and his company took advantage of the ready capital provided by foreign investors to the tune of $400 million plus accrued interest and penalties. Even now, rather than abiding by the clear and unambiguous terms of the debt contract that requires (i) regular payments of interest, (ii) adherence to express choice of law and venue provisions for any disputes, and (iii) full payment upon the August 9, 2024 maturity date, TV Azteca has instead defiantly refused to pay its debts, including the Notes controlled by Claimants.[2]

2.      Specifically, TV Azteca has been shielded from liability thanks to the absurd decisions of local Mexican courts, which have wittingly or unwittingly done Mr. Salinas' bidding. TV Azteca's noteholders have had to engage in a Kafka-esque struggle to cease those efforts in Mexican courts while simultaneously seeking recovery for TV Azteca's unlawful defaults on its debt obligations in U.S. court proceedings, consistent with the forum selection clause governing the TV Azteca notes. This campaign has proven so effective for TV Azteca that, even today, following the recent natural maturity of the notes, TV Azteca refuses to concede an inch, confident that the Mexican courts will continue to aid and abet its ongoing impunity regarding its debt obligations.

3.      The Claimants in this action – along with the other TV Azteca noteholders – have been involuntarily subjected to processes, procedures, and rulings in the Mexican courts that have defied fact, logic, reason, and decency – including actions that constitute a violation of Mexico's obligations under international law, putting it in breach of NAFTA.

4.      Most notably, TV Azteca obtained an injunction barring any effort at recovery in a secret *ex parte* proceeding in Mexican court before a known "friend judge" of Mr. Salinas, on false and easily disprovable grounds. Today, the proceedings that yielded

---

[1] *See* **C-0001** (Summary of Mexican Court Proceedings) for a summary of the Mexican court proceedings (hereinafter "Mexican Court Proceedings") that derived from the secret proceeding initiated by TV Azteca in September 2022 and an injunction granted by the Sixty- Third Superior Court of Mexico City in favor of TV Azteca.

[2] This is a pattern of conduct that Mr. Salinas has regularly deployed against other foreign creditors. *See* e.g. **C-0002** (08.13.24 Mexican Billionaire Salinas Accused of Defaulting on $110 Million Loan - Bloomberg).

that injunction are formally on hold until TV Azteca decides – at its own discretion and on its own timetable – to undertake the actions necessary to move the proceedings forward.  In other words, justice delayed is justice denied.

5.      TV Azteca has no incentive to move forward in those proceedings because, as long as the injunction remains in place, it serves as a complete bar to recovery – even while the natural maturity date of the notes has now come and gone with no sign of payment in sight.

6.      In their efforts to push back against the obstruction indulged and facilitated at every step by the Mexican courts, the noteholders have been forced to participate in no less than *10* (and soon to be 11) separate court actions in Mexico – including by filing motions for reconsideration, appeals, and collateral amparo actions.  All of those steps stem from TV Azteca's willful default on its debt obligations and its successful gamesmanship of the Mexican civil justice system to shield itself from those obligations, including through the *ex parte* injunction that serves as the basis for the claim in these proceedings.

7.      Incredibly, TV Azteca's obstruction efforts remain <u>*ongoing*</u>.  In a brief filed ***just days ago*** in the U.S. court proceedings, TV Azteca objected to the plaintiffs' request for an anti-suit injunction that would bar TV Azteca's ongoing, vexatious parallel proceedings in Mexico.  TV Azteca argued that such an order would "violate the fundamental right of access to justice and effective judicial protection of such right as granted by the Mexican Federal Constitution and the Federal Civil Code."[3]

8.      Mexico is responsible internationally for the misuse of its judicial system in favor of TV Azteca and Mr. Salinas.  But Mexico has refused to engage with Claimants on what should be a common objective to stop this self-serving abuse of Mexico's judiciary for personal gain.  Instead Mexico is choosing to waste its finite resources to contend that this Tribunal lacks jurisdiction to hear our claims. As a result, Mexico is sending a clear signal to foreign investors that it is willing to allow Mexican courts to unfairly shield a Mexican billionaire and his companies from having to pay their debts. Unfortunately, that denial of justice will give prospective investors serious pause before investing in Mexico and its enterprises.

9.      Although the local courts' unlawful protection of Mr. Salinas and TV Azteca runs counter to Mexico's national interest, Mexico is choosing to mount a vigorous defense to this arbitration.  That odd election has the effect of according legitimacy to the Mexican courts' wayward actions and serves as nothing short of an explicit permission slip to Mr. Salinas to continue his misuse of the Mexican justice system to shield TV Azteca, and ultimately himself, from the consequences of TV Azteca's baseless refusal to follow through on its valid debt obligations.  The government's policy decision to shield Mr. Salinas is all the more surprising given his refusal to pay

---

[3] **C-0003** (Declaration of Maria Teresa Llantada Voigt in Opposition re Motion to Enjoin Defendant TV Azteca), at ¶ 8.

his Mexican tax obligations.[4]  Mexico's vigorous defense here also contradicts the government's high-profile efforts elsewhere to address what it acknowledges to be deeply embedded corruption in the judiciary.[5]

10.    When prospective investors consider the viability and feasibility of undertaking any material investment in Mexico they will surely consider the actions of the sovereign State in this case.  Unfortunately, what they will see is the State's choice to bless unlawful local actions rather than counter the threat that such actions pose to the perception of Mexico as a stable and functioning target for foreign investment. Although the Mexican courts are allowing TV Azteca to dodge its contractual agreements, the Tribunal should hold Mexico to its treaty obligations.

### B.    Executive Summary

11.    Mexico's jurisdictional objections are baseless and should be dismissed.

12.    Claimants are U.S. investors who control investments in Mexico that qualify as legacy investments for purposes of Annex 14-C of the USMCA because the Notes under their control were issued by TV Azteca, a Mexican corporation, on August 9, 2017 and had more than a three-year period of maturity.

13.    On February 9, 2021, TV Azteca ceased making any of its required interest payments under the Notes.  TV Azteca has not complied with any of its debt obligations regarding the Notes since the initial default.  To date, TV Azteca owes more than $547 million under the terms of the Notes.

14.    Rather than comply with its obligations or simply defending the basis for its default in U.S. court pursuant to the agreed-to forum selection clause, TV Azteca initiated and obtained a secret injunction from a so-called "friend judge" in Mexico City on the basis of a factually incorrect premise that its business operations had been detrimentally impacted by the COVID-19 pandemic.  That injunction remains in effect today, barring any recovery against TV Azteca in Mexico, where the majority of its assets are located.

15.    In failing to accord Claimants any notice or opportunity to oppose TV Azteca's request for an Injunction before it was issued in a secret proceeding, Mexican courts withheld justice from the Claimants, contrary to the principle of due process embodied in the principal legal systems of the world and as required by Article 1105 (Minimum Standard of Treatment) of NAFTA.

---

[4] **C-0004** (03.20.2024 Salnias Group Owes 3.8 Billion – Bloomberg).  Regardless of what reform of the judiciary Mexico now contends is necessary, the expressed need for some reform is an admission by Mexico of a broken judiciary.

[5] **C-0005** (08.28.2024 Last Crusade of Mexico's President_ A Drastic Redesign of the Judiciary - The New York Times).

16.  In its Memorial on Jurisdiction, Mexico raises eight objections to the Tribunal's jurisdiction over Claimants' claim.  Each of those objections must be rejected.

17.  Regarding Objection 1, the Claimants made a good faith effort to observe a 90-day pause between registration of the arbitration and any formal advancement of those proceedings.  Regardless, because the 90-day period referred to in Article 1119 does not pertain to Mexico's consent to arbitrate, any failure to adhere to the timeline suggested by Article 1119 would not eliminate jurisdiction over the claim.

18.  With respect to Objection 2, both Claimants are enterprises of the United States that control Notes that are investments in the territory of Mexico.  Each Claimant incurred loss or damage arising from the Sixty-Third Superior Court's conduct that amounted to a denial of justice with respect to those Notes under their respective control.

19.  Objection 3 similarly fails because the Notes controlled by the Claimants were issued on August 9, 2017, and remained in existence on July 1, 2020. Claimants' investments thus qualify as "legacy investments" under Annex 14-C of the USMCA.

20.  Objection 4 is without merit because the text of the USMCA clearly establishes that Mexico's consent to arbitrate claims under NAFTA extends to measures that occurred between July 1, 2020 and July 1, 2023.

21.  Regarding Objection 5, the Notes meet the definition of investment under Article 1139 of NAFTA and thus satisfy the requirements of Article 25 of the ICSID Convention.  Because the terms of the treaty provide an express definition of investment, Mexico's reliance on the *Salini* factors to argue that Claimants do not have a valid investment is misplaced.

22.  With respect to Objection 6, both Cyrus and Contrarian controlled Notes that were held by defendants in the suit brought by TV Azteca in Mexico (the "Mexican Court Proceedings").  Therefore, Cyrus and Contrarian were subject to the Injunction and the Sixty-Third Superior Court's related breach of due process arising from that proceeding and Injunction.

23.  Objection 7 fails because the Claimants' waivers are plainly valid. Mexico has failed to establish how the waivers are not sufficient in scope or how the Claimants are not abiding by the commitments in fact.

24.  Finally, Objection 8 fails because Contrarian controls Notes that were the subject of the Injunction at the time of its issuance and the related breach of due process by Judge Robles.

25.  This Response to Mexico's Memorial on Jurisdiction is organized as follows: In **Section II**, Claimants set out the factual aspects of this case. In **Section III**, Claimants demonstrate that the Tribunal has jurisdiction over this dispute. In **Sections IV through XI**, Claimants respond to each of Mexico's objections.  Finally, **Section XII** concludes and sets out Claimants' Request for Relief.

PUBLIC VERSION

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Claimants are U.S. Investors who Acquired and Control Investments in Mexico

26. On August 9, 2017, TV Azteca S.A.B. de C.V. ("TV Azteca"), a Mexican multimedia conglomerate majority-owned by Grupo Salinas, a special purpose vehicle controlled by Mexican billionaire Mr. Ricardo B. Salinas Pliego, issued $400 million in debt securities ("Notes") pursuant to an indenture agreement ("Indenture") entered into the same day with the Bank of New York Mellon ("BNYM" or "Trustee") as both The Trustee and principal paying agent.[6]

27. Under the terms of the Indenture, TV Azteca is obligated to make semi-annual interest payments to the holders of the Notes ("Noteholders"), including certain entities under Claimants' respective control, at the rate of 8.250% per annum on the $400 million principal sum on August 9 and February 9 of each year during the term of the Indenture. Each required interest payment totaled $16,500,000.  The maturity date of the Notes was August 9, 2024.

### i.  Cyrus Capital Partners, L.P.

28. Cyrus Capital Partners, L.P. ("**Cyrus**") is a limited liability partnership organized under the laws of the State of Delaware, United States, with a principal place of business as follows:[7]

> 65 East 55th Street, 35th Floor
> New York, NY 10022
> United States of America

29. Cyrus Opportunities Master Fund II., Ltd., ("Opps II Master"), the Cyrus Noteholder identified in the Request for Arbitration, is a Cayman Islands limited company majority owned by two entities: (1) Cyrus Opportunities Fund II, L.P., a Delaware limited partnership ("Opps II Domestic Feeder") and (2) Cyrus Opportunities Fund II Ltd, a Cayman Islands limited company ("Opps II Offshore Feeder").  Opps II Master acquired the Notes in the aggregate principal amount of $24,477,000 in separate acquisitions dated November 31, December 1, December 9 and December 10, 2021; and May 9, May 11, September 20, October 26, and November 8, 2022.[8]

30. Opps II Master, Opps II Domestic Feeder, and Opps II Offshore Feeder (collectively, the "Opportunities Funds") entered into an investment management agreement with **Cyrus** (the "Cyrus Opportunities Funds IMA").[9]  Under section 2 of the Cyrus

---

[6] **C-0006 (**TV Azteca Indenture (August 9, 2017)).

[7] **C-0007** (Cyrus State of Delaware and New York Registration Documents).

[8] **C-0008** (Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Cyrus)).

[9] **C-0009** (Cyrus Opportunities Funds Investment Management Agreement).

Opportunities Funds IMA, Cyrus has the authority to undertake the following actions "in the name of the Opportunities Funds," among other actions:

- To invest and trade securities;
- To possess and exercise "all rights, powers, privileges, and other incidents of ownership or possession with respect to securities and other property owned by the Opportunities Funds";
- to purchase securities and hold them for investment;
- to engage attorneys;
- to enter into contracts for or in connection with investments in securities;
- "to do any and all acts on behalf of the Opportunities Funds, and exercise all rights of the Opportunities Funds, with respect to their interest in any person, including with limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;"
- To authorize any agent of Cyrus to act for or on behalf of the Opportunities Funds in all matters incidental to the foregoing; and
- "To do such other acts as the Investment Manager may deem necessary or advisable in connection with the maintenance and administration of the Opportunities Funds."

As a result, Cyrus primarily directs, controls, and coordinates the Opportunities Funds' activities from its principal place of business in New York, New York.

31.    █████████████████████████████████████████
       ██████████████████████████████████
       ████████████████████████████████████████████
       ███████████████████████ █ ███████████████████████
       ██████████████████████████████████████████
       ██████████████████████████████████████████
       ███████████████████████████

_____

█ ███████████████████████████████████████████████
████████████████████████████████████



### ii. Contrarian Capital Management, L.L.C.

32.     Contrarian Capital Management, L.L.C. ("**Contrarian**") is a limited liability company organized under the laws of the State of Delaware, United States, with a principal place of business as follows:[11]

> 411 West Putnam Ave. #425
> Greenwich, CT 06830
> United States of America

33.     Sandpiper Limited, the Contrarian Noteholder identified in the Request for Arbitration, is a Cayman Islands limited company wholly owned by its sole member, Contrarian Funds, L.L.C., a Delaware limited liability company with a principal place of business at 411 West Putnam Ave. #425, Greenwich, CT 06830, United States of America.[12]

34.     Contrarian is the Manager of Contrarian Funds, L.L.C.[13]  In this capacity Contrarian is "solely responsible" for making all decisions concerning Contrarian Funds, L.L.C. under section 3.01 of the Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C. (6th A&R LLCA of Contrarian Funds,

---

[11] **C-0012** (Contrarian State of Connecticut Registration Certificate and 2023 Annual Report to Connecticut Secretary of the State).

[12] **C-0013** (Sandpiper Limited Register of Members).

[13] **C-0014** (Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.).

L.L.C.) at C-0014.[14]  Moreover, Contrarian has the authority to carry out all activities and authorities under section 1.03 of the 6th A&R LLCA of Contrarian Funds, L.L.C.,[15] which includes: directing investments by Contrarian Funds, L.L.C., as well as exercising "the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes of" Contrarian Funds, L.L.C.

35.    As the sole member of Sandpiper Limited, Contrarian Funds, L.L.C. controls Sandpiper Limited.[16]  Accordingly, as the sole managing member of Contrarian Funds L.L.C., Contrarian wholly controls Sandpiper Limited.  Contrarian primarily directs, controls, and coordinates Sandpiper Limited's activities from its principal place of business in Greenwich, Connecticut.

36.    Contrarian Funds, L.L.C. is in turn owned by multiple Contrarian-controlled investment funds (several of which were identified as defendants in the TV Azteca injunction proceeding before the Sixty-Third Superior Court: to include Contrarian Emerging Markets, L.P.; Boston Patriot Summer St LLC; Contrarian EM II, LP; EMMA 1 Master Fund, L.P.; EMMA 2 Fund, L.P.)[17] and which each still hold TV Azteca Notes in their own right with the exception of Contrarian Emerging Markets, L.P., which transferred its Notes to its Contrarian affiliate Sandpiper Limited in March 2023, as described in more detail below.  Contrarian is the investment manager to all those entities and thus can further demonstrate control of Contrarian Fund, L.L.C., and its wholly owned subsidiary, Sandpiper Limited, by virtue of its control of the direct and indirect owners of those two entities, respectively.[18]  Contrarian's control of Contrarian Funds L.L.C. is derived through the Sixth Amended and Restated Limited Liability Company Agreement, under which the Contrarian Funds, L.L.C. was formed as an "acquisition vehicle in which investment management clients of Contrarian may make investments at the discretion of the Manager."

37.    Moreover, all but one of Contrarian Funds, L.L.C.'s owners each have a general partner entity that are each in turn ultimately owned and controlled by the same three U.S. nationals (Jon Bauer, Janice Stanton, and Gil Tenzer) who also own and control

---

[14] *Id.*

[15] *Id.*

[16] **C-0015** (Sandpiper Limited Articles of Association).

[17] **C-0016** (Injunction notification documents served to Cyrus on June 27, 2023).

[18] **C-0017** (See, e.g., Contrarian Emerging Markets, L.P.-Contrarian Investment Management Agreement).  This IMA vests Contrarian with the authority to "open, maintain and close, in the name of the Feeder Fund and the Master Fund, securities accounts with any brokerage firm or custodian accounts with any bank designated by the Investment Manager at its sole discretion and, in connection therewith, (i) to invest and reinvest the assets of the Feeder Fund, including money borrowed, in the Master Fund; (ii) to purchase, hold, sell and otherwise deal in securities and financial instruments or obligations of any sort and rights therein, on margin or otherwise . . ." among numerous other authorities that vest Contrarian with control of this entity as an "acquisition vehicle" for Contrarian investment management clients.

Contrarian.[19]  Each of those general partner entities holds an economic interest in their respective limited partnership fund entities, and thus Sandpiper Limited, by virtue of the general partner's economic interest in the funds that own Sandpiper Limited.  Accordingly, the ultimate parents of Contrarian have an economic interest in the Notes held by those funds, including those held by Sandpiper Limited.

38.    Sandpiper Limited acquired its Notes on March 13, 2023 from its affiliate and partial owner, Contrarian Emerging Markets, L.P.[20]  Contrarian Emerging Markets, L.P. acquired those Notes in February 2021.

**B.    TV Azteca Stopped Making Required Interest Payments on the Notes**

39.    After making its first six required interest payments on the Notes, on February 9, 2021, TV Azteca announced that it would "defer" the interest payment due on that date.[21]

40.    After the expiration of the 30-day grace period for missed interest payments, on March 22, 2021, The Trustee sent TV Azteca a Notice of Event of Default pursuant to the Indenture, informing TV Azteca that it had not made the required February 2021 payment and had failed to cure the default within 30 days, and, as such, an Event of Default had occurred.[22]  TV Azteca has since failed to make all other required semi-annual interest payments under the Notes, including those controlled by Claimants.

41.    Following months of unsuccessful negotiations with TV Azteca to resolve its multiple and growing number of events of default, The Trustee, at the direction of Claimants and other Noteholders, accelerated the debt in August 2022.[23]

42.    TV Azteca acknowledged the acceleration in a press release, but made no efforts to comply with its obligations to satisfy all outstanding principal and interest payments under the Notes, including those controlled by Claimants.[24]

43.    After TV Azteca failed to comply with the terms of the Indenture and ignored the notices of acceleration, on August 26, 2022, The Trustee sued TV Azteca in New York

---

[19] **C-0014** (Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.).

[20] **C-0018** (Contrarian Emerging Markets, L.P. May 13, 2023 Transfer).

[21] **C-0019** (Feb. 9, 2021 TV Azteca Press Release Announcing Deferred Payment).

[22] **C-0020** (March 22, 2021 Notice of Event of Default). After a debtor goes into default, a trustee is required under law to take action that would facilitate the noteholders' best chance of recovery against the creditor.  The Trustee in this case did so through the Notice of Event of Default and subsequent actions taken to recover against TV Azteca.

[23] **C-0021** (August 5, 2022 and August 8, 2022 Notices of Acceleration).

[24] **C-0022** (August 8, 2022 TV Azteca Press Release Acknowledging Acceleration).

State court seeking compensatory damages under the Indenture.[25] The damages encompass the aggregate amount of accrued and unpaid interest based on TV Azteca's failure to make three interest payments, the full amount of the interest up to the date of acceleration on August 5, 2022, the redemption premium, and the full amount of the principal due under the Indenture at the time, collectively totaling $469,783,272.[26]  At present, TV Azteca owes the Noteholders in excess of $547,728,147, of which not less than $219,050,000 is owed to U.S. investors.

44.     On September 23, 2022, TV Azteca removed that case to the U.S. District Court for the Southern District of New York, which remains pending as discussed further below.

###     C.     Mexican Court Violates Claimants' Due Process Rights

45.     In the meantime, on September 22, 2022, just one day before removing the case pending in New York State court to the U.S. District Court of the Southern District of New York, TV Azteca initiated a secret proceeding in the Sixty-Third Superior Civil Court ("Sixty-Third Superior Court") in Mexico City.  TV Azteca did not provide any notice of the Mexican proceeding to Claimants, the other Noteholders, The Trustee, or the court presiding over the U.S. litigation.  The clear purposes of the secret proceeding were to obstruct the resolution of the U.S. litigation, prevent enforcement of the Notes, and preclude any recovery by Claimants and other Noteholders against TV Azteca.[27]

46.     Specifically, TV Azteca sought a court decree that the COVID-19 pandemic constituted an Act of God or *force majeure* event that prevented TV Azteca from performing its obligations under the Indenture. On that contrived basis, TV Azteca alleged that it should be entirely relieved from performing any obligations under the Notes, including making the required interest payments under the Notes controlled by Claimants, as well as the requirement to repay in full upon the natural maturity of the Notes.

47.     On September 27, 2022, just five days after the complaint was filed, the Sixty-Third Superior Court granted TV Azteca's request for an injunction (the "Injunction").[28] The Court did not hold a hearing or provide the named defendants, including Noteholders under Claimants' control, any notice or opportunity to be heard in opposition to the granted request for a decree.

48.     The Sixty-Third Superior Court is presided over by Judge Miguel Angel Robles Villegas ("Judge Robles"), who is known to be very partial to TV Azteca and Grupo

---

[25] The Notes are subject to New York law and included a consent to New York jurisdiction by all parties.  Conversely, neither the Trustee nor the Noteholders have consented to any jurisdiction in Mexico involving the Notes.

[26] **C-0023** (Motion for Summary Judgment in NY State Court Proceeding).

[27] **C-0024** (TV Azteca Complaint in Mexican Court Proceeding (filed September 22, 2022)).

[28] **C-0025** (September 27, 2022, Injunction in Mexican Court Proceedings).

Salinas.  The Court stated in the September 2022 injunction ruling that, "until such time as the World Health Organization decrees the extinction of the pandemic known as SARS-CoV2 (COVID 19), [TV Azteca] is prohibited to make payments of obligations due prior to the present lawsuit."

49.    The Injunction also orders, among other requirements:

(i) a "prohibition on the co-defendants from initiating and/or filing any proceedings for the collection and/or payment of the unpaid principal of the Bonds issued under the issuance agreement dated August 9, 2017";

(ii) the "suspension of all enforcement proceedings";

(iii) a "suspension of the effects and consequences that could derive from the early maturity of the principle and accrued and unpaid interest of all the bonds," i.e., the acceleration of the debt; and

(iv) the "suspension of all payment obligations" arising from the Indenture, full stop.

50.    In other words, the Injunction not only bars efforts to remedy TV Azteca's multiple defaults under the Notes, as well as to suspend its obligations arising from those defaults; it further bars any action to require payment even once the Notes reached maturity on August 9, 2024.

51.    By its own terms the Injunction will be indefinite.  That is because its condition – that the Injunction shall remain in place until the WHO declares the "the extinction of the pandemic known as SARS-CoV2 (COVID 19)" – will necessarily never occur because the WHO does not and will not declare the start or end of the COVID-19 pandemic.  Instead, the WHO declares the beginning and end of public health emergencies of international concern.[29]  As will be discussed in more detail below, despite the WHO declaring the end of the public health emergency related to COVID-19 in May 2023, Judge Robles subsequently declined to vacate the Injunction on the ground that the condition had not been met – i.e., the WHO did not declare an "end" to COVID-19 and, therefore, because COVID-19 still exists, the Injunction must remain in place. [30]

52.    To reiterate, neither The Trustee, Claimants, nor other Noteholders were provided contemporaneous notice of (i) TV Azteca's lawsuit in the Sixty-Third Superior Court, (ii) its motion for an injunction to suspend its payment obligations and bar recovery efforts by the named defendants, or (iii) the Injunction once it was issued.  On

---

[29] However, the International Health Regulations (IHR) provide a legal framework for declaring the start and end of a Public Health Emergency of International Concern (PHEIC). Refer to Article 12.5 of the IHR, Third Edition, World Health Organization. *See*, **C-0026** (International Health Regulations (2005) – Third edition), at ¶ 12.5. This framework was used when the WHO Director-General declared the end of COVID-19 as a PHEIC on May 5, 2023.

[30] **C-0027** (01.26.24 - Judge Robles Denial of Trustee's Motion to Vacate).

February 21, 2023—approximately five months after TV Azteca removed the New York state court proceeding to the U.S. federal district court—TV Azteca finally served The Trustee with the complaint and the Injunction.[31] Upon information and belief, counsel for Trustee was not made aware of that delivery of service until the first week of March.

53.    Subsequently, The Trustee issued a notice to the Noteholders on April 6, 2023 regarding the Mexico proceeding and injunction.[32] The Claimants were not formally served notice of the Mexico proceeding until late June 2023.[33]

54.    The decision to maintain precautionary measures under the injunction contradicts the COVID-19 policies and protocols that the Sixty-Third Superior Court was itself subject to at the time.

55.    The Sixty-Third Superior Court is one of the local courts in Mexico City comprising the Superior Court writ large and is subject to the administration and oversight of the Judiciary Council.[34] On March 4, 2022, the Judiciary Council issued guidelines addressed to the different entities comprising the Superior Court of Justice of Mexico City, including the Sixty-Third Superior Court, ordering resumption of its regular activities after the end of the COVID-19 pandemic. At that time, Mexico City's "epidemiological traffic light" turned to green, indicating a return to better health conditions. Because COVID-19 was no longer considered an out-of-control disease, the Sixty-Third Superior Court resumed its regular activities effective from March 14, 2022 (i.e., a full six months before the issuance of the Injunction).[35]

---

[31] **C-0028** (BNYM mailroom log for February 21 2023 process of service of complaint and injunction).

[32] **C-0029** (TV Azteca Notice to Holders 04.06.2023).

[33] *See* **C-0030** (Cyrus communications re serving of Injunction on June 27 2023); **C-0031** (Injunction notification documents served to Cyrus on June 27 2023); **C-0032** (Contrarian communications re serving of Injunction on June 29 2023); **CL-0033** (Injunction notification documents served to Contrarian on June 29 2023)

[34] To provide more context on the internal measures adopted by the judicial power in Mexico related to the management of the pandemic, it is necessary to clarify that the Superior Court of Justice is a governmental body responsible for the administration and adjudication of justice in Mexico City and operates in plenary sessions and chambers. The Court is composed of 78 Magistrates and a Presiding Magistrate, and has approximately 400 judges in different areas, such as civil, family, and criminal, among others. The Court has a permanent constitutional chamber and a Judiciary Council (called in Spanish, *Consejo de la Judicatura*). The Judiciary Council of the Superior Court of Mexico City is the body in charge of administration, oversight, evaluation, discipline and career service.

[35] See, **C-0034** (Internal communication from the Judiciary Council, Circular CJCDMX - 13/2022 from March 4, 2022), at p. 1, 2 and 6. A very similar situation occurred at the federal level of the judiciary in Mexico. On April 18, 2022, the Federal Judiciary Council (CJF) (an entity from the Judicial Power in Mexico that is chaired by President of the Supreme Court of Justice on the Nation (SCJN) and responsible of preserving and strengthening the autonomy, independence and impartiality of the jurisdictional bodies, issued an official decision (acuerdo) to adopt the necessary measures to reactivate all the activities of the judicial power after the sanitary contingency due COVID -19. *See* **C-0035** (04.18.22 Decision of the Federal Judiciary

56.     It is paradoxical and contradictory that in the month of September 2022, Judge Robles issued an injunction to shield a private company from needing to comply with its financial obligations because of COVID-19, six months after the activities of the Sixty-Third Superior Court had fully resumed.

57.     To challenge the Injunction, on March 15, 2023, The Trustee, as the only defendant served at the time in the Mexican Court Proceedings, filed an "Amparo" in Mexican federal court, seeking relief from the Injunction.[36]  An Amparo is a form of relief that is available in Mexican courts to seek protection from acts that violate fundamental constitutional rights under Mexican law.

58.     The Amparo in this case argued that the Injunction violated the Constitution of Mexico by depriving the defendants of fundamental rights to due process. Specifically, The Trustee argued in its Amparo filing that, even though framed as a "precautionary measure" to maintain the status quo, the Injunction issued by Judge Robles was in fact a form of final relief that was improperly granted to TV Azteca, because it essentially provided indefinite relief from TV Azteca's obligations under the Indenture.  Under Mexican law, however, such final relief should only be granted following a trial on the merits when defendants would have been afforded the opportunity to defend against the claims.  The defendants' inability to mount a defense to the claims thus constituted a violation of the defendants' constitutional rights, including the right of access to justice.

59.     In seeking the Amparo, The Trustee further argued that the Injunction was improper because the defendants in the Mexican Court Proceeding had not been informed of the secret proceeding, let alone afforded an opportunity to mount a defense.  In light of such clear constitutional defects, the Amparo sought a suspension of the Injunction.

60.     On March 23, 2023, however, the Mexican federal court dismissed the Amparo without prejudice due to "a failure to exhaust local remedies."[37]  As a result, The Trustee subsequently filed an appeal to the Third Superior Court of Appeals challenging the Injunction issued by Judge Robles.[38]  As explained in more detail below, the Third Superior Court of Appeals has not yet ruled in that case, having stayed its decision pending TV Azteca's service of all defendants– an undertaking in TV Azteca's unilateral control that TV Azteca has taken no steps to advance.

61.     Meanwhile, back in the United States, on March 27, 2023, certain Noteholders, including those under the control of the Claimants, filed a petition for involuntary

---

Council repealing Covid-19 related measures).  On October 28, 2022, the Plenary of the CJF issued another decision by which it was declare that the regular activities of the jurisdictional bodies of the CJF were resumed and the special scheme established in those decisions issued due to the sanitary contingency caused by the COVID-19 virus to be concluded. *See* **C-0036** (10.28.22 Decision of the Federal Judiciary Council terminating sanitary contingency measures caused by Covid-19).

[36] **C-0037 (**Amparo in Mexican Federal Court).

[37] **C-0038** (March 23, 2023 Mexican Federal Court Order Dismissing the Amparo).

[38] **C-0039** (March 30, 2023 Appeal of the Injunction).

Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York in an effort to seek relief from TV Azteca. The litigation before the U.S. District Court for the Southern District of New York was stayed during the pendency of the Chapter 11 proceeding, which has now been dismissed. Accordingly, the proceedings in that suit in U.S. federal district court have now resumed.

62.     The Trustee submitted its answer in the Mexican Court Proceeding on April 20, 2023, along with a motion to dismiss the suit for lack of jurisdiction based on the exclusive jurisdiction granted to New York courts under the forum selection clause contained in the Indenture.[39]

63.     TV Azteca then moved the Sixty-Third Superior Court to reject The Trustee's answer as untimely filed. And, predictably, Judge Robles rejected The Trustee's answer as untimely filed on May 2, 2023.[40] As a result, on May 8, 2023, The Trustee was forced to seek reconsideration of Judge Robles' ruling in order to preserve its ability to maintain its appearance in the case and seek dismissal for lack of jurisdiction. On May 15, 2023, Judge Robles conceded his error and reversed his decision, declaring The Trustee's answer to be timely filed.

64.     Because The Trustee's appeal of the Injunction had been lodged with the Third Superior Court of Appeals, pursuant to the rules governing civil procedure in Mexico, Judge Robles transferred The Trustee's pending motion for lack of jurisdiction from his Sixty-Third Superior Court to the Third Superior Court of Appeals. TV Azteca promptly filed an appeal from the court's grant of reconsideration and acceptance of the answer as timely filed, which was ruled on July 8, 2024, confirming the acceptance of the answer as timely filed.

65.     In the meantime, on May 5, 2023, the WHO Director-General declared that COVID-19 is now an "established and ongoing" health issue that no longer constitutes a "public health emergency of international concern" ("PHEIC").[41] On May 9, 2023, the Mexican President concurred with the WHO, issuing a decree that COVID-19 is no longer a health emergency in Mexico.[42]

66.     Accordingly, on May 15, 2023, The Trustee filed a motion with Judge Robles to vacate the Injunction on the grounds that the underlying condition for the Injunction – that it should remain in place "until such time as the World Health Organization decrees the extinction of the pandemic known as SARS-CoV2 (COVID-19)" – was no longer in effect based on the declaration that COVID-19 no longer constituted a public health emergency.[43]

---

[39] **C-0040** (Trustee's April 20, 2023 Response in Mexican Court Proceedings).

[40] **C-0041** (May 2, 2023 Order Finding Response to Complaint in Mexican Court Proceeding Untimely).

[41] **C-0042** (May 5, 2023 WHO Statement on COVID-19).

[42] **C-0043** (May 9, 2023 Mexican President Statement on COVID-19).

[43] **C-0044** (Trustee's Motion to Vacate the Injunction (filed May 15, 2023)).

67.     Meanwhile, at the Third Superior Court of Appeals, on December 13, 2023, TV Azteca formally requested that the court halt further consideration of The Trustee's motion to dismiss for lack of jurisdiction on the ground that not all defendants in its lawsuit had been served; the court subsequently granted this request, as discussed further below.  It is worth underscoring that, because of a peculiarity in Mexico's rules of procedure, it is entirely in the hands of the plaintiff in the Mexican Court Proceeding – i.e., TV Azteca – as to whether and when the defendants will be served.

68.     Turning back to The Trustee's attempt to get the COVID-19 pandemic-tied Injunction vacated on the ground that the COVID-19 pandemic had ended, on January 25, 2024, after a delay of more than eight months, Judge Robles finally issued a decision denying The Trustee's Motion to Vacate on the grounds that "only the extraordinary actions were declared finished, but there are still cases of the COVID 19 virus," and thus TV Azteca's obligations under the Note were suspended "until such time as the World Health Organization decrees the extinction of the pandemic known as SARS-CoV2 (COVID 19)."[44]

69.     This decision is extraordinary.  Having conditioned the Injunction on a circumstance that was legally and factually never going to happen in the first instance, i.e., that the WHO would at some point in time declare the extinction of the pandemic and COVID-19 – something that the WHO simply does not do[45] – Judge Robles then assessed that the condition had not been met.  Judge Robles also concluded that it was necessary to leave the Injunction in place to preserve the issue for a decision on the merits, i.e., whether COVID-19 relieved TV Azteca's obligations to make interest payments and to repay the debt in full.

70.     In addition, on January 8, 2024, Judge Robles ordered that the U.S. federal district court hearing the lawsuit against TV Azteca be "notified" of the Mexican Court Proceeding and its current status so that the U.S. federal district court could, "in order to avoid the possibility of contradictory decisions . . . , refrain from issuing a decision" in the U.S. federal court proceeding.  That notice was therefore lodged with Judge Paul Gardephe of the U.S. District Court of the Southern District of New York.[46]

71.     The Trustee promptly appealed Judge Robles' order denying the motion to vacate the Injunction.  On July 8, 2024, the Third Superior Court of Appeals affirmed Judge Roble's ruling.  According to the Third Superior Court of Appeals, it was not the pandemic *per se* that gave rise to the injunction, but the impact the pandemic had on

---

[44] **C-0027** (01.26.24 Judge Robles Denial of Trustee's Motion to Vacate).

[45] As noted earlier, the International Health Regulations (IHR) contain a legal framework for declaring a start and end to a Public Health Emergency of International Concern (PHEIC). This process led to the May 5, 2023, declaration by the WHO Director-General discussed in ¶ 58.  There are no other parameters by which the WHO assesses the "start" or "end" of a pandemic.

[46] **C-0045** (01.08.24 Judge Robles order to U.S. federal district court)

TV Azteca's ability to fulfil its obligations.[47] In its ruling, the Third Court of Appeals held that, notwithstanding the fact that the conditions precipitating the request for an injunction had changed—i.e., the COVID-19 pandemic had dissipated—"the termination or not of the pandemic cannot have as a consequence the lifting of the [Injunction]" because lifting the Injunction would deprive the underlying case of its subject matter.

72.     Thus, despite the Injunction's terms stating that it should apply until the WHO decrees the end of the pandemic, and despite the appeals court acknowledging that this condition had been met, the Third Superior Court of Appeals nevertheless affirmed Judge Robles' ruling to keep the Injunction in place.[48]

### D.     Claimants Cannot Find Relief in Mexico's Justice System

73.     As previewed above, on January 30, 2024, the Third Superior Court of Appeals granted TV Azteca's request to suspend its further judgment on The Trustee's motion that the Mexican courts lack jurisdiction over the matter.  The proceeding is effectively stayed—with the Injunction in effect until TV Azteca elects to serve all 35 defendants.[49]

74.     The Trustee subsequently sought and received an Amparo from a Mexican federal court, which vacated the Third Superior Court of Appeals' decision to suspend the proceeding until all 35 defendants had been served.[50]   However, TV Azteca appealed that decision and, on July 3, 2024, the federal appeals court vacated the Amparo, reinstating the Third Superior Court of Appeals' decision to defer resolution of The Trustee's jurisdictional challenge until all defendant Noteholders in the Mexican Court Proceeding had been served.[51]  That decision is not appealable.  Accordingly, should TV Azteca elect not to serve the remaining defendants, The Trustee's

---

[47] **C-0046** (07.08.24 - Third Superior Court of Appeals rejection of the appeal of denial of the motion to vacate).

[48] It is not possible to explain the logic of the Third Superior Court of Appeals' decision, so instead here is the final paragraph of the decision explaining why it was affirming Judge Robles' ruling to uphold the Injunction:

> Thus, it is considered that it is not the pandemic per se that gave rise to the granting of the measures decreed by the primary Judge, but the impact they had on the plaintiffs economy, which prevented the latter from complying with its obligations and, therefore, the end of the same, cannot be considered a sufficient reason for the lifting of the measures, since it is insisted that if such lifting were granted, the original trial would be without subject matter.

[49] Under Mexico's rules of procedure, when the defendant has a foreign domicile outside Mexico City, service of process involves letters rogatory, which the plaintiff, in this case, TV Azteca, bears the responsibility to obtain.  Normally, the prospect of not having its claim adjudicated incentivizes a plaintiff to undertake the foreign service of process.  However, here, where TV Azteca has already obtained the relief it seeks – protection from its obligations to pay under the Notes – it has no incentive to serve the defendants and in fact is *disincentivized* from doing so because it will trigger resumption of the proceedings.

[50] **C-0047** (April 16, 2024 Amparo Ruling).

[51] **C-0048** (July 3, 2024 overturn of Amparo).

jurisdictional challenge based on the forum selection clause in the Indenture will remain pending, leaving the Injunction in place and in effect, potentially indefinitely.

75.     Thus, on the basis of that initial Injunction – the product of a flawed process that violated Mexico's obligations under NAFTA to provide a minimum standard of treatment to U.S. investors – TV Azteca has successfully ground to a halt the Mexican Court Proceedings that Claimants are seeking to have dismissed. Such maneuvering, blessed by the Mexican courts, effectively provides a shield to TV Azteca's obligations under the Indenture by preventing The Trustee and the Noteholders (and, by extension, Claimants) from obtaining a ruling that the Indenture's forum selection clause grants exclusive jurisdiction to New York courts to adjudicate the case's merits.

### E.     Judge Robles is Known to Unfairly Favor TV Azteca and its Majority Owner, Grupo Salinas

76.     Judge Robles, the presiding judge in the Mexican Court Proceedings, has an unfortunate track record of unfairly and baselessly favoring TV Azteca and other Grupo Salinas companies in proceedings before him. For example, in a 2020 case brought by TV Azteca involving an ongoing contractual dispute occurring outside of Mexico between TV Azteca and Diamond Films, Judge Robles granted TV Azteca's request for an injunction to prevent Diamond Films from enforcing any remedies against TV Azteca for its failure to pay required content licensing fees.[52]

77.     In addition, on May 9, 2023, Judge Robles issued another injunction at TV Azteca's request without providing the defendants notice or opportunity to be heard, also in clear violation of Mexican law.[53] That other injunction permits TV Azteca, to its benefit, to refrain from abiding by its obligations as a publicly-traded company on the Mexican stock exchange to report financial information to the public until a final judgment in the Mexican Court Proceeding is issued. The lack of publicly reported financial information has enabled TV Azteca to successfully obscure the true status of its financial health and ability to abide by its debt obligations and repay its creditors, including the Noteholders under Claimants' control.

78.     Indeed, based on those examples and others, a news article was published on May 12, 2023, that was entitled, "TV Azteca has its 'friend judge.'"[54] Citing the Injunction secretly issued against The Trustee and the Noteholders in the Mexican Court Proceeding, as well as similar abuses of the Court's powers for the benefit of Grupo Salinas, the article explains that Judge Robles has "repeatedly favored Ricardo Salinas Pliego's companies."

---

[52] **C-0049** (Diamond Films August 2020 Mexican Court Injunction Order); **C-0050** (Diamond Films Bankruptcy Petition Filing).

[53] **C-0051** (May 9, 2023 Injunction in Mexican Court Proceeding)

[54] **C-0052** (May 12, 2023 Reforma Article: "TV Azteca Has its 'Judge Friend'").

79.    The fact that the Injunction remains pending although its underlying "justification" has very obviously lapsed has even attracted press coverage in Mexico. A news article titled "TV Azteca continues to be protected from its creditors despite the end of the pandemic" cites a Mexican bankruptcy expert, who states that the Injunction should no longer have any legal effect due to the statement from the WHO about the end of the COVID-19 pandemic.[55] Mainstream media in Mexico have continued since then to report on the close relationship and the favoritism with which Judge Robles has conducted himself in relation to TV Azteca. On March 9, 2024, for example, the newspaper Reforma published another story highlighting that, under the excuse of COVID-19, Judge Robles' continues to shield TV Azteca against U.S. creditors, to whom it owes almost US$500 million, for which it has not paid interest for three years.[56]

F.    **TV Azteca's Claims in the Secret Mexican Court Proceeding Were False and Claimants Could Have Demonstrated that to be the Case Before the Mexican Court if Permitted**

80.    TV Azteca's claim that an injunction against its creditors was warranted because it could not perform its obligations due to the COVID-19 pandemic, were and are provably false. That is because TV Azteca made significant, publicly reported payments toward its subordinate local debt _at the same time_ it was defaulting on its priority obligations to foreign creditors under the Notes, including the Noteholders under Claimants' control.

81.    In the same press release announcing that TV Azteca would "defer" payment under the Notes, TV Azteca also publicly announced that it would repay local, subordinate debt early. In particular, TV Azteca announced that it would amortize early up to $60 million of structurally subordinate and unsecured local debt instruments known as Certificados Bursatiles.[57] And, on March 5, 2021, TV Azteca finalized the purchase of $57 million[58] of its issued Certificados Bursatiles on the secondary market.

82.    Moreover, on July 28, 2022, TV Azteca announced that it had purchased an additional $105 million worth of issued Certificados Bursatiles.[59]

83.    Accordingly, from February 2021, at the time of its initial default on the Notes, to August 2022, when Claimants, on behalf of the Noteholders under their control and other Noteholders, were forced to accelerate the debt and pursue their remedies in U.S. court, TV Azteca spent the equivalent of $165 million to purchase its outstanding local debt instruments that were not yet due, all the while refusing to

---

[55] **C-0053** (May 17 2023 Expansion Article: "TV Azteca Continues to be Protected from its Creditors Despite the End of the Pandemic").

[56] **C-0054** (03.09.24 Grupo Reforma news article on Judge Robles protection of TV Azteca).

[57] **C-0019** (Feb. 9, 2021 TV Azteca Press Release Announcing Deferred Payment).

[58] Value of 1,211 million peso in U.S. dollars as of March 5, 2021.

[59] **C-0055** (July 28, 2022 TV Azteca Press Release Announcing Additional Debt Purchases and Net Sales and EBITDA).

make required payments to foreign creditors under the Notes, including those controlled by Claimants.

84. Additionally, on July 28, 2022, only two months prior to initiating the secret Mexican Court Proceeding to obtain an Injunction on the basis of the supposed hardship it was suffering due to the COVID-19 pandemic, TV Azteca announced improved net sales, net income, and EBITDA.[60] Upon information and belief, from the end of 2020 through the last twelve months of the 3rd Quarter 2022, TV Azteca grew EBITDA by over 140% while reducing total debt by over 25%.

85. Accordingly, at the time the Sixty-Third Superior Court was secretly considering TV Azteca's claim in September 2022, the repayment of the Certificados Bursatiles and the improved financial performance of the company clearly refuted TV Azteca's allegation that it was entitled to relief from its creditors due to the COVID-19 pandemic.

86. By denying Claimants an opportunity to be heard prior to issuing the Injunction that impacted the legal rights of the Noteholders under their respective control, the Mexican court unquestionably denied Claimants fair and equitable treatment in accordance with the customary international law principles of due process, thus violating Mexico's obligations under the Minimum Standard of Treatment requirement of Article 1105.

## G.    Procedural History and Attempts to Negotiate

87. On June 28, 2023, Claimants submitted their Notice of Intent to Arbitrate to Mr. Alan Bonfiglio Ríos, the Mexican official responsible for representing Mexico in this arbitration consistent with the process for initiating an arbitration as outlined by Chapter 11, Section B of NAFTA.[61]

88. Under USMCA Annex 14-C Article 3, Mexico's consent to submissions of claims to arbitration that allege a breach of an obligation under Section A of Chapter 11 of NAFTA expired on July 1, 2023.

89. To safeguard their rights and avoid irrevocably forfeiting their ability to arbitrate their minimum standard of treatment claim under NAFTA, Claimants submitted a Request for Arbitration on June 30, 2023, prior to the expiry of Mexico's consent on July 1, 2023.

90. To allow for settlement discussions (consistent with NAFTA Article 1119), Claimants in their Request for Arbitration requested that the ICSID Secretariat suspend the

---

[60] *Id.*

[61] **C-0056** (Stamped Notice of Intent)

28

proceedings for 90 days under Rule 54(7) of the ICSID Arbitration Rules following the formal registration of the Request for Arbitration.[62]

91.   Mexico objected to the registration of the Request for Arbitration in a letter to the ICSID Secretary General dated July 5, 2023.[63] Among other things, Mexico alleged that Claimants failed to comply with NAFTA Article 1119 because they had not met the 90-day time-period outlined in that Article. Mexico submitted a second letter to ICSID on July 25, 2023, again objecting to registration, including the proposed suspension of the proceedings.[64]

92.   The ICSID Secretariat asked Claimants questions about the Request for Arbitration in letters dated July 18 and August 2, 2023.[65] Claimants responded in letters dated July 24 and August 8, 2023, respectively.[66]

93.   The ICSD Secretary General subsequently rejected Mexico's request for denial of registration and registered the Request for Arbitration on August 11, 2023.[67] The ICSID Secretary General did not grant Claimants' request to suspend the proceedings.

94.   To nevertheless allow time for consultation and negotiation, Claimants sent a letter to Mr. Bonfiglio Ríos on August 17, 2023, requesting agreement to suspend the proceedings for 90 days, consistent with Rule 54(1) of the ICSID Arbitration Rules.[68] Mexico incorrectly claims in the Jurisdictional Memorial that this request for suspension was directed at ICSID and that ICSID had rejected the request.[69]

95.   In the August 17 letter, Claimants also notified Mr. Bonfiglio Ríos that even if Mexico did not agree to a formal suspension, Claimants nonetheless intended to unilaterally abide by a 90-day pause, during which time they would refrain from taking any formal actions with respect to the arbitration proceedings in order to engage in consultations and negotiations with his office regarding possible settlement of the claim. To that end, Claimants requested a meeting with Mr. Bonfiglio Ríos in person at his offices or at another convenient location. Claimants offered in the alternative to arrange a virtual meeting using Mr. Bonfiglio Ríos' preferred video conference platform.

---

[62] Request for Arbitration, June 30, 2023 at ¶ 30.

[63] **C-0057** (2023.07.05 – Respondent's Letter - Seeking Denial of Registration).

[64] **C-0058** (2023.07.25 – Respondent's Letter - Denial of Registration).

[65] **C-0059** (2023.07.18 – ICSID's Letter - Questions on the RFA; **C-0060** (2023.08.02 ICSID Second Letter - Questions on the RFA).

[66] **C-0061** (2023.07.24 – Claimants' Letter - Response to Questions on the RFA); **C-0062** (2023.08.08 - Claimants' Letter - Response to ICSID).

[67] **C-0063** (08.11.23 ICSID Notice of Registration).

[68] **C-0064** (08.17.23 - Claimants request for consultations).

[69] Respondent's Memorial on Jurisdiction, at ¶ 48.

PUBLIC VERSION

96.     In a letter dated August 30, 2023, Mr. Bonfiglio Ríos rejected Claimants' request to suspend the proceedings. Claimants' offer to consult and negotiate, in person or virtually, was also not accepted by Mr. Bonfiglio Ríos.[70]

97.     Claimants replied to Mr. Bonfiglio Ríos' in a letter dated September 11, 2023.[71] Claimants acknowledged Mexico's rejection of the request to mutually suspend the proceedings for 90 days, but informed Mexico that Claimants nevertheless intended to observe a 90-day pause from the date of registration, August 11, 2023. During this period, Claimants stated that they intended to refrain from taking any formal actions with respect to the arbitration proceedings, including by not naming an arbitrator, in order to allow time for consultations and negotiations with Mexico. Claimants restated their request to discuss this matter and attempt to reach an amicable solution.

98.     Mexico again ignored Claimants' offer for consultations. Instead, Mexico proceeded to appoint Professor Zachary Douglas as arbitrator on September 27, 2023.[72]  On October 11, 2023, Mexico sought to gain an advantage over Claimants by making a surprise request for the Secretary General of ICSID to appoint the Claimants' arbitrator in light of Claimants inactivity to date, knowing full well that Claimants had not appointed an arbitrator as part of Claimants' transparent and good-faith effort to allow for consultations and negotiations with Mexico.[73]  Claimants timely objected to Mexico's ploy and proceeded to appoint David J. A. Cairns as arbitrator on October 13, 2023 (*i.e.,* over 100 days after Claimants submitted their Notice of Intent to Arbitrate).[74] The parties subsequently agreed on a process to appoint the President of the Tribunal through various communications from October 18, 2023 to January 2024, and agreed to appoint Lord Collins of Mapesbury as the President of the Tribunal on January 23, 2024.[75]

## III.    BASED ON THE TEXT OF NAFTA AND THE USMCA, THE TRIBUNAL ABSOLUTELY HAS JURISDICTION OVER THIS DISPUTE.

99.     The NAFTA Parties began negotiations to update or replace NAFTA in August 2017 and concluded those negotiations in 2018.  As a result of that process, the NAFTA Parties signed the USMCA on November 30, 2018, and the USMCA subsequently entered into force on July 1, 2020.

100.    Under the procedures set forth in the *Protocol Replacing the North American Free Trade Agreement with the Agreement between the United States of America, the United Mexican States, and Canada* ("USMCA Protocol"), the USMCA replaced

---

[70] **C-0065** (08.30.24 Respondent rejects consultations).

[71] **C-0066** (09.11.23 Claimants' request for consultations).

[72] **C-0067** (2023.09.27 - Respondent's Letter - Nominates Professor Zachary Douglas).

[73] **C-0068** (2023.10.11 - Respondent´s request for ICSID to appoint Claimants' arbitrator).

[74] **C-0069** (2023.10.13 - Claimants' Letter - Appoints Mr. David J. A. Cairns).

[75] **C-0070** (2023.01.24 ICSID's Letter - President Appointment Ack Receipt).

NAFTA on July 1, 2020.[76]   However, as part of the USMCA, the Parties agreed to extend certain portions of NAFTA following the USMCA's entry into force and termination of NAFTA to allow for a smooth transition, including pursuant to Annex 14-C.[77]

101.    Annex 14-C provides that, for a period of three years ("Transition Period") after the date on which the USMCA replaced NAFTA, claimants holding "legacy investments" may bring claims alleging a breach of Section A of Chapter 11 of NAFTA using the procedures set forth in Section B of Chapter 11 of NAFTA.[78]

102.    For purposes of Annex 14-C, "legacy investments" means "an investment of an investor of another Party in the territory of the Party established or acquired between January 1, 1994, and the date of termination of NAFTA 1994, and in existence on the date of entry into force of [the USMCA]".[79]

103.    Annex 14-C, paragraph 1 of USMCA, states as follows:

> 1. Each Party consents, with respect to a legacy investment, to the submission of a claim to arbitration in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994 and this Annex alleging breach of an obligation under:
>
> *(a) Section A of Chapter 11 (Investment) of NAFTA 1994;*
>
> (b) Article 1503(2) (State Enterprises) of NAFTA 1994; and
>
> (c) Article 1502(3)(a) (Monopolies and State Enterprises) of NAFTA 1994 where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A of Chapter 11 (Investment) of NAFTA 1994. [FN20] [FN21]
>
> [FN20] For greater certainty, the relevant provisions in Chapter 2 (General Definitions), Chapter 11 (Section A) (Investment), Chapter 14 (Financial Services), Chapter 15 (Competition Policy, Monopolies and State Enterprises), Chapter 17 (Intellectual Property), Chapter 21 (Exceptions), and Annexes I-VII (Reservations and Exceptions to Investment, Cross-

---

[76] Paragraph 1 of the USMCA Protocol states that, "[u]pon entry into force of this Protocol, the USMCA, attached as an Annex to this Protocol, shall supersede the NAFTA, without prejudice to those provisions set forth in the USMCA that refer to provisions of the NAFTA. Thus, when provisions of USMCA refer to provisions of NAFTA 1994, the NAFTA provisions remain applicable despite the fact that USMCA replaced NAFTA 1994. See, **CL-0001**, Protocol Replacing the North American Free Trade Agreement with the Agreement Between the United States of America [hereinafter "USMCA Protocol"].

[77] *See,* for example USMCA Article 34.1, which provides "The Parties recognize the importance of a smooth transition from NAFTA 1994 to this Agreement." **CL-0002**, USMCA Chapter 34.

[78] *See* **CL-0003**, USMCA Annex 14-C, ¶¶ 1, 3.

[79] *See id.* at ¶ 6.

Border Trade in Services and Financial Services Chapters) of NAFTA 1994 apply with respect to such a claim.

[FN21] Mexico and the United States do not consent under paragraph 1 with respect to an investor of the other Party that is eligible to submit claims to arbitration under paragraph 2 of Annex 14-E (Mexico-United States Investment Disputes Related to Covered Government Contracts).

Annex 14-C, paragraph 3 states: "A Party's consent under paragraph 1 shall expire three years after the termination of NAFTA 1994." (emphasis added).

104. Furthermore, Annex 14-C paragraph 4 states:

4. For greater certainty, an arbitration initiated pursuant to the submission of a claim under paragraph 1 may proceed to its conclusion in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994, the Tribunal's jurisdiction with respect to such a claim is not affected by the expiration of consent referenced in paragraph 3, and Article 1136 (Finality and Enforcement of an Award) of NAFTA 1994 (excluding paragraph 5) applies with respect to any award made by the Tribunal.

105. Paragraphs 1 and 3 of Annex 14-C require that investors must establish the following four conditions in order to take advantage of the legacy investment protections:

a. First, the claim must be "with respect to a legacy investment."

b. Second, the claim must allege a breach of an obligation under Section A of Chapter 11 of NAFTA 1994.

c. Third, the claim must be submitted "in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994."

d. Fourth, the claim must be brought during the Transition Period.

106. The Claimants have established those four conditions in the present case:

a. the claim relates to a legacy investment, i.e., an "investment" established between January 1, 1994 and July 1, 2020 and that was in existence on July 1, 2020;

b.  the claim relates to a breach of Article 1105 of under Section A of Chapter 11 of NAFTA;

c. the claim was submitted in accordance with Section B of Chapter 11 of NAFTA; and;

d. the request for arbitration was submitted during the Transition Period prior to July 1, 2023.

32

107.    The plain text of Annex 14-C of the USMCA confirms that the USMCA Parties agreed to allow claims alleging a breach of NAFTA Chapter 11 with respect to legacy investments where the breach occurred during the Transition Period of July 1, 2020 to July 1, 2023. Mexico's chief negotiator has confirmed that the goal of Annex 14-C was to extend Chapter 11's substantive obligations throughout the Transition Period, as detailed in the witness statement filed in conjunction with this Counter Memorial. His statement validates that the USMCA Parties intended that the legacy investment provision would "ensure that all of the substantive provisions of NAFTA Chapter 11, as well as the ISDS mechanism, would be extended for three years after the NAFTA had been replaced by the new agreement."  This is relevant because it confirms that it was the understanding and intention of the Parties during the negotiations that legacy investments would be able to have access to NAFTA's ISDS mechanism to arbitrate breaches of the obligations under NAFTA Chapter 11 that arose during the Transition Period from July 1, 2020 to June 30, 2023.[80]

108.    The U.S. negotiator for the investment chapter of the USCMA has also since confirmed that one of the key features of the USMCA Chapter 14 was the "three-year transition period during which investors from all three jurisdictions could continue to use NAFTA ISDS rules and procedures ***to bring claims in relation to 'legacy investments'*** established or acquired in the territory of another Party during the lifetime of the NAFTA" (emphasis added).[81]

109.    Specifically, the relationship among Annexes 14-C, 14-D, and 14-E of the USMCA further shows that Annex 14-C allows claimants with legacy investments to bring claims in connection with measures taken during the Transition Period.  This relationship provides relevant context for interpreting Annex 14-C.

110.    Footnote 21 of Chapter 14 of the USMCA governs the relationship between Annex 14-C and 14-E (i.e., the Annex that provides the scope of claims that can be arbitrated under the USMCA's revised ISDS procedures), and states as follows: "Mexico and the United States do not consent under paragraph 1 [of Annex 14-C] with respect to an investor of the other Party that is eligible to submit claims to arbitration under paragraph 2 of Annex 14-E (Mexico-United States Investment Disputes Related to Covered Government Contracts)."  Footnote 21 thus recognizes that there will be scenarios in which an investor could bring a claim under either Annex 14-C or Annex 14-E and operates to eliminate that investor's eligibility to rely on the legacy investment protections of Annex 14-C.

---

[80] The U.S. negotiator for the investment chapter of the USCMA has also since confirmed that one of the key features of the USMCA Chapter 14 was the "three-year transition period during which investors from all three jurisdictions could continue to use NAFTA ISDS rules and procedures to bring claims in relation to 'legacy investments' established or acquired in the territory of another Party during the lifetime of the NAFTA." *See,* **CL-0004** (Mandell, Lauren, "The Trump Administrations' Impact on US Investment Policy", ICSID Review, Vol. 35, No. 1-2, Oxford University Oress, 2020 at p. 357.)

[81] *Id.*

111.    Footnote 21 only makes sense if Annex 14-C was meant to apply to legacy investment claims that are based on measures that took place following the USMCA's entry into force, i.e., during the three-year Transition Period between July 1, 2020 and July 1, 2023.   That is because claims that can be arbitrated under Annex 14-E can have arisen only following the USMCA's entry into force.

112.    Simply put, Annex 14-C and Annex 14-E can overlap only if they both apply to measures that occurred during the Transition Period, i.e., that post-date the USMCA's entry into force and NAFTA's termination on July 1, 2020.

113.    Claimants' claim arose during the Transition Period. Judge Robles issued the Injunction at issue in this case in September 2022, a full 10 months before the Transition Period expired on July 1, 2023.   The Tribunal thus has jurisdiction over the present dispute.  This jurisdiction is established consistent with Mexico's consent and agreement when it negotiated the plain text of Annex 14-C to extend the NAFTA Parties' Chapter 11 obligations – along with the consent to arbitrate any such violations of NAFTA Chapter 11 – through the term of the Transition Period.

## IV.    RESPONSE TO OBJECTION 1: CLAIMANTS SATISFIED ALL JURISDICTIONAL REQUIREMENTS TO SUBMIT THEIR CLAIMS UNDER NAFTA CHAPTER 11.

114.    Claimants have satisfied each of the provisions under Chapter 11 to properly submit their claims to arbitration. In fact, Claimants never closed the door for possible negotiations with Mexico. As Claimants will explain in this brief and as evidenced in the series of written communications sent to Mexico both prior to and following registration of this arbitration, Claimants made consistent efforts to propose a path for dialogue between the two disputing parties to explore a mutually satisfactory solution.[82] Mexico simply rejected all such efforts.[83]

115.    Mexico argues that Claimants cannot pursue their claim here because they did not file a Notice of Intent prior to April 1, 2023.   That is unreasonable, for one simple and straightforward reason: From September 2022 to June 27, 2023 in the case of Cyrus, and June 29, 2023 in the case of Contrarian, because they were not served with the lawsuit and injunction prior to the June 2023 dates, Claimants were not formally put on notice regarding TV Azteca's lawsuit and resulting injunction issued by the Sixty-Third Superior Court. Nor were Claimants reasonably able to reach and undertake decisions to pursue a NAFTA claim in the short timeframe prior to April 1, 2023 when the Claimants may have arguably had informal, constructive notice of the Injunction based on the service of process on The Trustee.

116.    Regardless, even assuming *arguendo* that Claimants failed to satisfy the requirements of NAFTA Article 1119, that still would not result in the loss of jurisdiction. Several

---

[82] *See* **C-0064** (08.17.23 - Claimants request for consultations) and **C-0066** (09.11.23 Claimants request for consultations).

[83] *See*, *e.g.* **C-0065** (08.30.24 Respondent rejects consultations).

tribunals and awards have previously confirmed that the requirements of Article 1119 do not constitute a jurisdictional element of consent under NAFTA Article 1121.[84]

**A.**   **Claimants have satisfied each of the procedures under Chapter 11 to submit their claims to arbitration.**

117.   Claimants respectfully maintain that the relevant requirements of Article 1119 of NAFTA have been satisfied.

118.   NAFTA Article 1119 provides:

> **Article 1119: Notice of Intent to Submit a Claim to Arbitration.**
>
> The disputing investor shall deliver to the disputing Party written notice of its intention to submit a claim to arbitration at least 90 days before the claim is submitted, which notice shall specify:
>
> the name and address of the disputing investor and, where a claim is made under Article 1117, the name and address of the enterprise;
>
> the provisions of this Agreement alleged to have been breached and any other relevant provisions;
>
> the issues and the factual basis for the claim; and
>
> the relief sought and the approximate amount of damages claimed.

119.   On June 28, 2023, Claimants delivered the Notice of Intent containing all the relevant information to Mr. Alan Bonfiglio Ríos, the Mexican official responsible for representing Mexico in the present arbitration. The Notice of Intent was submitted prior to when the Claimants submitted the Request for Arbitration on June 30, 2023.

120.   The Notice of Intent specified the names and addresses of the disputing investors, the provisions of NAFTA alleged to have been breached, the issues and factual basis for the claim, and the relief sought, as well as the approximate amount of damages claimed, as required by NAFTA Article 1119.

121.   Claimants recognize the value of engaging in settlement discussions, as reflected in NAFTA Articles 1118 and 1119. However, Article 1118 of NAFTA does not *require*

---

[84] *See,* e.g. **CL-0005**, *B-Mex, LLC and others v. United Mexican States,* ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, at ¶ 112; **CL-0006**, *Crompton (Chemtura) Corp. v. Government of Canada,* PCA Case No. 2008-01, Award, 2 August 2010 at ¶ 102; **CL-0007,** *Mondev International Ltd. v. United States of America,* ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, at ¶ 44; **CL-0008,** *Ethyl Corporation v. Government of Canada,* UNCITRAL, Award on Jurisdiction, 24 June 1998 at ¶¶ 73-76; **CL-0009,** *Cargill, Incorporated v. United States of America,* ICSID Case No. ARB(AF)/05/2, Award, 18 September 2009, at ¶183; **CL-0010***, Western NIS Enterprise Fund v. Ukraine,* ICSID Case No. ARB/04/2, Order, 16 March 2006, at ¶¶ 4-7.

disputing parties to first attempt to settle a claim through consultation or negotiation, only that the disputing parties "*should*" do so (emphasis added).[85] The version in Spanish of NAFTA article 1118 confirms this interpretation, the Parties "*intentarán primero dirimir la controversia por vía de consulta o negociación*".

122.    Claimants sought in good faith to engage in amicable discussions with Mexico prior to taking any actions to advance the arbitration following registration, affirmatively pledging on multiple occasions that it would abstain from taking actions that would move the arbitration along in the process for 90 days following registration. Mexico, however, simply refused to participate in those discussions seemingly in the belief that it could wring out a procedural victory over Claimants by brazenly thwarting the intent and purpose of the very article Mexico proclaims Claimants violated.

123.    *First,* Claimants requested that the Secretary General of ICSID suspend the proceedings for 90 days under Rule 54(7) of the ICSID Arbitration Rules, which allows the Secretary General to suspend proceedings if a Tribunal has not been constituted, following the formal registration of the Request for Arbitration. Claimants made this request even prior to formal registration to allow time for consultation and negotiation, consistent with Article 1118 of Chapter 11 of NAFTA, which provides that disputing parties should attempt to settle a claim first through consultation or negotiation.[86] In a written response on July 25, 2023, Mexico rejected our request for ICSID to grant a suspension, frustrating Claimants' intent to have an amicable discussion of this matter as soon as possible.

124.    *Second,* once ICSID registered the proceeding on August 11, 2023, on August 17, 2023, Claimants sent a formal communication to Mexico seeking its mutual agreement to suspend the proceedings for 90 days, consistent with Rule 54(1) of the ICSID Arbitration Rules.

125.    In this communication, Claimants also state they would unilaterally abide by a 90-day pause, during which time they intended to refrain from taking any formal actions with respect to the arbitration proceedings in order to engage in good faith consultations and negotiations with Mexico regarding possible settlement of the claim.[87] It is well known that one of the strength of international investment arbitration is its ability to adopt flexible procedural rules to accommodate changing circumstances. However, Mexico rejected all requests to engage in a consultation and negotiation process with Claimants. On August 30, 2023, Mexico sent a communication stating that consultation or negotiation under NAFTA Article 1118 must occur prior to formal submission of the claim to arbitration and is a *sine qua non* condition consent to

---

[85]  Article 1118 of NAFTA states in full: "The disputing parties ***should*** first attempt to settle a claim through consultation or negotiation." The version in spanish of the same article states: "Las partes contendientes ***intentarán*** primero dirimir la controversia por vía de consulta o negociación." In french the same provision refers: "Les parties contestantes ***devraient*** d'abord s'efforcer de régler une plainte par la consultation et la négociation." (emphasis added).  *See* **CL-0011,** NAFTA Chapter 11.

[86]  Request for Arbitration, June 30, 2023, at ¶ 30.

[87]  **C-0064** (08.17.23 Claimants request for consultations).

36

arbitrate the dispute.[88] The possibility of consultation or negotiation continues, however, throughout the whole arbitration proceeding, and is a bilateral decision by the disputing parties to try to find a mutually agreed solution to a dispute.

126. Mexico's rigid interpretation would imply that under no circumstances would the disputing parties be able to agree on a different mechanism to engage in consultations or negotiations for the purpose set forth in NAFTA Article 1118. As explained below, that position is inconsistent with the purpose and construction of NAFTA.

**B.    Failure to satisfy the requirements of Article 1119 does not result in the loss of jurisdiction.**

127. Claimants' approach of offering a 90-day pause following the registration of its request was the only practical alternative to what would otherwise have been an irrevocable loss of its ability to bring a claim challenging the denial of justice under NAFTA. Under the terms of the USMCA, Claimants had to submit their Request for Arbitration prior to July 1, 2023; they had no other viable option to secure access to the investment dispute resolution mechanism provided for in Annex 14-C of the USMCA, applicable to disputes arising out of legacy investments. Waiting 90 days following the Notice of Intent would have caused Claimants to forfeit their ability to bring a claim under NAFTA.

128.  As we have explained previously, Paragraph 3 of Annex 14-C of the USMCA states, "A Party's consent under paragraph 1 shall expire three years after the termination of NAFTA 1994." The USMCA entered into force on July 1, 2020, so the expiration date of Mexico's consent to submit to arbitration under the provisions of NAFTA Chapter 11 was July 1, 2023. Even with constructive knowledge of the injunction in late February or early March 2023, Claimants could not have reasonably assessed the viability of initiating an arbitration against Mexico under NAFTA, resolved to take on the burden and costs of initiating such a NAFTA arbitration, and drafted and sent a notice of intent prior to April 1, 2023. As a result of TV Azteca's delays in effecting service – delays that were fully embraced and exacerbated by the Mexican court that issued the Injunction that amounts to a denial of justice in this case – Claimants were simply not positioned to understand what options and remedies might exist under NAFTA prior to April 1, 2023. Acting with all deliberate speed to ensure it submitted its Request for Arbitration prior to July 1, 2023, Claimants nevertheless resolved to propose viable alternatives to Mexico, such as an agreement to suspend the arbitration proceedings or otherwise voluntarily refrain from taking actions to advance the arbitration, thereby allowing for a 90-day period for consultation or negotiation. However, Mexico simply "objected" to these proposals and "did not agree" to initiate a consultation process full stop.

129. Assuming *arguendo* that Claimants failed to fulfil specific procedural requirements under NAFTA Article 1119, this does not affect Mexico's consent to arbitrate. Indeed, previous tribunals have already rejected the view that failure on the part of the

---

[88] **C-0065** (08.30.24 Respondent rejects consultations).

investor to meet the conditions in Article 1119 must result in the loss of jurisdiction for the tribunal to hear the claims for breach of NAFTA's substantive provisions.

130.  The arbitral tribunal in *Mondev v the United States* clarified the distinction of the conditions provided in NAFTA article 1121 that relate to a Party's consent to arbitrate and other procedural requirements in NAFTA Chapter 11 that do not affect the tribunal's jurisdiction (i.e., Article 1119):

> It may be that a distinction is to be drawn between compliance with the conditions set out in Article 1121, which are specifically stated to be "conditions precedent" to submission of a claim to arbitration, and other procedures referred to in Chapter 11. Unless the condition is waived by the other Party, non-compliance with a condition precedent would seem to invalidate the submission, whereas a minor or technical failure to comply with some other condition set out in Chapter 11 might not have that effect, provided at any rate that the failure was promptly remedied. **Chapter 11 should not be construed in an excessively technical way, so as to require the commencement of multiple proceedings in order to reach a dispute which is in substance within its scope**.[89]

131.  In *Pope & Talbot Inc. v. Canada*, the tribunal found:

> … as rulings by this Tribunal and the *Ethyl [Corporation v. Canada]* Tribunal have found, **strict adherence to the letter of those NAFTA articles is not necessarily a precondition to arbitrability but must be analyzed within the context of the objective of NAFTA in establishing investment dispute arbitration in the first place**. That objective, found in Article 1115, is to provide a mechanism for the settlement of investment disputes that assures "due process" before an impartial tribunal. Lading that process with a long list of mandatory preconditions, applicable without consideration of their context, would defeat that objective, particularly if employed with draconian zeal.[90]

132.  The respondent in *Chemtura* disputed the jurisdiction of the tribunal because the conditions set forth in Articles 1119 and 1112 were not fulfilled. The tribunal dismissed the claim, deeming it fundamental that the defects did not cause the respondent prejudice in relation to the right protected by the rule:

> More fundamentally, the fact that the Claimant may have advanced arguments in its Memorial which were not spelled out in its previous submissions in connection with Article 1103 has not caused any prejudice to the ability of the Respondent to respond to such arguments. Indeed, the

---

[89] **CL-0007**, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, at ¶ 44 (emphasis added) (Footnotes omitted).

[90] **CL-0012**, *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Decision on Motion Regarding Superfee, 7 August 2000, at ¶ 26.

Respondent has had ample opportunity to state its position, and has done so in its briefs and at the hearings.[91]

133. Similarly, the tribunal in *ADF* noted, with respect to the requirements set forth in Article 1119(2):

> We find it difficult to conclude that failure on the part of the investor to set out an exhaustive list of 'other relevant provisions' in its Notice of Intention to Submit a Claim to Arbitration must result in the loss of jurisdiction to consider and rely upon any unlisted but pertinent NAFTA provision in the process of resolving the dispute. … Finally, we observe that the Respondent has not shown that it has sustained any prejudice by virtue of the non-specification of Article 1103 as one of the provisions allegedly breached by the Respondent. Although the Investor first specified its claim concerning Article 1103 in its Reply to the Respondent's Counter-Memorial, the Respondent had ample opportunity to address and meet, and did address and meet, that claim and the Investor's supporting arguments, in its Rejoinder.[92]

134. In *B-Mex*, Mexico contended that the failure by the so-called "additional claimants" to submit a notice of intent "rendered their purported submission to arbitration void ab initio." Mexico maintained that the additional claimants failed to engage its consent to arbitration in accordance with the procedures set out in NAFTA under Article 1122.[93]

135. The *B-Mex* tribunal clarified that the relevant test for jurisdiction was whether the consent given by the Respondent in Article 1122(1) was made conditional upon satisfaction of Article 1119(a)."[94]  After a thoughtful assessment based on the Vienna Convention over the relevant provision,[95] the tribunal found ***"that Article 1119 does not condition the Respondent's consent to arbitration in Article 1122*** and that the Additional Claimants' failure to issue a notice of intent therefore does not deprive the Tribunal of jurisdiction over them.'"[96]

136. Mexico filed an application to set aside this partial award to the Ontario Superior Court of Justice, which dismissed Mexico's application. Mexico then appealed this decision to the Ontario Court of Appeal. The Ontario Superior Court did not agree

---

[91] **CL-0006,** *Crompton (Chemtura) Corp. v. Government of Canada*, PCA Case No. 2008-01, Award, 2 August 2010, at ¶ 104.

[92] **CL-0013,** *ADF Group Inc. v. United States of America*, Case No. ARB(AF)/00/1, Award of 9 January 2003, at ¶¶ 134, 138.

[93] **CL-0005,** *B-Mex, LLC and others v. United Mexican States* (ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, at ¶ 63.

[94] *Id.* at ¶ 76.

[95] *Id.* at ¶¶ 77 -78.

[96] *Id.* (emphasis added).

with some of the reasonings of the majority of the arbitral tribunal in *B-Mex* with respect to article 1119, but confirmed that:

> …the settlement purpose is not contingent upon strict adherence to all procedural steps set out in Article 1119. Indeed, an overly formalistic interpretation of Article 1119 may stymie the ultimate goal of facilitating settlement. This view is supported by the Free Trade Commission, which states that the "notice of intent naturally serves as the basis for consultations or negotiations between the disputing investor and the competent authorities of a party." It is agreed between the parties that failure to pursue settlement, as was the case here, is no bar to pursuing arbitration…. [97]

137.    Like the tribunals in *ADF* and *Chemtura*, the tribunal in *B-Mex* and the Ontario Court of Appeal dismissed the proposition that a failure to satisfy the requirements of Article 1119 must result in the loss of jurisdiction of the tribunal.

## C.    Mexico's due process rights were not deprived.

138.    According to the *Statement of the Free Trade Commission on notices of intent to submit a claim to arbitration* (FTC Statement), the Notice of Intent under Article 1119 "serves as the basis for consultations or negotiations between the disputing investor and the competent authorities of a Party."[98] The notice of intent and the 90-day cooling off period are thus intended to provide a NAFTA party with information it needs to assess amicable settlement opportunities as contemplated in Article 1118.[99] As explained, Claimants took specific measures to cure the defect and ensure that this purpose would be fulfilled.  Mexico rejected any effort to engage in an amicable settlement discussion with Claimants.

139.    In their Request for Arbitration, Claimants expressly requested the Secretary-General of ICSID to suspend the proceedings for 90 days following the formal registration of the request to allow time for settlement discussions to occur.[100]  In addition, Claimants' letter to Mexico dated August 17, 2023, proposed that the parties suspend the procedure for 90 days based on Rule 54(1) of the ICSID Arbitration Rules and Article 1118 of the NAFTA so that they could attempt to settle the dispute through consultations or negotiation.  Claimants requested a meeting with Mr. Alan Bonfiglio Ríos at his office or at another location convenient for him. Alternatively, Claimants offered to arrange a virtual meeting. Mexico denied the request in its letter of August 30, 2023. Nevertheless, Claimants informed Mexico in a letter dated September 11,

---

[97] **CL-0014,** *B-Mex, LLC and others v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Judgment of Ontario Superior Court, 20 July 2020, at ¶ 97

[98] **CL-0015,** Statement of the Free Trade Commission on notices of intent to submit a claim to arbitration.

[99] **CL-0005,** *B-Mex, LLC and others v. United Mexican States* (ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, at ¶ 130.

[100] Request for Arbitration, June 30, 2023, at ¶¶ 28, 30.

2023, of their intention to observe a 90-day pause from the date of registration, August 11, 2023. During this period, Claimant intended to refrain from taking any formal actions with respect to the arbitration proceedings in order to allow time for consultations and negotiations with Mexico. Claimants further restated their request to meet with Mr. Bonfiglio Ríos to discuss the matter and attempt to reach an amicable resolution. It was Mexico that took the first steps to advance the proceeding by naming its arbitrator.

140. Mexico cannot therefore credibly claim that it was deprived of its due process rights because of a defect under Articles 1118 or 1119. Mexico was offered ample opportunity to consider the claims and engage in consultations or negotiations for a settlement for 90 days before the arbitration would proceed beyond the submission of the claim. In fact, it was Mexico that was not willing to engage, apparently on the belief that engaging with Claimants on their claim would prejudice their ability to argue Claimants have failed to satisfy certain procedure requirements. It follows that the defect claimed by Mexico did not cause it any prejudice and would not have changed the course of any settlement effort. Its cynical gamesmanship at the outset of this proceeding should not be rewarded.

### D. Claimants acted in good faith and are not at fault.

141. Furthermore, circumstances outside of Claimants' control prevented Claimant from delivering the Notice of Intent on a date prior to June 27, 2023, and from submitting the claim to arbitration on a date later than June 30, 2023.

142. Under Mexico's framing, Claimants were required to send the Notice of Intent no later than April 1, 2023. However, June 27 was the first date that Claimants were formally made aware of the action in Mexican court and the accompanying Injunction. Even to date, not all of the defendants in TV Azteca's injunction proceeding have been formally served. Clearly, constructive notice via The Trustee was not sufficient for the Mexican court to proceed with its consideration of The Trustee's motion to dismiss for lack of jurisdiction. Moreover, TV Azteca is using that lack of formal service to further delay the Mexican proceeding, giving indefinite effect to the Injunction issued ostensibly due to the COVID-19 pandemic.

143. Even taking account of the constructive notice Claimants received based on the service on The Trustee, Claimants could not have reasonably sent out a Notice of Intent to Mexico before April 1, 2023 and should not be penalized for taking actions to preserve their remedy under NAFTA, at the very least prior to the date when Mexico's consent terminated. That is particularly true when the delay in both constructive and formal notice can be attributed to the Mexican court's acquiescence to TV Azteca's self-serving delays in initiating service of process to notify the defendants of the lawsuit it had baselessly and in bad faith initiated against them. This inaction therefore prevented Claimants from reasonably being able to provide a notice of intent by April 1, 2023.

144.    Claimants chose to file their Request for Arbitration on June 30, 2023 rather than
        waiting 90 days following their notice of intent on June 28, 2023 and risking a more
        serious argument from Mexico that its consent under NAFTA Section A of Chapter 11
        expired on July 1, 2023. Claimants acted in good faith and as fast as they could under
        the specific circumstances of this case and should not be faulted.

145.    Reading Article 1119 as automatically requiring dismissal would, as explained by the
        tribunal in *B-Mex,* be inconsistent with the object and purpose of NAFTA, which
        includes the "creat[ion] [of] effective procedures for … the resolution of disputes."[101]
        As discussed above, other NAFTA tribunals have repeatedly insisted that
        "international law does not place emphasis on mere formal considerations, nor does it
        require new proceedings to be commenced where a mere procedural defect is
        involved."[102]

146.    No NAFTA tribunal has ever dismissed an investor's claim simply because
        procedural aspects within Article 1119 were not able to be fulfilled.  This tribunal
        should not be the first to contradict NAFTA's object and purpose on the claimed
        technicality.

147.    Based on the foregoing, it is clear that Claimants have satisfied the jurisdictional
        requirements of NAFTA to submit their Chapter 11 claim to arbitration, and the
        Tribunal must reject Mexico's objection.

## V.    RESPONSE TO OBJECTION 2: CLAIMANTS ARE INVESTORS UNDER NAFTA ARTICLE 1116(1).

### A.    NAFTA covers investors who "own *or* control" investments "directly *or* indirectly."

148.    Article 1116(1) of NAFTA provides that an "investor of a Party" is eligible to submit
        to arbitration a claim that another Party has breached an obligation under Section A of
        NAFTA Chapter 11.  NAFTA Article 1139 defines "investor of a Party" as:

                A Party or state enterprise thereof, or a national or an enterprise of such
                Party, that seeks to make, is making, or has made an investment.

149.    Cyrus and Contrarian are clearly enterprises of the United States.  Moreover, although
        the Noteholders controlled by each Claimant are not organized under the laws of the
        United States, their principal places of business – where their managing member,
        general partner, or equivalent (i.e., Cyrus and Contrarian, respectively) primarily

---

[101] **CL-0005,** *B-Mex, LLC and others v. United Mexican States* (ICSID Case No. ARB(AF)/16/3,
Partial Award, 19 July 2019, at ¶ 124.

[102] **CL-0007,** *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2,
Award, 11 October 2022, at ¶ 86.  *See also* **CL-0012,** *Pope & Talbot Inc. v. The Government of Canada*,
Award Concerning the Motion by Government of Canada Respecting the Claim Based Upon Imposition of the
"Super Fee", 7 August 2000, at ¶ 26.

directs, controls, or coordinates its activities – is in the United States – New York, New York and Greenwich, Connecticut specifically.

150.    In the case of Cyrus, Cyrus exercises control over Opps II Master Fund as that entity's investment manager pursuant to the Cyrus Opportunities Fund IMA. There is no question that the Notes held by Opps II Master Fund are an investment of Cyrus under its control.

151.    In the case of Contrarian, Sandpiper Limited is wholly owned by a Delaware limited liability company, Contrarian Funds, L.L.C., which has a principal place of business in Greenwich, Connecticut and whose Manager is Contrarian. In that role Contrarian is "solely responsible" for the actions of Contrarian Funds, L.L.C. and its wholly owned subsidiaries, including Sandpiper Limited. Contrarian also serves as the investment manager to the funds that own Contrarian Funds, L.L.C. There is no question that the Notes held by Sandpiper Limited are an investment of Contrarian under its control.

152.    Moreover, Claimants contend that Mexico breached its obligation to provide the minimum standard of treatment under Article 1105, which requires the Parties to "accord to investments of investors of another Party treatment in accordance with international law." (emphasis added). Article 1139 of NAFTA specifies that an "investment of an investor of a Party" means an "investment owned or controlled directly or indirectly by an investor of such Party."

153.    Mexico argues that Claimants do not meet this definition of "investors" under NAFTA. But by reading that term in isolation, Mexico ignores that investments of an investor of a Party include investments owned *or controlled* directly *or indirectly* by the investor, a critical element of the definition that is provided for specifically within the treaty definitions. As outlined above, both Cyrus and Contrarian clearly exercise control over Opps II Master Fund and Sandpiper Limited, respectively, and – consistent with their control of those entities – have clearly suffered damage and loss stemming from the Mexican court's denial of justice that forms the basis of Claimants' claim in this arbitration.

154.    In interpreting the term "investor of a Party" and applying Article 1116(1), previous tribunals have examined the full context of Chapter 11, including the definition of "investment of an investor of a Party." In *SD Myers, Inc. v. Gov't of Canada,* for example, the Tribunal analyzed Article 1116(1) in the context of the definition of "investment of an investor of a Party" provided in Article 1139.[103] Finding jurisdiction, the Tribunal specifically stated that it did not accept that:

---

[103] **CL-0016,** *S.D. Myers, Inc. v. Gov't of Canada, UNCITRAL, Partial Award*, 13 November 2018, at ¶ 225.

an otherwise meritorious claim should fail solely by reason of the
corporate structure adopted by claimant in order to organise the way in
which it conducts its business affairs.[104]

155.    Similarly, in *MAKAE Europe SARL v. the Kingdom of Saudi Arabia,* the tribunal
found the treaty at issue clearly established ownership or control as alternative bases
of jurisdiction based on the context of investment in the treaty overall:

> The Tribunal does not accept the Respondent's contention that proof of de
> facto control requires a claimant to demonstrate some ownership or other
> form of economic interest in an investment. The Treaty clearly establishes
> ownership or control as alternative bases of jurisdiction. The contention
> that control requires ownership or other form of economic interest
> disregards this distinction, and conflicts with the ordinary meaning of the
> Treaty's words.[105]

156.    As explained in detail above, Claimants' control of the Notes derives from a typical
U.S. investment fund structure, whereby an investment manager – whether as a direct
managing member of an entity or through an investment manager agreement – is
entitled to exercise control and act on behalf of investment funds created by it or
entities under common control with it.  That the Claimants have chosen to structure
their investments in this manner is not inconsistent with the Tribunal's jurisdiction, as
NAFTA Article 1116(1) clearly covers investments of this type.

**B.    Claimants control Notes issued by TV Azteca under the August 9, 2017
Indenture.**

157.    Claimants, by virtue of their control of the Noteholders – and therefore the Notes – as
described in more detail above, indisputably meet, at minimum, the "control" prong
of Article 1116(1).[106]

158.    NAFTA's definition of "investment of investor of a Party" refutes Mexico's a textual
contention that Claimants were required to make a "type of contribution . . . to
acquire an asset or increase its value, coupled with an expectation or desire that the
asset will produce a return for that same person or entity." As with many of Mexico's
other jurisdictional objections, it attempts to read additional requirements into the
agreement that simply do not exist.  NAFTA's disjunctive use of "*or*" in the definition
demonstrates that ownership or legal title is not a prerequisite for investment under
the treaty.  Claimants' *control* of qualifying investments is sufficient to qualify them
as investors under this definition.

---

[104] *Id.* at ¶ 229.

[105] **CL-0017,** *MAKAE Europe SARL v. Kingdom of Saudi Arabia*, ICSID Case No. ARB/17/42,
Award of 31 August 2021.

[106] Respondents attempt to read various definitions of "to invest" into NAFTA that were not included
in the agreement.  Respondent's Memorial on Jurisdiction at ¶¶ 64-65.

159.    While Mexico cherry picks certain definitions of "to invest" to suit its inaccurate narrative that Claimants must have committed their own capital, investment treaty tribunals have regularly held that where an investment treaty covers ownership or control investment activity, like NAFTA, the expenditure of money or capital is not an independent requirement.  Tribunals have recognized that control can exist through the direction and management of investment decisions.  For example, in *Mason Capital L.P. and Mason Management LLC v. Republic of Korea,* the tribunal examined a structure of a fund that included general partner control of an offshore fund assets.  There, the tribunal concluded that an investment manager, general partner, managing member, or equivalent with "investment decision-making, management, and expertise" was sufficient to confer jurisdiction under the agreement based on a control analysis.[107]  Similarly, in *BRIF TRES d.o.o. Beograd and BRIF-TC d.o.o. Beograd v. Republic of Serbia* the tribunal observed that:

> …"*Control*" is generally ascertained through legal control founded on the percentage of ownership title of shares (direct or indirect), including an analysis of voting rights and shareholders' agreements, or through actual control, which requires establishing the capacity to control and direct a company's day-to-day management and activities…[108]

160.    The tribunal in *Mera Investment Fund Limited v. Republic of Serbia* reached a similar conclusion.  The term "making investments," the tribunal reasoned, extends beyond mere economic contribution and:

> comprises more than funding and acquisition of investments, but as well, the holding and management of investments.[109]

161.    Mexico attempts to obfuscate the issue by suggesting that Claimants' status vis-à-vis the Noteholders is akin to that of a mere agent or administrator.[110]  That is wrong.

---

[107] **CL-0018,** *Mason Capital L.P. and Mason Management LLC v. Republic of Korea*, PCA, Decision on Respondent's Preliminary Objections, 22 December 2019, at ¶ 207.

[108] **CL-0019,** *BRIF TRES d.o.o. Beograd and BRIF-TC d.o.o. Beograd v. Republic of Serbia*, ICSID Case No. ARB/20/12, Award, 30 January 2023, at ¶ 174.

[109] **CL-0020,** *Mera Investment Fund Limited v. Republic of Serbia,* ICSID Case No. ARB/17/2, Decision on Jurisdiction, 30 November 2018, at ¶ 107.  Tribunals have regularly held that contributions may extend beyond mere capital or economic contribution.  *See, e.g.,* **CL-0021,** *Hassan Awdi, Enterprise Business Consultants, Inc. and Alfa El Corporation v. Romania,* ICSID Case No. ARB/10/13, Award, 2 March 2015, at ¶ 194 (holding that "contribution" in the context of investment "concerns the requirement that the investor commits a certain amount of resources, economic or otherwise").

[110] Respondent's Memorial on Jurisdiction at ¶ 65.  As articulated by Claimants' expert in *The Carlyle Group L.P., Carlyle Investment Management LLC, Carlyle Commodity Management LLC and Others v. Kingdom of Morocco,* investment management agreements for funds established in the Cayman Islands are typically delegated significant authority pursuant to articles of organization:  "In the Cayman Islands it is typically the case that an investment manager, unlike an investment advisor, will have delegated to it pursuant to the terms of the investment management agreement by the directors of the fund discretionary investment decision making authority. This is distinct from the pure investment advisory agreement under which the decision with regard to investments remains with the board of directors of the fund and the investment advisor

The reality is that Claimants are the primary entity responsible for directing, controlling, and coordinating the activities of the Noteholders under their respective control, as set forth in and delegated by the organizational documents for both entities.

162. To wit, the articles of organization for Opps II Master Fund provides that

> the Directors shall appoint the Investment Manager and may on appointment or any time after, confer upon the Investment Manager so appointed any of the powers exercisable by them upon such terms and conditions, including the right to remuneration payable by the Company and with such restrictions and powers of delegation as they, in their discretion, think fit and either collaterally with or to the exclusion of their own powers.[111]

163. The Cyrus Opportunities Funds IMA vests Cyrus as the investment manager with the authority to, for example: invest and trade securities; possess and exercise "all rights, powers, privileges, and other incidents of ownership or possession with respect to securities and other property owned by the Opportunities Funds"; to purchase securities and hold them for investment; to engage attorneys; to enter into contracts for or in connection with investments in securities; and to authorize any agent of Cyrus to act for on behalf of the Opportunities Funds.  Specific to controlling claims for the Opportunities Fund II investments, Cyrus is authorized to:

> do any and all acts on behalf of the Opportunities Funds, and exercise all rights of the Opportunities Funds, with respect to their interest in any person, including with limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.[112]

164. Accordingly, Cyrus demonstrably controls the Notes held by Opps II Master Fund.[113]

165. Similarly, Contrarian exercises the requisite control over the Notes held by Sandpiper Limited.  As the Manager for Contrarian Funds, L.L.C., which wholly owns Sandpiper Limited, Contrarian is "solely responsible" for all decisions concerning Contrarian Funds, L.L.C.  Contrarian is vested with complete authority under the

---

makes recommendations only."  **CL-0022,** *The Carlyle Group L.P., Carlyle Investment Management LLC, Carlyle Commodity Management LLC and Others v. Kingdom of Morocco,* ICSID Case No. ARB/18/29, Counter-Memorial on Jurisdiction, 22 June 2020, at ¶ 109.

[111] **C-0071** (Memorandum of Association of Cyrus Opportunities Master Fund II, Ltd., Adopted by special resolution passed on September 4, 2012).

[112] **C-0072** (Cyrus Investment Management Agreement).

[113] As with the investment in *International Thunderbird,* for example, Claimants here exercise a "significant influence on the decision-making of [the Master Funds] and [], through its actions, officers, resources, and expertise, [act as] the consistent driving force" of the investment decisions relating to the Notes at issue in this dispute.  **CL-0023,** *International Thunderbird Gaming Corporation v. The United Mexican States,* UNCITRAL, Award, 26 January 2006, at ¶ 107.

Amended and Restated LLC Agreement of Contrarian Funds, L.L.C. to direct investments and to "exercise the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes of" Contrarian Funds, L.L.C., including directing the actions of its wholly owned subsidiaries, e.g., Sandpiper Limited.[114]

166.    Ignoring these indicia of control, Mexico argues that it is impossible for Claimants to "allege that they legally own the notes," based on the Indenture's apparent restriction that the Notes may not be "offered, sold, pledged or otherwise transferred" unless the acquirer represents that it is "not a U.S. person (within the meaning of Regulation S under the Securities Act)" and will not further "offer, sell, pledge, or transfer" the Notes.  However, certain exceptions apply, including with respect to the transfer or sale to U.S. persons so long as an applicable exception applies.[115]

167.    Notably, here, the "Global Note" issued pursuant to the Indenture was and is registered in the name of The Depositor: The Bank of New York Depository (Nominees) Limited for Euroclear Bank S.A./N.V, and Clearstream Banking, *societe anonyme*, Luxembourg.  TV Azteca sold and transferred beneficial interest in the Global Note (i.e., the "Notes") in the market simultaneously with the issuance of the Global Note. Presumably, TV Azteca made such sales in accordance with the Indenture and applicable securities laws.

168.    Accordingly, there are a number of reasons why the Noteholders were entitled to purchase the Notes on the secondary market.  Significantly for purposes of Mexico's specific argument here, under none of those circumstances does the Noteholders' possession of the Notes serve as proof that the Claimants are not entitled to bring a claim under Article 1116(1) against Mexico.  Mexico simply misunderstands the nature of the Indenture governing the Notes, the subsequent transfer on the secondary market, and the requirements of eligibility.  Mexico erroneously conflates eligibility for the Noteholders to purchase the Notes on the secondary market for myriad reasons with eligibility of the Claimants to act as an investor under NAFTA.  Claimants face a total loss of control of the Notes as a result of the actions of Judge Robles in violation of NAFTA Article 1105.  Claimants may thus properly bring this claim under NAFTA Article 1116(1) on their own behalf, contrary to Mexico's implied contention that relief would only be available under NAFTA Article 1117 by bringing a claim on behalf of a third party.[116]

---

[114] **C-0014 (**Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.).

[115] **C-0006 (**TV Azteca Indenture (August 9, 2017).  The offer, sale, pledge, or transfer of the note or any beneficial interest in the note was permissible so long it was "(A) to the Company, (B) pursuant to a registration statement which has become effective under the Securities Act, (C) in an offshore transaction in compliance with Rule 904 of Regulation S under the Securities Act, or (D) pursuant to an exemption from the registration requirements of the Securities Act provided By Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act." Exhibit A to the Indenture.

[116] Respondent's Memorial on Jurisdiction at ¶ 67.

### C.    Claimants' direct economic interest in the Notes further establishes their standing as NAFTA investors.

169.    As set forth above, Claimants readily meet the definition of "investor of a Party" without need for further examination.  Nevertheless, both Cyrus and Contrarian can also demonstrate that their ultimate parents have an indirect economic interest in the Noteholders under their respective control, which further supports the basis for this Tribunal's jurisdiction under NAFTA Article 1116(1).

170.    Indeed, in addition to an investor's control over the relevant investment, tribunals have also generally considered an investor's entitlement to protection under an investment treaty in light of broadly construed underlying economic interest.  For example, the tribunal in *Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S.A. v. The Dominican Republic*, observed that:

> The Tribunal is next persuaded that the definition of investment under the Treaty Article I (1) relates protection not only to a formal ownership of shares or other such usual kind of transaction but also to a broader category of rights and interests of any nature. This allows for great flexibility in respect of the manner in which the investment is organized, and nothing suggests that the corporate structure chosen is contrary to this objective. As long as the business undertaken and the pertinent legal arrangements are lawful, as is the case here, there will be no reason to refuse the protections of the Treaty. This in the end is the reason why investment law has always searched for the economic interest underlying a given transaction and if it is compatible with the terms of the law and the Treaty, such interest is recognized as entitled to protection.[117]

171.    ███████████████████████████████████████████████████
        ████████████████████████████████████████████
        ████████████████████████████████████████████████████
        █████████████████████████████████████████████████
        ██████████████████████████████████████████████████
        ███████████████████████████████████

---

[117] **CL-0024**, *Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S.A. v. The Dominican Republic*, LCIA Case No. UN 7927, Award on Preliminary Objections to Jurisdiction, 19 September 2008, at ¶ 48.

N

of

PUBLIC VERSION



172.    Likewise, all but one of Contrarian Funds, L.L.C.'s owners have a general partner entity that are each in turn ultimately owned and controlled by the same three U.S. nationals (Jon Bauer, Janice Stanton, and Gil Tenzer) who own and control Contrarian.  Each of those general partner entities holds an economic interest in their respective partnerships, and thus Sandpiper Limited, by virtue of their economic interest in the funds that own Sandpiper Limited.  Accordingly, the ultimate parents of Contrarian have an economic interest in the Notes held by those funds, including those held by Sandpiper Limited.

173.    The present dispute is thus nowhere similar to *Komaksavia Airport Invest Ltd. Republic of Moldova*, the case on which Mexico relies.  There, the investor, Komaksavia, "never made a payment, in any amount or by any apparent means, to acquire Komaksavia's 95% share in Avia Invest."  The evidence before that tribunal confirmed that "the stated sale price was never paid."[118] This situation is in complete contrast: Here, the Notes were acquired and paid for by the Noteholders at the direction of the Claimants, with expectations to earn a financial return.

174.     Because Claimants ultimately control the Notes in question, and because they have economic interests in the investments, they are investors of a Party that are entitled to prosecute the claim against Mexico under Article 1116(1).  The Tribunal must therefore reject Objection #2.

---

[118] *See* **CL-0025**, *Komaksavia Airport Invest Ltd. v. Republic of Moldova*, SCC Case No. EA 2020/074, Award, 3 August 2022, at ¶ 167.

PUBLIC VERSION

## VI.    RESPONSE TO OBJECTION 3: CLAIMANTS HAVE VALID "LEGACY INVESTMENTS" UNDER ANNEX 14-C OF THE USMCA.

175.    Claimants' investments meet all of the required conditions to qualify as "legacy investments" under the definition of the USMCA.

176.    Mexico argues that Claimants' interests in the Notes do not qualify as "legacy investments" because the Noteholders under their respective control acquired the Notes after the termination of NAFTA on July 1, 2020.[119]  However, as with its other jurisdictional arguments on Annex 14-C, Mexico is reading an additional criterion for legacy investments into the USMCA that simply does not exist in the agreement. Simply put, there is no requirement that Claimants must have acquired their interests in the Notes before the termination of NAFTA in order to take advantage of the legacy investment protections of Annex 14-C of the USMCA.

177.    Annex 14-C defines "legacy investment" as an:

> investment of an investor of another Party in the territory of the Party established or acquired between January 1, 1994, and the date of termination of NAFTA 1994, and in existence on the date of entry into force of this Agreement.[120]

178.    Claimants meet each requirement:

a.    Claimants have an "investment," i.e. the Notes under their control issued by TV Azteca, a Mexico-domiciled company, in 2017;

b.    Claimants are "investors" of "another Party," i.e., the United States, because Cyrus and Contrarian are organized under the laws of the State of Delaware and have their principal places of business in New York, New York and Greenwich, Connecticut, in the United States, respectively;

c.    Claimants' investments were established prior to the termination of NAFTA on August 9, 2017, i.e., prior to July 1, 2020, when the debt was issued by TV Azteca under the terms of the Indenture; and

d.    Claimants' investments were in existence at the time of the entry into force of the USMCA, i.e. July 1, 2020.

179.    As explained below, because the debt instruments held by the Noteholders under Claimants' control were issued by TV Azteca on August 9, 2017, and thus were "established" well before July 1, 2020, the subsequent date of their *acquisition* by the Noteholders is irrelevant. Mexico's contrary position conflates the date of establishment with the date of acquisition.  But the legacy definition stipulates that

---

[119] Respondent's Memorial on Jurisdiction at ¶ 70.

[120] **CL-0003**, Annex 14-C, at ¶ 6(a).

investments must have been "established **or** acquired" prior to July 1, 2020 – not established **and** acquired prior to that date.

### A. The Notes issued by TV Azteca in 2017 qualify as an "investment" under NAFTA.

180. Annex 14-C clarifies that "investment" as referenced in the legacy investment definition have the meanings accorded in Chapter 11 of NAFTA.

181. For purposes of this dispute, it is unambiguous that the definition of "investment" under Article 1139 includes "a debt security of an enterprise . . . where the original maturity of the debt security is at least three years.". Here, the Notes under Claimants' control issued on August 9, 2017 and have a maturity date of more than three years.

182. Furthermore, as clearly established by the Indenture, the Notes pertain to "TV Azteca, S.A.B. de C.V., a publicly traded variable capital corporation (sociedad anónima bursátil de capital variable) organized and existing under the laws of the United Mexican States ('Mexico')" with notice to be provided to TV Azteca under the Indenture to its address in Mexico City, Mexico: Insurgentes Sur 3579, Col. Tlalpan la joya, 14000, México, D.F., México.[121]

### B. Claimants are "investors" of "another Party," i.e., the United States, because they are organized under the laws of Delaware and have their principal places of business in New York and Connecticut, respectively.

183. Mexico argues that Claimants attempt to read "investor of another Party" out of the Annex 14-C language. On the contrary, as set forth in the above response to Mexico's second jurisdictional objection, Claimants are investors because they exercise control of the Notes issued by TV Azteca. And an investor's control of an investment is clearly covered under NAFTA Article 1139, for the reasons explained in response to Mexico's second jurisdictional objection above. Because Claimants are organized under U.S. state law and have their principal places of business in the United States, they are investors of "another Party."

### C. Claimants' investments were "established" in 2017 when the debt was issued by TV Azteca.

184. Although Claimants did not acquire the Notes under their control prior to the termination of NAFTA, the Notes were issued – and therefore "established"– well before that time. Instead of confronting that reality, Mexico effectively seeks to delete the word "established" from Annex 14-C.

185. The term "established" is not defined in the USMCA or NAFTA. According to the principles of treaty interpretation in the VCLT Article 31, a term must be accorded its

---

[121] **C-0006** (TV Azteca Indenture (August 9, 2017)), at p. 95.

"ordinary meaning" in the context of the treaty and in light of the object and purpose of the treaty.

186.   Common definitions of "establish" include:

a.   "to bring into existence"[122];

b.   "to begin or create (something that is meant to last for a long time)"[123];

c.   "to set up (a business, institution, government, etc.) on a secure or permanent basis."[124]

187.   Prior tribunals have recognized the that the continuous investment nature of a debt security is not dependent on the party that acquires it.  In the seminal *Fedex v. Venezuela,* for example, the Tribunal observed that:

> although the identity of the investor will change with every endorsement, the investment itself will remain constant, while the issuer will enjoy a continuous credit benefit until the time the notes become due. To the extent that this credit is provided by a foreign holder of the notes, it constitutes a foreign investment which in this case is encompassed by the terms of the Convention and the Agreement. While specific issues relating to the promissory notes and their endorsements might be discussed in connection with the merits of the case, the argument made by the Republic of Venezuela that the notes were not purchased on the Venezuelan stock exchanges does not take them out of the category of foreign investment because these instruments were intended for international circulation. Nor can the Tribunal accept the argument that, unlike the case of an investment, there is no risk involved in this transaction: the very existence of a dispute as to the payment of the principal and interest evidences the risk that the holder of the notes has taken.[125]

188.   The investment in this dispute was "brought into existence," "created," or "set up" when TV Azteca issued $400 million in debt securities pursuant to the Indenture, which were subsequently purchased by the Noteholders under Claimants' control.[126] Under the terms of the Indenture, the issue date of the Notes was August 9, 2017. The investment was thus established prior to the termination of NAFTA and remains a viable investment to date.

---

[122] **CL-0026,** Merriam-Webster Dictionary, "Establish."

[123] **CL-0027,** The Brittanica Dictionary, "Establish."

[124] **CL-0028,** Oxford English Dictionary, "Establish."

[125] **CL-0029,** *Fedax NV v. The Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, at ¶ 4 0.

[126] **C-0006 (**TV Azteca Indenture (August 9, 2017)).

189.   Because Annex 14-C requires only that an investment has been "established *or* acquired" prior to July 1, 2020, Claimants were not required to have acquired the Notes prior to the termination of NAFTA.

###   D.   Claimants' investments were in existence on July 1, 2020.

190.   Mexico states that a legacy investment "must have existed at least on two dates: before July 1, 2020 and on July 1, 2020."[127]  It is indisputable that the Notes in question were in existence when the USMCA entered into force on July 1, 2020. Indeed, the Notes remain valid debt securities today.

191.   Because Claimants meet each element of the legacy investment definition Mexico's third objection should be dismissed.

## VII.   RESPONSE TO OBJECTION 4: THE NAFTA VIOLATION GIVING RISE TO CLAIMANTS' CLAIM AROSE IN THE THREE-YEAR TRANSITION PERIOD UNDER WHICH MEXICO CONSENTED TO ARBITRATE "LEGACY INVESTMENT" CLAIMS UNDER ANNEX 14-C OF THE USMCA.

192.   Based on a plain reading of the USMCA, Mexico consented in Annex 14-C to arbitrate legacy investment claims arising within the three-year Transition Period. Mexico erroneously contends that because Claimants allege a violation of NAFTA Chapter 11 that occurred after NAFTA's termination, the Tribunal lacks jurisdiction to hear the claim.

193.   As discussed further below, Mexico's post hoc interpretation of Annex 14-C is incorrect for at least four reasons:

a.   Mexico reads into the agreement a temporal limitation that does not exist under any reasonable "ordinary meaning" reading of the USMCA;

b.   The context of Annex 14-C – including the definition of "legacy investment" itself, Footnotes within the Annex, the USMCA Negotiating Protocol, and other annexes within the agreement – demonstrates that the legacy investment provision was intended to extend NAFTA's substantive Chapter 11 obligations;

c.   Claimants' reading of Annex 14-C supports transparency, predictability, and stability, the "object and purpose" underlying the USMCA; and

d.   Even if the Tribunal decided that Annex 14-C was ambiguous and resorted to supplementary means of treaty interpretation under VCLT Article 32, such materials support Claimants' interpretation of Annex 14-C.

---

[127] Respondent's Memorial on Jurisdiction at ¶ 72.

A.  **Mexico consented to arbitrate substantive Chapter 11 claims related to "legacy investments" that arose after NAFTA terminated and during the Transition Period.**

194.  All agree that "[a]n act of a State does not constitute a breach of an international obligation unless the State is bound by the obligation in question at the time the act occurs."[128]

195.  Under Annex 14-C of the USMCA, Mexico consented in writing to arbitrate claims for legacy investments, including those that arose during the specified three-year Transition Period.[129]  Mexico was thus bound by the obligations in Article 1105 of NAFTA when the Sixty-Third Superior Court engaged in the violating conduct on September 27, 2022.

196.  Mexico seeks to dodge that fact by arguing it "was not subject to the obligations established in Article 1105 of the NAFTA as of July 1, 2020" because the USMCA superseded NAFTA on that date.  However, Mexico blatantly mischaracterizes the effect of NAFTA's termination on July 1, 2020 and effectively ignores the scope of the consent that it extended when it agreed to arbitrate legacy investment claims within the scope of Annex 14-C.

197.  Similarly, Mexico's argument under Article 70(1) of the VCLT does not hold water.  Article 70(1) provides that "*[u]nless the treaty otherwise provides or the parties agree otherwise,* the termination of a treaty under its provisions or in accordance with the present Convention: (a) Releases the parties form any obligation further to perform the treaty . . ."[130]  The USMCA Parties ***did*** "agree otherwise" when they agreed to incorporate Annex 14-C, which extends NAFTA's Chapter 11 obligations for the three-year Transition Period.

198.  Specifically, Annex 14-C of the USMCA provides in relevant part that:

> Each Party consents, with respect to a legacy investment, to the submission of a claim to arbitration in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994 and this Annex alleging breach of an obligation under:
>
> a.  *Section A of Chapter 11 of NAFTA 1994*;
> b.  Article 1503(2) (State Enterprise) of NAFTA 1994; and
> c.  Article 1502(3)(a) (Monopolies and State Enterprises) of NAFTA 1994 where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A of Chapter 11 (Investment) of NAFTA 1994.

---

[128] **CL-0030,** Draft articles on Responsibility of State for Internationally Wrongful Acts, with commentaries, 2012, Article 13.  *See* Respondent Memorial on Jurisdiction at ¶ 78.

[129] Notice of Arbitration, June 30, 2023.

[130] **CL-0031**, Vienna Convention on the Law of Treaties, Article 70 [hereinafter "VCLT Article 70"].

…

A Party's consent under paragraph 1 shall expire three years after the termination of NAFTA 1994.[131] (emphasis added)

This provision memorializes Mexico's agreement to be bound by NAFTA Chapter 11's substantive investment obligations as set forth in Section A for a period of three years after NAFTA's termination with respect to "legacy investments."

199.    Notably, the negotiators did notexclude from the scope of coverage of Annex 14-C acts or facts that took place **after** the USMCA's entry into force.  USMCA Chapter 14 provides that "[f]or greater certainty, this Chapter, **except as provided for in Annex 14-C (Legacy Investment Claims and Pending Claims)** does not bind a Party in relation to an act or fact that took place or a situation that ceased to exist before the date of entry into force into this agreement."[132]  (emphasis added).  The foregoing limiting language relates only to circumstances not covered within the scope of Anenx 14-C.

200.    That omission contrasts with to another termination treaty negotiated in the same period by Mexico.  In March 2018, at the same time it was negotiating the terms of the USMCA, Mexico negotiated the termination of its BIT with Australia and incorporated clear and unequivocal language limiting consent to any "act or fact" that took place prior to the termination of the treaty, i.e., barring claims based on measures that occurred following termination.  Specifically, Article 13 of that agreement provided that:

The [Mexico-Australia BIT] shall continue to apply for a period of three years from the date of termination to any investment . . . which was made before the entry into force of the Agreement for both Australia and the United Mexican States with respect to any act or fact that took place or any situation that existed before the date of termination.

A claim under Article 13 (Arbitration: Scope and Standing and Time Periods) of the IPPA may only be made within three years from the date of termination **and only with respect to any act or fact that took place or any situation that existed before the date of termination**.[133] (emphasis added).

---

[131] **CL-0003,** Annex 14-C at ¶¶ 1(a)-(c), 3.

[132] **CL-0032,** USMCA Chapter 14, Art. 14.2(3) (emphasis added).

[133] **CL-0033,** Agreement to terminate the Agreement between the Government of Australia and the Government of the United Mexican States on the Promotion and Reciprocal Protection of Investments." Mexico has used an identical approach in the termination of the Bilateral Investment Treaty with Singapore based on a side letter that was signed on January 26, 2022 in the framework of the negotiation of the Free Trade Agreement between Singapore and the Pacific Alliance. See, **CL-0034,** Letter of termination of the BIT between Mexico and Singapore - FTA Singapore – Pacific Alliance.

201.   USMCA Parties, including Mexico, clearly chose **not** to limit the scope of Annex 14-C in a similar manner. If they intended to extend the Parties' consent only for arbitration of claims based on measures that occurred prior to July 1, 2020, they would have done so – as Mexico did in the case of the clear and unequivocal Australia BIT termination language specifying that any claim must relate to an act arising prior to the termination of that treaty.

202.   The plain text of the USMCA provisions make clear that Mexico agreed to be bound by NAFTA Chapter 11's substantive obligations throughout the term of the Transition Period. Although the parties generally terminated their NAFTA obligations on July 1, 2020, "the parties agree[d] otherwise" with respect to legacy investments for the three-year Transition Period specified in Annex 14-C.[134]

203.   The tribunal in *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America* recently considered the scope of Annex 14-C in light of the substantive obligations in NAFTA Chapter 11.[135]  As emphasized by the dissent in that case:

> In my view, the natural meaning of Annex 14-C is that the Parties agreed to arbitrate claims alleging breaches of obligations under NAFTA Chapter 11, Section A for a period of three years after the termination of NAFTA. Therefore, unless the text otherwise expressly provides, for the purposes of Annex 14-C, Chapter 11, Section A must remain in force. Again, Annex 14-C 1 does not limit its application to alleged breaches that occurred prior to the termination of NAFTA. Rather, it provides consent to arbitrate claims alleging a breach of an obligation of Section A of Chapter 11 with respect to legacy investments, without distinguishing between breaches that occurred before or after the termination of NAFTA. The Respondent seeks to read in a temporal limitation and effectively add an additional condition in the language of the text. In my view, the Respondent's

---

[134] Article 70(1) of the VCLT (*see* Respondent's Memorial on Jurisdiction at ¶ 79).

[135] **CL-0035,** *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America,* ICSID Case No. ARB/21/63, Award, 12 July 2024.  Claimants emphasize that while two members of the tribunal in the *TC Energy* concluded as a matter of first impression that they did not have jurisdiction based on the scope of Annex 14-C, there is no *stare decisis* in international arbitration.  *See* **C-0036,** *Fábrica de Vidrios Los Andes, C.A. and Owens-Illinois de Venezuela, C.A. v. Bolivarian Republic of Venezuela I,* ICSID Case No. ARB/12/21, Decision on Annulment, 22 November 2019.  There, the tribunal stated:

> The Applicants have argued that the Tribunal disregarded the decisions of other tribunals which decided the same issue. It is well known that there is no stare decisis in international law. Tribunals are independent from each other and not bound by other tribunals' decisions. The Committee concurs in that it is desirable to develop a jurisprudence constante by consideration of precedents and explanation in what aspects they are similar or need to be distinguished from the instant case. However, the standing of precedents is not at the level of the applicable law. To ignore them just by itself would not be tantamount to an egregious misapplication of the law. In any event, the Tribunal took into account and analyzed previous decisions on the same issue, as explained in the next paragraph.

*Id.* at ¶ 111.

interpretation, which the majority accepts, makes the term "obligation" bear a meaning that is not justified in the context of Annex 14-C.[136]

204.    The *TC Energy* dissent correctly accepts the most clear and reasonable interpretation of the text of Annex 14-C as written. The reasoning of the Award adopted by a majority of the tribunal, on the other hand, takes great pains to avoid adopting the most straightforward interpretation of Annex 14-C by ignoring the plain language of the USMCA and Annex 14-C  in order to interpret the scope of Annex 14-C as narrowly as possible as a procedural provision only.  As explained in Section VII(B) immediately below, and supported by the dissent in *TC Energy* and its interpretation of the relevant provisions, the context of the agreement makes abundantly clear that the parties clearly intended the substantive obligations under Chapter 11 (Section A) would apply during the Transition Period.

205.    The Tribunal should therefore reject Mexico's *post hoc* rationalization that does not comport with the principles of treaty interpretation and would effectively render Annex 14-C a nullity.

    B.    **The "ordinary meaning" of Annex 14-C compels the conclusion that Mexico agreed to extend the substantive obligations of Chapter 11 of NAFTA to the whole of the Transition Period.**

206.    Mexico's argument relies heavily on the text of the USMCA Protocol and the Preamble of the USMCA.  Mexico argues that the "ordinary meaning" of these provisions compel the Tribunal to the conclusion that "NAFTA Parties agreed to terminate the NAFTA and replace its substantive obligations with newly negotiated obligations of the USMCA, effective July 1, 2020."[137]

207.    Claimants do not dispute that both the USMCA Preamble and the USMCA Protocol are relevant to discerning the ordinary meaning of the USMCA and Annex 14-C. Mexico's argument, however, is misleading.  In fact, while Mexico quotes these passages from the USMCA at length in advancing their argument, they do not quote the full relevant text of Annex 14-C, which on its face clearly extends NAFTA Chapter 11's substantive obligations.  Indeed, employing the same principles of treaty interpretation that Mexico relies upon within the ***full context of the USCMA and Annex 14-C***, it becomes obvious that the USMCA Parties intended to extend the substantive obligations of NAFTA Chapter 11 throughout the full term of the Transition Period.

208.    Read plainly, in context, and in light of the USMCA's object and purpose, neither Annex 14-C nor any text in the agreement create any limits relating to ***when*** the measures given rise to a claim must have taken place.  Mexico's interpretation of the provision reads into the agreement an additional temporal limitation that was simply

---

[136] **C-0037,** *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America,* ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, K.C., 12 July 2024, at ¶ 9.

[137] Respondent's Memorial on Jurisdiction at ¶ 84.

not included in the USMCA by the Parties.  To accept Mexico's interpretation requires defying the rules of interpretation set forth under the VCLT.

209.    The USMCA Parties explicitly considered and incorporated multiple temporal conditions relating to the legacy investment claims and explicitly placed limitations where they intended to limit the reach of those clauses.  On its face, the USMCA establishes four temporal criteria relating to legacy investments –

   a.   That the provision will expire three years after the termination of NAFTA (i.e., the Transition Period will last until July 1, 2023)[138];

   b.   That legacy investments must have been "established or acquired" prior to the termination of NAFTA 1994 (i.e., July 1, 2020)[139];

   c.   That legacy investments must have been in existence on the date that the USMCA entered into force (i.e., July 1, 2020)[140]; and

   d.   That Annex 14-C claims may arise from acts that took place prior to the USMCA's entry into force[141].

210.    Critically, none of these provisions relating to timing of a legacy investment claim place any limitation on when the conduct must have occurred.  The first condition establishes the length of the Transition Period.  The second and third conditions the eligibility which investments are entitled to benefit from the protections of Annex 14-C.  And the fourth condition confirms that Annex 14-C *can* apply to claims based on acts that took place before entry into force of the USMCA, but notably does not say that Annex 14-C can *only* apply to acts that took place before entry into force of the USMCA.

211.    As directed by the VCLT, the ordinary meaning of the terms of a treaty must be interpreted in light of the terms' "context" and the agreement's "object and purpose."  Both the context of the USMCA and the "object and purpose" of the agreement support Claimants' reading.

   *iii.   The terms of Annex 14-C read in context support the conclusion that the Parties' substantive obligations extend through the Transition Period.*

---

[138] **CL-0003,** Annex 14-C ¶ 3.

[139] *Id.* at ¶ 5(a).

[140] *Id.*

[141] **CL-0032,** USMCA Chapter 14, at Art. 14.2(3).  This provision provides that "[f]or greater certainty, this Chapter, *except as provided for in Annex 14-C (Legacy Investment Claims and Pending Claims)* does not bind a Party in relation to an act or fact that took place or a situation that ceased to exist before the date of entry into force into this agreement" (emphasis added).  19.  This Article thus stipulates that Chapter 14 of the USMCA does not apply to "an act or fact that took place or a situation that ceased to exist" before July 1, 2020, except as provided for legacy investment claims in Annex 14-C.

212.   The USMCA Protocol provides that even though NAFTA will be superseded upon the
USMCA's entry into force, the USMCA expressly incorporates certain NAFTA
provisions:

> The United States of America, the United Mexican States, and Canada (the
> "Parties"), *Having regard to the North American Free Trade Agreement*,
> which entered into force on January 1, 1994 (the "NAFTA"),
>
> *Having undertaken* negotiations to amend the NAFTA pursuant to Article
> 2202 of the NAFTA that resulted in the Agreement between the United
> States of America, the United Mexican States, and Canada (the
> "USMCA");
>
> HAVE AGREED as follows:
>
> 1.   Upon entry into force of this Protocol, the USMCA, attached as an
> Annex to this Protocol, shall supersede the NAFTA, ***without
> prejudice to those provisions set forth in the USMCA that refer to
> provisions of the NAFTA.***[142] (emphasis added).

213.   In other words, the Protocol ***carves out certain articles of NAFTA*** from being
superseded. Annex 14-C is one of the provisions contemplated in the Negotiating
Protocol that "refer[s] to the provisions of the NAFTA."[143]  Thus, Mexico's argument
that NAFTA does not have a "survival clause" that extends the USMCA Parties'
substantive obligations is without merit; as the language in the USMCA Protocol
performs the function of allowing the NAFTA provisions referenced in the USMCA
to continue as intended in the agreement.[144]

214.   Standard definitions of "without prejudice to" confirm this reading of the Negotiating
Protocol.  For example:

   a.   *Cambridge Dictionary* provides that "[i]f a decision or action is made without
   prejudice to a right or claim, it is made without having an effect on that right or
   claim."[145]

   b.   *Merriam-Webster* defines the term as "without injury to or detraction from one's
   own rights or claims or any cause of action or defense asserted."[146]

215.   Mexico argues that "Chapter 14 of the USMCA covers the same subject matter as
Chapter 11 of the NAFTA, which is additional evidence that the Parties of the
USMCA intended to terminate the obligations of the NAFTA to make way for the

---

[142] **CL-0001,** USMCA Protocol.

[143] **CL-0001,** USMCA Protocol.

[144] Respondent's Memorial on Jurisdiction at ¶ 84.

[145] **CL-0038,** Cambridge Dictionary, "Without prejudice to something."

[146] **CL-0039,** Merriam-Webster, "Without prejudice."

application of the new obligations agreed within the USMCA."[147]  Claimants do not disagree with this premise, as the USMCA was indisputably intended to supersede NAFTA. However, the Parties agreed that this substitution would not affect the ability of investors holding legacy investments to have the protection of Chapter 11 of NAFTA during the Transition Period.

216.    Mexico ultimately misplaces its interpretive focus.  The provisions of NAFTA that are otherwise referred to within the USMCA are carved out of the immediate replacement of NAFTA with the USMCA.  The three-year Transition Period should be read separate and apart from the termination language contemplated in the USMCA Protocol, as contemplated by the "without prejudice to" language.

217.    Annex 14-C itself supports the conclusion that the USMCA Parties intended to extend NAFTA's Chapter 11 substantive obligations for the Transition Period.  As stated above, legacy investments include only investments that exist **on the date of entry into force** of the USMCA.  Thus, even if an investor had a claim that arose prior to the termination of NAFTA but for which the investment no longer existed as of July 1, 2020, Annex 14-C would not provide protection.  In other words, the USMCA Parties were explicit about the scope of the legacy provision.  They did not leave anything ambiguous here.

218.    Footnote 20 of Annex 14-C reinforces that reading by providing that, "[f]or greater certainty, the relevant provisions in . . . Chapter 11 (Section A) (Investment) . . . of NAFTA 1994 apply with respect to" a claim concerning a legacy investment.  In contrast with other parts of the agreement that do place conditions or limitations on the temporal scope of the Annex, this language – which seeks to add greater certainty to the scope of the legacy investment provision – **does not** restrict the treaty text to measures arising before the termination of NAFTA.[148]

219.    The application of Annex 14-C must be read in conjunction with Footnote 21, too.  This footnote makes clear that claims against the United States or Mexico, brought by investors of the other Party cannot be arbitrated under Annex 14-C where such claims are also eligible to be arbitrated under Annex 14-E:

> Mexico and the United States do not consent under paragraph 1 with respect to an investor of the other Party that is eligible to submit claims to arbitration under paragraph 2 of Annex 14-E (Mexico-United States Investment Disputes Related to Covered Government Contracts).

---

[147] Respondent's Memorial on Jurisdiction at ¶ 84.

[148] **CL-0037**, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America,* ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, K.C., 12 July 2024, at ¶ 10 ("…Annex 14-C provides for the continued application of Sections B and A of NAFTA Chapter 11, both of which are required to determine a claim alleging a breach of Section A with respect to a legacy investment. Annex 14-C 1 plainly refers to both sections of Chapter 11 and provides for the application of each in the case of a claim with respect to a legacy investment.  ***The application of Section A is confirmed by footnote 20.***") (emphasis added).

220. In other words, if a claimant is eligible to bring a claim against Mexico under the ISDS process set forth under the USMCA, they are precluded from arbitrating the claim under NAFTA pursuant to the legacy investment protections of Annex 14-C of the USMCA. Negotiators thus recognized there would be overlapping applicability of Annex 14-C and Annex 14-E to certain claims, and reflected this recognition – and an attendant solution, i.e., limiting the eligibility of such claims – in the text of Footnote 21.[149]  Mexico's interpretation would render Footnote 21 superfluous: If a claim is eligible to be arbitrated under Annex 14-E, is the claim necessarily based on a measure that occurred *after* July 1, 2020 when USMCA was in force; however, under Mexico's view, Annex 14-C applies only to claims based on measures that occurred *before* July 1, 2020. Mexico's construction would strip Footnote 21 of any effect whatsoever.

221.  The public international law rules of treaty interpretation demand that provisions be read in a way that gives effect to their meaning.  For example, according to the tribunal in *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Bizkaia Ur Partzuergoa v. The Argentine Republic:*

> Any treaty rule is to be interpreted in respect of its purpose as a rule with an effective meaning rather than as a rule having no meaning and effect. This principle is one of the main features of the law of treaties and has been applied by many ICSID Tribunals.[150]

222. Using this guiding principle, it becomes clear that Footnote 21 supports the notion that Annex 14-C was intended to apply NAFTA's substantive Chapter 11 obligations during the Transition Period.  Footnote 21 would be rendered superfluous if the types of claims that could be brought under Annex 14-C and Annex 14-E could not overlap.[151]  This context thus accords with Claimants' interpretation of Annex 14-C.

       *iv.  The object and purpose the USMCA compels the interpretation of the treaty that extend of the substantive obligations of NAFTA Chapter 11 through the Transition Period.*

223. VCLT Article 31(1) requires that a treaty must be interpreted "in light of its object and purpose."[152]  The intentions of the USMCA Parties with respect to the object and

---

[149] *See* Witness Statement-Kenneth Smith Ramos-Counter-Memorial on Jurisdiction, at ¶ 26 ("Because it was possible for legacy investments to have a claim under NAFTA and the USMCA – if the breach occurred during the three-year transition period – the parties wanted to steer claimants to the ISDS mechanism under the USMCA where it was an available option.").

[150] **CL-0040,** *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Bizkaia Ur Partzuergoa v. The Argentine Republic*, ICSID Case No. ARB/07/26, Decision on Jurisdiction, December 12, 2023, at ¶ 52:

[151] **CL-0041,** Annex 14-E of the U.S.-Mexico-Canada Agreement [hereinafter "Annex 14-E of the USMCA"].

[152] **CL-0042,** VCLT Article 31(1).

purpose of the USMCA can be found in part in its Preamble, which provides that the agreement was designed to:

> ESTABLISH a clear, transparent, and predictable legal and commercial framework for business planning, that supports further expansion of trade and investment; [and]
>
> . . .
>
> PROMOTE transparency, good governance and the rule of law, and eliminate bribery and corruption in trade and investment;
>
> . . .
>
> ESTABLISH an Agreement to address future trade and investment challenges and opportunities, and contribute to advancing their respective priorities over time . . .[153]

224.    The principles of transparency, predictability, clarity, and stability vis-à-vis international investments are consistent with a purpose aimed to expand investment. But Mexico's proposed interpretation of Annex 14-C undermines the transparency, predictability, clarity, and stability negotiated specifically for legacy investment claims and the ability to protect those investments for the duration of the Transition Period.

225.    Neither Annex 14-D nor Annex 14-E suggests otherwise, contrary to Mexico's argument. As mentioned, Footnote 21 of Annex 14-C explains the relationship between that Annex and Annex 14-E.

226.    Annex 14-D allows for investment dispute resolution under the USMCA in the context of specific, limited claims and applies only between Mexico and the United States.  In other words, except for this privileged subset of qualifying investments, access to ISDS is otherwise available only for claims relating to National Treatment, Most Favored Nation Treatment, and Direct Expropriation.[154]

227.    Thus, the structure of the Chapter 14 Annex regime promotes stability during the Transition Period, allowing legacy investors to access dispute resolution for legacy claims under Annex 14-C that would otherwise be barred under Annexes 14-D and 14-E.

228.    Such protection of investments advances an important purpose for treaties of this type.[155] *In SGS Société Générale de Surveillance S.A. v. Philippines*, for example, the

---

[153] **CL-0043,** USMCA Preamble.

[154] **CL-0044,** Annex 14-D of the U.S.-Mexico-Canada Agreement [hereinafter "USMCA Annex 14-D"].

[155] **CL-0045,** Law and Practice of Investment Treaties: Standards of Treatment, Chapter 2 – Applicable Substantive Law and Interpretation at p. 17.

Tribunal explained that "it is legitimate to resolve uncertainties in [an investment treaty's] interpretation so as to favour the protection of covered investments" because the purpose of the treaty in question was to promote the protection of reciprocal investment. [156]Given the text of the USMCA's Preamble, Claimants' position on the interpretation of Annex 14-C is consistent with those purposes of expanding investment and protecting investors.

229.    In addition, in determining the object and purpose of a treaty, Tribunals have often considered the principle of *effet utile*, under which the interpretation that accords a practical meaning to a treaty provision is provided more weight over an interpretation that deprives it of such effect.  According to the Tribunal in *Eureko B.V. v. Republic of Poland*:

> It is a cardinal rule of the interpretation of treaties that each and every operative clause of a treaty is to be interpreted as meaningful rather than meaningless. It is equally well established in the jurisprudence of international law, particularly that of the Permanent Court of International Justice and the International Court of Justice, that treaties, and hence their clauses, are to be interpreted so as to render them effective rather than ineffective.[157]

230.    Annex 14-C, particularly in conjunction with Footnote 21 and its context, was included explicitly as a mechanism to provide investors with a stable transition regime after the termination of NAFTA.

### C.    The USMCA Parties' negotiating history confirms the meaning of Annex 14-C.

231.    Under VCLT Article 32, the Tribunal may use negotiating history to confirm the meaning of a treaty after applying Article 31.[158]  Specifically, the Tribunal may have recourse to supplementary means of interpretation, "including preparatory of the treaty and the circumstances of its conclusion" to confirm the meaning resulting from the application of Article 31.[159]

232.    Negotiations between the USMCA Contracting Parties were confidential and not made publicly available.  Mexico's Chief Negotiator of the USMCA, Mr. Kenneth

---

[156] **CL-0046,** *SGS Société Générale de Surveillance S.A. v. Philippines*, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, at ¶ 116.

[157] **CL-0047,** *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award and Dissenting Opinion, 19 August 2004, at ¶ 248.

[158] **CL-0048,** Vienna Convention on the Law of Treaties, Article 32 [hereinafter "VCLT Article 32"].

[159] Article 32 of the VCLT also provides that if the interpretation according to Article 31 "leaves the meaning ambiguous or obscure" or "leads to a result which is manifestly unreasonable," the Tribunal may have recourse to supplementary means of interpretation.  While Claimants' position is that the ordinary meaning is not ambiguous – as described above – any recourse to supplementary means of interpretation also supports the Claimants' reading of Annex 14-C and the extension of the substantive rules of Chapter 11 of NAFTA throughout the term of the Transition Period.

Smith Ramos, provides further context on the goal and function of Annex 14-C, as informed by his experience negotiating the provision. As described in his witness statement, Mr. Smith confirms that:

> the Mexican position regarding the legacy provisions, and the intention of the negotiators of Mexico, Canada, and the United States, was to ensure that all of the substantive provisions of NAFTA Chapter 11, as well as the ISDS mechanism, would be extended for three years after the NAFTA had been replaced by the new agreement.[160]

233.    Mr. Smith further confirms that no argument arose – at any point during the course of the negotiations concerning the legacy provisions – that the substantive provisions of NAFTA Chapter 11 would not apply during the Transition Period. Mr. Smith cites to three meetings with Mexican Ministry of Economy officials and other Mexican stakeholders concerning the legacy investment provisions, each of which involved explicit discussions on the intent of the parties to extend NAFTA Chapter 11's substantive investment protections for three years after NAFTA terminated.

234.    Various statements by the USMCA Parties and former USMCA negotiators confirm Mr. Smith's statement that Annex 14-C was intended to extend the substantive obligations in Chapter 11 for the full term of the Transition Period.

235.    For example, the claimants in the *TC Energy Corporation, TransCanada PipeLines Limited v. United States of America* reference a number of statements by U.S. officials relevant to this negotiating history. [161]   While the United States is not party to the instant arbitration, these statements are relevant to assess the intentions of a key USMCA Negotiating Party, particularly as the only other party to Annex 14-C. The claimants in *TC Energy* pointed out that Mexico failed to take its current position on the interpretation of Annex 14-C in a separate arbitration proceeding until the United States raised its objection in the *TC Energy* case, suggesting, "that Mexico did not even consider an objection on the basis of Annex 14-C until the United States raised the issue with them to coordinate a new position" long after the treaty was executed.[162]

236.    In addition, as claimants in the TC Energy case point out in their rejoinder, "it is important to recognize that the United States was the drafter and advocate for the legacy investment annex during the negotiation of USMCA."[163]   The Annex to the TC Energy claimants' counter-memorial provides a list of statements from U.S. USMCA

---

[160] *See* Witness Statement-Kenneth Smith Ramos-Counter-Memorial on Jurisdiction.

[161] *See, e.g.,* **CL-0049,** *TC Energy Corporation, TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Claimants' Counter-Memorial on Respondent's Preliminary Objection, 11 August 2023, at ¶¶ 109-111[hereinafter "TC Energy Claimants' Counter-Memorial"].

[162] *Id.* at ¶ 117.

[163] **CL-0050,** *TC Energy Corporation, TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Claimants' Rejoinder on Respondent's Preliminary Objection, 9 February 2024, at ¶ 13 [hereinafter "TC Energy Claimants' Rejoinder"].

negotiators and officials that confirm that the legacy investment provision was intended to extend the NAFTA's "**rules and procedures**" for the full three-year Transition Period.[164]

237.   The lead U.S. negotiator for the USMCA, Mr. Lauren Mandell, has also provided confirmation consistent with Mr. Smith's witness statement regarding the intent of the parties, stating that "*[w]e intended the annex to cover measures in existence before AND after usmca entry into force*."[165]   He further elaborates on how the text of Annex 14-C supports that conclusion:

> If we were just intending to allow claims for pre-existing measures, we likely wouldn't have framed a three-year consent period -- we would have just defaulted to the statute of limitations in NAFTA Secon B that would apply to claims for those measures. In other words, we would have omitted paragraph 3 altogether. The contrary argument -- the purpose of paragraph 3 was intended to alter the SOL for claims with respect to pre-existing measures, that's it, doesn't make a lot of sense. I think it's also significant that the title of the annex -- and the key concept in the annex -- references legacy investments, not legacy measures. If we were focused only on legacy measures, it would have been easy to expressly limit paragraph 1 accordingly, but we didn't. Finally, I think footnote 21 probably helps as well. The whole point of the footnote was to require keyhole investors to arbitrate under the "new and improved" USMCA rules and procedures (there was no reason to give them the option of arbitrating under NAFTA rules and procedures under 14-C instead). If 14-C only applied to pre-existing measures, there'd be no reason to say that. We'd just be punishing keyhole investors, which is contrary to the clear intentions of the whole keyhole framework.[166]

238.   Mr. Mandell also summarized his understanding of the Annex and the key features of the investor-state dispute settlement approach in the USMCA in a later article as follows:

> no ISDS with Canada; limited ISDS as between the United States and Mexico; *and a three-year transition period during which investors from all three jurisdictions could continue to use NAFTA ISDS rules and procedures to bring claims in relation to 'legacy investments'* established

---

[164] **CL-0049,** TC Energy Claimants' Counter-Memorial, at Annex pp. A-1-A-3.

[165] **CL-0037,** *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America,* ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, K.C., July 12, 2024, at ¶ 29.

[166] *Id.*

or acquired in the territory of another Party during the lifetime of the NAFTA.[167]

239. Notably, Mr. Mandell's summary does not mention any temporal limitation on when the breach giving rise to a claim must have occurred in order for investors with legacy investments to be able to avail themselves of the legacy investment protections of Annex 14-C. This passage also again draws attention to investors' ability to use the "rules and procedures" of NAFTA during the three-year Transition Period.

240. Based on the foregoing, it is clear under well-established principles of treaty interpretation that Claimants' claim is covered – and was intended by the USMCA negotiators to be covered – under Annex 14-C. Thus, Mexico's fourth jurisdictional objection is without merit and the Tribunal should reject it as such.

## VIII. RESPONSE TO OBJECTION 5: THE TRIBUNAL HAS JURISDICTION *RATIONE MATERIAE* BECAUSE CLAIMANTS HAVE DEMONSTRATED THAT THEY HAVE A PROTECTED INVESTMENT UNDER NAFTA ARTICLE 1139.

241. Jurisdiction *ratione materiae* requires that the disputes submitted to arbitration be within the scope of consent. In the case of international investment arbitration, a basic jurisdictional requirement is that the dispute must relate to a protected or covered investment.

242. Mexico submits that the Tribunal lacks jurisdiction *ratione materiae* because Claimants have not demonstrated that they have an investment within the meaning of Article 25 of the ICSID Convention.

243. Mexico's argument is circular and pointless for the following reasons:

a. The applicable standard in this dispute for determining the existence of an investment is Article 1139 of NAFTA, which contains an express definition of investment - unlike Article 25 of the ICSID Convention.

b. Article 1120 sets out the procedural rules for submitting a claim to arbitration under NAFTA, as incorporated by the USMCA through Annex 14-C. The ICSID Convention is one of those procedural rules. However, Article 1120 clarifies that "the applicable arbitration rules shall govern the arbitration except to the extent modified by this Section." Article 1139, which is part of the same Section as Article 1120, sets forth the governing definition of an investment.

c. Thus, contrary to Mexico's contention, Claimants are not required to demonstrate the existence of an investment "risk" or that the investment involves a "contribution to economic development" to the host State, because the appropriate

---

[167] **CL-0004,** Lauren Mandell, *The Trump Administration's Impact on US Investment Policy,* ICSID Review, Vol. 35 (Nov. 4, 2020), at p. 357.

standard for determining the Tribunal's jurisdiction is whether the investment meets the definition in Article 1139.

d.   As explained above, the definition of "investment" under NAFTA Article 1139 includes debt securities of an enterprise that have a maturity date of more than three years. The Notes under the control of Claimants meet that definition because they are debt securities that TV Azteca issued on August 9, 2017, with a maturity date on August 9, 2024.

e.   The fact that the terms of the Notes published in TV Azteca's Final Offering state that a foreign holder is exempt from the payment of internal taxes[168] does not affect the character of the investment or whether it meets the definition under NAFTA; and

f.   Even assuming *arguendo* that Article 25 of the ICSID Convention were relevant, Claimants' investments would satisfy the criteria to be considered an "investment" under the Article 25(1) of the ICSID Convention: (1) contribution; (2) certain duration; (3) risk; and (4) contribution to the economic development of the host State.

244.   To establish the Tribunal's subject-matter jurisdiction, Claimants must prove that the dispute falls within the scope of NAFTA Chapter 11, and they have done so here. Article 1101, the access point to NAFTA Chapter 11, establishes that the Chapter applies to "measures adopted or maintained by a Party relating to: […] (b) investments of investors of another Party in the territory of the Party."[169] Accordingly, for the Tribunal to have jurisdiction over Claimants' claims, Claimants must establish that they held an investment as defined by Article 1139.

245.   Mexico argues that the Tribunal should apply is the so-called "*Salini* test."[170] However, NAFTA already contains a specific provision on what is considered "investment" for purposes of Chapter 11.  And as arbitral tribunals in the past have confirmed, "the primary legal framework for determining the existence of an 'investment' must lie in the will of the Parties as set forth in the definition of 'investment' under the [investment agreement at issue]."[171]  There is no reason—and

---

[168] Respondent's Memorial on Jurisdiction at ¶¶ 106, 107.

[169] **CL-0011,** NAFTA Chapter 11, at Art. 1101.

[170] Respondent's Memorial on Jurisdiction at 92.

[171] **CL-0021,** *Hassan Awdi, Enterprise Business Consultants, Inc. and Alfa El Corporation v. Romania*, ICSID Case No. ARB/10/13, Award, 2 March 2015, at ¶ 197. *See also*, **CL-0051,** *The Lopez-Goyne Family Trust and others v. Republic of Nicaragua*, ICSID Case No. ARB/17/44, Award, 1 March 2023, at ¶ 329: "In the present case, the Tribunal finds it unnecessary to engage in the debate on the applicability of the Salini test. This is because in the chapeau of Article 10.28 of the Treaty an investment is defined a "every asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, including such characteristics as the commitment of capital or other resources, the expectation of gain and profit, or the assumption of risk."

no license—for the Tribunal to look beyond NAFTA's plain text, as incorporated through Annex 14-C.

**A. The scope of the "Investment" definition under NAFTA Article 1139 is broad and exhaustive.**

246.    Article 1139 prescribes an exhaustive, not illustrative, list of what constitutes an investment for purposes of NAFTA Chapter 11. To qualify as an investment under NAFTA, it must meet the requirements of one of the prescribed categories of investment.

247.    Article 1139 defines investment as follows:

> investment means:
> (a) an enterprise;
> (b) an equity security of an enterprise;
> (c) a debt security of an enterprise
>> (i) where the enterprise is an affiliate of the investor, or
>> (ii) where the original maturity of the debt security is at least three years,
>> but does not include a debt security, regardless of original maturity, of a state enterprise;
> (d) a loan to an enterprise
>> (i) where the enterprise is an affiliate of the investor, or
>> (ii) where the original maturity of the loan is at least three years,
>> but does not include a loan, regardless of original maturity, to a state enterprise;
> (e) an interest in an enterprise that entitles the owner to share in income or profits of the enterprise;
> (f) an interest in an enterprise that entitles the owner to share in the assets of that enterprise on dissolution, other than a debt security or a loan excluded from subparagraph (c) or (d);
> (g) real estate or other property, tangible or intangible, acquired in the expectation or used for the purpose of economic benefit or other business purposes; and
> (h) interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory, such as under:
>> (i) contracts involving the presence of an investor's property in the territory of the Party, including turnkey or construction contracts, or concessions, or
>> (ii) contracts where remuneration depends substantially on the production, revenues or profits of an enterprise;
>
> but investment does not mean,
>
> (i) claims to money that arise solely from

> (ii) commercial contracts for the sale of goods or services by a national or enterprise in the territory of a Party to an enterprise in the territory of another Party, or
>
> (iii) the extension of credit in connection with a commercial transaction, such as trade financing, other than a loan covered by subparagraph (d); or

(j) any other claims to money, that do not involve the kinds of interests set out in subparagraphs (a) through (h);"[172]

248. For purposes of this dispute, there is no doubt that the definition of "investment" under Article 1139 of NAFTA includes in subparagraph c) "a debt security of an enterprise . . . where the original maturity of the debt security is at least three years, but does not include a debt security, regardless of original maturity, of a state enterprise." Again, the Notes under Claimants' control, which were issued on August 9, 2017, meet that definition.

**B.    The reference of Article 25 of the ICSID Convention in Claimants' Request for Arbitration does not change the fact that NAFTA Article 1139 is the relevant provision in this dispute to the determine the existence of a protected investment.**

249. Article 25 of the ICSID Convention provides that "[t]he jurisdiction of the Centre shall extend to disputes of a legal nature arising directly out of an investment...."[173] The ICSID Convention does not provide a specific definition of what is considered as an investment. Indeed, the ICSID Convention drafters avoided including a definition of "investment" to give parties a wide margin of discretion in determining a definition under the various substantive treaties.[174] As confirmed in Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines II,

> In the absence of any definition of "investment" under the ICSID Convention, the BIT and international law, as the law governing the BIT, assume relevance to establish jurisdiction *ratione materiae*.[175]

250. Likewise, Professor Gary Born has explained that, although

> …there are similarities between the jurisdictional requirements under ICSID Convention and those applicable under individual BITs (e.g., the "investment" and "nationality" requirements). Nonetheless, the meaning of these requirements may differ between the ICSID Convention and

---

[172] **CL-0011,** NAFTA Chapter 11, at Art. 1139.

[173] **CL-0052,** ICSID Convention, Art. 25(1) ("The jurisdiction of the Centre shall extend to disputes of a legal nature arising directly out of an investment...").

[174] **CL-0053,** Zachary Douglas, The International Law of Investment Claims, Cambridge University Press, p. 164.

[175] **CL-0054,** Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines II, ICSID Case No. ARB/11/12, Award, 10 December 2014 at ¶ 197.

individual BITs (for example, the "investment" and "nationality" requirements). Nonetheless, the meaning of these requirements may differ between the ICSID Convention and individual BITs (for example, the "investment" requirements may be less expansive under the Convention than under a particular BIT).[176]

251.   Since the ICSID Convention does not define the term "investment," tribunals have debated the scope of that term.[177] But bilateral investment agreements (BITs) and investment chapters in trade agreements often include more precise definitions that include exhaustive lists of types of investment,[178] or exclusions.[179] In the present dispute, the appropriate test for analyzing whether the notes are an "investment" is if they meet the express definition of investment under NAFTA Article 1139. Indeed, that is the approach other NAFTA tribunals have followed.[180]

---

[176] **CL-0055,** Born, Gary B. *International Arbitration: Law and Practice*, Third Edition, Wolters Kluwer, 2021, page 502.

[177] There is a longstanding debate on the approach to be taken by tribunals to interpret the term "investment" when a BIT does not provide a definition of investment or if the arbitration relies on Article 25 from ICSID Convention. This significant debate appears among scholars and arbitrators alike as to whether— and how—this word, which itself is found within Article 25 of the ICSID Convention, should be interpreted. Two basic approaches tribunals have taken to address the matter are: First, there is the traditional approach, which involves deferring to a definition of "investment" as consented to by the parties to the dispute (typically found within the relevant bilateral investment treaty language). The second, more restrictive approach, which resulted from the decision rendered in *Salini Costruttori S.p.A. v. Kingdom of Morocco*, uses a four-pronged test, described by the respondent in that case. **CL-0056,** *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco,* ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001. *See* **CL-0057,** *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013, at ¶¶ 448-454 (considering the history of Article 25 of the ICSID Convention and concluding that there was a deliberate decision not to have a definition); **CL-0058,** *Philip Morris Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. The Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction, 2 July 2013, at ¶ 198.

[178] *See, e.g.*, **CL-0032,** USMCA Chapter 14, at Art. 14.1; Comprehensive and Progressive Agreement for Trans-Pacific Partnership (CPTPP), Article 9.1, at **CL-0059,** CPTPP Chapter 9; **CL-0060,** *Acuerdo entre los Estados Unidos Mexicanos y la República Federal de Alemania para Promoción y Protección Recíproca de las Inversiones*, Article 1.1.) ("El concepto de 'inversiones' comprende toda clase de bienes adquiridos o utilizados, directa o indirectamente, para actividades económicas u otros fines empresariales, en especial...").

[179] *See, e.g.* **CL-0061,** *Treaty between the United States of America and the Oriental Republic of Uruguay concerning the Encouragement and Reciprocal Protection of Investment*, Article 1 Definitions, footnote 4: "The term "investment" does not include an order or judgment entered in a judicial or administrative action."; **CL-0060,** *Acuerdo entre los Estados Unidos Mexicanos y la República Federal de Alemania para Promoción y Protección Recíproca de las Inversiones*, Article 1.1 ("Sin embargo, 'inversiones' no incluye las transacciones comerciales diseñadas exclusivamente para la venta de bienes o servicios y créditos para financiar las transacciones comerciales con una duración menor a tres años, otros créditos con una duración menor a tres años, ni los créditos otorgados a un Estado Contratante o a una empresa del Estado....").

[180] *See, e.g.*, **CL-0062,** *Apotex Inc. v. United States*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013; **CL-0063,** *Grand River Enterprises Six Nations, Ltd. and others v. United States of America*, UNCITRAL, Award, 12 January 2011; **CL-0064,** *Waste Management Inc. v. United Mexican States II*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004; **CL-0065,** *Lion Mexico*

252.    The award of the tribunal in *Hassan Awdi* provides helpful guidance:

> "197. The Tribunal has noted the disputes surrounding the term "investment" as used in Article 25 of the ICSID Convention. ***In the absence of a definition in Article 25, the Tribunal considers that the primary legal framework for determining the existence of an "investment" must lie in the will of the Parties as set forth in the definition of "investment" under the BIT***, provided that such will is consistent with Article 25 of the ICSID Convention. The Salini criteria may be useful in describing the typical characteristics of an investment, ***but they cannot, as a general rule, prevail over the will of the parties***, given the indefiniteness and some flexibility of the term used by the drafters of the ICSID Convention."[181]   (Emphasis added)

253.    This is similar to the situation in the present dispute, where an express definition, with an exhaustive and limited list of the type of covered investments, is provided by NAFTA.  As the tribunal in *Hassan Awdi* concluded:

> Thus, ***the definition of "investment" in a treaty will determine its content in an exclusive way, with no room for additions or subtractions.*** Only when the definition of "investment" chosen by the parties to the treaty refers to the notion of investment (as is sometimes the case) may the specific components of the definition be supplemented by additional elements deduced from the term "investment" as interpreted under the Vienna Convention on the Law of Treaties. In the BIT applicable to the present dispute, no such "double reference" to investment is found.[182]

254.    As other tribunals resolving cases under NAFTA Chapter 11 have concluded, the *Salini* test provides no reason to depart from the definition of "investment" expressly

---

*Consolidated L.P. v.United Mexican States*, ICSID Case No. ARB(AF)/15/2, Decision on Jurisdiction, 30 July 2018.

[181] **CL-0066,** *Hassan Awdi, Enterprise Business Consultants, Inc. and Alfa El Corporation v. Romania*, ICSID Case No. ARB/10/13, Award, 2 March 2015, at ¶ 197.

[182] *Id.* at ¶ 199 (emphasis added).

set forth in Article 1139.[183]  That test provides no basis for limiting the Parties'
agreed-to understanding of an "investment." [184]

**C.    Even under the so-called *Salini* test, a debt security is an investment that
entails a "risk" per se and "contributes to the economic development" of the
host State.**

255.    At most, given the express definition of "investment" in NAFTA, the *Salini* test
criteria are "mere examples and not necessary as elements that are requires for its
existence," as established *M.C.I v. Ecuador*. [185] The guiding criteria provide more
flexibility if needed (not less). [186]

---

[183] **CL-0056**, *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No.
ARB/00/4, Decision on Jurisdiction, 16 July 2001, at ¶¶ 50-58. If the *Salini* test would be considered as the
appropriate test by the Tribunal it would go against the aim of the ICISD convention as was established in the
*Abaclat and others v. Argentine Republic case*:  "If Claimants' contributions were to fail the Salini test, those
contributions – according to the followers of this test – would not qualify as investment under Article 25
ICSID Convention, which would in turn mean that Claimants' contributions would not be given the procedural
protection afforded by the ICSID Convention. The Tribunal finds that such a result would be contradictory to
the ICSID Convention's aim, which is to encourage private investment while giving the Parties the tools to
further define what kind of investment they want to promote." **CL-0067**, *Abaclat and others v. Argentine
Republic* (ICSID Case No. ARB/07/5), Decision on Jurisdiction and Admissibility, 4 August 2011, at ¶ 364.

[184] *See, e.g.,* **CL-0068**, *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*,
ICSID Case No. ARB/03/6, Award, July 31, 2007, at ¶ 165 ("The Tribunal states that the requirements that
were taken into account in some arbitral precedents for purposes of denoting the existence of an investment
protected by a treaty (such as the duration and risk of the alleged investment) must be considered as mere
examples and not necessarily as elements that are required for its existence."); **CL-0067**, *Abaclat et al. (Case
formerly known as Gionanna a Beccara et al.) v. The Argentine Republic*, ICSID Case No. ARB/07/5,
Decision on Jurisdiction and Admissibility, 4 August 2011, at ¶ 364 ("[T]he Tribunal does not see any merit in
following and copying the Salini criteria. The Salini criteria may be useful to further describe what
characteristics contributions may or should have. They should, however, not serve to create a limit, which the
Convention itself nor the Contracting Parties to a specific BIT intended to create."); **CL-0069**, *Philip Morris
Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. The Oriental Republic of Uruguay*, ICSID
Case No. ARB/10/7, Decision on Jurisdiction, 2 July 2013, at ¶¶ 204-206.  ("204…Whether the so-called
Salini test relied upon by the Respondent has any relevance in the interpretation of the concept of "investment"
under Article 25(1) of the ICSID Convention is very doubtful"…"206. In the Tribunal's view, the four
constitutive elements of the Salini list do not constitute jurisdictional requirements to the effect that the
absence of one or the other of these elements would imply a lack of jurisdiction. They are typical features of
investments under the ICSID Convention, not "a set of mandatory legal requirements…".).

[185] **CL-0068**, *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case
No. ARB/03/6, Award, 31 July 2007, at ¶ 165.

[186] *See, e.g.,* **CL-0057**, *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No.
ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013, at ¶ 481 ("…, the criteria assembled
in the Salini test, while not constituting mandatory prerequisites for the jurisdiction of the Centre in the
meaning of Art. 25 of the ICSID Convention, may still prove useful, provided that they are treated as
guidelines and that they are applied in conjunction and in a flexible manner); **CL-0070**, *SGS Société Générale
de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12
February 2010, at ¶ 108 ("[W]hile the Tribunal does not see the features of investments identified in Salini as a
definitional test, nor does it believe that it is necessary to even look for those elements here absent any


256. The Notes would easily meet any of the relevant criteria as applied here.  For example, a debt security plainly carries a risk.[187]

257. In its memorial, Mexico qualifies the risk associated to the Notes as a "commercial risk" and not a risk related to the return of the investment.[188] But in its own Exhibit R-0016, Mexico contradicts itself. The front page of the Offering Circular issued by TV Azteca contains the following disclaimer: "**Investing in the notes involves risks. See "*Risk Factors*" beginning on page 20**."

258. The terms and condition of the Offering Circular in Exhibit R-0016 includes an ample explanation of "Risk Factors", from page 20 to 30 of that exhibit, including the following introductory paragraph:

> Following are certain risks associated with our business and the investment in our securities. The risks and uncertainties described below are not the only risks that we face but represent some of the risks that our management considers important. ***Some of the risks of investing in our securities are general risks relating to entering into transactions in Mexico.*** Other risks are specific to our operations. Should any of the following risks materialize, they may materially and adversely affect operations, our financial condition or operating results. ***Should the foregoing happen, the trading price of the notes may diminish and investors may lose their investment in whole or in part***. (emphasis added)

259.  The detailed explanation of the section called "Risk factors" under Exhibit R-0016 also confirms that in the case that any of such risks could materialize, the investor that control the Notes cannot be sure of the return of the investment. As the arbitral tribunal in *Romak v. Uzbekistan* confirmed:

> An "investment risk" entails a different kind of *alea*, ***a situation in which the investor cannot be sure of a return on his investment, and may not know the amount he will end up spending, even if all relevant counterparties discharge their contractual obligations***. Where there is

---

suggestion that the BIT's definition of investment is improperly overreaching, it has nevertheless considered the Salini elements in light of the Parties' extensive briefing of the issue.").

[187] Respondent's Memorial on Jurisdiction at ¶¶ 94-95. It is well known that debt security will always entail a risk. There are no doubts that Notes is a debt security and constituted the investment under control of Claimants. For example, the website Investopedia explains in a publication called "What Is a Debt Security? Definition, Types, and How to Invest the following: "What Is the Risk of a Debt Security?  The risk of a debt security is that the issuer defaults on their debt. If the issuer experiences financial hardship, they may no longer be able to make interest payments on their outstanding debt. They may also not be able to repurchase their outstanding debt at maturity, particularly if they go bankrupt." See, **CL-0071** (Investopedia: "What is a debt security").

[188]  Respondent's Memorial on Jurisdiction at ¶ 98.

Case 1:22-cv-08164-PGG    Document 129-5    Filed 11/12/25    Page 75 of 82

PUBLIC VERSION

"risk" of this sort, the investor simply cannot predict the outcome of the transaction. [189]

260.    Accordingly, using the relevant *Salini* test factors as a guide, the Tribunal can readily conclude that the risks attendant with the Notes, and their contribution to the development of Mexico, confirm the dispute concerns a protected investment at issue in this dispute, and Mexico's fifth objection should be rejected in full.

## IX.    RESPONSE TO OBJECTION 6: THE TRIBUNAL HAS RATIONE TEMPORIS JURISDICTION.

261.    In Objection #6, Mexico contends that the Tribunal lacks jurisdiction because "the alleged denial of justice occurred before Sandpiper Limited acquired all of its Notes and before Opportunities acquired some of its Notes."

262.    With respect to Cyrus, Mexico concedes that the Noteholder under its control – Opps II Master Fund – did own Notes at the time the Mexican court issued the Injunction. Accordingly, Mexico's jurisdictional argument under this objection is simply not applicable to Cyrus and can be disregarded.

263.    With respect to Contrarian, as explained above, the Notes held by Sandpiper Limited were, at the time the Sixty-Third Superior Court entered the Injunction, held by its affiliate and partial owner, Contrarian Emerging Markets, L.P., an entity that is also controlled by Contrarian.  Furthermore, Sandpiper Limited is indirectly owned by several Contrarian-controlled funds that are also controlled by Contrarian, including multiple defendants in the Mexican Court Proceedings that are subject to the Injunction, including Contrarian Emerging Markets, L.P.  Therefore, Contrarian clearly controlled the Notes that were the subject of the Injunction at the time the Injunction was issued and the related breach of due process occurred.

264.    Accordingly, even accepting the legal premise of Mexico's Objection #6 (which the Claimants, for avoidance of doubt, do not), the facts clearly establish that both Cyrus and Contrarian controlled the Notes that were the subject of the Injunction and the related breach of due process at the time the Injunction was issued and the related breach of due process occurred. Claimants have therefore duly established that jurisdiction ratione temporis, even under Mexico's interpretation of that concept and its requirements, exists.  The Tribunal should thus discard Mexico's sixth jurisdiction.

## X.    RESPONSE TO OBJECTION 7: THE CLAIMANTS SUBMITTED PROPER WAIVERS AS REQUIRED BY ARTICLE 1121 OF NAFTA.

265.    Mexico argues that the waivers submitted by Claimants do not meet the requirements set forth in Article 1121 of NAFTA as they "only waived their right to initiate any proceedings against the President or officials of the Superior Court of Justice of

---

[189] **CL-0072**, *Romak S.A. (Switzerland) v. The Republic of Uzbekistan*, UNCITRAL, PCA Case No. AA280, Award, 26 November 2009, at ¶ 230 (emphasis added)

Mexico City (TFJCDMX)".[190] Contrary to Mexico's assertion, however, the waiver as submitted accords fully with the provisions of Article 1121. Claimants' waivers pertain to the substantive claim of the NAFTA arbitration (a breach of due process perpetrated by the Sixty-Third Superior Court) and Claimants have not, in fact, initiated any proceedings outside of this arbitration contesting the measures at issue in this arbitration.

266.    Mexico's arguments under this objection do not explain how Claimants have not met either standard.  Rather, Mexico's brief simply repeats the language of the waiver without explaining why it is not sufficiently broad to be valid.  Nor does Mexico point to or explain what conduct the Claimants have engaged in that is not aligned with their commitments made in their respective waivers.

### A.  The waivers meet the requirements of Article 1121(1) and (3).

267.    NAFTA Article 1121 (Conditions Precedent to Submission of a Claim to Arbitration) provides as follows:

> A disputing investor may submit a claim under Article 1116 to arbitration only if:
>
> (a) the investor consents to arbitration in accordance with the procedures set out in this Agreement; and
>
> (b) the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party.

268.    NAFTA Article 1121(1) requires that a claimant consent to the arbitration and waive (with limited exceptions) its right to "initiate or continue proceedings before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116." Article 1121(3) in turn requires that the consent and waiver "shall be in writing, shall be delivered to the disputing Party and shall be included in the submission of a claim to arbitration."

---

[190] Respondent's Memorial on Jurisdiction at ¶ 121.

269.    Claimants consented to arbitration by submitting, with the Request to Arbitration, their NAFTA Article 1121 Consent to Arbitration and Waiver of Other Dispute Settlement Procedures.[191] Claimants also included their consent and waiver in the Request for Arbitration, copies of which were delivered to Mexico. The waiver for each Claimant reads as follows:

> **Claimant's Waiver**
>
> Pursuant to Article 1121(3) of the North American Free Trade Agreement between the United States of America, the United Mexican States, and Canada, signed on 17 December 1992, and entered into force on 1 January 1994 ("NAFTA"), **[Cyrus Capital Partners, L.P. ("Cyrus")/Contrarian Capital Management, L.L.C.]** hereby waives the right to bring any claim against the presiding judge or other officials of the Superior Court of Justice of Mexico City that seeks any damages for the breach of its due process rights, and those of the noteholders under its control, in connection with the issuance of an ex parte injunction in file no. 995/2022 before that court. For avoidance of doubt, this waiver does not apply to any current or future proceeding in Mexico related to the underlying private dispute involving TV Azteca, including file no. 995/2022 itself.

270.    Mexico seeks support from the decisions in W*aste Management v. Mexico I, Commerce Group c. la Republica de El Salvador ("Waste Management I")* and *Renco Group Inc. v. Republic of Peru ("Renco Group Inc.")* to maintain that Claimants' waiver was deficient.[192] However, those decisions are inapplicable as claimants in those cases initiated or continued legal actions *against the host States* in parallel with NAFTA investment arbitration or reserved the right to initiate further litigation against the host State following the conclusion of the investment treaty arbitration. Neither of those facts are present in this case,

271.    In *Waste Management I*, the claimant pursued local proceedings against the Municipality of Acapulco de Juarez and Banobras (a State-owned bank). The tribunal found that the claimant's local proceedings fell within the prohibition of Article 1121 because those proceedings "directly affected the international obligations assumed by the Mexican government, given that they had their origin in the same measures invoked by the Claimant."[193] Claimants have not initiated or continued any parallel proceedings against Mexico or any Mexican official or body, full stop.

272.    In *Renco Group Inc.*, Renco qualified its written waiver by reserving its right to bring claims in another forum for resolution on the merits if that tribunal were to decline to hear any claims on jurisdictional or admissibility grounds. The tribunal concluded that this qualification was not permitted by the express terms of Article 10.18 (2) (B),

---

[191] **C-0073** (Cyrus Waiver); **C-0074** (Contrarian Waiver).

[192] Respondent's Memorial on Jurisdiction at ¶ 122 and footnotes 115-116.

[193] *See* **CL-0073**, *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/98/2, Award, 2 June 2000, at. ¶ 28.

the relevant provision in the Free Trade Agreement between Peru and the United States, equivalent to NAFTA article 1121.[194] In assessing the object and purpose of the waiver provision derived from the FTA between Peru and the United States and its comparison with Article 1121 from NAFTA, the tribunal in *Renco Group Inc.* clarified:

> The Tribunal's interpretation of Article 10.18(2)(b) is consistent with the object and purpose of the waiver provision. Renco, Peru and the United States all agree that ***the object and purpose of Article 10.18(2)(b) is to protect a respondent State from having to litigate multiple proceedings in different fora relating to the same measure, and to minimize the risk of double recovery and inconsistent determinations of fact and law by different tribunals.***

In the present dispute, Claimants' waiver did not reserve their right to bring claims in another forum subject to the decision of jurisdiction of this arbitration proceeding.

273.     In *Commerce Group*, the Claimants issued a formal waiver but and maintained that it was up to the respondent to seek discontinuance of the domestic court proceedings.[195] The tribunal in that case concluded:

> …. that Article 10.18(2)(b) of CAFTA requires Claimants to file a formal "written waiver", and then materially ensure that no other legal proceedings are "initiated" or "continued".

> At this juncture, the Tribunal observes that, as Claimants would have it, the Waiver Provision requires only the delivery of a signed waiver to Respondent, and Respondent would have to seek discontinuance of the domestic court proceedings itself. In other words, Claimants consider that while the formal requirement may be Claimants" responsibility, the material element is Respondent's.

> The Tribunal does not agree. The Tribunal has been provided with no reason to conclude that the formal and material elements of the Waiver Provision should be divided between the Parties. In any event, logic tells us that it is up to Claimants to make the waiver of their legal rights effective, not Respondent.[196]

Claimants in this proceeding have no parallel proceedings on the basis of the claim that serves as the basis for this arbitration.

---

[194] **CL-0074**, *The Renco Group, Inc. v. Republic of Peru [I],* ICSID Case No. UNCT 13 1, Partial Award on Jurisdiction, 15 July 2016, at ¶ 119.

[195] **CL-0075,** *Commerce Group Corp. and San Sebastian Gold Mines, Inc. v. Republic of El Salvador*, ICSID Case No. ARB/09/17, Award, 14 March 2011 at ¶ 73.

[196] *Id.*, at ¶¶ 84-86.

PUBLIC VERSION

274.    In this proceeding, there is no doubt that Claimants have complied with the letter and spirit of the waiver requirement. As stated in Exhibits 7 and 8 to Claimants' Request for Arbitration (incorporated again as **C-0073** and **C-0074** in the instant submission), Claimants have waived their "right to bring any claim against the presiding judge or other officials of the Superior Court of Justice of Mexico City that seeks any damages for the breach of its due process rights, and those of the Noteholders under its control, in connection with the issuance of an ex parte injunction in file no. 995/2022 before that court."

275.    Claimants' waiver is clear, explicit, and categorical.

**B.    Claimants have not initiated parallel proceedings in respect of the same measure.**

276.    The claims giving rise to these proceeding involve the mistreatment of Claimants by the Sixty-Third Superior Court.  Claimants are not bringing, have not brought, and will not bring any claim against Mexico or Mexican officials that is premised on a breach of Claimants' due process rights in any other forum.

277.    Although Mexico does not imply that the Mexican Court Proceedings or the U.S. court proceedings are contrary to the Claimants' commitments in their waivers, for avoidance of doubt, those proceedings involve a private dispute over the debt obligations of TV Azteca (not Mexico) and categorically do not "relate to the measure" that serves as the basis of these NAFTA proceedings.  Rather, the measures in the underlying private dispute, to which the waiver does not extend, relate to TV Azteca's breaches of contract.  Claimants make no claim relating to TV Azteca's breaches of contracts in these arbitration proceedings.  Instead, the measure at issue here is the Government of Mexico's denial of justice, rooted in the unfair treatment of Claimants by the Sixty-Third Superior Court.  These proceedings can therefore coexist simultaneously with proceedings in a national forum because they do not relate to the same measure.

278.    Claimants have not initiated any proceedings before any administrative tribunal or court under the law of any Party, or any other dispute settlement procedures, against the presiding judge or any other official of the Sixty-Third Superior Court that seeks any damages for the court's breaches of the Claimants' due process rights.

279.    Accordingly, the Tribunal should reject Mexico's seventh objection in full.

**XI.    RESPONSE TO OBJECTION 8: THE TRIBUNAL HAS JURISDICTION OVER THE CLAIMS FROM CONTRARIAN AND THE NOTEHOLDER UNDER ITS CONTROL, SANDPIPER LIMITED.**

280.    Mexico contends that Contrarian lacks standing to submit a claim to arbitration because neither it nor Sandpiper Limited were named defendants in the domestic

litigation before the Sixty-Third Superior Court.[197]  Moreover, Mexico alleges that because Sandpiper Limited only obtained the Notes in March 2023, Contrarian's interest was likewise only acquired at that time and thus cannot claim to have subject to the denial of justice propagated by the Mexican court.[198]

281.  As described in more detail above, however, Sandpiper Limited acquired its Notes from another Contrarian-controlled entity, its affiliate Contrarian Emerging Markets, L.P. [199]  Contrarian Emerging Markets, L.P. was not only a named defendant in the Mexican Court Proceedings[200] but also indirectly owns Sandpiper Limited, along with several other Contrarian-controlled investment funds that were also named defendants. [201]  The Notes that Sandpiper Limited acquired in March 2023 *were* under the control of Contrarian at the time of the Mexican Court Proceeding in September 2022 by virtue of Contrarian's control of Contrarian Emerging Markets, L.P. Accordingly, Mexico's assertion that Contrarian did not acquire its interest in the Notes until March 2023 is simply incorrect.

282.  Furthermore, Sandpiper Limited is wholly owned by Contrarian Funds, L.L.C.,[202] which is in turn owned by multiple Contrarian-controlled investment funds, several of which were identified as defendants in the September 2022 proceeding before the Sixty-Third Superior Court: Contrarian Emerging Markets, L.P.; Boston Patriot Summer St L.L.C.; Contrarian EM II, L.P.; EMMA 1 Master Fund, L.P.; EMMA 2 Fund, L.P.  Contrarian is the investment manager of those entities.[203]  For example, the Investment Management Agreement between Contrarian Emerging Markets and Contrarian spells out that Contrarian has authority to, among many delegated authorities, "open, maintain and close, in the name of the Feeder Fund and the Master Fund, securities accounts with any brokerage firm or custodian accounts with any bank designated by the Investment Manager at its sole discretion" and, in connection with this authority:

> (i) to invest and reinvest the assets of the Feeder Fund, including money borrowed, in the Master Fund;
> (ii) to purchase, hold, sell and otherwise deal in securities and financial instruments or obligations of any sort and rights therein, on margin or otherwise;
> (iii) to sell short securities of any sort and rights therein, on margin or otherwise and to cover such short sales;

---

[197] Respondent's Memorial on Jurisdiction at ¶ 126.

[198] *Id.* at ¶ 132.

[199] **C-0018** (Contrarian Emerging Markets, L.P. May 13, 2023 Transfer).

[200] **C-0075** (TV Azteca's September 22 2022 Injunction Request).

[201] *See* members of Contrarian Funds L.L.C. at **C-0014** (Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.), p. 10; and **C-0013** (Sandpiper Limited Register of Members).

[202] **C-0013** (Sandpiper Limited Register of Members).

[203] *See* **C-0014** (Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C.).

> (iv) to write, purchase, hold, sell and otherwise deal in put and call options and any combination thereof on stocks, baskets of stocks, exchange traded funds, bonds and stock market indices . . .[204]

283. Thus, Contrarian controlled the Notes now held by Sandpiper Limited at the time of the Injunction ruling.

284. Finally, Contrarian Emerging Markets, L.P. is one of the owners of Contrarian Funds, L.L.C. and thus Sandpiper Limited. Accordingly, Contrarian's interest in that same set of Notes that were transferred to Sandpiper Limited at the time of the injunction proceeding until today remains unbroken.

285. In conclusion, at the time Judge Robles issued the Injunction, Contrarian was subject to its terms by virtue of its control over the Noteholders named in that lawsuit, one of whom subsequently transferred its Notes to Sandpiper Limited, another Contrarian-controlled affiliate, and thus was directly impacted by the denial of justice that occurred in that proceeding.

286. Contrarian controlled multiple Noteholders subject to the domestic legal proceeding before the Sixty-Third Superior Court. As the entity responsible for directing, controlling, and coordinating the defendant Contrarian-controlled Noteholders on the basis of its investment management agreements with those entities (including Contrarian Emerging Markets, L.P.), Contrarian had the authority to "purchase, hold, sell and otherwise deal in securities and financial instruments or obligations of any sort and rights therein, on the margin or otherwise"[205] and thus was clearly subject to the terms of the injunction and thus impacted by the denial of justice that occurred in that proceeding. It was not notified or served about the initiation of the proceeding, nor notified of the Injunction. Thus, it was subject to the arbitrary conduct of the Sixty-Third Superior Court displays "a wilful disregard of due process of law, … which shocks, or at least surprises, a sense of judicial propriety".[206]

287. Objection #8 is thus premised on an erroneous understanding of the facts. Contrarian has standing to arbitrate the denial of justice claim. Accordingly, the Tribunal should reject Mexico's Objection #8 in full.

## XII.    CONCLUSION

288. For the reasons explained above, the Tribunal should reject the entirety of the jurisdictional objections contained in the Memorial on Jurisdiction and order Mexico

---

[204] *See* **C-0017** (Contrarian Emerging Markets, L.P. Investment Management Agreement).

[205] *Id.*

[206] **CL-0007,** *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, at ¶ 127, citing *Elettronica Sicula S.p.A. (ELSI) United States of America v. Italy* , **CL-0076,** ICJ Reports 1989, at ¶ 128; *See also* **CL-0077,** *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Award, 20 September 2021, at ¶¶ 288-289.

PUBLIC VERSION

to compensate Claimants for all costs and attorney fees associated with the bifurcated stage of this arbitration.

.

DATED this 29th day of August 2024.


Respectfully submitted on behalf of Claimants,




[Signed]




Jonathan C. Poling
Stephen S. Kho
Katherine P. Padgett
Lide Paterno
Hannes Sigurgeirsson
Shannon A. Jackenthal
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

*Attorneys for Claimants*