# Exhibit 6



**BEFORE THE HONORABLE ARBITRAL TRIBUNAL ESTABLISHED UNDER CHAPTER XI OF THE NORTH AMERICAN FREE TRADE AGREEMENT (NAFTA) AND ANNEX 14-C OF THE AGREEMENT BETWEEN THE UNITED STATES OF AMERICA, THE UNITED MEXICAN STATES AND CANADA (USMCA)**

**CYRUS CAPITAL PARTNERS, L.P. & CONTRARIAN CAPITAL MANAGEMENT, LLC (CLAIMANTS)**

**c.**

**UNITED MEXICAN STATES, (RESPONDENT)**

**(ICSID Case No. ARB/23/33)**

---

**REPLY ON JURISDICTION**

---

**ON BEHALF OF THE UNITED MEXICAN STATES**:
Alan Bonfiglio Ríos

**ASSISTED BY:**

***Ministry of Economy***
Rosalinda Toxqui Tlaxcalteca
Rafael Alejandro Augusto Arteaga Farfán
Alicia Monserrat Islas Martínez

***Pillsbury Winthrop Shaw Pittman LLP***
Stephan E. Becker
Gary J. Shaw
D. Carolina Plaza E.

**April 16, 2025**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 3

    A.   Opportunities and Sandpiper Acquired Their Notes After June 30, 2020, Solely to Execute the Overdue Payment and Take Over TV Azteca. .............................................................................................................. 3

    B.   Cyrus and Contrarian Are Investment Managers and Do Not Control Opportunities and Sandpiper. .................................................................. 6

    C.   The Claimants' Witness Does Not Provide Accurate Information On the Negotiation of Annex 14-C of The USMCA. ............................................... 9

    D.   It Was No Longer Possible to Hold Consultations Under Article 1119 When The Request for Arbitration Had Already Been Filed ...................... 13

    E.   Update on Mercantile Lawsuit 995/2022, Now Mercantile Lawsuit 203/2025 ....................................................................................................... 15

III.  THE TRIBUNAL LACKS JURISDICTION TO HEAR THE CASE ............. 17

    A.   Objection 1: The Claimants Did Not Wait The 90 Days Between the Notice of Intent and The Request for Arbitration as Required by NAFTA Article 1119. ................................................................................. 17

    B.   Objection 2: The Claimants Are Not Investors Under NAFTA but Agents of the Cayman Islands Funds. .............................................................. 24

        1.   The Claimants Are Not Investors Under NAFTA ..................................... 24

        2.   The Claimants Do Not Own or Control, Directly or Indirectly, The Notes. .......................................................................................... 25

        3.   The Decisions Cited by The Claimants Are Not Persuasive ................... 31

    C.   Objection 3: The Claimants Do Not Have a Legacy Investment ........................ 33

    D.   Objection 4: The Alleged Breaches Occurred After NAFTA Was Terminated ........................................................................................................ 35

        1.   The Ordinary Meaning of Annex 14-C Is That The USMCA Parties Consented to Arbitrate Claims for Violations of NAFTA Chapter XI, Section A That Arose Before NAFTA Was Terminated ..................................................................................... 36

        2.   The "Negotiating History" Offered by The Claimants Is Neither Applicable nor Persuasive .............................................................. 47

        3.   The "Subsequent Practice" Establishes the Parties' Agreement regarding the Interpretation of Annex 14-C ............................................. 50

    E.   Objection 5: The Tribunal Lacks Jurisdiction *Ratione Materiae*: The Claimants Have Not Demonstrated that They Have an

Investment Within the Meaning of Article 25 of The ICSID
Convention.................................................................................................52

F.    Objection 6: The Tribunal Lacks Jurisdiction *Ratione Temporis*
      Over Contrarian's Claim and Part of Cyrus' Claim Because the
      Alleged Denial of Justice Occurred Before Sandpiper Acquired All
      of Its Notes and Before Opportunities Acquired Some of Its Notes.....................57

G.    Objection 7: The Claimants Did Not Submit the Waiver as
      Required by NAFTA Article 1121 and Therefore the Tribunal
      Lacks Jurisdiction *Ratione Voluntatis*. ...................................................58

      1.    The State's Consent and The Tribunal's Jurisdiction *Ratione
            Voluntatis* Are Subject to The Fulfillment of the Following
            Preconditions.........................................................................59

      2.    The Waivers Submitted by The Claimants Do Not Meet the
            Requirements of NAFTA Article 1121.......................................63

      3.    The Defects in the Waiver Cannot Be Cured Without the
            Respondent's Consent.............................................................67

H.    Objection 8: Contrarian Does Not Have Standing to Bring a Denial
      of Justice Claim Because Sandpiper Was Not a Party to The
      Underlying Proceedings in Mexico. ..........................................................68

IV.   THE DENIAL OF JUSTICE CLAIM IS NOT ADMISSIBLE BECAUSE THE
      PROCEEDINGS ARE ONGOING .................................................................69

V.    REQUEST FOR RELIEF .............................................................................71

# GLOSSARY

| | |
|---|---|
| **BNYM or Trustee** | The Bank of New York Mellon. |
| **BNYM LB** | The Bank of New York Mellon London Branch. |
| **ICSID** | International Centre for Settlement of Investment Disputes. |
| **Final Offering Circular** | Circular issued in August 2017, whereby TV Azteca tendered $400,000,000 aggregate principal amount of the Notes bearing interest at 8.250% due 2024. |
| **Contrarian** | Contrarian Capital Management, LLC. |
| **VCLT** | Vienna Convention on the Law of Treaties. |
| **Contrarian Funds** | Contrarian Funds, LLC. |
| **Contrarian Markets** | Contrarian Emerging Markets L.P. |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States. |
| **Cyrus** | Cyrus Capital Partners L.P. |
| **Cayman Islands Funds or Funds** | Cyrus Opportunities Master Fund II, Ltd. and Sandpiper Limited. |
| ***Indenture* or Bond Agreement** | Bond Indenture dated August 9, 2017. |
| **Mercantile Lawsuit 995/2022** | Ordinary Mercantile Lawsuit 995/2022 filed in the 63rd Civil Court. |
| **63rd Civil Court** | Sixty-Third Civil Court of the Superior Court of Justice of Mexico City. |
| **Injunction or September 2022 Injunction** | The Injunction was issued in the Ordinary Mercantile Lawsuit 995/2022, in which the execution of any collection related to the Bond Agreement was temporarily suspended. |
| **Notes** | Unsecured debt issued by TV Azteca in the amount of USD $400 millions. |

| | |
|---|---|
| **Notice of Intent** | Notice of Intent to submit a claim to arbitration, filed on June 28, 2023. |
| **Opportunities** | Cyrus Opportunities Master Fund II, Ltd. |
| **USMCA Protocol** | Protocol replacing the North American Free Trade Agreement with the Agreement between the United States of America, the United Mexican States and Canada. |
| **Sandpiper** | Sandpiper Limited. |
| **Request for Arbitration** | Request for Arbitration filed on June 30, 2023. |
| **Noteholders** | Noteholders that purchased the Notes. |
| **Third Chamber** | Third Civil Chamber of the Superior Court of Justice of Mexico City. |
| **CPTPP** | Comprehensive and Progressive Agreement for Trans-Pacific Partnership. |
| **NAFTA** | North American Free Trade Agreement. |
| **USMCA** | Agreement between the United States of America, the United Mexican States and Canada. |

## I.    INTRODUCTION

1.      This case is plagued by jurisdictional deficiencies that the Claimants have failed to rebut. The Claimants do not comply with the requirements of Chapter XI of the NAFTA, Article 25 of the ICSID Convention, or Annex 14-C of the USMCA.

2.      The Claimants filed a claim for denial of justice, frivolously claiming to be victims of a secret scheme by a Mexico City court and TV Azteca S.A.B. de C.V. (TV Azteca), designed to help TV Azteca avoid paying its debts. But documents produced by the Claimants have revealed a different plan. The Claimants planned to acquire part of TV Azteca's already overdue debt and use it as leverage to take a relevant share in TV Azteca through insolvency proceedings in Mexico and the United States. This type of scheme is not the type of conduct that NAFTA nor the USMCA seeks to protect.

3.      As was addressed in the Memorial on Jurisdiction, Claimant's case faces at least eight jurisdictional deficiencies. The Claimants' Counter-Memorial on Jurisdiction presents wholly unsatisfactory responses to the jurisdictional deficiencies set forth by Respondent. Indeed, Claimants misinterpret or sometimes completely ignore Respondent's arguments from the Memorial on Jurisdiction.  Should Claimants respond to any of Mexico's arguments for the first time in their Rejoinder, when they had the opportunity to do so in their Counter-Memorial on Jurisdiction, Mexico will request an opportunity to respond to them.

4.      International investment tribunals should exercise great caution when analyzing the existence of their potential jurisdiction.[1] The Tribunal will note that this case is an abuse of the

---

[1]      Zachary Douglas, "*The International Law of Investment Claims*," CUP (2009), p. 74 ("Arbitral tribunals constituted to hear International or transnational disputes are creatures of consent. Their source of authority must ultimately be traced to the consent of the parties to the arbitration itself. In an arbitration between the two contracting state parties to an investment treaty, the consent of the parties can properly be said to emanate from that international instrument."). **RL-0002**. Consent is critical situation, as explained by Professor Georges Abi-Saab: "In international law, all tribunals - not only arbitral, but even judicial – are tribunals of attributed, hence limited jurisdiction … all International adjudicatory bodies are empowered from below, being based on the consent and agreement of the subjects […]. This is the reason why, the fundamental principle and basic rule in international adjudication, is that of the consensual basis of jurisdiction. It also explains the prominent place of questions of jurisdiction both in the jurisprudence and in the writings on international adjudication. It explains as well the widely shared perception that the first task of an international tribunal is to ascertain its jurisdiction; and the great care international tribunals take in establishing from the outset, the existence and limits of the consent of the parties before them, on which

investor-state dispute settlement system as it was initiated with the claimants' full knowledge that they had not complied with the jurisdictional requirements.

5.    *First Objection*: The Claimants failed to comply with NAFTA Article 1119, which explicitly requires each claimant to file a Notice of Intent at least 90 days before filing a Request for Arbitration. On 28 June 2023, Claimants filed their Notice of Intent, and only 48 hours later, Respondent received the Request for Arbitration. Strict compliance with Article 1119 is a mandatory precondition of Mexico's consent to arbitration.

6.    *Second Objection*: Contrary to what the Claimants may argue, they do not meet the criteria to be considered "investors" under NAFTA Article 1116(1) and Article 1139, since they did not contribute any capital to the acquisition of the Notes and do not own or control, directly or indirectly, Opportunities and Sandpiper.

7.    *Third Objection*: The Claimants have not demonstrated that they have a legacy investment within the meaning of Annex 14-C of the USMCA. The Notes do not qualify as legacy investments as they were not established or acquired by the Claimants while NAFTA was in force. NAFTA ceased to be in force on July 1, 2020, while Opportunities and Sandpiper acquired the Notes between November 2021 and March 13, 2023.

8.    *Fourth Objection*: The measure complained of by the Claimants is outside the scope of NAFTA and the USMCA. Mexico was not subject to the obligations set out in NAFTA Article 1105 after its termination on July 1, 2020. In attempting to support their position, the Claimants rely primarily on inferences from what Annex 14-C does not say, rather than addressing the ordinary meaning of the actual text. Respondent is emphatic that the text of the treaty must guide the Tribunal.

9.    *Fifth Objection*: The Tribunal lacks jurisdiction as the Claimants do not have an investment under Article 25 of the ICSID Convention. Claimants have the burden to demonstrate that they can initiate arbitration against Mexico under that article, yet they have failed to meet this burden. The Claimants did not make any contribution to acquire the Notes, nor did they have any risk

---

their jurisdiction is founded." *See Abaclat and others v. Argentine Republic,* ICSID Case No. ARB/07/5, Dissenting Opinion of Professor Georges Abi-Saab on the Decision on Jurisdiction and Admissibility, October 28, 2011, ¶¶ 7-8. **RL-0046**.

because their acquisition was made based on TV Azteca's non-payment, much less any contribution to the State—which they did not dispute

10.    *Sixth Objection*: The Respondent has established that there is no jurisdiction *ratione temporis* regarding most of the alleged investment, as the Injunction was issued on September 27, 2022. In that regard, Sandpiper acquired the Notes on March 13, 2023, and Opportunities obtained some of its Notes after September 27, 2022. The Claimants have failed to disprove such assertions and have not met their burden of proof.

11.    *Seventh Objection*: The Claimants have not submitted waivers that comply with NAFTA Article 1121 and have not complied with the treaty's preconditions. Therefore, Mexico's consent to arbitrate the dispute has not been established, and the Tribunal lacks jurisdiction *ratione voluntatis*.

12.    *Eighth Objection*: The Claimants have not disproved that Contrarian was not a party to the Mexican judicial proceedings in which the purported denial of justice is alleged. Therefore, it cannot have suffered any denial of justice.

13.    Finally, the Respondent emphasizes that this case is not admissible in claiming a denial of justice when judicial proceedings before Mexican courts are ongoing.

14.    For the foregoing reasons, the Tribunal lacks jurisdiction to hear the case brought by the Claimants. The claims may be dismissed, and the Claimants may be ordered to pay costs and expenses related to the arbitration.

15.    The Respondent reserves the right to raise additional jurisdictional objections if the dispute proceeds to the 'merits.

## II.    FACTS

### A.    Opportunities and Sandpiper Acquired Their Notes After June 30, 2020, Solely to Execute the Overdue Payment and Take Over TV Azteca.

16.    It is undisputed and the Claimants accept that Opportunities and Sandpiper acquired their Notes after June 30, 2020, when NAFTA was no longer in force. Opportunities began its first

acquisitions in November and December 2021, continuing into May and late 2022.[2] Sandpiper acquired its Notes from Contrarian Emerging Markets L.P. (Contrarian Markets) in March 2023.[3]

17.    Moreover, the documents produced by the Claimants reveal some of the circumstances surrounding their alleged investments.

18.    First, since 2021, the Claimants intended to obtain equity in TV Azteca and its subsidiaries and, in 2022, take over the company. Second, in March 2023, Sandpiper acquired Contrarian's Notes to facilitate TV Azteca's involuntary bankruptcy filing in U.S. courts. According to an email chain from just a few days earlier, the Claimants wanted to prevent hedge funds such as Contrarian Markets from being claimants in that lawsuit.

- On September 7, 2021, ████████████, a director of Cyrus Capital Partners Europe LLP, requested legal advice in Mexico because they were "[...] contemplating becoming creditors of [TV Azteca] and envisage a relatively robust amount of work on Mexican insolvency process / cross-border issues."[4]

- On September 8, 2021, ████████████ of Cyrus, in summarizing the situation of TV Azteca, stated: "TV Azteca missed its coupon payment in February 2021 and is in default. 25% of the bondholders have the right to deliver notice of acceleration, but we understand that the bondholders have not accelerated. We think the situation is ripe for us to step in, and we seek to develop a strategy based on a clear understanding of the various options we (and Salinas, in response) have." In addition, among the issues discussed were how they could receive more than 49% of the equity in TV Azteca and what would happen to the television broadcasting concessions if the insolvency proceeding were to take place in Mexico.[5]

- On September 26, 2021, ████████████ described in more detail the situation of the Notes and the strategy to be taken: "[...] the situation and strategy is straightforward

---

[2]    Counter-Memorial on Jurisdiction, ¶ 29.

[3]    Counter-Memorial on Jurisdiction, ¶ 38.

[4]    RE: Re: Cyrus Capital Partners/New Matter ████████████, p. 3. **R-0017**.

[5]    In Mexico, the insolvency proceeding is called *concurso mercantil* and in this email ████████████ refers to *concurso mercantil* instead of insolvency process. *See* RE: Re: Cyrus Capital Partners/New Matter ████████████, p. 1. **R-0017**.

enough: seek a judgment in the US for missed payment, accelerate, proceed to enforcement/attachment in the US as well as commence parallel enforcement/attachment proceedings for all non-US guarantor subsidiaries (upon acceleration of such guarantees);" furthermore, he wrote that to enforce the default they did not need 25% of the Notes to initiate legal proceedings.[6]

- In November 2021, Opportunities began acquiring its Notes.

- On February 25, 2022, in a list with the items to be discussed for a meeting called "Cyrus/Contrarian Meeting Agenda - TV Azteca," several items were scheduled including item five, which indicated "how/should we make public bid to acquire TV Azteca?" and in item six, in which one of the matters to be discussed was "[i]nternational treaty arbitration."[7]

- On March 7, 2023, ███████████████████████, sent to ████████████████ ██████████████, both from Contrarian Capital Management, among other recipients, an email requesting the documents that were necessary to file the involuntary bankruptcy lawsuit against TV Azteca before U.S. courts.[8]

- On March 7, 2023, ██████████ of Contrarian, stated, "[w]e are not the best plaintiff from a PR perspective. Petitioning creditors solely consisting of hedge funds is optically flawed."[9]

- On March 13, 2023, Contrarian Markets transferred to Sandpiper its Notes "free of payment."[10] Therefore, neither Contrarian Capital Management, LLC nor Sandpiper made any contribution to the Notes.

19.    The Claimants clearly planned to take over TV Azteca. Not only this, but by February 2022, there were already references to an "international treaty arbitration."

---

[6]    TVA - Introduction, pp. 1, 5. **R-0018**.

[7]    Cyrus/Contrarian Meeting Agenda – TV Azteca, February 25, 2022. **R-0019**.

[8]    RE: TV Azteca (Privileged and Confidential/Attorney Work Product) ██████████, p. 2. **R-0020**.

[9]    RE: TV Azteca (Privileged and Confidential/Attorney Work Product) ██████████, p. 2. **R-0020**.

[10]    Counter-Memorial on Jurisdiction, ¶ 38. Contrarian Emerging Markets, L.P. May 13, 2023 Transfer. **C-0018**.

20.     Finally, concerning the Claimants' constructive knowledge, it is important to highlight the following:

- Copied in the March 7, 2023, email from ▮▮▮▮▮▮▮, of Contrarian, is ▮▮▮▮▮▮ ▮▮▮▮▮▮, who represents The Bank of New York Mellon (BNYM) and The Bank of New York Mellon London Branch (BNYM LB) in the Mercantile Lawsuit 995/2022.[11]

- On the appeal against the Injunction, ▮▮▮▮▮▮▮▮▮▮, on behalf of BNYM and BNYM LB, confirmed that his clients were served with the TV Azteca lawsuit in Mexico City (Mercantile Lawsuit 995/2022) on February 21, 2023.

- In the same March 7 email, ▮▮▮▮▮▮▮ acknowledged the Injunction's existence by stating: "[l]egally, from an injunction perspective, there's no difference between the SPV and EM, for example. The injunction isn't effective against either entity. We've never been served. But I see a PR reason for using Sandpiper."[12]

21.     It is undisputed that the Claimants knew about the Injunction at least as early as March 7, 2023.  Moreover, the Notes were acquired to facilitate Claimants' legal strategy and not to be paid with interest.

### B.     Cyrus and Contrarian Are Investment Managers and Do Not Control Opportunities and Sandpiper.

22.     Cyrus and Contrarian argued in the Request for Arbitration that they had control over Opportunities and Sandpiper. Now, in the Counter-Memorial on Jurisdiction, they change their position and emphasize that they have control over the alleged investments, the Notes.[13] This change of position is, in effect, a concession that none of the Claimants own or control the Cayman Islands Funds.

23.     The Claimants submitted Exhibit C-0010 and figures 1 and 2, which clearly show that Cyrus does not own or have any control over Opportunities. The majority owner with ▮▮▮▮ is another Cayman Islands company called Cyrus Opportunities Fund II Ltd, and two other

---

[11]     RE: TV Azteca (Privileged and Confidential/Attorney Work Product) ▮▮▮▮▮▮▮, p. 2. **R-0020**. *See* Appeal filed on March 31, 2023 by BNYM and BNYM LB against the Injunction, p. 2. **R-0004**.

[12]     RE: TV Azteca (Privileged and Confidential/Attorney Work Product) ▮▮▮▮▮▮▮, p. 1. **R-0020**.

[13]     Request for Arbitration, ¶ 21. Counter-Memorial on Jurisdiction, ¶¶ 12, 150-151.

companies that hold ▆▆▆: Cyrus Capital Advisors, LLC (Cyrus Advisors), only ▆▆▆, and Cyrus Opportunities Fund II, LP, ▆▆▆.[14]

24.     Despite this, the Claimants justify their alleged U.S. control by claiming that ▆▆▆ of the investors in Opportunities are U.S. investors. Not only do they fail to prove or identify who those investors are,[15] but it is also clear that none are Cyrus. Another argument by the Claimants is that they have the "economic interest" because an ultimate owner named Cyrus Capital Partners GP L.L.C. controls both Cyrus (Claimant) and Cyrus Advisors. Still, it only owns ▆▆ of Cyrus Advisors and thus, only a ▆▆▆ indirect interest in Opportunities.[16]  Notably, the Claimant, Cyrus, has no economic interest in Opportunities.

25.     The Claimants allege that the investment management agreement (Cyrus Management Agreement) gives Cyrus control over the Notes.[17] But, any control over the Notes can only derive from control over the owner of the Notes, *i.e.*, Opportunities. Yet, the Claimants cannot show that Cyrus had control over Opportunities. Instead, they merely list Cyrus' activities as an investment manager.[18]

26.     The Claimants omit that the Cyrus Management Agreement identifies Cyrus as an "independent contractor and not an employee of any of the Opportunities Funds." This agreement also emphasizes that under no circumstances should Cyrus be understood to be associated or in joint business with Opportunities. The Cyrus Management Agreement is clear: "[t]he Investment Manager shall have no authority to act for, represent, bind or obligate the Opportunities Funds, except as specifically provided herein."[19]  In addition, *i)* all of its activities are subject to the control

---

[14]      Counter-Memorial on Jurisdiction, ¶¶ 29-31.

[15]      In fact, although the Claimants assert this, they do not prove it and limit themselves to claiming that "*tax exempt vehicles typically invest through offshore feeders." See* Opportunities Diagram. **C-0010**.

[16]      *See* Opportunities Diagram. **C-0010**.

[17]      Counter-Memorial on Jurisdiction, ¶ 30.

[18]      Counter-Memorial on Jurisdiction, ¶ 30.

[19]      § 4 Status of the Investment Manager. ("The Investment Manager shall, for all purposes, be an independent contractor and not an employee of any of the Opportunities Funds, nor shall anything herein be construed as making any of the Opportunities Funds a partner or co-venturer with the Investment Manager or any of its affiliates or clients. The Investment Manager shall have no authority to act for, represent, bind or obligate the Opportunities Funds, except as specifically provided herein.") Cyrus Investment Management Agreement, p. 5. **C-0072**.

of Opportunities' board of directors or senior partner, *ii)* it has an obligation to report its activities, when required, and *iii)* all of its decisions must comply with the Agreement and policies adopted by Opportunities' board of directors.[20]

27.     Therefore, it is clear that, beyond its role as manager, Cyrus does not control Opportunities, which has its own policies and is controlled by its board of directors or senior partner. Accordingly, Cyrus does not control the Notes held by Opportunities.

28.     In the case of Contrarian, the Claimants accept that Sandpiper is controlled by another company, Contrarian Funds, LLC (Contrarian Funds).[21] They insist that, as the sole manager of Contrarian Funds,[22] they also control Sandpiper. The Claimants make a leap in the chain of control over Sandpiper that should not be accepted.

29.     Although the Claimants refer to Contrarian as the "sole managing member," in reality, the limited liability company agreement clarifies that it is a "non-member manager."[23] Those who receive the "investment" payments are the members of Contrarian Funds, not Contrarian. The Claimants are only entitled to be paid for their management fees.[24]

30.     Similar to their allegations of a U.S. interest in Opportunities, the Claimants, without demonstrating it, allege that a general partner of one of the members of Contrarian Funds is allegedly controlled by three U.S. citizens, in respect of whom they do not even say what percentage interest they hold. Even if that were relevant, again, Claimants do not show the control

---

[20]     *See* §3 Policies of the Opportunities Funds y §5 Investments. Cyrus Investment Management Agreement, p. 5. **C-0072**.

[21]     Counter-Memorial on Jurisdiction, ¶ 35.

[22]     Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., p.4. **C-0014**.

[23]     § 3.01, Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., p. 3. **C-0014**.

[24]     § 9.01. Allocation of Expenses. ("Other than expenses relating to Investments, which shall be charged against the Participation Payments and/or Cash Flow relating to such Investment, as more fully described in Section 4, each Member shall be obligated to pay its pro rata portion of the Company's business and organizational expenses including but not limited to the preparation of the Company's tax returns, and other administrative expenses incurred by the Company that do not relate to a specific Investment. Each Member's pro rata portion of expenses shall be based on its percentage interest as set forth opposite each Member's name on Schedule A to this Agreement"), Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., pp. 8-9. **C-0014**.

that Contrarian should demonstrate over Sandpiper, but instead speak of a general partner — unknown— that allegedly ultimately controls most of the Contrarian Funds' companies and which, in turn, is owned by three U.S. citizens, who are not themselves claimants in this arbitration. Again, Claimants make leaps in the corporate chain that do not demonstrate the control Contrarian should have over Sandpiper.

### C. The Claimants' Witness Does Not Provide Accurate Information On the Negotiation of Annex 14-C of The USMCA.

31.    For context, Mr. Aristeo Lopez was the lead negotiator of the investment chapter of the negotiations of the USMCA, on Mexico's side.[25] Mr. Lopez reported on the negotiations, orally and in writing, to Mr. Smith Ramos, who in turn reported to his superiors, Mr. Juan Carlos Baker, then Undersecretary of Foreign Trade, and Mr. Ildefonso Guajardo, then Secretary of Economy. Although most of the reports were transmitted orally, the negotiating texts and the reports to the three chief negotiators were deposited in the electronic platform administered by the Office of the United States Trade Representative (USTR) known as "MAX." Mexico already provided these documents to the Claimants at the document production stage.[26]

32.    The Claimants submitted the witness statement of Mr. Smith Ramos to assist them in arguing that Annex 14-C of the USMCA extended the substantive obligations of NAFTA Chapter XI until July 1, 2023. According to Mr. Smith Ramos, the ultimate understanding of the U.S.-Mexico negotiations was to extend the substantive obligations of NAFTA Section A for an additional three years.[27] However, there are contemporaneous documents that directly contradict his position.[28]

33.    First, Mr. Smith Ramos misrepresents Mexico's position during the negotiations. He begins by claiming that Mexico sought to maintain the substantive provisions of NAFTA Chapter XI and improve them according to what was agreed to in the Comprehensive and Progressive

---

[25]    Witness Statement of Mr. Smith Ramos, ¶14.

[26]    On October 10, 2024, Mexico voluntarily produced all of these documents.

[27]    Witness Statement of Mr. Smith Ramos, ¶¶ 24-25.

[28]    For example, Mexico's position at the beginning of the negotiations was the CPTPP text. *See* Memorandum of the first round of investment group negotiations, August 18, 2017., pp. 1, 4. **R-0021**. Although on February 4, 2016 member countries signed the TPP, after the United States withdrew in January 2017, members continued negotiations to sign CPTPP on March 8, 2018 in Santiago, Chile. *See The U.S. Officially Withdraws from the Trans-Pacific Partnership*, 30 January 2017. **R-0028**.

Agreement for Trans-Pacific Partnership (CPTPP).[29]  However, in the first round of negotiations report, Mr. Lopez clearly reports that Mexico's proposal was the text of the then Trans-Pacific Partnership (TPP), with some exclusions.[30]

34.    Second, Mr. Smith Ramos argues that, as of October 2017, the Parties agreed that the substantive obligations of NAFTA Chapter XI would be extended for an additional three years. According to Mr. Smith Ramos, the United States made the proposal to include an annex that would allow investors to continue to bring claims three years after the new agreement replaced NAFTA.[31] To support this, Mr. Smith Ramos attached three reports or memoranda, dated October 16, 2017,[32] February 27, 2018, and May 4, 2018.[33] In reality, neither the memoranda nor the contemporaneous documents support Mr. Smith Ramos' claim.

- The October 2017 memorandum merely notes that the United States submitted a proposal based, among other things, on the protection of investors and investments (legacy investments) under section B.  Referencing section B means that arbitrations could be filed for three more years, not that the substantive obligations under section A could be extended.[34] Indeed, Section B of NAFTA begins with Article 1115 (Objective), which establishes "a mechanism for the settlement of investment disputes."[35]

---

[29]    Witness Statement of Mr. Smith Ramos, ¶ 15.

[30]    *See* Memorandum of the first round of negotiations of the investment group, August 18, 2017., pp. 1, 4. **R-0021**.

[31]    Witness Statement of Mr. Smith Ramos, ¶ 20.

[32]    *See* E-mail from Mr. Aristeo Lopez to various Mexican officials forwarding the consolidated text of Section A of the Investment Chapter, October 30, 2017. ("MX/US: For greater certainty, this Chapter shall not bind a Party in relation to an act or fact that took place or a situation that ceased to exist before the date of entry into force of this Agreement."). **R-0022.1**. *See also* Attachment of the email from Mr. Aristeo Lopez to several Mexican officials forwarding the consolidated text of Section A of the Investment Chapter, October 30, 2017. **R-0022.2**.

[33]    *See* Memorandum dated October 16, 2017. **KS-004**. Memorandum dated February 27, 2017. **KS-003**. Memorandum dated May 4, 2018. **KS-002**.

[34]    *See* Memorandum dated October 16, 2017. **KS-004**.

[35]    NAFTA Article 1115 ("Without prejudice to the rights and obligations of the Parties under Chapter Twenty (Institutional Arrangements and Dispute Settlement Procedures), this Section establishes a mechanism for the settlement of investment disputes that assures both equal treatment among investors of the Parties in accordance with the principle of international reciprocity and due process before an impartial tribunal."). **RL-0073**.

- The February 2018 memorandum notes that the United States *i)* sought to extend the term of the ISDS mechanism to allow ongoing disputes to be continued to completion, *ii)* the ISDS mechanism would be allowed to be used for three years —not the substantive obligations—, *iii)* Canada rejected the proposal, and *iv)* Mexico would review it.

- In April 2018, Mexican negotiators informed Mr. Smith Ramos that the sunset clause would only apply to the ISDS mechanism, not to substantive obligations: "EE.UU. propone un Anexo con sunset clause para ISDS […]."[36]

- The May 2018 memorandum reaffirms Mexico and Canada's rejection of the U.S. proposal, as they had no mandate to accept it.[37]

35.    Third, Mr. Smith Ramos does not attach any documents to support his argument that, in August 2018, at the conclusion of the U.S.-Mexico negotiations, the intention of the three delegations "was to ensure that all of the substantive provisions of NAFTA Chapter XI, as well as the ISDS mechanism, would be extended for three years after the NAFTA had been replaced by the new agreement."[38]   Instead, he simply refers to notes, which at no point were attached to his witness statement, about three meetings (from August, September, and October 2018) in which he purportedly orally reported this understanding. The Claimants later confirmed that Mr. Smith Ramos possesses none of those notes.[39]

36.    In contrast to the foregoing, two documents from November 2018 and others from 2019 completely contradict Mr. Smith Ramos' statements. One was prepared during the legal scrubbing of the USMCA, and another was an official document in which Mr. Smith Ramos participated.

- In the document entitled "Chapter 14, Investment. Legal review under track changes and comments of the Parties," a modification to Article 14.2. was proposed to clarify that

---

[36]    Internal memorandum from Messrs. Lopez and Malpica dated April 20, 2018., p. 3. **R-0023**.

[37]    Memorandum dated May 4, 2018. **KS-002**.

[38]    Witness Statement of Mr. Smith Ramos, ¶ 24.

[39]    The Claimants requested copies of these notes at the document production stage. *See* Procedural Order 4, Annex B, Request No. 14. The Claimants responded to the request, stating: "[F]or the avoidance of doubt, Mr. Smith does not maintain other documentation relating to the negotiating history relevant to this dispute."

Annex 14-C applied to acts that occurred before the USMCA entered into force.[40] This proposal was added to paragraph 3 of Article 14.2.[41]

- In the "Report of the Ministry of Economy to the Senate of the H. Congress of the Union on the final result of the negotiations for the modernization of the [NAFTA]," it was reported, as the final result of the investment chapter, that the transition period only applied to the investor-state arbitration mechanism, not to the substantive obligations.[42]

- The "USMCA Reports" informed the general public of the progress of the negotiations and stated with respect to Annex 14-C that: "[i]n the case of claims that could arise between the investors from Canada and the United States with their respective governments, NAFTA's mechanism of dispute resolution will continue to apply provisionally. After three years of the entry into force of the USMCA such mechanism will have no effect for Canada and the United States…."[43] Therefore, it is not credible that the industry has been informed in its reports of an interpretation of Annex 14-C that does not correspond to the one informed to the rest of the Mexican population or even to the Senate.

37.    From the above we can draw two conclusions: *i)* the Mexican negotiators always made the distinction between the ISDS mechanism and the substantive investment protection obligations; and *ii)* the Mexican negotiators —including Mr. Smith— expressly informed the Senate that Annex 14-C would only extend NAFTA's ISDS mechanism for three more years, not the substantive obligations.

---

[40]    Chapter 14, Investment. Legal review under track changes and comments of the Parties, November 8, 2018, p. 14-3, U.S. Comment. **R-0024**.

[41]    Thus the language we can read says: "For greater certainty, this Chapter, except as provided for in Annex 14-C (Legacy Investment Claims and Pending Claims) does not bind a Party in relation to an act or fact that took place or a situation that ceased to exist before the date of entry into force of this Agreement." Article 14.2 (Scope of application) of the USMCA.

[42]    *See* Report of the Ministry of Economy to the Chamber of Senators of the H. Congress of the Union on the final result of the negotiations of the North American Free Trade Agreement, November 9, 2018, ("Finally, a transition period of the arbitration mechanism of the current NAFTA was trilaterally agreed, to keep it in force for three years, once the USMCA enters into force"). p. 47. **R-0025**.

[43]    USMCA Report No. 14, September 9, 2019, p. 2. **R-0038**. USMCA Report No. 16, September 23, 2019, p. 2., p. 3. **R-0039.**

38.    In summary, none of Mr. Smith Ramos' statements are sustainable, and there is evidence that clearly contradicts his witness statement.

39.    Finally, Respondent notes that, at least since 2022, Mr. Smith Ramos and the Claimants' representatives have maintained a business relationship, collaborating on various issues.[44]

### D.    It Was No Longer Possible to Hold Consultations Under Article 1119 When The Request for Arbitration Had Already Been Filed

40.    As explained in the Memorial on Jurisdiction,[45] the Claimants never intended to comply with the requirements outlined in the NAFTA to initiate arbitration under the said Treaty (*i.e.*, Article 1119, which expressly provides for a 90-day cooling-off period before formally submitting a claim to arbitration). The Claimants filed a Notice of Intent[46] on June 28, 2023, and, 48 hours later, a Request for Arbitration.[47]

41.    The Claimants argued that the alleged Notice of Intent was submitted: "[...] with the intent to initiate settlement discussions with Mexico under Article 1118,"[48] which is particularly surprising for the Respondent, since if the Request for Arbitration was submitted two days after having received the Notice of Intent, it is evident that the Claimants had no intention of complying with the requirements under NAFTA, much less of initiating negotiations to reach an amicable settlement.

42.    According to the Claimants, they acted "[t]o safeguard their rights and avoid irrevocably forfeiting their ability to arbitrate their minimum standard of treatment claim under NAFTA."[49] However, the Claimants had already lost their procedural rights long before initiating their claim.

---

[44]    Witness Statement of Mr. Smith Ramos, ¶ 5. LinkedIn posting of Mr. Smith Ramos, January 2025. **R-0026**. Re: Auto ROO Dispute – Memo on Potential U.S. Arguments and Responses. **R-0027**.

[45]    Memorial on Jurisdiction, ¶ 40.

[46]    Notice of Intent, June 28, 2023. **R-0008**.

[47]    ICSID's June 30, 2023 communication acknowledging receipt of Claimants' Request for Arbitration and payment. **R-0009**.

[48]    Claimants' communications of July 24 and August 8, 2023. **R-0011**.

[49]    Counter-Memorial on Jurisdiction, ¶ 89.

43.     To avoid repetition of the events before the constitution of the Arbitral Tribunal that Mexico cited in the Memorial on Jurisdiction,[50] the Respondent will focus on the Claimants' allegations regarding their intentions to suspend the arbitration for 90 days.

44.     On August 17, 2023, the Claimants requested a 90-day pause to suspend the proceedings and enter consultations and negotiations with Mexico.[51]  In this regard, on August 30, 2023, the Respondent rejected this request because the attempt to settle the dispute through consultations or negotiations was a prerequisite to the formal submission of the claim under NAFTA Article 1118, a situation that clearly could no longer be fulfilled by the Claimants because the claim had already been submitted to arbitration.[52]

45.     On September 11, 2023, the Claimants continued to insist on the suspension and meetings.[53]  The Respondent appointed Professor Zachary Douglas as its co-arbitrator on September 27, 2023, to continue with the proceedings and comply with the deadlines and procedural rules.[54] Subsequently, given the Claimants' procedural inactivity, on October 11, 2023, the Respondent requested ICSID to appoint the Claimants' co-arbitrator, under NAFTA Article 1124.[55]

46.     As a result, on October 13, 2023, the Claimants proceeded to appoint David J. A. Cairns as their co-arbitrator.[56] The parties agreed on the process for appointing the President of the Tribunal and appointed Lord Collins of Mapesbury by common agreement.[57]

47.     In this sense, the arbitration was never suspended, and the breach of Article 1119 could not be "remedied."

---

[50]     *See* Memorial on Jurisdiction, ¶¶ 40-48.

[51]     Claimants' communication of August 17, 2023. **R-0014**.

[52]     Respondent's Response to the Claimants' Request for Stay of Proceedings, dated August 30, 2023. **R-0030**.

[53]     Claimants' request for stay of proceedings, dated October 11, 2023. **C-0066**.

[54]     Respondent's communication appointing Professor Zachary Douglas as co-arbitrator. **C-0067**.

[55]     Respondent's request for appointment of Claimants' arbitrator of October 10, 2023. **R-0031**.

[56]     Communication from the Claimants appointing Mr. David J. A. Cairns as co-arbitrator. **C-0069**.

[57]     ICSID Notice of Appointment of the President of the Tribunal of January 23, 2024, **C-0070**.

### E.    Update on Mercantile Lawsuit 995/2022, Now Mercantile Lawsuit 203/2025

48.    As explained below, the Claimants' claim for an alleged denial of justice is inadmissible because the judicial decision they complain about has not been declared final. Indeed, the Claimants used more than ten pages of their factual section to describe how the proceedings are continuing. An account of the judicial proceedings before Mexican courts is succinctly set forth below to clarify facts and update the Tribunal.

- The lawsuit that TV Azteca filed against the Noteholders, which commenced before the 63rd Civil Court, has now been assigned to the Thirty-Eighth Civil Court of Written Process (38th Civil Court), with file number 203/2025. This change of court and file number is due to the fact that, on May 21, 2024, through an agreement of the Council of the Mexico City Judiciary, a new order was established in the organization of various courts and files.[58] This reorganization process was completed in January 2025 for Mercantile Lawsuit 995/2022, when the 38th Civil Court ordered its filing (or new admission).[59]

- As described in the Memorial on Jurisdiction, on March 31, 2023, BNYM and BNYM LM filed an appeal against the Injunction (Appeal 1186/2023),[60] and the Third Chamber was the judicial body in charge of resolving it.[61] On July 8, 2024, the Third Chamber decided in essence to maintain the Injunction because *i)* it would allow resolving the lawsuit without undermining the right of any of the parties, since the Injunction is only temporary and *ii)* without the Injunction the operability and viability of the company could be put at risk, *i.e.*, the essential requirements for the Injunction to proceed were met.[62]

---

[58]    Notice of compliance with General Agreement 44-17/2024, June 12, 2024. **R-0032**.

[59]    Case 1:22-cv-08164-PGG Exhibit 66, Report filed February 12, 2025. **R-0033**. Search by file in the Mexico City Judiciary Branch Bulletin, January 23, 2025. **R-0042**.

[60]    Memorial on Jurisdiction, ¶ 36. Appeal 1186/2023 filed by BNYM and BNYM LB against the Injunction, March 31, 2023. **R-0004**.

[61]    According to Article 51 of the Organic Law of the Judiciary Branch of Mexico City, the Chambers of the Superior Court of Justice are in charge of resolving appeals filed against civil resolutions. *See* Organic Law of the Judiciary Branch of Mexico City. **R-0034**. Memorial on Jurisdiction, ¶ 36.

[62]    In Mexican law these requirements are called appearance of good faith (*apariencia del buen derecho*) and danger in the delay (*peligro en la demora*).

- On May 16, 2023, BNYM and BNYM LB also filed a motion for revocation against the Injunction, alleging that the COVID-19 pandemic was no longer a public health emergency. The 63rd Court rejected this motion,[63] and in response, they filed an appeal, which was resolved in file 694/2024 before the Third Chamber. On July 8, 2024, the Third Chamber rejected this appeal because it considered that the Injunction was not granted because of the pandemic itself, but because of the impact it had on the economics of the company (Appeal 694/2024).[64]

- BNYM and BNYM challenged the rulings of Appeals 1186/2023 and 694/2024, through Indirect Amparo 1009/2024,[65] before the Fourteenth District Court in Civil Matters of Mexico City (Fourteenth District). According to public information,[66] on January 31, 2025, the Fourteenth Court did not grant the Indirect Amparo in favor of BNYM, and BNYM filed an appeal for review on February 27, 2025, against the Indirect Amparo ruling. Currently, the Tenth Collegiate Court in Civil Matters of the First Circuit (Collegiate Court) is in charge of resolving the appeal and has assigned it the file number 71/2025.[67]

- In addition, on April 21, 2023, BNYM and BNYM LB also filed a plea of lack of jurisdiction against the lawsuit filed by TV Azteca, which was registered under file number Toca 1681/2023, before the Third Chamber, alleging in essence that the "Indenture Agreement" was subject to the exclusive jurisdiction of the U.S., and that it was not possible for Mexican courts to rule on the action of fortuitous event filed by TV Azteca in Mercantile Lawsuit 995/2022.[68] To resolve this plea of lack of jurisdiction, TV Azteca

---

[63]     Resolution of the Motion for Revocation of the Injunction, dated January 25, 2024. **R-0006**.

[64]     Appeal Resolution Toca 694/2024 dated July 8, 2024. **C-0046**.

[65]     The amparo proceeding, in Mexican law, is a procedure through which violations of fundamental rights, such as due process, are alleged. Generally speaking, there are two types of *amparo*, the *direct amparo* that challenges decisions issued by courts or final decisions and the *indirect amparo* that may refer to violations within a judicial proceeding.

[66]     The tracking of files at the federal level is done through the Integral File Tracking System (*Sistema Integral de seguimiento de expedientes*, SISE) belonging to Mexico's Federal Judiciary Council (*Consejo de la Judicatura Federal de México*).

[67]     Admissory Agreement of Appeal for Review 71/2025, March 4, 2025. **R-0035**.

[68]     Plea of No Jurisdiction by Declinatory Relief of April 21, 2023. **R-0036**.

requested the Third Chamber to summon all defendants, which was granted in its favor on January 30, 2024.[69]

- In February 2025, the 38th Civil Court ordered TV Azteca to summon all defendants within 200 days.[70]

49.     These judicial proceedings are still ongoing and are awaiting the competent authorities to issue the appropriate rulings under the law; therefore, the Respondent reiterates its position that the Claimants' argument of an alleged denial of justice or less favorable treatment is inadmissible.

50.     Finally, the Respondent emphasizes that the lawsuit filed by the Trustee before the Southern District Court of New York is still ongoing, and it is precisely in this lawsuit that the Trustee, for the benefit of the Noteholders, would collect the debts against TV Azteca.[71]

### III.    THE TRIBUNAL LACKS JURISDICTION TO HEAR THE CASE

51.     The Claimants fail to rebut any jurisdictional objections the Respondent has raised, as described below.

### A.    Objection 1: The Claimants Did Not Wait The 90 Days Between the Notice of Intent and The Request for Arbitration as Required by NAFTA Article 1119.

52.     The Claimants assert they have satisfied all Chapter XI provisions necessary to submit their claims to arbitration properly.[72] This assertion is incorrect. They failed to comply with NAFTA Article 1119, which explicitly requires each claimant to submit a notice of intent (NOI) at least 90 days before filing a request for arbitration. Despite knowing about the September 2022 Injunction for months, the Claimants submitted their NOI on June 29, 2023 —only two days before filing their Request for Arbitration on June 30, 2023.[73]

53.     The Claimants essentially ask the Tribunal to excuse their non-compliance with Article 1119 for two reasons: *i)* that they were not "formally put on notice" of the Injunction until June

---

[69]     Resolution of the Third Chamber of January 30, 2024. **R-0037.**

[70]     Case 1:22-cv-08164-PGG Exhibit 72, Report filed March 14, 2025. **R-0040**.

[71]     In this lawsuit, the Trustee is filing reports regarding updating the judicial proceedings before the Mexican courts, but has not been suspended because of the Injunction.

[72]     Counter-Memorial, ¶ 114.

[73]     Counter-Memorial on Jurisdiction, ¶ 119.

27, 2023, in the case of Cyrus, and June 29, 2023, in the case of Contrarian; and *ii)* even with "informal, constructive notice of the Injunction," they were not "reasonably able to reach and undertake decisions to pursue a NAFTA claim … before April 1, 2023."[74]

54.    As discussed *supra*, the Claimants' own documents demonstrate that they were aware of the "international treaty arbitration" a year earlier. Moreover, the Claimants freely admit that they knew of the Injunction as early as "late February" 2023,[75] *i.e.*, more than 90 days before the June 30 deadline for initiating the arbitration under Annex 14-C.

55.    Context is also important here. The documents produced by the Claimants demonstrate that the acquisition of the Notes was part of a much larger strategy to take over TV Azteca after it had difficulty paying them.[76] They planned to litigate insolvency proceedings in Mexico and the United States. Despite this, Claimants contend in this arbitration that TV Azteca and the Mexican courts acted secretly against the Noteholders and were unaware of the Mercantil Lawsuit until March 2023. This narrative is implausible. In any event, Claimants cannot sincerely ask to be excused from complying with the requirements of NAFTA because, according to them, the Injunction interrupted their taking of TV Azteca. Nor should they be allowed to claim a denial of justice.

56.    Regardless of the foregoing, strict compliance with Article 1119 is a mandatory precondition of Mexico's consent to arbitration. As a fundamental principle of treaty interpretation, the analysis must begin with the text itself.[77] The word "shall" in the English version is deliberately used in Article 1119 to require investors to submit a written notice at least 90 days before a Request for Arbitration.[78] In the Spanish version, the obligation is clear "[el] inversionista contendiente 'notificará'…." The provision does not contain any element allowing exceptions or excuses for non-compliance. As the drafters of the VCLT noted, "[i]t is not the function of

---

[74]    Counter-Memorial on Jurisdiction, ¶ 115.

[75]    Counter-Memorial on Jurisdiction, ¶ 128.

[76]    *See* Section II.A. Opportunities and Sandpiper acquired their Notes after June 30, 2020 for the sole purpose of executing the payment due and taking ownership of TV Azteca.

[77]    International Law Commission (ILC), *Draft Articles on the Law of Treaties with commentaries (1966)*, 1966, (commentary to article 27, equivalent to article 31 in the final text of the VCLT) p. 220. **RL-0050**.

[78]    *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Opinión Disidente Parcial de Raúl E. Vinuesa, 6 de julio de 2019, ¶ 41 (Case law is categorical in the sense that the term "shall" denotes an obligation or mandate that must be inexorably complied with). **RL-0006**.

interpretation to revise treaties or to read into them what they do not, expressly or by implication, contain."[79]

57.    The Claimants argue that the breach of NAFTA Article 1119 does not invalidate Mexico's consent to arbitration.[80] They are wrong. Under Article 1122(1), Mexico "consent[ed] to arbitration in accordance with the procedures set out in" the NAFTA. Read clearly, the phrase in accordance with the procedures" modifies the phrase "submit a claim," meaning that the submission of a claim must comply with the provisions of NAFTA, including Article 1119. If the procedures are not followed, Mexico did not consent to the submission of the filed claim to arbitration.

58.    The context of Article 1119 supports this reading. Articles 1116 to 1121 set out numerous steps an investor must take to submit a claim to arbitration. None of these articles suggests that these steps are discretionary. Precisely, the following Article, 1122, establishes that the Treaty Parties consent to "the submission of a claim…in accordance with the procedures set out in this Agreement." This is a reference to the pre-submission steps identified in Articles 1116 to 1121.

59.    Multiple NAFTA tribunals have recognized that Article 1119 constitutes a prerequisite necessary to establish the Parties' consent to arbitration. In *Methanex Corp. v. United States of America*, the tribunal stated that "[i]n order to establish the *necessary consent* to arbitration, it is sufficient to show (i) that Chapter XI applies in the first place … and (ii) that a claim has been brought by a claimant investor in accordance with Articles 1116 or 1117 (and that *all pre-conditions and formalities required under Articles 1118-1121 are satisfied*). Where these requirements are met by a claimant, Article 1122 is satisfied; and the NAFTA Party's consent to arbitration is established."[81]

60.    Similarly, in *Canfor Corporation v. United States of America*, the tribunal confirmed that "[i]n making [a jurisdictional] determination, [a] tribunal is required to interpret and apply the jurisdictional provisions, including procedural provisions of NAFTA relating thereto, i.e., whether

---

[79]    ILC, *Draft Articles on the Law of Treaties with commentaries (1966)*, (commentary to article 27, equivalent to article 31 in the final text of the VCLT) pp. 220-21. **RL-0050**.

[80]    Counter-Memorial on Jurisdiction, ¶ 129.

[81]    *Methanex Corp. v. United States of America*, NAFTA/UNCITRAL, First Partial Award, August 7, 2002, ¶ 120. (emphasis added). **RL-0029**.

the requirements of Article 1101 are met; whether a claim has been brought by a claimant investor in accordance with Article 1116 or 1117; and whether all pre-conditions and formalities under Articles 1118-1121 are satisfied."[82] And in *Merrill & Ring v. Canada*, the tribunal emphasized that the consent to arbitration under Article 1122 "could only be perfected" if all of the preconditions required in Articles 1118 to 1121 were satisfied.[83]

61.    The Parties to NAFTA have consistently affirmed this interpretation.[84] Per the customary international law principles of treaty interpretation, as codified in Article 31(3)(a)-(b) of the Vienna Convention, the Tribunal must consider this shared understanding.[85] As the tribunal in

---

[82]    Canfor Corporation v. United States of America, Tembec Inc. et. al. v. United States of America and Terminal Forest Products Ltd. v. United States of America, UNCITRAL, Decision of Preliminary Question, 6 June 2006, ¶ 171. **RL-0051**.

[83]    *Merrill & Ring Forestry L.P. v. Canada*, UNCITRAL, Decision on a Motion to Add a New Party, January 31, 2008, ¶¶ 28–29 ("The Tribunal has no doubt about the importance of the [preconditions] and finds that they cannot be regarded as merely procedural niceties. They perform a substantial function which, if not complied with, would deprive the Respondent of the right to be informed beforehand of the grievances against its measures and from pursuing any attempt to defuse the claim announced. This would be hardly compatible with the requirements of good faith under international law and might even have an adverse effect on the right of the Respondent to a proper defence."). **RL-0010**.

[84]    *Carlos Sastre and others v. United Mexican States*, ICSID Case No. UNCT/20/2, Submission of the Government of Canada, December 17, 2021, ¶¶ 16-18 ("In order for a claimant to obtain the necessary consent to arbitrate pursuant to Article 1122(1) of the NAFTA, it must ensure that the claim is submitted to arbitration in "accordance with the procedures set out in this Agreement." Compliance by the claimant with each of the NAFTA's prerequisites for submitting a claim to arbitration, including those set out in Articles 1116 to 1121, must be satisfied for a Chapter Eleven Tribunal to have jurisdiction over a claim. This has been confirmed by several NAFTA tribunals and has been the longstanding position of the three NAFTA Parties…") (internal citation omitted). **RL-0052**. *Carlos Sastre and others v. United Mexican States*, ICSID Case No. UNCT/20/2, Submission of the United States of America, December 17, 2021, ¶¶ 18-20 ("The "procedures set out in this Agreement" required to engage the NAFTA Parties' consent and form the agreement to arbitrate are found principally in Articles 1116-1121… A disputing investor who does not deliver a Notice of Intent at least 90 days before it submits a Notice of Arbitration or Request for Arbitration fails to satisfy this procedural requirement and fails to engage the respondent's consent to arbitrate…") (internal citation omitted). **RL-0053**. *Mesa Power Group LLC v Canada,* PCA Case No. 2012-17, Article 1128 Submission of Mexico, 25 July 2014, ¶ 4 ("Mexico considers that by entering into the Agreement, the NAFTA Parties made their consent to arbitration conditional upon compliance with the procedural requirements stipulated in Articles 1116, 1117, 1118, 1119, 1120, and 1121."). **RL-0054**.

[85]    Article 31(3)(a)-(b) of the Vienna Convention (For the interpretation of a treaty, "there shall be taken into account… (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation …"). **RL-0042**. *See also* e.g., *Westmoreland Coal Company v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶ 162 (adopting the consistent views of the Parties to NAFTA expressed in party submissions and non-disputing party submissions). **RL-0055**. *Clayton v. Government of Canada*, NAFTA/UNCITRAL, PCA

*Bilcon v. Canada* emphasized, "[t]he heightened protection given to investors from other NAFTA Parties under Chapter Eleven of the Agreement *must be* interpreted and applied in a manner that respects the limits that the NAFTA Parties put in place as integral aspects of their consent…."[86]

62.     The Claimants rely on *Mondev v. The United States, Pope & Talbot Inc v. Canada, Chemtura v Canada, ADF v. the United States of America, and B-MEX v. Mexico* to support their position on jurisdiction. However, these decisions do not supersede the shared understanding of the three NAFTA parties.

63.     To the extent these decisions can be considered, they are not persuasive because their facts differ materially from the key disputed issue here: in each of those cases, the NOIs were timely filed. None of the cases address an investor's failure to comply with the 90-day waiting period.

64.     First, in *Mondev*, the claimant submitted a timely NOI but omitted the address of the investor's enterprise and any reference to a claim under Article 1117.[87] On that basis, the respondent challenged the investor's standing to bring a claim under Article 1117 of NAFTA. The

---

Case No. 2009-04, Award on Damages, January 10, 2019, ¶ 379 ("[T]he consistent practice of the NAFTA Parties in their submissions before Chapter Eleven tribunals . . . can be taken into account in interpreting the provisions of NAFTA. Thus, the NAFTA Parties' subsequent practice militates in favour of adopting the Respondent's position on this issue[.]"). **RL-0056**. *Mobil Investments Canada Inc. v. Government of Canada*, NAFTA/ICSID Case No. ARB/15/6, Decision on Jurisdiction and Admissibility, July 13, 2018, ¶¶ 103, 104, 158, 160 (explaining that the approach advocated by claimant had "clearly been rejected by all three NAFTA Parties in their practice subsequent to the adoption of NAFTA," as evidenced by "their submissions to other NAFTA tribunals," and that "[i]n accordance with the principle enshrined in Article 31(3)(b) of the Vienna Convention on the Law of Treaties, 1969, the subsequent practice of the parties to a treaty, if it establishes the agreement of the parties regarding the interpretation of the treaty, is entitled to be accorded considerable weight."). **RL-0057**. *Canadian Cattlemen for Fair Trade v. United States of America*, NAFTA/UNCITRAL, Award on Jurisdiction, January 28, 2008, ¶¶ 188, 189 (explaining that "the available evidence cited by the Respondent," including submissions by the NAFTA Parties in arbitration proceedings, "demonstrates to us that there is nevertheless a 'subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its applications[.]'"). **RL-0058**. International Law Commission, Draft Conclusions on Subsequent Agreements and Subsequent Practice in Relation to the Interpretation of Treaties, with Commentaries, Conclusion 4, cmt. 18, UN Doc. A/73/10 (2018) (stating that subsequent practice under Article 31(3)(b) of the Vienna Convention "includes not only officials acts at the international or at the internal level that serve to apply the treaty . . . but also, inter alia, . . . statements in the course of a legal dispute . . . ."). **RL- 0059**.

[86]     *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton, and Bilcon of Delaware Inc. v. Government of Canada*, UNCITRAL, Award on Jurisdiction and Liability, 17 March 2015, ¶ 229. **RL-0003**.

[87]     *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, at ¶ 49. **RL-0038**.

tribunal ruled that the omission was inconsequential for purposes of standing.[88] The respondent never challenged jurisdiction under Article 1119 or Article 1122 (as Mexico does here), and the tribunal never addressed those issues.

65.    Likewise, in *Pope & Talbot Inc v. Canada*, the issue was whether a claim based on the "Super Fee" constituted a new claim requiring separate notification or merely an extension of an already-notified claim.[89] The tribunal determined that the respondent had already been made aware of the claim, and therefore, the notification requirements were satisfied.[90] However, the tribunal did not address the jurisdictional consequences of failing to comply with Articles 1119 or 1122.[91]

66.    In both *ADF v. the United States of America* and *Chemtura v Canada*, each tribunal considered the consequences of incomplete information in a timely filed NOI.[92] The tribunals were addressing the scope of a requirement under Article 1119(b), not whether said requirement (or any requirement) was entirely excusable. Neither tribunal analyzed the timing of the NOI or the jurisdictional consequences of filing a request for arbitration before the 90-day period had elapsed.

67.    In *B-MEX v. Mexico*, the sole defect in the NOI was the failure to identify the Additional Claimants under Article 1119(a).[93] Similar to *ADF* and *Chemtura*, the tribunal in *B-Mex* addressed

---

[88]    *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002, at ¶ 50. **RL-0038**.

[89]    *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Decision on Motion Regarding Superfee, 7 August 2000, at ¶ 8-9, 15. **RL-0060**.

[90]    *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Decision on Motion Regarding Superfee, 7 August 2000, at ¶ 25. **RL-0060**.

[91]    After dismissing the objection, the tribunal went on to consider whether consent under Article 1122 is conditioned on satisfying the procedures set out in Articles 1116-1122. But its analysis was premised on prior decisions interpreting Article 1121, not Article 1122. Accordingly, the decision holds no persuasive value.

[92]    *ADF Group Inc. v. United States of America*, Case No. ARB(AF)/00/1, Award of 9 January 2003, ¶ 105. **RL-0061**; *Crompton (Chemtura) Corp. v. Government of Canada*, PCA Case No. 2008-01, Award, 2 August 2010, at ¶ 100. **RL-0062**.

[93]    *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶ 67. **RL-0024**.

the scope of a requirement under Article 1119(a); not whether that requirement was entirely excusable.[94] Notably, the tribunal reaffirmed that Article 1119 was written in mandatory terms.[95]

68.     The general findings from the *B-Mex* tribunal about the test for jurisdiction[96] were premised on an erroneous reading of Article 1122. Specifically, the tribunal linked the phrase "in accordance with the procedures set out in this Agreement" in Article 1122 to the word "arbitration" rather than "submission of a claim to arbitration."[97] It accordingly held that the *submission of a claim* (including the submission of an NOI) need not comply with the procedures in NAFTA. That is a manifestly incorrect reading of Article 1122, as it would effectively give investors freedom to disregard the mandatory terms of Articles 1116-1121 and submit claims in whatever manner they choose.[98] If the Tribunal were to ignore the mandatory conditions for initiating an arbitration, it would be disregarding the terms of the arbitration agreement.

69.     The Claimants also claim that no NAFTA tribunal has dismissed a case solely for failure to comply with Article 1119's procedural requirements.[99] That is misleading. No tribunal has ever been confronted with a *complete* failure to file a NOI timely, nor has any tribunal ruled that such noncompliance is excusable or a curable jurisdictional defect. The fact that prior tribunals have tolerated NOIs with incomplete information does not mean claimants can bypass the 90-day notice period. Article 1119 is designed to protect respondent states' due process rights, and disregarding it would set a dangerous precedent that would weaken the treaty's procedural integrity.

---

[94]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶ 120 ("Based on the foregoing, the Tribunal concludes that the Respondent's consent in Article 1122 is not conditioned upon the satisfaction of the requirement of Article 1119(a) to identify the Additional Claimants in the Notice…"). **RL-0024**.

[95]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶ 81. **RL-0024**.

[96]     Counter-Memorial on Jurisdiction, ¶ 135.

[97]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶ 89. **RL-0024**.

[98]     For example, Articles 1116 and 1117 state that investors "may not make a claim if more than three years have elapsed" from when the investor first acquired knowledge of the breach; Article 1120 only allows investors to submit claims "provided that six months have elapsed since the events giving rise to the claim;" and Article 1121–titled "Conditions Precedent to Submission of a Claim to Arbitration"– requires investors to consent to arbitration in writing and waive its rights, also in writing, to pursue alternative remedies for damages in other proceedings.

[99]     Counter-Memorial on Jurisdiction, ¶ 146.

70.     As discussed in the Memorial, the Claimants were well aware at the time they filed the Request for Arbitration that they did not comply with Article 1119 and repeatedly sought ICSID and Mexico to help them by agreeing to somehow "suspend" the proceedings for sixty days.[100] In other words, the Claimants made a conscious decision to try to avoid an express condition for submitting a request for arbitration. They do not deserve the Tribunal's sympathy.

**B.      Objection 2: The Claimants Are Not Investors Under NAFTA but Agents of the Cayman Islands Funds.**

71.     The Claimants argue that they qualify as "investors of a Party" under Article 1116 of NAFTA because they allegedly "own or control" the Notes through their roles as investment managers. However, a proper interpretation of the provisions in NAFTA confirms that the Claimants do not meet the necessary criteria to be considered "investors" under Article 1116(1) and Article 1139.

**1.      The Claimants Are Not Investors Under NAFTA**

72.     The Claimants do not address the argument of the Respondent that they are not "investors" under Article 1139 because they did not make an investment as the definition requires.[101] Instead, they conflate this argument with the definition of "investments" under the same Article.[102]  If the Claimants finally decide to address that issue in their Rejoinder, Mexico will request an opportunity to respond to that new argument.  The Claimants should not be allowed to simply "skip" an issue in their Counter-Memorial and then raise it in their Rejoinder for the first time.

73.     To reiterate, the definition of "investment" in NAFTA is inherently tied to the existence of an "investor" of a Party. The definition states:

> [i]nvestment *of an investor of a Party* means an investment owned or controlled directly or indirectly by an *investor of such Party*;[103]

74.     Thus, before assessing whether an "investment" exists and determining its "ownership" or "control," the threshold inquiry is whether the claimant qualifies as an "investor" under NAFTA. The Claimants fail this test. As the Respondent established in its Memorial on Jurisdiction—and

---

[100]     Memorial on Jurisdiction, ¶ 60.
[101]     Counter-Memorial on Jurisdiction, ¶ 153.
[102]     Counter-Memorial on Jurisdiction, ¶ 153.
[103]     NAFTA, Article 1139. (emphasis added).

the Claimants did not contest—Article 1116(1) of NAFTA allows only an "investor of a Party" to submit arbitration claims, meaning only a national or enterprise that *has* made, is making, or seeks to make an investment may bring claims under Article 1116. While NAFTA does not define "making an investment," its ordinary meaning implies a contribution of resources with an expectation of financial return. An investment inherently involves committing capital or effort to acquire or enhance an asset.[104] The Claimants do not dispute any of this.

75.    Here, the Notes were purchased and held by Sandpiper and Opportunities. And the Claimants concede that they did not contribute any capital toward acquiring the Notes. To quote the decision in *Komaksavia Airport Invest Ltd., Republic of Moldova*, the Claimants "never made a payment, in any amount or by any apparent means, to acquire" the Notes.[105] Thus, they do not qualify as "investors" under NAFTA.

76.    Separately, the Claimants have failed to prove that they suffered any loss under Article 1116, an issue of legal standing that the Respondent raised in its Memorial.[106] They concede that they have no economic interest in the Notes. In the case of Cyrus, its "ultimate parent holds a ▮▮▮▮ indirect economic interest in Opps II Master Fund (and thus the Notes)." The same is true for Contrarian. Its "ultimate parents…have an economic interest in the Notes,"[107] although the amount is not identified. Contrarian itself holds no economic interest in the Notes. Absent an economic interest in the Notes or any allegation of loss, the Claimants have not satisfied Article 1116.

### 2.    The Claimants Do Not Own or Control, Directly or Indirectly, The Notes.

77.    The Claimants assert that they meet the "control prong" of Article 1116(1) "by virtue of control" over Sandpiper and Opportunities.[108] However, Article 1116(1) does not mention "control," and the Claimants do not raise any claims under Article 1117, which does mention "control."

---

[104]    Memorial on Jurisdiction, ¶¶ 63-65.
[105]    *Komaksavia Airport Invest Ltd. v. Republic of Moldova*, SCC Case No. EA 2020/074, Award, August 3, 2022, at ¶ 167. **RL-0015**.
[106]    Memorial on Jurisdiction, ¶ 67.
[107]    Counter-Memorial on Jurisdiction, ¶ 172.
[108]    Counter-Memorial on Jurisdiction, ¶ 157.

78.     In any event, should the Tribunal find that the Claimants qualify as investors (they do not), the next question is whether they sufficiently own or control the Notes to meet the definition of "investment" under Article 1139 of NAFTA, which specifies that an "investment of an investor of a Party" means an "investment owned or controlled directly or indirectly by an investor of such Party." Mexico emphasizes that the control issue presented here is not an alternative basis for the Claimants to qualify as investors. For jurisdiction to exist, the Claimants bear the burden of satisfying both conditions, that is, their status as investors and their ownership or control of an investment.

### a. The Claimants Do Not Control the Noteholders or The Notes.

79.     The Claimants neither own the Noteholders nor the Notes. Opportunities is owned by two other entities, neither of which is Cyrus.[109] Sandpiper is wholly owned by an entity called Contrarian Funds L.L.[110]

80.     On this control issue, the Claimants have failed to demonstrate that they "control" the Noteholders, Opportunities, and Sandpiper. Therefore, their argument that by "controlling" Opportunities and Sandpiper, they control the Notes is flawed and misinterprets precedent.[111]

81.     Article 1139 defines "investment of an investor of a Party" as an "investment owned or controlled directly or indirectly by an investor of such Party." Tribunals have consistently found that ownership or control —as those terms are interpreted— must have existed both at the time of the breach and at the time the request for arbitration is filed. To establish jurisdiction, the Claimants must show that they owned or controlled Opportunities and Sandpiper, either directly or indirectly, both at the time of the alleged breach (September 27, 2022) and at the time the Request for Arbitration was filed (June 30, 2023). Claimants lacked ownership and control over Opportunities and Sandpiper at the time of the alleged breach —as they do today— and therefore, they cannot meet this requirement.

---

[109]     Counter-Memorial on Jurisdiction, ¶ 29. *See also supra* ¶ 23.

[110]     Counter-Memorial on Jurisdiction, ¶ 33. *See also supra* ¶¶ 28-29.

[111]     Counter-Memorial on Jurisdiction, ¶¶ 150-153.

82.     The term "control" means to have and exercise exclusive power to the exclusion of all other power or influence. NAFTA tribunals have stated that "control" can mean "legal capacity to control" or "*de facto* control."[112] "Ownership and legal control may assure that the owner or legally controlling party has the ultimate right to determine key decision;" while "*de facto* control" refers to "the power to effectively decide and implement the key decisions of the business activity of an enterprise."[113] Applying these two definitions, arbitrator Mr. Vinuesa has clarified that:

> the term control can be categorized as legal control or de facto control, but this characterization does not modify the content and scope of the term "control," which is the exercise of power in the management of an enterprise, exclusively and excluding other power. Control must be contextualized in time. Only the investor exercising "effective control" at a given time is entitled to resort to arbitration...[114]

83.     Mr. Vinuesa's definition of "control" is based on *i)* the ordinary meaning of the term "control" and *ii)* the award rendered in the case of *Thunderbird v. Mexico*.

84.     With respect to the first premise, Mr. Vinuesa stated that the ordinary meaning of "control" implies the exercise of "power, decisive influence or discretionary management."[115] "Power" and "decisive influence" have been accepted as a definition of control. For example, the tribunal in *Kuntur Wasi v. Peru*, endorsing Professor Schreuer's opinion, stated that "control [was] the 'actual power to steer the investment' of an enterprise through whatever power (including blocking power) and authority that party may possess...where blocking power is shared equally by two shareholders, ... that power would seem to fall short even of negative control ...."[116]

---

[112]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶¶ 209-210. **RL-0024**.

[113]     *International Thunderbird Gaming Corporation c. Estados Unidos Mexicanos*, CNUDMI, Laudo Arbitral, 26 de enero de 2006, ¶ 108. **RL-0063**.

[114]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Opinión Disidente Parcial de Raúl E. Vinuesa, 6 de julio de 2019, ¶ 144. **RL-0006**.

[115]     *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Opinión Disidente Parcial de Raúl E. Vinuesa, 6 de julio de 2019, ¶ 139. **RL-0006**.

[116]     *Sociedad Aeroportuaria Kuntur Wasi S.A. and Corporación América S.A. v. Repúblic of Peru*, ICSID Case No. ARB/18/27, Decision on Jurisdiction, Liability and Certain Aspects of Quantum, with Further Directions on Quantum, August 11, 2023, ¶ 254. **RL-0064**. Later on, the same tribunal in Wasi declared that "control" "[…] is a flexible standard that looks at all the relevant facts and circumstances concerning the operation and management of the enterprise, including expertise and know-how that may lead to operational control." *Id* ¶ 255.

85.    Moreover, scholars have stated that "to truly own or control property connotes the ability to do with it as one pleases; to have dominion or control over it. Dominion/control in a substantive sense is the very essence of ownership of an asset; the owner has the right to use and enjoy a thing as against others who have a duty not to do so."[117]  Furthermore, the European Commission has noted that "[s]ole control is acquired if one undertaking alone can exercise decisive influence on an undertaking." Decisive influence was defined as the power to block actions that determine the strategic commercial behavior of an undertaking.[118]

86.    Regarding the second premise, Mr. Vinuesa relied on the definition given in *Thunderbird*:

> Ownership and legal control may ensure that the owner, or the entity exercising that control, ultimately has the right to make key decisions. However, if in practice a person exercises [that position] .... it is conceivable that there is a genuine link by virtue of which that person exercises control of the company....[119]

87.    In this sense, it could be said that Mr. Vinuesa's interpretation that a party exercises "control in an manner exclusive and excluding other power" is equivalent to a party that has, in the word of the *Thunderbird* tribunal, "the ultimate right to determine key decisions"[120] without the interference of any other person.[121]

### b. Cyrus Does Not Control Opportunities.

88.    Cyrus does not control Opportunities,[122] and, consequently, does not control the Notes. The investment management agreement expressly limits Cyrus to the capacity of "independent

---

[117]    Simon Foote, *Giving Substance to a Substantive Approach 1: The Problems with Control and Substantial Business Activity*, in Simon Foote, The Bona Fide Investor: Corporate Nationality and Treaty Shopping in Investment Treaty Law, International Arbitration Law Library, Volume 63 (Kluwer Law International 2021), p. 132. **RL-0065**.

[118]    Commission Consolidated Jurisdictional Notice under Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings, (2008/C 95/01), ¶¶ 54, 62, available in C_2008095EN.01000101.xml (providing guidance on questions of jurisdiction under Council Regulation (EC) No. 139/2004 (DO L 24, 29.1.2003). **RL-0066**.

[119]    *International Thunderbird Gaming Corporation c. Estados Unidos Mexicanos*, CNUDMI, Laudo Arbitral, 26 de enero de 2006, ¶ 108. **RL-0063**.

[120]    *International Thunderbird Gaming Corporation c. Estados Unidos Mexicanos*, CNUDMI, Laudo Arbitral, 26 de enero de 2006, ¶ 108. **RL-0063**.

[121]    *See also Vento Motorcycles, Inc. c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/17/3, Laudo, 6 de julio de 2020, ¶ 221. **RL-0047**.

[122]    *See* Articles of Association of Cyrus Opportunities Master Fund II, LTD, pp. 3 and 46, ¶ 24.1(b). **C-0071**.

contractor and not an employee of any of the Opportunities Funds," with no authority to bind or represent Opportunities.[123] In fact, Opportunities' articles of association explicitly vest management and control in its Directors, stating that "… the business of the Company shall be managed by the Directors who may exercise *all* the powers of the Company…."[124] Under these Articles, the Directors are responsible for appointing an Investment Manager (Cyrus), defined as "any person appointed and for the time being acting as investment manager, portfolio manager or trading advisor of the Company."[125] The investment manager's authority is strictly limited to the powers conferred upon it by the directors.[126]

89.    The extent of these powers and limitations is further defined in the investment management agreement, which explicitly states that Cyrus' role is solely to "manage the investment and re-investment of the cash, securities and other properties comprising the assets of the Opportunities…"[127] The agreement clearly outlines Cyrus' permitted activities, which include investing in and trading securities, engaging in lawful securities transactions, and other related functions.[128] However, nothing in the agreement suggests that Cyrus "directly or indirectly controls" Opportunities or has the authority to act on its behalf without interference. Instead, the agreement affirms that, *i)* "[t]he activities engaged in by the Investment Manager on behalf of the Opportunities Funds shall be *subject to the policies and control* of the respective Boards of Directors or general partner, as applicable, of the Opportunities Funds;" *ii)* Cyrus is required to report its activities, when required, and *iii)* all of its decisions must comply with the agreement and the policies adopted by Opportunities' board of directors.[129]

---

[123]    *See* Articles of Association of Cyrus Opportunities Master Fund II, LTD, pp. 3 and 46, ¶ 24.1.(b). **C-0071**.

[124]    *See* Articles of Association of Cyrus Opportunities Master Fund II, LTD, p. 45, ¶ 23.1. (emphasis added). **C-0071**.

[125]    *See* Articles of Association of Cyrus Opportunities Master Fund II, LTD, pp. 3 and 46, ¶ 24.1.(b). **C-0071**.

[126]    *See* Articles of Association of Cyrus Opportunities Master Fund II, LTD, pp. 3 and 46, ¶ 24.1.(b). **C-0071.**

[127]    *See* Cyrus Investment Management Agreement, p. 2, ¶ 1. **C-0072**.

[128]    *See* Cyrus Investment Management Agreement, p. 2, ¶ 2. **C-0072**.

[129]    *See* Cyrus Investment Management Agreement, pp. 4-5, ¶¶ 3, 5. **C-0072**.

90.    In addition, article 15 of the agreement explicitly gives the directors the power to terminate Cyrus as investment manager at any time,[130] reinforcing the fact that ultimate control remains in the hands of the directors and not Cyrus. Therefore, it is the board of directors, and not Cyrus, who controls Opportunities and, by extension, the Notes

91.    Under the legal framework of "control," as explained above, true control requires exclusive and autonomous decision-making power, something that Cyrus undeniably lacks. As Professor Vinuesa emphasized, control must be "exclusive and excluding other power," yet Cyrus' authority is continually subject to the oversight and discretion of Opportunities' directors. Therefore, it cannot be said that Cyrus directly or indirectly controls Opportunities or the Notes.

### c.    Contrarian Does Not Control Sandpiper.

92.    Similarly, Contrarian does not control Sandpiper, and, consequently, does not control the Notes. Sandpiper is controlled by Contrarian Funds,[131] which, in turn, is controlled by different members, one of them being Contrarian EM.[132] Contrarian (the Claimant) apparently acts as an investment manager for all Contrarian Funds' members, including Contrarian EM. However, the investment management agreement between Contrarian and Contrarian EM explicitly limits Contrarian's authority over Contrarian EM. Section 1 clarifies that "…the Investment Manager [*i.e.,* Contrarian] shall have *no* authority to act for, represent, bind or obligate [Contrarian EM] …."[133] Moreover, section 8 grants Contrarian EM the right to terminate the agreement anytime, reinforcing that Contrarian lacks ultimate authority.[134]

93.    These facts unequivocally demonstrate that Contrarian neither directly nor indirectly controls the members of Sandpiper's owner, Contrarian Funds. Consequently, Contrarian does not control the Notes. Like Cyrus, Contrarian does not have control over Sandpiper or the Notes within

---

[130]    *See* Cyrus Investment Management Agreement, p. 12, ¶ 15. **C-0072**.

[131]    *See* Sandpiper Limited Register of Member, pp. 1-2. **C-0013**.

[132]    *See* Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., Schedule A. **C-0014**.

[133]    *See* Contrarian Emerging Markets, L.P.- Contrarian Investment Management Agreement, p. 2. **C-0017**.

[134]    *See* Contrarian Emerging Markets, L.P.- Contrarian Investment Management Agreement, p. 9. C-0017. Mexico does not have access to the management agreements between Contrarian and the other members of Contrarian LLC, if they exist.

the well-established meaning of that term, because its authority is subject to the control of Sandpiper's members, that is, the members of Contrarian Funds, including Contrarian EM.

### 3.    The Decisions Cited by The Claimants Are Not Persuasive

94.    The Claimants rely on *S.D. Myers, Inc. v. Canada*, but their reliance is misplaced. In *S.D. Myers*, the tribunal examined whether the claimant had an "investment" in Canada.[135] The tribunal found that the claimant had lent money to Myers Canada (the investment), expected to share in its profits, and received payments for services, establishing an economic interest.[136] After determining that the same individuals owned the shares of both the claimant and the investment, the tribunal concluded that the claimant exercised "control" over the investment[137] and was therefore an "investor" under NAFTA.[138] This reasoning does not apply here. The Claimants have not shown any direct financial contribution or loss, and the evidence confirms that they do not exercise control over Opportunities and Sandpiper.

95.    The Claimants also rely on *MAKAE Europe SARL v. the Kingdom of Saudi Arabia*. In that case, the tribunal concluded that the claimant had not demonstrated *de facto* control over the investment because it lacked decision-making authority over the investment, and its employees had only administrative roles.[139] The same situation exists in this case. As subsections (b) and (c) above explain, there is no evidence that the Claimants exercise ultimate *de facto* control over Opportunities, Sandpiper, or the Notes.

96.    Similarly, the Claimants' reliance on *Mason v. Republic of Korea* is unpersuasive.[140] In *Mason*, the investment vehicle was a Cayman Islands entity without legal personality that had invested in shares of Samsung. The U.S. general partner of the investment was deemed the owner

---

[135]    *S.D. Myers, Inc. v. Canada,* UNCITRAL, Partial Award, 13 November 2000, ¶ 224. **RL-0048**.

[136]    *S.D. Myers, Inc. v. Canada,* UNCITRAL, Partial Award, 13 November 2000, ¶ 226. **RL-0048**.

[137]    *S.D. Myers, Inc. v. Canada,* UNCITRAL, Partial Award, 13 November 2000, ¶ 227 ("Mr. Dana Myers owned 51% of [SMDI]. His was the authoritative voice in SDMI and the evidence of his brother, Mr. Scott Myers, was that Dana Myers was the authoritative voice in Myers Canada."). **RL-0048**.

[138]    *S.D. Myers, Inc. v. Canada,* UNCITRAL, Partial Award, 13 November 2000, ¶ 231. **RL-0048**.

[139]    *MAKAE Europe SARL v. Kingdom of Saudi Arabia*, ICSID Case No. ARB/17/42, Award of 31 August 2021, ¶¶ 133, 137, 142-145, 148, 151-154, 158. **RL-0049**.

[140]    *Mason Capital LP and Mason Management LLC v. Republic of Korea*, PCA Case No. 2018-55, Decision on Preliminary Objections, 22 December 2019, ¶ 207. **RL-0067**.

of the securities and had standing to bring the claim.[141] By contrast, Sandpiper and Opportunities are distinct entities with independent legal personality.

97.    In contrast, *Gramercy v. Peru* presents a factually analogous scenario and supports the position presented by Respondent. In that case, the tribunal rejected the argument that an investment manager could bring a claim because it controlled the enterprise and indirectly controlled its assets.[142] After a thorough analysis of the term "control," the tribunal found that "control" for purposes of the treaty can only be exercised over a corporation in which the investor already holds an ownership interest and only at the level of its owners, not at that of its administrators or officers.[143] An investment manager's role is fundamentally subordinate.[144] Here, the Claimants are not the owners of Sandpiper and Opportunities; they are only their investment managers and therefore subordinate.

98.    This principle is further supported by *B-MEX v. Mexico*, where the tribunal found that managerial control alone is insufficient for an investor to acquire standing under a treaty.[145] The tribunal emphasized that mere managerial control does not satisfy ownership or control requirements of NAFTA, which were designed to protect investments made by investors of another Party, not management services provided by third parties.[146]

99.    The same logic applies here. Sandpiper and Opportunities, as legally distinct entities, cannot rely on their investment managers to bring claims on their behalf. The Claimants' argument that their managerial role equates to control over the Notes is flawed and unsupported by precedent. The tribunal's findings in *Gramercy* and *B-MEX* confirm that mere investment management does not confer ownership or control over assets. Since Sandpiper and Opportunities lack ownership or

---

[141]    *Mason Capital LP and Mason Management LLC v. Republic of Korea*, PCA Case No. 2018-55, Decision on Preliminary Objections, 22 December 2019, ¶¶ 156-163, 180. **RL-0067**.

[142]    *Gramercy Funds Management LLC, and Gramercy Peru Holdings LLC v. The Republic of Peru*, ICSID Case No. UNCT/18/2, Final Award, 6 December 2022, ¶¶ 607, 612. **RL-0068**.

[143]    *Gramercy Funds Management LLC, and Gramercy Peru Holdings LLC v. The Republic of Peru*, ICSID Case No. UNCT/18/2, Final Award, 6 December 2022, ¶¶ 628, 635. **RL-0068**.

[144]    *Gramercy Funds Management LLC, and Gramercy Peru Holdings LLC v. The Republic of Peru*, ICSID Case No. UNCT/18/2, Final Award, 6 December 2022, ¶ 637. **RL-0068**.

[145]    *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶ 246. **RL-0024**.

[146]    *B-Mex, LLC y otros c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/16/3, Laudo Parcial, 19 de julio de 2019, ¶¶ 245-246. **RL-0024**.

direct control over the investment funds, the Claimants cannot establish standing under Article 1116(1) based on their alleged control.

### C.    Objection 3: The Claimants Do Not Have a Legacy Investment.

100.    There is no dispute that Opportunities and Sandpiper acquired the Notes after July 1, 2020. The question is whether the Notes qualify as a legacy investment under paragraph 6(a) of Annex 14-C.

101.    Mexico established in the Memorial that that the Notes do not qualify as legacy investments because the word "investment" in paragraph 6(a) of Annex 14-C of the USMCA is *immediately* qualified by the phrase "of an investor of another party," which ultimately means that it must have been *the claimant* who established or acquired the investment in the host state while NAFTA was in force.[147] Otherwise, the qualifier has no meaning.

102.    The context of paragraph 6(a) reinforces this interpretation. The word "existent" is not defined in either treaty, but the general meaning of "existent" in Spanish and "legacy" in English, when used as an adjective, confirms that it refers to something from an earlier time:

- "That exists in a determined moment."[148]

- "That exists."[149]

- "of, relating to, associated with, or carried over from an earlier time, technology, business, etc."[150]

- "Designating something left over from a previous era but still in active existence."[151]

103.    Both NAFTA and the USMCA require that protected investments be owned or controlled, directly or indirectly, by a protected investor.[152] Reading the terms "legacy" and "investment"

---

[147]    Memorial on Jurisdiction, ¶¶ 71-73.

[148]    Diccionario RAE. https://dle.rae.es/existente. **RL-0069**.

[149]    Diccionario del Español de México, https://dem.colmex.mx/Ver/existente. **RL-0070**.

[150]    *Legacy*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/legacy. **RL-0071**.

[151]    *Legacy*, Oxford English Dictionary, https://www.oed.com/dictionary/legacy_n. **RL-0072**.

[152]    NAFTA, Article 1139. **RL-0073**; USMCA, Article 14.1. **RL-0074**. *See also Westmoreland Coal Company v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶ 162. **RL-0055**.

together, in conjunction with the rest of paragraph 6(a), demonstrates that the investment must have been established or acquired by a protected investor before NAFTA terminated. The Claimants clearly did not establish or acquire the Notes in that timeframe; therefore, their investment is not tied to the legacy of NAFTA.

104.    The Claimants refer to this argument as "irrelevant."[153] In their view, it is sufficient that any entity established the Notes–not the protected investor– when the NAFTA was in force.[154] Their argument rewrites paragraph 6(a) to delete the phrase "of an investor of another party," and accordingly contradicts the principle of *effet utile*. As explained in the ILC's commentary to Article 31, "[w]hen a treaty is open to two interpretations one of which does and the other does not enable the treaty to have appropriate effects, good faith and the objects and purposes of the treaty demand that the former interpretation should be adopted."[155]

105.    The *Westmoreland Coal Company v. Canada (III)* tribunal recently addressed this issue. There, the claimant had previously owned a Canadian enterprise operating a coal mine. Before NAFTA terminated and the USMCA took effect, the claimant sold its interest in the enterprise. In the arbitration, Canada challenged jurisdiction for lack of a legacy investment. The tribunal accepted the challenge and dismissed the claim because, in its view, an investor can only satisfy the "in existence" language of paragraph 6(a) if it owns or controls the investment upon entry into force of the USMCA.[156] The tribunal summarized its view as follows:

> The language in Paragraph 6(a) requiring an investment "in existence" upon the entry into force of the USMCA is a distinct element of the "legacy investment" definition that must be given effet utile. In doing so, the Tribunal finds that an investment is "in existence" at a given time if it is owned or controlled by the investor at that time. As explained below and contrary to the Claimant's view, this interpretation is consistent with the relevant definitions in NAFTA Article 1139; the purpose of the USMCA; the requirement under NAFTA that the investor must hold the investment at the time of the alleged breaches; and it does not yield

---

[153]    Counter-Memorial on Jurisdiction, ¶ 179.

[154]    Counter-Memorial on Jurisdiction, ¶¶ 179, 184-189.

[155]    International Law Commission (ILC), *Draft Articles on the Law of Treaties with commentaries (1966)*, page 219 (commentary to Article 27, equivalent to Article 31 in the final text of the VCLT). **RL-0050**.

[156]    *Westmoreland Coal Company v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶¶ 161-171. **RL-0055**.

allegedly "absurd" results, such as "abruptly" leaving investors with no investment protection under NAFTA, in relation to expropriatory measures or generally.[157]

106.   In sum, neither the Opportunities nor the Sandpiper Notes qualify as an existing investment under Section 6(a) because they were not established or acquired by the Claimants whilst NAFTA was in force.

### D.   Objection 4: The Alleged Breaches Occurred After NAFTA Was Terminated

107.   In the Memorial on Jurisdiction, the Respondent established, in accordance with the plain meaning of USMCA Annex 14-C and the relevant rules of international law, that Mexico was not subject to the obligations set forth in NAFTA Article 1105 after it was terminated on July 1, 2020.[158] This position is not new. It is premised on principles of state responsibility and treaty interpretation that have applied for decades.[159] The only two tribunals that have issued awards on this issue have interpreted Annex 14-C in the same way.[160]

108.   In response, the Claimants recycle a textual argument that other tribunals have already rejected. They argue that Mexico "consented in Annex 14-C to arbitrate legacy investment claims arising within the three-year Transition Period."[161] They say that the USMCA Parties agreed under Annex 14-C to extend the substantive obligations of NAFTA Chapter XI until July 1, 2023.[162]

109.   It is beyond dispute that the Claimants have the burden to establish the jurisdiction of the tribunal,[163] which means they must establish that the USMCA Parties agreed to extend the

---

[157]   *Westmoreland Coal Company v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶ 161. **RL-0055**.

[158]   Memorial on Jurisdiction, § III.E.

[159]   Memorial on Jurisdiction, ¶¶ 78-79 (discussing Article 13 of the International Law Commission's Articles on International Responsibility of States and Article 70(1) of the Vienna Convention on the Law of Treaties (VCLT).

[160]   *TC Energy Corp. et al v. United States of America*, ICSID Case No. ARB/21/63, Award, July 12, 2024, ¶ 142. **RL-0076**. *Westmoreland Coal Co. v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶ 143. **RL-0055**.

[161]   Counter-Memorial on Jurisdiction, ¶ 192.

[162]   Counter-Memorial on Jurisdiction, ¶ 197 ("The USMCA Parties *did* 'agree otherwise' [in satisfaction of Article 70(1) of the VCLT] when they agreed to incorporate Annex 14-C, which extends NAFTA's Chapter 11 obligations for the three-year Transition Period.") (emphasis in original).

[163]   *Hydro S.r.l. et al. v. Republic of Albania*, ICSID Case No. ARB/15/28, Award, 24 April de 2019, ¶ 470: "The Respondent is right to point out that too expansive a construction is not to be given to consent,

substantive protections of NAFTA past its termination. The Claimants fail to meet their burden. They have not shown that the text of the Annex 14-C, read in context and according to its object and purpose, evidences any agreement by the USMCA Parties to extend the substantive protections of NAFTA Chapter XI.

110.    The Claimants seek to rely principally on inferences from what Annex 14-C does *not say* rather than address the ordinary meaning of the actual text. They argue that the USMCA Parties "did not exclude" from the scope of Annex 14-C acts after NAFTA was terminated, meaning they "clearly chose not to limit the scope of Annex 14-C."[164]

111.    That is not the proper way to interpret treaties: "It is not the function of interpretation to revise treaties or to read into them what they do not, expressly or by implication, contain."[165] Said in another way: "there is no room for any presumed intention of the Contracting Parties …, as an independent basis of interpretation."[166] The Tribunal must be guided by the text of the treaty.[167]

### 1.    The Ordinary Meaning of Annex 14-C Is That The USMCA Parties Consented to Arbitrate Claims for Violations of NAFTA

---

following the decision in Tulip Real Estate, and the burden lies with the Claimants to show that the Tribunal has jurisdiction." **RL-0077**. *Lighthouse Corporation Pty Ltd and Lighthouse Corporation Ltd, IBC. v. Democratic Republic of Timor-Leste Oriental*, ICSID Case No. ARB/15/2, Award, December 22, 2017, ¶ 148: "Further, the burden of proving the existence of consent is on the Claimants, as they are the ones asserting jurisdiction." **RL-0078**. *Sergei Pugachev v. Rusia*, UNCITRAL, Award on Jurisdiction, June 18, 2020, ¶ 248 (in which it states that "[i]t is an accepted principle of international law that the claimant in an arbitration bears the legal burden of showing that the tribunal has jurisdiction to consider its claim." **RL-0079**. *See also, ICS Inspection & Control Services Ltd. c. Argentina*, Caso CPA No. 2010-09, Laudo sobre Jurisdicción, 10 de febrero de 2012, ¶ 280: "The burden of proof for the issue of consent falls squarely on a given claimant who invokes it against a given respondent. Where a claimant fails to prove consent with sufficient certainty, jurisdiction will be declined." **RL-0080**.

[164]    Counter-Memorial on Jurisdiction, ¶¶ 199, 201.

[165]    ILC, *Draft Articles on the Law of Treaties with commentaries* (1966), pp. 220-221 (commentary to Article 27, equivalent to Article 31 in the final text of the VCLT). **RL-0050**. *See also Case Concerning Rights of Nationals of the United States of American in Morocco*, ICJ Reports, 1952, p. 196 (refusing to derive treaty rules not expressed in the agreement). **RL-0081**.

[166]    The quote continues: "because this opens up the possibility of an interpreter (often, with the best of intentions) altering the text of the treaty in order to make it conform better with what he (or she) considers to be the treaty's 'true purpose'." *Wintershall Aktiengesellschaft c. República Argentina*, Caso CIADI No. ARB/04/14, Laudo, 8 de diciembre de 2008, ¶ 88. **RL-0082**.

[167]    See *Wintershall Aktiengesellschaft c. República Argentina*, Caso CIADI No. ARB/04/14, Laudo, 8 de diciembre de 2008, ¶¶ 76-91 (citing various ICJ decisions supporting the principle). **RL-0082**.

Chapter XI, Section A That Arose Before NAFTA Was Terminated

112.    Although it is the burden of the Claimants to establish their interpretation of the text, Mexico will address the ordinary meaning of Annex 14-C in accordance with the principles of international law. There is no dispute that the governing law for this analysis is the VCLT, specifically Article 31. In Mexico's view, Article 32 is not applicable because the text's ordinary meaning is clear.[168]

113.    Article 31(1) of the VCLT instructs that a "treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." The text is key because it is "presumed to be the authentic expression of the intentions of the parties."[169] To determine the plain meaning of the text, Article 31 instructs that the text must be read "in the context of the treaty and in the light of its object and purpose."[170]  International tribunals that have had the task of interpreting Article 31(1) of the VCLT have emphasized that the three components should not be considered in isolation, but as a cohesive framework for treaty interpretation.[171]

---

[168]    *See Case concerning the Arbitral Award of 31 July 1989* (Guinea-Bissau v. Senegal), Judgment of November 12, 1991, ICJ Reports, 1991, para. 48, p. 69 ("the first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur. If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter. If, on the other hand, the words in their natural and ordinary meaning are ambiguous or lead to an unreasonable result, then, and then only, must the Court, by resort to other methods of interpretation, seek to ascertain what the parties really did mean when they used these words.") (Emphasis in original.) **RL-0083**.

[169]    ILC, Draft Articles on the Law of Treaties with commentaries (1966), p. 220 (commentary to Article 27, equivalent to Article 31 in the final text of the VCLT). **RL-0050**. *Wintershall Aktiengesellschaft c. República Argentina*, Caso CIADI No. ARB/04/14, Laudo, 8 de diciembre de 2008, ¶ 84 ("Even before the entry into force of the 1969 VCLT (in 1980), the Institute of International Law had adopted a textual approach to treaty interpretation – "*le texte signé est, sauf de rares exceptions, la seule et la plus récente expression de la volonté commune des parties*" ("The signed text, is except for rare exceptions, the only and the most recent expression of the common accord [or common will] between the parties"). **RL-0082**.

[170]    ILC, Draft Articles on the Law of Treaties with commentaries (1966), p. 221 (commentary to Article 27, equivalent to Article 31 in the final text of the VCLT). **RL-0050**.

[171]    Special Group Report, United States – Sections 301-310 of the Trade Act of 1974, WT/DS152/R, adoptado el 27 de enero de 2000, DSR 2000: II, 815, ¶ 7.22, **RL-0084**. Special Group Report, Canada – Certain Measures Affecting the Automotive Industry, WT/DS139/R, WT/DS142/R, adopted on June 19, 2000, as modified by the Appellate Body Report WT/DS139/AB/R, WT/DS142/AB/R, DSR 2000: VII,

114.    According to Article 31(1) of the Vienna Convention, below we review *i)* the treaty text, *ii)* the context of the relevant provisions, and *iii)* the object and purpose of the provisions.

**a.  The Text of Annex 14-C Plainly Refers to The USMCA Parties' Consent to Arbitrate Claims for Breaches That Took Place While Section A's Obligations Were Binding On the Parties Prior to the Termination of The NAFTA**

115.    Under the heading "Legacy Investment Claims and Pending Claims," Annex 14-C consists of six paragraphs and two footnotes (footnotes 20 and 21, both of which are provided concerning the first paragraph). The first paragraph is the key provision, establishing the "consent" of the USMCA Parties to arbitrate claims with respect to legacy investments alleging breaches of obligations under Section A of Chapter XI (among others) using the dispute resolution mechanism set out in Section B of Chapter XI. The parties agree on this.

116.    For reference, the text of paragraphs 1-3 of Annex 14-C reads:

1. Each Party consents, with respect to a legacy investment, to the submission of a claim to arbitration in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994 and this Annex alleging breach of an obligation under:

(a) Section A of Chapter 11 (Investment) of NAFTA 1994;

(b) Article 1503(2) (State Enterprises) of NAFTA 1994; and

(c) Article 1502(3)(a) (Monopolies and State Enterprises) of NAFTA 1994 where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A of Chapter 11 (Investment) of NAFTA 1994.

2. The consent referred to in paragraph 1 and the submission of a claim to arbitration under Section B of the NAFTA 1994 in accordance with this Annex shall satisfy the requirements set forth in:

(a) Chapter II of the ICSID Convention (Centre Jurisdiction) and the ICSID Additional Facility Rules requiring the written consent of the parties to the dispute;

(b) Article II of the New York Convention, which requires a "written agreement;" and

(c) Article I of the Inter-American Convention that requires an "agreement."

3. A Party's consent under paragraph 1 shall expire three years after the termination of the 1994 NAFTA.

---

3043, ¶ 10.12. **RL-0085**. *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, April 9, 2015, ¶ 282. **RL-0086**.

117.    The phrase "alleging *breach* of an *obligation* under: … Section A of Chapter 11" in paragraph 1 is central to the interpretation of Annex 14-C because it limits the types of claims to which the USMCA Parties consented under paragraph 1.[172]

118.    The common definition of the term "non-compliance" is "lack of compliance" which includes as synonyms "disobedience, breach, infraction, transgression, violation, infringement, contravention, non-observance, disrespect, fault, omission, forgetfulness, informality, deception."[173] In the context of Annex 14-C, the ordinary meaning of a "breach" is therefore an act in violation of an obligation (*i.e.*, under Section A of NAFTA Chapter XI). In turn, the common definition of the term "obligation" is "a bond that binds one to do or refrain from doing something, established by law, by voluntary granting or by direct derivation of certain acts."[174] It is clear from the foregoing that, by definition, an obligation must be binding.

119.    Therefore, a key element of the ordinary meaning of the phrase "breach of an obligation" is that the obligation is "legally binding" on the State Parties at the time when the (alleged) breach takes place. The basic point is straightforward: for a State to breach its obligations under international law, the obligations in question must be binding on the State when the alleged breach occurred.

120.    Precisely, the language "submit to arbitration under this Section a claim that another Party has breached an obligation under... Section..." comes from NAFTA Articles 1116 and 1117, and this same language has already been analyzed by the tribunal in *Feldman v. Mexico*, and has rejected the Claimants' proposed interpretation.

> The reliance of the Tribunal on alleged violations of NAFTA Chapter Eleven Section A also implies that the Tribunal's jurisdiction ratione materiae becomes jurisdiction ratione temporis as well. Since NAFTA, and a particular part of NAFTA at that, delivers the only normative framework within which the Tribunal may exercise its jurisdictional authority, the scope of application of NAFTA in terms of time defines also the jurisdiction of the Tribunal ratione temporis. Given that NAFTA came into force on January 1, 1994, no

---

[172]    Paragraph 1 references other potential breaches separate from those under Section A, but those obligations are not relevant to this dispute.

[173]    *Diccionario de la lengua española*, definition on Non-compliance [*Incumplimiento*], https://dle.rae.es/incumplimiento?m=form.

[174]    *Diccionario de la lengua española*, definition on Obligation [*Obligación*], https://dle.rae.es/obligaci%C3%B3n?m=form.

obligations adopted under NAFTA existed, and the Tribunal's jurisdiction does not extend, before that date. NAFTA itself did not purport to have any retroactive effect.[175]

121.    This meaning is consistent with the principles of customary international law codified in Articles 12 and 13 of the ILC's Articles on Responsibility of States for Internationally Wrongful Acts.[176] Article 12 ("*Existence of a breach of an international obligation*") provides that: "There is a breach of an international obligation by a State when an act of that State is not in conformity with <u>what is required of it by that obligation</u>, regardless of its origin or character." Article 13 ("*International obligation in force for a State*") goes on to provide that: "An act of a State does not constitute a breach of an international obligation <u>unless the State is bound by the obligation</u> in question <u>at the time the act occurs</u>." These reflect "the general principle of intertemporal law."[177]

122.    After NAFTA terminated on July 1, 2020, Section A of Chapter XI was no longer binding on Mexico. The USMCA Protocol plainly expresses the NAFTA Parties' intent to replace NAFTA with the USMCA on the day the USMCA enters into force, as Mexico explained in the Memorial.[178] Thus, the ordinary meaning of the phrase "*a breach of an obligation under: ... Section A of NAFTA Chapter 11*" refers to a breach that takes place while the Section A obligation is binding on the State Parties, that is, prior to the termination of the NAFTA on July 1, 2020.[179]

---

[175]    *Marvin Roy Feldman Karpa c. Estados Unidos Mexicanos*, (Caso CIADI No. ARB(AF)/99/1), Decisión provisional acerca de cuestiones jurisdiccionales preliminares, 6 de diciembre de 2000, ¶ 62. (original emphasis). As a consequence, the tribunal in *TC Energy v. United States* concluded: "In sum, the situation in this case is not conceptually different than that which led the Feldman tribunal to decline jurisdiction: for the same reasons why a treaty-based tribunal has no jurisdiction on breaches pre-dating the treaty, it equally lacks jurisdiction on breaches post-dating its termination. [...] In the same way as in Feldman, where the claimants relied on NAFTA as the applicable law to preexisting breaches, in this case, the Claimants rely on NAFTA, through Annex 14-C, to apply to posterior breaches. Because Annex 14-C only applies prospectively in respect of the offer to arbitrate and of Section B of NAFTA, and not in respect of the substantive provisions of Section A, in both cases, the treaty was not applicable at the time of the breach and the tribunal consequently lacks jurisdiction." *TC Energy Corp. et al v. United States of America*, ICSID Case No. ARB/21/63, Award, July 12, 2024, ¶ 207.

[176]    Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001, **RL-0001**.

[177]    Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001, p. 57. **RL-0001**.

[178]     Memorial on Jurisdiction, ¶ 80-81.

[179]    In this regard, the ordinary meaning of the larger phrase, "*a claim ... alleging a breach of an obligation under: ... Section A of NAFTA Chapter 11*," simply refers to a *claim* that alleges such a breach, that is, a breach that takes place while the Section A obligation is binding on the State Parties. The ordinary meaning of the full phrase —"*Each Party consents, with respect to a legacy investment, to the submission*

123.    The tribunal in *TC Energy v. United States* recently interpreted Annex 14-C in the very same way,[180] with the majority holding:

> In the ordinary meaning of its terms, Annex 14-C therefore operates to establish consent to arbitrate certain claims: the intention of the State parties was to allow the submission to arbitration, after 30 June 2020, of claims for breaches of an obligation under Section A. This, however, does not imply that they also agreed to extend Section A itself. This is perfectly understandable in the context of the transition between NAFTA and USMCA. Pursuant to Article 70(1) VCLT, the termination of a treaty releases the parties from any obligation to further perform the treaty. That applies to the substantive provisions of the treaty as well as to an offer to arbitrate contained in the treaty. Consequently, absent any transitory provision, the termination of NAFTA would have had the consequence not only that its substantive provisions would no longer be applicable past 30 June 2020, but also that investors would no longer be able to accept the offer to arbitrate contained in Section B, irrespective of the date of the alleged breach. As correctly noted by Prof. Schreuer, the USMCA parties could have agreed to make an exception to that general rule by extending the offer to arbitrate, by extending the substantive provisions of NAFTA, or both. The ordinary terms of Annex 14-C indicate that they agreed to extend the offer to arbitrate. They did however not agree to also extend Section A.
>
> \*    \*    \*
>
> [T]he meaning resulting from its Article 31 analysis is not ambiguous, obscure, absurd or unreasonable. Rather, the general rule leads to the conclusion that the USMCA parties intended through Paragraph 1 of Annex 14-C to ensure that, for a period limited to three years, holders of legacy investments could arbitrate under Section A of Chapter 11 claims resulting from breaches of Chapter 11 that occurred prior to the termination of NAFTA…
>
> From a general perspective, the Claimants' applicable law theory cannot lead to a different conclusion than that reached by the Tribunal based on an interpretation of Annex 14-C. This is because the agreement to arbitrate resulting from the acceptance of an offer contained in a treaty cannot have a broader scope than the offer to arbitrate itself. If the USMCA parties did not agree to extend Section A beyond 30 June 2020, the Claimants cannot have agreed by way of the Request for Arbitration to arbitrate claims based on events post-dating 30 June 2020. …[181]

---

*of a claim to arbitration … alleging breach of an obligation under: … Section A of NAFTA Chapter 11"*—simply adds the State Parties' *consent*, with respect to a Legacy Investment, to the arbitration of such a claim. This text is completely silent on the "temporality" of the obligations under Section A. It neither addresses nor establishes the period of time when those obligations are binding on the State Parties.

[180]    *TC Energy Corp. et al v. United States of America*, ICSID Case No. ARB/21/63, Award, July 12, 2024, ¶ 142 ("The point of interpretation at stake goes to the terms "breach of an obligation under Section A of Chapter 11": do these terms refer to obligations existing under Chapter 11 while NAFTA was into force, or did the USMCA parties agree that these obligations would continue to exist after 30 June 2020 in respect of legacy investments?"). **RL-0076.**

[181]    *TC Energy Corp. et al v. United States of America*, ICSID Case No. ARB/21/63, Award, July 12, 2024, ¶¶ 142, 179. **RL-0076.**

124.    Likewise, the Westmoreland Coal Company v. Canada tribunal confirmed that Annex 14-C "offers investment protection for breaches preceding the USMCA that occurred while NAFTA was still in force."[182]

### b.   The Context of the Provisions

125.    The "context" for purposes of treaty interpretation includes *i)* the text of the treaty, including its preamble and annexes, *ii)* any agreement or instrument relating to the treaty made in connection with its conclusion, *iii)* any subsequent agreement between the parties regarding the interpretation of the treaty; and *iv)* any relevant rules of international law applicable in the relations between the parties.[183] Viewed in its context, Annex 14-C establishes the consent of the parties to arbitrate claims for breaches of obligations under Section A without extending those obligations beyond the life of NAFTA. Below are nine relevant points of context that all support Mexico's interpretation.

126.    *Point 1.*  The first point of supporting context is the USMCA Protocol mentioned above. The Protocol states clearly that the provisions of NAFTA were superseded when the USMCA came into force.

> 1. Upon entry into force of this Protocol, the USMCA, attached as an Annex to this Protocol, shall supersede the NAFTA, without prejudice to those provisions set forth in the USMCA that refer to provisions of the NAFTA.

127.    The Claimants argue that the terms "without prejudice" in the USMCA Protocol "carves out certain articles of NAFTA from being superseded," including the "three-year Transition Period" established in Annex 14-C.[184] That is incorrect. The "without prejudice" language does not extend the application of any article past the termination of the NAFTA. It simply means that the USMCA text may rely on the NAFTA provisions in whatever way the USMCA Parties intend.[185] For example, Annex 14-C establishes that the USMCA Parties <u>consent to arbitrate</u> claims arising under Section A, Chapter XI. It does not "carve out" Section A from being superseded by

---

[182]    *Westmoreland Coal Co. v. Canada (III)*, ICSID Case No. UNCT/23/2, Award, December 17, 2024, ¶ 143. **RL-0055**.

[183]    VCLT, Article 31.1. **RL-0042**

[184]    Counter-Memorial on Jurisdiction, ¶¶ 213-216.

[185]    This is consistent with the definition of "without prejudice" put forth by the Claimants: "If a decision or action is made without prejudice to a right or claim, it is made without having an effect on that right or claim." Counter-Memorial on Jurisdiction, ¶ 214.

the USMCA as the Claimants suggest. The references to Section A give meaning to the consent established, which is consistent with the "without prejudice" language in the USMCA Protocol.

128.    *Point 2.*  A second point of supporting context comes from paragraphs 4 and 5 of Annex 14-C, which read:

> 4. For greater certainty, an **arbitration** initiated pursuant to the submission of a claim **under paragraph 1** may proceed to its conclusion in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994, the Tribunal's jurisdiction with respect to such a claim is not affected by **the expiration of consent referenced in paragraph 3**, and Article 1136 (Finality and Enforcement of an Award) of NAFTA 1994 (excluding paragraph 5) applies with respect to any award made by the Tribunal.

> 5. For greater certainty, an **arbitration** initiated pursuant to the submission of a claim **under Section B of Chapter 11 (Investment) of NAFTA 1994 while NAFTA 1994 is in force** may proceed to its conclusion in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994, the Tribunal's jurisdiction with respect to such a claim is not affected by **the termination of NAFTA 1994**, and Article 1136 of NAFTA 1994 (excluding paragraph 5) applies with respect to any award made by the Tribunal.

129.    The use of the word "arbitration" in the first sentence of each paragraph further confirms that the purpose of Annex-14 is to offer consent to arbitration rather than extend the substantive provisions of Section A. The rest of paragraphs 4 and 5 further establish this same meaning. Paragraph 5 refers to the arbitrations initiated "while NAFTA 1994 is in force." By contrast, paragraph 4 refers to arbitrations under paragraph 1 of Annex-14-C, meaning arbitrations initiated after NAFTA terminated. Read together, the Treaty Parties intended to draw a line between arbitrations initiated before and after the USMCA entered into force. That line would be meaningless if Section A's obligations extended beyond the life of NAFTA, and paragraph 5 would be redundant from paragraph 4.

130.    *Point 3.* A third point of supporting context comes from the other obligations referenced in paragraph 1, namely Article 1503(2) and 1502(3)(a). These two articles generally require the NAFTA Parties to "act in a manner that is not inconsistent with" other parts of *NAFTA*. Article 1502(3)(a) even requires the Parties to comply with *all* their obligations under NAFTA. If Claimants position were correct, and paragraph 1 extends the obligations identified in (a)-(c), including NAFTA Articles 1502(3)(a) and 1503(2), then pursuant to those two articles, the USMCA Parties would be required comply with *all* their obligations under NAFTA for an additional three years despite the fact that the NAFTA terminated. In other words, Claimants' interpretation extends all NAFTA for three years. That is also nonsensical and is not correct.

131.    *Point 4.*  A fourth point of context arises from the fact that the USMCA Parties have all agreed that the substantive protections of Section A ended when NAFTA terminated.[186] This agreement represents an "authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation."[187]

132.    *Point 5.* A fifth point of context is Article 14.2(3) of the USMCA, which provides that: "this Chapter, except as provided for in Annex 14-C (Legacy Investment Claims and Pending Claims) does not bind a Party in relation to an act or fact that took place or a situation that ceased to exist before the date of entry into force of this Agreement." By setting out Annex 14-C as the exception, Article 14.2(3) clarifies that Annex 14-C binds the State Parties in relation to acts or facts that took place and situations that ceased to exist *before* the USMCA entered into force – that is, while the NAFTA was still in force, prior to its termination on July 1, 2020.

133.    The Claimants argue that Article 14.2(3) means that Annex 14-C extends Section A to acts or facts that took place after the USMCA came into force. That is incorrect. Article 14.2(3) does not address any acts or facts taking place after the USMCA came into force. Therefore, *a contrario sensu*, only the Parties are bound after the entry into force of the USMCA. The fact that Annex 14-C is set out as the exception does not change the scope of Article 14.2(3).

134.    *Point 6.* A sixth point of context comes from the "relevant rules of international law applicable in the relations between the parties." This includes the rule of intertemporal law under ILC Article 13 and its commentary,[188] according to which a state does not breach an obligation under a treaty unless that obligation is binding at the time the act occurs. The rule applies even in the absence of an express statement by the treaty parties. This principle of intertemporal law is the context that supports that the ordinary meaning of the phrase "breach of an obligation under… Section A of Chapter 11" is no doubt limited to a period when Section A is binding.

---

[186]    *See generally TC Energy Corporation et al. v. United States of America (II)*, ICSID Case No. ARB/21/63, U.S. Memorial on Preliminary Objections, August 11, 2023. **RL-0089**. *See also Ruby River Capital LLC v. Canada*, ICSID Case No. ARB/23/5, Canada's Counter-Memorial on the Merits, July 15, 2024, ¶ 196 *et seq.* **RL-0090**.

[187]    ILC, Draft Articles on the Law of Treaties with commentaries (1966), p. 221 (commentary to Article 27, equivalent to Article 31 in the final text of the VCLT). **RL-0050**.

[188]    ILC, *Yearbook of the International Law* Commission, Vol. II, Part 2 (2001), U.N. Doc. A/CN.4/SER.A/2001/Add.1 (Part 2), ¶¶ 54-59, available online in: https://legal.un.org/ilc/publications/yearbooks/english/ilc_2001_v2_p2.pdf. **RL-0091**.

135.    Another relevant rule of international law is Article 70(1) of the Vienna Convention, pursuant to the termination of a treaty, "releases the parties from any obligation further to perform the treaty" unless the treaty provides, or the parties agree otherwise. There is no dispute that the NAFTA terminated upon the entry into force of the USMCA, which means that the USMCA Parties would have had to expressly except Section A of Chapter XI from that termination to keep it in force. There is no evidence that the parties had any intention of doing so. Accordingly, paragraph 1 of Annex 14-C only establishes the consent of the parties to arbitrate claims.

136.    *Point 7.* (Sic) The last point of supporting context is Footnote 20, which clarifies for purposes of claims under paragraph 1 that relevant provisions of the NAFTA "apply with respect to such a claim." (Emphasis added.) The use of the word "claim" means that NAFTA only applies in the context of a claim as opposed to a broader application to all investors operating in the host state. Claimants interpret Footnote 20 to "***not*** restrict the treaty text to measures arising before the termination of the NAFTA."[189] But that argument is premised on what the treaty does not say, rather than what it says.

137.    According to the Claimants, in footnote 21, the Parties acknowledged the possibility of "overlap" between claims under Annex 14-C and claims under Annex 14-E and then "limit[ed]" the eligibility of such claims to Annex 14-E. In their view, the potential for "overlap" suggests that claims under Annex 14-C can arise from acts that occurred after the NAFTA terminated.[190] The argument fails because there is no evidence that the Parties intended any "overlap" between claims under Annex 14-C and those under Annex 14-E.[191] The Parties acknowledged that for situations involving legacy investments, *i.e.*, investments existing at the time of termination, there may be instances where a dispute involves claims that arise both before and after the NAFTA terminates. That is not an overlap. Footnote 21 addresses those instances and instructs investors to file claims under Annex 14-E.

---

[189]    Counter-Memorial on Jurisdiction, ¶ 218. (emphasis in the original).

[190]    Counter-Memorial on Jurisdiction, ¶ 220.

[191]    *See TC Energy Corporation y TransCanada Pipelines Limited c. Estados Unidos de América*, Caso CIADI No. ARB/21/63, Mexico's submission pursuant to Article 1128 of NAFTA, September 11, 2023, ¶ 14. **RL-0092**. *Ruby River Capital LLC c. Canada*, Affaire CIRDI No. ARB/23/5, Contre-Mémoire sur le fond et Mémoire sur la Compétence, 15 Juillet 2024, ¶ 216. **RL-0090**.

138.    *Point 8.* Article 34.1. of the USMCA (Transitional Provisions of NAFTA 1994) clearly states that some parts of NAFTA continue. For example, the continuation of NAFTA Chapter XIX. In contrast, Article 34.4 says nothing about NAFTA Chapter XI. Therefore, it is clear that, if the Parties had wanted to extend NAFTA Chapter XI, they could have done so in Article 34.4, but did not do so.[192]

139.    *Point 9.* USMCA Chapter 14 contains annexes and appendices. The contents of Articles 14.1 to 14.17 refer to their substantive obligations and commitments, not to procedural matters. Annexes 14-A to 14-E, together with the appendices to Annex 14-D, contain clarifications and details that would apply in cases of disputes. It is clear that the procedural part of Chapter 14 of the USMCA is in its annexes. Thus, Annex 14-C deals exclusively with procedural and not substantive issues.

### c.   Object and Purpose

140.    Article 31 of the Vienna Convention provides that a "treaty shall be interpreted… *in the light of its object and purpose*."[193] The Claimants focus on the general objectives of clarity, transparency, predictability, and stability in the Preamble, while ignoring the overarching goal, which is to "replace" NAFTA with a "high standard new agreement," which includes limiting the availability of ISDS to certain investors and certain types of claims.[194] This is evident from the following uncontested facts:[195]

- Annex 14-D (the general ISDS mechanism under the USMCA) only applies between the United States and Mexico.

- Annex 14-D only allows claims for breach of national treatment, most favored nation (MFN) treatment, and direct expropriation (as per Article 14.D.3, subparagraphs

---

[192]    *See United States – Crystalline Silicon Photovoltaic Cells Safeguard Measure*, USMCA Case No. USA-CDA-2021-31-01, Final Report, February 1, 2022, ¶¶ 41-43. **RL-0095**.

[193]    VCLT, Article 31.1. **RL-0042**.

[194]    *TC Energy Corporation et al. v. United States of America (II)*, ICSID Case No. ARB/21/63, United States Reply on Jurisdiction, ¶ 75. **RL-0093**.

[195]    Memorial on Jurisdiction, ¶¶ 32-36, 45-50.

1(a)(i)(A), 1(a)(i)(B), 1(b)(i)(A) and 1(b)(i)(B)). This is a subset of the claims that could be submitted to arbitration under Chapter XI of the NAFTA.

- Access to ISDS under Annex 14-D is subject to a domestic litigation requirement of 30 months.[196]

- Annex 14-E also only applies between the United States and Mexico. Annex 14-E allows investors to submit a claim for breach of one or more of the substantive obligations in Chapter 14 of the USMCA without exhausting domestic remedies. However, this option is limited to investors with investments in certain sectors such as telecommunications and oil and gas.

141. As can be seen, the USMCA Parties obviously intended to limit access to ISDS in the USMCA. The Claimants argue that Annex 14-C was designed to "promote stability during the Transition Period." However, they offer no evidence of the intent of the Parties to create a "Transition Period" where the Section A obligations apply, nor any evidence that the Parties intended to promote "stability" by extending those obligations during a Transition Period.

### 2. The "Negotiating History" Offered by The Claimants Is Neither Applicable nor Persuasive

142. The Claimants attempt to "confirm" their interpretation of Annex 14-C pursuant to Article 32 of the Vienna Convention by presenting the "negotiating history" of the text through witness testimony of Mr. Ken Smith.[197] They then present statements purportedly made by the Parties and their negotiations after the USMCA entered into force to "confirm" Mr. Smith's testimony.[198]

143. Article 32 states:

Supplementary means of interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

---

[196]    Article 14.D.5.1 of the USMCA: "(b) the claimant or the enterprise obtained a final decision from a court of last resort of the respondent or 30 months have elapsed from the date the proceeding in subparagraph (a) was initiated…" **RL-0074**.

[197]    Counter-Memorial on Jurisdiction, ¶ 231.

[198]    Counter-Memorial on Jurisdiction, ¶ 234.

(a) leaves the meaning ambiguous or obscure; or

(b) leads to a result which is manifestly absurd or unreasonable.

144.    As shown above, Article 32 allows recourse to "supplementary means of interpretation" for two purposes only: either *i)* to confirm the meaning resulting from the application of Article 31; or *ii)* as a means to interpret text that is either ambiguous or would lead to a manifestly absurd result when read in accordance with Article 31.[199] The second purpose is not applicable here. The Claimants present Mr. Smith's testimony only to "confirm" their reading of Annex 14-C. They agree that the text is clear,[200] and they never identify any absurd results. Thus, the Tribunal can only rely on Mr. Smith's testimony to "confirm" the reading of the Claimants, which would require the Claimants to first convince the Tribunal that the plain meaning of Annex 14-C extends the substantive obligations of NAFTA. The Tribunal may not use Mr. Smith's testimony to "interpret" Annex 14-C.

145.    When offered for the limited purpose of confirmation, Mr. Smith's testimony must be approached with skepticism because it is after-the-fact evidence paid for by the Claimants to confirm their reading of Annex 14-C. None of Mr. Smith's documents establishes any type of agreement or intention among the USMCA Parties to extend Section A, leaving only his witness testimony as possible confirmatory evidence.[201] However, testimonial evidence is not contemplated under Article 32.

146.    Moreover, Mr. Smith's testimony is not persuasive and falls short of confirming the text's meaning. According to Mr. Smith, Annex 14-C (in some form) was proposed by the United States in 2017, but Mexico and Canada did not accept the proposal.[202] He states that the "legacy provisions" were finally concluded as "part of a closing package for the Investment Chapter." Still,

---

[199]    Competence of the General Assembly for the Admission of a State to the United Nations, Advisory Opinion, I.C.J. Reports 1950, P 8. ("the first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur. If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter. If, on the other hand, the words in their natural and ordinary meaning are ambiguous or lead to an unreasonable result, then, and then only, must the Court, by resort to other methods of interpretation, seek to ascertain what the parties really did mean when they used these words."). **RL-0094**.

[200]    Counter-Memorial on Jurisdiction, ¶ 231, fn. 159.

[201]    *See supra* ¶¶ 32-37.

[202]    Witness Statement of Mr. Smith Ramos, ¶ 20.

he offers no description or evidence of what the "closing package" included.[203] He then confirms the reading of the Claimants of Annex 14-C based on the *absence* of "discussion" amongst the Parties regarding whether Section A would be extended.[204] However, the absence of discussion does not demonstrate the text's plain meaning at issue. Mr. Smith identifies three different meetings in August - October 2018 when, according to his written notes, the extension of Section A was allegedly confirmed.[205] Mr. Smith never provided any evidence of these meetings, and after his witness statement, *the Claimants confirmed that these notes do not exist.*[206]

147.    In addition, Mexico has submitted additional documents that contradict Mr. Smith Ramos' statements regarding the intent of the negotiating parties.[207]

148.    Another element to consider is the USMCA Drafting Convention, which contains the guidelines for drafting the texts of the USMCA to ensure consistency in the instrument, standardize terms, and correct formatting issues, among others. It establishes that, "[a]ll of the provisions in the text should be in the active voice, not passive, which means that the Party or Parties, etc. responsible for the obligation should be clearly set out," also stating that "[i]n this Agreement, the Parties use the word 'shall' to create an obligation on a Party to act or refrain from acting."[208] In the absence of an expressly established obligation, it must be understood that such an obligation does not exist. In short, for a breach to exist, there must be a prior obligation.

149.    The non-continuance of substantive obligations was also taken up in the *United States - Crystalline Silicon Photovoltaic Cells Safeguard Measure dispute under Chapter 31 (Dispute Settlement)* Panel, which stated the following:

> In the view of the Panel, the NAFTA and the USMCA are separate treaties. Indeed, upon the entry into force of the USMCA, the NAFTA came to an end, "but without prejudice to those provisions set forth in USMCA that refer to the provisions of NAFTA." It would have been possible for the Parties to have inserted a provision in the USMCA providing for the continuation of all obligations under the NAFTA as obligations under the USMCA.

---

[203]    Witness Statement of Mr. Smith Ramos, ¶ 21.

[204]    Witness Statement of Mr. Smith Ramos, ¶ 24.

[205]    Witness Statement of Mr. Smith Ramos, ¶ 28.

[206]    Claimants requested copies of these notes in the document production phase. *See* Procedural Order 4, Annex B, Request No. 14. The Claimants responded to the request, saying: "For the avoidance of doubt, Mr. Smith does not maintain other documentation relating to the negotiating history relevant to this dispute."

[207]    *See supra* ¶¶ 36-37.

[208]    Drafting Convention, point 5. "Statement of Obligations," p. 8. **R-0041**.

But they did not do so. The Parties created self-standing USMCA obligations even though such obligations were stated in "identical or nearly identical form" to obligations under NAFTA. Where the Parties wanted to carry over specific the NAFTA obligations, such as NAFTA Chapter Nineteen, they did so explicitly in Article 34.

Equally, the Panel does not consider that the reference in Article 34.1 to "the importance of a smooth transition from NAFTA to CUSMA" implies continuity in obligations. Regardless of the abstract meaning or dictionary definitions that might be attached to the words "smooth transition," the Panel has difficulty in seeing how they can imply the incorporation of the substantive NAFTA obligations into the USMCA. A "smooth transition" is facilitated by clarity in the obligations under the Agreement and clarity in how the Parties are to carry them out. But this is not achieved by treating the words "smooth transition" as an implicit carryover of the NAFTA obligations into the USMCA when there are no other words in the USMCA doing that.

Accordingly, the Panel takes the view that the question of whether it has jurisdiction over disputes about measures taken before the USMCA came into force cannot be resolved by an assumption of continuity of the NAFTA obligations into the USMCA.[209] [emphasis added]

### 3. The "Subsequent Practice" Establishes the Parties' Agreement regarding the Interpretation of Annex 14-C.

150.    For the subsequent practice of the Parties to be equivalent to an authentic interpretation of the provisions of a treaty, it needs to reflect the "common understanding of the parties as to the meaning of the terms."[210] In this regard, the Tribunal in *Kappes v. Guatemala* noted that "a demonstration that all the State Parties to a particular treaty had expressed a common understanding, albeit through separate submissions in separate cases, could be compelling evidence of subsequent practice."[211] Similarly, in *Methanex v. United States*, the Tribunal considered that submissions by non-disputing parties (NDPs) serve as evidence of the Parties' intent and interpretative guidance to clarify the treaty text.[212]

151.    According to the ILC itself, declarations by the parties to a treaty are valid as subsequent practice, even if they are made in the context of legal disputes:

---

[209]    United States – Crystalline Silicon Photovoltaic Cells Safeguard Measure, USMCA Case No. USA-CDA-2021-31-01, Final Report, February 1, 2022, ¶¶ 41-43. **RL-0095**.

[210]    ILC, *Draft Conclusions on Subsequent Agreements and Subsequent Practice in relation to the Interpretation of Treaties, with commentaries (2018)* II (2) YBILC, ('ILC Draft Conclusions with commentaries'), commentary to Conclusion 3, ¶ 10. **RL-0059**.

[211]    *Kappes v Guatemala*, ICSID Case No. ARB/18/43, Decision on Respondent's Objection to Jurisdiction, March 13, 2020, ¶156. **RL-0096**.

[212]    *Methanex Corporation v. United States of América*, UNCITRAL Case, Final Award on Jurisdiction on Meritos, August 3, 2005, ¶ 21. **RL-0097**.

> Subsequent practice under article 31, paragraph 3 (b), must be conducted "in the application of the treaty." This **includes** not only official acts at the international or at the internal level that serve to apply the treaty, including to respect or to ensure the fulfilment of treaty obligations, but also, inter alia, official statements regarding its interpretation, such as statements at a diplomatic conference, **statements in the course of a legal dispute**, or judgments of domestic courts; official communications to which the treaty gives rise; or the enactment of domestic legislation or the conclusion of international agreements for the purpose of implementing a treaty even before any specific act of application takes place at the internal or at the international level.[213]

152.    Another tribunal that has also recognized the validity of the Parties' harmonized statements as evidence of subsequent practice was *The Canadian Cattlemen for Fair Trade v. United States*, which noted that "statements on the [arbitration] before [the] Tribunal and elsewhere" constitute "evidence of a sequence of facts and acts that amount to a practice that is concordant, common and consistent. The Tribunal is of the view that this is a 'subsequent practice' within the meaning of Article 31[3][c] ."[214]

153.    In this regard, it is pertinent to recall the non-disputing Party submission of the United States in *Legacy Vulcan v. Mexico*, regarding that Annex 14-C only allows claims for NAFTA violations that occurred before the entry into force of the USMCA, emphasizing also that upon termination of NAFTA, the Parties did not explicitly or implicitly preserve the substantive obligations of Section A,[215] a position that the Respondent also took in *Westmoreland v. Canada (III)*.[216]

154.    In this regard, the three Parties to NAFTA and the USMCA have consistently confirmed and defended their agreement on this position: the non-extension of the substantive obligations of Section A of NAFTA Chapter XI during the transition period. In addition to this arbitration, the Parties have presented their position similarly in the following cases: *Access Business Group, LLC*

---

[213]    ILC, *Draft Conclusions on Subsequent Agreements and Subsequent Practice in Relation to the Interpretation of Treaties, with Commentaries*, UN Doc. A/73/10 (2018)., ¶ 18 (added emphasis). **RL-0059**.

[214]    *Canadian Cattlemen for Fair Trade v. United States of America*, NAFTA/UNCITRAL, Award on Jurisdiction, January 28, 2008, ¶ 189. **RL-0058**.

[215]    *Legacy Vulcan, LLC v. United Mexican States,* ICSID Case No. ARB/19/1, Second Submission of the United States of America, July 21, 2023. **RL-0098**.

[216]    *Westmoreland Coal Company v. Canada III*, ICSID Case No. UNCT/23/2, Submission of the United Mexican States, April 10, 2024, ¶¶ 3, 5, 7. **RL-0099**.

*v. Mexico*, ICSID Case No. ARB/23/15;[217] *TC Energy Corporation and TransCanada Pipelines Limited v. United States*, ICSID Case No. ARB/21/63;[218] *Coeur Mining, Inc. v. Mexico*, ICSID Case No. UNCT/22/1 (Coeur Mining);[219] *Legacy Vulcan, LLC v. Mexico*, ICSID Case No. ARB/19/1 (Legacy Vulcan);[220] *AMERRA Capital Management et al v. Mexico*, ICSID Case No. UNCT/23/21 (Amerra Capital);[221] *Ruby River Capital LLC v. Canada*, ICSID Case No. ARB/23/5 (Ruby River);[222] *Alberta Petroleum Marketing Commission v United States*, ICSID Case No. UNCT/23/4,[223] and *Westmoreland Coal Company v. Canada*, ICSID Case No. UNCT/23/2.[224]

155.    Based on the foregoing, the Tribunal lacks jurisdiction *ratione voluntatis* over the claim.

### E.    Objection 5: The Tribunal Lacks Jurisdiction *Ratione Materiae*: The Claimants Have Not Demonstrated that They Have an Investment Within the Meaning of Article 25 of The ICSID Convention.

#### 1.    Article 1139 does not conflict with Article 25 of the ICSID Convention.

156.    The Claimants have the burden of proof to demonstrate that they can initiate arbitration against Mexico under Article 25 of the ICSID Convention and have failed to meet this burden. As the Respondent emphasized in the Memorial on Jurisdiction, in the Request for Arbitration,

---

[217]    *See Access Business Group LLC v. United Mexican States* (ICSID Case No. ARB/23/15)*, Submission of Canada pursuant NAFTA Article 1128, March 28 2025. **RL-0130**. *Access Business Group LLC v. United Mexican States* (ICSID Case No. ARB/23/15)*, Submission of the United States of America pursuant NAFTA Article 1128, March, 28 2025. **RL-0075**.

[218]    *TC Energy Corporation y TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Mexico´s Submission pursuant to Article 1128 of NAFTA, September 11, 2023, ¶¶ 3-7. **RL-0092.**

[219]    *Coeur Mining, Inc. c. Estados Unidos Mexicanos,* Caso CIADI No. UNCT/22/1, Submission of the United States of America, 12 de febrero de 2024, ¶¶ 2-6. **RL-0018**.

[220]    *Legacy Vulcan, LLC v. Estados Unidos Mexicanos, ICSID Case No. ARB/19/1,* Submission of the United States of America, June 7, 2021, pursuant NAFTA Article 1128, ¶¶ 23-25. **RL-0127**.

[221]    *See:* https://icsid.worldbank.org/cases/case-database/case-detail?CaseNo=UNCT/23/1.

[222]    *Ruby River Capital LLC v. Canada*, ICSID Case No. ARB/23/5, Canada's Counter-Memorial on the Merits, July 15, 2024, ¶¶ 196-197 **RL-0090**.

[223]    *Alberta Petroleum Marketing Commission v. United States of America (ICSID Case no. UNCT/23/4,* Submission of Canada pursuant NAFTA Article 1128, January 15, 2025, ¶¶ 4-9. **RL-0128**. *Alberta Petroleum Marketing Commission v. United States of America (ICSID Case no. UNCT/23/4,* Submission of United Mexican States pursuant NAFTA Article 1128, January 15, 2025, ¶¶ 3-6. **RL-0129**.

[224]    *Westmoreland Coal Company v. Canada III, Caso CIADI No. UNCT/23/2,* Submission of the United Mexican States, April 10, 2024, pursuant NAFTA Article 1128, ¶ 7. **RL-0099**.

Claimants argued that they were submitting their request under such Article.[225] Now, the Claimants argue that the terms of Article 25 do not apply.

157. The Claimants contend that the analysis to determine whether there is jurisdiction *ratione materiae* is restricted to NAFTA Article 1139, so it is not necessary to demonstrate the risk or contribution to the State's economic development of the Claimants' alleged investment.[226]

158. The Claimants argue that under NAFTA Article 1120, the ICSID Convention governs only except as modified by Section B of Chapter XI.[227] The Respondent emphasizes that the applicable rules are those provided by the ICSID Convention, because that was the option that the Claimants chose to submit their request for arbitration under Article 1120. Thus, Article 25 also imposes requirements that must be demonstrated to assert that the Tribunal has jurisdiction. These rules do not conflict with Chapter XI, but rather complement Chapter XI.

159. Specifically, there is no "conflict between the conception of investment in Article 25 of the ICSID Convention,"[228] and the definition of investment in Article 1139. Moreover, "the open-textured nature of the standard formulation in investment treaties preserves the ordinary meaning of the term 'investment' and therefore its consistency with the characteristics that must be attributed to the same term as employed in Article 25 of the ICSID Convention."[229]

160. According to the Claimants, NAFTA tribunals have decided that the analysis for determining whether an investment is covered is limited to Article 1139. However, the Claimants cite cases that did not involve Article 25 of the ICSID Convention in conjunction with Article 1139.[230] *Apotex v. United States* and *Grand River v. United States* are cases under the Arbitration Rules of the United Nations Commission on International Trade Law. *Waste Management (II) v.*

---

[225]    Memorial on Jurisdiction, ¶ 93.

[226]    Counter-Memorial on Jurisdiction, ¶ 243, c.

[227]    Counter-Memorial on Jurisdiction, ¶ 243, b.

[228]    *See* Zachary Douglas, *The International Law of Investment Claims*.1ª ed., 2009. ("¶ 344. It is difficult to conceive of a hypothetical conflict between the conceptions of an investment in Article 25 of the ICSID Convention and an investment treaty because the use of the term 'investment' in both instruments imports the same basic economic attributes of an investment derived from the ordinary meaning of that term […]"). **RL-0002**.

[229]    *See* Zachary Douglas, *The International Law of Investment Claims*, (1ª ed., 2009, ¶ 343). **RL-0002**.

[230]    *See* Counter-Memorial on Jurisdiction, ¶ 251, n 180.

*Mexico* and *LMC v. Mexico* are cases under the ICSID Additional Facility Rules.[231] In footnote 183, the Claimants also claim to cite cases that were decided based on NAFTA Article 1139, but this is incorrect.[232] *Salini v. Morocco* and *Abaclat v. Argentine* are evidently not NAFTA cases.

161.    According to the Claimants, meeting the four elements of the so-called *Salini* test is tantamount to limiting the Parties' agreement on the definition of investment.[233] However, ICSID tribunals typically apply a two-pronged test to determine whether the claimants have an investment under the ICSID Convention and the applicable investment agreement or treaty.[234] As explained above, there is no contradiction between NAFTA Article 1139 and Article 25 of the ICSID Convention. Once the Claimants chose to bring their claim under the ICSID Convention Rules, they were bound by the requirements of the ICSID Convention, including Article 25.

162.    If the Claimants' proposal to isolate the investment test under Article 1139 were to be taken, the *effet utile* of Article 25 would be eliminated. In the words of the executive directors of the ICSID Convention "[w]hile consent of the parties is an essential prerequisite for the jurisdiction of the Centre, consent alone will not suffice to bring a dispute within its jurisdiction. In keeping

---

[231]    Mexico did not become a party to the ICSID Convention until August 26, 2018. *See:* https://icsid.worldbank.org/about/member-states/database-of-member-states/member-state-details?state=ST195

[232]    *See* Counter-Memorial on Jurisdiction, ¶ 251, n 183.

[233]    Counter-Memorial on Jurisdiction, ¶ 254.

[234]    *Muhammet Çap & Sehil Inşaat Endustri ve Ticaret Ltd. Sti. v. Turkmenistan*, ICSID Case No. ARB/12/6, Award, May 4, 2021, ¶ 665 ("The issue to be determined here is whether the Tribunal has jurisdiction *ratione materiae* over the dispute, i.e. do Claimants' claims arise out of an '*investment*' under Article 25 ICSID Convention and Article I(2) BIT…"). **RL-0103**. *Krederi Ltd. v. Ukraine*, ICSID Case No. ARB/14/17, Award, July 2, 2018, ¶ 243 ("It is well-established that in addition to fulfilling the jurisdictional requirements of Article 25 ICSID Convention, an investment tribunal must assure itself that an investment meets the jurisdictional requirements of the applicable BIT or IIA, pursuant to what has been referred to as the so-called double-barrelled test in ICSID cases…") (foot notes omitted). **RL-0105**. *Koch Minerals Sàrl and Koch Nitrogen International Sàrl v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/19, Award, October 30, 2017, ¶ 6.50 ("The Tribunal accepts the Respondent's submission that KNI must satisfy the definitions of 'investment' in both the Treaty and the ICSID Convention…"). **RL-0123**. *Phoenix Action Ltd v. Czech Republic*, ICSID Case No. ARB/06/5, Award, April 15, 2009, ¶ 74 ("It is common ground … that the jurisdiction of the Tribunal is contingent upon the fulfillment of the jurisdictional requirements of both the ICSID Convention and the relevant BIT … 'a finding that the Contract satisfied the definition of 'investment' under the BIT would not be sufficient for this Tribunal to assume jurisdiction, if the Contract failed to satisfy the criterion of an 'investment' within the meaning of Article 25." (foot notes omitted). **RL-0124**.

with the purpose of the Convention, the jurisdiction of the Centre is further limited by reference to the nature of the dispute and the parties thereto."[235]

## 2. The Notes do not meet the *Salini* test criteria.

163.    For the Claimants, the *Salini test* criteria should be applied flexibly.[236] The Respondent considers that the test must be strictly complied with because consent is extremely important and tribunals must take extreme care to confirm their jurisdiction.[237] ICSID Article 25 is a specific provision for determining the consent and jurisdiction of the tribunal, so it is not possible to lower the standard as proposed by the Claimants. The *Salini* test contains legally relevant criteria.[238]

164.    Moreover, the four criteria of this test: contribution, duration, risk and contribution to the economic development of the host State may be closely related, must be examined in their totality, and depend on the circumstances of each case. As determined by the tribunals in *Noble Energy v. Ecuador* and *Jan de Nul v. Egypt*, a full analysis of the circumstances of the alleged investments is required.[239] Precisely, the circumstances in this case demonstrate that the Notes cannot be considered as protected investments, because there is no contribution, nor did they assume any risk, much less any contribution to the State.

165.    First, the only contribution that the Claimants can claim to have made is to perform the duties of an investment manager.[240] These are not the type of contributions required by Article 25. The Claimants must have committed financial or economic resources "to acquire [an] asset or enhance its value, coupled with an expectation or desire that the asset will produce a return over a period of time, with the possibility or risk that it may not do so (with the result that the contribution

---

[235]    *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States,* March 18, 1965, ¶ 25. **RL-0125.**

[236]    Counter-Memorial on Jurisdiction, ¶ 255.

[237]    S*ee Abaclat and others v. Argentine Republic, ICSID Case No. ARB/07/5,* Dissenting Opinion of Professor Georges Abi-Saab on the Decision on Jurisdiction and Admissibility, October 28, 2011, ¶¶ 7-8. **RL-0046.**

[238]    *See RENERGY S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/14/18, Award, May 5, 2022, ¶ 562. **RL-0100.**

[239]    *Noble Energy, Inc. y Machalapower Cia. Ltda. c. La República de Ecuador y Consejo Nacional de Electricidad*, Caso CIADI No. ARB/05/12, Decisión sobre Jurisdicción, 5 de marzo de 2008, ¶ 128. **RL-0101** *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, June 16, 2006, ¶ 91. **RL-0102.**

[240]    *See* Counter-Memorial on Jurisdiction, ¶¶ 30, 282.

might be forfeited in part or in whole)."[241] Neither Cyrus nor Contrarian contributed any capital for the acquisition of the Notes.[242] In the case of Contrarian, Sandpiper did not make any payment to acquire its Notes. On March 13, 2023, Contrarian Markets transferred "free of payment" its Notes to Sandpiper. Clearly, Sandpiper also did not make any contribution to acquire the Notes.[243]

166.    Second, *in arguendo*, the Claimants argue that the Notes meet the test because they involve a risk.[244] Respondent has pointed out that the Notes only involve a commercial risk, but not an investment risk,[245] because Claimants would know, in theory, exactly the date and time they would receive the return on their investment, as well as the amount of the 8.25%.[246] This fact is not disputed by the Claimants. Not only this, the Noteholders acquired the Notes once TV Azteca had already stopped paying interest. Therefore, the Claimants did not assume any risk for the potential default of TV Azteca.

167.    The Respondent emphasizes that neither the Claimants nor the Noteholders acquired the Notes under the risk that the value of the Notes would decrease, as they allege, following TV Azteca's Final Offering, "the trading price of the notes may diminish and investors may lose their investment in whole or in part."[247] In reality, the risk that the Notes might decrease in value had already occurred at the time Opportunities and Sandpiper acquired the Notes. Therefore, there was never a "participation in the risk of the transaction."[248]

168.    Third, the Claimants make no attempt to prove that there was any contribution to the economic development of the State and do not do so simply because there was none.[249] The Notes

---

[241]    *Komaksavia Airport Invest Ltd. v. Republic of Moldova*, SCC Case No. EA 2020/074, Award, August 3, 2022, ¶ 167. **RL-0015**.

[242]    *See* Section III. B. 1, The Claimants Are Not Investors Under NAFTA.

[243]    Counter-Memorial on Jurisdiction, ¶ 38. Contrarian Emerging Markets, L.P. May 13, 2023 Transfer. **C-0018**.

[244]    Counter-Memorial on Jurisdiction, ¶¶ 256-259.

[245]    Memorial on Jurisdiction, ¶ 95.

[246]    Memorial on Jurisdiction, ¶ 96.

[247]    Counter-Memorial on Jurisdiction, ¶ 258.

[248]    *See Salini Costruttori S.P.A. and Italstrade S.P.A. v Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, July 16, 2001, ¶ 52. **RL-0022**.

[249]    Nor did they make any reference to the lack of territorial nexus between the alleged investments and Mexico. Thus, the Claimants concede that their sale in Singapore does not meet the necessary territorial nexus.

were acquired in the secondary market, which is simply the "[...] transfer of ownership from one person to another, which has no effect on the company's cash [TV Azteca], assets, or operations [....]."[250]

169.    In sum, the Claimants have failed to demonstrate that they meet the requirements of the *Salini test* in terms of Article 25 of the ICSID Convention, which must be read in conjunction with NAFTA Article 1139 as containing legally relevant criteria.

> **F.    Objection 6: The Tribunal Lacks Jurisdiction *Ratione Temporis* Over Contrarian's Claim and Part of Cyrus' Claim Because the Alleged Denial of Justice Occurred Before Sandpiper Acquired All of Its Notes and Before Opportunities Acquired Some of Its Notes.**

170.    Mexico established in its Memorial that for the Tribunal to have jurisdiction *ratione temporis*, the Claimants must have owned or controlled the Notes at the time of the alleged breach,[251] which allegedly occurred in September 2022.[252] The Claimants reject this "legal premise" but do not explain why.[253]

171.    There is no dispute that all the Notes belonging to Sandpiper (Contrarian) were acquired after September 2022.[254] Yet Claimants contend that the Notes were, at that time, held by an entity "also controlled by Contrarian" called Contrarian Markets.[255] Claimants do not explain why this

---

[250]    *See* TVA - Introduction ("[…] we acquired them in the secondary market, and currently own appx. $21.00mm principal amount. The notes do not trade in large sizes but we are slowly accumulating a larger investment."), p. 1. **R-0018**. Brealey *et al*, *Principles of Corporate Finance* ("We have explained that corporations raise money by selling financial assets such as stocks and bonds. This increases the amount of cash held by the company and the amount of stocks and bonds held by the public. These issues are known as primary issues that are sold in the primary market. But in addition to helping companies to raise cash, financial markets also allow investors to trade stocks or bonds among themselves… […] The result is simply a transfer of ownership from one person to another, which has no effect on the company's cash, assets, or operations. Such purchases and sales are known as secondary transactions and they take place in the secondary market […]"), p. 354. **RL-0106**.

[251]    Memorial on Jurisdiction, ¶¶ 109-115.

[252]    *See* Request for Arbitration, ¶¶ 82, 87 ("By denying the Claimants an opportunity to be heard prior to issuing the Injunction, the Mexican court unquestionably denied the Claimants fair and equitable treatment in accordance with the customary international law principles of due process, thus violating Mexico's obligations under the Minimum Standard of Treatment requirement of Article 1105."). *See also* Counter-Memorial on Jurisdiction, ¶ 45.

[253]    Counter-Memorial on Jurisdiction, ¶ 264.

[254]    Memorial on Jurisdiction, ¶ 116.

[255]    Counter-Memorial on Jurisdiction, ¶ 263.

is relevant given that *i)* they claim to be investors through their alleged control of Sandpiper,[256] while *ii)* Sandpiper admitted to not holding any Notes in September 2022. In the absence of an explanation, Claimants have not met their burden of proof.[257]

172.    As for Cyrus, Mexico established in the Memorial that some of the Notes belonging to Opportunities were acquired in October and November 2022.[258] The Claimants do not dispute this point. Instead, they seem to contend that jurisdiction *ratione temporis* exists over all the Notes because it exists over some of the Notes. That is incorrect and the Claimants do not offer any legal support for that contention.

173.    Opportunities acquired the Notes piecemeal. Prior to acquiring the Notes in October and November 2022, those Notes were not protected by the rights of Claimants under NAFTA. In other words, those Notes were not protected when the alleged breach occurred in September 2022. Moreover, the Notes acquired in October and November were not protected under Article 1105, which requires the Parties "to accord *to investments* of investors of another Party treatment in accordance with international law."

### G.    Objection 7: The Claimants Did Not Submit the Waiver as Required by NAFTA Article 1121 and Therefore the Tribunal Lacks Jurisdiction *Ratione Voluntatis*.

174.    As explained in the Memorial on Jurisdiction, NAFTA Article 1121 sets forth the pre-conditions to the submission of a claim to arbitration. Pursuant to paragraphs 1(b) and 2(b) of that Article, one of the conditions is the requirement to submit waivers of the right to "initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is

---

[256]    Request for Arbitration, ¶ 21-22.

[257]    To the extent relevant, the evidence does not establish that Contrarian exercised control over Contrarian Markets in September 2022. Contrarian is the investment manager of Contrarian Markets (Counter-Memorial on Jurisdiction, ¶ 36). Any purported "control" over the Notes exercised by Contrarian in September 2022 was based on an agreement between Contrarian and Contrarian Markets, which is subject to modification or termination, at any time, by Contrarian Markets. In other words, the control exercised by Contrarian is at the will of Contrarian Markets. Accordingly, Contrarian did not exercise sufficient control over Contrarian Markets in September 2022. *See* Section II.B Cyrus and Contrarian are investment managers and do not control Opportunities and Sandpiper, supra.

[258]    Memorial on Jurisdiction, ¶ 117.

alleged to be a breach." This requirement must be met by both the investor and any enterprise on whose behalf a claim is submitted to arbitration.

175.    In this case, the Claimants have failed to comply with the requirement to submit a waiver as required by the NAFTA since *i)* they limit the scope of the waivers submitted only to "the right to bring any claim against the presiding judge or other officials of the Superior Court of Justice of Mexico City that seeks any damages for the breach of its due process rights, and those of the noteholders under its control, in connection with the issuance of an ex parte injunction in file no. 995/2022 itself."[259]

176.    As will be noted below, the defects of a waiver cannot be remedied without the express consent of the Respondent. Thus, contrary to the Claimants' contention in their Counter-Memorial on Jurisdiction, the Claimants did not submit a waiver as required by NAFTA Article 1121, which has the direct consequence that the Tribunal lacks jurisdiction *ratione voluntatis*.[260]

### 1.    The State's Consent and The Tribunal's Jurisdiction *Ratione Voluntatis* Are Subject to The Fulfillment of the Following Preconditions

177.    Contrary to what happens in domestic judicial proceedings where a State adopts its jurisdiction, in investment arbitration tribunals acquire their jurisdiction from the mutual consent of the parties. Without such unequivocal consent, any decision or award rendered by a tribunal would be subject to challenge and annulment for manifest excess of powers.[261] Compliance with the preconditions limiting the consent of the Parties is not a mere formality. It is the only way to ensure that a tribunal has jurisdiction to arbitrate a dispute and that its decision or award will be valid and binding on the parties.

---

[259]    Cyrus Capital Partners waiver. **Exhibit 6**. Contrarian Capital Management waiver. **Exhibit 7**.

[260]    Counter-Memorial on Jurisdiction, ¶ 265; Memorial on Jurisdiction, ¶¶ 118-125.

[261]    *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais, ICSID Case No. ARB/81/2,* Decision rendered by the Ad Hoc Committee on the Application for Annulment, May 3, 1985, ¶ 4. **RL-0107**. Cited in *CMS Gas Transmission Company c. República Argentina*, Caso CIADI No. ARB/01/8, Extracts from the Decision of the Ad Hoc Committee on Annulment of the Republic of Argentina, 25 de septiembre de 2007, ¶ 47. **RL-0108**.

178.    Indeed, it is common practice for States to condition their consent on a claimant party's strict compliance with the preconditions and other requirements set out in the relevant treaty.[262] Such conditions —such as waiting periods or waiver of rights to initiate or pursue further proceedings— far from being arbitrary obstacles, are an intrinsic part of the State's offer of arbitration that a claimant party must accept in order to shape the State's consent. The Respondent is emphatic that this offer cannot be unilaterally modified by a claimant party or a tribunal since it derives from a sovereign decision of the Parties to a treaty.

179.    The Respondent has already explained that in the specific case of NAFTA, consent to resolve a dispute through arbitration is set out in Article 1122(1). This consent is not unconditional and requires that the claim be submitted "in accordance with the procedures set out in this Agreement," including the conditions precedent to the submission of a claim to arbitration set out in Article 1121.[263]

180.    NAFTA tribunals have recognized that preconditions must be met to determine the tribunal's jurisdiction. In the words of the tribunal in *Waste Management I*:

> NAFTA Article 1121 allows a disputing investor to submit to arbitration proceedings, "only if" certain requirements are met, generally speaking, consent and waiver of certain rights.[264]

181.    The Claimants argue that the cases cited by the Respondent in support of its position are inapplicable simply because "claimants in those cases initiated or continued legal actions against the host States in parallel with NAFTA investment arbitration or reserved the right to initiate further litigation against the host State following the conclusion of the investment treaty

---

[262]    *See* For example Articles 14.D.4 Consent to Arbitration and 14.D.5 Conditions and Limitations on Consent of the USMCA ("Each Party to the Annex consents to the submission of a claim to arbitration under this Annex and in accordance with this Agreement" and "No claim shall be submitted to arbitration under this Annex unless [...] the notice of arbitration is accompanied: (i) for claims submitted to arbitration under Article 14. .1(a) (Submission of a Claim to Arbitration), with the claimant's written waiver, and [...]). **RL-0074**. *See also*, CPTPP Articles 9.20 and 9.21 ("Each Party consents to the submission of a claim to arbitration under this Section and in accordance with this Agreement" and "No claim shall be submitted to arbitration under this Section unless [...] the notice of arbitration is accompanied: (i) for claims submitted to arbitration under Article 9.19.1(a) (Submission of a Claim to Arbitration), with the claimant's written waiver, and [...]). **RL-0044**.

[263]    Memorial on Jurisdiction, ¶¶ 118-119.

[264]    *Waste Management c. Estados Unidos Mexicanos (I)*, Caso CIADI No. ARB(AF)/98/2, Laudo, 2 de junio de 2000, ¶ 14. **RL-0030**.

arbitration."[265] Notably, the Claimants have done something similar. By reserving the right to initiate future local proceedings, they have reserved the right to initiate additional treaty proceedings against Mexico based on the developments in the future local proceedings. In any event, Claimants' distinction is irrelevant since these other tribunals made an interpretation of the NAFTA provisions that is applicable to any dispute.

182.    In addition to the cases presented by the Respondent in its Memorial on Jurisdiction, in *Merrill & Ring Forestry v. Canada*, in deciding whether to accept an additional claimant as a party to the arbitration, the tribunal noted the importance of the protections set out in Articles 1118 to 1121 and ruled that "[they] cannot be regarded as merely procedural niceties."[266]

183.    In the same vein, the tribunal in *Canfor v. United States* noted the importance of complying with the preconditions: "the tribunal is required to interpret and apply the jurisdictional provisions, including procedural provisions of the NAFTA relating thereto, i.e., whether the requirements of Article 1101 are met; whether a claim has been brought by a claimant investor in accordance with Article 1116 or 1117; *and whether all pre-conditions and formalities under Articles 1118-1121 are satisfied.*"[267]

184.    Moreover, all three NAFTA Parties agree on the enforceability of these requirements and the consequences of non-compliance. This position has been consistently expressed in numerous submissions by non-disputing Parties under NAFTA Article 1128 in other arbitrations.

185.    In this regard, in *Mesa Power v. Canada*, the United States emphasized that NAFTA Article 1121 establishes the preconditions for submitting a claim to arbitration. It also noted that Article 1122 formalizes the consent of the Parties to arbitration in accordance with these procedural requirements. On this basis, the United States concluded that "[n]o Chapter Eleven claim may be submitted unless these procedures have been satisfied."[268] Similarly, in the same case, Mexico

---

[265]    Memorial on Jurisdiction, ¶¶ 118-119.

[266]    *Merrill & Ring Forestry L. P. v. Government of Canada*, CNUDMI, administered by ICSID, Decision on a Motion to Add a New Party, January, 31, 2008, ¶ 29. **RL-0010**.

[267]    *Canfor Corporation v. United States of America, Tembec Inc. et. al. v. United States of America and Terminal Forest Products Ltd. v. United States of America*, CNUDMI, Decisión sobre la Cuestión Preliminar, 6 de junio de 2006, ¶ 171. (emphasis added) **RL-0051**.

[268]    *Mesa Power Group LLC v Canada,* PCA Case No. 2012-17, Submission of the United States of America, July 25, 2014, ¶ 2. **RL-0109**.

reiterated that for a tribunal to have jurisdiction, the disputing investor must fully comply with all the requirements specified in Section B.[269]

186.    Specifically, the United States has confirmed that "the waiver provision requires an investor to 'definitively and irrevocably' waive all rights to pursue claims in another forum once claims are submitted to arbitration with respect to a measure alleged to have breached the Agreement."[270]

187.    Similarly, in *KBR v. Mexico*, the United States emphasized that the filing of a waiver, in the exact terms prescribed by Article 1121, is one of the "*preconditions to the NAFTA Parties' consent*."[271] Likewise, Canada confirmed that the jurisdiction of a NAFTA tribunal depends fundamentally on the consent of the State Parties. Since this consent is expressly conditioned on compliance with Articles 1116 to 1121, any failure to comply with these requirements effectively renders both consent and jurisdiction non-existent:

> 3. **The jurisdiction of any arbitral tribunal rests upon the consent of the parties before it to arbitrate a particular dispute**. Under Article 1122(1), the NAFTA Parties have offered consent to arbitrate with investors provided that certain conditions are met at the time the claim is submitted to arbitration. **Compliance with Articles 1116 to 1121 is necessary to perfect the consent of a NAFTA Party to arbitrate and establish the jurisdiction of the tribunal**.
>
> […]
>
> 5. There is no consent to arbitration under Article 1122(1), and hence no jurisdiction for a NAFTA tribunal, unless a claimant complies with the conditions precedent to the submission of a claim to arbitration set out in Article 1121.[272]
>
> [Emphasis added]

188.    It is therefore clear that compliance with the preconditions set forth in NAFTA Chapter XI is necessary to establish the consent of a State Party to arbitrate a dispute, which has a direct

---

[269]    *Mesa Power Group LLC v Canada,* PCA Case No. 2012-17, Article 1128 Submission of Mexico, July 25, 2014, ¶ 7. **RL-0054**.

[270]    *Finley Resources, Inc. et al. v. United Mexican States*, ICSID Case No. ARB/21/25, Submission of the United States, August 21, 2023, ¶ 13. **RL-0126**.

[271]    *KBR Inc. v. United Mexican States,* ICSID Case No. UNCT/14/1, Submission of the United States of America, July 30, 2014. **RL-0110**.

[272]    *KBR Inc. v. United Mexican States, ICSID Case No. UNCT/14/1,* Submission of the Government of Canada pursuant to NAFTA Article 1128, July 30, 2014. **RL-0111**.

bearing on the jurisdiction of a tribunal. It is also clear that the waiver required by NAFTA Article 1121 is a condition precedent to the consent of the Parties.

### 2. The Waivers Submitted by The Claimants Do Not Meet the Requirements of NAFTA Article 1121.

189.    In an attempt to justify the alleged compliance of the submitted waivers with the requirements of NAFTA Article 1121, the Claimants merely point to the content of such waivers and say that they have not initiated parallel proceedings with respect to the same measure. This is insufficient to overcome the Claimants' failure to comply with Article 1121.

190.    As stated in the Memorial on Jurisdiction, the waivers submitted by the Claimants only refer to the right to initiate any proceedings against the President or officials of the Superior Court of Justice of Mexico City (TSJCDMX):

> […] Cyrus Capital Partners, L.P. ("Cyrus") hereby waives the right to bring any claim against the presiding judge or other officials of the Superior Court of Justice of Mexico City that seeks any damages for the breach of its due process rights, and those of the noteholders under its control, in connection with the issuance of an ex parte injunction in file no. 995/2022 before that court. For avoidance of doubt, this waiver does not apply to any current or future proceeding in Mexico related to the underlying private dispute involving TV Azteca, including file no. 995/2022 itself.[273]

> […] Contrarian Capital Management, L.L.C., hereby waives the right to bring any claim against the presiding judge or other officials of the Superior Court of Justice of Mexico City that seeks any damages for the breach of its due process rights, and those of the noteholders under its control, in connection with the issuance of an ex parte injunction in file no. 995/2022 before that court. For avoidance of doubt, this waiver does not apply to any current or future proceeding in Mexico related to the underlying private dispute involving TV Azteca, including file no. 995/2022 itself.[274]

191.    As noted above, a simple reading of the waivers submitted by the Claimants reveals that they are limited to the initiation of proceedings against officials of the TSJCDMX. In addition, both waivers contain exceptions with respect to "any current or future proceeding in Mexico related to the underlying private dispute involving TV Azteca, including file no. 995/2022 itself."

192.    In this regard, it is important to consider that, although it is not entirely clear to the Respondent which measures the Claimants consider to be in breach, the Claimants have expressly stated that "[t]he claims giving rise to these proceedings involve the mistreatment of Claimants by

---

[273]    Cyrus Capital Partners waiver. **Exhibit 6**.

[274]    Contrarian Capital Management waiver. **Exhibit 7**.

the Sixty-Third Superior Court" and that "the measure at issue here is the Government of Mexico's denial of justice, rooted in the unfair treatment of Claimants by the Sixty-Third Superior Court."[275]

193.    Based on these statements and the facts presented in section II.E above, it is clear that the proceeding is ongoing and that the denial of justice claim is focused solely on the first instance proceeding. Mexico explains below how the claim is inadmissible in these circumstances. Claimants clearly know this. Thus, for purposes of Article 1121, their waivers focus exclusively on the first-instance measures that are the subject of their denial of justice claim. And they expressly exclude from their waiver "any current or future proceeding in Mexico related to the underlying private dispute involving TV Azteca, including file no. 995/2022 itself."

194.    This is not acceptable since neither NAFTA Chapter XI nor Annex 14-C of the USMCA provides for arbitration on a "piecemeal" basis. One of the characteristics of arbitration is its finality. However, the waivers submitted by the Claimants do not guarantee such finality. Rather, they open the door to further local proceedings and, therefore, to further opportunities for redress against Mexico.

195.    The Respondent submits that investment arbitration is not a game of trial and error, in which Claimants can experiment with different claims, pursuing each in turn until the most advantageous outcome is achieved. This is precisely the type of litigious harassment that the waiver requirement is intended to prevent. Allowing investors to manipulate waiver requirements or engage in opportunistic litigation strategies would undermine the credibility of the investment arbitration regime, creating incentives for claimants to "game" the system. Not only would this dilute the effectiveness of the Treaty's protections, but it would also diminish the willingness of states to arbitrate disputes, potentially eroding the entire investment arbitration framework.

196.    Mexico's position is supported by several tribunals. In *Renco v. Peru*, the tribunal stressed the importance of a full and unqualified waiver. In that case, it emphasized that the relevant waiver provision of the Peru-United States FTA (2006), which is similar to NAFTA Article 1121, requires the waiver of any right to initiate or continue any proceedings related to the alleged breach.[276] The

---

[275]    Counter-Memorial on Jurisdiction, ¶¶ 276-277.

[276]    *The Renco Group Inc. c. República del Perú I*, Caso CIADI No. UNCT/13/1, Laudo parcial sobre jurisdicción, 15 de julio de 2016, ¶ 82. **RL-0004**.

tribunal held that Renco's waiver limitation —which was circumscribed based on the outcome of the arbitration— was impermissible as the only exception to the waiver requirement, expressly permitted in the treaty, was for proceedings seeking interim injunctive relief, which did not involve the payment of damages.[277] The court further emphasized the "no-turn-back" structure of the provision, which precluded a return to domestic courts after arbitration, regardless of the outcome of the arbitration proceedings.[278]

197.    The conduct of Cyrus through BNYM[279] and of Contrarian on its own account demonstrates that they have attempted to participate in the national proceedings against the measures it claims and which were explained *supra*:

- On August 7, 2023, Contrarian filed an appeal as part of Mercantil Lawsuit 995/2023.[280]

198.    Should Claimants ultimately prevail in the local proceedings, there is a real risk of double recovery. On the one hand, Claimants allege that "[e]ach Claimant incurred loss or damage arising from the Sixty-Third Superior Court's conduct that amounted to a denial of justice with respect to those Notes under their respective control."[281] Furthermore, Claimants contend that Mercantil Lawsuit 995/2023 "prevent enforcement of the Notes, and preclude any recovery by Claimants and other Noteholders against TV Azteca" and that "the Injunction not only bars efforts to remedy TV Azteca's multiple defaults under the Notes, as well as to suspend its obligations arising from those defaults; it further bars any action to require payment even once the Notes reached maturity on August 9, 2024."[282] Should the Injunction be lifted, or should the Claimants prevail in the court proceedings, they could receive a double benefit, *i.e.*, enforcement of the Notes and a possible award in this arbitration.

---

[277]    *The Renco Group Inc. c. República del Perú I*, Caso CIADI No. UNCT/13/1, Laudo parcial sobre jurisdicción, 15 de julio de 2016, ¶ 81. **RL-0004**.

[278]    *The Renco Group Inc. c. República del Perú I*, Caso CIADI No. UNCT/13/1, Laudo parcial sobre jurisdicción, 15 de julio de 2016, ¶ 81. **RL-0004**.

[279]    As can be seen from Sections II B, C and D of the Counter-Memorial on Jurisdiction, BNYM is acting on behalf of the trust for the representation of the Notes, in its capacity as trustee. It is undisputed that BNYM has continued the Mercantil Lawsuit 995/2023; Counter-Memorial on Jurisdiction, ¶¶ 57-75.

[280]    Written communication dated August 7, 2023, filed by Contrarian in the Mercantile Lawsuit 995/2023. **R-0029**.

[281]    Counter-Memorial on Jurisdiction, ¶ 18.

[282]    Counter-Memorial on Jurisdiction, ¶¶ 45,50.

199.    In this regard, it is important to note that the tribunal in *Waste Management I* analyzed the claimant's conduct and concluded that its actions were prohibited by Article 1121.[283] In particular, the tribunal found that the claimant's actions and statements were contradictory as it took the position that it had complied with the waiver and yet continued with a commercial action in the domestic forum for the same facts, thus violating the terms of NAFTA. This inconsistency led the tribunal to conclude that the claimant had materially breached the waiver, resulting in the dismissal of the case:

> In view of the above, this Tribunal has arrived at the following conclusions regarding the validity of the waiver tendered: 1. With respect to the content of the text of the NAFTA Article 1121 waiver, it is obvious that the Claimant did not limit itself to a full transcription of the content of this Article, which in itself is sufficiently complete and clearly reflects the scope of the waiver, but instead additionally introduced a series of statements that reflected its own understanding of the waiver submitted, as is evident from the findings of fact outlined in this arbitral award now issued hereunder.
>
> This Tribunal cannot concur with the Claimant's earlier assertions regarding its intention to present the waiver in accordance with the scope of Article 1121, given that it has been established that for more than 14 months, it systematically failed to comply with the actual agreement that the waiver of NAFTA Article 1121 requires from those parties seeking to submit a claim to arbitration in accordance with the dispute settlement procedure set forth in Chapter XI of the NAFTA. The fact is that the Claimant did not have the intention of presenting the waiver within the terms prescribed in NAFTA Article 1121; rather, it had the intention to present it in accordance with its own interests.
>
> Accordingly, this Tribunal cannot deem as valid the waiver tendered by the Claimant in its submission of the claim to arbitration, in view of its having been drawn up with additional interpretations, which have failed to translate as the effective abdication of rights mandated by the waiver.[284]

200.    The same tribunal recognized that the waiver functions as a "unilateral act" that extinguishes the right of a claimant's to bring related claims in other forums, thus avoiding the risks of duplicative proceedings in which a claimant may obtain a "double benefit."[285] The Claimants themselves acknowledge that this is the purpose of the waivers.[286]

---

[283]    *Waste Management Inc. c. México (I)*, Caso CIADI No. ARB(AF)/98/2, Laudo Arbitral, 2 de junio de 2000, ¶ 31. **RL-0030**.

[284]    *Waste Management Inc. c. México (I)*, Caso CIADI No. ARB(AF)/98/2, Laudo Arbitral, 2 de junio de 2000, ¶ 31. **RL-0030**.

[285]    *Waste Management Inc. c. México (I)*, Caso CIADI No. ARB(AF)/98/2, Laudo Arbitral, 2 de junio de 2000, ¶¶ 18, 27. **RL-0030**.

[286]    Counter-Memorial on Jurisdiction, ¶ 272.

201.    Therefore, the waivers submitted by the Claimants do not comply with NAFTA Article 1121 and, as a consequence, the Tribunal lacks jurisdiction *ratione voluntatis* to hear the present dispute.

### 3.    The Defects in the Waiver Cannot Be Cured Without the Respondent's Consent.

202.    It has been established by the NAFTA tribunals, and confirmed by the NAFTA Parties, that a defective waiver cannot be corrected in the course of arbitration unless the NAFTA Party has consented to it, which has not happened in this case. In this regard, the tribunal in *KBR v. Mexico* noted:

> The Tribunal believes that it need not decide whether submission of a complying waiver is a matter of admissibility or jurisdiction. The fact is that, whether it is considered to be one or the other, the view of the NAFTA Parties and the practice of previous NAFTA tribunals adduced by the Parties in this case shows that the waiver may not be corrected in the course of the arbitration concerned unless the NAFTA Party consents to such correction. Having found that the waiver submitted in this arbitration by Claimant and COMMISA is defective and Respondent not consenting to a correction, a determination as to the jurisdictional or admissibility nature of the requirement would not affect the outcome of the case and can thus be dispensed with.[287]

> [Emphasis added]

203.    In the same vein, the tribunal in *Renco* found that the waiver provision contains the terms upon which Peru's non-negotiable offer to arbitrate may be accepted by an investor. Therefore, the tribunal concluded that Renco's defective waiver meant that arbitration agreement had never existed.[288]

204.    Similarly, the tribunal in *Bacilio Amorrotu v. Peru* noted that, if a tribunal were to allow a waiver to be cured without the Respondent's consent, it would be tantamount to consenting to arbitration on behalf of the State:

---

[287]    *KBR Inc. v. United Mexican States,* ICSID Case No. UNCT/14/1, Award, April 30, 2015, ¶ 148. **RL-0112**. *See also KBR c. Estados Unidos Mexicanos*, ICSID Case No. UNCT/14/1, Submission of the Government of Canada, July 30, 2014, ¶ 6 ("A claimant cannot ex post facto cure Article 1121 jurisdictional defects absent the express consent of the responding NAFTA Party.") (citing *Railroad Development Corporation v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Decision on Objection to Jurisdiction CAFTA Article 10.20.5, November 17, 2008, ¶ 61). **RL-0104**.

[288]    *The Renco Group, Inc. c. República del Perú* [I], Caso CIADI núm. UNCT/13/1, Laudo parcial sobre jurisdicción, 15 de julio de 2016, ¶ 142. **RL-0004**.

"[A]uthorizing the cure of a flawed waiver, rather than accepting Respondent's objection, would be tantamount to the Tribunal generating consent to arbitration when such consent did not exist when the Tribunal was constituted."[289]

205. The Respondent emphasizes that NAFTA Article 1121.3 provides: "A consent and waiver required by this Article shall be in writing, shall be delivered to the disputing Party and shall be included in the submission of a claim to arbitration." (Emphasis added.) Article 31.1 of the VCLT provides: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." The "ordinary meaning" of Article 1121(3) is clear, and there is no ambiguity that would permit the interpretation that the submission of a consent and waiver can be cured during the course of an arbitration. In other words, to apply Article 1121.3 in a manner that omits the phrase "shall be included in the submission of a claim to arbitration" would be inconsistent with the principle of *effet utile*.[290]

206. The Respondent wishes to emphasize that the Claimants have not even attempted to cure their waivers, yet even if they did, they could not do so without Respondent's consent.

### H.    Objection 8: Contrarian Does Not Have Standing to Bring a Denial of Justice Claim Because Sandpiper Was Not a Party to The Underlying Proceedings in Mexico.

207. The Respondent explained that neither Contrarian nor Sandpiper could bring a denial of justice claim under Article 1105 because neither was a party to the Mercantile Lawsuit 995/2022.[291] It further explained at length that, to bring a claim for denial of justice under customary international law, the claimant must have been a party to the proceeding in which the denial of justice allegedly occurred.[292] The Claimants do not dispute any of these points and tacitly accept that Contrarian, nor Sandpiper, are parties to the Mercantile Lawsuit 995/2022.

---

[289]    *Bacilio Amorrortu c. República del Perú*, Caso CPA núm. 2020-11, Laudo Parcial sobre Jurisdicción, 5 de agosto de 2022, ¶ 237. **RL-0113**.

[290]    *See Southern Pacific Properties (Middle East) Limited v. Republic of Egypt*, ICSID Case No. ARB/84/3, Decision on Jurisdiction, April 14, 1988, ¶ 94 ("Under general principles of statutory interpretation, a legal text should be interpreted in such a way that a reason and a meaning can be attributed to every word in the text"). **RL-0114**.

[291]    Memorial on Jurisdiction, ¶ 126.

[292]    Memorial on Jurisdiction, ¶ 130.

208.    Instead, the Claimants argue that this objection is based on a misapprehension of the facts because somehow "... Contrarian's interest in that same set of Notes that were transferred to Sandpiper Limited at the time of the injunction proceeding until today remains unbroken."[293] Clearly, the Claimants cannot assert that Contrarian or Sandpiper are parties to the Mercantile Lawsuit 995/2022, let alone sustain their "unbroken interest" theory, as they provide no legal authority for doing so. The Claimants simply repeat that Sandpiper acquired the Notes from Contrarian Markets, which was named as a defendant in the Mercantile Lawsuit 995/2022. However, Contrarian Markets transferred the Notes, under its possession, after the Injunction was issued. The fact that the Claimant, Contrarian, was involved in the transaction as the investment manager does not mean that the current holder of the Notes, Sandpiper, suffered a denial of justice before the Mexican courts.[294]

209.    In conclusion, Contrarian lacks standing to bring a claim against Mexico in the present arbitration, and its claim should be dismissed in its entirety.

## IV.    THE DENIAL OF JUSTICE CLAIM IS NOT ADMISSIBLE BECAUSE THE PROCEEDINGS ARE ONGOING

210.    Should the Tribunal conclude that the Claimants have met their burden on jurisdiction, their single claim for denial of justice claim is inadmissible nonetheless because it was not "ripe" when the Claimants filed their Request for Arbitration on June 30, 2023.[295] This is a threshold issue that the Tribunal should decide as a matter of judicial economy.[296]

---

[293]    Counter-Memorial on Jurisdiction, ¶¶ 284, 287.

[294]    Moreover, Contrarian Markets is not a party to this arbitration and Contrarian does not own or control the Notes, nor does it control Contrarian Markets or Sandpiper. *See* Objection 2 *supra*.

[295]    There can be no dispute that the alleged breach of NAFTA must precede the claim. *See* Article 1116(1) ("An investor of a Party, on behalf of an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this Section a claim that the other Party <u>has breached</u> an obligation under: (a) Section A") (emphasis added). *See also Amec Foster Wheeler USA Corp. et al v. Republic of Colombia*, ICSID Case No. ARB/19/34, Award, December 19, 2024, ¶ 204. **RL-0115**.

[296]    *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, June 14, 2013, ¶ 259 ("[W]hether characterized as admissibility or ripeness or jurisdiction, the question whether Apotex can properly state a claim that non-final judicial acts violated the NAFTA is a threshold issue. It should be decided by the Tribunal as a matter of sound judicial economy."). **RL-0116**.

211.    The judicial proceedings in Mexico City were just beginning when the Claimants filed the Request for Arbitration on June 30, 2023. Prior to that date, the Injunction was issued in September 2022, and on May 15, 2023, the Trustee had requested the Sixty-Third Superior Court to vacate the September 2022 Injunction.[297] That request was still pending when the Claimants filed the Request for Arbitration. The facts presented by the Claimants in the Counter-Memorial reveal that the proceedings are indeed still ongoing, and the Claimants have been actively pursuing remedies against the Injunction in the Mexican courts.[298] Based on the facts as presented by the Claimants, the case has clearly not reached a final resolution. Under these circumstances, the denial of justice claim fails at the outset because Mexico cannot have breached the treaty when the Request for Arbitration was filed.

212.    A claim for denial of justice in violation of Article 1105 of NAFTA can arise only once there is a *final action* by the State's judicial system as a whole. The principle is based on the notion that judicial action is a single action from beginning to end, so that the State has not spoken until all appeals have been exhausted. In other words, the State is not responsible for the errors of its courts until the matter is finally resolved by the highest court.[299] The legal principle has been

---

[297]    Counter-Memorial on Jurisdiction, ¶ 63

[298]    Counter-Memorial on Jurisdiction, ¶¶ 67-75.

[299]    *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, June 26, 2003, ¶¶ 153, 156 ("The principle that a court decision which can be challenged through the judicial process does not amount to a denial of justice at the international level has been linked to the duty imposed upon a State by international law to provide a fair and efficient system of justice….The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision. The requirement has application to breaches of Articles 1102 and 1110 as well as Article 1105.") (Emphasis added). **RL-0117.**

consistently adopted by tribunals under NAFTA and other investment treaties.[300] Professor Paulsson has also confirmed this principle.[301]

213.    Accordingly, should the Tribunal find jurisdiction, it should nonetheless rule as a preliminary matter that the claim is not admissible or otherwise that no denial of justice has occurred.

## V.    REQUEST FOR RELIEF

214.    In view of the foregoing, Respondent requests that this Tribunal dismiss Claimants' claim in its entirety, with a corresponding award on costs in favor of Respondent.

Respectfully submitted,

**General Counsel for International Trade**

**Alan Bonfiglio Ríos**

---

[300]    *See Lion Mexico Consolidated L.P. c. Estados Unidos Mexicanos*, Caso CIADI No. ARB(AF)/15/2, Laudo, 20 de septiembre de 2021, ¶ 551 ("The system must be tried and have failed, and thus in this context the notion of exhaustion of local remedies is incorporated into the substantive standard and is not only a procedural prerequisite to an international claim") **RL-0118**, quoting *Waste Management c. Estados Unidos Mexicanos (II)*, Caso CIADI No. ARB(AF)/00/3, Laudo, 30 de abril 2004, ¶ 97. **RL-0039**. *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, June 14, 2013, ¶ 282 (denial of justice "claims depend upon the demonstration of a systemic failure in the judicial system. Hence, a claimant cannot raise a claim that a judicial act constitutes a breach of international law, without first proceeding through the judicial system that it purports to challenge, and thereby allowing the system an opportunity to correct itself."). **RL-0116**. *Amec Foster Wheeler USA Corp. et al c. República de Colombia*, Caso CIADI No. ARB/19/34, Laudo, 19 de diciembre de 2024, ¶ 216 ("Considering that [the first instance ruling] could be overturned after judicial review, it cannot constitute a denial of justice or a breach of any of the other substantive obligations under the Treaty alleged by Claimants."). **RL-0115**. *Infinito Gold Ltd. c. República de Costa Rica*, Caso CIADI No. ARB/14/5, Laudo, 3 de junio de 2021, ¶ 445 ("…a claim for denial of justice presupposes the exhaustion of local remedies…"). **RL-0119**. *Chevron Corporation and Texaco Petroleum Company c. República del Ecuador (II)*, Caso PCA No. 2009-23, Segundo Laudo Parcial sobre el Tramo II, 30 de agosto de 2018, ¶ 7.121 (adopting the principle as stated in *Loewen*). **RL-0120**. *Corona Materials, LLC c. República Dominicana*, Caso CIADI No. ARB(AF)/14/3, Laudo Sobre Objeciones Preliminares Expeditas de la Demandada de Conformidad Con El Artículo 10.20.5 Del DR-CAFTA, 31 de mayo de 2016, ¶¶ 259-261, 270. (adopting the principle as stated in *Loewen* and denying the denial of justice claim for failure to pursue court remedies). **RL-0121**.

[301]    Jan Paulsson, *Denial of Justice in International Law* 108 (2005) ("For a foreigner's international grievance to proceed as a claim of denial of justice, the national system must have been tested. Its perceived failings cannot constitute an international wrong unless it has been given a chance to correct itself."). **RL-0122**.