UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Bank of New York Mellon, solely in its capacity as Trustee for the TV Azteca, S.A.B. de C.V. 8.25% Senior Notes Due 2024, | |
| Plaintiff, | Case No. 1:22-cv-08164-PGG |
| v. | |
| TV Azteca, S.A.B. de C.V., *et al*., | |
| Defendants. | |

## NOTICE OF APPEAL

Notice is hereby given that Defendants TV Azteca, S.A.B. de C.V., *et al*, ("Defendants") hereby appeal to the United States Court of Appeals for the Second Circuit from the entirety of the Order dated November 4, 2025, of Hon. Paul G. Gardephe of the United States District Court for the Southern District of New York, which denied Defendants' motion for reconsideration of the Memorandum Opinion and Order dated September 22, 2025, which provided that Defendants are enjoined from "from prosecuting the July 2022 Mexican Action and the September 2022 Mexican Action; are instructed to take all steps necessary, forthwith, to dismiss or cause to be dismissed these actions and any other actions currently pending in Mexico arising from the Indenture; and are enjoined from prosecuting any legal actions in Mexico arising from the Indenture, or commencing any new legal actions in Mexico arising from the Indenture." A copy of the transcript in which this order was made is attached hereto as Exhibit A. Defendants' Notice of Appeal is timely filed.

Dated: New York, New York
       December 4, 2025

**GREENBERG TRAURIG, LLP**

By: _/s/ Hal S. Shaftel_____
    Hal S. Shaftel
    Daniel Pulecio-Boek
    John C. Molluzzo Jr.

One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200
shaftelh@gtlaw.com
pulecioboekd@gtlaw.com

*Attorneys for Defendants T.V. Azteca,*
*S.A.B. de C.V., et al.*

# Exhibit A

PB4ATheC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    THE BANK OF NEW YORK MELLON,

4                   Plaintiff,

5              v.                          22 Civ. 8164 (PGG)

6    TV AZTECA, S.A.B. DE C.V. ET
     AL.,
7                                          Conference

8                   Defendants.

9    ------------------------------x
                                           New York, N.Y.
10                                         November 4, 2025
                                           10:02 a.m.
11
     Before:
12
                        HON. PAUL G. GARDEPHE,
13
                                           District Judge
14
                              APPEARANCES
15
     MOLOLAMKEN LLP
16        Attorneys for Plaintiff
     BY:  JUSTIN M. ELLIS
17        MASON E. REYNOLDS
          ERIC J. ROLSTON
18
     RIKER DANZIG SCHERE HYLAND PERRETTI
19        Attorneys for Plaintiff
     BY:  CURTIS M. PLAZA
20
     GREENBERG TRAURIG, LLP
21        Attorneys for Defendant
     BY:  HAROLD S. SHAFTEL
22        JOHN C. MOLLUZZO
          DANIEL PULECIO-BOEK
23

24

25

PB4ATheC

1          THE DEPUTY CLERK:  Counsel for the plaintiff, please

2     state your appearances.

3          MR. ELLIS:  Good morning.

4          Justin Ellis, MoloLamken for the trustee.  With me

5     here today is Mason Reynolds, Eric Rolston, also of MoloLamken,

6     as well as Curtis Plaza of Riker Danzig, outside general

7     counsel for the trustee.

8          THE DEPUTY CLERK:  Counsel for defendant please state

9     your appearances.

10          MR. SHAFTEL:  Judge, yes, thank you.  Good morning,

11     your honor.

12          Hal Shaftel on behalf of the TV Azteca defendants from

13     the Greenberg Traurig firm.  I'm joined at counsel table by my

14     colleagues John Molluzzo and Daniel Pulecio-Boek.

15          THE COURT:  Mike, could you give this to the court

16     reporter.

17          THE DEPUTY CLERK:  Yes.

18          THE COURT:  I'm going to be beginning by issuing a

19     bench ruling on defendant's motion for reconsideration.

20          Defendants TV Azteca S.A.B. de C.V. and thirty-four TV

21     Azteca subsidiary guarantors have moved for reconsideration of

22     my September 22, 2025 memorandum opinion and order granting

23     plaintiff's motion to enjoin defendants from litigating in

24     Mexico issues relating to defendants alleged default on

25     $400 million in notes.  In the event reconsideration is denied,

PB4ATheC

defendants seek a stay pending resolution of their appeal concerning my injunction order.

The case stems from defendants' alleged breach of an indenture agreement that plaintiff Bank of New York Mellon entered into with defendant TV Azteca in 2017. Citing the complaint Dkt. No. 80, paragraph 1. Pursuant to the indenture, TV Azteca issued $400 million in notes due in 2024, with plaintiff serving as the indenture trustee. *Id.* In connection with the notes, TV Azteca agreed to make regularly scheduled interest payments to noteholders and repay the full amount of the principal when the notes matured in August 2024. *Id.* paragraph 2. Plaintiff alleges that TV Azteca and its subsidiary guarantors defaulted on the notes, and have not made semi-annual interest payments since February 2021, and did not pay the principal due and owing when the notes matured in August 2024. *Id.* paragraphs 2-4, 50.

Prior to initiating this action on May 3, 2022, and August 5, 2022, plaintiff, acting on behalf of the noteholders, transmitted notices of acceleration to TV Azteca declaring the unpaid principal premium, and accrued and unpaid interests among notes "to be due and payable immediately as provided" under the August 9, 2017 indenture." Citing the September 23, 2025 opinion, Dkt. No. 97, pages 1-2.

TV Azteca responded to the May 3, 2022 notice of acceleration by filing an action in Mexico, even though the

PB4ATheC

indenture provides, among other things, that "any suit, action
or proceeding... arising out of or relating to this indenture,
(including the note guarantees) or the notes...may be
instituted in any court of the State of New York or any United
States court sitting...in the Borough of Manhattan, the City of
New York, New York, United States of America." *Id.* at pages
4-5.  In the indenture, TV Azteca and its guarantors
"irrevocably consent and submit to the exclusive jurisdiction
of any court of the State of New York or any United States
court sitting...in the Borough of Manhattan, the City of New
York, New York, United States of America." *Id.* page 5.

Despite this indenture provision granting state and
federal courts in New York exclusive jurisdiction, on July 8,
2022, TV Azteca filed suit against certain noteholders in the
Ninth Superior Court of Mexico, requesting that the Court hold
the May 3, 2022 notice of acceleration "legally invalid" and
"order that the payment of the unpaid principal of the bonds
issued under the indenture...is not due and payable." *Id.* at
page 2.  On July 12, 2022, the Ninth Superior Court issued an
injunction prohibiting the noteholders from taking further
efforts to collect the unpaid principal and interest due on the
notes.  *Id.*

Plaintiff responded on August 26, 2022, by filing a
motion for summary judgment in lieu of a complaint in Supreme
Court of the State of New York, New York County.  *Id.*; see also

PB4ATheC

1    notice of removal, Dkt. No. 1, paragraph 1.

2              On September 22, 2022, TV Azteca filed a complaint

3    against Bank of New York Mellon.  As trustee, Bank of New York

4    Mellon, London Branch, as principal paying agent, and certain

5    noteholders in the Sixty-Third Superior Court of Mexico,

6    seeking a ruling that due to the COVID-19 pandemic, the

7    performance of its obligations under the notes was a legal

8    impossibility, and that as a result, TV Azteca had not failed

9    to perform its contractual obligations under the indenture.

10   Citing the June 28, 2024 Castillo declaration, Exhibit 7, Dkt.

11   No. 49-7, at pages 4 and 7.

12             On September 23, 2022, defendants removed the instant

13   case on diversity grounds.  Citing Dkt. No. 1.

14             On September 27, 2022, the Sixty-Third Superior Court

15   issued an injunction, citing the June 28, 2024 Castillo

16   declaration, Dkt. No. 49, paragraph 20, barring TV Azteca from

17   making payments due under the indenture until the World Health

18   Organization had decreed that the COVID-19 pandemic had ended.

19   *Id.* exhibit 8, Dkt. No. 49-8 at pages 7 and 19.

20             Between October 2023 and October 2024, the instant

21   case was stayed because of a chapter 11 bankruptcy petition

22   filed against defendants by certain noteholders. Citing the

23   September 22, 2025 Opinion, Dkt. No. 97 at 10-11.

24             On June 28, 2024, plaintiff moved for an order

25   enjoining defendants from "continuing to prosecute, or

PB4ATheC

initiating any claims in, any action in Mexico in connection with the [indenture]." Citing Dkt. No. 46.

In the September 22, 2025 opinion and order, I granted plaintiff's motion and enjoined defendants from continuing to prosecute ongoing actions in Mexico related to the indenture, and from initiating new actions in Mexico arising under the indenture. Citing Dkt. No. 97.

On October 7, 2025, defendants moved for reconsideration and vacatur of my injunction. As I've said, in the alternative, defendants ask me to stay the September 22, 2025 order pending their appeal of the injunction. Citing Dkt. Nos. 100, 101. Defendants filed their appeal on October 20, 2025. Citing Dkt. No. 114.

Before turning to the merits of defendants' motion for reconsideration — given defendants' appeal — I will first address the issue of jurisdiction.

"The filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the Court of Appeals and divests the district court of its control over those aspects of the case involved in the appeal." Citing *Griggs v. Provident Consumer Discount*, 459 U.S. 56, 58 (1982). An exception to this general rule applies to injunctions that are being challenged on appeal, however.

Fed. R. Civ. P. 62 states that "while an appeal is pending from an interlocutory order...that grants...an

PB4ATheC

injunction" a court "may suspend, modify, restore, or grant an

injunction on terms for bond or other terms that secure the

opposing party's rights."  Moreover, Fed. R. App. P. 8 provides

that "a party must ordinarily move first in the district court"

for relief from "an order suspending, modifying, restoring, or

granting an injunction while an appeal is pending."  Finally,

courts have concluded that "the general proposition" set forth

in *Griggs*, "does not apply in a case where, as here, the

decision being appealed involves an injunction."  Citing *SEC v.*

*Byers*, 637 F.Supp.2d 166, 174, (S.D.N.Y. 2009), citing *Webb v.*

*GAF Corp.*, 78 F3.d 53, 55 (2d Cir. 1996).  ("Although the

filing of a notice of appeal ordinarily divests the district

court over issues decided in the order being appealed, you are

jurisdiction is retained where, as here, the appeal is from an

order granting or denying a preliminary injunction.")

        Accordingly, I conclude that — notwithstanding

defendants' appeal of my order granting the injunction — I have

jurisdiction to consider defendants' motion for

reconsideration.

        As to the legal standards applicable to defendants'

motion, the decision of "whether to grant or deny a motion for

reconsideration...is in the sound discretion of a district

court judge."  Citing *Bennett v. Watson Wyatt & Co*, 156

F.Supp.2d 270, 271-272 (S.D.N.Y. 2001).  "Reconsideration is an

extraordinary remedy to be employed sparingly."  *Drapkin v.*

PB4ATheC

*Mafco Consol. Grp., Inc.*, 818 F.Supp.2d 678, 695 (S.D.N.Y. 2011). "The standard for granting such a motion is strict." *Shrader v. CSX Transp. Inc.*, 70 F3.d 255, 257 (2d Cir. 1995). "Motions for reconsideration are properly granted only if there is a showing of: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error or prevent manifest injustice." *Drapkin*, 818 F.Supp.2d at 696.  "Where the movant merely offers the same arguments offered on the original motion, the motion for reconsideration must be denied." *Cobalt Multifamily Inves. I, L.L.C. v. Shapiro*, 2009 WL 4408207, at *2 (S.D.N.Y. Dec. 1, 2009).

"A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *Davidson v. Scully*, 172 F.Supp.2d 458, 461(S.D.N.Y. 2001). "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." *In re Calpine Corp.*, 2008 WL 11404251 at *1(S.D.N.Y. June 24, 2008).  Indeed, "Local Rule 6.3 is intended to ensure the finally of decisions and to prevent the practice of a losing party...plugging the gaps of a lost motion with additional

PB4ATheC

1    matters." *Id.*

2            In the 40-page September 22, 2025 opinion, the Court

3    considered at great length both the two threshold requirements

4    for issuing an anti-suit injunction, and the five so called

5    *China Trade* factors:  (1) frustration of a policy in the forum;

6    (2) the vexatiousness of the foreign action; (3) whether the

7    foreign proceedings present a threat to this Court's

8    jurisdiction; (4) equitable considerations; and (5) whether the

9    adjudication of the same issues in both domestic and foreign

10   proceedings would result in delay, inconvenience, additional

11   expense to the parties, and a risk of inconsistent results.

12   Citing September 22, 2025 opinion, Dkt. No. 97, at page 19,

13   which in turn is quoting *China Trade & Dev. Corp. v. M.V.*

14   *Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987).  See also *Id.* at

15   pages 11-30.  The Court concluded that "all of the *China Trade*

16   factors weigh in favor of issuing an anti-suit injunction."

17   *Id.* at page 30.

18           Defendants argue, however, that reconsideration is

19   necessary because certain "overlooked and newly developed facts

20   [would] fundamentally alter the *China Trade* analysis."  Citing

21   defendant's reconsideration brief, Dkt. No. 101 at page 6.  In

22   particular, defendants argue that the Court overlooked the fact

23   that "plaintiff and the noteholders (which are the same party

24   and interest as plaintiff) availed themselves of Mexico and the

25   International Centre for Settlement of Investment Disputes (the

PB4ATheC

```
1    ICSID) — as fora for litigation regarding the notes."  *Id.* at

2    page 8.  According to defendants, the Court overlooked status

3    reports from the parties indicating that "plaintiff has

4    commenced three separate litigations in Mexican courts in

5    contravention of plaintiff's own interpretation of the

6    indentures forum selection clause."  *Id.*

7              The Court did not overlook the fact that plaintiff had

8    pursued litigation in Mexico, however.  Indeed, the

9    September 22, 2025 opinion states that "plaintiff filed an

10   *Amparo* action in Mexico, which is a separate proceeding in a

11   separate court to seek relief available in Mexican courts to

12   protect fundamental Constitutional rights."  Citing the

13   September 22, 2025 opinion, Dkt. No. 97, at page 10, note 3,

14   which in turn is quoting the June 28, 2024 Del Castillo

15   declaration, Dkt. No. 49, paragraph 23, note 1.  But defendants

16   never argued that plaintiff's request for an anti-suit

17   injunction should be denied because plaintiff had brought an

18   *Amparo* proceeding in a Mexican court and "motions for

19   reconsideration cannot be based on arguments not previously

20   raised." Citing *Scott v. Chipotle Mexican Grill, Inc.*, 306

21   F.R.D. 120, 124 (S.D.N.Y. 2015).

22             In any event, there is no merit to defendants' new

23   argument to plaintiff's request for an anti-suit injunction

24   should be denied because plaintiff — through its filing of

25   multiple *Amparo* actions — has voluntarily submitted to the
```

PB4ATheC

1    jurisdiction of Mexican courts.

2            As stated in the September 22, 2025 opinion, an Amparo

3    action is a procedural vehicle that allows a litigant in a

4    Mexican court that believes it has been deprived of its

5    fundamental Constitutional rights to seek relief through a

6    collateral attack on a prior court's ruling.  See September 22,

7    2025 opinion, Dkt. No. 97 at page 10, note 3.  See also the

8    October 16, 2025 Del Castillo declaration, Dkt. No. 110,

9    paragraph 18 ("while filing an Amparo technically creates a

10   separate proceeding, it is the proper vehicle under Mexican law

11   to obtain Constitutional relief from a judicial officer who

12   does not follow the law.")

13           Here, plaintiff filed its Amparo actions in response

14   to developments in the September 2022 Mexican action brought by

15   TV Azteca against plaintiff and certain noteholders in the

16   Sixty-Third Superior Court in Mexico.  Citing the October 16,

17   2025 Del Castillo declaration, Dkt. No. 110, paragraphs 12-14,

18   15-19, and 23-26.

19           In the first Amparo action, plaintiff sought to

20   challenge the Mexican court's *ex parte* injunction barring

21   collection on the notes*, Id.* paragraphs 12-14; in the second

22   Amparo action, plaintiffs sought enforcement of the forum

23   selection clause in the indenture*, Id.* paragraphs 15-19; and in

24   the third Amparo action, plaintiff again sought relief from the

25   same injunction that was the subject of the first Amparo

1     action, which had been dismissed, *Id.* paragraphs 23-26.

2             But defendants have cited no case law or authority of

3     any sort in support of their argument that plaintiff's

4     collateral attack in Mexico on the injunctions obtained in

5     Mexican courts in flagrant violation of the forum selection

6     clause provides a basis to deny plaintiff's application for an

7     anti-suit injunction.

8             In sum, defendants' argument regarding plaintiff's

9     Amparo actions fails, both because it was not raised before and

10    because it is utterly unsupported by case law or any other

11    authority.

12            Defendants' arguments regarding the arbitration claim,

13    certain noteholders filed with the International Centre for

14    Settlement of Investment Disputes fail for similar reasons.  As

15    an initial matter, while the ICSID arbitration was initiated on

16    June 30, 2023 — more than a year before defendants filed their

17    brief opposing plaintiff's application for an anti-suit

18    injunction, see defendants reconsideration brief, Dkt. No. 101,

19    at page 10, and defendant's injunction opposition brief, Dkt.

20    No. 52 — defendants did not mention the ICSID arbitration in

21    their opposition brief.  See generally defendants' injunction

22    opposition brief, Dkt. No. 52.  And, in seeking

23    reconsideration, defendants have offered no explanation for

24    their failure to discuss the ICSID arbitration in their

25    opposition brief.  See generally defendants' reconsideration

PB4ATheC

1    brief, Dkt. No. 101.

2           Given that defendants have not previously argued that

3    plaintiff's request for an anti-suit injunction should be

4    denied because certain noteholders brought an arbitration claim

5    before the ICSID, they cannot make this argument now in their

6    motion for reconsideration.  See *Scott*, 306 F.R.D. at 124.

7           In any event, the ICSID arbitration has no relevance

8    here.

9           In that arbitration, certain noteholders contend that

10   the Mexican government — through the actions of Mexican

11   courts — has violated its treaty obligations under the North

12   American Free Trade Agreement, commonly referred to as NAFTA,

13   by denying the noteholders their due process rights.  See

14   request for arbitration, Dkt. No. 103-1, paragraphs 2-5.  ("The

15   claims here involve the extraordinary mistreatment of the

16   claimants by the Superior Court of Justice of Mexico City,

17   which committed multiple brazen violations of the claimants'

18   due process rights in the proceedings before it, including

19   denying the claimants any notice or opportunity to be heard

20   prior to issuing an injunction that serves as a bar on their

21   ability to pursue relief as creditors of TV Azteca.")  And

22   while defendants argue that plaintiff is a party-in-interest to

23   the ICSID arbitration because, as trustee, plaintiff represents

24   the interests of the noteholders, see defendants'

25   reconsideration brief, Dkt. No. 101 at page 6, the indenture's

PB4ATheC

```
 1    forum selection clause has no application to the ICSID

 2    arbitration, because the claim brought by the noteholders in

 3    the ICSID arbitration is brought against the Mexican

 4    government, and not against defendants.

 5           Forum selection clause provides that "each of the

 6    parties hereto...agrees that any suit, action or proceeding

 7    against it arising out of or relating to this indenture

 8    (including the note guarantees)...may be instituted in any

 9    court of the State of New York or any United States court"

10    sitting in New York, New York.  Citing the complaint, exhibit

11    A, the indenture, docket 80-1 at 106.  The indenture's forum

12    selection clause thus addresses suits brought by the parties

13    against each other, and not against third parties such as the

14    Mexican government.

15           Finally, in seeking reconsideration defendants argue

16    that "new evidence" has emerged in the ICSID arbitration that

17    "fundamentally undermines the injunction."  Citing defendants'

18    reconsideration brief, Dkt. No. 101 at page 12.  The alleged

19    "new evidence" is the "noteholders' concessions...that they are

20    investors of a party under NAFTA, that their notes constitute

21    investments in the territory of Mexico, and that Mexico

22    therefore has a direct interest in this case."  *Id.*  As

23    discussed above, however, the ICSID arbitration was filed long

24    before defendants filed their brief opposing plaintiff's

25    application for an anti-suit injunction and defendants have
```

PB4ATheC

1    known since the arbitration claim was filed that "the

2    noteholders were putting the Mexican government at issue."  *Id.*

3    at page 13.  But defendants made no argument concerning the

4    ICSID arbitration in their opposition brief.  Having not made

5    this argument before, they may not raise it now.  Citing

6    *Drapkin*, 818 F.Supp.2d at 695.

7             In sum, there is no basis for granting reconsideration

8    here, and defendants' motion for reconsideration is denied.

9             As I noted at the outset, defendants argue that — in

10    the event the Court denies their motion for reconsideration —

11    it should stay this action pending their appeal of my

12    injunction.

13             As to the applicable legal standard "a stay is not a

14    matter of right, even if irreparable injury might otherwise

15    result."  *Nken v. Holder*, 556 U.S. 418, 433 (2009).  The

16    issuance of a stay is "an exercise of judicial discretion."

17    *Id.*  Four factors guide courts in exercising their discretion.

18    "(1) whether the stay applicant has made a strong showing that

19    he's likely to succeed on the merits; (2) whether the applicant

20    will be irreparably injured absent a stay; (3) whether issuance

21    of the stay will substantially injure the other parties

22    interested in the proceeding; and (4) where the public interest

23    lies."  *Id.* at 426.  The moving party bears the burden of

24    showing that a stay is justified.  *Id.* at 433-434.

25             Here, defendants have not met their burden.  As

PB4ATheC

discussed in the September 22, 2025 opinion, all of the *China Trade* factors weigh in favor of issuing an anti-suit injunction.  Citing September 22, 2025 opinion, Dkt. No. 97 at page 30.  Accordingly, defendants have not demonstrated a likelihood of success on the merits of their appeal.  Moreover, as the Court found in the September 22, 2025 opinion, the trustee has been harmed by continued delays in this case.  *Id.* at pages 31-35.  As to the public interest, defendants have not even presented an argument as to how a stay would advance the public interest.  And, finally, while dismissal of the Mexican actions may cause injury to defendants "the Supreme Court has made clear that irreparable injury alone does not require a state."  *Citing U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC,* 2020 WL 359907, at *5 (S.D.N.Y. Jan.21, 2020).  For all of these reasons, defendants have not shown that a stay is warranted.  Accordingly, the application for a stay is denied.

Defendants argue, however, that if this Court denies their stay application, it should require plaintiff to "post a substantial bond."  Citing defendants' reconsideration brief, Dkt. No. 101 at page 14.

The Second Circuit has noted that "Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction...only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully

PB4ATheC

```
 1    enjoined or restrained... Courts have the discretion however,

 2    to require no security at all depending on the specific

 3    circumstances."  Citing State Farm Mut. Auto Ins. Co. v.

 4    Tri-Borough NY Med. Prac. P.C., 120 F.4d 59, 86 (2d Cir. 2024).

 5              Courts may dispense with the bond requirement "where

 6    there has been no proof of likelihood of harm or where the

 7    injunctive order was issued to aid and preserve the Court's

 8    jurisdiction over the subject matter involved."  GFF v. Trump,

 9    781 F.Supp. 3d 195, 213(S.D.N.Y. 2025).  For reasons I

10    explained in the September 22, 2025 opinion, the anti-suit

11    injunction was issued in part because the Mexican actions

12    present a threat to this Court's jurisdiction.  Given these

13    circumstances, plaintiff will not be required to post a bond.

14              For all these reasons, defendants' motion for

15    reconsideration is denied; defendants' request for a stay is

16    denied; and defendants' request that plaintiff be required to

17    post a bond is likewise denied.

18              I will now turn to certain premotion letters and other

19    correspondence that has been submitted by the parties.

20              On August 6, 2025, defendants filed a motion seeking a

21    premotion conference regarding their request to file a motion

22    to dismiss or, alternatively, a motion to stay this action

23    pending the ICSID arbitration.  Citing Dkt. No. 91.

24              On October 14, 2025, the parties filed a status update

25    pertaining to pending litigation in Mexico.  Citing Dkt. No.
```

PB4ATheC

107.  In this status update, plaintiff says that defendant has continued to litigate in Mexican courts in violation of the Court's anti-suit injunction issued on September 22, 2025; defendants deny these allegations.  See *Id.*

Plaintiff complains that since the anti-suit injunction was issued, defendants have filed (1) letters rogatory in a Mexican court; (2) a motion seeking to continue with the processing of these letters rogatory; (3) "a motion to intervene" in an Amparo action filed by plaintiff; and (4) a motion to reaccuse two of three assigned judges in the Amparo action.  *Id.* pages 1-2.

Defendants respond that their motion for the Mexican court to issue letters rogatory was filed on September 19, 2025, before the Court's September 22, 2025 anti-suit injunction was issued.  *Id.*  They further contend that subsequent actions they took pertaining to these letters rogatory were taken in order to comply with the orders issued on September 19, 2025, and February 12, 2025, and they also say that their counsel in Mexico "is formally bringing this Court's order, ECF No. 97, to the Mexican courts' attention." Defendants also say that they "have no plans to otherwise actively prosecute these cases contrary to this Court's order." *Id.* at page 2.  Defendants further describe their October 7, 2025 filing in plaintiff's Amparo action as "a motion seeking an impartiality review of the panel of judges," and not, as

PB4ATheC

1   plaintiff states, as a "motion to intervene." *Id.* at page 3.

2          In an October 16, 2025 letter, plaintiff seeks leave

3   to file a motion under Federal Rule of Civil Procedure 70 to

4   (1) hold TV Azteca and its management group, Grupo Salinas, in

5   contempt of the Court's September 22, 2025 anti-suit

6   injunction; (2) impose sanctions on TV Azteca; and (3)

7   authorize discovery into whether TV Azteca's controlling

8   shareholder and others acting in concert with defendant should

9   also be held in contempt.  Citing Dkt. No. 111, at pages 1-3.

10  Plaintiff has requested that the Court address their request

11  for contempt sanctions at today's conference or set a briefing

12  schedule.  *Id.* at page 3.

13         I will first address defendants' request for leave to

14  move to dismiss or any alternative for a stay pending

15  Resolution of the ICSID arbitration.  See docket 91.

16         In their premotion letter, defendants say that

17  plaintiff has failed to plead a breach of contract claim

18  because it has not adequately alleged performance.  *Id.* at page

19  3.

20         Under the terms of the indenture and the notes — which

21  are incorporated by reference into the indenture — the

22  "notes...may not be offered, sold, pledged or otherwise

23  transferred" to any acquirer unless the acquirer "represents

24  that it is not a U.S. person within the meaning of Regulation S

25  under the Securities Act."  *Id.*  Defendants contend that

noteholders engaged in the ICSID arbitration have represented

that they are "organized under the laws of the United States

and have principal places of business in the United States."

Citing Dkt. No. 91-1, paragraph 6.  Defendants argue that these

are "U.S. persons" who are not eligible to hold the notes, and

that "because plaintiff does not plead the non-U.S. status of

all noteholders, which should be identifiable in the registry

required to be maintained [by the trustee]," plaintiff has

failed to plead performance of its contractual obligations.

Citing Dkt. No. 91 at page 3.

            In their August 11, 2025 response, Dkt. No. 92,

plaintiff asserts that (1) performance need not be specifically

alleged in a complaint seeking recovery on a promissory note;

(2) the complaint contains sufficient factual matter to support

an inference of performance, including that defendants received

$400 million that they promise to repay; (3) "defendants'

theory of breach defies the indenture and the notes' plain

text"; and (4) the breach defendant implies plaintiff has

committed — failing to maintain a proper registry of

noteholders — is immaterial.  *Id.*

            Based on what I have read so far, I am concerned about

whether there is a nonfrivolous basis for a motion to dismiss

here.  I do want to make clear I am not ruling on any motion to

dismiss theory today.  My purpose is only to give you my

impressions concerning the letters I have read.

PB4ATheC

1      As an initial matter "a prima facie case for recovery

2  on a promissory note requires only proof of a note and failure

3  to make payment." *Dresser-Rand Co. v. Petroleos de Venezuela,*

4  *S.A.*, 439 F.Supp. 3d 270, 273 (S.D.N.Y. 2020), which in turn is

5  quoting *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F.Supp.2d

6  462, 470 (S.D.N.Y. 2006).

7      Here, plaintiff appears to plausibly allege the

8  existence of the notes as well as defendants' failure to make

9  payment.  Citing the complaint, Dkt. No. 80 at pages 49-51.

10 ("TV Azteca issued the notes pursuant to the indenture.")  See

11 also *Id.* at paragraph 60-63, ("On February 9, 2021, TV Azteca

12 failed to make the scheduled interest payment, in whole or in

13 part...TV Azteca also failed to repay the notes' $400 million

14 in principal, in whole or in part.")  Defendants have not

15 argued that plaintiff has failed to plead these two essential

16 elements.  That being, the existence of the note and defendants

17 failure to pay.

18     Second, it appears that plaintiff has sufficiently

19 pled the performance element of a breach of contract action.

20 "In alleging a claim for breach of contract under New York law,

21 a plaintiff is required to, at least, generally plead her own

22 performance under the contract."  Citing *Evans v. Select*

23 *Portfolio Servicing, Inc.*, 2020 WL 5848619, at *14 (E.D.N.Y.

24 Sept. 30, 2020).  See also *Jasper & Black LLC v. Carolina Pad*

25 *Co. LLC*, 2020 WL 413869, at *9 (S.D.N.Y. Feb. 9, 2012)("a

PB4ATheC

general allegation of due performance" obviates the need for

plaintiff to plead all of "the actual facts constituting

plaintiff's performance" and "all the conditions required to be

performed.")  Here, the complaint makes a general allegation of

due performance by establishing the Bank of New York Mellon's

role and continued service as trustee under the terms of the

indenture.  Citing the complaint, Dkt. No. 80, at paragraph 48.

Plaintiff's services trustee provides "factual content that

allows the Court to draw the reasonable inference" that

plaintiff has performed its contractual obligations.  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants' argument — if accepted — would require

plaintiff to plead its performance of each and every one of its

duties as trustee.  The Rule 8's pleading standard does not

require such "detailed factual allegations."  Rule 8 requires

only "sufficient factual matter, accepted as true, to state a

claim for relief that is plausible on its face."  *Id.*

Another court dealing with a similar argument in a

case involving a dispute over promissory notes addressed it as

follows:  "In the absence of allegations that [plaintiff]

fulfilled the purported obligation" to maintain a directory

tracking the transfer of notes, "defendant suggests the amended

complaint fails to plausibly plead adequate performance...this

argument asks the Court to draw inferences in [defendant's],

rather than plaintiffs' favor; that is, of course, not

PB4ATheC

permissible on a motion to dismiss." *Pure Diets India Ltd. v.*

*Genco*, 2019 WL 428834, at *5, note 4 (S.D.N.Y. Feb. 4, 2019).

In sum, I am concerned that there are not adequate

grounds to go forward on a motion to dismiss on the theory of a

failure to adequately plead performance.

In their premotion letter, defendants also contend

that the Court should stay this case pending resolution of the

ICSID arbitration.  As grounds for a stay, defendants argue

that:  (1) there is factual overlap between the ICSID

arbitration and the instant case, because both proceedings

"arise from the same issuance of notes by the defendants"; (2)

there is a risk of inconsistent determinations; (3) efficiency

and judicial economy argues in favor of a stay; and (40)

plaintiff will suffer no prejudice.  Citing Dkt. No. 91 at page

4.

In response, plaintiff says that a stay is an

"extraordinary remedy" premised on "an appeal to equity," and

that a stay is unwarranted here because defendants have acted

"inequitably by waiting over two years since the NAFTA

arbitration was filed to seek a stay based on that proceeding."

Citing Dkt. No. 92 at page 4.  Plaintiff further argues that

their request for a stay pending the ICSID arbitration "defies

defendants' explicit promise that any suit arising out of the

indenture or the notes would be heard exclusively in this

Court."  *Id.*

PB4ATheC

1        In part for reasons I have already explained, it does

2    not appear to me — based on what I have read so far — that a

3    stay in favor of the ICSID arbitration would be appropriate.

4        As I have already explained, while certain noteholders

5    are party to the ICSID arbitration, the other party is the

6    Mexican government.  Defendants are not party to the ICSID

7    arbitration.  And as to disputes between plaintiff and

8    defendants, the parties agreed — in the indenture — that

9    disputes arising out of the indenture would be addressed by New

10   York State or federal courts.  Citing June 28, 2024 Qureshi

11   declaration, exhibit 2, which is the indenture, Dkt. No. 48-2

12   at page 106.  Given these circumstances, I do have great

13   difficulty understanding why the instant case should be stayed

14   in favor of an arbitration involving certain noteholders who

15   are alleging that the Mexican government has violated NAFTA.

16       "The Court has the power to grant a stay pursuant to

17   the power inherent in every court to control the disposition of

18   the cases on its docket with economy of time and effort for

19   itself, for counsel, and for litigants."  *Birmingham Assoc.*

20   *Ltd. v. Abbott Lab'ys*, 547 F.Supp.2d, 295, 302 (S.D.N.Y. 2008).

21   "The movant bears the burden of demonstrating that a stay is

22   justified"; first by "establishing that there are common issues

23   to the arbitration and the Court, and that those issues will

24   finally be determined by arbitration, and then if this test is

25   met, by showing that the stay will not hinder the arbitratio*n*."

PB4ATheC

 1    *Id.*  Courts in this district have found stays "particularly

 2    appropriate where they promote judicial economy, avoidance of

 3    confusion, and possible inconsistent results." *Id.*

 4         While the ICSID arbitration involves the same debt

 5    instruments that are at the heart of the instant case, neither

 6    plaintiff nor defendants are party to that arbitration.  Citing

 7    June 23, 2023 request for arbitration, Dkt. No. 91-1, at page 1

 8    and pages 4-5.  The claimants in the ICSID arbitration are a

 9    group of U.S. based noteholders, and as I've said, the

10    respondent is the nation of Mexico.  *Id.*  The claims underlying

11    the arbitration are distinct from those in the instant case,

12    because they "arise under NAFTA" and "pertain to the treatment

13    of the claimants by Mexico, and more specifically, a Mexico

14    court in a proceeding relating to and affecting the TV Azteca

15    note." *Id.* at page 4.  The claimants seek judgment entered

16    against Mexico for allegedly breaching its treaty obligations

17    under NAFTA by permitting a Mexican court to issue an

18    injunction preventing noteholders from collecting on the notes.

19    *Id.* at pages 22-23.

20         Because the issue in the ICSID arbitration will be

21    whether Mexico violated its obligations under NAFTA, it is

22    difficult to see how any ruling by the arbitrators there could

23    have reclusive effect here.  And because it appears unlikely

24    that the arbitral result will have reclusive effect here,

25    judicial economy weighs against staying the instant

PB4ATheC

1    proceedings.

2            In sum, based on what I have read to date, it appears

3    to me that the proposed motion for a stay has little chance of

4    success.

5            So I want defendants to take a week to think about

6    what I've said, both as to their proposed motion to dismiss and

7    their proposed motion for a stay.  And then submit a letter in

8    a weeks' time telling me how they wish to proceed with respect

9    to these proposed motions.  And if the answer is they want to

10    proceed with the motions, they need to address the concerns

11    that I've raised today about whether there's a nonfrivolous

12    basis for proceeding with the motions.

13            As I noted a moment ago, in an October 16, 2025

14    letter, plaintiff seeks leave to file a motion asking the Court

15    to find TV Azteca and Grupo Salinas in contempt of this Court's

16    September 22, 2025 injunction, seeking the imposition of

17    sanctions for contempt, and authorizing discovery into the

18    involvement of affiliates in the alleged contempt of the

19    Court's order.

20            In their letter motion, plaintiff alleges the

21    following violations of the anti-suit injunction:

22            On October 1, 2025, TV Azteca filed a motion in the

23    Thirty-Eighth Superior Court "seeking to continue with the

24    processing of letters rogatory to serve unserved noteholders."

25    Citing Dkt. No. 111 at page 2.

1          On October 7, 2025, counsel for the trustee learned

2     that TV Azteca had previously filed in the Ninth Superior Court

3     a request for letters rogatory to serve on the trustee and two

4     noteholders' investment managers in the United States.    *Id.*

5          On October 8, 2025, TV Azteca filed in the Tenth

6     Circuit Court a motion to "intervene and to reaccuse two of the

7     magistrates that were assigned to hear the Amparo review filed

8     by the trustee against the Amparo rulings related to the

9     September injunction" *Id.*

10          Plaintiff also "seeks leave to take discovery

11     regarding whether TV Azteca's controlling shareholder or others

12     acting in concert with the defendants, are also in contempt of

13     the September 22 order."    *Id.* at page 3.    Plaintiff alleges

14     that because the controlling shareholder has served as the

15     chairman of both TV Azteca and Grupo Salinas, "he is directly a

16     position to comply or not comply with the Court's orders."    *Id.*

17          As I stated earlier, in their letter response

18     defendants say that they have done nothing to violate the

19     injunction.    Citing Dkt. No. 117.    Defendants say that upon

20     receipt of the September 22, 2025 opinion and order and

21     injunction they instructed their Mexican counsel to inform the

22     Ninth Civil Court and the Thirty-Eighth Civil Court of this

23     Court's decision.    Defendants further say that the only filings

24     they have made since then were: (1) in "compliance with

25     court-ordered ministerial paperwork"; and (2) "one defensive

PB4ATheC

1   filing in one of the Amparo lawsuits commenced by plaintiff."

2   *Id.* at page 2.

3           Now, let me ask plaintiff's, whether there have been

4   any further developments since the correspondence that I've

5   eluded to, which suggests to them there has been actions that

6   were taken in Mexico that are in contempt of the anti-suit

7   injunction?

8           Has there been anything new?

9           MR. ELLIS:  Good morning, your Honor.  I don't believe

10  there are further filings in violation of the anti-suit

11  injunction.  However, there are two developments, which may be

12  relevant to your decision here.  Happy to describe them.

13          We put these in our letter last night.  That was

14  document 123.  First, one of the two injunctions at issue,

15  that's the one from the Thirty-Eighth Civil Court having to do

16  with the COVID pandemic, we understand has been vacated in a

17  bench ruling due to the Amparo taken by the trustee.  There is

18  no written ruling reflecting that bench decision yet, but we

19  understand one should be forthcoming rather shortly.

20          However, on October 23, TV Azteca did file another

21  request to process a letter rogatory.  That prompted the

22  Thirty-Eighth Civil Court to direct TV Azteca to explain how

23  that is consistent with this Court's anti-suit injunction.  I

24  believe their response to that filing is due today,

25  November 4th.

PB4AtheC

1          THE COURT:  Well, why is TV Azteca still pursuing

2     these letters rogatory?

3          First of all, do you agree that these actions continue

4     to be taken with respect to the letters rogatory?

5          MR. SHAFTEL:  Your Honor, again, good morning.  Hal

6     Shaftel on behalf of the defendants.

7          We did receive, I think it was after 6:00 last night,

8     the letter reporting on these alleged developments.  Whatever

9     the intent effect was, I need to -- we need to trace to ground

10    what the reference is.

11         It is certainly our understanding that the client,

12    counsel for the client in Mexico fully appreciates, respects --

13    I don't think there was any ever -- ever any effort to deny the

14    effect of the Court's order.  You know, I think our good faith,

15    your Honor, is shown by the transparency.  We explained the

16    dilemma that there are issues under Mexican law about dismissal

17    without prejudice.  We've tried to navigate that by bringing to

18    your Honor by order to show cause our request, which I

19    understand the application has been denied today.  But we would

20    not agree with the characterization and would dispute that

21    anywhere, including in Mexico, we've taken steps disrespectful

22    to this Court's directives.  And we do believe, further,

23    whether it be motion practice, discovery, is not the right

24    focus for this case.

25         THE COURT:  Well, you know, it's a little hard for

PB4ATheC

```
 1    me -- I don't, you know, I don't know anything about Mexican

 2    civil procedure.  It's a little hard for me to appreciate the

 3    significance of some of the actions that plaintiff says have

 4    been taken in Mexico since the injunction.

 5         Defendant characterizes some of it as "court-ordered

 6    ministerial paperwork."  I don't know whether that's an

 7    accurate characterization or not.  I do wonder why, if in fact

 8    actions are being taken to file additional letters rogatory as

 9    recently as October 23rd, I wonder why that's happening, how

10    that could be reviewed as consistent with the injunction I

11    issued.

12         You haven't said anything about the letter rogatory

13    that your adversary says was filed on October 23rd.  Do you

14    know anything about that?  Do you have anything to say about

15    that?

16         MR. SHAFTEL:  Your Honor, I do not.  The assertion

17    was -- and, again, I'm not suggesting anything about the

18    intent, but the effect of bringing this to our attention at

19    6:00 last night is I've not been able to run it to ground.  Of

20    course we can, and of course we will.

21         I will indicate, which I don't think is in dispute, is

22    that with respect to I believe it's the Thirty-Eighth Civil

23    Court, with respect to some letters rogatory which was, if you

24    will, on the assembly line, it was issued, my client has done

25    nothing with it.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PB4ATheC

1          So to me, the active prosecution would be, well, TV

2     Azteca would then go and serve letters rogatory, and that is

3     not alleged.  That is not what there's any indicia was done.  I

4     realize what's ministerial in one person's eye may not be in

5     another's.  But we've not seen, and I don't think there's any

6     indicia of, something actively being pursued or prosecuted

7     against the plaintiff or the noteholders in Mexico at this

8     point.

9          And, again, to reaffirm what does and should go

10    without saying, but our clients understand the order, have

11    recognized its affect.  That's why we immediately, by order to

12    show cause, brought the application we did to your Honor.  We

13    did in the context of dismissals without prejudice, as the --

14    I'm sorry, dismissals with prejudice, as the general rule in

15    Mexico, did try to both be transparent with the Court,

16    transparent with plaintiff, raise what our concerns were, raise

17    what we were doing.  We do believe that's the hallmark of good

18    faith.  And that is how we've tried to approach your Honor's

19    directives.

20          THE COURT:  Well, let me say that there is indicia of

21    good faith here in the sense that defendants' Mexican counsel,

22    according to the representations that have been made in

23    correspondence to me, has brought to the attention of the

24    Mexican courts the injunction I issued.  So I do see some

25    indicia of good faith on defendants' part.

PB4ATheC

1          As I said, it's hard for me to get a grip on how

2   significant some of the so-called ministerial paperwork is.

3   But let me ask plaintiff:  Is it your intention to proceed with

4   a contempt application?  Do you think that's warranted given

5   where we are today?

6          MR. ELLIS:  Your Honor, we have suffered and are

7   continuing to suffer harm in Mexico from the violation of the

8   anti-suit injunction.  We're continuing to incur time and

9   expense in dealing with these actions that we shouldn't have to

10  spend.  But what we really want is for the defendants to come

11  into compliance with the injunction and for this side show to

12  be over.  We'd like the cases to be dismissed.  We think that's

13  especially appropriate in the Thirty-Eighth Civil Court action.

14  Because now, we understand, and I recognize Mr. Shaftel may not

15  have seen it, that one of those actions is now effectively

16  defunct.

17          But what we want to avoid is a situation where we're

18  hamstrung in New York, where the case is supposed to proceed,

19  because the trustee is at risk of adverse legal actions in

20  Mexico, and also the inability to collect in Mexico due to the

21  injunction, the Ninth Civil Court injunction that is still

22  standing.

23          So what we first and foremost want is TV Azteca to

24  comply, to dismiss the cases, forthwith, as your Honor noted

25  ordered.  I note it has been six weeks since the anti-suit

PB4ATheC

1    injunction was issued.  While defendants, you know, have

2    brought the order to the Mexican court's attention, they have

3    not taken any steps yet to dismiss that litigation.  There is

4    no stay in effect.  They have not gotten a stay from any court.

5    We hope that they'll comply quickly.

6            So I do not see a contempt motion as an emergency by

7    any means.  But I do believe that it should remain on the table

8    if we still see a failure to comply here.

9            THE COURT:  So why is it six weeks down the road and

10   this action hasn't been dismissed yet?

11           MR. SHAFTEL:  Your Honor, if I may, again, Hal Shaftel

12   for the court reporter.

13           We have had recently discussions with plaintiffs,

14   plaintiff's counsel.  We were, in the fullness of transparency,

15   there's no, you know, under the cloak of night trying to do

16   something in Mexico here.  We've tried to navigate this

17   dismissal with prejudice issue.  And the plaintiff, and I

18   respect it, raised in their papers opposing our reconsideration

19   motion, if my recollection is right, the prospect, well, why

20   has TV Azteca not come and just sought an on-consent dismissal

21   without prejudice.

22           I would like to give my adversaries credit for a good

23   idea.  I think we may have simultaneously had it.  I would like

24   to see whether that could be worked out.  Obviously, to the

25   extent down the road the injunction that this Court has issued,

PB4ATheC

1    that we understand and we respect, is deemed in whole or in

2    part not appropriate, we do run the risk.  My clients do run

3    the risk of having legal rights extinguished forever and I

4    think an accommodation here can be we will -- we are ready to

5    dismiss.  We would like to come up with a mechanism to dismiss

6    those cases without prejudice.  I think the Thirty-Eighth Civil

7    Court action service has not been effectuated, so we'll have to

8    deal with getting the plaintiff served, so then it can be

9    dismissed without prejudice on consent.  We'd like to explore

10   that.  We think that's an appropriate route which takes into

11   account, for of course the Court's order, first and foremost.

12   It takes into account plaintiff's interests.  We too do not

13   want a side show, but we also think it appropriately respects

14   and has regard for TV Azteca's rights.

15            MR. ELLIS:  May I briefly respond, your Honor.

16            THE COURT:  Sure.

17            MR. ELLIS:  Thank you, your Honor.

18            We did get a proposal from defendants to say the two

19   Mexican actions.  We replied to them last night.  We see two

20   problems with their stay request for the Thirty-Eighth Superior

21   Court action.  Again, that is not defunct so we don't see any

22   reason why that should be stayed.  It should be dismissed.

23   It's meritless under Mexican law as well, as in violation of

24   your injunction.

25            For the Ninth Civil Court action, the problem is also

PB4ATheC

1    we have not been served.  And I understand, from Mexican

2    counsel, not being anymore of an expert in Mexican civil

3    procedure than you are, that we cannot stipulate to stay

4    anything because we're not parties to that case.

5         That being said, if they are willing to stipulate

6    promptly to dismiss this case without prejudice, something our

7    Mexican counsel tells us is possible, we are happy to do that.

8    Again, what we want is for the cases to go away now.

9         THE COURT:  All right.  So my impression is that

10   things are moving in the right direction.  I of course must

11   take very seriously any allegation that parties subject to an

12   injunction is violating the injunction.  I do take it very

13   seriously.  But based on what I've heard so far, it does sound

14   to me like things are moving in the right direction.  If that

15   changes over time, I'm sure plaintiff will bring it to my

16   attention.  I don't want to set a schedule for motion practice

17   that is wasteful and unnecessary.

18        So I'm not going to set a briefing schedule on an

19   application for contempt sanctions now.  I do so because it

20   sounds to me like the matter is moving forward in a positive

21   way and I know that plaintiff will bring to my attention any

22   acts of alleged contempt that happen in the future.

23        So let me turn to the case management, the proposed

24   case management plan the parties have submitted.  And let me

25   inquire first whether there's been any effort made to settle

PB4ATheC

1    the case.

2              So let me hear from plaintiff on that.

3              MR. ELLIS:  No, your Honor.  I believe the position is

4    still the same as it was described in the status letter.  I

5    think both parties are telling the Court they're open to a

6    settlement, but we remain rather far apart.

7              THE COURT:  All right.  So let me hear from the

8    defendants.  I mean, what's the future of the case going to be?

9    Do your clients have any interest in trying to settle this, or

10   do they just want to continue litigating it indefinitely?

11             MR. SHAFTEL:  Oh, for sure, your Honor.  I didn't know

12   whether you meant the future of the case in terms of the scope

13   of discovery, but you mean on the consensual resolution front.

14             You know, we've all been at innumerable, I mean, not

15   as many as your Honor has, status conferences.  Everyone wants

16   to settle.  But it's the other guy's fault for not settling.

17   I'm not sure this case is any different in terms of the -- in

18   terms of the finger pointing.

19             What I will say is we've got sophisticated commercial

20   parties on both sides.  I will note, the significance of which

21   I do not know, but we have a changing of the guard between --

22   of counsel for both sides.  Much of the history that your Honor

23   recorded in the decision was history that predated the arrival

24   of current counsel on either side.  I know the standard case

25   management plan -- and I don't think either party here

PB4ATheC

1   objects -- has a settlement feature built in, and I know I'm

2   not saying anything other than mush, which is not my intent.

3   But I would hope the parties can get serious.

4           THE COURT:  All right.  This is a case premised on

5   allegations that payments due on notes that was a default.  So

6   what discovery is necessary here from plaintiff's perspective?

7   Do you need discovery?

8           MR. ELLIS:  From plaintiff's perspective, your Honor,

9   no.  We have the proof we need to establish the two elements of

10  our claim.  I note that defendant has of course raised multiple

11  discovery theories they'd like to pursue, and Mr. Shaftel will

12  tell you about those, but all of those in one way or another

13  are based on Mexican law, which simply does not apply given the

14  indenture's choice-of-law clause --

15          THE COURT:  Well, doesn't he -- he has this theory

16  that U.S. persons were permitted to purchase the notes and they

17  weren't supposed to and so on and so forth.  Isn't that one of

18  his theories?

19          MR. ELLIS:  That is a theory.  Thank you for raising

20  that, your Honor.

21          I think that can also be quickly disposed if in fact

22  we're trying to come up with a way to dispose of it.  I will

23  note, at the outset, we believe that defense is patently

24  meritless.  Easy reason being that under Section 6.8 of the

25  indenture, the trustee has a right to bring suit to collect

PB4ATheC

1    overdue payments from TV Azteca whether or not it's directed to

2    do so by any noteholder.  So the status of the noteholders,

3    what they did with the direction, what they did with the

4    acceleration notice, simply falls away.

5         Moreover, the trustee doesn't have much of the

6    information that TV Azteca thinks it has, because as also

7    described in the indenture, the so-called registry lists a

8    single entity, Bank of New York Mellon, London Branch as the

9    common depository that holds 100 percent of the notes.  So we

10   think this is a clear distraction that doesn't warrant

11   discovery either.

12        However, given they want to raise these arguments

13   about the U.S. status of the holders as well as the Mexican law

14   usury and public policy defenses, we're trying to get rid of

15   this as quickly as we can.  And what we've proposed to the

16   defendants is that now that you've entered a protective order,

17   we would be willing to provide to them, one, the identity of

18   the holders listed in the registry, though there's no surprise,

19   the beneficial holders that are actually known to the trustee;

20   and then, two, information, all the information that defendants

21   have said they need in their status report about the holders,

22   such as where they bought, when they bought, and for what

23   price.

24        We are prepared to do that fairly quickly.  The

25   defense have come back to us with some questions.  We're going

PB4ATheC

```
 1    to get back to them today.  I'm hopeful we can get to an
 2    agreement.  If not, of course, we'll bring it to you.
 3            My point is simply even assuming this is a legitimate
 4    topic of discovery, this is not something that requires any
 5    extended amount of time in the fact discovery period, or
 6    frankly, expert discovery to process.  We're hopeful we can do
 7    this noncustodial discovery, quick productions, and get to
 8    summary judgment where this case belongs.
 9            THE COURT:  All right.  I'll hear from defendants
10    about what plaintiff's counsel just said, as well as any other
11    discovery that they would like to tell me about.
12            MR. SHAFTEL:  Yes.  Thank you, your Honor.
13            What plaintiff describes as a garden variety onion,
14    when you start to peel it back, is anything but.  And there are
15    two buckets of issues which will have, can have, serious,
16    substantial magnitude effects on the extent of recovery or any
17    recovery in this case.  And I put it into two buckets, the
18    first of which -- and they're both equally important.  But the
19    first of which is what plaintiff's counsel has just referred
20    to.
21            In the global note, there is explicit statement
22    covering ownership and beneficial ownership, that to acquire
23    these notes, the acquirer must represent it is a non-U.S.
24    citizen.  Now, that raises several discovery issues.  And I do
25    note plaintiff's counsel says, well, discovery should be
```

PB4ATheC

1    quicker and narrower because we don't even have all the

2    information.  When I hear that, I think discovery is going to

3    have to be broader because I'm going to have to go get it from

4    a third party.

5          So we need to know the identity of these noteholders

6    because it obviously impacts who and how much any one can

7    collect.

8          THE COURT:  So it sounds like your adversary is

9    prepared to give you that information.  I mean, that's what

10    I -- I mean, is that what you get from what he said or is there

11    more that you want than what he offered?

12          MR. SHAFTEL:  We do want what plaintiff has offered,

13    but plaintiff is not, as I understand it, in a position, I

14    think I just heard it in the discussion with the Court, to

15    provide the identification for the totality of the noteholders.

16          Let's assume from the plaintiff or from a third-party

17    registrar we get that information.  And I do note if it

18    requires third-party discovery, that makes this more, not less,

19    complicated, if you will.

20          But that then raises the issue.  We clearly, as I read

21    in the papers, the filings with the Court, a real dispute over

22    the meaning of this legend, of this restriction in the bond.

23    We think it means, frankly, what it says, you need to be a

24    non-U.S. citizen.  Plaintiff seems to suggest the contrary

25    reading.  That's going to raise discovery about the intent of

PB4ATheC

1    the parties.  And if there is some ambiguity, it's going to

2    raise expert discovery about customs and practices in the

3    securities industry, how clauses, references along these lines,

4    are understood.  I don't know how you read no U.S. citizens to

5    mean anything but, but if plaintiff is going to press an

6    alternative interpretation, we need discovery on what the

7    understanding of the parties was at the time of contracting, if

8    you will, and if there's a dispute, if there's some questions

9    about the meaning, you have to read in customary industry

10   practices, that will move from fact discovery to expert

11   discovery.

12          So that's one bucket, your Honor.  In equally -- at

13   least an equally important bucket.  And I do need to put to

14   rest plaintiff's reference that, oh, U.S. law automatically

15   applies.  Or New York law more specifically.

16          Your Honor, when you look at the documentation, that

17   is far from the case.  I will try to do this as quickly as I

18   can, but it does start with Section 11.7 in the indenture,

19   which is the governing law section.  And it says -- let me

20   actually quote it correctly.  Section 11.7 of the indenture,

21   it's an attachment to the complaint.  So 107, docket 81 at page

22   98:  This indenture...shall be governed by and construed in

23   accordance with the law of the State of New York.  Period.

24   Close quote.  And I emphasize:  Period.  Close quote.

25          It brings me back to law school.  This governing law

PB4ATheC

1   provision raises the renvoi issue.  It does not have -- which

2   is contract 101, contracts 101, and we have sophisticated

3   parties every which way in this case.  It does not have, of

4   course, the key language without regard to choice of law

5   principles.  This is a renvoi situation, where New York law may

6   point to foreign law, and I'm going to get more specific when

7   it comes to the question of usury, your Honor.  But plaintiff

8   embraces the case -- just as an example, the *Petróleos* case,

9   where UCC actually applied Venezuelan law but the New York

10  Court of Appeals held that for other reasons other than

11  validity, you would look to New York law, but that had the

12  standard language, which everybody knows how to write, without

13  regard to choice of law principles.  These parties know how to

14  write contracts, sophisticated parties, didn't write the choice

15  of law provision in a way to avoid the renvoi issue.

16          So now let me take that to where this -- where the

17  rubber meets the road in this case.  And that's the question of

18  usury laws under Mexico, under Mexican law.  And they come in a

19  variety of flavors.

20          There's more standard usury laws about rate of returns

21  and quantum of interest.  And there's also more specific

22  provisions, as I understand it, that will have to be developed

23  through discovery, in fact in expert, about the rate of return

24  an acquirer of distress debt can get when it purchases the debt

25  at a discount.  Here, rough math from the pleading, the

PB4ATheC

1    noteholders, current noteholders, paid 50 percent of the value

2    and are going to triple their money, if you do the math and if

3    they are able to recover what they purport to claim to recover.

4    There's a section in the indenture, your Honor, and it is 3.7,

5    so that's going to be page 48 at docket 80-1.  And it says:

6    The company in each subsidiary guarantor covenants to the

7    fullest extent permitted by applicable law that it will not --

8    and it goes onto claim a usury defense.

9         It says any applicable law.  It doesn't say New York

10    law.  And more than that, it wouldn't make sense to read New

11    York law into that provision because New York law, under the

12    general obligations law, doesn't even apply usury prohibitions

13    in debts above two and a half million dollars.

14         So what does the reference mean to the extent that the

15    company will not invoke usury laws to the extent permitted by

16    applicable law?  Well, we already know in the choice of law

17    provision, it is not air shut that -- airtight I should say,

18    that New York law applies.  We have the renvoi problem, issue.

19    And then we note here in section 3.7 specific to usury, it's

20    not speaking about New York law.  It can't be speaking about

21    New York law, because New York usury law does not fit the shoe,

22    does not fit debt above two and a half million dollars.

23         So what does any applicable law mean?  We think it

24    clearly means Mexico.  I believe the plaintiffs are presumably

25    likely to take a different position.  But this then raises the

PB4AТhеC

1    issue of what does the provision mean as a matter of contract

2    formation, fact issue. And then it also raises the issue of

3    Mexican law, the Mexican usury laws, public policy. I should

4    have made the point and would have clarified under Mexican

5    laws, these usury prohibitions that I'm referring to, as I

6    understand it, cannot be waived.

7        So we do believe, between the choice of law provision

8    and 3.7 specific to usury, that Mexican law is imported into

9    this contract. It's going to be a less subject to stipulation

10    by plaintiffs, it will be, I presume, disputed and it

11    implicates both fact discovery about contract formation, expert

12    discovery about Mexican law and potentially customs and

13    practices, and prevailing market rates in Mexico for usury

14    purposes.

15        So we do believe that -- I guess to start -- to end

16    where I began. While plaintiff paints this as a garden variety

17    onion, there are real issues here that will seriously impact

18    who can recover and how much can be recovered. I'll simply add

19    the reference to section 6.8, that the trustee is able to just

20    collect the whole ball of wax for everyone, is not our reading

21    of 6.8.

22        The trustee is allowed to collect "to the extent then

23    due" and what's due is going to be hotly contested based on the

24    identity of the parties and based on the application of whose

25    usury laws, if any, apply. So we do see both fact and expert

PB4ATheC

1    discovery as very much relevant and indeed, essential.

2            MR. ELLIS:  May I, your Honor.

3            THE COURT:  Sure.

4            MR. ELLIS:  Thank you, so much.

5            To start at the end, Section 6.8 and what amounts are

6    due under the indenture, there's no dispute here that the notes

7    have matured and been accruing 8.25 percent interest.  I note

8    Mr. Shaftel did not provide any authority on US law or Mexican

9    law stating that 8.25 percent, the rate in the indenture, is

10   somehow usurious.  I know as you've seen, as we cited, TV

11   Azteca has in fact stipulated to the fact that the notes went

12   unpaid.  So it's not clear that there's too much dispute here,

13   either about what's actually owed or about the trustee's

14   authority to collect it.

15           Moving onto the holders, there is something I would

16   like to clarify as to what information the trustee has and what

17   information the beneficial holders have.

18           As I described, all the trustee can see is, one, the

19   registry, which lists a single holder, the Bank of New York

20   Mellon, London Branch, as common depository, as the capital H,

21   Holder, of the capital end notes.  It's very common global note

22   form.  Beneficial interests in the notes were held through

23   securities intermediaries the same way that you or I would hold

24   beneficial interests in stock through the DTC in the United

25   States.

PB4ATheC

1          So all the trustee has is the name of the Bank of New

2     York Mellon, which is not illuminating, that's what's on the

3     registry, or whatever holders have reached out to it directly

4     to direct to sue or to ask questions and we're not even sure if

5     there's anyone in that second category.

6          So there's not too much that can be sought from the

7     trustee on these grounds.  However, like prior counsel, I want

8     to be clear, we also represent the ad hoc group of noteholders,

9     which as directed the trustee to sue, it's only on behalf of

10    those noteholders that we would be willing to provide the

11    information I described as us offering to Mr. Shaftel.  The

12    entire point of that being to avoid third-party subpoena

13    practice, to avoid people trying to chase noteholders around

14    the globe so as to drag this case out longer than it needs to

15    be dragged.

16         Point two, the notes and the form of the global note.

17    I'm glad Mr. Shaftel raised this as well, I agree with him that

18    the global note means what it says.  And what it clearly says

19    is that the initial holder of the note, Bank of New York

20    Mellon, London Branch, may not be a U.S. person under Reg S,

21    and that's easy to comply with, because as the name implies,

22    Bank of New York Mellon, London Branch, does not happen to be

23    in the United States.  However, the note specifically

24    contemplates that U.S. persons can take subsequent beneficial

25    interests in the notes as long as they comply with an exception

PB4ATheC

 1    to the securities laws.  That's why the note at Dkt. No. 80-2

 2    makes references, for instance, to persons in the note under

 3    one rule 144(a) and other exceptions.  So I believe that issue

 4    falls away as well.

 5            Point three, Mexican law, this is the first we are

 6    hearing about a renvoi theory.  They can make that argument if

 7    they wish.  I note Mr. Shaftel has made no argument, cited no

 8    authority as to how New York choice of law principles actually

 9    require the application in Mexican law.  I'm fairly confident

10    that in a transaction in U.S. dollars with a U.S. party, the

11    Bank of New York Mellon, for issuance of the notes in the

12    United States with a New York closing, that all those factors

13    would clearly point towards application of New York law.

14            However, if they want to raise that argument, they

15    should feel perfectly able to do so on summary judgment.  I do

16    not see why that would require extended fact or expert

17    discovery in advance.

18            Finally, the usury laws, point four.  It is a little

19    remarkable that TV Azteca is citing 3.7 of the indenture as a

20    way to apply Mexican usury law so as to avoid their obligations

21    to pay the hundreds of millions of dollars they indisputably

22    owe.  Because in 3.7, the company in any subsidiary guarantor

23    covenanted to the fullest extent permitted by applicable law

24    that it will not at any time insist upon or plead or in any

25    manner whatsoever claim or take the benefit or advantage of any

PB4ATheC

1    stay or extension law or any usury law or other law that would

2    prohibit or forgive the company or such subsidiary guarantor

3    for paying any or all portion of the principal and interest on

4    the notes as contemplated herein.

5         They are trying to take a provision that says thou

6    shall not raise a usury defense --

7         THE COURT:  Yeah, but he says under Mexican law you

8    can't waive that.  That's what he -- I mean, that's what I

9    thought I heard him say.

10        MR. ELLIS:  I understand that.  And that's only

11   obviously if Mexican law applies in the first place.  My point

12   is that, simply, this is a promise not to waive this in the

13   first place.  Perhaps it is unenforceable.  They're allowed to

14   raise that argument.  But this is a waiver of defense.  This is

15   not a preservation of a defense.

16        THE COURT:  So it's clear that the parties sort of

17   have wildly different views about what discovery is going to

18   look like here.  So it seems like -- I'm not sure there's much

19   point in me entering the case management plan until we've

20   resolved the issues about what discovery is actually

21   appropriate and what discovery is not appropriate.

22        Do you disagree?

23        MR. ELLIS:  No, your Honor.  We just need to find the

24   appropriate way to do that.  We're happy to proceed by letter

25   motion if you'd like to address the choice of law issues.  We

PB4ATheC

1    do think, in fact, that it would be helpful to handle threshold

2    issues up front.

3           THE COURT:  To handle what?  You said what issues up

4    front?

5           MR. ELLIS:  Oh.  Threshold issues.  Sorry.

6           THE COURT:  Threshold issues, yeah.

7           MR. ELLIS:  About what law applies.

8           THE COURT:  Yeah.  Yeah.  Because, I mean, it seems

9    pointless for me to set a particular period for discovery

10   because the length of the period is going to be determined by

11   the subjects that are going to be taken up in discovery and the

12   parties don't appear to agree on what the appropriate scope of

13   discovery is.  So it does seem to me that as a threshold

14   matter, I or the assigned magistrate, would have to resolve

15   what the scope of appropriate discovery is.  Ordinarily, I

16   don't get involved in discovery matters.  But given that so

17   much turns on the appropriate scope of discovery here, it may

18   be that I would vary from my usual practice.

19          In any event, how do you suggest -- and maybe the

20   lawyers need to talk about this.  I'm interested in the lawyers

21   coming up with proposed mechanism for how we address the issues

22   raised today about the proper scope of discovery.  Do you want

23   to talk with each other and then send me a letter in a few

24   days' time with a proposal about how to proceed?

25          MR. ELLIS:  We can do that, your Honor.  Let me throw

PB4ATheC

1  out a proposal now, though, and then we can discuss.

2              I would suggest that we could submit letter briefings

3  rather quickly on the two threshold issues.  That is, one,

4  which law applies; and, two, this issue about the U.S. persons

5  under the note.  I suggest we could have that done in a week.

6  But what I'm also concerned about is that we do not let time

7  spin out any further.  So let us, at the same time, try to get

8  done what we can through discovery.  We can work out, for

9  instance, this issue about holder discovery, I would like to

10 see initial disclosures, I would like to see whatever document

11 requests we're going to serve.  There's no reason to hold that

12 back.  We may not have an end date yet, but we should certainly

13 get going.

14             THE COURT:  Okay.  What do you think?

15             MR. SHAFTEL:  Your Honor, that makes perfect sense to

16 me, but I do need to have one footnote.  What is being

17 described as predicate issues are issues that may require

18 discovery.  I do not -- I am not at all confident, unless I'm

19 particularly persuasive, that the Court is going to be able to

20 determine what law applies based on the face of pleadings.  I

21 mean, that is part of the discovery process.  Where are the

22 contacts?  What were the expectations?  Where were the

23 dealings?

24             THE COURT:  Only if the agreement is ambiguous.

25 Right?  I don't get to any ex-parte stuff unless the agreement

PB4ATheC

1    is ambiguous.  Now, you have made an argument that it is.  What

2    do you say?  Do you think it's ambiguous?

3                MR. ELLIS:  Me?

4                THE COURT:  Yeah.

5                MR. ELLIS:  No, your Honor, I don't think it is.

6                THE COURT:  Right.

7                MR. SHAFTEL:  Your Honor, to be clear -- and if I

8    misspoke, I do want to correct that.  It is not our view that

9    this language is ambiguous in any of the provisions I

10   referenced.  But, at the same time, I realize the other side is

11   taking a different position.

12               THE COURT:  Well, you have this argument that one of

13   the provisions should be interpreted to indicate that New York

14   law doesn't apply and that, you know, there was an intent *sub*

15   *silentio* to indicate that Mexico law actually applies.  And,

16   you know, maybe you're right about that.  Maybe you're wrong

17   about that.  I don't know.  But if I were to conclude that the

18   agreement, the language of the indenture is clear, then that's

19   sort of the end of the matter.  I have no interest in hearing

20   what people thought at the time or what experts think now.  If

21   the language is clear, the language is clear, and I don't go

22   any further than the language.

23               So what seems to me to make sense is the lawyers talk

24   about this over a weeks' time and try to reach agreement on as

25   much as they can.  And then as to what they can't reach

PB4ATheC

1    agreement on, brief what they think should happen in terms of a

2    discovery plan.  I don't see me -- you know, I don't see a

3    point in me today issuing an order that says all discovery

4    should be done in 30 days or all discovery should be done in 60

5    days when we have like fundamental disagreements it sounds like

6    about what the scope of discovery should be.

7              So what I would like you to do in the first instance

8    is see what areas of agreement there can be, timing, for

9    example, for initial disclosures, whatever else you can agree

10   on.  And then exhaust what you can agree on, both in terms of

11   formal or informal discovery if there's an opportunity for

12   informal discovery to satisfy some of the peoples' concerns.

13   And then second stage, in your submission, what you can agree

14   on and briefing as to why you're right and the other side is

15   wrong.  That's what I have in mind.  And given the lengthy

16   delays that the case has already experienced, I would like to

17   get this submission in a weeks' time.

18             MR. ELLIS:  We're happy to do that, your Honor.  I

19   should also have noted earlier that we've already served our

20   initial disclosures.  We're happy to move things on as

21   expeditiously as we can.

22             THE COURT:  Okay.  So is everybody clear on what I

23   want?

24             MR. SHAFTEL:  I hope so.  I think so, your Honor.

25             THE COURT:  I want a fairly detailed plan.  I mean,

 1    and joint would be great.  But when your agreement breaks down,

 2    assuming it does, for the contrasting views of discovery, I

 3    want a detailed plan of what that's going to look like.

 4            And to the extent legal issues are implicated in your

 5    arguments for the discovery you need, obviously I'm going to

 6    need supporting authority for those points.

 7            And if you come to think that a week is not adequate

 8    to properly brief this, then tell me and I'll give you more

 9    time.  I don't know how complex these issues are that we

10    touched on today.  But if you conclude a week is not adequate,

11    tell me that and propose what time you think would be adequate.

12    It's more important to me that the issues be properly briefed

13    than it is that I get it in a weeks' time.

14            MR. ELLIS:  For our part, your Honor, we believe it

15    absolutely can be done in a week.  The issues have already been

16    briefed.  The lawyers are clearly conversant with those issues.

17    I don't believe they're that complex.  I think we'd be happy to

18    get detailed submissions in seven days.

19            THE COURT:  Okay.  And what about you, do you think a

20    week is enough?

21            MR. SHAFTEL:  I want to give it a try, your Honor.  If

22    I need a few more days, hopefully counsel will be able to work

23    that out consensually.

24            THE COURT:  All right.  Is there anything else we

25    should talk about now?

PB4ATheC

 1              MR. ELLIS:  Not from us.  Thank you so much, your
 2     Honor.
 3              MR. SHAFTEL:  Thank you, your Honor.
 4              THE COURT:  All right.  Thank you all.  And have a
 5     good day.
 6              And just to reiterate, I want defendants to send me a
 7     letter in a weeks' time telling me what they want to do with
 8     their proposed motion to dismiss and motion for a stay.  Okay?
 9              MR. SHAFTEL:  Understood.  Thank you.
10              THE COURT:  Yep.
11              (Adjourned)
12
13
14
15
16
17
18
19
20
21
22
23
24
25