# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,<br><br>Plaintiff,<br><br>v.<br><br>TV AZTECA, S.A.B. DE C.V. ET AL.,<br><br>Defendants. | Case No. 1:22-cv-08164-PGG-BM<br><br>Hon. Paul G. Gardephe<br><br>Hon. Barbara Moses |
| TV AZTECA, S.A.B. DE C.V., ET AL.<br><br>Defendants and<br>Third-Party Plaintiffs,<br><br>v.<br><br>CYRUS CAPITAL PARTNERS, L.P. AND CONTRARIAN CAPITAL MANAGEMENT, LLC<br><br>Third-Party Defendants. | |

## DECLARATION OF NORMA URZÚA

Norma Urzúa declares the following pursuant to 28 U.S.C. § 1746:

1.    I act as the Corporate Legal Director of Mergers & Acquisitions for TV Azteca, S.A.B. de C.V. ("TV Azteca"), a defendant in the above-captioned action. I am a Mexican attorney and have been practicing law in Mexico since 1995. Since 2013, I have been acting as an advisor for TV Azteca. As such, I have 30 years of experience in capital markets, securities, and cross-

1

border finance transactions and have been involved in eight securities issuances on behalf of TV Azteca and other issuers.

2. I respectfully submit this declaration in opposition to Plaintiff's motion for summary judgment and in support of Defendants' cross-motion for summary judgment.

3. This declaration is based upon my own personal knowledge, including my direct, firsthand involvement in the negotiation, drafting, and execution of the Indenture dated August 9, 2017 (the "Indenture"), entered into by TV Azteca, its Subsidiary Guarantors, The Bank of New York Mellon as Trustee ("Plaintiff" or "Trustee"), and The Bank of New York Mellon, London Branch as Principal Paying Agent, as well as the negotiation and issuance of the related Global Note dated August 9, 2017 (the "Global Note"), the preliminary Offering Circular dated July 24, 2017 ("Preliminary Offering Circular"), and the final Offering Circular dated August 2, 2017 (the "Final Offering Circular") (collectively, the "Transaction Documents"). Attached hereto as **Exhibit A**, **Exhibit B**, **Exhibit C**, and **Exhibit D** are true and correct copies of the Indenture, Global Note, Preliminary Offering Circular, and Final Offering Circular, respectively. This declaration is also based upon my review of TV Azteca's books and records kept in the ordinary course of its business. If called as a witness, I could and would testify competently to the matters set forth in this Declaration.

4. Plaintiff is the Trustee for the 8.250% Senior Notes Due 2024 (the "Notes"), issued by TV Azteca under the Indenture. The Notes were issued in the form of a Global Note in the principal amount of $400 million. *See* Ex. A at § 2.1.

**A.**    **The Indenture and Transaction Documents Were the Product of Arm's-Length Negotiations Among Sophisticated, Counseled Parties**

5.    TV Azteca retained sophisticated U.S. and Mexican outside counsel and financial advisors to advise on, draft, and negotiate the Indenture, the Global Note, the Preliminary Offering, the Final Offering Circular, and the related transaction documents.

6.    Plaintiff is a sophisticated New York chartered bank with extensive experience serving as indenture trustee for international debt offerings and was likewise represented by experienced counsel and other advisors in connection with the negotiation and execution of the Indenture and the Transaction Documents.

7.    During the negotiations of the Transaction Documents, multiple drafts of the Indenture, Global Note, the Preliminary Offering and Final Offering Circular were exchanged, marked up, and revised by the parties and their counsel and advisors.

8.    No party to the Transaction Documents was under any economic compulsion or duress, and each party had the opportunity to review, comment on, and negotiate every material provision of the Transaction Documents.

**B.**    **The Parties Expressly and Repeatedly Prohibited U.S. Persons from Acquiring or Holding Any Interest in the Notes**

9.    From the very inception of the offering, TV Azteca structured the Notes as a Regulation S offering with the additional requirement that U.S. Persons could never purchase the Notes. The Transaction Documents repeatedly and prominently confirm that intent at every level—the Preliminary Offering Circular, the Final Offering Circular, the Global Note, and the Indenture itself.

10.    Both the Preliminary Offering Circular and Final Offering Circular, which TV Azteca used to market the Notes, open with the following capitalized and bolded text:

3

**IMPORTANT NOTICE**

**NOT FOR DISTRIBUTION TO ANY U.S. PERSON. THIS OFFERING IS AVAILABLE ONLY TO NON-U.S. PERSONS.**

*See* Ex. C & D at 1.

11.    The Offering Circulars further state that the offering is available only to non-U.S. persons within the meaning of Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), outside the United States, and that the Notes "MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT, OF, U.S. PERSONS" except pursuant to certain limited exceptions. *Id.*

12.    The first page of the Offering Circulars further state that, **"THIS OFFERING IS AVAILABLE ONLY TO NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE 'SECURITIES ACT') OUTSIDE THE U.S."** *Id.*

13.    The Offering Circulars also provide that they and the offer of the Notes itself are only addressed to and directed at certain persons within the European Economic Area and the United Kingdom. *Id.*

14.    The second page of the Offering Circulars provides, in the paragraph entitled "Confirmation of your Representation," that "[i]n order to be eligible to view this Offering Circular or make an investment decision with respect to the securities, investors must be non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S." *Id.* at 2.

15.    The same paragraph also provides that by accepting the e-mail containing and accessing the Offering Circular, the recipient shall be deemed to have represented that "you and any customers you represent are non-U.S. persons (within the meaning of Regulation S under the

4

Securities Act) and that the electronic mail address that you gave us and to which this Offering Circular has been delivered is not located in the U.S." *Id.*

16.    Consistent with the Offering Circulars, the Global Note itself contains a legend prohibiting U.S. Persons from acquiring or holding any beneficial interest in the Notes (the "No U.S. Person Requirement"). *See* Ex. A at A-1; Ex. B at 1.

17.    I was directly involved in the negotiation and drafting of the Transaction Documents, including the No U.S. Person Requirement. Based on those negotiations and the documents exchanged among the parties, the No U.S. Person Requirement was included to minimize U.S. connections to the Notes and reduce the risk of U.S. securities litigation. No party to the negotiations expressed any disagreement with that purpose.

18.    The No U.S. Person Requirement was a material, bargained-for term of the Notes. Without it, TV Azteca would not have issued the Notes on the terms reflected in the Transaction Documents.

19.    No one who was part of the negotiations—including Plaintiff, bankers, advisers, or any party that expressed an interest in acquiring the Notes—ever raised any question, objection, or concern regarding the No U.S. Person Requirement.

20.    The structure of the Notes was consistent with TV Azteca's note issuances immediately preceding the Indenture. In 2011 and 2013, TV Azteca issued a total of approximately $500 million in notes. Indeed, part of the proceeds of the 2017 issuance were precisely to pay the 2013 notes. As in the 2017 issuance, the 2011 and 2013 issuances were made outside of the United States, made available exclusively to non-U.S. persons, and U.S. persons were restricted from buying notes either initially or in the secondary market. Bank of New York Mellon was also the trustee of those issuances.

21.     The reason for minimizing U.S. connections in these issuances is that TV Azteca was highly sensitive to exposure to U.S. federal securities laws and was focused on minimizing potential exposure to any U.S. securities litigation or investigations risk.   TV Azteca was particularly sensitive to U.S. securities litigation and investigation risk because of SEC actions in 2005 against TV Azteca, leading to a September 2006 settlement.

**C.     Plaintiff Bound Itself to Maintain a Register of Noteholders to Police the No U.S. Person Requirement**

22.     TV Azteca and Plaintiff specifically negotiated and agreed to Sections 2.3 and 2.5 of the Indenture. Section 2.3 requires Plaintiff, as Registrar, to "keep a register of the Notes and of their transfer and exchange." Section 2.5 provides that "[t]he Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders." *See* Ex. A at §§ 2.3, 2.5.

23.     Based on the negotiations in which I participated, Sections 2.3 and 2.5 were designed to ensure that TV Azteca had a means to monitor and enforce the No U.S. Person Requirement and to ensure that beneficial interests in the Notes were not acquired or held by U.S. Persons.  Neither Plaintiff nor anyone else involved in the negotiations of these provisions raised any objection or alternative interpretation to these provisions.

24.     Absent these requirements, TV Azteca would have had no way of knowing whether U.S. Persons were improperly purchasing the Notes.

25.     During the negotiations leading up to the Indenture, Plaintiff did not object to or raise any concern regarding its obligations under Sections 2.3 and 2.5.

26.     Defendants only learned of Plaintiff's failure to keep a register and a list of Holders once this litigation began.

6

**D.    The Parties Deliberately Carved Out Mexican Law to Govern Usury and Public Policy Issues**

27.    During the negotiations, the parties specifically discussed the inclusion of Section 3.7, titled "Waiver of Stay, Extension or Usury Laws" and its "applicable law" carve-out from the Indenture's general New York choice-of-law clause (set forth in Section 11.7). The parties understood that "applicable law," as used in Section 3.7, would mean the law of Mexico with respect to usury.

28.    The language in Section 3.7 contains the same "applicable law" language reflected in the Offering Circular. *See* Ex. C at 118. As such, Section 3.7 was entirely consistent with what TV Azteca had offered and announced in its Offering Circular. No one involved in the transaction and none of the parties who received or reviewed the Offering Circular, including Plaintiff, ever raised any questions or concerns regarding the inclusion and application of Mexican usury laws.

29.    TV Azteca and Plaintiff understood that New York usury laws were necessarily inapplicable to the Indenture because those laws do not apply to loans over $2.5 million, and the parties did not intend to include superfluous language in the Indenture. The "applicable law" language in Section 3.7 was therefore included specifically to ensure that Mexican usury law would apply.

30.    In nearly every instance the Indenture uses the term "applicable law," it refers to Mexican law or some other relevant foreign law (and not to New York law). A summary of those provisions is contained as Appendix A to the accompanying memorandum of law.

31.    No one who was part of the negotiations—including Plaintiff, bankers, advisers, or any party that expressed an interest in acquiring the Notes—ever raised any question, objection, or concern regarding Section 3.7 or its incorporation of Mexican law.

7

32.     The National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*), the primary Mexican banking and securities regulator, expressly informed TV Azteca, in connection with the issuance of the Notes, that Mexican public policy would always prevail in connection with the issuance, interpretation, and enforcement of the Notes. Attached hereto as **Exhibit E** is a true and correct copy of the letter from the National Banking and Securities Commission to TV Azteca dated August 22, 2017.

**E.     An Unforeseeable Tax Ruling, Driven by the Ad-Hoc Group's Lobbying Campaign, Rendered TV Azteca and its Subsidiaries Insolvent and Triggered a Mexican Bankruptcy Proceeding**

33.     On November 13, 2025, the Mexican Supreme Court affirmed a massive tax liability against TV Azteca and its affiliates (the Guarantors in this action), which Defendants had been disputing for years. Attached hereto as **Exhibit F** is a true and correct copy of the Supreme Court's decision, with a translation. Because of the way in which TV Azteca and its subsidiaries file taxes in Mexico, the ruling in practice made them jointly and severally liable and also made all of the subsidiaries subject to enforcement actions by the Mexican government to attempt to collect on the tax debt.

34.     This adverse ruling followed months of intense public lobbying by the Ad-Hoc Group against Defendants, including a campaign to influence the President of Mexico and the Mexican judiciary to take adverse actions against Defendants, as shown in the articles attached to Mr. Pulecio-Boek's declaration.

35.     This outcome was unforeseeable. The disputed tax liability was based on false allegations and legally unsupported theories. The legal theories behind the tax liability were so outlandish that Defendants (which aggregate their financial reporting and accounting statements) had not even provisioned for the liability in their financial statements.

8

36. The Ad-Hoc Group's lobbying campaign and the resulting ruling took Defendants by surprise and imperiled their ability to survive.

37. After the surprising tax ruling, TV Azteca faced the risk that the Mexican government would seize the operations and take over its assets. To prevent such actions, TV Azteca paid the tax debt, which totaled approximately $200 million. Attached hereto as **Exhibit G** is a true and correct copy of TV Azteca's press release announcing this payment.

38. To be able to pay the tax debt, TV Azteca entered into a loan agreement up to 5,000,000,000.00 pesos (approximately $288 million) with a third party. The payment of the tax debt rendered all Defendants insolvent and unable to pay their debts and liabilities, including amounts purportedly owed under the Notes.

39. On March 10, 2026, TV Azteca filed for *concurso mercantil* in Mexico, the equivalent of a Chapter 11 bankruptcy proceeding. The *concurso* proceeding is ongoing.

40. Plaintiff has filed an *amparo* with the concurso court seeking access to the case file, and in that amparo it invokes human rights, including protections afforded by the American Convention on Human Rights. Attached hereto as **Exhibit H** is a true and correct copy of that filing.

41. In his declaration, Mr. Pulecio-Boek discusses the arbitration filed by Contrarian Capital Management, LLC ("Contrarian") and Cyrus Capital Partners, L.P. ("Cyrus") before the International Centre for Settlement of Investment Disputes. The filings in connection with that

9

arbitration    can    be    found    here:    https://icsid.worldbank.org/cases/case-database/case-detail?CaseNo=ARB/23/33. The arbitration is ongoing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on June 1, 2026

Norma Urzúa