**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,<br><br>Plaintiff,<br><br>v.<br><br>TV AZTECA, S.A.B. DE C.V., ET AL.,<br><br>Defendants. | Case No. 1:22-cv-08164-PGG<br><br>Hon. Paul G. Gardephe<br><br>Hon. Barbara Moses |
| TV AZTECA, S.A.B. DE C.V., ET AL.<br><br>Defendants and Third-Party Plaintiffs,<br><br>v.<br><br>CYRUS CAPITAL PARTNERS, L.P. AND CONTRARIAN CAPITAL MANAGEMENT, LLC<br><br>Third-Party Defendants. | |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants respectfully submit this Notice of Supplemental Authority in connection with Defendants' Opposition to Plaintiff's Motion for Summary Judgment. (ECF Nos. 263-270, 273.) Defendants' Opposition responded to Plaintiff's argument that there is no breach of the Indenture because the Common Depository is the sole "Holder" of the Notes, arguing that such a reading would render meaningless and superfluous the many Indenture provisions referring to "Holders" and "Notes" in the plural. (ECF No. 263 at 12-13.)

The Second Circuit's recent opinion in *UMB Bank, N.A. v. Bristol-Myers Squibb Company*, 2026 WL 2339538 (2d Cir. Aug. 13, 2026) considers similar contractual language. *See* Exhibit A. The case involved a Contingent Value Rights Agreement ("CVR Agreement") that defined "Holder" as a "Person in whose name a Security is registered in the Security Register" and where the "*Beneficial owners*" were "not registered in the Security Register; instead their ownership is recorded through DTC book entries." *Id*. at *4 (emphasis in original).

The Second Circuit noted that UMB Bank, N.A., as Trustee under the CVR Agreement, "identifie[d] several references to 'Holder' within the Agreement that would only make sense if 'Holder' was understood to refer to the beneficial owner rather than the registered holder—that is, the DTC." *Id.* at *9. While the Court did not resolve that question, it concluded the suit could proceed even assuming the beneficial owners' action "did not comport with the strict terms of the CVR Agreement." *Id.* In so holding, the Court explained that the Agreement's registered-holder requirements were "contractual formalities, not substantive protections for the CVR Holders." *Id.* at *13. That reasoning defeats Plaintiff's contention that the Common Depositary's status as the sole registered "Holder" is dispositive of whether the Noteholders (i.e., the real owners of the Notes) breached the Indenture's prohibition against U.S. Persons holding the Notes.

UMB Bank, N.A., which prevailed in the appeal, was represented by, among others, Plaintiff's counsel in this case.

Dated: New York, New York
August 20, 2026

**GREENBERG TRAURIG, LLP**

By:

*/s/ Hal S. Shaftel*
Hal S. Shaftel
Daniel Pulecio-Boek
John C. Molluzzo Jr.
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200
shaftelh@gtlaw.com
pulecioboekd@gtlaw.com
molluzzoj@gtlaw.com

*Counsel for Defendants/Third-Party Plaintiffs TV Azteca, S.A.B. de C.V., et al.*

# Exhibit A

2026 WL 2339538
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

UMB BANK, N.A., solely in its capacity AS TRUSTEE UNDER the CONTINGENT VALUE RIGHTS AGREEMENT BY AND BETWEEN BRISTOL–MYERS SQUIBB COMPANY AND EQUINITI TRUST COMPANY, DATED NOVEMBER 20, 2019, Plaintiff-Appellant-Cross-Appellee,

v.

BRISTOL-MYERS SQUIBB COMPANY, Defendant-Appellee-Cross-Appellant.

Docker Nos. 24-2865 (Lead), 24-2928 (XAP)
|
August Term, 2025
|
Argued: December 5, 2025
|
Decided: August 13, 2026

Appeal from the United States District Court for the Southern District of New York (Furman, *J.*)

**Attorneys and Law Firms**

Jeffrey A. Lamken, MoloLamken LLP, Washington, D.C. (Eugene A. Sokoloff, Harry P. Larson, Caroline Veniero, MoloLamken LLP, Washington, D.C.; Philippe Z. Selendy, Maria Ginzburg, Sean P. Baldwin, Joshua S. Margolin, Selendy & Gay PLLC, New York, NY; David Andrew Crichlow, Katten Muchin Rosenman LLP, New York, NY, on the brief) for Plaintiff-Appellant-Cross-Appellee.

John J. Clarke, Jr., DLA Piper LLP (US), New York, NY (Jessica A. Masella, Steven M. Rosato, DLA Piper LLP (US), New York, NY; Samantha L. Chaifetz, DLA Piper LLP (US), Washington D.C., on the brief) for Defendant-Appellee-Cross-Appellant.

Before: Robinson, Merriam, and Kahn, Circuit Judges.

**Opinion**

Robinson, Circuit Judge:

***1** Plaintiff-Appellant-Cross-Appellee UMB Bank, N.A., appeals a judgment of the United States District Court for the Southern District of New York (Furman, *J.*) dismissing its claims against Defendant-Appellee-Cross-Appellant Bristol-Myers Squibb for lack of subject matter jurisdiction. Bristol-Myers conditionally cross-appeals the district court's denial of its first motion to dismiss.

As part of a corporate acquisition of another company, Bristol-Myers and a predecessor Trustee, Equiniti Trust Company, entered into a Contingent Value Rights Agreement (“the Agreement” or “the CVR Agreement”) whereby Equiniti held Contingent Value Rights – as Trustee – on behalf of each person entitled pursuant to the merger agreement to receive cash payments from Bristol-Myers under certain conditions. Following a process whereby UMB was purportedly appointed as substitute Trustee,

UMB, acting "solely in its capacity as Trustee," sued Bristol-Myers for injuries arising from Bristol-Myers' alleged breaches of its obligations under the CVR Agreement. App'x 24.

The district court dismissed the action on the ground that UMB lacked Article III standing to bring the claims because it was not properly substituted as Trustee pursuant to the terms of the CVR Agreement. UMB appealed. Bristol-Myers conditionally cross-appealed, challenging the district court's prior denial of its motion to dismiss UMB's claims on different grounds.

We conclude that the district court erred in concluding that UMB lacked Article III standing, and that it thus lacked subject matter jurisdiction, based on the alleged defects in UMB's appointment as Trustee. Because the injuries to the beneficial owners of the CVRs constituted cognizable and redressable injuries to *the trust*, and because UMB's claims were solely brought in its putative capacity as Trustee of the trust, any defects in UMB's appointment as Trustee implicate its *capacity* to sue, but not its Article III standing.

Even if UMB's initial appointment as Trustee did not comport with the requirements of the CVR Agreement, UMB may maintain this suit because all parties to the Agreement, including Bristol-Myers, accepted UMB's appointment as Trustee, and the record reflects that a majority of the beneficial owners of the CVRs do not object to the substitution. Whether characterized as a waiver of objections or ratification of UMB's appointment, on this record Equiniti's and Bristol-Myers' actions preclude Bristol-Myers' challenge to UMB's capacity to act on behalf of the trust.

Because we conclude that the district court has subject matter jurisdiction to adjudicate UMB's claims, and we reject Bristol-Myers' challenge to UMB's capacity to act as Trustee, we lack appellate jurisdiction over Bristol-Myers' conditional cross-appeal challenging the district court's denial of its motion to dismiss UMB's claims on alternate grounds.

Thus, for the reasons set forth more fully below, we **VACATE** the district court's judgment, **DISMISS** the cross-appeal, and **REMAND** the matter to the district court.

## BACKGROUND

### I. The Facts[1]

***2** In 2019, Bristol-Myers acquired Celgene, a competitor pharmaceutical company. As part of the acquisition, for each share of Celgene a shareholder owned, Bristol-Myers paid the shareholder one share of Bristol-Myers common stock, $50 cash, and one contingent-value right, or CVR. This agreement was memorialized in a CVR Agreement dated November 20, 2019. *See* App'x 61.

*A. The CVR Agreement*

The associated CVR Agreement establishes a trust indenture "in favor of each person who from time to time holds one or more Contingent Value Rights." Agreement Preamble, App'x 67. Bristol-Myers and Celgene agreed in the CVR Agreement that each CVR would carry a one-time $9 payment, contingent on various FDA approvals for each of three Celgene products by specified deadlines. If all three products were approved by their respective deadlines, Bristol-Myers would pay more than $6 billion in satisfaction of its obligations under the CVRs. Those funds would be payable to the Trustee for distribution to each Holder of the securities. If any of these "Milestone" deadlines was not met, Bristol-Myers would owe the CVR holders nothing and the CVR Agreement would terminate. App'x 35. The Agreement obligates Bristol-Myers to use "Diligent Efforts" to secure the various approvals within the designated time limit. Agreement § 7.8; App'x 98. If Bristol-Myers breaches the Agreement, then, after notice, the Trustee is to "bring suit to protect the rights of the" CVR holders. Agreement § 8.1, App'x 100.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Equiniti was the original Trustee. However, the Agreement provides that the "Trustee may be removed at any time by an act of the Majority Holders, delivered to the Trustee and to the Company." Agreement § 4.10(c), App'x 91. And the Majority Holders may similarly appoint a successor Trustee. Agreement § 4.10(e), App'x 91. "No resignation or removal of the Trustee and no appointment of a successor Trustee" pursuant to these provisions is effective until the successor Trustee accepts the appointment. Agreement § 4.10(a), App'x 90.

"Majority Holders" are defined as "Holders of at least a majority of the [o]utstanding CVRs." Agreement § 1.1, App'x 71. "Holders" are persons "in whose name a Security is registered in the Security Register." Agreement § 1.1, App'x 70. The CVR Agreement distinguishes "Holders" from "Indirect Participants" who hold "a beneficial interest" in the security "through" an account holder with the Depositary Trust Company ("DTC") or its nominees or successors. Agreement § 1.1, App'x 70. At all relevant times, Cede & Co., as nominee of the DTC, was the Holder of nearly all of the CVRs "for the benefit of the beneficial owners." Agreement Annex A, App'x 113.

The Agreement also sets forth the manner in which the Holders may exercise their authority: Persons who are Holders of CVRs on a record date may take action as of that date by delivering a signed instrument or instruments to the Trustee and, where required by the Agreement, to Bristol-Myers. Agreement § 1.4(a), App'x 75. Ownership of the CVRs is to be "proved by the Security Register." Agreement § 1.4(c), App'x 76.

*B. The Purported Trustee Substitution*

Bristol-Myers met the first (of three) FDA product approval deadlines upon which payment pursuant to the CVRs depended. The second approval deadline was December 31, 2020. As that date approached without the second FDA approval, on December 9, "one of the largest holders" of CVRs issued a press release indicating that Equiniti had an affiliation with Bristol-Myers and suggesting that CVR holders would be better served by a trustee with no such affiliation and "with a reputation for effective representation of shareholders." App'x 317.[2] The press release indicated that more than 30% of the CVR holders had already consented to UMB's substitution as Trustee and that approval of 50% of the CVR holders was necessary to effectuate the substitution. It called on "all CVR holders ... to grant consent for the appointment" of UMB as successor Trustee to "protect their rights" if Bristol-Myers missed any deadline. *Id.* at 318.

***3** On December 18, UMB gave Bristol-Myers and Equiniti written notice that as of December 9, 2020, "the Holders of not less than 50% of" outstanding CVRs had removed Equiniti as Trustee and appointed UMB Bank as Trustee. *Id.* at 335. Appended to the notice was an "Instrument of Removal, Appointment and Acceptance" ("the Instrument of Removal") signed by UMB and attaching signatures of persons described as "Majority Holders." *Id.* at 338–342.

In subsequent communications between Equiniti and Bristol-Myers regarding the purported substitution, Bristol-Myers' counsel asked an Equiniti officer to confirm whether UMB "did in fact get the required 50% of CVR holders for the trustee change." *Id.* at 347. In a reply email to Bristol-Myers' counsel, copying the Bristol-Myers Vice-President of Litigation, the Equiniti officer responded, "None of the shareholders listed are registered holders, with that being said I cannot verify the shareholders or the number of shares each holds. Based on the number of *shares* indic[a]ted on each form, the total does exceed 50% of outstanding shares." *Id.* at 346 (emphasis added).

In the ensuing back-and-forth, Bristol-Myers' counsel noted Equiniti's obligation to examine "the assertions made by the purported 'Majority Holders' to 'determine whether or not they conform to the requirements of the Agreement.' " *Id.* at 344 (alterations accepted). She raised specific concerns about the lack of dates on the appended signature pages and the related possibility that signatories may have disposed of their CVRs after signing the Instrument but before the December 18 delivery of the Instrument to Equiniti. Bristol-Myers' counsel suggested several steps Equiniti could take to assure that the signatories to the Instrument owned the stated number of CVRs as of the relevant dates, which she identified as December 9 and December 18. *See id.* at 345.

Consistent with Bristol-Myers' recommendations, Equiniti's General Counsel subsequently emailed UMB to ask for "proof that the Holders who have joined the Instrument were Holders as of December 9, and that the number of CVRs owned by each of those Holders as of December 9 is accurately recorded on the Instrument." *Id.* at 351. He explained, "This will enable Equiniti Trust Company to confirm that a majority of the Holders have authorized the removal." *Id.*

After UMB provided additional documentation to both Equiniti and Bristol-Myers, Bristol-Myers indicated to Equiniti that it "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee." *Id.* at 387. The communication from Bristol-Myers' counsel to Equiniti, which copied Bristol-Myers' Vice-President of Litigation and its Corporate Secretary, stated, "If [Equiniti] is comfortable moving forward, we will provide our sign-off for distributing the notice to holders noting the change." *Id.*

Equiniti's General Counsel confirmed to Bristol-Myers that the brokerage statements provided by UMB "appear to confirm ownership of a majority of CVRs by parties who signed the Instrument of Removal." *Id.* at 388. Bristol-Myers then announced in a "Notice to Holders" that "the holders of not less than 50% of the outstanding CVRs have removed the Trustee, Equiniti Trust Company, and appointed a successor Trustee, UMB Bank." *Id.* at 394.

After the December 31, 2020, deadline for the second FDA approval passed without approval, Bristol-Myers also announced that the "CVR Agreement has automatically terminated in accordance with its terms ... and the CVRs are no longer eligible for payment." *Id.* at 53.

## II. Procedural History

***4** UMB, acting "solely in its capacity as Trustee," filed this action in June 2021. *Id.* at 24. UMB primarily alleges that Bristol-Myers failed to make contractually required "Diligent Efforts" to meet the deadline for the second FDA approval. *Id.* at 53.

Prior to filing its answer, Bristol-Myers moved to dismiss the case, arguing that the CVR Agreement barred the suit because UMB failed to comply with the pre-suit notice procedure that was a precondition to its authority to sue. The district court denied the motion.

Nearly two and a half years into the litigation, and following Bristol-Myers' unsuccessful first motion to dismiss, Bristol-Myers argued for the first time that UMB lacked standing to sue because its purported appointment to serve as Trustee did not comply with the CVR Agreement. Bristol-Myers argued that only "Majority Holders" may replace the Trustee under the Agreement, and "Holder" is defined as "a Person in whose name a Security is registered in the Security Register." *See* Agreement § 4.10(c), App'x 91; Agreement § 1.1, App'x 70. *Beneficial* owners of CVRs are not registered in the Security Register; instead, their ownership is recorded through DTC book entries. Agreement §§ 3.2, 3.5, App'x 81–85. Because the *beneficial owners* of a majority of CVRs *directly* consented to UMB's substitution, rather than directing the *registered Holders* (primarily Cede & Co., as nominee of the DTC) to consent on their behalf,[3] Bristol-Myers argued that UMB was never validly made Trustee and so lacked Article III standing to sustain this suit.

UMB disagreed. It emphasized that Bristol-Myers' argument did not implicate Article III standing and, as relevant here, it argued that UMB was properly appointed Trustee pursuant to the plain terms of the CVR Agreement, that Bristol-Myers procedurally waived its challenge by not raising the argument in its first motion to dismiss or in its answer to the complaint, and that even if DTC authorization was required, Bristol-Myers ratified UMB's appointment as Trustee and waived any deficiency in UMB's substitution. After UMB submitted evidence that a majority of beneficial owners provided retrospective DTC authorization with respect to a majority of the CVRs, it further argued that any standing issue was resolved by the reconfirmation of UMB's appointment as successor trustee by the registered Holders of a majority of the CVRs.

Ultimately, the district court agreed with Bristol-Myers. *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 1:21-CV-4897, 2024 WL 4355029 (S.D.N.Y. Sept. 30, 2024). In a thoughtful and thorough decision, the court concluded that "UMB was not properly appointed Trustee" under the terms of the CVR Agreement. *Id.* at *1. And it found that Bristol-Myers, through its actions, neither ratified UMB as Trustee nor waived its contractual defenses to UMB's appointment. *Id.* at *7–8.

The court concluded that these deficiencies implicated UMB's Article III standing and, in turn, the district court's subject matter jurisdiction. *Id.* at *8–9. That conclusion informed the court's determination that the defect in UMB's appointment—in the court's view, its "lack of standing"—cannot be cured. *Id.* at *8–12. And the court's conclusion that Bristol-Myers' challenges implicated Article III standing contributed to its skepticism of UMB's argument that, by its conduct in recognizing the substitution, Bristol-Myers ratified the substitution or waived its challenge to UMB's status as Trustee. *Id.* at *7. It also explains the court's decision not to address UMB's procedural waiver argument. *Id.* at *5 (noting that challenges to a federal court's subject matter jurisdiction may be raised "at any stage in the litigation"). The district court thus dismissed the case without prejudice.[4] *Id.* at *14.

***5** UMB appeals, arguing, among other things, that the validity of its contractual appointment as Trustee has no bearing on subject matter jurisdiction and that Bristol-Myers ratified the appointment of UMB as Trustee. Bristol-Myers also conditionally cross-appeals seeking our review of the district court's denial of its first motion to dismiss in the event that we conclude that the district court had subject matter jurisdiction.

## DISCUSSION

Article III standing is an essential element of a federal court's subject matter jurisdiction over a dispute. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020). Following a district court's dismissal for lack of standing, we review the district court's legal conclusions without deference. *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). And because in this case the district court made factual findings relying on information outside of the complaint, we review the district court's factual findings predicate to its dismissal for lack of jurisdiction for clear error. *Hussein v. Maait*, 129 F.4th 99, 110 (2d Cir. 2025).

As set forth more fully below, we conclude that Bristol-Myers' challenges to UMB's capacity to sue as Trustee do not implicate Article III standing or subject matter jurisdiction. Moreover, even if UMB's substitution did not comport with the requirements of the CVR Agreement, UMB may maintain this suit because all parties to the CVR Agreement accepted UMB's substitution with full knowledge of the relevant facts and the beneficial owners of a majority of the CVRs approved the substitution. Finally, we conclude that we lack appellate jurisdiction over Bristol-Myers' conditional cross-appeal challenging the district court's denial of its motion to dismiss UMB's claims on alternate grounds.

### I. Whether UMB's appointment complied with the CVR Agreement implicates its capacity to sue, not Article III standing.

Standing is a doctrine that ensures that "federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016).[5] It "limits the category of litigants" who may sue in federal court "to seek redress for a legal wrong." *Id.* The "irreducible constitutional minimum of standing" requires three elements: (1) "the plaintiff must have suffered an 'injury in fact' "; (2) "there must be a causal connection between the injury and the conduct" at issue; and (3) a favorable decision will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In arguing that UMB lacks Article III standing, Bristol-Myers emphasizes that UMB has suffered no personal injury as a result of Bristol-Myers' alleged breach of the CVR Agreement and asserts that UMB has no standing based on its purported status as Trustee because it was not properly appointed to that role. UMB contends that the CVR Holders were undisputedly injured,

and whether UMB was properly substituted as Trustee for the benefit of the CVR holders implicates its *capacity* to sue, but not its *standing*.

We agree with UMB. Whether UMB has *personally* suffered an injury is immaterial to our analysis, because the alleged injury was to the trust, and the CVR owner-beneficiaries of that trust. The alleged defect in UMB's substitution may implicate its *capacity* to maintain this suit as Trustee, but does not, on these facts, defeat the court's Article III jurisdiction to adjudicate the claims.

*A. UMB's personal injury, or lack thereof, is immaterial.*

***6** We have long recognized that where a trustee sues in its capacity *as trustee* on behalf of a trust, the *trustee* need not have *personally* suffered a cognizable injury. As the Supreme Court has stated, "Trustees bring suits to benefit their trusts." *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 287, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008); *see also id.* at 304 n.2, 128 S.Ct. 2531 (Roberts, *C.J.*, dissenting) (noting that suits by trustees "make up a settled, continuous practice of the sort traditionally amenable to, and resolved by, the judicial process").

UMB sued as "trustee of an express trust for the benefit of the CVR holders," App'x 56, 58, as required by the Agreement. Agreement § 8.2, App'x 102 (providing that "proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust"). Though Bristol-Myers challenges UMB's appointment as Trustee, there is no doubt here that the trust (and beneficiaries) for which UMB purported to act suffered redressable injury. The Agreement created a trust to protect the rights of "each person who from time to time holds one or more Contingent Value Rights." Agreement Preamble, App'x 67. Payments under the CVR Agreement were payable to the Trustee as legal representative of the trust for ultimate distribution to the Holders. And the complaint alleged that the Trustee, "*as trustee of an express trust for the benefit of the CVR holders*" lost billions of dollars because of Bristol-Myers' alleged breach of its obligation under the Agreement to use "Diligent Efforts" to acquire FDA approval by the relevant deadlines. App'x 56.

The trust thus plainly had standing to sue through its Trustee. *See* Federal Rule of Civil Procedure 17(a)(1) (empowering a "trustee of an express trust" to sue in its own name "without joining the person for whose benefit the action is brought"). Bristol-Myers' argument that UMB was not personally injured by Bristol-Myers' alleged breach is thus beside the point. UMB purported to act on behalf of an express trust for the benefit of the CVR holders, and the trust had Article III standing to pursue its claims.

*B. The alleged defects in UMB's appointment implicate its capacity to act on behalf of the trust, not constitutional standing.*

Several Second Circuit decisions in analogous cases support the conclusion that Bristol-Myers' challenge to UMB's appointment by the beneficial owners of a majority of the CVRs implicates UMB's *capacity* to sue, but not its *standing*, and a squarely on point decision from the Sixth Circuit bolsters our conclusion. Bristol-Myers' arguments to the contrary are not persuasive.

First, the Second Circuit decisions. In *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, we treated the failure of a beneficial owner of a security to secure the DTC's permission to pursue litigation as a non-jurisdictional defect relating to the owner's *capacity* to litigate rather than its *Article III standing*. 415 F.3d 242, 245 (2d Cir. 2005). In *Applestein*, a beneficial owner of an indenture note from Buenos Aires held by the DTC or its nominee sued Buenos Aires to recover missed interest payments as well as the note's principal. There, the indenture agreement provided that only the "Holder of any Note" could "institute suit for the enforcement of ... payment," and that the DTC was the "sole owner or Holder of the Notes represented thereby for all purposes." *Id.* at 243. In support of its motion for summary judgment, Buenos Aires argued for the first time that the plaintiff "lacked standing to sue on account of being a beneficial owner rather than the registered holder of the note." *Id.* at 244. The plaintiff subsequently obtained permission to sue from the DTC, and the district court concluded that the plaintiff had standing.

***7** On appeal, we agreed, relying on the after-the-fact permission the plaintiff had secured from the DTC. For several reasons, we rejected Buenos Aires' argument that the permission was ineffective because it was obtained after the plaintiff initiated the action. At the outset, we suggested that "an assertion of a party's incapacity to sue should fall within the class of threshold defenses—issues that must be raised and disposed of at the outset of the suit," and that by failing to raise the incapacity argument in its answer, Buenos Aires thus appeared "to have waived the argument that the indenture does not give [the plaintiff] standing to sue." *Id.* at 245. It's clear from the context that although we used the word "standing," we weren't talking about Article III standing but instead were discussing the plaintiff's contractual *capacity* or authority to sue. In particular, the decision references the terms of *the indenture* rather than Article III, and it cites as primary authority the section of Wright & Miller's *Federal Practice and Procedure* relating to waiver of objections to *capacity* of a plaintiff. *Id.*; *see also SM Kids*, 963 F.3d at 211 (describing "a party's right to relief for breach of contract" as "contractual standing," and noting that it "is distinct from Article III standing").

We also concluded that Buenos Aires had waived its challenge by implicitly conceding the validity of the authorization. *Applestein*, 415 F.3d at 246. And we noted that given that the DTC had already given its permission by that time, forcing the plaintiff to refile the complaint would lead to "a completely wasteful repetition of proceedings that have already occurred." *Id.* None of these considerations would have applied if the plaintiff's failure to secure DTC permission before filing suit implicated Article III standing, and thus the court's subject matter jurisdiction, rather than the plaintiff's *capacity* to sue.

As in *Applestein*, the beneficial owners here consented to the substitution of a trustee directly rather than with permission of the DTC, even though the Agreement requires that acts like removal and appointment of the Trustee be undertaken by registered Holders. The reasoning of *Applestein* clearly supports our conclusion that this defect, if it was a defect, impacts UMB's *capacity* to litigate, not its standing.

Our reasoning is supported by two more recent decisions in analogous cases. In *Fund Liquidation Holdings LLC v. Bank of America Corp.*, two Cayman Islands investment funds sued various banks alleging that they manipulated certain benchmark interest rates. 991 F.3d 370, 375 (2d Cir. 2021). As the case unfolded, the defendants learned that the two named-plaintiff funds had actually dissolved, and that a separate entity, Fund Liquidation Holdings, was prosecuting the matter after being assigned the dissolved entities' claims. *Id.* at 376. The district court dismissed on the theory that the action was initiated by non-existent parties and was accordingly a nullity. *Id.* at 375, 378.

We vacated and remanded. *Id.* at 375. Though the original named plaintiffs lacked Article III standing at the time of filing because the dissolution of the funds prior to filing suit extinguished their legal existence under Cayman Islands law, we held that Article III is satisfied as to the suit "so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed." *Id.* at 386. "Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction." *Id.*

In so holding, we expressly rejected the "nullity doctrine ... which says that a case initiated in the name of a plaintiff that lacks standing is an incurable nullity." *Id.* After tracing the evolution of pleading rules as to whether the nominal or real party in interest must prosecute claims where claims have been transferred pursuant to a legal assignment, we concluded that "if we can alter the party in whose name a case must be prosecuted without offending Article III, it stands to reason that failing to initially name the correct party is not itself a constitutional problem." *Id.* at 388.

***8** True, *Fund Liquidation* does not squarely resolve this appeal; this case does not involve an assignment of interests, and naming UMB as plaintiff was, in Bristol-Myers' view, more than a mere technical defect in pleading. But the reasoning of that decision is on point. We asked, "Why ... should jurisdiction to hear the controversy turn on whether the *nominal* plaintiff has standing? That would be nonsensical. Indeed, in other jurisdictional contexts, we often ignore nominal plaintiffs and look only to the party with a real interest in the controversy." *Id.* at 389. We recognized that "the concerns animating a constitutional principle are absent" where a real party in interest seeks redress for a cognizable injury, and invoked "practical considerations."

*Id.* at 391. The rationale underlying our decision in *Fund Liquidation* supports the conclusion that identifying the wrong trustee to represent the real parties in interest—if, in fact, UMB is the wrong Trustee—does not defeat Article III standing.

We subsequently applied the reasoning of *Fund Liquidation* in the context of a claim improperly brought in the name of a *trust* rather than its *trustee*. *Revitalizing Auto Communities Environmental Response (RACER) Trust v. National Grid USA*, 10 F.4th 87, 98 (2d Cir. 2021). In that case RACER, a trust established to conduct environmental remediation, sued a number of defendants who it alleged contributed to pollution it was charged with remediating. RACER brought the suit in its own name. The district court dismissed its claims on other grounds, but concluded that if the suit was to proceed, RACER's trustee must be substituted as a plaintiff because the trust lacked capacity to sue. *Id.* at 93, 97. On appeal, we agreed that under New York law, which governed RACER's capacity to sue in its own name pursuant to Federal Rule of Civil Procedure 17(b), RACER's trustee, not RACER itself, had capacity to sue on behalf of the trust. *Id.* at 97–98. In assessing the remedy, we said, “Capacity to sue is non-jurisdictional in nature, and can be waived.” *Id.* at 98.

Again, *RACER* is not on all fours. In Bristol-Myers’ view, the complaint initiating this lawsuit wasn't simply brought by the wrong entity—trust versus trustee; it was brought by an entity that had no legal connection to the case. But in *RACER*, as here, Article III standing arose from the cognizable and redressable injuries to the trust and its beneficiaries; whether the proper plaintiff was named in the suit seeking remedy for those injuries was a matter of *capacity to sue*, not subject matter jurisdiction.

The Sixth Circuit so held in a case closely analogous to this one. *See* *Brown v. Keller*, 274 F.2d 779, 780 (6th Cir. 1960). The plaintiffs in *Brown* filed a suit “as trustees” of an employees’ retirement fund. *Id.* The defendants contended that the plaintiffs had ceased to be trustees prior to filing the suit and thus could not sue on behalf of the fund. On appeal from a ruling for the plaintiffs on the merits, the Sixth Circuit affirmed. With respect to the status of the trustees as litigants, the Court explained that the issue was “not strictly a question of jurisdiction, but [whether] lack of capacity on the part of the plaintiffs to sue [was] a bar to the action.” *Id.* Because another plaintiff who was “entitled to go forward with the action” had joined the action, the district court did not err in declining to dismiss “for lack of a party plaintiff with capacity to sue.” *Id.* at 781. *Cf.* *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992) (whether beneficiaries could sue for injuries to a trust and an estate is a question of *capacity*, not *standing*).

Bristol-Myers’ arguments to the contrary, and in particular its reliance on the Supreme Court's decision in *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 140 S.Ct. 1615, 207 L.Ed.2d 85 (2020), are unpersuasive. In *Thole*, the Supreme Court held that beneficiaries of a defined-benefit retirement plan lacked standing to pursue claims on behalf of the plan for alleged mismanagement. *Id.* at 541–42, 140 S.Ct. 1615. The Court rejected the plaintiffs’ trust-based theory of standing because “participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust” who have a financial stake in the management of the trust, which affects “the value of the trust property and the ultimate amount of money” beneficiaries receive. *Id.* at 542–43, 140 S.Ct. 1615. The Court also held that the plaintiffs lacked standing as representatives of the plan itself because they “themselves [did] not have a concrete stake” in the suit and, in contrast to guardians, receivers, or executors, they had not “been legally or contractually appointed to represent the plan.” *Id.* at 543–44, 140 S.Ct. 1615.

***9** Bristol-Myers argues that UMB is just like the plaintiffs in *Thole*, lacking both a personal stake in the controversy and a contractual assignment to represent CVR holders. But UMB is not similarly situated to the *Thole* plaintiffs because it does not purport to act on its own behalf; it sued “solely in its capacity as Trustee” under the CVR Agreement. App'x 24. The *Thole* plaintiffs brought suit “on behalf of themselves and all others similarly situated,” *Thole v. U.S. Bank, N.A.*, Joint App'x, 2019 WL 5066770, at *42 (U.S. 2019). They did not purport to be duly appointed trustees of the Plan.

For the above reasons, we conclude that the dispute before us does not implicate the subject matter jurisdiction of the federal courts to adjudicate the claims raised. That doesn't end the analysis. If UMB lacks *capacity* to maintain this action, the suit cannot proceed and Bristol-Myers prevails. But our conclusion that the question before us implicates capacity rather than standing renders inapposite some of the legal principles that constrained the district court's analysis. *See, e.g.*, *UMB Bank*, 2024 WL 4355029, at *8–12 (concluding that the defect it found in UMB's appointment cannot be cured); *id.* at *7 (“UMB does not cite,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and the Court has not found, any authority supporting application of waiver or ratification under the circumstances here, namely in opposition to a motion to dismiss for lack of subject-matter jurisdiction."); *id.* at *5 (challenge to subject matter jurisdiction may be raised "at any stage in the litigation").

**II. UMB may maintain this suit.**

UMB contends that its appointment comported with the requirements of the CVR Agreement. Though it acknowledges the Agreement's definition of "Holder," it identifies several references to "Holder" within the Agreement that would only make sense if "Holder" was understood to refer to the beneficial owner rather than the registered holder—that is, the DTC. Given that "Holder" refers to beneficial owners throughout the Agreement, and given that the Agreement assigns Equiniti the ultimate discretion to determine whether it has been properly removed and substituted, UMB argues that Equiniti reasonably exercised its discretion in concluding that it had been duly removed by holders of a majority of the CVRs. UMB further contends that even if its substitution did not fully comply with the literal requirements of the Agreement, Bristol-Myers waived any objection to or otherwise ratified the substitution when it announced publicly that UMB was the Trustee in January 2021. And, in any event, UMB maintains that Bristol-Myers forfeited any challenge to its capacity to sue under the Agreement by failing to raise the challenge at the outset of the case.

We need not address all of UMB's arguments because we conclude that even if UMB's appointment did not comport with the strict terms of the CVR Agreement, and even if Bristol-Myers did not forfeit its challenge to UMB's status as Trustee by failing to litigate the question sooner, UMB may maintain this action as Trustee because Equiniti and Bristol-Myers knowingly agreed to its appointment, and beneficial owners of a majority of the CVRs approved of that action.

As noted above, because UMB's capacity to sue as Trustee here does not implicate Article III standing and subject matter jurisdiction, the district court's conclusion that a "ratification" or "waiver" defense cannot defeat a motion to dismiss for lack of subject matter jurisdiction falls away. *Id.* at *7. But the district court found in the alternative that UMB failed to establish ratification or waiver by Bristol-Myers as a matter of fact. *Id.* at *8.

***10** We review the district court's factual findings for clear error. *Hussein*, 129 F.4th at 110 (clear error review for factfinding made to evaluate subject matter jurisdiction); *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996) (clear error review for factfinding relevant to enforceability of contracts).

Applying New York law, and considering the underlying facts found by the district court, we conclude that the district court's alternative holding was error. Whether framed in terms of waiver or ratification, Bristol-Myers' and Equiniti's acceptance of UMB's appointment as Trustee and subsequent acts bar them from challenging the validity of that appointment at least where, as here, the acceptance of UMB as duly appointed trustee does not compromise the interests of the beneficial owners of the CVRs.

*A. Waiver, Estoppel and Ratification under New York Law*

The Agreement provides that it "shall be governed by and construed in accordance" with New York law. Agreement § 1.10, App'x 78. Under New York law, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.*, 7 N.Y.3d 96, 104, 817 N.Y.S.2d 606, 850 N.E.2d 653 (2006). "Such abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage," and must be "based on a clear manifestation of intent to relinquish a contractual protection." *Id.*

Equitable estoppel is imposed by law "to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Id.* at 106, 817 N.Y.S.2d 606, 850 N.E.2d 653.

The doctrines of waiver and estoppel are interrelated; the New York Court of Appeals has noted in the context of dealings between mortgagors and mortgagees that "cases are not always clear concerning whether what is being discussed is waiver, estoppel, bad faith or unconscionable conduct." *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 183, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982).[6]

Under New York law, "[r]atification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011). The ratification "may be express or implied, or may result from silence or inaction." *Id.* at 692. *See also* *Schenck v. State Line Telephone Co.*, 238 N.Y. 308, 313, 144 N.E. 592 (1924) (explaining that a party may ratify a voidable transaction, "even by silence and inaction with knowledge of one's rights").

*B. The District Court's Underlying Factfinding*

In assessing UMB's capacity, the district court highlighted several important provisions of the CVR Agreement. First, "only the Trustee is authorized to bring suit in the event of a default." *UMB Bank*, 2024 WL 4355029, at *2 (citing Agreement § 8.1, App'x 100; Agreement § 8.4, App'x 103).

***11** Second, as noted above, under Section 4.10 of the Agreement "the Trustee may be removed at any time by an act of the Majority Holders, delivered to the Trustee and to the Company," *id.*, and the Majority Holders may appoint a successor Trustee, *id.* at *3. "Majority Holders" are defined as the "Holders of at least a majority of the Outstanding CVRs," and "Holders" are defined as those "in whose name a Security is registered in the Security Register." *Id.* (citing Agreement § 1.1, App'x 70–71).

Third, Holders' acts "may be embodied in and evidenced by one or more instruments signed by such Holders in person or by an agent duly appointed in writing." *Id.* (citing Agreement § 1.4(a), App'x 75). Proof of ownership is to be "proved by the Security Register." *Id.* (citing Agreement § 1.4(c), App'x 76).

Finally, the Company and Trustee may amend the Agreement without approval of the Holders under certain circumstances, provided those amendments do not "adversely affect the interests of the Holders," and may make other amendments "with the consent of the Majority Holders." *Id.* (citing Agreement §§ 6.1, 6.2, App'x 94–95).

The district court explained what happened here as follows. In the fall of 2020, some CVR investors grew concerned that Bristol-Myers would miss the milestone deadlines. *Id.* at *3. The investors, UMB, and the existing Trustee Equiniti began to discuss replacing Equiniti with UMB as Trustee. *Id.* The investors and UMB, despite receiving questions about whether the consent of *registered* holders was required, "persisted in their approach of seeking support only from beneficial CVR holders." *Id.* On December 18, 2020, UMB sent a letter to Bristol-Myers informing it that "the Holders of not less than 50% of the principal amount of CVRs Outstanding have removed Equiniti as trustee under the Agreement, and appointed UMB ... as successor trustee." *Id.*

On December 22, Bristol-Myer's counsel sought confirmation from Equiniti that UMB had received the required support. Equiniti told Bristol-Myers that "[n]one of the shareholders listed are registered holders." *Id.* at *7. At that time, Bristol-Myers "knew that none of the signatories to the instrument of removal were Registered Holders." *Id.* In emails with Equiniti, Bristol-Myers "expressed its concern that it cannot verify the holders listed as signatories" because the information provided was insufficient on its face, and so it sought proof of sufficient ownership. *Id.* Bristol-Myers "knew that DTC was the Registered Holder of over 99% of the CVRs, and that there had been no proxy effort at that point." *Id.*

Following that prompting by Bristol-Myers, Equiniti asked UMB to provide proof that "the Holders who have joined the instrument were Holders as of December 9, and that the number of CVRs owned by each of those Holders" was accurately recorded. *Id.* at *4. On December 31, 2020, UMB provided proof "of the beneficial ownership of the investors who had signed

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the Instrument." *Id.* On January 4, 2021, Equiniti and Bristol-Myers issued a "Notice to Holders," announcing that UMB had replaced Equiniti as Trustee. *Id.* "As of that date, both [Bristol-Myers] and Equiniti believed that UMB had been appointed Trustee." *Id.*

*C. The Ultimate Facts of Ratification, Waiver and Estoppel*

The district court found that UMB had failed to show waiver or ratification because the record fails to show that Bristol-Myers had "full knowledge" of the material facts or had "intent to relinquish a contractual protection." *Id.* at *8. It found that "the record might support a conclusion that [Bristol-Myers] *should have* known that the instrument removing Equiniti and installing UMB was not sufficient" under the Agreement, but that Bristol-Myers' "silent acquiescence" to the transaction "credibly appears to have resulted from the complexity of the situation rather than intent," such that Bristol-Myers did not ratify UMB's appointment. *Id.* (citing *Adelphia Recovery Trust*, 634 F.3d at 693–94).

***12** We conclude that this finding was clearly erroneous based on the record and the district court's underlying factfinding, which was otherwise supported by the record. Bristol-Myers was not confused about the status of the investors who purported to appoint UMB. Equiniti specifically told Bristol-Myers that "[n]one of the shareholders listed" on the instrument removing Equiniti were "registered holders." App'x 346.

Moreover, Bristol-Myers told Equiniti there were "a number of steps" that Equiniti could take to evaluate whether the "assertions made by the Holders" who signed the instrument " 'conform to the requirements of' the Agreement," including requesting evidence of the "Holders' ownership of CVRs," "[o]btaining lists of 'non-objecting beneficial holders,' " or "[r]equesting evidentiary support" such as account statements or sworn representations to show ownership. *Id.* at 345. These suggestions were designed to establish that *beneficial owners* of a majority of CVRs approved of the substitution as of the record date. As noted, Bristol-Myers suggested that Equiniti could verify the Trustee substitution by "[o]btaining lists of 'non-objecting beneficial holders.' " *Id.* And its other recommendations for proving the "Holders' ownership of CVRs" were clearly directed at corroborating the *beneficial owners*' interests. By definition, proof of the identity of *the Holders* is reflected in the security register. Agreement § 1.1, App'x 70 (defining "Holder" as a "Person in whose name a Security is registered in the Security Register").

As the district court found, in response to Equiniti's request for such proof, UMB provided evidence of "the *beneficial* ownership of the investors who had signed the instrument." *UMB Bank*, 2024 WL 4355029, at *4 (emphasis added). In particular, the record reflects that UMB provided evidence that the "*parties who signed the Instrument of Removal*"—who were *not* Holders listed in the Security Register—owned a majority of CVRs. App'x 388 (emphasis added). And, as the district court also found, Bristol-Myers "knew that DTC was the Registered Holder of over 99% of the CVRs, and that there had been no proxy effort at that point." *UMB Bank*, 2024 WL 4355029, at *7.

Given this record, there is no basis to infer that Bristol-Myers did not understand that the Instrument of Removal was signed by beneficial owners of a majority of the CVRs.

Nor is there any basis to infer that Bristol-Myers did not understand the process of Trustee removal and appointment outlined in the CVR Agreement at the time that it announced UMB's appointment. During the exchanges between Bristol-Myers' counsel and Equiniti assessing UMB's assertion that Equiniti had been duly removed and UMB had been duly appointed, Bristol-Myers' counsel specifically flagged the provision in the CVR Agreement requiring that Equiniti's removal be approved by an act of the "Majority Holders," and cited the Agreement's provision defining "Majority Holders." App'x 344.

Thus, when Bristol-Myers and Equiniti accepted as sufficient UMB's proof that the persons who signed the Instrument of Removal beneficially owned a majority of the CVRs and publicly announced the replacement of Equiniti with UMB as Trustee on January 4, 2021, they did so with knowledge of the relevant circumstances. App'x 394. Bristol-Myers' public

announcement, along with its subsequent conduct in treating UMB as Trustee for the following years, collectively constituted "a clear manifestation of intent" to accept UMB's appointment based on the votes of the beneficial owners. *Fundamental Portfolio Advisors*, 7 N.Y.3d at 104, 817 N.Y.S.2d 606, 850 N.E.2d 653. Bristol-Myers and Equiniti thus ratified UMB's appointment notwithstanding potential deficiencies in the formalities by which UMB was appointed, and they waived the challenge to UMB's appointment that Bristol-Myers now raises.

***13** Critical to our analysis is our conclusion that in giving effect to Equiniti's and Bristol-Myers' respective waivers and ratifications, we do not undermine the interests of the beneficial owners of the CVRs—the beneficiaries of the trust's protections. As set forth above, at the time of the purported substitution of UMB as Trustee, the owners of a majority of the CVRs expressly approved UMB's substitution. Any failure in the process by which UMB was appointed relates to contractual formalities, not substantive protections for the CVR Holders.

### III. Bristol-Myers' Cross-Appeal

Bristol-Myers conditionally cross-appealed the district court's denial of its first motion to dismiss, in the event that we concluded that the district court had subject matter jurisdiction. In its first motion to dismiss, Bristol-Myers argued that UMB could not maintain this suit because it did not send a notice of default to Bristol-Myers, which was necessary to convert an alleged contract breach into an actionable "Event of Default" as defined in the Agreement, until months after the Agreement terminated. In Bristol-Myers' view, an "Event of Default" cannot arise when notice is not sent until after the CVR Agreement terminates. The district court disagreed.

The district court's denial of Bristol-Myers' motion is clearly a non-final interlocutory order. *Hill v. City of New York*, 45 F.3d 653, 659 (2d Cir. 1995) ("[A] denial of a motion to dismiss is ordinarily considered non-final, and therefore not immediately appealable."). Bristol-Myers did not seek or obtain an order granting interlocutory review of the district court's decision. And our discretion to exercise pendent jurisdiction over otherwise nonappealable district court rulings is limited to those "that are inextricably intertwined" with, or "necessary to ensure meaningful review of," the issues that are within our jurisdiction. *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010). "[I]ssues usually will not be considered inextricably intertwined where review of the unappealable issue is not necessary for review of the issue over which we have appellate jurisdiction." *Lamar Advertising of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 372 (2d Cir. 2004).

Resolution of the cross-appeal would require us to consider different portions of the CVR Agreement and distinct questions unrelated to the issues raised by UMB's direct appeal. Accordingly, the issues presented by the cross-appeal are not "inextricably intertwined" with the issues over which we have jurisdiction, and we dismiss the cross-appeal for lack of jurisdiction.

## CONCLUSION

For these reasons, we **VACATE** the district court's judgment, **DISMISS** the cross-appeal, and **REMAND** the matter to the district court.

### All Citations

--- F.4th ----, 2026 WL 2339538

Footnotes

1 The facts in this background section are drawn from the CVR Agreement, UMB's complaint, and the various documents submitted by the parties in connection with Bristol-Myers' motion to dismiss for lack of subject matter jurisdiction. Unless otherwise noted, the recited facts—as opposed to their significance—are not in dispute.

2 The press release's colloquial use of the term “holder” does not necessarily align with the formal definition in the CVR Agreement; the entity that issued the press release was not a “Holder” as that term was defined in the Agreement but, rather, was an “Indirect Participant,” or beneficial owner.

3 Under New York law, the DTC may not exercise a registered holder's rights except at the beneficial holders’ direction. *See* N.Y. Uniform Comm. Code § 8-506.

4 UMB then filed a new suit, asserting most of the claims at issue here and several new causes of action. *See UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 24-cv-08668 (S.D.N.Y. Nov. 14, 2024). That case is proceeding in the district court.

5 In quotations from caselaw, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

6 UMB primarily invokes waiver and ratification in its appeal briefs but also references the related doctrine of estoppel. Because of the close relationship between waiver and estoppel, we describe that doctrine here. We do not primarily rely on equitable estoppel in our analysis.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.