**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE TV AZTECA, S.A.B. DE C.V. 8.25% SENIOR NOTES DUE 2024,<br><br>Plaintiff,<br><br>v.<br><br>TV AZTECA, S.A.B. DE C.V., ET AL.,<br><br>Defendants. | Case No. 1:22-cv-08164-PGG<br><br>Hon. Paul G. Gardephe<br><br>Hon. Barbara Moses |
| TV AZTECA, S.A.B. DE C.V., ET AL.<br><br>Defendants and Third-Party Plaintiffs,<br><br>v.<br><br>CYRUS CAPITAL PARTNERS, L.P. AND CONTRARIAN CAPITAL MANAGEMENT, LLC<br><br>Third-Party Defendants. | |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants respectfully submit this Notice of Supplemental Authority in connection with Defendants' Opposition to Plaintiff's Motion for Summary Judgment. ECF Nos. 263-270, 273. Defendants' Opposition established that the Indenture prohibits U.S. Persons from acquiring or holding the Notes (the "No U.S. Person Requirement"). It also explained that the Noteholders directing Plaintiff's enforcement of the Notes are owned or controlled by U.S. Persons, in breach of that requirement. ECF No. 263 at 8-14.

On July 30, 2026, the arbitral tribunal in *Cyrus Capital Partners, L.P. and Contrarian Capital Management, LLC v. United Mexican States*, ICSID Case No. ARB/23/33, issued its Award (the "Award"). *See* Exhibit A. The claimants in that arbitration, Cyrus Capital Partners, L.P. and Contrarian Capital Management, LLC (together, "Cyrus and Contrarian"), are Delaware entities. Award ¶ 2. They are Third-Party Defendants in this action, and Plaintiff acts as their proxy in this litigation. The Tribunal declined jurisdiction on treaty-specific grounds. Award ¶¶ 221-235.

Two statements in the Award are directly relevant to the pending motion.

*First*, the Tribunal recognized that the No U.S. Person Requirement applies to every transferee of the Notes, not merely the initial purchaser. It stated: "Noteholders could not be United States companies because under the Indenture any transferee had to represent that it was not a U.S. person within the meaning of the Securities Act, Regulation S." Award ¶ 177 (citing Indenture at A-1).

*Second*, to establish standing as U.S. investors, Cyrus and Contrarian represented to the Tribunal that they control the Notes through the funds and vehicles that are the record holders of the Notes and are, as a result, "ultimate beneficial owners" under U.S. law. As the Tribunal stated: "According to the Claimants, their control of the Noteholder funds establishes them as 'ultimate beneficial owners' under U.S. law, and in particular under the Corporate Transparency Act, which is designed to mitigate the effects of anonymous shell companies." *Id.* ¶ 233; *see also id.* ¶ 85 (claimants "control the Noteholders and thus indirectly control the Notes held by the Noteholders"); *id.* ¶ 212.

Therefore, Cyrus and Contrarian represented to an international tribunal that they are U.S. persons and the ultimate beneficial owners of the Notes, while the Tribunal held that the Indenture

precludes U.S. ownership of the Notes. As such, Plaintiff cannot enforce Cyrus and Contrarian's Notes, in defiance of the findings in an international investment treaty award.

Importantly, the arbitration was governed by the International Centre for Settlement of Investment Disputes ("ICSID"). Award ¶ 1. The United States is a party to the ICSID Convention. 17 U.S.T. 1270; 22 U.S.C. §§ 1650, 1650a. Under Article 54 of the ICSID Convention, "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding (. . .)." As such, the Award's findings against Cyrus and Contrarian are entitled to comity and recognition by U.S. courts.

Dated: New York, New York
October 15, 2026

**GREENBERG TRAURIG, LLP**

By:

*/s/ Hal S. Shaftel*
Hal S. Shaftel
Daniel Pulecio-Boek
John C. Molluzzo Jr.
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200
shaftelh@gtlaw.com
pulecioboekd@gtlaw.com
molluzzoj@gtlaw.com

*Counsel for Defendants/Third-Party Plaintiffs TV Azteca, S.A.B. de C.V., et al.*

# Exhibit A

**CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**CYRUS CAPITAL PARTNERS, L.P. AND CONTRARIAN CAPITAL MANAGEMENT, LLC.**

Claimants

and

**UNITED MEXICAN STATES**

Respondent

**ICSID Case No. ARB/23/33**

---

# AWARD

---

***Members of the Tribunal***
Rt. Hon. Lord Collins of Mapesbury, LLD, FBA, President
Dr. David J.A. Cairns, Arbitrator
Prof. Zachary Douglas, KC, Arbitrator

***Secretary of the Tribunal***
Ms. Patricia Rodríguez Martín

*Date of dispatch to the Parties:* 30 July 2026

## REPRESENTATION OF THE PARTIES

*Representing Cyrus Capital Partners, L.P. and Contrarian Capital Management, LLC*:

Cyrus Capital Partners, L.P. and Contrarian Capital Management, LLC
c/o Mr. Jonathan C. Poling
Mr. Stephen S. Kho
Ms. Katherine P. Padgett
Ms. Shannon Jackenthal
Mr. Lide Paterno
Mr. David Giller
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006
United States of America

*Representing United Mexican States*:

United Mexican States
c/o Mr. Alan Bonfiglio Ríos
Ms. Rosalinda Toxqui Tlaxcalteca
Mr. Rafael Alejandro Augusto Arteaga Farfán
Mr. Alejandro Rebollo Ornelas
Ms. Paulina Jazmín Rodríguez Cruz
Ms. Alicia Monserrat Islas Martínez
Dirección General de Consultoría Jurídica de Comercio Internacional
Secretaría de Economía
Torre Ejecutiva
Calle Pachuca #189, Piso 7
Colonia Condesa
Demarcación Territorial Cuauhtémoc
Mexico City 06140
United Mexican States
and
c/o Mr. Stephan E. Becker
Mr. Gary J. Shaw
Ms. Carolina Plaza
Pillsbury Winthrop Shaw Pittman, LLP
1200 Seventeenth Street, NW
Washington, DC 20036
United States of America
and
c/o Mr. Greg Tereposky
Tereposky & DeRose, LLP
81 Metcalfe Street, Suite 1000
Ottawa, Ontario
K1P 6K7
Canada

# TABLE OF CONTENTS


I. INTRODUCTION AND PARTIES ... 1

II. PROCEDURAL HISTORY ... 1

III. THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ... 9

IV. JURISDICTION AND ADMISSIBILITY ... 10

A. Objection 1: Failure to observe the 90 days between Notice of Intent and Request for Arbitration ... 10

(1) The Respondent's Position ... 10

(2) The Claimants' Position ... 12

B. Objection 2: The Claimants do not qualify as investors under NAFTA ... 15

(1) The Respondent's Position ... 15

(2) The Claimants' Position ... 17

C. Objection 3: The Claimants do not have a Legacy Investment within the meaning of Annex 14-C of the USMCA ... 20

(1) The Respondent's Position ... 20

(2) The Claimants' Position ... 22

D. Objection 4: The alleged breach of Art. 1105 occurred after the NAFTA terminated 25

(1) The Respondent's Position ... 25

(2) The Claimants' Position ... 30

E. Objection 5: The Claimants have not demonstrated that they have an investment within the meaning of Art. 25 of the ICSID Convention ... 33

(1) The Respondent's Position ... 33

(2) The Claimants' Position ... 35

F. Objection 6: The Tribunal lacks *ratione temporis* jurisdiction over Contrarian and part of Cyrus's claims because the relevant Notes were acquired after the alleged denial of justice 37

(1) The Respondent's Position ... 37

(2) The Claimants' Position ... 39

G. Objection 7: The Claimants did not present the waiver as required by Article 1121 of the NAFTA, so Tribunal lacks jurisdiction *ratione voluntatis* ... 39

(1) The Respondent's Position ... 40

(2) The Claimants' Position ... 41

H. Objection 8: Standing of Contrarian to Claim Denial of Justice ... 42

(1) The Respondent's Position ... 42

(2) The Claimants' Position ..... 43

I. Admissibility ..... 44

(1) The Respondent's Position ..... 44

(2) The Claimants' Position ..... 46

V. THE TRIBUNAL'S DECISION ..... 48

A. Objection 2 ..... 48

(1) The essence of the Respondent's objection and the Claimants' response ..... 48

(2) The relevant texts ..... 48

(3) The Notes, default and US bankruptcy proceedings ..... 50

(4) The complaint ..... 51

(5) The First and Second Claimants and their relationship with the Funds ..... 52

a. The First Claimant ..... 53

b. The Second Claimant ..... 55

(6) The Tribunal's Analysis ..... 57

B. Objection 3 ..... 65

(1) Annex 14-C ..... 65

(2) The critical dates ..... 66

(3) The Tribunal's Analysis ..... 68

VI. COSTS ..... 70

A. The Claimants' Costs Submission ..... 70

B. The Respondent's Costs Submission ..... 71

C. The Tribunal's Decision on Costs ..... 71

VII. AWARD ..... 73

## TABLE OF [SELECTED] ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2022 |
| C-[#] | Claimants' Exhibit |
| Cl. C-Mem. | Claimants' Counter-Memorial on Jurisdiction dated 29 August 2024 |
| Cl. PHB | Claimants' Post Hearing Brief dated 29 January 2026 |
| Cl. Rej. | Claimants' Rejoinder on Jurisdiction dated 30 June 2025 |
| CL-[#] | Claimants' Legal Authority |
| Hearing | Hearing on Jurisdiction held 5-6 November 2025 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| Resp. Mem. | Respondent's Memorial on Jurisdiction dated 4 June 2024 |
| Resp. PHB | Respondent's Post Hearing Brief dated 29 January 2026 |
| Resp. Reply | Respondent's Reply on Jurisdiction dated 16 April 2025 |
| RL-[#] | Respondent's Legal Authority |
| Tr. Day [#] [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 6 February 2024 |

## I. INTRODUCTION AND PARTIES

1. This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of Chapter 11 of the North American Free Trade Agreement ("**NAFTA**"), which entered into force on 1 January 1994 and terminated on 1 July 2020; Annex 14-C of Chapter 14 of the United States-Mexico-Canada Agreement, which replaced the NAFTA following its termination ("**USMCA**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2. The claimants are Cyrus Capital Partners, L.P. ("**Cyrus**"), and Contrarian Capital Management, LLC ("**Contrarian**"), both companies incorporated under the laws of Delaware, United States of America (together, the "**Claimants**").

3. The respondent is the United Mexican States ("**Mexico**" or the "**Respondent**").

4. The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

## II. PROCEDURAL HISTORY

5. On 30 June 2023, ICSID received a request for arbitration dated 30 June 2023 from Cyrus and Contrarian against Mexico (the "**Request**"), together with Exhibits 1 to 30.

6. On 11 August 2023, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

7. The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follow: the Tribunal would consist of three arbitrators, one to be

appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

8. The Tribunal is composed of Lord Lawrence Collins, a national of the United Kingdom of Great Britain and Northern Ireland, President, appointed by agreement of the Parties; Dr. David J.A. Cairns, a national of the United Kingdom of Great Britain and Northern Ireland and New Zealand, appointed by the Claimants; and Professor Zachary Douglas, a national of the Commonwealth of Australia and Switzerland, appointed by the Respondent.

9. On 6 February 2024, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Verónica Lavista, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

10. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 21 March 2024 by videoconference.

11. Following the first session, on 3 April 2024, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 1 July 2022, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, D.C., United States of America. Procedural Order No. 1 also sets out the agreed schedule for the jurisdictional phase of the proceedings.

12. On the same date, the Tribunal issued Procedural Order No. 2, on transparency and confidentiality.

13. In accordance with Procedural Order No. 1, on 4 June 2024, the Respondent filed its Memorial on Jurisdiction, together with Exhibits R-1 to R-16 and Legal Authorities RL-1 to RL-43.

14. On 15 August 2024, the Parties communicated to the Tribunal that they had agreed to an extension of 10 days for the Claimants' presentation of the Counter-Memorial on Jurisdiction, in addition to changing the trigger date for the Reply on Jurisdiction.

15. On 20 August 2024, the Tribunal issued Procedural Order No. 3, adopting the revised procedural calendar as agreed by the Parties.

16. On 29 August 2024, the Claimants filed their Counter-Memorial on Jurisdiction, together with the Witness Statement of Mr. Kenneth Smith Ramos, dated 29 August 2024, Witness Statement Exhibits KS-1 to KS-5, Exhibits C-1 to C-75 and Legal Authorities CL-1 to CL-77.

17. On 13 September 2024, ICSID informed the Parties that following the departure of Ms. Verónica Lavista, Ms. Patricia Rodríguez Martín, ICSID Legal Counsel, would serve as the Secretary of the Tribunal.

18. On 1 October 2024, the Claimants filed the corrected versions of Exhibits C-7, C-28, CL-53, and CL-55.

19. Further to the Tribunal's invitation of 11 December 2024, the Parties informed the Tribunal on 18 December 2024 of their agreement to hold a three-day hearing during the week of 3 November 2025.

20. On the same date, the Tribunal issued Procedural Order No. 4, concerning the Parties' Requests for Document Production, simultaneously exchanged by the Parties on 7 November 2024, along with their respective Objections and Replies.

21. On 13 January 2025, the Parties communicated to the Tribunal that they had agreed to an extension of two weeks for the production of documents and to the remaining deadlines of the procedural calendar.

22. On 15 January 2025, the Tribunal issued Procedural Order No. 5, adopting the revised procedural calendar as agreed by the Parties.

23. On 26 February 2025, ICSID informed the Parties that Ms. Elisa Méndez Bräutigam, ICSID Legal Counsel, would serve as the Secretary of the Tribunal.

24. On 28 and 31 March 2025, the Parties communicated to the Tribunal that they had agreed to an extension of two weeks for the filing of the Respondent's Reply on Jurisdiction and to extensions of the remaining deadlines of the procedural calendar.

25. On 2 April 2025, the Tribunal issued Procedural Order No. 6, adopting the revised procedural calendar as agreed by the Parties.

26. On 16 April 2025, the Respondent filed its Reply on Jurisdiction, together with Factual Exhibits R-17 to R-42 and Legal Authorities RL-44 to RL-128.

27. On 21 April 2025, the Respondent informed the Tribunal of an errata in the English and Spanish versions of Procedural Order No. 6.

28. Further to the Respondent's correspondence, the Tribunal dispatched corrected English and Spanish versions of Procedural Order No. 6 on 22 April 2025.

29. On 4 June 2025, the Tribunal informed the Non-Disputing Treaty Parties of the updated procedural calendar of the case, including the dates for any submission to be filed pursuant to NAFTA Article 1128 and the hearing on jurisdiction.

30. On 11 June 2025, the Tribunal set 5 September 2025 as the deadline for the Parties to submit their respective notifications of the witnesses and experts to be cross-examined at the Hearing, and invited the Parties to confirm, by 18 June 2025, their availability to hold the pre-hearing organizational meeting on 9 October 2025.

31. Following correspondence with the Parties on 17, 18, 20 and 24 June 2025, the Tribunal confirmed on 25 June 2025 that the pre-hearing organizational meeting would be held on 14 June 2025.

32. On 30 June 2025, the Claimants filed their Rejoinder on Jurisdiction, together with the Second Witness Statement of Mr. Kenneth Patrick Smith Ramos, dated 30 June 2025, Exhibits C-76 to C-82 and Legal Authorities CL-78 to CL-92.

33. On 15 July 2025, both Canada and the United States of America filed their respective written submissions as Non-Disputing State Parties pursuant to NAFTA Article 1128.

34. On 5 August 2025, the Respondent filed its observations on the Non-Disputing State Parties submissions, together with Legal Authorities RL-129 to RL-140.

35. On 7 August 2025, the Claimants informed the Tribunal of their general disagreement with the Non-Disputing Treaty Parties' submissions of 15 July 2025, noting that they would not submit additional written comments at that time and would instead address any further observations during the hearing on jurisdiction.

36. On the same date, the Respondent informed the Tribunal that it would object to the Claimants' introduction of new arguments regarding the Non-Disputing Treaty Parties' NAFTA Article 1128 submissions during the hearing, as it would place the Respondent at a procedural disadvantage.

37. On 11 August 2025, the Tribunal invited the Claimants to file a reply to the Respondent's communication by 18 August 2025, and further directed that, should the Claimants wish to comment on the NAFTA Article 1128 submissions at the hearing, they must provide reasons in their reply as to why such comments should be permitted.

38. On the same date, the Claimants wrote to the Tribunal expressing strong objection to the Respondent's request to "limit [their] ability to present […] views during the hearing," noting that while they had already addressed points raised by Canada and the United States of America in prior written submissions and had no additional written comments at that time, this should not constrain their oral arguments, including rebuttal of Canada's and the United States' submissions.

39. On 18 August 2025, the Claimants requested the Tribunal to confirm that the Claimants may refer to and comment on the Non-Disputing Parties' Submissions of the United States of America and Canada during the hearing on jurisdiction and in their Post-Hearing briefs.

40. On 22 August 2025, the Tribunal invited the Respondent to file a reply by 29 August 2025.

41. On 29 August 2025, the Respondent opposed the Claimants' 18 August 2025 request and asked that, should the Claimants introduce new comments on the NDTP Briefs during the hearing or in their Post-Hearing brief, the Respondent be permitted to submit a written response to those new comments and be granted additional pages in its Post-Hearing brief to address them.

42. On 8 September 2025, the Respondent informed the Tribunal that, on 5 September 2025, it had requested that the Claimants make Mr. Kenneth Smith Ramos available for examination by the Respondent at the hearing.

43. On 15 September 2025, ICSID informed the Parties that Ms. Patricia Rodríguez Martín, ICSID Legal Counsel, would serve as the Secretary of the Tribunal.

44. On the same date, the Tribunal informed the Parties that "the Claimants may, should they wish, make additional comments on the NDP submissions either at the hearing or in their post-hearing briefs. If they do so, the Tribunal will ensure that equality of arms is maintained, and in particular, the Respondent will be afforded a full opportunity to make submissions on how it proposes to address such comments."

45. On 23 September 2025, further to the Claimants' request and the Respondent's agreement, the Tribunal confirmed that the pre-hearing organizational meeting would take place on 21 October 2025.

46. On 24 September 2025, the Tribunal confirmed the hearing dates to the Non-Disputing Treaty Parties and invited them to inform the disputing parties, the Tribunal and ICSID by 1 October 2025 if they plan to (i) attend the hearing, and, if so, (ii) make any oral submissions.

47. On 30 September 2025 and 1 October 2025, the Non-Disputing Treaty Parties informed the disputing parties, the Tribunal and ICSID of their intention to attend the hearing and make oral submissions.

48. On 17 October 2025, the Claimants requested that the Tribunal grant a temporary suspension of the arbitration proceedings for a period of three months, pursuant to Rule 54(2) of the ICSID Arbitration Rules.

49. By email dated 18 October 2025, the Respondent requested that the Tribunal afford it an opportunity to respond to the suspension request. The Respondent further requested that the pre-hearing organisational meeting proceed as scheduled.

50. On the same date, the ICSID Secretariat, on behalf of the Tribunal, invited the Respondent to submit its response to the suspension request by 5:00 p.m. (GMT) on 20 October 2025, and confirmed that the pre-hearing organisational meeting would proceed as scheduled.

51. On 20 October 2025, the Respondent submitted its response to the suspension request, indicating that it did not consent to the requested suspension.

52. On 21 October 2025, the Tribunal held the pre-hearing organizational meeting with the Parties by videoconference, during which the Parties were given an opportunity to further elaborate upon their respective positions with regard to the suspension request. At the pre-hearing organisational meeting, the Tribunal informed the Parties that the suspension request was denied. The Tribunal and the Parties further discussed the draft procedural order circulated to them on 4 September 2025 including in particular the Parties' comments of 10 October 2025, advising the Tribunal of the agreements reached and their respective positions where no agreement was reached on the organization of the Hearing.

53. On 21 and 23 October 2025, the Parties shared their respective versions of the chronology of events, *dramatis personae*, and substantiative list of issues for the Tribunal's consideration.

54. On 28 October 2025, the Tribunal issued Procedural Order No. 7, concerning the organization of the hearing, which specified the new hearing dates of 5 and 6 November 2025.

55. On 5 November 2025, the Tribunal issued Procedural Order No. 8, conveying the reasons for the Tribunal's decision to deny the suspension request.

56. The hearing on jurisdiction was held in Washington, D.C. from 5 to 6 November 2025 (the "Hearing"). The following persons were present at the Hearing:

*Tribunal*:

| | |
|---|---|
| Lord Lawrence Collins | President |
| Dr. David J.A. Cairns | Arbitrator |
| Prof. Zachary Douglas, KC | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Ms. Jara Mínguez Almeida | Legal Counsel |

*For the Claimants*:

| | |
|---|---|
| Ms. Katherine Padgett | Akin Gump Strauss Hauer & Feld LLP |
| Mr. Lide Paterno | Akin Gump Strauss Hauer & Feld LLP |
| Mr. David Giller | Akin Gump Strauss Hauer & Feld LLP |
| Mr. Stephen Kho | Akin Gump Strauss Hauer & Feld LLP |
| Ms. Shannon Jackenthal (remote) | Akin Gump Strauss Hauer & Feld LLP |
| Ms. Lauren Zou | Akin Gump Strauss Hauer & Feld LLP |

*For the Respondent*:

| | |
|---|---|
| Mr. Alan Bonfiglio Ríos | Counsel - Secretaría de Economía |
| Ms. Rosalinda Toxqui Tlaxcalteca | Counsel - Secretaría de Economía |
| Mr. Rafael Alejandro Augusto Arteaga Farfán | Counsel - Secretaría de Economía |
| Ms. Alicia Monserrat Islas Martínez (remote) | Counsel - Secretaría de Economía |
| Ms. Paulina Jazmín Rodríguez Cruz | Counsel - Secretaría de Economía |
| Mr. Ricardo Salazar García (remote) | Counsel - Secretaría de Economía |
| Mr. Stephan E. Becker | Counsel - Pillsbury Winthrop Shaw Pittman LLP |
| Mr. Gary J. Shaw | Counsel - Pillsbury Winthrop Shaw Pittman LLP |
| Ms. Carolina Plaza (Remote) | Counsel - Pillsbury Winthrop Shaw Pittman LLP |

*Non-Disputing NAFTA Party Representatives*
*For the United States of America*:

| | |
|---|---|
| Ms. Lisa J. Grosh | Assistant Legal Adviser – U.S. Department of State |
| Mr. John D. Daley | Deputy Assistant Legal Adviser – U.S. Department of State |
| Ms. Kristina E. Beard | Attorney-Adviser – U.S. Department of State |

*For Canada*:

| | |
|---|---|
| Ms. Heather Squires (remote) | Deputy Director and Senior Counsel – Trade Law Bureau |
| Ms. Dayeon Min (remote) | Counsel – Trade Law Bureau |
| Ms. Jaena Kim (remote) | Counsel – Trade Law Bureau |

*Court Reporters*:
Ms. Dawn Larson
D-R Steno

*Interpreters*:
Ms. Silvia Colla
Mr. Daniel Giglio
Mr. Charles Roberts

57. During the Hearing, the following persons were examined:

*On behalf of the Claimants*:
Mr. Kenneth Patrick Smith Ramos (remote)

58. The Parties filed simultaneous Post-Hearing briefs on 29 January 2026.

59. The Parties filed their submissions on costs on 11 February 2026.

60. On 23 June 2026, the Respondent requested the Tribunals leave to introduce the decision in *Silver Bull Resources, Inc. v. United Mexican States* (ICSID Case No. ARB/23/24) into the record of this arbitration. At the Tribunal's invitation, the Claimants submitted their observations on the Respondent's request on 3 July 2026, indicating that they did not object thereto.

61. On 14 July 2026, the Respondent submitted the *Silver Bull* Award as legal authority RL-0142.

## III. THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

62. The Respondent's final request for relief is as follows:

> *For all the foregoing reasons, the Respondent requests this Tribunal to dismiss the Claimant's [sic]claim in its entirety, with the corresponding award of costs in favor of the Respondent.*[1]

63. The Claimants' final request for relief is as follows:

> *For the reasons explained above and documented on the record in its prior submissions and at the Hearing, the Tribunal should reject the entirety of Respondent's jurisdictional objections and hold in abeyance its admissibility contention. Accordingly, Claimants respectfully request that the Tribunal confirm its jurisdiction over the claims. In addition, Claimants respectfully request that the Tribunal order Respondent to compensate Claimants for all costs and attorney fees associated with the bifurcated stage of this arbitration.*[2]

## IV. JURISDICTION AND ADMISSIBILITY

### A. Objection 1: Failure to observe the 90 days between Notice of Intent and Request for Arbitration

#### (1) The Respondent's Position

64. The Respondent submits that the Tribunal lacks jurisdiction because the Claimants failed to comply with the mandatory requirement in NAFTA Article 1119 to wait at least 90 days between the delivery of the Notice of Intent and the submission of the Request for Arbitration.

65. According to the Respondent, the wording of Article 1119 in both its English and Spanish versions is clear and unambiguous in requiring that a claimant submit its claim to arbitration only after the expiry of a minimum 90-day period following the Notice of Intent. The use of the term "shall" in English and "*notificará*" in Spanish reflects a mandatory obligation.[3] The Respondent further relies on a binding interpretation of the NAFTA Free

[1] Resp. PHB, para. 126.

[2] Cl. PHB, paras. 125-126.

[3] Resp. Mem., para. 57, citing RL-6, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Dissenting Opinion of Arbitrator Raúl E. Vinuesa, 3 July 2019, para. 41.

Trade Commission, as well as consistent tribunal jurisprudence, confirming that compliance with the 90-day notice period is compulsory.[4]

66. The Respondent notes that the Claimants delivered their Notice of Intent on 28 June 2023 and submitted their Request for Arbitration only two days later, on 30 June 2023, in manifest violation of Article 1119.[5] The Respondent emphasizes that the Claimants were aware of this non-compliance, as they expressly acknowledged it in their Request for Arbitration and sought a suspension of the proceedings for 90 days under the ICSID Arbitration Rules, to which the Respondent objected.[6] In the Respondent's submission, there is no legal basis for the Tribunal to waive or modify the mandatory requirement set out in Article 1119, and the failure to comply with that requirement requires dismissal of the case.

67. The Respondent further contends that the Claimants' arguments to excuse this non-compliance are meritless. They claim they were not "formally put on notice" until late June 2023 or could not have acted earlier. However, the Respondent points out that the Claimants were aware of the Injunction granted on 22 September 2022 ("the September 2022 Injunction") and the possibility of pursuing "international treaty arbitration" as early as February 2023—well over 90 days before filing the Request for Arbitration.[7] The Respondent highlights that the acquisition of the Notes was part of a broader strategy targeting TV Azteca, and the Claimants' assertion that they could not have undertaken arbitration decisions earlier is implausible.[8] Finally, the Respondent emphasized that the Claimants admitted at the Hearing that: (i) they learned about the September 2022 Injunction by the "*end of February, early March*"; and (ii) that the reason they did not file the Notice earlier was for "*practical reasons*", in particular because they were "*thinking*

---

[4] Resp. Mem., para. 57, citing RL-7, Statement of the Free Trade Commission on notices of intent to submit a claim to arbitration, 7 October 2003, para. 1. Pursuant to NAFTA Article 1131(2), interpretations of the FTC "shall be binding on a Tribunal established under this Section."

[5] Resp. Mem., para. 59.

[6] Resp. Mem., para. 60, citing Request, para 30; R-11, Claimants' communications, 24 July 2023 and 8 August 2023, p. 3; R-14, Claimants' Communication, 17 August 2023.

[7] Resp. Reply, paras. 53, 54.

[8] Resp. Reply, para. 55.

*about* [whether they] *want*[ed] *to spend the resources to pursue this Claim*"; and on whether filing a claim "*fit into their overall strategy*".[9]

68. According to the Respondent, the Claimants acknowledged at the Hearing that they had "constructive knowledge" of the domestic proceeding by February 2023 and therefore, could have filed the Notice within the deadline of 30 March 2023 (which corresponds to 90-days before Mexico's consent under Annex 14-C expired).[10]

69. Strict compliance with Article 1119 is a mandatory precondition for the Respondent's consent to arbitration.[11] Prior NAFTA tribunal decisions cited by the Claimants – including *Mondev*, *Pope & Talbot*, *ADF*, *Chemtura*, and *B-MEX* – are inapposite, as in those cases NOIs were filed in time or deficiencies were minor, and none addressed a complete failure to observe the 90-day waiting period or its jurisdictional consequences.[12] Articles 1116–1121 set out the substantive procedural steps required for submission of a claim, and non-compliance deprives Mexico of consent, undermines the treaty's procedural integrity, and prejudices the Respondent's ability to defend itself.[13] The Claimants' attempt to retroactively remedy their non-compliance by requesting a suspension further demonstrates that they were aware of the violation and that it was deliberate and not excusable.

**(2) The Claimants' Position**

70. The Claimants contend that they have satisfied all procedural requirements under NAFTA Chapter 11 to submit their claims to arbitration. The Claimants emphasize that they never

---

[9] Resp. PHB, para. 7, citing Tr. Day 1, pp. 249-251.

[10] Resp. PHB, para. 9, citing Tr. Day 1, p. 155: 18-19.

[11] Resp. Reply, paras. 56-58, 69, citing RL-50, International Law Commission (ILC), Draft Articles on the Law of Treaties with commentaries, 1966, pp. 220-221; RL-6, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Dissenting Opinion of Arbitrator Raúl E. Vinuesa, 6 July 2019, para. 41.

[12] Resp. Reply, paras. 62-68, citing RL-38, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, paras. 49, 50; RL-60, *Pope & Talbot Inc v. Government of Canada*, UNCITRAL, Award Concerning the Motion by Government of Canada Respecting the Claim Based Upon Imposition of the "Super Fee", 7 August 2000, paras. 8, 9, 15, 25; RL-61, *ADF Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/00/1, Award, 9 January 2003, para. 105; RL-62, *Chemtura Corporation (formerly Crompton Corporation) v. Government of Canada*, PCA Case No. 2008-01, Award, 2 August 2010, para. 100; RL-24, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, paras. 67, 81, 89, 120.

[13] Resp. Reply, para. 58.

closed the door to negotiations with the Respondent and consistently made efforts to engage in dialogue both prior to and following the registration of this arbitration. They contend that the Respondent rejected all such efforts, preferring instead to raise procedural objections rather than participate in consultations or negotiations.[14]

71. The Claimants argue that the Respondent's assertion that they failed to file a Notice of Intent prior to 1 April 2023 is unreasonable. They say that, due to delayed service of TV Azteca's lawsuit and the resulting injunction, they were not formally on notice of the legal proceedings and therefore could not reasonably assess or pursue a NAFTA claim in the period before 1 April 2023.[15] The Claimants submit that on 28 June 2023, they delivered the Notice of Intent containing all required information to the Mexican official responsible for the arbitration, and this was done prior to the submission of the Request for Arbitration on 30 June 2023, thereby complying with the requirements of NAFTA Article 1119.[16]

72. The Claimants maintain that their conduct reflected the practical necessity of preserving their right to submit a NAFTA claim before the expiration of the Respondent's consent under the USMCA. They argue that waiting for a full 90-day pre-submission period would have jeopardized their ability to access the NAFTA dispute resolution mechanism, given the 1 July 2023 expiration of the Respondent's consent.[17] The Mexican court's delays in putting the Claimants on both constructive and formal notice about the September 2022 Injunction made timely notice of this arbitration impossible. The Claimants' acted as quickly as possible in taking the necessary and reasonable steps to preserve their NAFTA remedy before the Respondent's consent expired.[18] The Claimants therefore assert that they acted responsibly and in good faith, while the Respondent's objection is both procedurally and substantively unfounded.[19]

---

[14] Cl. C-Mem., para. 114, citing C-64, Claimants' request for consultations, 17 August 2023; C-65, Respondent rejects consultations, 30 August 2023; C-66, Claimants' request for consultations, 11 September 2023.

[15] Cl. C-Mem., para. 115.

[16] Cl. C-Mem., paras. 117-120.

[17] Cl. PHB, paras. 16-18.

[18] Cl. Rej., para. 68.

[19] Cl. C-Mem., paras. 141-147, citing CL-5, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, para. 124; CL-7, *Mondev International Ltd. v. United States of America*,

73. The Claimants further maintain that, while they sought to engage in consultations under NAFTA Articles 1118 and 1119, Article 1118 does not make such consultations mandatory, only that the parties "should" attempt them.[20] They contend that they acted in good faith by offering a 90-day suspension of the arbitration proceedings to facilitate discussions with the Respondent, including submitting requests to the ICSID Secretary-General and sending formal communications proposing pauses in the proceedings.[21] The Respondent's repeated and admitted failure to engage with the Claimants demonstrates that it was not deprived of due process rights. It had ample opportunity to engage in good faith negotiations with the Claimants during a proposed 90-day pause of these proceedings but elected not to do so.[22] The Claimants say that the Respondent refused all such proposals, interpreting Article 1118 in a rigid and formalistic manner.[23]

74. In addition, the Claimants submit that even if they had failed to satisfy Article 1119, such a failure would not affect the Tribunal's jurisdiction. They cite precedent, including the *Mondev*, *Pope & Talbot*, *Chemtura, ADF*, and *B-Mex* cases, in which tribunals have distinguished between procedural requirements and conditions affecting a party's consent to arbitrate. According to the Claimants, these cases confirm that minor or technical failures to comply with Chapter 11 procedures do not deprive a tribunal of jurisdiction, particularly where the respondent suffers no prejudice.[24] Specifically, the cases cited by the Respondent do not address whether the timing of a notice of intent may constitute a deficiency of jurisdictional significance. The cases also do not evaluate circumstances wherein an

---

ICSID Case No. ARB(AF)/99/2, Award, 11 October 2022, para. 86; and CL-12, *Pope & Talbot Inc v. Government of Canada*, UNCITRAL, Award Concerning the Motion by Government of Canada Respecting the Claim Based Upon Imposition of the "Super Fee", 7 August 2000, para. 26; Cl. PHB, paras. 17-18.

[20] Cl. C-Mem., para. 121, referring to CL-11, NAFTA Chapter 11, 1 January 1994.

[21] Cl. C-Mem., paras. 122-124; Cl. PHB, para. 19.

[22] Cl. C-Mem., paras. 138-140, citing CL-15, Statement of the Free Trade Commission on notices of intent to submit a claim to arbitration, 7 October 2003; CL-5, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, para. 130; Cl. Rej., paras. 49, 60.

[23] Cl. C-Mem., paras. 125-126, citing C-65, Respondent rejects consultations, 30 August 2023; Cl. Rej., para. 49.

[24] Cl. C-Mem., paras. 127-135, citing CL-7, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2022, para. 44; CL-12, *Pope & Talbot Inc v. Government of Canada*, UNCITRAL, Award Concerning the Motion by Government of Canada Respecting the Claim Based Upon Imposition of the "Super Fee", 7 August 2000, para. 26; CL-6, *Crompton (Chemtura) Corp. v. Government of Canada*, PCA Case No. 2008-01, Award, 2 August 2010, para. 104; CL-13, *ADF Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/00/1, Award, 9 January 2003, paras. 134, 138; CL-5, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, para. 63.

investor demonstrated a good faith effort to comply with the 90-day cooling-off period through repeated attempts to engage in consultations, only to encounter repeated rejection by the host State.[25]

## B. OBJECTION 2: THE CLAIMANTS DO NOT QUALIFY AS INVESTORS UNDER NAFTA

### (1) The Respondent's Position

75. The Respondent contends that the Claimants do not qualify as "investors of a Party" under NAFTA and therefore lack standing to bring claims under Article 1116.

76. The Respondent argues that under Articles 1116(1) and 1139 of NAFTA, only a national or enterprise that *itself* made an investment and incurred loss or damage may submit a claim to arbitration.[26] Article 1139 defines "investment of an investor of a Party" as an "investment owned or controlled directly or indirectly by an investor of such Party." Tribunals have consistently found that ownership or control must have existed both at the time of the breach and at the time the request for arbitration is filed. To establish jurisdiction, the Claimants must show that they owned or controlled Opportunities and Sandpiper, either directly or indirectly, both at the time of the alleged breach (27 September 2022) and at the time the Request for Arbitration was filed (30 June 2023). The Claimants lacked ownership and control over Opportunities and Sandpiper at the time of the alleged breach – as they do today – and therefore, they cannot meet this requirement.[27]

---

[25] Cl. Rej., paras. 51-55, referring to CL-78, *Methanex Corporation v. United States of America*, NAFTA/UNCITRAL, First Partial Award, 7 August 2002, paras. 10–12; CL-79, *Merrill & Ring Forestry L.P. v. Government of Canada*, UNCITRAL, Decision on a Motion to Add a New Party, 31 January 2008, paras. 1-3; CL-80, *Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*, UNCITRAL, Decision on Preliminary Question, 6 June 2006, paras. 138-140, 175, 273; CL-81, *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton, and Bilcon of Delaware, Inc. v. Government of Canada*, UNCITRAL, Award on Jurisdiction and Liability, 17 March 2015, para. 230.

[26] Resp. Mem., paras. 63-65, citing RL-11, Merriam-Webster, invest definition, last accessed 22 June 2026: https://www.merriam-webster.com/dictionary/invest; RL-12, Cambirdge Dictionary, invest definition, last accessed 22 June 2026: https://dictionary.cambridge.org/dictionary/english/invest; RL-13, Oxford Learner's Dictionary, invest definition, last accessed 22 June 2026: https://www.oxfordlearnersdictionaries.com/definition/english/invest; RL-14, *Romak S.A. (Switzerland) v. Republic of Uzbekistan*, PCA Case No. 2007-07/AA280, Award, 26 November 2009, para. 177.

[27] Resp. Reply, para. 81.

77. According to the Respondent, the evidence shows that the Cayman Islands funds, Opportunities and Sandpiper, and not the Claimants, purchased and held the Notes, while the Claimants acted solely as their agents or investment managers.[28] The Respondent further argues that the Claimants cannot plausibly claim legal ownership of the Notes, since the offering documents expressly prohibited distribution to U.S. persons and required Noteholders to certify that they were not U.S. persons.[29] The Respondent submits that acting as an investment manager does not confer investor status under NAFTA, as the Claimants did not contribute any capital or resources of their own to acquire the Notes, and do not have economic interest in the Notes.[30] The Respondent further argues that the Claimants have not pointed to any loss they have suffered as a result of the Respondent's alleged treaty breaches, which supports its argument that the Claimants have no economic interest in the Notes.[31]

78. Neither can the Claimants claim control, as true control requires authority to make key decisions over the investment at both the time of the alleged breach and the filing of the arbitration request.[32] The investment management agreements demonstrate that Cyrus and Contrarian's authority was strictly subordinate to the boards of Opportunities and Sandpiper, with no ability to bind or represent the funds.[33]

---

[28] Resp. Mem., para. 62; Resp. PHB, para. 13.

[29] Resp. Mem., para. 68, citing R-16, TV Azteca Final Offering Circular, August 2017, p. 1; Exhibit 10, Indenture executed by TV Azteca, BNYM and BNYM LB, 9 August 2017, p. A-1.

[30] Resp. Mem., para. 62; Resp. PHB, para. 15.

[31] Resp. PHB, para. 13.

[32] Resp. Reply, paras. 82-87, citing RL-6, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Dissenting Opinion of Arbitrator Raúl E. Vinuesa, 6 July 2019, paras. 139, 144; RL-24, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, paras. 209, 210; RL-47, *Vento Motorcycles, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/17/3, Award, 6 July 2020, para. 221; RL-63, *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, 26 January 2006, para. 108; RL-64, *Sociedad Aeroportuaria Kuntur Wasi S.A. and Corporación América S.A. v. Republic of Peru*, ICSID Case No. ARB/18/27, Decision on Jurisdiction, Liability and Certain Aspects of Quantum, with Further Directions on Quantum, 11 August 2023, para. 254; RL-65, Simon Foote, *Giving Substance to a Substantive Approach 1: The Problems with Control and Substantial Business Activity*, in Simon Foote, *The Bona Fide Investor: Corporate Nationality and Treaty Shopping in Investment Treaty Law*, International Arbitration Law Library, Volume 63, Kluwer Law International, 2021, p. 132; RL-66, Commission Consolidated Jurisdictional Notice under Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings, (2008/C 95/01), available on C_2008095EN.01000101.xml.

[33] Resp. Reply, paras. 88-93; Tr. Day 1, p. 81; Resp. PHB, paras. 19-20; C-72, Cyrus Investment Management Agreement, 28 August 2015, p. 4, para. 3.

79. Furthermore, the Respondent contends that Article 1116 does not permit a claimant to seek compensation for losses allegedly suffered by third parties; such claims may only be brought under Article 1117 and only on behalf of enterprises of another NAFTA Party.[34] Opportunities and Sandpiper are incorporated in the Cayman Islands and therefore fall outside the scope of Article 1117.[35]

80. On this basis, the Respondent concludes that the Claimants are not "investors of a Party" within the meaning of NAFTA, that the alleged investment was made and held exclusively by the Cayman Islands funds, and that the Claimants acted merely as their agents. Accordingly, the Respondent maintains that the Tribunal lacks jurisdiction over the claims.

**(2) The Claimants' Position**

81. According to the Claimants, they qualify as "investors of a Party" under NAFTA Article 1116(1). They contend that Cyrus and Contrarian are enterprises of the United States and that, although the Noteholders are not organized under U.S. law, their principal places of business, where their activities are primarily directed and controlled, are in New York, New York, and Greenwich, Connecticut, respectively.[36] The Claimants say that they are protected investors because they: (i) exercise direct control over the Noteholders, including Opps II Master Fund and Sandpiper Limited, through established fund structures and investment management agreements; and (ii) maintain an indirect economic interest in the Notes.[37]

82. The Claimants emphasize that they exercise decisive control over the TV Azteca Notes, which constitutes an investment under NAFTA. Cyrus, as investment manager of Opps II Master Fund, has authority to "*invest, trade securities, and exercise all rights, powers, and privileges associated with securities and other properties*" owned by the fund.[38] Similarly,

---

[34] Resp. Mem., para. 67.

[35] Resp. Mem., para. 67.

[36] Cl. C-Mem., para. 149.

[37] Cl. C-Mem., paras. 150-151; Cl. Rej., para. 83; Cl. PHB, para. 25.

[38] Cl. C-Mem., para. 163; Cl. PHB, para. 31.

Contrarian, as manager of Contrarian Funds, L.L.C., exercises full decision-making authority over Sandpiper Limited and its investments.[39]

83. According to the Claimants, characterizing their role as simply administrative or akin to an "agent" fundamentally misunderstands and mischaracterizes the role of investment managers vis-à-vis the investment vehicles under their control.[40] They argue that Cyrus and Contrarian are responsible for all investment decisions, exercise authority over the Noteholders' assets, and direct litigation strategy, and that in the absence of such control the Noteholders would lack the capacity to invest or pursue claims.[41]

84. While acknowledging that the Notes are debt securities, the Claimants maintain that their control over the Noteholder funds establishes them as "ultimate beneficial owners" under U.S. law.[42] With respect to Cyrus, the General Partner of the Opps II Domestic Feeder fund holds a [redacted] interest in Opps II Master Fund, which means that Cyrus's ultimate beneficial owner – Stephen C. Freidheim, a U.S. citizen – directly owns [redacted] of the Notes. Similarly, Contrarian's ultimate beneficial owners possess economic stakes in the Notes through their respective interests ([redacted]) in the General Partners of the funds that own Contrarian Funds LLC, and consequently, the Notes owned by Sandpiper.[43] The general partners of most of the funds that own Contrarian Funds, L.L.C. are ultimately owned and controlled by the same three U.S. nationals who control Contrarian—Jon Bauer, Janice Stanton, and Gil Tenzer. Through these general partners, Contrarian's ultimate owners retain an indirect economic interest in the TV Azteca Notes, including those held by Sandpiper Limited.[44]

---

[39] Cl. C-Mem., para. 165; Cl. PHB, para. 32.
[40] Cl. Rej., para. 94; Cl. PHB, para. 30.
[41] Cl. Rej., para. 94; Cl. PHB, para. 24.
[42] Cl. PHB, paras. 30, 33.
[43] Cl. PHB, para. 34.
[44] Cl. PHB, para. 35.

85. The Claimants further submit that the organizational and contractual documents governing the relevant funds confirm their authority and control.[45] Under the relevant investment agreements and organizational documents, Cyrus and Contrarian have the power to manage the Notes, make investment decisions, exercise voting rights, participate in legal proceedings, and direct the actions of their subsidiaries.[46] In particular, the Claimants say that they control the Noteholders and thus indirectly control the Notes held by the Noteholders.[47] Similarly, Contrarian is solely responsible for all decisions concerning Sandpiper via its control of Contrarian Funds L.L.C., including directing the actions of its wholly owned subsidiaries, e.g., Sandpiper.[48]

86. The Claimants also point to their direct and indirect economic interest in the Notes.[49] The ultimate parent entities of both Cyrus and Contrarian hold small but significant economic interests in the funds and Noteholders under their control.[50]

87. The Claimants further argue that the Respondent's contention that they must have legal ownership or make a capital contribution is incorrect. NAFTA's definition of "investment of an investor of a Party" covers assets "owned or controlled directly or indirectly," and tribunals have consistently held that control over an investment, even through a fund structure, is sufficient to establish jurisdiction.[51] The Claimants cite authorities including *SD Myers*, *MAKAE Europe*, *Mason Capital*, and *Mera Investment Fund*, which recognize that an investment manager or equivalent exercising direction and control qualifies as an

---

[45] Cl. C-Mem., paras. 161-168, citing CL-22, *The Carlyle Group L.P., Carlyle Investment Management L.L.C., Carlyle Commodity Management L.L.C. and others v. Kingdom of Morocco*, ICSID Case No. ARB/18/29, Counter-Memorial on Jurisdiction, 22 June 2020, para. 109; CL-23, *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, 26 January 2006, para. 107.

[46] C-71, Memorandum of Association of Cyrus Opportunities Master Fund II, Ltd., Adopted by special resolution passed on 4 September 2012; C-72**,** Cyrus Investment Management Agreement, 28 August 2015; C-14, Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., 10 February 2017; Cl. Rej., para. 92.

[47] Cl. Rej., para. 92.

[48] Cl. Rej., para. 93.

[49] Cl. C-Mem., paras. 169-174, citing CL-24, *Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S.A. v. Dominican Republic*, LCIA Case No. UN 7927, Award on Preliminary Objections to Jurisdiction, 19 September 2008, para. 48; CL-25, *Komaksavia Airport Invest Ltd v. Republic of Moldova*, SCC Case No. EA 2020/074, Final Award, 3 August 2022, para. 167.

[50] Cl. Rej., para. 95.

[51] Cl. C-Mem., paras. 154-156.

investor for treaty purposes.[52] Because it is sufficient for the Claimants to establish that they control the Notes via their control of the Noteholders, they have established that they are "investors of a Party" entitled to submit claims under Article 1116.[53]

## C. OBJECTION 3: THE CLAIMANTS DO NOT HAVE A LEGACY INVESTMENT WITHIN THE MEANING OF ANNEX 14-C OF THE USMCA

### (1) The Respondent's Position

88. The Respondent submits that the Tribunal lacks jurisdiction because the Claimants do not hold a "legacy investment" within the meaning of Annex 14-C of the USMCA. Annex 14-C limits claims to investments of an investor of another Party that were established or acquired while NAFTA was in force and were still in existence on the date the USMCA entered into force on 1 July 2020.[54]

89. The Claimants argue that the TV Azteca Notes qualify as a legacy investment because they were originally issued in 2017, irrespective of when the Notes were acquired by the Cayman Islands funds.[55] The Respondent rejects this interpretation, submitting that a legacy investment must have been acquired by the *claimant* while NAFTA was in force and continuously held on and after 1 July 2020.[56] The Respondent points out that this interpretation was confirmed at the Hearing by the United States' representative.[57]

90. The Respondent further submits that the text of paragraph 6(a) of Annex 14-C confirms that the relevant investment must be an investment of an investor of another Party that was established or acquired while NAFTA was in force. According to the Respondent, the Claimants' interpretation deprives this qualifying language of any meaning, contrary to the

---

[52] Cl. C-Mem., paras. 154-160, citing CL-16, *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL, Partial Award, 13 November 2000, para. 225; CL-17, *MAKAE Europe SARL v. Kingdom of Saudi Arabia*, ICSID Case No. ARB/17/42, Award, 30 August 2021; CL-18, *Mason Capital L.P. (U.S.A.) and Mason Management LLC (U.S.A.) v. Republic of Korea*, PCA Case No. 2018-55, Decision on the Respondent's Preliminary Objections, 22 December 2019, para. 207; CL-20, *Mera Investment Fund Limited v. Republic of Serbia*, ICSID Case No. ARB/17/2, Decision on Jurisdiction, 30 November 2018, para. 107.

[53] Cl. Rej., para. 90.

[54] Resp. Mem., para. 70.

[55] Resp. Mem., para. 71.

[56] Resp. Mem., para. 71.

[57] Resp. PHB, para. 23.

principle of *effet utile*. Read in context, the requirement that the investment be "in existence" upon the entry into force of the USMCA presupposes that it was owned or controlled by the protected investor at that time.[58]

91. The Respondent also relies on the ordinary meaning of the terms "legacy" and "existent," which, when used adjectivally, refer to something originating in an earlier period and continuing to exist thereafter. In the Respondent's submission, this reinforces the conclusion that Annex 14-C protects only those investments that were established or acquired by a protected investor before NAFTA's termination and remained owned or controlled by that investor on 1 July 2020.[59]

92. The Respondent invokes the reasoning of the tribunal in *Westmoreland Coal Company v. Canada (III)*, which held that an investment is "in existence" for purposes of paragraph 6(a) only if it is owned or controlled by the investor at the time the USMCA entered into force. Applying that reasoning, the Respondent submits that the Notes cannot qualify as legacy investments, since they were acquired well after NAFTA's termination and were not owned or controlled by the Claimants at the relevant time.[60]

93. According to the Respondent, it is undisputed that neither Opportunities nor Sandpiper acquired or held the Notes while NAFTA was in force or on 1 July 2020. The evidentiary

---

[58] Resp. Reply, paras. 101-104, citing RL-69, Royal Academy of Spanish Language's Dictionary, last accessed 22 June 2026: https://dle.rae.es/existente; RL-70, Spanish Dictionary from Mexico, last accessed 22 June 2026: https://dem.colmex.mx/Ver/existente; RL-71, Merriam-Webster Dictionary, legacy definition, last accessed 22 June 2026: https://www.merriam-webster.com/dictionary/legacy; RL-72, Oxford's English Dictionary, legacy definition, last accessed 22 June 2026: https://www.oed.com/dictionary/legacy_n?tl=true; RL-73, *Alberta Petroleum Marketing Commission v. United States of America*, ICSID Case No. UNCT/23/4, Submission of United Mexican States pursuant NAFTA Article 1128, 15 January 2025; RL-74, *Access Business Group LLC v. United Mexican States*, ICSID Case No. ARB/23/15, Submission of Canada pursuant to NAFTA Article 1128, 28 March 2025; RL-75, *Access Business Group LLC v. United Mexican States*, ICSID Case No. ARB/23/15, Submission of the United States of America, 28 March 2025; RL-50, International Law Commission (ILC), Draft Articles on the Law of Treaties with commentaries, 1966, p. 219; RL-55, *Westmoreland Coal Company v. Government of Canada (III)*, ICSID Case No. UNCT/23/2, Award, 17 December 2024, paras. 161-171.

[59] Resp. Reply, paras. 102-103, citing RL-69, Royal Academy of Spanish Language's Dictionary, last accessed 22 June 2026: https://dle.rae.es/existente; RL-70, Spanish Dictionary from Mexico, last accessed 22 June 2026: https://dem.colmex.mx/Ver/existente; RL-71, Merriam-Webster Dictionary, legacy definition, last accessed 22 June 2026: https://www.merriam-webster.com/dictionary/legacy; RL-72, Oxford's English Dictionary, legacy definition, last accessed 22 June 2026: https://www.oed.com/dictionary/legacy_n?tl=true.

[60] Resp. Reply, paras. 105-106, citing RL-55, *Westmoreland Coal Company v. Government of Canada (III)*, ICSID Case No. UNCT/23/2, Award, 17 December 2024, paras. 161-171.

record shows that Opportunities acquired the Notes between November 2021 and November 2022, and that Sandpiper acquired its Notes in March 2023. Any prior ownership also post-dated the termination of NAFTA.[61]

94. On this basis, the Respondent concludes that, even assuming *arguendo* that the Claimants otherwise qualified as investors, the investments relied upon do not constitute "legacy investments" under Annex 14-C of the USMCA[62]. Accordingly, the Respondent maintains that the Tribunal lacks jurisdiction and that the claims must be dismissed.

**(2) The Claimants' Position**

95. The Claimants say that their investments qualify as "legacy investments" under Annex 14-C of the USMCA. They maintain that the Respondent's argument that the Noteholders acquired the Notes after the termination of NAFTA misreads the USMCA. According to the Claimants, Annex 14-C does not require that a legacy investment be acquired prior to the termination of NAFTA; rather, it must have been "established ***or*** acquired" between 1 January 1994, and the date of NAFTA's termination and be in existence at the entry into force of the USMCA.[63] According to the Claimants, there is no requirement under Annex 14-C for an investment to have been both established and acquired prior to the entry into force of the USMCA; an investment established by the issuer before 1 July 2020, is sufficient.[64]

96. The Claimants contend that all conditions of the legacy investment definition are satisfied. They point out that the Notes under their control were issued by TV Azteca in 2017, that Cyrus and Contrarian are investors of another Party organized under Delaware law with principal places of business in the United States and that the investments were established

[61] Resp. Mem., paras. 74-75, citing Exhibit 8a, Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Cyrus), 20 March 2023; Exhibit 8b, Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Contrarian), 20 March 2023.

[62] Resp. Mem., para. 76.

[63] Cl. C-Mem., para. 179.

[64] Cl. Rej., para. 97.

prior to the termination of NAFTA on 1 July 2020.[65] Moreover, the investments were in existence at the time the USMCA entered into force on 1 July 2020. The Claimants argue that the subsequent acquisition of the Notes by the Noteholders does not affect this analysis. The Respondent's attempt to impose additional requirements not in Annex 14-C contradicts the *effet utile* of the Vienna Convention on the Law of Treaties and imposes conditions that the treaty text does not support.[66]

97. According to the Claimants, the Notes issued in 2017 clearly qualify as an "investment" under NAFTA Article 1139, which includes debt securities with an original maturity of at least three years.[67] The Notes were issued by a Mexican company, TV Azteca, with clear notice provisions to Mexico, satisfying the territorial requirement for a protected investment.[68] The Claimants say that this establishes the Notes as a valid investment for purposes of Annex 14-C. Debt securities are tradable commodities, and the time at which the investor acquires them is immaterial; what matters is that the investment was established before NAFTA's termination.[69] Even if the identity of the investor changes due to endorsements, the investment itself remains constant, and the issuer continues to enjoy the credit benefit, qualifying the debt as a foreign investment.[70]

98. The Claimants further contend that they qualify as investors of another Party because they exercise control over the Noteholders and their investments.[71] As in the Claimants' response to Objection 2, NAFTA recognizes control as sufficient to establish investor status, regardless of legal ownership. The Claimants argue that the Respondent's attempt to read additional conditions into Annex 14-C is inconsistent with the treaty text and prior tribunal practice. The Respondent's assertion that the investor must also "establish" the

---

[65] Cl. C-Mem., paras. 178-179, 183-191, citing to CL-26, Merriam-Webster Dictionary, Establish definition, last accessed 22 August 2024; CL-27, The Brittannica Dictionary, Establish definition, last accessed 22 August 2024; CL-28, Oxford English Dictionary, Establish definition, last accessed 22 August 2024; CL-29, *Fedax N.V. v. Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, para. 40.

[66] Cl. Rej., para. 98.

[67] Cl. C-Mem., paras. 181-182.

[68] Cl. C-Mem., para. 182.

[69] Cl. Rej., para. 105.

[70] Cl. Rej., para. 104, citing CL-29, *Fedax N.V. v. Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, para. 40.

[71] Cl. C-Mem., para. 183.

debt demonstrates a fundamental misunderstanding; it is the issuer that establishes the debt, and the investors acquire it. The requirement suggested by the Respondent has no basis in treaty text or practice.[72]

99. The Claimants also emphasize that the investments were "established" when TV Azteca issued the Notes in 2017.[73] They note that the term "established" should be interpreted according to its ordinary meaning, consistent with the VCLT, as bringing the investment into existence or creating it on a lasting basis. The Claimants cite precedent, including *Fedax v. Venezuela*, confirming that continuous investments, such as debt securities, retain their status regardless of subsequent endorsements or changes in holders.[74] Tribunals have consistently recognized that an investment's continuity, not the specific identity of the holder at each moment, determines its validity for treaty protection.[75]

100. Finally, the Claimants assert that the Notes were in existence at the time of the USMCA's entry into force on 1 July 2020, and remain valid debt securities today. They conclude that they meet each element of the legacy investment definition under Annex 14-C, and therefore, the Respondent's Objection 3 should be dismissed.[76] The Claimants have provided documentary evidence demonstrating that the Notes were "in existence" at USMCA entry into force, rendering the Respondent's attempt to focus on definitions irrelevant. The Tribunal should disregard the Respondent's mischaracterization of the facts.[77]

[72] Cl. Rej., para. 103.

[73] Cl. C-Mem., paras. 184-185.

[74] Cl. C-Mem., para. 187, citing CL-29, *Fedax N.V. v. Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, para. 40.

[75] Cl. Rej., para. 104, citing CL-29, *Fedax N.V. v. Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, para. 40.

[76] Cl. C-Mem., para. 190.

[77] Cl. Rej., para. 106.

## D. OBJECTION 4: THE ALLEGED BREACH OF ART. 1105 OCCURRED AFTER THE NAFTA TERMINATED

### (1) The Respondent's Position

101. The Respondent submits that the Tribunal lacks jurisdiction *ratione voluntatis* because the alleged breach of Article 1105 of the NAFTA occurred after the NAFTA had terminated. According to the Respondent, the Claimants' claim is based solely on a court injunction issued on 27 September 2022, whereas the NAFTA was replaced by the USMCA, which entered into force on 1 July 2020. [78] The Respondent contends that, as of that date, the Respondent was no longer bound by the substantive obligations of the NAFTA, including Article 1105.[79]

102. The Respondent's position is that Annex 14-C of the USMCA preserves only the Parties' consent to arbitrate, for a limited period, claims concerning legacy investments, and does not extend or revive the substantive obligations of NAFTA Chapter Eleven after its termination. According to the Respondent, the text of Annex 14-C confines consent to claims alleging a breach of obligations under Section A of Chapter XI while those obligations were binding, that is, before NAFTA terminated on 1 July 2020. A "breach of an obligation" necessarily presupposes that the obligation was legally in force at the time of the alleged conduct; once NAFTA ceased to apply, Section A obligations were no longer binding on the Respondent and could not be breached. The Respondent submits that interpreting Annex 14-C as allowing claims based on post-termination conduct would contradict the ordinary meaning of its terms and would impermissibly expand consent beyond what the USMCA Parties agreed.[80] The Respondent further submits that the

[78] Resp. Mem., para. 77, citing RL-19, Protocol replacing the North American Free Trade Agreement with the Agreement between Canada, the United States of America, and the United Mexican States, 30 November 2018, p. 1.

[79] Resp. Mem., para. 81.

[80] Resp. Mem., paras. 78-79, citing RL-1, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2021, Article 13; RL-17, *TC Energy Corporation and TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, the United States of America's Memorial on its Preliminary Objection, 12 June 2023; RL-18, *Coeur Mining, Inc. v. United Mexican States*, ICSID Case No. UNCT/22/1, Submission of the United States of America, 12 February 2024; CL-31, Vienna Convention on the Law of Treaties, 22 May 1969, Article 70; Resp. Reply, para. 119.

NAFTA does not contain a survival clause extending its substantive obligations beyond termination, and that the USMCA expressly replaced the NAFTA as of 1 July 2020.[81]

103. In the Respondent's submission, the USMCA Protocol confirms that NAFTA was superseded upon the USMCA's entry into force, and the "without prejudice" language merely permits references to NAFTA provisions for definitional or procedural purposes. Paragraphs 4 and 5 of Annex 14-C further demonstrate that the Annex addresses only the continuation of arbitral proceedings and jurisdiction, drawing a deliberate distinction between arbitrations initiated before and after NAFTA's termination, which would be redundant if substantive obligations continued. Other contextual elements such as the reference to Articles 1502 and 1503, Article 14.2(3) of the USMCA, the rules of intertemporal law and Article 70 of the Vienna Convention, Footnotes 20 and 21, Article 34 of the USMCA, and the structure of Chapter 14, uniformly confirm that the Parties did not preserve or revive NAFTA's substantive protections, but instead limited Annex 14-C to a procedural mechanism for arbitrating alleged breaches that occurred while NAFTA was in force.[82]

104. The Respondent also points out that both the US' and Canada's intervention during the Hearing confirmed its interpretation of Annex 14-C.[83]

105. According to the Respondent, interpreting Annex 14-C as extending NAFTA's substantive obligations would be inconsistent with the object and purpose of the USMCA, which was

---

[81] Resp. Mem., para. 83, citing RL-20, Royal Academy of Spanish Language's Dictionary, substitute definition, last accessed 22 June 2026: https://dle.rae.es/sustituir; RL-21, Royal Academy of Spanish Language's Dictionary, replace definition, last accessed 22 June 2026: https://dle.rae.es/reemplazar; RL-42, Vienna Convention on the Law of Treaties, 22 May 1969, Article 31; Resp. Reply, para. 123, citing RL-76, *TC Energy Corp. et al. v. United States of America*, ICSID Case No. ARB/21/63, Award, 12 July 2024, paras. 142, 179.

[82] Resp. Reply, paras. 125-139, citing RL-42, Vienna Convention on the Law of the Treaties, 22 May 1969, Article 31.1; RL-89, *TC Energy Corporation et al. v. United States of America (II)*, ICSID Case No. ARB/21/63, U.S. Memorial on Preliminary Objections, 12 de junio de 2023; RL-90, *Ruby River Capital LLC. v. Canada*, ICSID Case No. ARB/23/5, Reply Brief on the Merits and Brief on Canada's Jurisdiction, 15 July 2024, paras. 196 *et seq.*; RL-50, International Law Commission (ILC), Draft Articles on the Law of Treaties with commentaries, 1966, p. 221; RL-91, ILC, *Yearbook of the International Law Commission*, Vol. II, Part 2 (2001), U.N. Doc. A/CN.4/SER.A/2001/Add.1 (Part 2), paras. 54-59, available online in: https://legal.un.org/ilc/publications/yearbooks/english/ilc_2001_v2_p2.pdf; RL-92, *TC Energy Corporation and TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Mexico's Submission pursuant to Article 1128 of NAFTA, 11 September 2023, para. 14; RL-95, *United States – Crystalline Silicon Photovoltaic Cells Safeguard Measure*, USMCA Case No. USA-CDA-2021-31-01, Final Report, 1 February 2022, paras. 41-43.

[83] Resp. PHB, para. 47.

expressly intended to replace NAFTA with a new agreement that significantly restricts access to investor-State dispute settlement. The structure of Chapter 14 demonstrates a deliberate narrowing of ISDS, limiting both the range of claims and the categories of eligible investors, and imposing additional conditions such as domestic litigation requirements. Against this background, the Claimants' reliance on generalized notions of stability or predictability is misplaced, as there is no evidence that the Parties intended to promote stability by prolonging NAFTA's substantive protections during a so-called transition period. Rather, the design of the USMCA reflects a conscious policy choice to curtail ISDS, and Annex 14-C must be interpreted consistently with that objective as a narrowly framed consent provision, not as a vehicle for extending expired treaty obligations.[84]

106. The Respondent argues that the negotiating history invoked by the Claimants does not assist their interpretation and is neither applicable nor persuasive under Article 32 of the Vienna Convention. Because the text of Annex 14-C is clear and does not lead to any absurd or unreasonable result, recourse to supplementary means of interpretation is unwarranted, and negotiating history cannot be used to alter or reinterpret the ordinary meaning established under Article 31. In any event, the witness testimony relied upon by the Claimants constitutes after-the-fact, uncorroborated evidence that does not demonstrate any shared intention among the USMCA Parties to extend NAFTA Chapter XI obligations. The absence of contemporaneous documentary support, the internal inconsistencies in the testimony, and the existence of contrary documentary evidence submitted by the Respondent further undermine its probative value. The Respondent also notes that the USMCA drafting conventions confirm that treaty obligations must be expressly stated, reinforcing that, in the absence of clear language extending substantive obligations, no such extension can be inferred.[85]

---

[84] Resp. Reply, paras. 140-141, citing RL-42, Vienna Convention on the Law of Treaties, 22 May 1969, Article 31.1; RL-93, *TC Energy Corporation and TransCanada PipeLines Limited v. United States of America (II)*, ICSID Case No. ARB/21/63, The United States of America's Reply its Preliminary Objection, 27 December 2023, para. 75.

[85] Resp. Reply, paras. 142-149, citing RL-94, *Competence of the General Assembly for the Admission of a State to the United Nations*, Advisory Opinion, ICJ. Reports, 1950, p. 8; RL-95, *United States – Crystalline Silicon Photovoltaic Cells Safeguard Measure*, USMCA Case No. USA-CDA-2021-31-01, Final Report, 1 February 2022, paras. 41-43.

107. The Respondent submits that the subsequent practice of the USMCA Parties confirms a common and consistent understanding that Annex 14-C does not extend the substantive obligations of NAFTA Chapter XI beyond its termination. Statements and submissions made by all three Parties—Mexico, the United States, and Canada—in multiple arbitral proceedings uniformly affirm that Annex 14-C permits arbitration only in respect of alleged breaches occurring while NAFTA was in force. Such concordant positions, expressed in formal pleadings as non-disputing party submissions and party submissions alike, constitute relevant subsequent practice under Article 31(3)(b) of the Vienna Convention, as recognized by international jurisprudence and the ILC. This consistent and harmonized conduct reflects an authentic agreement among the Parties regarding the interpretation of Annex 14-C and confirms that the Tribunal lacks jurisdiction over claims premised on post-termination conduct.[86]

108. The Respondent rejects the Claimants' contention that the absence of an express temporal limitation on substantive obligations in Annex 14-C permits claims based on post-USMCA conduct. That argument impermissibly relies on silence to expand treaty obligations and disregards the settled rule that the burden rests on the claimant to establish the existence of

---

[86] Resp. Reply, paras. 150-155, citing RL-18, *Coeur Mining, Inc. v. United Mexican States*, ICSID Case No. UNCT/22/1, Submission of the United States of America, 12 February 2024, paras. 2-6; RL-58, *The Canadian Cattlemen for Fair Trade v. United States of America*, NAFTA/UNCITRAL, Award on Jurisdiction, 28 January 2008, para. 189; RL-59, ILC, *Draft Conclusions on Subsequent Agreements and Subsequent Practice in Relation to the Interpretation of Treaties, with Commentaries*, UN Doc. A/73/10, 2018, para. 18; RL-75, *Access Business Group LLC. v. United Mexican States,* ICSID Case No. ARB/23/15, Submission of the United States of America pursuant, 28 March 2025; RL-90, *Ruby River Capital LLC v. Canada*, ICSID Case No. ARB/23/5, Reply Brief on the Merits and Brief on Canada's Jurisdiction, 15 July 2024, paras. 196-197; RL-92, *TC Energy Corporation y TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Mexico´s Submission pursuant to Article 1128 of NAFTA, 11 September 2023, paras. 3-7; RL-96, *Daniel W. Kappes and Kappes, Cassiday & Associates v. Republic of Guatemala*, ICSID Case No. ARB/18/43, Decision on the Respondent's Preliminary Objections, 13 March 2020, para. 156; RL-97, *Methanex Corporation v. United States of America*, UNCITRAL Case, Final Award of the Tribunal on Jurisdiction on Merits, 3 August 2005, para. 21; RL-98, *Legacy Vulcan, LLC v. United Mexican States*, ICSID Case No. ARB/19/1, Second Submission of the United States of America, 21 July 2023; RL-99, *Westmoreland Coal Company v. Government of Canada III*, ICSID Case No. UNCT/23/2, Submission of the United Mexican States pursuant to NAFTA Article 1128, 10 April 2024, paras. 3, 5, 7; RL-127, *Legacy Vulcan, LLC v. United Mexican States*, ICSID Case No. ARB/19/1, Submission of the United States of America pursuant to NAFTA Article 1128, 7 June 2021, paras. 23-25; RL-128, *Alberta Petroleum Marketing Commission v. United States of America,* ICSID Case No. UNCT/23/4, Non-Disputing Party Submission of the Government of Canada pursuant to NAFTA Article 1128, 15 January 2025, paras. 4-9; RL-73, *Alberta Petroleum Marketing Commission v. United States of America,* ICSID Case No. UNCT/23/4, Submission of Mexico pursuant to NAFTA Article 1128, 15 January 2025, paras. 3-6; RL-74, *Access Business Group LLC v. United Mexican States,* ICSID Case No. ARB/23/15, Non-Disputing Party Submission of the Government of Canada pursuant to NAFTA Article 1128, 28 March 2025.

consent and applicable substantive protections.[87] Annex 14-C cannot be interpreted so as to read into the Treaty obligations that the Parties deliberately chose not to include, as such an approach would contravene fundamental rules of treaty interpretation.[88]

109. Accordingly, Annex 14-C allows arbitration after NAFTA's termination only for breaches that occurred while NAFTA was in force, and the Tribunal lacks jurisdiction over claims based on acts occurring thereafter.[89]

110. The Respondent further submits that, even if the Claimants had properly invoked the USMCA and submitted their claim under Annex 14-D, claims based on the minimum standard of treatment – including those equivalent to Article 1105 of the NAFTA – are excluded from the scope of arbitrable disputes.[90]

111. For these reasons, the Respondent concludes that the Tribunal lacks jurisdiction to hear the Claimants' claims, which are based on events occurring after the termination of the NAFTA.

---

[87] Resp. Reply, paras. 109-111, citing RL-50, International Law Commission (ILC), Draft Articles on the Law of Treaties with commentaries, 1966, pp. 220-221; RL-77, *Hydro S.r.l. et al. v. Republic of Albania*, ICSID Case No. ARB/15/28, Award, 24 April 2019, para. 470; RL-78, *Lighthouse Corporation Pty Ltd and Lighthouse Corporation Ltd, IBC. v. Democratic Republic of Timor-Leste Oriental*, ICSID Case No. ARB/15/2, Award, 22 December 2017, para. 148; RL-79, *Sergei Viktorovich Pugachev v. Russian Federation*, UNCITRAL, Award on Jurisdiction, 18 June 2020, para. 248; RL-80, *ICS Inspection and Control Services Limited v. Argentine Republic,* PCA Case No. 2010-09, Award on Jurisdiction, 10 February 2012, para. 280; RL-81, *Case Concerning Rights of Nationals of the United States of American in Morocco*, ICJ Reports, 1952, p. 196; RL-82, *Wintershall Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/04/14, Award, 8 December 2008, paras. 76-91.

[88] Resp. Reply, paras. 109-111, citing RL-50, International Law Commission (ILC), Draft Articles on the Law of Treaties with commentaries, 1966, pp. 220-221; RL-77, *Hydro S.r.l. et al. v. Republic of Albania*, ICSID Case No. ARB/15/28, Award, 24 April 2019, para. 470; RL-78, *Lighthouse Corporation Pty Ltd and Lighthouse Corporation Ltd, IBC. v. Democratic Republic of Timor-Leste Oriental*, ICSID Case No. ARB/15/2, Award, 22 December 2017, para. 148; RL-79, *Sergei Viktorovich Pugachev v. Russian Federation*, UNCITRAL, Award on Jurisdiction, 18 June 2020, para. 248; RL-80, *ICS Inspection and Control Services Limited v. Argentine Republic,* PCA Case No. 2010-09, Award on Jurisdiction, 10 February 2012, para. 280; RL-81, *Case Concerning Rights of Nationals of the United States of American in Morocco*, ICJ Reports, 1952, p. 196; RL-82, *Wintershall Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/04/14, Award, 8 December 2008, paras. 76-91.

[89] Resp. Reply, paras. 115-124, citing RL-1, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2021, p. 57; RL-55, *Westmoreland Coal Company v. Government of Canada (III)*, ICSID Case No. UNCT/23/2, Award, 17 December 2024, para. 143; RL-76, *TC Energy Corporation and TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Award, 12 July 2024, paras. 142, 179.

[90] Resp. Mem., paras. 86-89.

**(2) The Claimants' Position**

112. The Claimants submit that the NAFTA violation giving rise to their claim occurred during the three-year Transition Period under which Mexico expressly consented to arbitrate legacy investment claims under Annex 14-C of the USMCA. They assert that the Respondent's contention that post-NAFTA violations fall outside the Tribunal's jurisdiction misinterprets the plain text, context, and object and purpose of Annex 14-C.[91] The Respondent's interpretation unjustly limits the ability of foreign investors to exercise their right to arbitration and misrepresents the purpose of Annex 14-C, which explicitly provides for a smooth transition from NAFTA to the USMCA and the continuation of protections during the three-year period.[92]

113. According to the Claimants, Annex 14-C memorializes the Respondent's agreement to extend NAFTA Chapter 11's substantive obligations to legacy investments for three years following the termination of NAFTA, including claims arising after 1 July 2020.[93] They note that the Respondent was bound by Article 1105 of NAFTA when the Sixty-Third Superior Court engaged in the acts that form the basis of the claim on 27 September 2022.[94] The Claimants reject the Respondent's argument under VCLT Article 70(1), emphasizing that the USMCA Parties "agreed otherwise" by incorporating Annex 14-C. The Respondent's position that NAFTA obligations terminate automatically on 1 July 2020, lacks textual support and disregards Annex 14-C's explicit extension of obligations during the Transition Period.[95]

114. The Claimants point to the plain language of Annex 14-C, which provides that each Party consents to arbitration of claims alleging breaches of Section A of NAFTA Chapter 11 with respect to legacy investments, and that such consent expires only three years after NAFTA's termination. They highlight that, unlike the Respondent's contemporaneous Australia BIT termination agreement, Annex 14-C does not limit claims to acts occurring

[91] Cl. C-Mem., para. 192.

[92] Cl. Rej., para. 111.

[93] Cl. C-Mem., paras. 195, 198-199, citing CL-3, USMCA Annex 14-C, 30 November 2018, paras. 1(a)-(c), 3; CL-32, USMCA Chapter 14, 30 November 2018, Art. 14.2(3).

[94] Cl. C-Mem., para. 195.

[95] Cl. Rej., para. 116.

before termination of NAFTA, demonstrating the Parties' intent to extend substantive obligations for the Transition Period.[96] The ordinary meaning of Annex 14-C confirms the Parties' consent to arbitrate claims during the Transition Period, without distinction between breaches occurring before or after NAFTA's termination.[97]

115. The Claimants argue that the ordinary meaning of Annex 14-C, read in context with the USMCA Protocol and Preamble, supports this interpretation. The "without prejudice to" language in the USMCA Protocol carves out certain NAFTA provisions, including Annex 14-C, from immediate replacement by the USMCA.[98] In context, the terms of Annex 14-C do not impose any temporal limitation on when the breach giving rise to a claim must occur; rather, the temporal criteria relate only to the existence and establishment of legacy investments and the duration of the Transition Period.[99] Footnotes 20 and 21 of Annex 14-C further confirm that NAFTA Chapter 11 obligations continue to apply during the Transition Period and provide mechanisms for overlapping claims under USMCA and NAFTA, directly contradicting the Respondent's argument.[100]

116. The Claimants further say that reading Annex 14-C in the light of its object and purpose - promoting transparency, predictability, stability, and protection of investments - supports their interpretation.[101] They note that a contrary reading would undermine the stability and

---

[96] Cl. C-Mem., para. 200, citing CL-33, Agreement to terminate the Agreement between the Government of Australia and the Government of the United Mexican States on the Promotion and Reciprocal Protection of Investments, 8 March 2018; CL-34, Letter of termination of the BIT between Mexico and Singapore - FTA Singapore – Pacific Alliance, 26 January 2022.

[97] Cl. Rej., para. 114, citing CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, K.C., 12 July 2024, para. 9.

[98] Cl. C-Mem., paras. 206-208.

[99] Cl. C-Mem., para. 210.

[100] Cl. Rej., paras. 126–128, citing CL-3, USMCA Annex 14-C, 30 November 2018, footnotes 20-21; CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, 12 July 2024, para. 29.

[101] Cl. C-Mem., paras. 211-224, citing CL-1, Protocol Replacing the North American Free Trade Agreement with the Agreement Between the United States of America, the United Mexican States, and Canada, 30 November 2018; CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, 12 July 2024, para. 10; CL-38, Cambridge Dictionary, definition of without prejudice to something, 23 August 2024; CL-39, Merriam-Webster Dictionary, definition of without prejudice, 28 August 2024; CL-40, *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Bizkaia Ur Partzuergoa v. Argentine Republic*, ICSID Case No. ARB/07/26, Decision on Jurisdiction, 19 December 2012, para.

clarity intended by the provision, contrary to established principles of treaty interpretation and the principle of *effet utile*, which requires treaty provisions to be given practical effect. The text, context, and object and purpose of the USMCA, including Articles 14.2(3) and 34.1(1), confirm that investors retain rights to arbitrate claims arising during the Transition Period and that the USMCA intended a smooth transition from NAFTA protections.[102]

117. Finally, the Claimants rely on the negotiating history of the USMCA.[103] Witness statements from Mr. Kenneth Smith Ramos, Mexico's Chief USMCA Negotiator, and Mr. Lauren Mandell, the lead U.S. negotiator, confirm that Annex 14-C was intended to extend all substantive obligations of NAFTA Chapter 11 for the full three-year Transition Period, and to cover measures arising both before and after the entry into force of the USMCA.[104] The Claimants note that no contemporaneous objection or limitation regarding post-NAFTA measures was ever raised by the Parties during negotiations. Mr. Smith's second witness statement further say that Annex 14-C provides consent to arbitrate all claims related to legacy investments during the Transition Period and that the separation of the arbitration mechanism from substantive obligations is a post-hoc invention, not reflective of the negotiations.[105]

118. Subsequent practice and interpretations relied upon by the Respondent, including positions adopted in TC Energy, are post-hoc, defensive litigation strategies and do not constitute binding interpretations of Annex 14-C.[106] The Respondent's attempts to impose temporal

52; CL-41, Annex 14-E of the USMCA, 30 November 2018; CL-42, Vienna Convention on the Law of Treaties, 22 May 1969, Article 31(1); CL-43, USMCA Preamble, 30 November 2018.

[102] Cl. Rej., paras. 129–130.

[103] Cl. C-Mem., paras. 231-232, citing CL-48, Vienna Convention on the Law of Treaties, 22 May 1969, Article 32.

[104] Cl. C-Mem., paras. 232-239, citing CL-4, Lauren Mandell, *The Trump Administration's Impact on US Investment Policy*, ICSID Review, Vol. 35, 4 November 2020, p. 357; CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, K.C., 12 July 2024, para. 29; CL-49, *TC Energy Corporation, TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Claimants' Counter-Memorial on Respondent's Preliminary Objection, 11 August 2023, Annex, pp. A-1-A-3 and paras. 109-111, 117; CL-50, *TC Energy Corporation, TransCanada PipeLines Limited v. United States of America*, ICSID Case No. ARB/21/63, Claimants' Rejoinder on Respondent's Preliminary Objection, 9 February 2024, para. 13. See also, Kenneth Smith Ramos First Witness Statement.

[105] Cl. Rej., paras. 113–114, 136–140, citing CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, 12 July 2024, para. 9. See also, Kenneth Smith Ramos Second Witness Statement.

[106] Cl. Rej., paras. 141–142.

limitations on alleged breaches, or to reinterpret the scope of "obligation" in Annex 14-C, are unsupported by the text and context and must be rejected.[107]

119. In sum, both the ordinary meaning and context of Annex 14-C, supported by negotiating history and the object and purpose of the USMCA, confirm that the Tribunal has jurisdiction to consider breaches occurring during the Transition Period, including after NAFTA's termination.[108] The Claimants' reading aligns with the explicit provisions of Annex 14-C and ensures effectivity of treaty protections without imposing any unwarranted temporal restrictions on post-NAFTA breaches.[109]

### E. Objection 5: The Claimants have not demonstrated that they have an investment within the meaning of Art. 25 of the ICSID Convention

#### (1) The Respondent's Position

120. The Respondent submits that the Tribunal lacks jurisdiction *ratione materiae* because the Claimants have failed to demonstrate the existence of an investment within the meaning of Article 25(1) of the ICSID Convention.[110] Having elected to submit their claims under the ICSID Convention pursuant to NAFTA Article 1120, the Claimants bear the burden of establishing that the requirements of Article 25 are satisfied, in addition to any requirements arising under NAFTA Chapter XI.[111]

121. According to the Respondent, the alleged investment consists of debt securities issued in August 2017. The Respondent contends that, in order to qualify as an investment under Article 25, the Notes must satisfy the criteria articulated in Salini, including, inter alia, the existence of investment risk and a contribution to the economic development of the host

[107] Cl. Rej., paras. 116–117, 119.

[108] Cl. Rej., paras. 122–135, CL-1, Protocol Replacing the North American Free Trade Agreement with the Agreement Between the United States of America, the United Mexican States and Canada, 30 November 2018; CL-37, *TC Energy Corporation and TransCanada Pipelines Limited v. United States of America*, ICSID Case No. ARB/21/63, Dissenting Opinion of Arbitrator Henri C. Alvarez, 12 July 2024, para. 9.

[109] Cl. Rej., paras. 131–135, citing CL-1, Protocol Replacing the North American Free Trade Agreement with the Agreement Between the United States of America, the United Mexican States and Canada, 30 November 2018.

[110] Resp. Mem., para. 93.

[111] Resp. Reply, paras. 156, 158.

State.[112] The Respondent emphasizes that there is no conflict between the definition of "investment" under NAFTA Article 1139 and Article 25 of the ICSID Convention, and that ICSID tribunals routinely apply a cumulative or "double-barrelled" test requiring compliance with both instruments.[113] The Respondent argues that the Claimants have not discharged their burden of proof, as they merely assert compliance with Article 25 without substantiating it.[114]

122. In particular, the Respondent submits that the Notes do not entail an investment risk, but rather only commercial risk, since the Claimants were contractually assured of fixed returns, amounts, and payment dates under the Indenture.[115] The Respondent further observes that the Noteholders acquired the Notes after the issuer had already ceased interest payments, such that any alleged risk had already materialized and could not constitute participation in the risk of the investment.[116] Accordingly, the Notes do not involve the type of risk contemplated by Article 25 of the ICSID Convention.

123. The Respondent further contends that the Notes did not contribute to Mexico's economic development, as they lack a direct territorial nexus with Mexico. The Notes and the Indenture were governed by New York law, disputes were subject to U.S. courts, and the Notes were traded outside Mexico.[117] The Respondent adds that the acquisition of the

---

[112] Resp. Mem., para. 92, citing RL-22, *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, para. 52.

[113] Resp. Reply, paras. 159-162, citing RL-2, Zachary Douglas, *The International Law of Investment Claims*, Cambridge University Press, 2009, paras. 343-344; RL-103, *Muhammet Çap & Bankrupt Sehil Inşaat Endustri ve Ticaret Ltd. Sti. v. Turkmenistan*, ICSID Case No. ARB/12/6, Award, 4 May 2021, para. 665; RL-105, *Krederi Ltd. v. Ukraine*, ICSID Case No. ARB/14/17, Award, 2 July 2018, para. 243; RL-123, *Koch Minerals Sàrl and Koch Nitrogen International Sàrl v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/19, Award, 30 October 2017, para. 6.50; RL-124, *Phoenix Action Ltd v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, para. 74; RL-125, International bank for Reconstruction and Development, *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, 18 March 1965, para. 25.

[114] Resp. Mem., para. 93.

[115] Resp. Mem., paras. 94-98, citing RL-14, *Romak S.A. (Switzerland) v. Republic of Uzbekistan*, PCA Case No. 2007-07/AA280, Award, 26 November 2009, paras. 229-230; Exhibit 10, Indenture executed by TV Azteca, BNYM and BNYM LB, 9 August 2017, p. 48.

[116] Resp. Reply, paras. 166-167, citing RL-22, *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, para. 52.

[117] Resp. Mem., paras. 99-103, citing RL-2, Zachary Douglas, *The International Law of Investment Claims*, Cambridge University Press, 2009, p. 191; RL-33, *Bayview Irrigation District et al. v. United Mexican States*, ICSID Case No. ARB(AF)/05/1, Award, 19 June 2007, para. 98.

Notes in the secondary market did not result in any contribution to the issuer's capital, assets, or operations, and therefore cannot constitute a contribution to the host State's economic development.[118]

124. The Respondent emphasizes that the only connection with Mexico is that the issuer is a Mexican company, which is insufficient to establish a qualifying investment.[119] The Respondent also notes that neither the Claimants nor the entities under their control contributed capital to acquire the Notes, including in circumstances where the Notes were transferred without payment, and that the Claimants were not subject to Mexican taxation in relation to the Notes.[120]

125. On this basis, the Respondent concludes that the Notes do not constitute an investment under Article 25(1) of the ICSID Convention and that the Tribunal therefore lacks jurisdiction *ratione materiae*.

**(2) The Claimants' Position**

126. The Claimants submit that the Tribunal has jurisdiction r*atione materiae* because the dispute arises from a protected investment under NAFTA Article 1139.[121] The Respondent contends that the Tribunal lacks jurisdiction because the Claimants' investments do not meet the requirements of Article 25 of the ICSID Convention. The Claimants reject this argument as circular and legally irrelevant, for the following reasons.[122]

127. The NAFTA definition of "investment" governs the Tribunal's jurisdiction under Chapter 11 as incorporated into the USMCA through Annex 14-C. According to the Claimants, Article 1139 is controlling, and arbitral practice confirms that the parties' treaty definition of "investment" governs over generalized tests such as the *Salini* criteria.[123] Article 1139

---

[118] Resp. Reply, para. 168, citing RL-106, Brealey *et al.*, *Principles of Corporate Finance*, 10th Ed., McGraw Hill, p. 354.

[119] Resp. Mem., para. 105.

[120] Resp. Mem., paras. 106-107; Resp. Reply, para. 165.

[121] Cl. C-Mem., para. 248.

[122] Cl. C-Mem., para. 243.

[123] Cl. C-Mem., para. 245, citing CL-21, *Hassan Awdi, Enterprise Business Consultants, Inc. and Alfa El Corporation v. Romania*, ICSID Case No. ARB/10/13, Award, 2 March 2015, para. 197; CL-51, *The Lopez-Goyne Family Trust and others v. Republic of Nicaragua*, ICSID Case No. ARB/17/44, Award, 1 March 2023, para. 329.

provides a comprehensive definition of covered investments, which expressly includes debt securities of an enterprise with an original maturity of at least three years. The Notes issued by TV Azteca on 9 August 2017, with a maturity of 9 August 2024, fall squarely within this definition. The Tribunal therefore need not look to ICSID Article 25 or any other standard.[124]

128. Even if Article 25 of the ICSID Convention were relevant (something which the Claimants deny), the Notes would satisfy its criteria of contribution, duration, risk, and contribution to the host State's economic development.[125] In the Claimants' submission, the Notes involve risk, as the Offering Circular expressly warns investors of uncertainties and potential losses, and they contribute to Mexico's economic development by financing TV Azteca's business operations.[126] Arbitral precedent confirms that such characteristics suffice to meet the "risk" and "economic development" elements of *Salini*.[127] Tribunals have emphasized that the *Salini* criteria are flexible and context-dependent, and the debt securities at issue inherently involve risk, including commercial, political, and repayment risks, as recognized in *Romak v. Uzbekistan* and *Manchester Securities v. Poland*.[128]

---

[124] Cl. C-Mem., paras. 243, 248.

[125] Cl. C-Mem., paras. 243, 249, citing CL-52, ICSID Convention, 18 March 1965, Art. 25(1); CL-53, Zachary Douglas, *The International Law of Investment Claims*, Cambridge University Press, 2009, p. 164; CL-54, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines II*, ICSID Case No. ARB/11/12, Award, 10 December 2014, para. 197.

[126] Cl. Rej., paras. 158-163, citing CL- 67, *Abaclat and others (formerly Giovanna a Beccara and others) v. Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011, paras. 365-366; CL-84, *Patel Engineering Limited (India) v. Republic of Mozambique*, PCA Case No. 2020-21, Final Award, 7 February 2024, para. 305; CL-89, *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012, para. 220; CL-90, *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, para. 111; CL-91, *İçkale İnşaat Limited Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/24, Award, 8 March 2016, para. 290.

[127] Cl. C-Mem., paras. 255-259, citing CL-57, *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013, para. 481; CL-68, *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award, 31 July 2007, para. 165; CL-70, *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010, para. 108; CL-71, Investopedia, *What is Debt Security*, 14 August 2023; CL-72, *Romak S.A. (Switzerland) v. Republic of Uzbekistan*, UNCITRAL, PCA Case No. AA280, Award, 26 November 2009, para. 230.

[128] Cl. Rej., paras. 155-157, citing CL-72, *Romak S.A. (Switzerland) v. Republic of Uzbekistan*, UNCITRAL, PCA Case No. AA280, Award, 26 November 2009, para. 230; CL-87, *Manchester Securities Corp. v. Republic of Poland*, PCA Case No. 2015-18, Award, 7 December 2018, para. 374; CL-88, *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007, para.117.

### F. OBJECTION 6: THE TRIBUNAL LACKS *RATIONE TEMPORIS* JURISDICTION OVER CONTRARIAN AND PART OF CYRUS'S CLAIMS BECAUSE THE RELEVANT NOTES WERE ACQUIRED AFTER THE ALLEGED DENIAL OF JUSTICE

#### (1) The Respondent's Position

129. The Respondent submits that the Tribunal lacks jurisdiction *ratione temporis* over the claim brought by Contrarian and over part of the claim brought by Cyrus, because the alleged denial of justice occurred before the relevant investments were acquired.[129] The Respondent recalls that the alleged breach is said by the Claimants themselves to have occurred in September 2022.[130]

130. According to the Respondent, Article 1116(1) of the NAFTA limits standing to an "investor of a Party," and Article 1101(1) further requires that the challenged measures relate to an investment of such investor at the time the measures were adopted or maintained.[131] The Respondent emphasizes that, for jurisdiction *ratione temporis* to exist, the Claimants must have owned or controlled the investment at the time of the alleged breach.[132]

131. The Respondent contends that NAFTA tribunals have consistently held that jurisdiction *ratione temporis* exists only where the claimant owned or controlled the investment at the time of the alleged treaty breach, relying inter alia on *Mesa Power*, *Gallo*, *Phoenix Action*, *B-Mex*, and *GAMI*.[133] The Respondent further submits that this interpretation reflects the general principle of non-retroactivity of treaties, as confirmed by tribunals constituted

---

[129] Resp. Mem., paras. 116-117.

[130] Resp. Reply, para. 170.

[131] Resp. Mem., paras. 109-110.

[132] Resp. Reply, para. 170.

[133] Resp. Mem., paras. 111-113, citing RL-9, *Mesa Power Group, LLC v. Government of Canada*, PCA Case No. 2012-17, Award, 24 March 2016, paras. 326-327; RL-23, *Vito G. Gallo v. Government of Canada*, UNCITRAL, Award, 15 September 2011, para. 326 (citing RL-124, *Phoenix Action Ltd v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, para. 68); RL-24, *B- Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, para. 145; RL-25, *GAMI Investments, Inc. v. Government of the United Mexican States*, UNCITRAL, Final Award, 15 November 2004, para. 93.

under other investment treaties.[134] The Respondent notes that, while the Claimants reject this legal premise, they do not say why it is incorrect.[135]

132. In the present case, the Respondent argues that Contrarian's claim for denial of justice is based exclusively on the September 2022 Injunction, whereas Sandpiper, the holder of the Notes managed by Contrarian, did not acquire the Notes until March 2023,[136] and there is no dispute that all of Sandpiper's Notes were acquired after September 2022.[137] Although the Claimants say that the Notes were, at the relevant time, held by another entity allegedly controlled by Contrarian, they do not say how this assertion is relevant, given that they claim standing through control of Sandpiper, which itself did not hold any Notes at the time of the alleged breach. In the absence of such explanation, the Claimants have failed to meet the burden of proof. [138]

133. The Respondent further argues that part of Cyrus's claim likewise falls outside the Tribunal's jurisdiction, as Opportunities acquired certain Notes only after the issue of the September 2022 Injunction.[139] According to its own declaration before the New York courts, Opportunities acquired its Notes "on November 31, 2021, December 1, 2021, December 9, 2021, December 10, 2021, May 9, 2022, May 11, 2022, September 20, 2022, October 26, 2022 and November 8, 2022."[140] The Respondent maintains that the Notes acquired on 26 October and 8 November 2022 are outside the jurisdiction of the Tribunal because they were purchased after the September 2022 Injunction was issued on 27 September 2022.[141]

[134] Resp. Mem., paras. 114-115, citing RL-26, *Renée Rose Levy y Gremcitel S.A. v. Republic of Peru*, ICSID Case No. ARB/11/17, Award, 9 January 2015, para. 147; RL-27, *Cementownia "Nowa Huta" S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)/06/2, Award, 17 September 2009, para. 112; RL-28, *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011, paras. 121-128.

[135] Resp. Reply, para. 170.

[136] Resp. Mem., para. 116.

[137] Resp. Reply, para. 171.

[138] Resp. Reply, para. 171.

[139] Resp. Mem., para. 117.

[140] Resp. Mem., para. 117, citing Exhibit 8a, Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Cyrus), 20 March 2023.

[141] Resp. Mem., para. 117.

134. While the Claimants do not dispute that some Notes were acquired in October and November 2022, they appear to contend that jurisdiction exists over all Notes merely because it exists over some of them.[142] According to the Respondent, this position is legally unfounded. Notes acquired after 27 September 2022 were not protected at the time of the alleged breach and therefore cannot give rise to compensable claims, even if liability were otherwise established.[143]

**(2) The Claimants' Position**

135. The Claimants contend that the Respondent concedes that Opps II Master Fund (under Cyrus's control) held Notes at the time the Sixty-Third Superior Court issued the September 2002 Injunction. The *ratione temporis* objection therefore does not arise in respect of Cyrus.[144]

136. With respect to Contrarian, the Claimants argue that at the time the Injunction was issued, the Notes later held by Sandpiper Limited were owned by Contrarian Emerging Markets, L.P., an affiliate and partial owner of Sandpiper Limited that was controlled by Contrarian. Sandpiper Limited itself is indirectly owned by Contrarian-controlled funds, including entities that were defendants in the Mexican court proceedings and were directly subject to the September 2022 Injunction.[145] The transfer of the Notes from one Contrarian-controlled entity to another after the Injunction does not affect the Tribunal's jurisdiction. The temporal limitations which the Respondent seeks to impose do not apply to an unbroken chain of control over an investment held by affiliated entities.[146]

137. Therefore, the Claimants submit that even accepting the Respondent's legal premise (which they do not), the facts establish that both Cyrus and Contrarian controlled the Notes at the relevant time.

## G. OBJECTION 7: THE CLAIMANTS DID NOT PRESENT THE WAIVER AS REQUIRED BY ARTICLE

[142] Resp. Reply, para. 172.
[143] Resp. Reply, para. 173.
[144] Cl. C-Mem., para. 262.
[145] Cl. C-Mem., paras. 263-264.
[146] Cl. Rej., paras. 165–167.

**1121 OF THE NAFTA, SO TRIBUNAL LACKS JURISDICTION *RATIONE VOLUNTATIS***

**(1) The Respondent's Position**

138. The Respondent submits that the Tribunal lacks jurisdiction *ratione voluntatis* because the Claimants did not comply with the waiver requirement under Article 1121 of the NAFTA.[147] According to the Respondent, Article 1121 sets forth mandatory preconditions to the submission of a claim to arbitration, and compliance with those preconditions is necessary to perfect the Respondent's consent under Article 1122.[148]

139. Article 1121 requires an investor to waive its right to initiate or continue proceedings before any administrative or judicial body regarding the same measures alleged to breach the NAFTA. This waiver is a condition precedent for establishing the NAFTA Party's consent to arbitration under Article 1122.[149]

140. The waivers submitted by the Claimants are deficient, as they only waived claims against officials of the Superior Court of Justice of Mexico City and expressly preserved their right to pursue other proceedings in Mexico concerning the underlying dispute.[150] The Respondent emphasizes that, contrary to the Claimants' position, defects in a waiver cannot be remedied unilaterally or during the course of the arbitration without the Respondent's express consent.[151]

141. The Respondent further argues that compliance with Article 1121 has both formal and material aspects: the waiver must be submitted in writing with the request for arbitration,

[147] Resp. Mem., para. 121.

[148] Resp. Reply, paras. 174, 179.

[149] Resp. Mem., paras. 118-120, 123-124, citing RL-10, *Merrill & Ring Forestry L.P. v. Government of Canada*, ICSID Case No. UNCT/07/1, Decision on a Motion to Add a New Party, 31 January 2008, para. 29; RL-29, *Methanex Corporation v. United States of America*, UNCITRAL, Partial Award, 7 August 2002, para. 120; RL-35, *The North American Free Trade Agreement Implementation Act*, 8 December 1993, p. 179; RL-36, *Ioan Micula, Viorel Micula and others v. Romania I*, ICSID Case No. ARB/05/20, Decision on Jurisdiction and Admissibility, 24 September 2008, para. 64.

[150] Resp. Mem., para. 121, citing Exhibit 6, Cyrus Capital Partners waiver, 26 June 2023; Exhibit 7; Contrarian Capital Management waiver, 27 June 2023.

[151] Resp. Reply, paras. 176, 202, citing RL-112, *KBR, Inc. v. United Mexican States*, ICSID Case No. UNCT/14/1, Final Award, 30 April 2015, para. 148; RL-111, *KBR, Inc. v. United Mexican States*, ICSID Case No. UNCT/14/1, Submission of the Government of Canada pursuant to NAFTA Article 1128, 30 July 2014, para. 6; RL-104, *Railroad Development Corporation v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Decision on Objection to Jurisdiction CAFTA Article 10.20.5, 17 November 2008, para. 61.

and it must commit the Claimants not to pursue other procedures in respect of the same measures.[152] Because the Claimants failed to satisfy either the formal or material requirements, the Respondent argues that consent to arbitration was never validly given, and the Tribunal therefore lacks jurisdiction to hear the claims.[153]

**(2) The Claimants' Position**

142. The Claimants submit that the waivers fully comply with Article 1121 because they were submitted in writing, delivered to Mexico, and included in the Request for Arbitration, thereby satisfying the consent and waiver requirements set forth in Article 1121(1) and (3).[154] The Claimants argue that the waivers expressly cover claims seeking damages for breaches of due process arising from the issue of the *ex parte* injunction by the Sixty-Third Superior Court in September 2022, which is the sole measure at issue in this arbitration.[155]

143. The Claimants further argue that the Respondent's objection fails because it does not identify any proceedings initiated or continued by the Claimants in respect of the measure challenged here, nor does it explain why the language of the waivers is insufficiently broad to be valid. According to the Claimants, the authorities relied upon by the Respondent – *Waste Management I, Renco, and Commerce Group* – are distinguishable, as the claimants in those cases either pursued parallel proceedings against the host State based on the same measures or reserved the right to initiate additional claims. In contrast, the Claimants have neither initiated nor maintained any proceedings against the Respondent or its judicial officials with respect to the alleged denial of justice.[156]

144. The Claimants also contend that ongoing proceedings in Mexico or elsewhere concern only a private commercial dispute involving TV Azteca and do not relate to the judicial measure

[152] Resp. Mem., para. 122, citing RL-30, *Waste Management, Inc. v. United Mexican States (I)*, ICSID Case No. ARB(AF)/98/2, Arbitral Award, 2 June 2000, paras. 20-24; RL-31, *Commerce Group Corp. and San Sebastian Gold Mines, Inc. v. Republic of El Salvador*, ICSID Case No. ARB/09/17, Award, 14 March 2011, paras. 79-86; RL-32, *Air Canada v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/17/1, Award, 13 September 2021, paras. 225-227; RL-4, *The Renco Group, Inc. v. Republic of Peru*, ICSID Case No. UNCT/13/1, Partial Award on Jurisdiction, 15 July 2016, para. 73.

[153] Resp. Mem., para. 125; Resp. Reply, paras. 181, 194.

[154] Cl. C-Mem., paras. 265, 269.

[155] Cl. C-Mem., paras. 269, 274.

[156] Cl. C-Mem., paras. 276-278.

challenged in this arbitration. Such proceedings fall within the exceptions explicitly provided under NAFTA Article 1121(1)(b), which permits investors to pursue injunctive or declaratory relief in domestic courts without affecting the validity of the waivers.[157] The exceptions in the waivers were included solely to allow the Claimants to defend themselves in the private dispute brought by TV Azteca, without reserving any right to pursue claims against the Respondent.[158]

145. Accordingly, those proceedings fall outside the scope of Article 1121 and do not affect the validity of the Claimants' waivers.[159]

## H. Objection 8: Standing of Contrarian to Claim Denial of Justice

### (1) The Respondent's Position

146. The Respondent submits that Contrarian lacks standing to assert a claim for denial of justice because it was not a party to the underlying Commercial Lawsuit 995/2022 in Mexico.[160] Neither Contrarian nor Sandpiper participated as parties in those proceedings, which is a necessary condition for bringing a denial of justice claim under customary international law.[161]

147. Under Article 1116 of NAFTA, only an "investor of a Party" that has incurred loss or damage may submit a claim. Even if Contrarian were considered an investor, it cannot bring a denial of justice claim under Article 1105 because neither it nor Sandpiper – the holder of the Notes – participated in the relevant proceedings. The Respondent notes that Article 1105 protects the treatment of the investment itself, not the investor personally, and that customary international law limits claims for denial of justice to parties that have

---

[157] Cl. Rej., paras. 173–174, citing CL-92, *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, paras. 71-73.

[158] Cl. Rej., para. 176.

[159] Cl. C-Mem., paras. 278-279.

[160] Resp. Mem., para. 126.

[161] Resp. Reply, para. 207.

directly participated in the judicial process.[162] The Claimants do not dispute that neither Contrarian nor Sandpiper was a party to Commercial Lawsuit 995/2022.[163]

148. In the present case, Sandpiper acquired its Notes in March 2023, months after the September 2022 Injunction – the sole basis of Contrarian's claim.[164] The Claimants' attempt to rely on an alleged "unbroken interest" in the Notes is legally irrelevant, as Contrarian Markets transferred the Notes after the Injunction was issued, and Contrarian's role as investment manager does not render either Contrarian or Sandpiper a party to the Mexican proceedings.[165] Accordingly, Contrarian lacks standing, and its denial of justice claim should be dismissed.

**(2) The Claimants' Position**

149. The Claimants contend that the Respondent's eighth objection is based on an incorrect understanding of the facts. According to the Claimants, Sandpiper Limited acquired its Notes from Contrarian Emerging Markets, L.P., an entity that was a named defendant in the September 2022 proceedings before the Sixty-Third Superior Court and was under Contrarian's control at the time. The Claimants argue that through its control of Contrarian Emerging Markets, L.P., Contrarian effectively controlled the Notes at the time of the injunction, contrary to the Respondent's assertion that the interest was only acquired in March 2023.[166]

150. The Claimants further argue that Sandpiper Limited is wholly owned by Contrarian Funds, L.L.C., itself controlled by multiple Contrarian-managed investment funds, several of which were also defendants in the domestic proceedings. According to the Claimants, under the relevant Investment Management Agreements, Contrarian had full authority to

[162] Resp. Mem., paras. 127-130, citing RL-37, NAFTA Free Trade Commission, *Notes of Interpretation of Certain Chapter 11 Provisions,* 31 July 2001, para. B.1; RL-38, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, para. 127; RL-39, *Waste Management, Inc. v. United Mexican States (II)*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, para. 95; RL-40, *Bridgestone Licensing Services, Inc. and Bridgestone Americas, Inc. v. Republic of Panama*, ICSID Case No. ARB/16/34, Panama's Rejoinder, 17 June 2019, para. 140.

[163] Resp. Reply, para. 207.

[164] Resp. Mem., para. 132.

[165] Resp. Reply, para. 208.

[166] Cl. C-Mem., para. 281; Cl. Rej., paras. 179-180.

direct, manage, and control the assets of these funds, including the purchase, sale, and holding of securities and financial instruments. As a result, Contrarian exercised control over the Notes that are now held by Sandpiper Limited at the time of the Injunction.[167]

151. The Claimants also contend that their interest in the Notes remains continuous and unbroken because Contrarian Emerging Markets, L.P. continues to own Contrarian Funds, L.L.C., and thus Sandpiper Limited. Therefore, at the time Judge Robles issued the Injunction, Contrarian was directly subject to its terms by virtue of its control over the Noteholders named in the Mexican proceedings, including those whose Notes were subsequently transferred to Sandpiper Limited.[168]

152. According to the Claimants, Contrarian's control over multiple Noteholders subject to the domestic proceedings establishes that it was directly impacted by the denial of justice, as it exercised authority over those Noteholders pursuant to its investment management agreements. Contrarian was neither notified nor served in the proceedings, nor informed of the Injunction, and thus was subject to the arbitrary conduct of the Sixty-Third Superior Court, which displayed a "wilful disregard of due process of law, […] which shocks, or at least surprises, a sense of judicial propriety."[169]

## I. ADMISSIBILITY

### (1) The Respondent's Position

153. In its Reply submission, the Respondent raised for the first time an admissibility objection, arguing that even if the Tribunal were to find jurisdiction, the Claimants' sole denial of justice claim is inadmissible because it was not ripe when the Request for Arbitration was

---

[167] Cl. C-Mem., para. 282; Cl. Rej., para. 180.

[168] Cl. C-Mem., paras. 284-285.

[169] Cl. C-Mem., para. 286, citing CL-7, *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2022, para. 127; CL-76, *Elettronica Sicula S.P.A. (ELSI)*, Judgment, ICJ Reports, 1989, para. 128; CL-77, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Award, 20 September 2021, paras. 288-289; Cl. Rej., paras. 179-181.

filed.[170] At that time, the domestic judicial proceedings in Mexico were still ongoing and had not reached a final resolution.[171]

154. The Respondent emphasizes that a denial of justice under Article 1105 of NAFTA can arise only once the State's judicial system has acted finally as a whole, after available remedies and appeals have been exhausted.[172] Because the Claimants were still actively pursuing relief in the Mexican courts when they commenced arbitration, Mexico could not have been in breach of the treaty at that point.[173]

155. In its Post-Hearing Brief, the Respondent noted that, on 22 October 2025, it became public that the Tenth Collegiate Tribunal ordered the decisions confirming the precautionary measure to be set aside. As a result, in November 2025, the Third Chamber revoked the Injunction, thereby depriving the measure challenged by the Claimants in this arbitration of any legal basis or continuing subject matter.[174]

156. This outcome confirms the Respondent's consistent position, including at the Hearing, that the Injunction, was not final and remained subject to effective judicial challenge, with a genuine possibility of revocation—which ultimately materialized. Because the Injunction, no longer exists, this arbitration has been deprived of its subject matter. The Respondent

---

[170] Resp. Reply, para. 210, citing RL-115, *Amec Foster Wheeler USA Corporation, Process Consultants, Inc., and Joint Venture Foster Wheeler USA Corporation and Process Consultants, Inc. v. Republic of Colombia*, ICSID Case No. ARB/19/34, Award, 19 December 2024, para. 204; RL-116, *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, para. 259.

[171] Resp. Reply, para. 211.

[172] Resp. Reply, para. 212, citing RL-39, *Waste Management, Inc. v. United Mexican States (II)*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, para. 97; RL-115, *Amec Foster Wheeler USA Corporation, Process Consultants, Inc., and Joint Venture Foster Wheeler USA Corporation and Process Consultants, Inc. v. Republic of Colombia*, ICSID Case No. ARB/19/34, Award, 19 December 2024, para. 216; RL-116, *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, para. 282; RL-117, The *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, 26 June 2003, paras. 153, 156; RL-118, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Award, 20 September 2021, para. 551; RL-119, *Infinito Gold Ltd. v. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Award, 3 June 2021, para. 445; RL-120, *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador (II)*, PCA Case No. 2009-23, Second Partial Award on Track II, 30 August 2018, para. 7.121; RL-121, *Corona Materials, LLC v. Dominican Republic*, ICSID Case No. ARB(AF)/14/3, Award on the Respondent's Expedited Preliminary Objections in accordance with Article 10.20.5 of the DR-CAFTA, 31 May 2016, paras. 259-261, 270; RL-122, Jan Paulsson, *Denial of Justice in International Law*, Cambridge University Press, 2005, p. 108.

[173] Resp. Reply, paras. 211, 213.

[174] Resp. PHB, paras. 112-116.

therefore reiterates that the arbitration was brought prematurely and that the Claimants' claims must be deemed inadmissible.[175]

**(2) The Claimants' Position**

157. The Claimants submit that the Respondent has waived its admissibility objection by raising it for the first time in its Reply on Jurisdiction. The Respondent's argument – that the denial of justice claim was not "ripe" because there was no final action by the judicial system – was not pleaded in its Memorial on Jurisdiction, which raised no admissibility objections at all, nor was it prompted by any new facts introduced by the Claimants.[176]

158. Under the ICSID Arbitration Rules, replies and rejoinders are limited to responding to prior submissions or genuinely new facts. The Respondent's new inadmissibility claim falls outside those limits and is therefore procedurally improper. The Respondent has not shown that the issue could not have been raised earlier.[177] Allowing the Respondent to advance a new objection at the reply stage would undermine procedural fairness and the purpose of the two-round written process.[178] Accordingly, the Tribunal should disregard the Respondent's untimely admissibility objection in its entirety.

159. Secondly, the Claimants argue that the Respondent's admissibility objection relates to the merits of the dispute or the assessment of damages, not to the Tribunal's jurisdiction, and therefore, falls outside the scope of the bifurcated proceeding.[179]

160. Thirdly, the Claimants contend that the admissibility objection also fails on the merits. The Claimants submit that the Respondent's admissibility objection is underdeveloped, and that deciding it at this stage would deprive both the Claimants and the Tribunal of full and informed briefing on complex issues that properly belong to the merits phase.[180] They

---

[175] Resp. PHB, paras. 117-118.

[176] Cl. Rej., para. 183.

[177] Cl. Rej., paras. 184-185, citing Rule 30(2) of the ICSID Arbitration Rules; CL-62, *Apotex Inc. v. United States of America*, ICSID Case No. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013, para. 257.

[178] Cl. Rej., paras. 186-187.

[179] Cl. PHB, paras. 114-115, citing *The Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Decision on Jurisdictional Objections, 5 January 2001, para. 74.

[180] Cl. PHB, para. 118.

emphasize that the issue raised by the Respondent is neither simple nor settled in investor-State arbitration, pointing to a broader debate over whether the customary international law requirement of "finality" applies in treaty claims. In this regard, the Claimants stress that NAFTA requires only a waiver, not exhaustion, of local remedies, and expressly allows proceedings for injunctive or declaratory relief, even while damages claims are waived.[181]

161. The Claimants further argue that, irrespective of whether the injunctions were later annulled, they suffered concrete and substantial harm well before initiating this arbitration.[182] For years, they were unable to recover funds owed under binding contracts and were forced to incur significant costs in collateral proceedings, including an anti-suit injunction in New York and related actions in Mexico.[183] Responding to questions raised at the Hearing, the Claimants say that the international wrong was done to them – the U.S. investors – when the Mexican judiciary imposed secret, *ex parte* injunctions without notice or an opportunity to be heard, thereby crystallizing a denial of justice under international law.[184]

162. Finally, the Claimants contend that the subsequent lifting of the injunctions affects only the amount of damages, not the existence of the denial of justice itself.[185] They argue that being compelled to pursue lengthy, complex, and opaque collateral remedies reflects the harm suffered rather than negates it. According to the Claimants, such extraordinary relief is expressly carved out under NAFTA and does not undermine the finality of the injury already imposed, particularly where those remedies were available only after a constitutional deprivation had occurred.[186] On this basis, the Claimants submit that the Tribunal should decline to entertain the Respondent's belated admissibility objection.[187]

---

[181] Cl. PHB, para. 119, citing RL-116, *Apotex Inc. v. United States of America*, ICSID Case N. UNCT/10/2, Award on Jurisdiction and Admissibility, 14 June 2013., para. 259.

[182] Cl. PHB, para. 120.

[183] Cl. PHB, para. 120.

[184] Cl. PHB, para. 121, citing CL-77, *Lion Mexico Consolidated L.P. v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Award, 20 September 2021, para. 631.

[185] Cl. PHB, para. 122.

[186] Cl. PHB, para. 123.

[187] Cl. PHB, para. 124.

## V. THE TRIBUNAL'S DECISION

163. The Tribunal has concluded that it has no jurisdiction because the Claimants are not investors for the purposes of NAFTA, Articles 1116 and 1139 (Objection 2), and because they do not have a "legacy investment" for the purposes of Annex 14-C of the USMCA (Objection 3). Since Objections 2 and 3 are upheld, the Tribunal has no jurisdiction. It is therefore not necessary to express an opinion on the other objections.

### A. OBJECTION 2

#### (1) The essence of the Respondent's objection and the Claimants' response

164. The Respondent says, relying on NAFTA, Articles 1116(1) and 1139, that the Claimants are merely investment managers, and not investors who contributed their own capital or resources to purchase the Notes, or who incurred losses themselves, or who suffered damage to an interest in an enterprise which is a juridical person and which they owned or controlled.[188]

165. The Claimants say that they exercise direct or indirect control over the Noteholders, and over the Notes, and have themselves suffered damage.[189] In particular, they say that, for the purposes of NAFTA, Article 1139: (1) investment includes a debt security of a maturity of at least 3 years; (2) they are enterprises of a Party to NAFTA; (3) they control the Noteholders which have made an investment; and (3) they control the Noteholders directly, and therefore control the Notes indirectly.[190]

#### (2) The relevant texts

166. The Claimants' claims are based on NAFTA, Article 1105, which under the heading "Minimum Standard of Treatment" provides:

---

[188] See specially Resp. Mem., paras. 63-64, 67-68; Resp. Reply, paras. 74-78, 81-82, 88-93; Resp. PHB, paras. 12-13.
[189] See specially Cl. C-Mem., paras. 150-153, 156-158; Cl. Rej., paras. 83, 86-96.
[190] Cl. PHB, paras. 86-92.

> *Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security.*

167. The provisions on which argument has turned are these:

168. Article 1116:

> *Claim by an Investor of a Party on Its Own Behalf*
>
> *An investor of a Party may submit to arbitration under this Section a claim that another Party has breached an obligation* [...] *and that the investor has incurred loss or damage by reason of, or arising out of, that breach* [...]

169. Article 1121:

> *Conditions Precedent to Submission of a Claim to Arbitration*
>
> *A disputing investor may submit a claim under Article 1116 to arbitration only if: (a) the investor consents to arbitration in accordance with the procedures set out in this Agreement; and (b) the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116* [...]

170. Article 1139:

> […] ***investment of an investor of a Party*** *means an investment owned or controlled directly or indirectly by an investor of such Party;*
>
> ***investor of a Party*** *means a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an investment.* [Emphasis added]

171. Article 1117 provides that:

> *An investor of a Party, on behalf of an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this Section a claim that the other Party has breached an obligation* […]

172. The Claimants do not bring a claim on behalf of another enterprise.[191]

**(3) The Notes, default and US bankruptcy proceedings**

173. On 9 August 2017, TV Azteca, S.A.B. de C.V. ("TV Azteca") entered into an Indenture under which it issued $400 million in 8.250% Senior Notes, with semi-annual payments of interest. The Bank of New York Mellon was the trustee, the Bank of New York Mellon, London was the principal paying agent, and a number of subsidiaries of TV Azteca were guarantors. The maturity date was 9 August 2024.

174. The Notes were in default from February 2021. They were accelerated by the trustee pursuant to section 6.2 of the Indenture on 3 May 2022. Among the beneficial owners of Notes on whose behalf the acceleration notice was given were Cyrus Capital Partners, L.P. (the First Claimant in these proceedings), Contrarian Emerging Markets, L.P., and Contrarian Emerging Markets II, L.P.[192]

175. On 20 March 2023, a petition for involuntary bankruptcy was filed against TV Azteca in the New York Bankruptcy Court. Among the 3 petitioners were Cyrus Opportunities Master Fund II, Ltd., and Sandpiper Limited. The petition was dismissed on 20 November 2023, on the ground that there was a bona fide dispute in the District Court for the Southern District of New York concerning the validity of the acceleration notice.[193]

176. According to the Respondent,[194] the acquisitions of the distressed debt were made (by Cyrus Opportunities Master Fund II, Ltd.) in late 2021 and 2022, and (by Sandpiper Limited) in 2023, after TV Azteca had defaulted and/or the debt had been accelerated, as

---

[191] Cl. C-Mem., para. 168.

[192] R-1, *TV Azteca, S.A.B. de C.V., et al. Bankruptcy Case No. 23-10385, ECF 81,* S.D.N.Y., Opinion and Order, 20 November 2023*,* fn. 3.

[193] R-1, *TV Azteca, S.A.B. de C.V., et al. Bankruptcy Case No. 23-10385, ECF 81,* S.D.N.Y., Opinion and Order, 20 November 2023.

[194] Resp. Reply, paras. 16-19.

part of a plan to take over TV Azteca, including obtaining a judgment in the United States and commencing parallel enforcement proceedings in the United States and Mexico. The use of the Claimants as Noteholders was to prevent the hedge funds from being claimants in the Mexican insolvency proceedings.

177. The Noteholders (Cyrus Opportunities Master Fund II, Ltd. and Sandpiper Limited) were both Cayman Islands companies. Noteholders could not be United States companies because under the Indenture any transferee had to represent that it was not a U.S. person within the meaning of the Securities Act, Regulation S.[195]

178. The Claimants describe the contentions that the Notes were acquired as part of a plan to take over TV Azteca as "a baseless diversion" and "speculative allegations."[196] Whether they are well-founded is not relevant to the present phase of the arbitration.

**(4) The complaint**

179. The central complaint in these proceedings is that on 27 September 2022, without holding a hearing or providing the defendants any notice or opportunity to be heard in opposition to the request for a decree, the Mexican court granted TV Azteca's request for an injunction, which relieved TV Azteca of its obligations to continue making payments on the Notes and prohibited any proceedings to enforce rights and remedies in respect of the Notes. The Claimants complain that the injunction prevented them from commencing any action or proceeding involving TV Azteca in Mexico relating to the Notes and purported to stay any effects of the acceleration of the Notes in Mexico, including those on account of TV Azteca's default.

180. The Claimants say that they have standing to pursue claims in respect of the Respondent's actions, because, through the Noteholders under their control, they control claims against TV Azteca, based upon their control of the Notes issued under the Indenture.

181. The question for the Tribunal on Objection 2 is whether, for the purposes of NAFTA, Articles 1116 and 1139, each of the Claimants is an investor which has made "an

[195] C-6, Indenture executed by TV Azteca, BNYM and BNYM LB, 9 August 2017, p. A-1.
[196] Cl. Rej., para. 13.

investment owned or controlled directly or indirectly" by it. The question whether the Claimants have incurred loss or damage for the purposes of Articles 1116 and 1121, and the reference in Article 1121 to "a juridical person that the investor owns or controls directly or indirectly," are only relevant insofar as they throw light on the interpretation of Articles 1116 and 1139.

182. It should be noted that the question whether the purchase of distressed debt securities, which are in default or have been accelerated, is an "investment" for the purposes of NAFTA (or other investment treaties) is not a question for decision by the Tribunal.

**(5) The First and Second Claimants and their relationship with the Funds**

183. According to the Claimants, investment managers use investment fund structures to pool capital from multiple investors to collectively purchase securities, offering a wider range of investment options, professional management, and lower fees compared to individual efforts. Debt securities, such as corporate bonds, represent loans made by investors to corporations in exchange for periodic interest payments and the return of the principal at maturity.

184. The Claimants say that these structures involved in this case are created to pool capital and account for tax considerations. For example, the organization of one fund under the laws of a state such as Delaware allows for the admission of U.S. investors under a favourable tax regime. The establishment of an offshore fund by the investment managers, owned and managed by the same entity, permits the inclusion of non-U.S. investors while avoiding adverse U.S. tax consequences. These "feeder funds" typically aggregate their assets into a master fund, which is also organized offshore, primarily for U.S. tax efficiency and regulatory considerations.

185. There was no evidence on whether the Claimants and the other companies in their respective groups have common officers, or on how in practice the different corporate entities in these tax and regulatory driven structures, which are in essence under common ownership, take decisions.

### *a. The First Claimant*

(i) Corporate structure

186. The First Claimant is a limited liability partnership organized under the laws of the State of Delaware, with its principal place of business in New York City, New York.

187. The First Claimant is the investment manager of (among other funds in the same group) Cyrus Opportunities Master Fund II., Ltd. ("Opps II Master"), the Noteholder, which is a Cayman Islands company.

188. Opps II Master is owned: [redacted][197]

189. According to the Claimants, the general partner (which is normally ultimately responsible to investors in the funds) of Opps II Domestic Feeder is Cyrus Capital Advisors, LLC, which has an economic interest of [redacted] in Opps II Domestic Feeder, and which has the same ultimate parent (Cyrus Capital Partners GP, LLC.) as the First Claimant.

190. Cyrus Capital Partners GP, LLC, has a [redacted] indirect economic interest in Opps II Master, and therefore in the Notes, by virtue of its ownership of Cyrus Capital Advisors, LLC, a shareholder in Opps II Master, with the result that Mr. Stephen C. Friedheim, the ultimate beneficial owner of the First Claimant through his ownership of Cyrus Capital Partners, LLC, indirectly owns [redacted] of the Notes.

(ii) Acquisition of the Notes

191. Opps II Master acquired the Notes in the aggregate principal amount of $24,477,000 in separate acquisitions (after the default on the Notes) on 31 November, 1 December, 9 December and 10 December 2021; and (after the notice of acceleration on 3 May 2022) on

[197] C-10, Opps II Master Fund Organizational Chart, undated.

9 May, 11 May, 20 September 2022; and (after the alleged wrongful act) on 26 October and 8 November 2022.[198]

(iii) Power to appoint Investment Manager: Articles of Association

192. The Articles of Association of the First Claimant[199] provide, in Article 24.1, under the heading "Delegation of Directors' powers," that the directors may "appoint any person to be the agent of the Company for such purposes and on such conditions as they, in their discretion, determine" and in particular "shall appoint the Investment Manager and [...] confer upon the Investment Manager so appointed any of the powers exercisable by them upon such terms and conditions, including the right to remuneration payable by the Company and with such restrictions and powers of delegation as they, in their discretion, think fit and either collaterally with or to the exclusion of their own powers." "Investment Manager" is defined by the Articles (Article 1) to be any person appointed and for the time being acting as investment manager, portfolio manager or trading advisor.

(iv) Investment Management Agreement

193. The Investment Management Agreement ("IMA")[200] is dated 28 August 2015, and deemed effective as of 1 July 2015, and is between the funds, Opps II Domestic Feeder, Opps II Offshore Feeder, Opps II Master, and Cyrus Capital Partners LP, the First Claimant, as investment manager (and executed on its behalf by Cyrus Capital Partners, G.P., LLC as the general partner of the Funds).

194. The IMA provides (section 2) under the heading "Authority of the Investment Manager" for the investment manager "to have the authority, […] subject to section 5, in the name of the [Funds], [inter alia,] to possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities and other property and funds held or owned by [the Funds]."

---

[198] Exhibit 8a, Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Cyrus), 20 March 2023, para. 3.

[199] C-71, Memorandum of Association of Cyrus Opportunities Master Fund II, Ltd., Adopted by special resolution passed on 4 September 2012.

[200] C-9, Cyrus Opportunities Funds Investment Management Agreement, 28 August 2015.

195. Other powers conferred on the investment manager include the power to enter into contracts for or in connection with investments, to do any and all acts on behalf of the funds and exercise all rights of the funds in connection with securities.

196. But by section 3: "The activities engaged in by the Investment Manager on behalf of the Opportunities Funds shall be subject to the policies and control of the respective Boards of Directors or general partner, as applicable, of the Opportunities Funds."

197. So also by section 4, which is headed "Status of the Investment Manager:" "The Investment Manager shall, for all purposes, be an independent contractor and not an employee of any of the [Funds], nor shall anything herein be construed as making any of the [Funds] a partner or co-venturer with the Investment Manager or any of its affiliates or clients. The Investment Manager shall have no authority to act for, represent, bind or obligate the [Funds], except as specifically provided herein."

198. Section 5 provides (inter alia) that all investments of the [Funds] shall be subject to "such policies as may be adopted from time to time by the respective Boards of Directors or general partner, as applicable, of the [Funds]."

199. Section 7 has detailed provision for quarterly fees as remuneration for the investment manager, which are a percentage of the value of the relevant funds.

200. By section 15, which is headed "Term": "This Agreement is effective from year to year but may be terminated at any time by the Investment Manager, or by [redacted] the Boards of Directors or general partner, as applicable, of the [Funds], upon [redacted]' prior written notice by the terminating party to the other party or parties."

***b. The Second Claimant***

(i) Corporate structure

201. According to the Claimants, the relevant structure is as follows.

202. The Second Claimant is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Greenwich, Connecticut.

203. Sandpiper Limited, the registered owner of the Notes is a Cayman Islands company, which is wholly owned by Contrarian Funds, L.L.C.

204. Contrarian Funds, L.L.C. is a Delaware company, owned by several Contrarian-controlled investment funds, including Contrarian Emerging Markets, L.P. and Contrarian EM II, L.P. The general partners of all but one of the funds which own Contrarian Funds, L.L.C. are ultimately owned and controlled by the three U.S. nationals who control Contrarian, Jon Bauer, Janice Stanton, and Gil Tenzer.[201]

205. According to the Sixth Amended and Restated Limited Liability Company Agreement,[202] executed by the Second Claimant on behalf of the various Contrarian funds, Contrarian Funds, LLC was formed "as an acquisition vehicle in which investment management clients of Contrarian Capital Management, L.L.C. (the 'Manager') may make investments at the direction of the Manager" (Section 1.03) and was to "be managed by the Manager as its non-Member manager, which shall be solely responsible for making all decisions concerning the Company" (Section 3.01). Under the Agreement the Second Claimant has very wide powers, at least equivalent to those of a board of directors.

(ii) Acquisition of the Notes

206. Sandpiper Limited acquired Notes in the aggregate principal amount of US$24,238,000 from Contrarian Emerging Markets, L.P., one of the funds which own Contrarian Funds, LLC, on 13 March 2023, without payment, after the default and the acceleration of the Notes, and after the alleged wrongful act, but just before the bankruptcy petition presented on 20 March 2023, in respect of which Sandpiper Limited was a petitioner. Contrarian Emerging Markets, L.P. acquired the Notes (which were in default from February 2021) between 10 February 2021 and 15 November 2022.[203]

---

[201] Hearing on Jurisdiction, Claimants' Slide 21, 5 November 2025. They are said to have an aggregate holding of [redacted]

[202] C-14, Sixth Amended and Restated Limited Liability Company Agreement of Contrarian Funds, L.L.C., 10 February 2017.

[203] Exhibit 8b, Excerpt from Amended Involuntary Petition in U.S. Bankruptcy Proceeding (Contrarian), 20 March 2023.

(iii) Investment Management Agreement

207. An investment management agreement dated as of 1 September 2019[204] was made between Contrarian Capital Management, LLC. (the investment manager and the Second Claimant), Contrarian Emerging Markets Offshore Fund, Ltd., an exempted Cayman Islands company (the "Feeder Fund") and Contrarian Emerging Markets, L.P., a Delaware limited partnership (the "Master Fund"). It is less elaborate than the First Claimant's management agreement.

208. The Agreement is governed by Connecticut law (section 12). It gives (section 1(a)) the investment manager extensive powers ("powers, rights, privileges and discretions conferred upon (i) the Feeder Fund or its Board of Directors [...] by the Articles and (ii) the Master Fund or its General Partner," but provides also (section 1(a)) that the investment manager shall not be an employee of the funds and shall have no authority to act for, represent, bind or obligate either fund except as provided for therein.

209. By section 2, the investment manager is paid management fees at [redacted] depending on the class of securities under management.

210. By section 8, which is headed "Term:" "This Agreement shall continue until the close of business on [redacted], except that any of the Feeder Fund, the Master Fund or the Investment Manager may terminate the Agreement effective as of the close of business on the last day of any month by giving the other parties not less than [redacted]' written notice. The Feeder Fund, however, may only terminate this Agreement if the termination is approved by [redacted] holders of Shares representing [redacted] of the holders of voting shares of the Feeder Fund."

**(6) The Tribunal's Analysis**

211. By way of preface, the Tribunal should make it clear that, in interpreting the NAFTA provisions in this arbitration, it has taken full account of the principles of treaty interpretation in the Vienna Convention on the Law of Treaties, Articles 31-32, which are too well-known to require elaboration. In particular, the Tribunal has sought to interpret

[204] C-17, Contrarian Emerging Markets, L.P.-Contrarian Investment Management Agreement, 1 September 2019.

the provisions in good faith according to their ordinary meaning and object and purpose, and in their context.

212. The Claimants put their case in two ways. First, they say that the Tribunal has jurisdiction, notwithstanding that the Notes are registered in the names of Cayman Islands companies, because the Claimants are United States companies which control the Notes, in the case of the First Claimant through Opps II Master, and in the case of the Second Claimant through Contrarian Funds, LLC. The basis for this contention is that each of the Claimants qualifies as an investor under Article 1139 because it "has made an investment" (the Notes) and the Notes are an investment because, even if they do not hold or own the Notes, the Notes are "controlled directly or indirectly" by the respective Claimants.

213. Second, they say that the Tribunal has jurisdiction because, as United States companies, they have an economic interest in the Notes. They also say that have suffered damage and loss stemming from the Mexican court's denial of justice which forms the basis of their claim in this arbitration.

214. The Tribunal was referred to several awards on the meaning of "control" in various different contexts.

215. In *S.D. Myers, Inc. v. Government of Canada*[205] the tribunal decided that, where the same persons owned the shares of the claimant, and also owned the investment, the claimant was an investor who controlled the investment. The tribunal said:[206]

> *Taking into account the objectives of the NAFTA, and the obligation of the Parties to interpret and apply its provisions in light of those objectives, the Tribunal does not accept that an otherwise meritorious claim should fail solely by reason of the corporate structure adopted by a claimant in order to organise the way in which it conducts its business affairs. The Tribunal's view is*

[205] RL-48, *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL, Partial Award, 13 November 2000, paras. 224-227.

[206] *Ibid*.

> *reinforced by the use of the word "indirectly" in the second of the definitions quoted above.*[207]

216. The Tribunal accepts the Respondent's submission that this decision is of no assistance in this arbitration. The tribunal in *S.D. Myers, Inc. v. Government of Canada* found that the claimant had a real economic interest in the investment by lending it money and expecting to share in its profits.

217. The other awards which were cited include two awards on NAFTA, Article 1117 which decided that a minority shareholder may exercise *de facto* control. The first is *International Thunderbird Gaming Corporation v. United Mexican States*,[208] in which the tribunal applied these tests and found that:[209]

> "*The Tribunal does not follow Mexico's proposition that Article 1117 of the NAFTA requires a showing of legal control. The term "control" is not defined in the NAFTA. Interpreted in accordance with its ordinary meaning, control can be exercised in various manners. Therefore, a showing of effective or "de facto" control is, in the Tribunal's view, sufficient for the purposes of Article 1117 of the NAFTA. In the absence of legal control however, the Tribunal is of the opinion that* de facto *control must be established beyond any reasonable doubt.*
>
> *It is quite common in the international corporate world to control a business activity without owning the majority voting rights in shareholders meetings. Control can also be achieved by the power to effectively decide and implement the key decisions of the business activity of an enterprise and, under certain circumstances, control can be achieved by the existence of one or more factors such as technology, access to supplies, access to markets, access to capital, know how, and authoritative reputation. Ownership and legal control may assure that the owner or legally controlling party has the ultimate right to determine key decisions. However, if in practice a person exercises that position with an expectation to receive an economic return for its efforts and eventually be held responsible*

[207] This is probably a reference to Article 1117, which is not quoted.

[208] CL-23, *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, 26 January 2006, paras. 106-108.

[209] *Ibid*.

> *for improper decisions, one can conceive the existence of a genuine link yielding the control of the enterprise to that person.*"

218. In *B-Mex, LLC v. United Mexican States*,[210] the tribunal expressly approved the reasoning in the *Thunderbird* award and decided[211] that:

> "*In the context of Article 1117, any ability to "exercise restraining or directing influence over" or to "have power over" a company would satisfy the ordinary meaning of control. There is no specific manner or form that "control" must take.*"

219. In *B-Mex* the tribunal decided that the minority shareholders' power to prevent shareholders' resolutions being passed and to prevent a quorum for board meetings gave them *de facto* control,[212] but without defining what *de facto* control meant. In his partial dissenting opinion Professor Vinuesa said that:

> "[...] *the term "control" may be classified as legal control or de facto control, but this characterization does not alter the content and scope of the term "control," i.e., the exercise of exclusive power in the management of an enterprise to the exclusion of any other power.*"[213]

220. The most elaborate consideration of control in the awards which were cited to this Tribunal is in *Gramercy Funds Management LLC v. Peru*,[214] in which the tribunal decided, that, in the context of the US-Peru Free Trade Agreement, control meant to have a controlling interest in a company, which in that case the investment manager did not have. The tribunal linked control to the exercise of shareholder rights:

> *How does an investor exercise control over an enterprise or corporation, be it in the home State or in the host State?*

[210] CL-5, *B-Mex, LLC et al. v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, 19 July 2019, paras. 210-221.

[211] *Ibid*, para. 212.

[212] *Ibid*, para. 237.

[213] *Ibid,* Partial Dissenting Opinion, 6 July 2019, para. 144.

[214] RL-68, *Gramercy Funds Management LLC and Gramercy Peru Holdings LLC v. Republic of Peru*, UNCITRAL, Case No. UNCT/18/2, Final Award, 6 December 2022.

> *Corporations are organized at two levels – that of the owners and that of the administrators (e.g., in a joint stock corporation, the general shareholders meeting and the board of directors). Each level constitutes a separate organ, but cross-participation is frequently permitted (e.g. in joint-stock companies shareholders may act as members of the board of directors).*
>
> *Owners (be they known as partners, shareholders or members) are those who contribute the funds required for the corporation's development, stand to benefit or suffer from the entity's activities, and receive the remaining funds upon the corporation's liquidation.*
>
> *The administrative organ (be it a sole manager, a general partner or a board) manages the affairs of the corporation and designates its officers; administrators and officers are both the corporation's servants, authorized by the owners or the founding documents to adopt decisions on the corporation's behalf and in its interest. Administrators and officers normally receive a remuneration for their services (which may or not be linked to the company's profits) and may or may not be subject to dismissal by the owners; what separates owners and administrators/officers is the business risk; that ultimate risk is always borne by the owners.*
>
> *Control of the corporation can only be exercised at the level of its owners – not at that of its administrators or officers. The owners, and not the administrators or officers, have an ownership interest in the company, and the owners are those who suffer the loss. The Treaty grants protection to assets owned or directly or indirectly controlled by an investor, reinforcing the conclusion that control must be exercised at ownership level.*[215]

221. The Tribunal considers that the concept of control in NAFTA, Articles 1121 and 1139, is inextricably linked with ownership, and not with mere management.

222. The Notes are registered Notes, and by section 2.8(a)(iv) of the Indenture, prior to any transfer being registered, the entity in whose name the Note is registered as the owner is to be treated "as the absolute owner of such Note for the purpose of receiving payment of

---

[215] RL-68, *Gramercy Funds Management LLC and Gramercy Peru Holdings LLC v. Republic of Peru*, UNCITRAL, Case No. UNCT/18/2, Final Award, 6 December 2022, paras. 631-635. In the context of the Korea-US Free Trade Agreement, RL-67, *Mason Capital L.P (USA) and Mason Management LLC (USA) v. Republic of Korea*, PCA Case No 2018-55, Decision on the Respondent's Preliminary Objections, 22 December 2019, paras. 194-196, the tribunal applied Cayman Islands law and decided that the General Partner *de jure* and *de facto* controlled investments through a fund, which had no legal personality.

principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Subsidiary Guarantors, the Trustee, or any Agent shall be affected by notice to the contrary."[216]

223. In the present case the Claimants are not shareholders, or co-owners or noteholders. They are the investment managers of various corporate vehicles, which include the Noteholders, which are incorporated in the Cayman Islands, and which therefore have no standing to make a claim under NAFTA.

224. Their control of the Notes is said to derive from the IMAs, the elements of which have been set out above. It requires emphasis that each of the Claimants are both presented solely as investment managers, with authority to make investments on behalf of the other parties to the agreements.

225. As regards the IMA with the First Claimant, there is nothing in it which is inconsistent with what would be expected to be the rights and obligations of an investment manager. It can buy and sell investments and exercise the rights connected with them (Section 2) and is remunerated by management fees based on the value of the investments (Section 7).

226. Although the Articles of Association of the Opps Master Fund II (Article 24.1)[217] say that the Directors may give power to the Investment Manager to the exclusion of directors' own powers, the IMA does not exercise that power, and, on the contrary, makes the powers of the investment manager subject to "the policies and control of the respective Boards of Directors or general partner, as applicable, of the Opportunities Funds" (Section 3). The powers are undoubtedly wide. But such powers as the power to exercise all rights and incidents of ownership (including exercise of voting rights and participation in arrangements with creditors) are wholly consistent with, and necessary for, the wide powers of investment management given by the IMA.

---

[216] Exhibit 10, Indenture executed by TV Azteca, BNYM and BNYM LB, 9 August 2017, p. 35.

[217] C-71, Memorandum of Association of Cyrus Opportunities Master Fund II, Ltd., adopted by special resolution passed on 4 September 2012.

227. In particular, its status as an investor manager only is underlined by the provisions that: (1) it is an independent contractor only, and not an employee or partner of the Funds, and has no authority to bind the funds except as specifically provided (Section 4); (2) its powers of investment and partner are subject to policies adopted by the boards or general partner of the funds (Section 5); and (3) the agreement is terminable on notice (Section 15).

228. The IMA with the Second Claimant also gives the investment manager wide powers of investment, remunerated by a management fee based on the value of the investments (section 2), but limits its authority in similar ways. The investment manager is not to be an employee of the funds and has no authority to act for them except as provided for therein: section 1(a). The IMA also has provision for termination: Section 8.

229. The IMAs delegate powers from the Noteholder (First Claimant only) and from direct and indirect shareholders in the Noteholders. These shareholders may have direct or indirect control (particularly in the case of the First Claimant) but the IMAs do not pass this indirect control to the Claimants. The indirect control remains with the shareholders and the Claimants exercise delegated powers on their behalf.

230. It follows from the terms of the IMAs that the Claimants cannot be said to have made a loss on the Notes themselves. There is no suggestion that they are the beneficial owners of the Notes, and consequently they have no direct or indirect proprietary interest in the Notes themselves. Prima facie, the most they could legitimately say is that, as the investment managers of the funds which own the Noteholders, they have lost a proportion of its management fee under the IMAs attributable to the diminution in the value of the Notes, but only for the diminution in value which occurred after the wrongs were allegedly committed.

231. The second way in which the case for the First Claimant is put is that (1) one of the two shareholders of Opps II Master is Opps II Domestic Feeder; (2) the general partner of Opps II Domestic Feeder is Cyrus Capital Advisors, LLC, which is said to have "an economic interest" of [redacted] in Opps II Domestic Feeder; (3) Cyrus Capital Advisors, LLC has the same "ultimate" parent, Cyrus Capital Partners GP, LLC as the First Claimant; (4) Cyrus Capital Partners GP, LLC, has a [redacted] "indirect economic interest" in Opps II Master, and

therefore in the Notes, by virtue of its ownership of Cyrus Capital Advisors, LLC; (5) the ultimate beneficial owner of the First Claimant, Mr. Stephen C. Friedheim, "indirectly" owns [redacted] of the Notes.

232. Similarly, the case for the Second Claimant is that its ultimate owners retain an indirect economic interest in the Notes, including those held by Sandpiper Limited.

233. According to the Claimants,[218] their control of the Noteholder funds establishes them as "ultimate beneficial owners" under U.S. law, and in particular under the Corporate Transparency Act, which is designed to mitigate the effects of anonymous shell companies. The Act defines a beneficial owner as "an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise [...] exercises substantial control over the entity."[219] This definition is plainly for a special purpose, not connected with the issue in this arbitration, and there was no expert evidence of U.S. law in this case. In any event the question is not one of U.S. law, but of interpretation of the relevant provisions of NAFTA.

234. The Tribunal accepts the Respondent's argument that the Claimants are seeking wholly to disregard the separate legal personalities in these complex structures. They have been designed for specific reasons, including taxation and regulatory regimes. In any event, the economic interests of the ultimate owners or general partners are not the interests of the Claimants, who have the function of investment managers in these structures. Indirect economic interests is not a legal concept relevant to this arbitration, and to the extent that it might be relevant, the economic interest belongs to persons who are not parties to this arbitration.

235. In conclusion, there are three critical points:

(1) The first is that a claim for direct damage under NAFTA Article 1116 requires there to be "the investor" which "has incurred loss or damage by reason of, or arising out of, that breach." The Claimants are not alleging that they lost management fees as

[218] Cl. PHB, fn. 34.

[219] Cl. PHB, fn. 34, citing 31 U.S. Code § 5336(a)(3) of the U.S. Corporate Transparency Act.

a result of the alleged breach, but are claiming the amounts due on the Notes. But the amounts are not due to them but to the Noteholders, who have no standing under NAFTA because they are both registered in the Cayman Islands.

(2) The second is that an indirect claim under Article 1117 can only be brought where the loss or damage has been caused to "an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly." It does not apply where the enterprise is of a non-Party (such as the Cayman Islands) or of the same Party (the United States), and in any event the Claimants do not control the Cayman Islands companies and nor do they make a claim pursuant to Article 1117.

(3) The third is that Article 1139 provides, so far as relevant that "investment of an investor of a Party means an investment owned or controlled directly or indirectly by an investor of such Party" and "investor of a Party" means "a national or an enterprise of such Party, that [...] has made an investment." There is no legitimate process of interpretation which could qualify the Claimants as investors, who have made no investment, nor control directly or indirectly any investment.[220]

## B. OBJECTION 3

### (1) Annex 14-C

236. So far as is material to Objection 3, Annex 14-C to the USMCA provides that:

> *1. Each party consents, with respect to a legacy investment, to the submission of a claim to arbitration in accordance with Section B of Chapter 11 (Investment) of NAFTA 1994 and this Annex alleging breach of an obligation under: (a) Section A of Chapter 11 (Investment) of NAFTA 1994* […]
>
> […]
>
> *3. A party's consent under paragraph 1 shall expire three years after the termination of NAFTA 1994.*

[220] As indicated above, the Tribunal is not called on to decide whether the purchase of distressed debt securities in the international market qualifies as an investment for treaty purposes.

> […]
>
> *6(a) "legacy investment" means an investment of an investor of another Party in the territory of the Party established or acquired between January 1, 1994, and the date of termination of NAFTA 1994, and in existence on the date of entry into force of this Agreement.*

237. The Request for Arbitration, which was presented on 30 June 2023, the day before the Respondent's consent (if any) expired on 1 July 2023, relied[221] on (inter alia) Annex 14-C to the USMCA as providing the basis, until 1 July 2023, for the submission to arbitration.

238. Objection 3 is only necessary for decision if the Tribunal's conclusion on Objection 2 is wrong, because Annex 14-C applies only if a claimant is an "investor," which is given the "meanings accorded in Chapter 11 (Investment) of NAFTA 1994",[222] and the Tribunal has decided in connection with Objection 2 that the Claimants are not investors for those purposes.

239. As noted above in connection with Objection 2, the essence of the complaint in the Request is that the Claimants' mistreatment by the Mexican courts from 27 September 2022 amounted to a denial of justice and a violation of the Respondent's obligations to provide the Claimants, as U.S. investors, with due process and fair and equitable treatment under NAFTA, Article 1105.

**(2) The critical dates**

240. For the purposes of Objection 3, the critical dates relating to an "investment", some of which have already been noted in connection with Objection 2, are as follows:

    (1) The Notes were issued on 9 August 2017.

    (2) The alleged breaches of the NAFTA, Article 1105, obligations commenced on 27 September 2022.

[221] Request, paras. 15, 19.

[222] Request, para. 6(b).

(3) The Notes were acquired by companies which the Claimants say were controlled by them as follows:

(4) Opps II Master acquired the Notes in the aggregate principal amount of $24,477,000 (after the default on the Notes) on 31 November, 1 December, 9 December and 10 December 2021; and (after the notice of acceleration on 3 May 2022) on 9 May, 11 May, 20 September 2022; and (after the injunction of 27 September 2022) on 26 October and 8 November 2022.

(5) Sandpiper Limited acquired Notes in the aggregate principal amount of $24,238,000 from Contrarian Emerging Markets, L.P., one of the funds which own Contrarian Funds, LLC, on 13 March 2023, without payment, after the default and the acceleration of the Notes, and after the alleged wrongful act, but just before the bankruptcy petition presented on 20 March 2023, in respect of which Sandpiper Limited was a petitioner.

241. The critical dates relating to the "legacy investment" claims, are:

(1) The date of termination of NAFTA, 30 June 2020: Annex 14-C, paras. 3, 6(a).

(2) The entry into force of USMCA, 1 July 2020: Annex 14-C, para. 6(a).

(3) The date on which the Request for Arbitration was made: 30 June 2023.

(4) The date on which the consent of the Contracting States to claims in respect of legacy investments expired, namely 3 years of termination of NAFTA, 1 July 2023: paras. 1, 6(a).

(5) The period between 1 January 1994 and the date of termination of NAFTA, 30 June 2020, in which an investment was "established or acquired": para. 6(a).

(6) There is no express provision relating to the date on which the claim arose, and that is the issue in relation to Objection 4, which the Tribunal has determined it is not necessary to decide.

**(3) The Tribunal's Analysis**

242. The essence of the issue is whether the investment can be "established" by some other person prior to the expiry of the time limit, from whom the investor acquires the investment after the expiry of the time limit, or whether an investor that acquired an investment must demonstrate acquisition prior to the expiry of the time limit.

243. The Claimants say that the investment was "established" while NAFTA was in force because the Notes were issued on 9 August 2017, namely between 1 January 1994 and 30 June 2020, and so comply with the definition of legacy investments.

244. The Respondent says that "established or acquired" refers to "an investment of an investor" in the words of para. 6(a) and is simply drawing a distinction between the methods by which the investor has come to have the investment.

245. The Tribunal has no doubt that, in the light of the wording of the provision and its evident intention of identifying the class of investments entitled to residual protection, the definition is simply drawing a distinction between an investor who has itself "established" the investment, e.g. by building a factory, and one who has "acquired" the investment by buying the factory. In order to give the notion of "legacy investment" more clarity, the text refers to both establishment by the investor and acquisition by the investor.

246. This is supported by a fundamental textual consideration. The investment which is "established" must be "an investment of an investor of another Party [to the treaty]," which is established in the relevant period. This does not work if, as in this case, the investment is regarded as having been established in 2017 by TV Azteca. Accordingly, the "establishment" relied upon by the Claimants does not satisfy the definition of a legacy investment while the acquisition fails to meet the temporal criteria of the definition.

247. The Tribunal does in the present case not find helpful, for either interpretation, the phrase "in existence on the date of entry into force of this Agreement." That phrase fits both interpretations, and works even if the investment has been "established" by a predecessor in title of the investor.

248. The award in *Westmoreland Coal Company v. Canada (III)*[223] dealt with a rather different issue. The claimant had sold its interest in a Canadian enterprise operating a coal mine before NAFTA terminated and the USMCA took effect. The claimant took the bold line that Annex 14-C did not require the investor to have owned or controlled the investment on 1 July 2020, and it was sufficient that it owned or controlled a protected investment before 1 July 2020, even though it no longer owned or controlled it, because the investment was still in existence.

249. The tribunal had no difficulty in rejecting the argument. It said:[224]

> *The language in Paragraph 6(a) requiring an investment "in existence" upon the entry into force of the USMCA is a distinct element of the "legacy investment" definition that must be given effet utile. In doing so, the Tribunal finds that an investment is "in existence" at a given time if it is owned or controlled by the investor at that time.* […] *[T]his interpretation is consistent with the relevant definitions in NAFTA Article 1139; the purpose of the USMCA; the requirement under NAFTA that the investor must hold the investment at the time of the alleged breaches; and it does not yield allegedly "absurd" results, such as "abruptly" leaving investors with no investment protection under NAFTA, in relation to expropriatory measures or generally.*

250. The Claimants say that it is the investors (the Claimants) who "acquire" the debt, and the issuer of the debt (TV Azteca) which establishes the debt, and that a debt security remains a legitimate investment, irrespective of the specific entity holding it, and that the issuer will enjoy a continuous credit benefit until the debt becomes due.[225] That may be so, but it does not assist in the answer to the question of whether acquisition after the expiry of the time limit satisfies the definition of legacy investment for the purposes of Annex 14-C, any more than the example of a factory acquired by an investor, but previously "established" by the original owner.

---

[223] CL-82, *Westmoreland Coal Company v. Government of Canada (III)*, ICSID Case No. UNCT/23/2, Award, 17 December 2024.

[224] *Ibid*, para. 161.

[225] Cl. Rej., para. 104, relying on CL-29, *Fedax NV v. Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997, para. 40; CL-65, *Lion Mexico Consolidated LP v. United Mexican States*, ICSID Case No. ARB(AF)/15/2, Decision on Jurisdiction, 30 July 2018, para. 194.

251. The Tribunal accepts that considered statements on behalf of States constitute subsequent practice for the purposes of VCLT, Article 31(3)(b), and provide an authentic interpretation of treaties, as the Canadian and United States Governments emphasized at the Hearing.[226] In its Non-Disputing Party Submission, the United States Government, as a party to USMCA, confirmed that the reference in Annex 14-C to "established or acquired" was to an investment established or acquired by a claimant,[227] and the representative of the United States Government confirmed at the Hearing[228] that the definition of legacy investment requires a claimant to demonstrate both that it was an investment established or acquired by the claimant investor while NAFTA was in force and also in existence on the date of entry into force of USMCA.

252. The Tribunal therefore concludes that the Claimants do not have a "legacy investment" and that Objection 3 should be upheld.

## VI. COSTS

### A. THE CLAIMANTS' COSTS SUBMISSION

253. In its statement on costs, the Claimants argue that the Respondent should bear the total arbitration costs incurred by the Claimants, including legal fees and expenses totalling USD 3,134,150.00, broken down as follows:[229]

| Expense | Entity | Total |
|---|---|---|
| Legal Fees & Expenses | Akin Gump Strauss Hauer & Feld LLP | $2,960,000.00 |
| Administrative Fees | ICSID | $150,000.00 |
| Witness Fees & Expenses | Mr. Kenneth Smith Ramos | $24,150.00 |
| | **Total** | $3,134,150.00 |

[226] Tr. Day 1, pp. 10-12, 45-48.

[227] Article 1128 Submission of the United States of America, 15 July 2025, para. 17.

[228] Tr. Day 1, pp. 10-13.

[229] Claimants' Costs Submission; Cl. PHB, para. 126.

254. Therefore, the Claimants' claim for costs (excluding advances made to ICSID) amounts to USD 2,984,150.00.

## B. THE RESPONDENT'S COSTS SUBMISSION

255. In its statement on costs, the Respondent submits that the Claimants should bear all the costs and expenses of these proceedings, including the Respondent's legal fees and expenses totalling USD 862,050.89, broken down as follows:[230]

| DESCRIPTION | ENTITY | AMMOUNT IN USD |
|---|---|---|
| Administrative payments | ICSID | $400,000.00 |
| Representatives' fees | *Secretaría de Economía* | $72,195.56[1] |
| External counsel's fees | Pillsbury Winthrop Shaw Pittman LLP | $373,033.00 |
| | Tereposky & DeRose LLP | $385.00 |
| Representatives' travel expenses | *Secretaría de Economía* | $16,437.33[2] |
| | **TOTAL** | **$862,050.89** |

256. Therefore, the Respondent's claim for costs (excluding advances made to ICSID) amounts to USD 462,050.89. The Respondent also requests the Tribunal to order that such sums accrue compound interest from the date of the Award until their full payment, at a reasonable commercial rate determined by the Tribunal.[231]

## C. THE TRIBUNAL'S DECISION ON COSTS

257. Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

[230] Respondent's Costs Submission; Resp. PHB, para. 126.

[231] Resp. PHB, para. 125.

258. ICSID Arbitration Rule 52(1) provides:

> ***Decisions on Costs***
>
> *(1) In allocating the costs of the proceeding, the Tribunal shall consider all relevant circumstances, including:*
>
> *(a) the outcome of the proceeding or any part of it;*
>
> *(b) the conduct of the parties during the proceeding, including the extent to which they acted in an expeditious and cost effective manner and complied with these Rules and the orders and decisions of the Tribunal;*
>
> *(c) the complexity of the issues; and*
>
> *(d) the reasonableness of the costs claimed.* […]

259. These provisions give the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate considering all relevant circumstances.

260. In this case, the Respondent has been successful and there are no reasons for departing from the usual principle that the losing party is responsible for the costs of the successful party and for Tribunal and administrative costs. There is no reason to doubt the reasonableness of the costs claimed by the Respondent.

261. The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses<br>Lawrence Collins<br>Zachary Douglas<br>David Cairns | <br>110,652.35<br>55,044.13<br>76,006.03 |
| ICSID's administrative fees | 156,000.00 |
| Direct expenses | 60,100.58 |
| **Total** | **457,803.09** |

262. As a result, each Party's share of the costs of the arbitration amounts to USD 228,901.55. These costs have been paid out of the advances made by the Parties: the Claimants have paid USD 150,000 and the Respondent USD 400,000.[232] Therefore, a portion of the Claimants' share of the costs of the arbitration (USD 72,618.15), was paid out of the advances made by the Respondent.

263. Accordingly, the Tribunal orders the Claimants to pay the Respondent **(i)** USD 301,519.69 (which corresponds to the difference between the total costs of the arbitration – USD 457,803.09 – and the amounts advanced by the Claimants – USD 156,283.39);[233] and **(ii)** USD 462,050.89 to cover the Respondent's legal fees and expenses. The Respondent is entitled to interest on costs. The Tribunal considers simple interest at the 30 day SOFR rate plus 2% to be a reasonable commercial rate.

264. **AWARD**

264. For the reasons set forth above, the Tribunal decides as follows:

(1) The Tribunal has no jurisdiction to determine the Claimants' claims.

(2) The Claimants shall be responsible for the costs and expenses of the Tribunal and of ICSID in the amount of USD 457,803.09. The Claimants shall pay to the Respondent within 60 days, USD 301,519.69 corresponding to the difference between the total costs of the arbitration and the amount advanced by the Claimants.

(3) The Claimants shall pay to the Respondent within 60 days its costs and expenses in the amount of USD 462,050.89.

(4) The sums due by the Claimants to the Respondent shall bear simple interest from the dates due until actual payment at the 30-day SOFR rate plus 2%.

---

[232] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

[233] This amount comprises the Claimants' advance payments to ICSID totaling USD 150,000.00, plus investment income of USD 6,283.39 generated thereon.

[Signed]

________________________________
Dr. David J. A. Cairns
Arbitrator

Date: 30 July 2026

________________________________
Prof. Zachary Douglas, KC
Arbitrator

________________________________
Hon. Lord Collins of Mapesbury, LLD, FBA
President of the Tribunal

[Signed]

Dr. David J. A. Cairns
Arbitrator

Prof. Zachary Douglas, KC
Arbitrator

**Date**: 30 **July** 2026

Hon. Lord Collins of Mapesbury, LLD, FBA
President of the Tribunal

Dr. David J. A. Cairns
Arbitrator

Prof. Zachary Douglas, KC
Arbitrator

[Signed]

Hon. Lord Collins of Mapesbury, LLD, FBA
President of the Tribunal

Date: 30 July 2026